**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED MEXICAN STATES<br><br>       Petitioner,<br><br>  v.<br><br>LION MEXICO CONSOLIDATED L.P.<br><br>       Respondent. | Case No. _____ |

**PETITION TO VACATE ARBITRAL AWARD**

Petitioner United Mexican States ("Mexico"), by and through its attorneys, Pillsbury Winthrop Shaw Pittman LLP, respectfully submit this petition to vacate an arbitral award (the "Award") rendered against it and in favor of Respondent Lion Mexico Consolidated L.P. ("Lion").

## I. PRELIMINARY STATEMENT

1. On September 20, 2021, a three-member arbitral tribunal ("tribunal") rendered the Award at issue in this petition under the North America Free Trade Agreement ("NAFTA"), Dec. 17, 1992, 32 I.L.M. 289 (1993).  Lion, a Canadian limited partnership with its headquarters in the United States, claimed that it suffered a denial of its rights under the NAFTA in relation to its efforts to enforce in the Mexican courts a mortgage against a borrower who had defaulted. Notwithstanding that Lion had abandoned the litigation, that the borrower had engaged in a fraud upon the courts, and that the tribunal found no intentional or bad faith behavior by the courts, the tribunal found that Lion had suffered a "denial of justice" and awarded Lion approximately $47 million, plus interest and reimbursement for certain attorney's fees and costs.

2. In making its determination, however, the tribunal exceeded its authority by inventing an obligation of Mexico not contained in the NAFTA.  Indeed, the tribunal openly

admitted that it was disregarding the plain meaning of the NAFTA, thereby manifestly disregarding the governing law.  Such conduct establishes that the award must be vacated under 9 U.S.C § 10(a)(4) and 9 U.S.C. § 207.

## II.     THE PARTIES

3.     Petitioner United Mexican States is a foreign state as defined in the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1603(a).

4.     Respondent Lion Mexico Consolidated L.P. is a limited partnership registered under the laws of Quebec, Canada, with its domicile and principal place of business at 1717 McKinney Avenue, Suite 1900, Dallas, Texas 75202.[1]

## III.    JURISDICTION AND VENUE

5.     This Court has jurisdiction over the subject matter of this proceeding under 9 U.S.C § 203, which states that "[t]he district courts of the United States… shall have original jurisdiction over… an action or proceeding [falling under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention")], regardless of the amount in controversy."  This proceeding falls under the New York Convention because it arises out of a commercial legal relationship within the meaning of 9 U.S.C. § 202 and pursuant to NAFTA Article 1122(2)(b) ("the consent given by paragraph 1 and the submission by a disputing investor of a claim to arbitration shall satisfy the requirement of … Article II of the New York Convention for an agreement in writing").  *See Argentina v. AWG Grp. Ltd*., 211 F. Supp. 3d 335, 338 n.1 (D.D.C. 2016); *see also Scandinavian Reinsurance Co. v. St. Paul Fire & Marine Ins. Co*., 668

---

[1]     Lion stated in the arbitration that the McKinney Avenue address is its headquarters.  Its registration with the State of Texas provides the address 2650 Cedar Springs Road, Suite 850 Dallas, Texas 75201.

F.3d 60, 71 (2d Cir. 2012); *Kailuan H.K. Int'l Co. v. Sino East Minerals, Ltd.*, No. 16 Civ. 2160, 2016 U.S. Dist. LEXIS 170821, at *11-12 (S.D.N.Y. Dec. 9, 2016).

6.      This Court also has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. § 1332(a)(4).  In this regard, Lion is a limited partnership and therefore its citizenship is the nationality of its partners.  *Carden v. Arkoma Assoc.*, 494 U.S. 185, 195-96 (1990).  Upon information and belief, all of Lion's partners are U.S. nationals.  In the event that Lion contests subject matter jurisdiction, Mexico will request limited discovery to determine the nationality of each of the partners.  *See Lincoln Benefit Life Co. v. AEI Life, LLC*, 800 F.3d 99, 111 (3d Cir. 2015) ("If defendants mount a factual challenge to jurisdiction on remand, …the District Court must permit jurisdictional discovery in order to ascertain whether complete diversity exists.").  The other requirements for diversity jurisdiction are met because Mexico is a foreign state as defined in 28 U.S.C. § 1603(a) and the amount in dispute exceeds $75,000, exclusive of interest and costs.

7.      This Court has personal jurisdiction over Lion because the arbitration took place in Washington, D.C.  *See, e.g., Creighton Ltd. v. Government of Qatar*, 181 F.3d 118, 126 (D.C. Cir. 1999) (agreeing to arbitrate in a jurisdiction implicitly waives any objection to personal jurisdiction in that jurisdiction).

8.      Venue is proper in this Court because the Award was rendered in Washington, D.C. and therefore this Court has primary supervisory jurisdiction.  *Termorio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 935 (D.C. Cir. 2007).  Venue is also proper pursuant to 9 U.S.C. § 204 because the Award was rendered in Washington, D.C.

9.      This petition is being filed and served within 90 days of the issuance of the award, and therefore is timely pursuant to 9 U.S.C. § 12.

## IV.     FACTUAL BACKGROUND

### A.     The Underlying Dispute

10.     Lion is a limited partnership that provided capital to finance two real estate developments in Mexico.  Becker Decl., Exhibit 1, *Lion Mexico Consolidated L.P. v. United Mexican States*, ICSID Case No. ARB(AF)/15/2, Award, September 20, 2021, ¶¶ 56-57.  Lion was introduced to Héctor Cárdenas Curiel, a Mexican businessman, who wanted to develop two real estate projects: the Nayarit Project and the Guadalajara Project.  *Id*. at ¶ 57.  The Nayarit Project was to be an oceanfront residential and resort development in Bahía de Banderas, State of Nayarit, while the Guadalajara Project was to be two skyscrapers in Guadalajara, State of Jalisco.  *Id*. at ¶ 59-60.

11.     Lion provided three loans to finance the purchase of the properties for the projects and provide working capital in February, June, and September 2007.  *Id*. at ¶ 62.  Each loan transaction included a Credit Agreement between Lion and companies owned by Mr. Cárdenas, a related promissory note, and a mortgage in favor of Lion in the properties which provided security to Lion for the transaction.  *Id*. at ¶¶ 63-85.  In total, Lion loaned $32,805,709 towards the two projects at an interest rate of 18% and a default interest rate of 25%.  *Id*.

12.     None of the initial deadlines for repayment of any of the loans were met.  *Id*. at ¶ 86.  Mr. Cárdenas negotiated several extensions on each loan until all three loans were declared to be in default and accruing interest at the default rate beginning on October 1, 2009.  *Id*. at ¶¶ 86-87.

13.     A representative for Mr. Cárdenas sought to negotiate a restructuring of the debt owed to Lion, but no agreement was reached.  *Id*. at ¶¶ 91-92.  Mr. Cárdenas and the companies he controlled (the "Debtors") then pursued a course of action that the tribunal characterized as a

complex judicial fraud scheme to prevent Lion from being able to foreclose on the mortgages on the properties. *Id*. at ¶¶ 93-95.

14.    First, relying on what the tribunal determined to be a forged settlement agreement, the Debtors had Lion's mortgages on the properties cancelled through judicial proceedings. *Id*. at ¶¶ 96-115.

15.    Second, to prevent Lion from challenging the cancellation of the mortgages, the Debtors had an attorney purporting to be a representative for Lion start and then abandon a court action (a type of action known in Mexico as an *amparo*). *Id*. at ¶¶ 116-130. Pursuant to Mexican law, an *amparo* action is inadmissible if it is based on the same facts as a previously abandoned *amparo*. *Id*. at ¶ 121. The false *amparo* action was filed, subsequently abandoned, and then declared final and not subject to appeal. *Id*. at ¶¶ 126, 129.

16.    Meanwhile, on April 3, 2012, Lion decided to foreclose on the Nayarit mortgage and began proceedings to do so. *Id*. at ¶ 132. But the Debtors had initiated a procedure to cancel the mortgage and the Registrar cancelled the mortgage. *Id*. at ¶¶ 135-36.

17.    In December 2012, Lion learned that the mortgages had been cancelled, and sought to undo the cancellation through an *amparo* action alleging that Lion had not been properly served in the cancellation proceedings. *Id*. at ¶¶ 138-145. Lion also tried to extend the scope of the *amparo* action, alleging that the basis for the cancellation was a forged document. *Id*. at ¶¶ 146-147.

18.    A Mexican court ruled that Lion's extension request was procedurally defective and denied Lion the opportunity to submit evidence of the fraudulent scheme. *Id*. at ¶¶ 151-154. The court deciding the *amparo* then dismissed all evidence related to the forgery claim. *Id*. at ¶¶ 155-157.

19.     On December 4, 2013, the court issued a decision on the *amparo* action (the "Amparo Judgment") in which it upheld the cancellation of the mortgages. *Id*. at ¶¶ 158-166. Lion appealed the Amparo Judgment, and on April 17, 2015, the appellate court remanded the case to determine whether Lion's *amparo* was admissible because there had been a different *amparo* (the earlier false *amparo*) which appeared to be related to the same facts that was earlier filed and abandoned. *Id*. at ¶¶ 171-172. On September 23, 2015, the lower court accepted into evidence a handwriting expert's report submitted by Lion to prove that the earlier *amparo* was inauthentic, along with briefing by Lion regarding the inauthenticity of the earlier *amparo*. *Id*. at ¶ 177.

20.     A few days after the court accepted the new evidence, Lion abandoned its challenge to the cancellation of the mortgages in the Mexican courts. *Id*. at ¶ 178.

21.     Lion separately initiated several criminal proceedings against Mr. Cárdenas, and he was incarcerated for a period. *Id*. at ¶¶ 180-81. Although not mentioned in the arbitral award, Mexico showed that Lion had presented its evidence of the alleged forgery of the settlement agreement in one of the criminal proceedings, and that the criminal court had found Lion's evidence unconvincing. Becker Decl., Exhibit 3, *Lion Mexico Consolidated L.P. v. United Mexican States*, ICSID Case No. ARB(AF)/15/2, Counter-Memorial, October 26, 2018, ¶ 119. Moreover, two other experts in further criminal proceedings initiated by Lion concluded that the signature on the settlement agreement were authentic. *Id*. at ¶¶ 121-123. The tribunal nonetheless made its own finding that the settlement agreement was forged. Becker Decl., Ex. 1, ¶ 103.

**B.      The Arbitration Against Mexico**

      **1.      The Arbitration Agreement**

22.     The arbitration agreement in this case is Chapter Eleven of the NAFTA.

23.     The NAFTA is a free trade agreement among the United States, Mexico, and Canada, specifically approved by Congress in 1993. North American Free Trade Agreement

Implementation Act, Pub. L. No. 103-182, 107 Stat. 2057 (1993).  It entered into force on January 1, 1994 and remained in effect until it was superseded by the U.S.-Mexico-Canada Agreement on July 1, 2020.  United States-Mexico-Canada Agreement Implementation Act, Pub. L. No. 116-113, 134 Stat. 11 (2020).

24.     Chapter Eleven of the NAFTA (entitled "Investment") sets out the rights and obligations of the three member nations with respect to cross-border investments in Section A.  As provided in NAFTA Article 1101, Section A applies to, *inter alia*, "measures adopted or maintained by a Party relating to: (a) investors of another Party; (b) investments of investors of another Party in the territory of the Party…."  *See* Becker Decl., Exhibit 2, NAFTA Chapter 11, Art. 1101.  Section A of NAFTA's Chapter Eleven establishes several general obligations, including obligations (i) to provide non-discriminatory treatment, (ii) to accord to investments the "minimum standard of treatment" under customary international law, and (iii) not to expropriate investments without the prompt payment of compensation equivalent to fair market value.  *Id*. at Arts. 1102-1105, 1110.  There are a substantial number of exceptions to certain of the obligations described both in (i) Chapter Eleven and (ii) Annexes to the NAFTA that contain the Parties' "reservations" to the treaty.  *See id*. at Art. 1138, Annexes 1120.1, 1137.2, 1137.4, and 1138.2. There is also a comprehensive set of definitions of the terms used in the Chapter.  *Id*. at Art. 1139.

25.     Reflecting the development of "investor-state" dispute settlement in bilateral investment treaties,[2] Section B of Chapter Eleven established a procedural mechanism allowing private investors to initiate arbitration proceedings directly against respondent governments seeking damages for alleged violations of the obligations of Section A.  The United States has

---

[2]      *See, e.g.*, M. Kinnear, et al., Investment Dispute under NAFTA: An Annotated Guide to NAFTA Chapter 11 27 (2006) ("By the late 1980s the U.S. BIT program was in full swing, and investor-State dispute settlement was included in the NAFTA at the behest of the United States.").

agreed to have similar arrangements in many trade agreements and investment treaties, under which the United States is subject to such claims against it from nationals of the partner countries. *See, e.g.*, United States – Singapore Free Trade Agreement, U.S.-Sing., May 6, 2003, Ch. 15, Hein's No. KAV 6376; United States – Korea Free Trade Agreement, U.S.-Kor., Mar. 15, 2012; Ch. 11, Hein's No. KAV 10312; Treaty Between the United States of America and the Oriental Republic of Uruguay Concerning the Encouragement and Reciprocal Protection of Investment, U.S.-Uruguay, Nov. 4, 2005, T.I.A.S. 06-1101.

26.     Section B describes in detail the conditions under which an "investor of a Party" may submit to arbitration a claim that another Party has breached an obligation in Section A. Claims may be brought on behalf of the investor itself under Article 1116 and/or by the investor on behalf of an enterprise that it owns or controls under Article 1117.   There is a three-year limitations period.   *Id.* at Arts. 1116(2) and 1117(2).   There are also a number of procedural requirements, including that the claimant waives the right to pursue damages based on the same governmental measures at issue in the NAFTA claim, including in domestic litigation.   *Id.* at Art. 1121.

27.     Under Article 1122, each of the NAFTA Parties consents "to the submission of a claim to arbitration in accordance with the procedures set out in this Agreement", and such consent is deemed to satisfy the requirement of Article II of the New York Convention for an agreement in writing.   *Id.* at Art. 1122.

## 2.     Lion's Arbitration Action

28.     On December 11, 2015, Lion filed a Request for Arbitration with ICSID to initiate the arbitration under the NAFTA.   Becker Decl., Ex. 1, ¶ 1.

29.    NAFTA Article 1120(1) allows a claimant to submit a claim under either the ICSID or UNCITRAL arbitration rules.  Becker Decl., Ex. 2.  Lion opted to initiate the case under the ICSID Additional Facility Arbitration Rules.  Becker Decl., Ex. 1, ¶ 3.

30.    On July 27, 2016, the tribunal was constituted, consisting of Juan Fernández-Armesto (President), David J.A. Cairns (appointed by Lion), and Ricardo Ramírez Hernández (appointed by Mexico).  *Id*. at ¶ 13.  On February 6, 2018, Mr. Ramírez Hernández was replaced by Laurence Boisson de Chazournes.  *Id*.

31.    On November 24, 2016, the tribunal issued Procedural Order No. 2, which set Washington, D.C. as the place of arbitration.  *Id*. at Annex A, ¶ 28.

32.    On December 12, 2016, the tribunal issued a decision dismissing Mexico's preliminary objection to the tribunal's jurisdiction.  *Id*. at Annex A, ¶ 29.

33.    On May 29, 2017, the tribunal agreed to bifurcate the proceedings to decide whether Lion had made a qualifying investment within the terms of the treaty as required by Articles 1101 and 1139 of the NAFTA.  *Id*. at Annex A, ¶ 33.  After briefing from both parties and a two-day hearing, on July 30, 2018, the tribunal issued its Decision on Jurisdiction, which held that only the mortgages in the properties, but not the promissory notes, constituted a qualifying investment.  *Id*. at Annex A, ¶¶ 34-42, 46-50, 266.

34.    After further briefing from the parties and a three-day hearing on the merits, on September 20, 2021, the tribunal issued its Award.  *Id*. at ¶¶ 17-54.

### 3.    The Tribunal's Ruling

35.    In the arbitration, the key NAFTA obligation at issue was Article 1105, Minimum Standard of Treatment, which provides in full:

1. Each Party shall accord to <u>investments of investors</u> of another Party treatment in accordance with international law, including fair and equitable treatment and full protection and security.

2. Without prejudice to paragraph 1 and notwithstanding Article 1108(7)(b), each Party shall accord to <u>investors of another Party, and to investments of investors of another Party,</u> non-discriminatory treatment with respect to measures it adopts or maintains relating to losses suffered by investments in its territory owing to armed conflict or civil strife.

3. Paragraph 2 does not apply to existing measures relating to subsidies or grants that would be inconsistent with Article 1102 but for Article 1108(7)(b).

Becker Decl., Ex. 2 (emphasis added).

36.     The tribunal ultimately held that Lion had been denied justice by the Mexican courts in a manner that constituted a violation of the obligation of Article 1105(1) to provide "fair and equitable treatment."  Becker Decl., Ex. 1, ¶¶ 359-374, 397-425, 436-450, 496-509.  The tribunal also determined that even though Lion did not exhaust local remedies, it was exempted from doing so because continuation with the court proceedings would have been futile.[3]  *Id.* at ¶¶ 596-609.

37.     The tribunal awarded Lion (1) $47,000,000 in compensation for the breach of NAFTA Article 1105, (2) reimbursement for legal fees arising out Lion's withdrawal from the *amparo* proceedings, and (3) $2,308,598.91 in costs and attorney's fees.  *Id.* at ¶ 924.  The tribunal also awarded Lion pre- and post-Award interest.  *Id.*

38.     The tribunal nonetheless was careful to emphasize that it "accept[ed] as proven that the Mexican judicial system acted in good faith, without colluding with Sr. Cárdenas or the Debtors, and without any impairment by corruption."  *Id.* at ¶ 368.

---

[3]     The tribunal felt that Lion having spent three years in domestic litigation, it was "most likely" that the Mexican courts ultimately would have ruled against it.  *Id.* at ¶¶ 600, 603.  The principal precedent on which the tribunal relied was an arbitral decision in an 1848 dispute between Peru and the United States (quoted from a third-party source), in which an arbitrator held that the United States violated a treaty because a U.S. marshal had failed to enforce a U.S. court judgment.  *Id.* at ¶¶ 605-606.

## V.    THE AWARD MUST BE VACATED BECAUSE THE TRIBUNAL EXCEEDED ITS POWERS AND ACTED IN MANIFEST DISREGARD OF THE GOVERNING LAW

39.     Pursuant to 9 U.S.C. § 10(a)(4), an award may be vacated when the arbitrators "exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."  This Court may also vacate an arbitral award for manifest disregard of the law.  *Lessin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 481 F.3d 813, 816 (D.C. Cir. 2007) (an award may be vacated if it is in manifest disregard of the law or is contrary to an explicit public policy).  Some courts have interpreted manifest disregard of the law as a "'judicial gloss on the specific grounds for vacatur of arbitration awards' in the FAA…."  *See, e.g.*, *Sutherland Global Servs. V. Adam Techs. Int'l SA de C.V.*, 639 Fed. Appx. 697, 699 (2d Cir. 2016) (quoting *Schwartz v. Merrill Lynch & Co.*, 665 F.3d 4444, 451-52 (2d. Cir. 2011).  In this case, the tribunal exceeded its powers and manifestly disregarded the law by finding that there was a violation of the NAFTA in disregard of the plain language of the agreement.

### A.    NAFTA Clearly Sets Forth the Limits of Obligations Under Article 1105

40.     NAFTA Chapter Eleven is clear in providing that "[a] Tribunal established under this Section shall decide the issues in dispute in accordance with this Agreement and applicable rules of international law."  Becker Decl., Ex. 2, Art. 1131.  Arbitrators are required to identify and apply unambiguous applicable legal standards appearing on the face of the parties' agreement.  *See Affinity Fin. Corp. v. AARP Fin., Inc.*, 468 Fed. Appx. 4, 5 (D.C. Cir. 2012) ("an arbitral panel 'may not ignore the plain language of the contract'…." (quoting *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987)); *Hay Adams Hotel LLC v. Hotel & Rest. Emples., Local 25*, Civ. A. No. 06-968, 2007 U.S. Dist. LEXIS 34129, at *8-9 (D.D.C. May 9, 2007) (vacating award because "the arbitrator failed to abide by the clear and unambiguous language of

11

the LCA.").  The tribunal, however, ignored this directive and invented legal obligations that do not exist.

41.      In this regard, NAFTA Chapter Eleven employs precise definitions that are used consistently throughout.  The definitions of "investor" and "investment" are particularly important. "Investor of a Party" is defined as follows: "a Party or state enterprise thereof, or a national or an enterprise of such Party, that seeks to make, is making or has made an investment[.]"  Becker Decl., Ex. 2, Art. 1139.  The definition of "investment" includes, in relevant part, "(g) real estate or other property, tangible or intangible, acquired in the expectation or used for the purpose of economic benefit or other business purposes[.]"  *Id*.  In its decision on jurisdiction, the tribunal found that Lion's mortgages constituted "intangible real estate" which fell within the definition of Art. 1139(g).  Becker Decl., Ex. 1, Annex A, ¶¶ 226-243.

42.      As a result, Lion qualified as an "investor of a Party," based on its property interest in the Mexican mortgages, which were the "investment."  *Id*. at ¶ 262.

43.      As discussed above, an investor may either bring claims on its own behalf under NAFTA Article 1116 or on behalf of an enterprise it owns or controls under Article 1117.  *See* ¶ 26 *supra*; Becker Decl., Ex. 2, Arts. 1116-1117.  Specifically, Chapter Eleven provides for an "investor" to submit a claim on arbitration on its own behalf under Article 1116 alleging that the respondent government has breached an obligation to it under Section A for which it has suffered damages:

Article 1116: Claim by an Investor of a Party on Its Own Behalf

1. An <u>investor of a Party</u> may submit to arbitration under this Section a claim that another Party has breached an obligation under:

(a) Section A or Article 1503(2) (State Enterprises), or

(b) Article 1502(3)(a) (Monopolies and State Enterprises) where the monopoly has acted in a manner inconsistent with the Party's obligations under Section A,

and that the <u>investor</u> has incurred loss or damage by reason of, or arising out of, that breach. [...]

Becker Decl., Ex. 2 (emphasis added).

44.     Chapter Eleven separately authorizes an investor to submit a claim on behalf of an enterprise it owns or controls if the enterprise has incurred damages by reason of the alleged breach:

> Article 1117: Claim by an Investor of a Party on Behalf of an Enterprise
>
> 1. An <u>investor of a Party, on behalf of an enterprise of another Party</u> that is a juridical person that the investor owns or controls directly or indirectly, may submit to arbitration under this Section a claim that the other Party has breached an obligation under:
>
> (a) Section A or Article 1503(2) (State Enterprises), or
>
> (b) Article 1502(3)(a) (Monopolies and State Enterprises) where the monopoly has acted in a manner inconsistent with the Party's obligations under Section A,
>
> and that <u>the enterprise</u> has incurred loss or damage by reason of, or arising out of, that breach. [...]

*Id.* (emphasis added).

45.     Lion brought its claim only under Article 1116 as an investor and not under Article 1117 on behalf of an enterprise, as it did not engage in any relevant activities in Mexico through a Mexican enterprise.  *See* Becker Decl., Ex. 1, ¶¶ 2, 799.  Further, all of Lion's claims were framed in terms of how it (Lion), the investor, was treated in the Mexican courts.  *See, e.g.*, *id.* at ¶ 300 ("Lion says that Mexico breached its duty to treat it in a fair and equitable manner through denying Lion justice in its pursuit of legal remedies against the Debtors…."), ¶ 310 ("Claimant says that it was not allowed to properly defend itself."), ¶ 375 ("Lion claims that it was denied access to justice by Mexico's courts….").  This distinction is crucial because Chapter Eleven is precise regarding to whom each of the Section A substantive obligations are owed.

13

46.     Thus, for example, the protection against discrimination on the basis of national origin under Articles 1102 and 1103 applies to both investors of another Party and investments of another Party.  Article 1102 provides in relevant part:

> 1. Each Party shall accord to <u>investors of another Party</u> treatment no less favorable than that it accords, in like circumstances, to its own investors with respect to the establishment, acquisition, expansion, management, conduct, operation, and sale or other disposition of investments.

> 2. Each Party shall accord to <u>investments of investors of another Party</u> treatment no less favorable than that it accords, in like circumstances, to investments of its own investors with respect to the establishment, acquisition, expansion, management, conduct, operation, and sale or other disposition of investments.

Becker Decl., Ex. 2 (emphasis added).

47.     Similarly, Article 1103 provides:

> 1. Each Party shall accord to <u>investors of another Party</u> treatment no less favorable than that it accords, in like circumstances, to investors of any other Party or of a non-Party with respect to the establishment, acquisition, expansion, management, conduct, operation, and sale or other disposition of investments.

> 2. Each Party shall accord to <u>investments of investors of another Party</u> treatment no less favorable than that it accords, in like circumstances, to investments of investors of any other Party or of a non-Party with respect to the establishment, acquisition, expansion, management, conduct, operation, and sale or other disposition of investments.

*Id*. (emphasis added).

48.     Article 1105(1), for its part, extends protection only to investments and not investors: "Each Party shall accord to  <u>investments of investors</u> of another Party treatment in accordance with international law, including fair and equitable treatment and full protection and security."  *Id*. (emphasis added).  In contrast, Article 1105(2) applies to both investors and investments: "…each Party shall accord to <u>investors of another Party, and to investments of investor of another Party</u>, non-discriminatory treatment with respect to measures it adopts or maintains relating to losses suffered by investments in its territory owing to armed conflict or civil

14

strife." *Id.* (emphasis added). Mexico raised these issues in its written submissions to the tribunal. *See* Becker Decl., Ex. 3, Section II.A.1.

49.     An important aspect of the interpretation of Article 1105 arises from the fact that NAFTA Chapter Twenty, in Article 2001, established the Free Trade Commission ("FTC"), comprised of cabinet-level representatives of the Parties or their designees, which was authorized to act in a collective manner to supervise implementation of the treaty. Pursuant to NAFTA Article 1131(2), "[a]n interpretation by the Commission of a provision of this Agreement shall be binding on a Tribunal established under this Section." Becker Decl., Ex. 2. Arbitration tribunals have uniformly acknowledged that such interpretations are binding.

50.     The FTC issued Notes of Interpretation of Certain Chapter 11 Provisions, dated July 31, 2001 (the "FTC Note"), which provides in relevant part:

> B. Minimum Standard of Treatment in Accordance with International Law
>
> 1. Article 1105(1) prescribes the customary international law minimum standard of treatment of aliens as the minimum standard of treatment to be afforded to investments of investors of another Party.
>
> 2. The concepts of "fair and equitable treatment" and "full protection and security" do not require treatment in addition to or beyond that which is required by the customary international law minimum standard of treatment of aliens.
>
> 3. A determination that there has been a breach of another provision of the NAFTA, or of a separate international agreement, does not establish that there has been a breach of Article 1105(1).

Becker Declaration, Exhibit 4.

51.     Thus, the NAFTA Parties established a binding interpretation of Article 1105 that is not subject to modification by a tribunal.

**B.     The Tribunal Expressly Stated It Was Disregarding the Language of Article 1105**

52.     In the award, the tribunal noted that Mexico had raised the issue regarding the scope of protection of Article 1105(1).  It stated:

> Mexico's first argument is based on a <u>literal reading of Art. 1105 of NAFTA</u>, which provides that Mexico 'shall accord to investments of investors' of the other treaty Parties treatment in accordance with international law, including FET and FPS. Respondent says that Art. 1105 only extends protection to investments, but not to investors.
>
> Contrary to Mexico's submission, the Tribunal finds that NAFTA Art. 1105 does indeed grant protection to Lion as an investor.
>
> The FTC Interpretation Note equates the standard of protection to be applied under Art. 1105 of the NAFTA with the standard of 'customary international law minimum standard of treatment of aliens'. The reference to 'aliens', in a context of investment protection, can only mean investors. A multitude of NAFTA Tribunals have also construed Art. 1105 as a source of protection for investors rather than solely for their investments.

Becker Decl., Ex. 1, ¶¶ 356-358 (citations omitted and emphasis added).

53.     Thus, the tribunal acknowledged the "literal reading" of Article 1105(1) but then expressly stated that it would not apply it.  The tribunal also acknowledged the FTC Note, which expressly equates "the customary international law minimum standard of treatment of aliens" with "the minimum standard of treatment to be afforded to <u>investments of investors</u> of another Party" but disregarded that as well.

54.     In a footnote, the tribunal tersely cited to three prior investment arbitration decisions as support for its interpretation—*GAMI v. Mexico*, *Chemtura v. Canada*, and *Merrill & Ring Forestry v. Canada*—but those rulings do not provide such support.[4]

---

[4]     There is no system of binding precedent in international investment arbitrations, placing a responsibility on tribunals to explain precisely why they believe a decision by another tribunal is persuasive.  *See* C. McLachlan L. Shore & M. Weiniger, International Investment Arbitration: Substantive Principles 87-91 (Ox. Univ. Pr. 2017); J. Arato, *The Margin of Appreciation in International Investment Law*, 54 Va. J. Int'l L. 545, 575, 577 (2014).  This tribunal provided no such explanation.

55.    In *GAMI v. Mexico*, the claimant company asserted a violation of Article 1105(1) based on what it alleged was a "[failure] to accord GAMI's <u>investment</u> 'fair and equitable treatment and full protection and security in accordance with international law' as required by NAFTA Article 1105."  Becker Decl., Exhibit 5, *GAMI Investments, Inc. v. The Government of the United Mexican States*, UNCITRAL, Final Award, Nov. 15, 2004, ¶ 24(A) (emphasis added). Throughout its analysis of GAMI's claim that Mexico had violated Article 1105(1), the tribunal was clearly assessing Mexico's treatment of the Mexican company in which GAMI had invested (GAM), the investment of an investor of another Party.  *See id*. at ¶ 99 ("The proposition that GAMI's investment was destroyed is plainly not proven. GAM still exists. …Nor can it be accepted that GAM's difficulties were due entirely to Mexico's alleged failure to implement the Sugar Program.").  Notably, the tribunal found no breach of Article 1105(1).  *See id.* at ¶¶ 85, 110.

56.    In *Chemtura v. Canada*, the claimant complained that the treatment of its Canadian subsidiary, Chemtura Canada, violated Article 1105(1).  Becker Decl., Exhibit 6, *Chemtura Corporation v. Government of Canada,* UNCITRAL, Award, Aug. 2, 2010, ¶ 6 n. 1 ("Shortly after Crompton changed its name to Chemtura Corporation ('Chemtura') in July 2005, Crompton Canada also changed its name to Chemtura Canada Co.Cie ('Chemtura Canada') in April 2006. The Claimant is Chemtura (formerly Crompton). In this award, the Tribunal will refer indistinctly to the 'Claimant', except in those cases where it deems it necessary to be more specific.").  Thus, again, the tribunal considered the impact of certain regulations on a claimant's investment, and not how the investor was treated.  *See e.g.*, *id*. at ¶ 123 ("In assessing whether the treatment afforded to the Claimant's investment was in accordance with the international minimum standard….").  The tribunal also did not find a breach of Article 1105.  *Id.* at pg. 80.

57.    In *Merrill & Ring Forestry v. Canada*, the claim was based on the treatment of the claimant's timber operations in the Canadian province British Colombia, where it did business through affiliates and agents.  Becker Decl., Exhibit 7, *Merrill and Ring Forestry L.P. v. Canada*, ICSID Case No. UNCT/07/1, Statement of Claim, December 27, 2006, ¶ 15.  Further, the tribunal in *Merrill* ultimately dismissed all of the claimant's claims.  Becker Decl., Exhibit 8, *Merrill and Ring Forestry L.P. v. Government of Canada*, ICSID Case No. UNCT/07/1, Award, March 31, 2010, Section IV, ¶ 1.  Indeed, in citing to the *Merrill* award, the tribunal in this case cited to a paragraph discussing whether a breach of Article 1102 had occurred, and not at all to Article 1105(1).  *See* Becker Decl., Ex. 1, ¶ 358 n. 384; Becker Decl., Ex. 8, ¶ 83.

58.    In sum, none of these cases found a violation of Article 1105 or specifically addressed whether the language of Article 1105(1) somehow could create obligations with respect to investors rather than investments.

59.    The tribunal also chose to ignore, and did not even mention in its decision, the submission of the United States Government in the case as a non-disputing party.[5]  Becker Decl., Exhibit 9, *Lion Mexico Consolidated L.P. v. United Mexican States*, ICSID Case No. ARB(AF)/15/2, Submission of the United States of America, June 21, 2019.  The United States explained that Article 1105(1) is only meant to afford protections to investment, stating as follows

> As noted above, Article 1105(1) requires each Party to 'accord to investments of investors of another Party *treatment* in accordance with international law, including fair and equitable treatment and full protection and security.' (Emphasis added). Article 1105(1) differs from other substantive obligations, such as those in Articles 1102, 1103 and the second paragraph of Article 1105, in that it obligates a Party to accord treatment only to an '*investment*.'  In the context of a claim for denial of justice under Article 1105(1), a claimant (*i.e.*, an investor) must therefore establish

---

[5]    NAFTA Article 1128 authorizes each of the NAFTA Parties (the United States, Canada and Mexico) to make submissions to an arbitral tribunal on issues of interpretation in arbitrations involving the others.  *See* Becker Decl., Ex. 2, Art. 1128.  Article 1128 submissions are in the nature of a governmental amicus curiae brief or statement of interest.

that the treatment accorded to its investment rose to the level of a denial of justice under customary international law.

*Id*. at ¶ 10.

60.     Although only discussed in three short paragraphs, the importance of the tribunal's decision regarding the scope of Article 1105 to the overall Award cannot be overstated.  All of Lion's claims and the tribunal's findings regarding liability are based on how *Lion*, as the investor, was treated by the Mexican courts.  There was no claim that the investment, here the mortgages, was somehow denied justice or otherwise treated unfairly.  Therefore, without ignoring and willfully disregarding the text of Article 1105, the tribunal would have no basis to find Mexico liable.

61.     The fact that Lion was defrauded by Mr. Cardenas is reprehensible, but that does not mean that Mexico was required to provide no-cost insurance for the loans made by Lion.  There are of course many instances in which plaintiffs in the U.S. courts have suffered injury but ultimately had no recourse because of jurisdictional or substantive limits in the law.  *See, e.g.*, *United States v. Park Place Assoc.*, 563 F.3d 90 (9th Cir. 2009) (refusing to confirm valid arbitration award against the U.S. Government because such authority is vested only with the Court of Federal Claims, even though the Federal Circuit, which had previously found that the U.S. Government waived its immunity, had held that the Court of Federal Claims lacked jurisdiction over the award.).  NAFTA Chapter Eleven does not vest arbitrators with the authority to decide disputes based on *ex aequo et bono*.  Rather, it sets out the specific law and obligations to be applied.

### C.     The Grounds for Vacating an Award Are Satisfied

62.     Article V(1)(e) of the New York Convention states that an award may be set aside by a "competent authority of the country in which, or under the law of which, that award was

made."  New York Convention, Art. V(1)(e), June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38.

Because Washington, D.C. was the seat of the arbitration and the award was made in Washington,

D.C., this Court is a competent authority to set aside the Award under the New York Convention.

*See Termorio*, 487 F.3d at 935 (stating same).

      63.    The New York Convention is codified under Chapter 2 of the FAA.  Thus, pursuant

to the New York Convention and 9 U.S.C. § 208, this Court may vacate the Award based on any

of the grounds enumerated in 9 U.S.C. § 10.

      64.    Section 10 of the FAA authorizes this Court to vacate an arbitral award "where the

arbitrators exceed their powers, or so imperfectly executed them that a mutual, final, and definite

award upon the subject matter was not made."  9 U.S.C. § 10(a)(4).  Arbitration is grounded in the

consent of the parties, and awards cannot exceed the bounds of the arbitration agreement.  *See*

*Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013).  "[W]hen [an] arbitrator…

effectively dispense[s] his own brand of industrial justice… an arbitration decision may be vacated

under § 10(a)(4) of the FAA… for the task of an arbitrator is to interpret and enforce a contract,

not to make public policy."  *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671-672

(2010) (quotations and citations omitted).  Stated another way, "the Court must vacate an award

that disregards the parties' agreement in favor of the arbitrator's 'own view of sound policy.'"  *Hill*

*v. Wackenhut Servs. Int'l*, 971 F. Supp. 2d 5, 10 (D.D.C. 2013) (quoting *Stolt-Nielsen*, 559 U.S. at

672).

      65.    Relatedly, this Court may vacate an arbitral award for manifest disregard of the law.

*Lessin*, 481 F.3d at 816.  In order to prove manifest disregard of the law, petitioner must show

"that '(1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it

altogether and (2) the law ignored by the arbitrators was well defined, explicit, and clearly

applicable to the case.'" *Affinity Fin. Corp.*, 468 Fed. Appx. at 5 (quoting *LaPrade v. Kidder, Peabody & Co., Inc.*, 246 F.3d 702, 706 (D.C. Cir. 2001)).

66.     In rendering the Award, the Tribunal exceeded its powers and acted in manifest disregard of the law by recognizing that the text of Article 1105 only afforded protection to investment, and then refusing to apply Article 1105 as stated.  As discussed above, the tribunal's refusal to apply Article 1105 as stated was unreasonable and unjustified.  Further, Article 1105 is well defined, explicit, and clearly applicable to the arbitration.  Indeed, it is the sole basis for liability in the Award.

67.     Courts have vacated awards in other cases that involved an obvious departure from well-established law.  For example, in *Raymond James Fin. Servs. v. Bishop*, 596 F.3d 183 (4th Cir. 2010), an arbitration award was issued against Raymond James Financial Services, Inc. ("Raymond James") in favor of three former broker/dealers of the company.  The employment agreement stated that they were independent contractors, and the company had complied with the five-day notice of termination.  *Id*. at 185-186.  However, the tribunal awarded the former broker/dealers wrongful termination damages claiming that they were damages for breach of fiduciary duty related to when in-house counsel for Raymond James had served as counsel for the employees as well in a separate arbitration.  *Id*. at 186-188.

68.     The Fourth Circuit affirmed the district court's decision to vacate the award.  *Id*. at 190-191.  In relevant part, the district court had decided that the arbitration panel had manifestly disregarded the law by awarding wrongful termination damages after finding a breach of fiduciary duty.  *Id*. at 189.

69.     The Fourth Circuit also determined that NASD arbitration was only available for issues "'arising out of the employment or termination of employment' of registered

representatives", but "the arbitrators based their award on Raymond James' alleged breach of 'fiduciary and legal duties' in connection with their joint representation with Raymond James by Bostic, the in-house lawyers."  *Id*. at 192, 193.   Therefore, "by rendering an award whose underlying legal basis exceeded the bounds of arbitrable employment-related disputes… the panel 'exceeded [its] powers' under 9 U.S.C. § 10(a)(4)."  *Id*. at 193.

70.   Similarly, in *Warfield v. ICON Advisors, Inc.*, No. 3:20CV195-GCM, 2020 U.S. Dist. LEXIS 105321 (W.D.N.C. June 16, 2020), an arbitrator had issued an award in favor of a former employee for firing the employee without cause, but the district court vacated the award for manifestly disregarding the well-established law that employment is at-will unless otherwise specified in the employment agreement.

71.   In *Swift Industries, Inc. v. Botany Industries, Inc.*, 466 F.2d 1125 (3rd Cir. 1972), as just another example, the arbitration award required one of the parties to the agreement to provide a cash bond to the other party for a potential tax liability that it was responsible for indemnifying, even though the tax liability had not yet been definitely decided or collected.  The Third Circuit determined that the arbitrators had exceeded their authority and manifestly disregarded the law because the agreement only required reimbursement for "all losses, liabilities and expenses *incurred or suffered*" but it was undeniable that Swift had yet to incur or suffer "any liability, expense, or loss as the result of the asserted tax deficiencies."  *Id*. at 1132-1133 (emphasis in original).  The Third Circuit therefore concluded that "the arbitrator's award of a six million dollar cash surety bond does not draw its essence therefrom and that it is in manifest disregard thereof and must be set aside."  *Id*. at 1134.

72.   These cases are akin to the situation here.  Article 1105 clearly only provides protection for investments of investors and not to the investors themselves.  The tribunal expressly

acknowledged this limitation.  Yet, in order to award Lion damages for the injustice the tribunal considered that it had suffered, the tribunal manifestly disregarded the clear terms of this provision and provided protection to Lion that is not available under the NAFTA.

73.     In *Hayday Farms v. Feedx Holdings*, No. CV 21-346, 2021 U.S. Dist. LEXIS 117648 (C.D.Cal. Apr. 30, 2021), as another example, the district court vacated an award which it determined had manifestly disregarded the law because the tribunal awarded damages in excess of the amount that the aggrieved party would have received if the contract had been fully performed, which was contrary to a well-established California statute.  Specifically, the district court ruled as follows:

> The Tribunal, however, did not recognize the limits set by Section 3358 of the California Civil Code, explicitly rejecting that an injured party should be placed in the same position it would have enjoyed had the contract been fully performed by both parties. Even under the permissive standard with which we view arbitral decisions, the impact of this omission is too significant to be countenanced in light of Section 3358. The Court concludes that by placing Hayday in a significantly better position than it would have been under full performance of the EDPA and SA, the Final Award is in manifest disregard of California contract law.

*Id*. at *22-23 (citation omitted).

74.     The district court in *Galloway Constr., LLC v. Utilipath, LLC*, No. 3:13-CV-161-PLR-CCS, 2014 U.S. Dist. LEXIS 111755 (E.D. Tenn. Aug. 13, 2014) similarly vacated an award for manifest disregard of law for awarding damages clearly not available under well-established Kentucky and Tennessee law.

75.     All of these cases show that, despite the sympathies that an arbitral tribunal may have, it cannot disregard the limitations of the law to compensate a claimant.  Yet, the tribunal did so here and thus this Award too must be vacated.

VI.     **CONCLUSION**

Petitioner United Mexican States respectfully requests this Court enter an order vacating the Award pursuant to 9 U.S.C. § 10 and 9 U.S.C. § 207 because the Tribunal has exceeded its powers and acted in manifest disregard of law.  Petitioner further requests that this Court award any other relief that this Court deems necessary and proper.

Dated:  Washington, D.C.
        December 6, 2021

                                        PILLSBURY WINTHROP SHAW PITTMAN LLP


                                        _____*/s/ Stephan E. Becker*_____
                                        Stephan E. Becker
                                        D.C. Bar No. 366676
                                        Kristina Fridman (*pro hac vice* - pending)
                                        PILLSBURY WINTHROP SHAW PITTMAN LLP
                                        1200 Seventeenth Street NW
                                        Washington, D.C. 20036-3006
                                        Tel.: +1 (202) 663-8000
                                        stephan.becker@pillsburylaw.com
                                        kristina.fridman@pillsburylaw.com

                                        *Attorneys for Petitioner Government of Mexico*