# EXHIBIT 1



**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

1818 H STREET, NW  |  WASHINGTON, DC 20433  |  USA
TELEPHONE +1 (202) 458 1534  |  FACSIMILE +1 (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

# C E R T I F I C A T E

### LION MEXICO CONSOLIDATED L.P.

### v.

### UNITED MEXICAN STATES

### (ICSID CASE NO. ARB(AF)/15/2)

I hereby certify that the attached documents are true copies of the English and Spanish versions of the Tribunal's Award dated September 20, 2021.

Meg Kinnear
Secretary-General

Washington, D.C., September 20, 2021



**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

**LION MEXICO CONSOLIDATED LP**
**Claimant**

**v.**

**UNITED MEXICAN STATES**
**Respondent**

**(ICSID Case No. ARB(AF)/15/2)**

---

# AWARD

---

***Members of the Tribunal***
Juan Fernández-Armesto, President of the Tribunal
David J.A. Cairns, Arbitrator
Laurence Boisson de Chazournes, Arbitrator

***Secretary of the Tribunal***
Francisco Grob

***Assistant to the Tribunal***
Adam Jankowski

Washington D.C., September 20, 2021

*Lion Mexico Consolidated v. Mexico*
ICSID Case No. ARB(AF)/15/2
Award

# TABLE OF CONTENTS

TABLE OF CONTENTS                                                          2

GLOSSARY OF TERMS AND ABBREVIATIONS                                        7

LIST OF CASES                                                             12

I.    INTRODUCTION                                                       16

II.   THE PARTIES                                                        18

      1.    Claimant: Lion Mexico Consolidated L.P.                      18

      2.    Respondent: United Mexican States                           19

III.  PROCEDURAL HISTORY                                                 21

IV.   FACTS                                                              29

      1.    Lion's investment in Mexico                                  29

            1.1   Sr. Cárdenas's Projects: Nayarit and Guadalajara      29

            1.2   The three sets of transactions                        30

      2.    The defaults                                                 34

      3.    The negotiations between Lion and Sr. Cárdenas              34

      4.    The Cancellation Lawsuit                                     35

            4.1   Judicial enforcement of the (false) *Términos*        36

            4.2   The *Términos* document is a forgery                  38

            4.3   *Emplazamiento* and declaration *en rebeldía*         39

            4.4   The Judgment of the *Juez de lo Mercantil*            40

      5.    False *Amparo* Proceedings                                   41

            5.1   The impersonation of Sr. Arechederra                  43

            5.2   The False *Amparo*                                     43

      6.    Lion forecloses on the (soon to be cancelled) Nayarit Mortgage    45

      7.    Lion's attempts to remedy the cancellation of the Mortgages    47

            7.1   Lion files an *Amparo indirecto*                      48

            7.2   Attempts to claim forgery                             48

            7.3   The dismissal of evidence on the forgery             49

            7.4   The *Amparo* Judgment                                 51

*Lion Mexico Consolidated v. Mexico*
ICSID Case No. ARB(AF)/15/2
Award

|  |  |  |  |
|---|---|---|---|
| | 7.5 | The *Recurso de Revisión* | 52 |
| | 7.6 | The remand *Amparo* | 54 |
| **8.** | | **Criminal proceedings and the fate of the Nayarit property** | **56** |
| **V.** | **RELIEF SOUGHT BY THE PARTIES** | | **58** |
| **VI.** | **MERITS** | | **60** |
| **VI.1.** | **DENIAL OF JUSTICE** | | **63** |
| **1.** | | **Overview** | **63** |
| | 1.1 | Procedural and substantive denial of justice | 65 |
| | 1.2 | Types | 67 |
| | 1.3 | Standard | 72 |
| **2.** | | **Claimant's position** | **82** |
| | 2.1 | Claimant was denied due process | 82 |
| | 2.2 | Mexico's unreasonable delay in administering justice | 85 |
| | 2.3 | Claimant complied with the exhaustion of local remedies rule | 86 |
| **3.** | | **Mexico's position** | **88** |
| | 3.1 | Respondent fully accorded claimant procedural due process | 89 |
| | 3.2 | Mexico's courts decided Lion's claims within a reasonable time | 91 |
| | 3.3 | Lion failed to exhaust local remedies | 92 |
| | 3.4 | Lion is barred from bringing its claims | 93 |
| **4.** | | **The Tribunal's decision** | **94** |
| | 4.1 | Respondent's preliminary objection | 94 |
| | 4.2 | Denial of justice | 96 |
| **VI.2.** | **EXHAUSTION OF LOCAL REMEDIES** | | **123** |
| **1.** | | **Position of the Parties** | **123** |
| **2.** | | **Facts** | **126** |
| **3.** | | **The law** | **128** |
| **4.** | | **Discussion** | **136** |
| **VI.3.** | **CONCLUSION** | | **146** |
| **VI.4.** | **THE ALTERNATIVE CLAIMS** | | **147** |
| **VII.** | **QUANTUM** | | **148** |

| | | | |
|---|---|---|---:|
| **VII.1.** | **IMPAIRMENT OF THE INVESTMENT** | | **152** |
| | **1.** | **The market value of the Nayarit Property** | **154** |
| | | 1.1   Claimant's valuation | 156 |
| | | 1.2   Respondent's valuation | 159 |
| | | 1.3   The Tribunal's decision | 162 |
| | **2.** | **The market value of the  Guadalajara Properties** | **173** |
| | | 2.1   Claimant's valuation | 174 |
| | | 2.2   Respondent's valuation | 176 |
| | | 2.3   The Tribunal's decision | 178 |
| | **3.** | **Calculation of the impairment** | **184** |
| | **4.** | **Respondent's ancillary objections** | **186** |
| | | 4.1   Shares in Debtor companies | 186 |
| | | 4.2   Criminal proceedings | 188 |
| **VII.2.** | **LEGAL FEES ARISING FROM THE WITHDRAWAL OF THE FORECLOSURE PROCEEDING** | | **191** |
| | **1.** | **The proper interpretation of Art. 1121(1)(b) NAFTA** | **192** |
| | **2.** | **Lion was obliged to withdraw the Foreclosure Proceeding** | **194** |
| | **3.** | **Discussion of the Legal Fees** | **196** |
| **VII.3.** | **EXPENSES INCURRED IN THE EXHAUSTION OF LOCAL REMEDIES** | | **198** |
| **VII.4.** | **CONCLUSION** | | **200** |
| **VIII.** | **INTEREST** | | **201** |
| | **1.** | **Claimant's position** | **201** |
| | **2.** | **Respondent's position** | **201** |
| | **3.** | **The Tribunal's decision** | **202** |
| | | 3.1   Interest Rate | 203 |
| | | 3.2   Calculation methodology | 204 |
| | | 3.3   *Dies a quo* and *dies ad quem* | 205 |
| **IX.** | **COSTS** | | **206** |
| | **1.** | **Claimant's position** | **206** |
| | **2.** | **Respondent's position** | **207** |
| | **3.** | **The Tribunal's decision** | **208** |

|       | 3.1 | Criteria for the decision on costs                        | 208 |
|       | 3.2 | Application of the "Cost Follow the Event" principle      | 209 |
|       | 3.3 | Interest                                                   | 211 |
| **X.** | **DECISION** |                                               | **212** |

*Lion Mexico Consolidated v. Mexico*
ICSID Case No. ARB(AF)/15/2
Award

# REPRESENTATION OF THE PARTIES

*Representing Lion Mexico Consolidated L.P.:*

Ms. Onay Payne, Managing Director
230 Park Avenue
New York, NY 10169
United States of America
 and
Mr. Robert J. Kriss
Mayer Brown LLP
71 S. Wacker Drive
Chicago, Illinois 60606
United States of America
 and
Mr. Dany Khayat
Mr. Alejandro Lopez Ortiz
Mr. Jose J. Caicedo
Ms. Patricia Ugalde Revilla
Mayer Brown LLP
10, avenue Hoche
75008 Paris
France

*Representing the United Mexican States*:

Mr. Orlando Pérez Garate
Ms. Cindy Rayo Zapata
Mr. Aristeo López Sánchez
Mr. Geovanni Hernández Salvador
Mr. Rafael Arteaga Farfán
Dirección General de Consultoría Jurídica
de Comercio Internacional
Secretaría de Economía
Calle Pachuca número 189, Piso 19
Colonia Condesa
Demarcación Territorial Cuauhtémoc,
C.P. 06140, Mexico City
United Mexican States
 and
Mr. J. Cameron Mowatt
Mr. Vincent DeRose
Ms. Jennifer Radford
Mr. Alejandro Barragan
Ms. Ximena Iturriaga
Tereposky & DeRose LLP
Suite 1000, 81 Metcalfe Street
Ottawa, Ontario, Canada
K1P 6K7
 and
Mr. Stephan E. Becker
Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street, NW
Washington, DC 20036
United States of America

# GLOSSARY OF TERMS AND ABBREVIATIONS

| | |
|---|---|
| **Américas I** | One of the two high-end mixed-use skyscrapers planned under the Guadalajara Project to be built in the city of Guadalajara, State of Jalisco |
| **Américas II** | One of the two high-end mixed-use skyscrapers planned under the Guadalajara Project to be built in the city of Guadalajara, State of Jalisco |
| **Arechederra** | Witness statement of Jose Arechederra |
| **Canada Submission** | Non-Disputing Party Submission of the Government of Canada submitted on June 21, 2019 |
| **CM** | Claimant's Memorial dated March 13, 2017 |
| **CR** | Claimant's Reply on the Merits dated February 21, 2019 |
| **CPHB** | Claimant's Post-Hearing Brief dated October 1, 2019 |
| **CC Jalisco** | Civil Code of Jalisco |
| **CC Nayarit** | Civil Code of Nayarit |
| **C&C Capital** | C&C Capital, S.A. de C.V., a company owned or controlled by Sr. Cárdenas |
| **C&C Ingeniería** | C&C Ingeniería y Proyectos, S.A. de C.V., a company owned or controlled by Sr. Cárdenas |
| **Clarion** | Clarion Partners, L.P., a real estate investment management company founded in New York in 1982, which manages real estate investments for institutional investors |
| **Commercial Code [of Mexico]** | Commercial Code of Mexico of 1889, with amendments, as under exhibit Zamora I-3 |
| **Costs of the Proceeding** | The fees and expenses of the members of the Tribunal and the expenses and charges of the Secretariat |
| **CPC Jalisco** | Civil Procedure Code of Jalisco |

*Lion Mexico Consolidated v. Mexico*
ICSID Case No. ARB(AF)/15/2
Award

| Credit Agreements | Three contracts signed by Lion with companies owned or controlled by Sr. Cárdenas in February, June and September 2007, making and governing the Loans |
|---|---|
| Debtors | Two Mexican companies, Inmobiliaria Bains, S.A. de C.V and C&C Capital, S.A. de C.V., the borrowing party in three loans made by Lion |
| Defense Expenses | The expenses incurred by the Parties in connection with the proceeding |
| First Loan | Loan, in the form of a "Credit Agreement", between Lion (as Lender), Inmobiliaria Bains (as Borrower) and C&C Ingeniería, another company of Sr. Cárdenas (as joint and several obligor). It was signed on February 27, 2007, for the amount of US $15,000,000 plus interest |
| First Note | Note issued by Inmobiliaria Bains in favor of Lion for US $15,000,000 on February 28, 2007 |
| *Juez de lo Civil* | The 39th Civil Court in Mexico City, before which the Foreclosing Proceedings were initiated |
| Foreclosure Proceedings | *Juicio Hipotecario;* Foreclosure proceedings initiated on 3 April 2012 by Lion against the Debtors, to enforce the Nayarit Mortgage |
| Guadalajara Mortgage 1 | Mortgage securing the Second Loan, granted by C&C Capital in favor of Lion over one of the properties pertaining to the Guadalajara Project on June 13, 2007 |
| Guadalajara Mortgage 2 | Mortgage securing the Third loan, granted by C&C Capital in favor of Lion over one of the properties pertaining to the Guadalajara Project on September 26, 2007 |
| Guadalajara Project | Real estate project that consisted of two high-end mixed-use skyscrapers (Américas I and Américas II), which were to be built by Sr. Cárdenas's companies in Guadalajara, State of Jalisco |
| Guadalajara Properties | Real estate covered by the two Guadalajara Mortgages, where the Guadalajara Project was intended to be developed |
| Hearing | The hearing on the Merits held at the World Bank Headquarters in Washington D.C. on July 22-14, 2019 |
| Hendricks | Witness statement of James Hendricks |

8

| | |
|---|---|
| **HT** | Transcripts of the Merits Hearing |
| **ICSID** | International Centre for Settlement of Investment Disputes |
| **ICSID AF Rules** | International Center for Settlement of Investment Disputes Additionally Facility Rules |
| **Inmobilaria Bains** | Inmobiliaria Bains, S.A. de C.V. a company owned or controlled by Cárdenas |
| **Lion/ Claimant** | Claimant. Lion Mexico Consolidated L.P. is a partnership constituted under the laws of Quebec (Canada), with its main place of business in Texas (USA) |
| **H1** | Lion's Opening Statement Presentation of July 22, 2019 |
| **Loans** | Three loans that Lion made in 2007 to two Mexican companies owned or controlled by Sr. Cárdenas, for a principal amount of approximately US $32.8 million. The Loans were secured by the three Mortgages and the issue of three Notes |
| **Mexico/ Respondent** | United Mexican States |
| **Mortgages** | Mortgages that secured the three Loans given by Lion in 2007, signed before a public notary in the Spanish language and subject to Mexican Law, namely the laws of the States of Jalisco and Nayarit |
| **NAFTA** | North American Free Trade Agreement between the United States, Canada and Mexico, which entered into force in January 1, 1994 |
| **Nayarit Project** | Real estate project to be developed by Sr. Cárdenas's companies in Bahía de Banderas, State of Nayarit, Mexico |
| **Nayarit Property** | Real estate covered by the Nayarit Mortgage, where the Nayarit Project was intended to be developed |
| **Nayarit Mortgage** | Mortgage granted by Inmobiliaria Bains in favor of Lion over the Nayarit Project property on April 2, 2008 |
| **Notes** | Notes formalizing the three Loans made by Lion in 2007, issued under Mexican law, and submitted to the exclusive jurisdiction of the courts of Mexico D.F. |

| | |
|---|---|
| **Paparinskis** | M. Paparinskis, "The International Minimum Standard and Fair and Equitable Treatment", Oxford Monographies in International Law, 2013 |
| **Paulsson Lecture** | J. Paulsson, "Issues Arising from Finding of Denial of Justice," Recueil des cours / Collected Courses 405 (2020): [i]-74. |
| **Payne I** | First witness statement of Onay Payne |
| **Payne II** | Second witness statement of Onay Payne |
| **Parties** | The Claimant and the Respondent together |
| **PO** | Procedural Order |
| **Properties** | The Nayarit Property and the Guadalajara Properties, together |
| **RCM** | Respondent's Counter Memorial dated October 26, 2018 |
| **RfA** | Request for Arbitration submitted by Lion against Mexico and dated December 11, 2015 |
| **RPHB** | Respondent's Post-Hearing Brief dated October 1, 2019 |
| **RR** | Respondent's Rejoinder dated June 3, 2019 |
| **Second Loan** | Loan, in the form of a "Credit Agreement", between Lion (as Lender), C&C Capital (as Borrower) and Inmobiliaria Bains (as joint and several obligor). It was signed on June 13, 2007, for the amount of US $12,450,000 plus interest |
| **Second Note** | Noted issued by C&C Capital in favor of Lion for US $12,450,000 on June 14, 2007 |
| **Third Loan** | Loan, in the form of a "Credit Agreement", between Lion (as Lender), C&C Capital (as Borrower) and Inmobiliaria Bains (as joint and several obligor). It was signed on September 26, 2007, for the amount of US $5,355,479 plus interest |
| **Third Note** | Note issued by C&C Capital in favor of Lion for US $5,355,479 on September 29, 2007 |
| **USA Submission** | Non-Disputing Party Submission of the United States of America submitted on June 21, 2019 |

| | |
|---|---|
| **VCLT** | Vienna Convention on the Law of Treaties, adopted on 23 May 1969 and opened for signature on 23 May 1969 |
| **Zamora Hearing Presentation** | Claimant's expert report presentation by Mr. Rodrigo Zamora Etcharren at the Merits Hearing |
| **Zamora I** | Claimant's expert report prepared by Mr. Rodrigo Zamora Etcharren dated March 6, 2017 |
| **Zamora II** | Claimant's expert report prepared by Mr. Rodrigo Zamora Etcharren dated October 23, 2017 |
| **Zamora III** | Claimant's expert report prepared by Mr. Rodrigo Zamora Etcharren dated January 18, 2018 |
| **Zamora IV** | Claimant's expert report prepared by Mr. Rodrigo Zamora Etcharren dated February 2, 2019 |

## LIST OF CASES

| | |
|---|---|
| ***ADC*** | *ADC Affiliate Limited and ADC & ADMC Management Limited v. The Republic of Hungary*, ICSID Case No. ARB/03/16, Award (27 September 2006), Exhibit CLA-212 |
| ***ADF*** | *ADF Group Inc. v. United States of America, ICSID Case No. ARB (AF)/00/1*, Award (9 January 2003) |
| ***Al-Bahloul*** | *Mohammad Ammar Al-Bahloul v. The Republic of Tajikistan*, SCC Case No. V (064/2008) , Partial Award on Jurisdiction and Liability (2 September 2009), Exhibit CLA-220 |
| ***Ambatielos*** | *The Ambatielos Claim* (Greece, United Kingdom of Great Britain and Northern Ireland), Award (6 March 1956), 12 U.N.R.I.A.A. 83 at 119, Exhibit CLA-249 |
| ***Ambiente Ufficio*** | *Ambiente Ufficio S.p.A. and others v. Argentine Republic*, ICSID Case No. ARB/08/9, Decision on Jurisdiction and Admissibility (8 February 2013), Exhibit CLA-291 |
| ***Amco Asia II*** | *Amco Asia Corporation and others v. Republic of Indonesia*, ICSID Case No. ARB/81/1, Award (20 November 1984), Exhibit CLA-213 |
| ***Apotex*** | *Apotex Inc. v. United States of America, NAFTA/UNCITRAL*, Award (June 14, 2013), Exhibit RL-061 |
| ***ATA Construction*** | *ATA Construction, Industrial and Trading Company v. The Hashemite Kingdom of Jordan*, ICSID Case No. ARB/08/2, Award (18 May 2010) |
| ***Azinian*** | *Robert Azinian, Kenneth Davitian, & Ellen Baca v. The United Mexican States*, ICSID Case No. ARB (AF)/97/2, Award (1 November 1999), Exhibit CLA-187 |
| ***Azurix*** | *Azurix Corp. v. The Argentine Republic*, ICSID Case No. ARB/01/12, Award (14 July 2006) |
| ***Ballistini*** | *Ballistini case, French-Venezuelan Commission* (1902), Award (1905), 10 U.N.RI.A.A. 18 at 20, Exhibit CLA-253 (Unofficial Translation from French) |
| ***Barcelona Traction*** | *Case concerning the Barcelona Traction, Light and Power Company*, Limited, Judgment (Merits) (5 February 1970), I.C.J. Reports 3 (1970); Exhibit CLA 235 |
| ***Chattin*** | *B. E. Chattin (United States.) v. United Mexican States*, General Claims Commission, Award (23 July 1927), 4 U.N.R.I.A.A. 282, Exhibit CLA-250 |
| ***Chemtura*** | *Chemtura Corporation v. Government of Canada*, UNCITRAL Award (2 August 2010), Exhibit CLA-139 |

| | |
|---|---|
| ***Chevron I*** | *Chevron Corporation (USA) and Texaco Petroleum Company (USA) v. The Republic of Ecuador*, Partial Award on the Merits (30 March 2010), Exhibit CLA-279 |
| ***Chevron II*** | *Chevron Corporation and Texaco Petroleum Corporation v. Ecuador (II),* Second Partial Award on Track II dated 30 August 2018 |
| ***CMS*** | *CMS Gas Transmission Company v. The Republic of Argentina*, ICSID Case No. ARB/01/8, Award (12 May 2005) |
| ***Chorzów Factory*** | *Case Concerning the Factory at Chorzów* (claim for indemnity) (merits), Judgment (13 September 1928), P.C.I.J. Series A No. 17, Exhibit CLA-180 |
| ***Churchill Mining*** | *Churchill Mining PLC and Planet Mining Pty Ltd v. Republic of Indonesia*, ICSID Case No. ARB/12/14 and 12/40, Award, 6 December 2016, Exhibit RL-100 |
| ***Corona Materials*** | *Corona Materials, LLC v Dominican Republic*, ICSID Case No ARB(AF)/14/3, Award on the Respondent's Expedited Preliminary Objections in Accordance with Article 10.20.5 of the DR-CAFTA, 31 May 2016, Exhibit RL-067 |
| ***Cotesworth & Powell*** | *Award Pronounced in the case of Cotesworth and Powell*, in H. La Fontaine, Pasicrisie Internationale: Historie Documentaire des Arbitrages Internationaux (1902), Exhibit CLA-239 and RL-103 |
| ***Dan Cake*** | *Dan Cake S.A. v. Hungary, ICSID Case No. ARB/12/9*, Decision on Jurisdiction and Liability (24 August 2015), Exhibit CLA-597 |
| ***Diallo*** | *Ahmadou Sadio Diallo* (*Republic of Guinea v. Democratic Republic of the Congo*), Judgment (Preliminary Objections) (24 May 2007), I.C.J. REPORTS 582 (2007) at p. 600, Exhibit CLA-285 |
| ***Duke Energy*** | *Duke Energy Electroquil Partners and Electroquil S.A. v. Republic of Ecuador*, ICSID Case No. ARB/04/19, Award of 18 August 2008 |
| ***El Oro Mining*** | *El Oro Mining and Railway Company (Ltd.) (Great Britain) v. United Mexican States*, Great-Britain and Mexico Claims Commission, Award (18 June 1931), 5 U.N.R.I.A.A. p. 191, Exhibit CLA-243 |
| ***Eli Lilly*** | *Eli Lilly and Company v. The Government of Canada*, UNCITRAL, ICSID Case No. UNCT/14/2, Final Award (16 March 2017), Exhibit CLA-564 |
| ***ELSI*** | *Elettronica Sicula s.p.a., (ELSI), (United States of America v. Italy*), Judgment (20 July 1989), I.C.J. REPORTS (1989), at p. 47, Exhibit CLA-234 |

| | |
|---|---|
| ***Fabiani*** | *Case of Fabiani (France v. Venezuela)*, Award (30 December 1896), 5 MOORE'S HISTORY AND DIGEST OF THE ARBITRATIONS TO WHICH THE UNITED STATES HAS BEEN A PARTY 4878, Exhibit CLA-236. |
| ***Finnish Vessels*** | *Claim of Finnish shipowners against Great Britain in respect of the use of certain Finnish vessels during the war*, Award (9 May 1934), 3 U.N.R.I.A.A. 1479, Exhibit CLA-649 |
| ***Flughafen*** | *Flughafen Zürich A.G. and Gestión e Ingenería IDC S.A. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/19, Award (18 November 2014) |
| ***Gami*** | *Gami Investments Inc. v. United Mexican States*, Award (15 November 2004), Exhibit CLA-616 |
| ***Glamis Gold*** | *Glamis Gold, Ltd. v. The United States of America*, (UNCITRAL) Award (8 June 2009), Exhibit CLA-142 |
| ***Idler*** | *Jacob Idler v. The United States of Venezuela*, Claim No. 2, Award, 14 July 1890, United States and Venezuelan Commission, Opinions, at pp. 155-172, Exhibit CLA-255 |
| ***Interhandel*** | *Interhandel, Preliminary Objections, Judgment*, I.C.J. Reports 1959 |
| ***Jan de Nul*** | *Jan de Nul N.V. v. Arab Republic of Egypt*, ICSID Case No. ARB/04/13, Award (6 November 2008), Exhibit CLA-240 |
| ***Krederi*** | *Krederi Ltd. v. Ukraine*, ICSID Case No. ARB/14/17, Excerpts of Award dated 2 July 2018 |
| ***Loewen*** | *Loewen Group, Inc. and Raymond L. Loewen v. United States of America*, ICSID Case No. ARB(AF)/98/3, Award (23 June 2003), Exhibit CLA-168. |
| ***Merrill*** | *Merrill & Ring Forestry L.P. v Canada*, (UNCITRAL) Award (31 March 2010), Exhibit CLA-615 |
| ***Metalclad*** | *Metalclad Corporation v. The United Mexican States*, ICSID Case No. ARB(AF)/97/1, Award (30 August 2000), Exhibit CLA-149 |
| ***Middle East Cement*** | *Middle Cement Middle East Cement Shipping and Handling Co v. Arab Republic of Egypt*, ICSID Case No. ARB/99/6, Award (12 April 2012), Exhibit CLA-211 |
| ***Mondev*** | *Mondev International Ltd. v United States of America*, ICSID Case No. ARB(AF)/99/2, Award (11 October 2002), Exhibit CLA-086 |
| ***MTD v. Chile*** | *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/7, Award, 25 May 2004, Exhibit RL-085 |
| ***Neer*** | *L. Fay, H. Neer and Pauline Neer (USA) v. United Mexican States*, RIAA, Volume IV pp. 60-66, 15 October 1926, Exhibit CLA-277 |

| | |
|---|---|
| *Norwegian Loans* | *Certain Norwegian Loans, Judgment*, I.C.J. Reports 1957 |
| *OI* | *OI European Group B.V. v Bolivarian Republic of Venezuela*, ICSID Case No ARB/11/25, Award, 10 March 2015, Exhibit RL-068 |
| *Oostergetel* | *Jan Oostergetel and Theodora Laurentius v. The Slovak Republic*, UNCITRAL Final Award (23 April 2012), Exhibit CLA-260. |
| *Pantechniki* | *Pantechniki S.A. Contractors & Engineers v. Republic of Albania*, ICSID Case No. ARB/07/21, Award (30 July 2009), Exhibit CLA-276 |
| *Pey Casado* | *Victor Pey Casado and President Allende Foundation v. Republic of Chile*, ICSID Case No. ARB/98/2, Final Award (8 May 2008), Exhibit CLA-202 |
| *Philip Morris v. Uruguay* | *Philip Morris Brands Salr, Philip Morris Products S.A. and ABAL Hermanos S.A. v. Oriental Republic of Uruguay*, ICSID Case No. ARB/10/7, Award, 8 July 2016, Exhibit RL-066 |
| *Renée Rose Levy* | *Renée Rose Levy de Levi v. Republic of Peru*, ICSID Case No. ARB/10/17, Award, 26 February 2014, Exhibit RL-101 |
| *Joseph F. Rihani* | *Joseph F. Rihani, American Mexican Claims Commission*, Decision No. 27-C (1942), 1948AM. MEX. CLAIMS REP. 254, Exhibit CLA-251 |
| *Robert E. Brown* | *Robert E. Brown (United States) v. Great Britain*, Award (23 November 1923), 6 U.N.R.I.A.A. 120 at 129, Exhibit CLA-294 |
| *Saluka* | *Saluka Investments B.V. v. The Czech Republic*, UNCITRAL, Partial Award of 17 March 2006 |
| *Saipem* | *Saipem S.p.A. v. The People's Republic of Bangladesh*, ICSID Case No. ARB/05/07, Award (30 June 2009), Exhibit CLA-185 |
| *Toto Construzioni* | *Toto Construzioni Generali S.p.A. v. The Republic of Lebanon*, ICSID Case No. ARB/07/12, Decision on Jurisdiction (11 September 2009), Exhibit CLA-244 |
| *Vivendi* | *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Award (20 August 2007), Exhibit CLA-310 |
| *Waste Management II* | *Waste Management v. Mexico*, Case N° ARB(AF)/00/3, (30 April 2004), Exhibit CLA-200 |

# I.   INTRODUCTION

1.   On December 11, 2015, the International Centre for Settlement of Investment Disputes ["**ICSID**"] received a request for arbitration [the "**RfA**"] submitted by Lion Mexico Consolidated L.P. ["**Lion**" or "**Claimant**"], a company constituted under the laws of Quebec, Canada, against the United Mexican States ["**Mexico**" or "**Respondent**"].

2.   The RfA was made pursuant to Arts. 1116, 1120, and 1122 of the North American Free Trade Agreement ["**NAFTA**"][1]. It included a request for approval of access to the Additional Facility of the Centre.

3.   On December 23, 2015, the Secretary-General registered the RfA and approved access to the Additional Facility pursuant to Art. 4 of the ICSID Additional Facility Rules ["**ICSID AF Rules**"].

4.   The Tribunal was officially constituted on July 26, 2016, after all the arbitrators accepted their appointments and the proceedings were deemed to have begun.

5.   At the time of this Award, the Tribunal is composed of three following members:

> Mr. Juan Fernández-Armesto
> Chairman – Spanish national
> Appointed by agreement of the Secretary-General on
> July 20, 2016.
> Armesto & Asociados
> General Pardiñas, 102
> 28006 Madrid, Spain
> Tel.: +34 91 562 16 25
> E-mail: jfa@jfarmesto.com

> Mr. David J.A. Cairns
> Co-Arbitrator – British/New Zealand national
> Appointed by Claimant on March 10, 2016.
> Int-Arb Arbitrators & Mediators
> Ponzano 6C
> Madrid 28003
> Spain
> Tel.: +34 91 423 7200
> E-mail: d.cairns@arbitration.es

> Prof. Laurence Boisson de Chazournes

---

[1] RfA, para. 7.

Co-Arbitrator – French/Swiss national
Appointed by Respondent on February 2, 2018.
University of Geneva, Faculty of Law
40, boulevard du Pont-d'Arve
1211 Geneva 4 (Switzerland)
Tel.: +41 (0) 22 379 85 44
E-mail: Laurence.BoissonDeChazournes@unige.ch

# II.  THE PARTIES

6.    This arbitration takes place between Lion Mexico Consolidated L.P. (Canada) and the United Mexican States, a sovereign state.

## 1.  CLAIMANT: LION MEXICO CONSOLIDATED L.P.

7.    Claimant is Lion Mexico Consolidated L.P., a partnership incorporated and registered under the laws of the Province of Quebec, Canada. Its main place of business and unified domicile for notifications is the following:

> 1717 McKinney Avenue, Suite 1900
> Dallas, Texas 75202
> United States of America[2]

8.    Claimant is represented in this arbitration by:

> Onay Payne
> Lion Mexico Consolidated L.P.
> 230 Park Avenue, 12th Floor
> New York, NY 10169
> T. 212.883.2507
> Email: Onay.Payne@clarionpartners.com
>
> Robert J. Kriss
> Mayer Brown LLP
> 71 S. Wacker Drive
> Chicago, Illinois, 60606
> Tel. +1 312 782 0600
> Email: rkriss@mayerbrown.com
>
> Dany Khayat
> Alejandro López-Ortiz
> José J. Caicedo
> Mayer Brown
> 20, avenue Hoche
> 75008 Paris – France
> Tel. +33.1.53.53.43.43
> Emails:    dkhayat@mayerbrown.com
>            alopezortiz@mayerbrown.com
>            jcaicedo@mayerbrown.com

---

[2] RfA, para. 2, and Exh. C-1.

**2.    RESPONDENT: UNITED MEXICAN STATES**

9.    Respondent is the United Mexican States, a sovereign State.

10.    The Respondent is represented in this arbitration by the following counsel:

> Samantha Atayde Arellano
> Directora General de Consultoría Jurídica de
> Comercio Internacional
> Email: samantha.atayde@economia.gob.mx
>
> Leticia Ramírez Aguilar
> Directora General Adjunta de Consultoría Jurídica de
> Comercio Internacional "B"
> Email: leticia.ramirez@economia.gob.mx
>
> Cindy Rayo Zapata
> Directora de Consultoría Jurídica de Comercio
> Internacional
> Email: cindy.rayo@economia.gob.mx
>
> Geovanni Hernández Salvador
> Director de Consultoría Jurídica de Comercio
> Internacional
> Email: geovanni.hernandez@economia.gob.mx
>
> Secretaría de Economía
> Av. Paseo de la Reforma 296, piso 25, Colonia
> Juárez, Delegación Cuauhtémoc, C.P. 06600
> Ciudad de México, México
>
> Aristeo López Sánchez
> Embajada de México
> 1911 Pennsylvania Ave NW
> Washington D.C. 20006
> Estados Unidos de América
> Email: alopez@naftamexico.net
>
> J. Cameron Mowatt
> J. Cameron Mowatt, Law Corporation
> Email: cmowatt@isds-law.com
>
> Stephan Becker
> Pillsbury Winthrop Shaw Pittman

Email: stephan.becker@pillsburylaw.com

Alejandro Barragán
J. Cameron Mowatt, Law Corporation
Email: abarragan@isds-law.com

11.    Henceforth, Claimant and Respondent will together be referred to as the "**Parties**".

# III.  **PROCEDURAL HISTORY**

12.   On December 11, 2015, Lion submitted to the ICSID a RfA against Mexico pursuant to Art. 36 of the ICSID Convention and on the basis of the NAFTA, between the United States of America, Canada and the United Mexican States, which entered into force on January 1, 1994.  On December 23, 2015, the Secretary-General of ICSID registered the RfA and approved access to the Additional Facility pursuant to Art. 4 of the ICSID AF Rules.

13.   The Tribunal was constituted on July 27, 2016, in accordance with Art. 6(3) of the ICSID AF Rules and was originally composed of Juan Fernández-Armesto a national of Spain, President, appointed by the Secretary-General pursuant to agreement of the Parties; David J.A. Cairns, a national of Great Britain and New Zealand, appointed by the Claimant; and Ricardo Ramírez Hernández, a national of Mexico, appointed by the Respondent. The Tribunal was reconstituted on February 6, 2018, with the appointment of Laurence Boisson de Chazournes, following the resignation of Ricardo Ramírez Hernández.

14.   In the course of the proceeding, the Tribunal issued a Decision on the Respondent's Preliminary Objection under Art. 45(6) of the ICSID AF Rules, dated December 12, 2016, a Decision on the Non-Disputing Party's Application, dated May 23, 2017, a Decision on Bifurcation, dated May 29, 2017, and a Decision on Jurisdiction, dated July 30, 2018. The full procedural history of this case is described in these decisions.

15.   The Decision on Jurisdiction forms part of this Award and is appended as Annex A. In the Decision on Jurisdiction, the Tribunal dismissed Respondent's jurisdictional objection and declared that[3]:

-   the Mortgages qualify as an investment, and

-   the Notes do not qualify as an investment.

16.   The procedural details of this proceeding following the Decision on Jurisdiction are summarized below.

17.   In accordance with section 17.1 of Procedural Order No. 1 ["**PO 1**"], Mexico submitted a document production schedule. Claimant filed its response and final version of the document production schedule containing both Parties' arguments, agreements and disagreements and requests the Tribunal to decide on the production of documents.

---

[3] Decision on Jurisdiction, para. 266.

18. On September 3, 2018, the Tribunal issued **Procedural Order No. 6** deciding on Mexico's request for production of documents.

19. On September 5, 2018, the updated procedural calendar (Annex A to PO 1) was transmitted to the Parties.

20. On October 2, 2018, following the Parties' document production exchanges, the Respondent informed the Tribunal that, in light of the confidential nature of some of the documents, the Claimant requested a Confidentiality Order for the protection of confidential information. The Parties agreed on the content of such order, which they attached with their communication for the Tribunal's approval and issuance.

21. On October 11, 2018, the Tribunal issued **Procedural Order No. 7** embodying the Parties' agreement with regards to the treatment of confidential documents.

22. On October 26, 2018, following an agreed extension, Mexico submitted its **Counter-Memorial on the Merits**, attaching 33 factual exhibits[4], 60 legal authorities[5], one witness statement (Raúl Calva Balderrama), three legal expert reports, prepared by the law firm Sánchez Devanny, Dr. Raúl Plasencia Villanueva and Dr. José Ovalle Favela, and a valuation expert report, prepared by CBRE.

23. On November 7, 2018, as agreed by the Parties, the Tribunal issued an amended procedural calendar (Annex A to PO 1).

24. On November 12, 2018, the Claimant submitted a document production request in accordance with section 17.1 of PO 1. On December 13, 2018, Mexico filed its response and final version of the document production schedule containing both Parties' arguments, agreements and disagreements and requests for the Tribunal to decide on the production of documents.

25. On January 3, 2019, the Tribunal issued **Procedural Order No. 8** deciding on the Claimant's requests for production of documents.  On January 8, 2019, the Claimant submitted a request for the Tribunal to reconsider one of the document requests which was ruled to be overbroad.  On January 29, 2019, after receiving comments from Mexico, the Tribunal rejected the Claimant's request for reconsideration.

26. On February 7, 2019, as agreed by the Parties, the Tribunal issued an amended procedural calendar (Annex A to PO 1).

---

[4] Exhs. R-001 to R-033.
[5] Exhs. RL-039 to RL-098.

27.  On February 21, 2019, the Claimant filed its **Reply on the Merits** together with 40 factual exhibits[6] and 218 legal authorities,[7] a second witness statement of Ms. Onay Payne, a fourth legal expert report by Mr. Rodrigo Zamora (which attached 20 legal authorities) and the expert valuation report and rebuttal report of Mr. Richard Marchitelli of Cushman Wakefield.

28.  On May 28, 2019, the United States of America wrote to the Tribunal requesting permission to file a submission on questions of treaty interpretation under NAFTA Art. 1128.

29.  On June 3, 2019, following an agreed extension, the Respondent filed its **Rejoinder on the Merits** together with 9 factual exhibits[8] and 21 legal authorities,[9] a second expert report of Dr. José Ovalle Favela, and a second valuation expert report prepared by CBRE.

30.  On June 5, 2019, the ICSID Secretariat transmitted to the Parties a draft **Procedural Order No. 9** ["**PO 9**"] concerning the organization of the hearing and inviting the Parties to confer and agree on the items addressed therein. The Parties were also informed that a pre-hearing conference would take place on June 24, 2019.

31.  On June 11, 2019, the Tribunal informed the United States that it had no objection to the proposal made on May 28, 2019 and therefore their submission should be filed by June 21, 2019.

32.  On June 14, 2019, following an agreed extension, each Party submitted the preliminary list of witnesses and experts for cross-examination at the hearing.

33.  On June 18, 2019, the Parties submitted a joint draft of PO 9 indicating the items on which they agreed and their respective positions regarding the items on which they did not agree. On June 21, 2019, the Tribunal provided the Parties the corresponding agenda of the items to be discussed in the pre-hearing conference.

34.  Also, on June 21, 2019, the United States of America and the Government of Canada each file a written submission as a non-disputing State Party pursuant to Art. 1128 of NAFTA.

35.  On June 24, 2019, the Tribunal held a pre-hearing organizational meeting with the Parties by teleconference.

---

[6] Exhs. C-157 to C-197.
[7] Exhs. CLA-493 to CLA-710.
[8] Exhs. R-034 to R-042.
[9] Exhs. RL-099 to RL-119.

36.    On June 26, 2019, the Tribunal issued **PO 9** concerning the organization of the hearing.

37.    On July 4, 2019, the Claimant informed the Tribunal that it did not wish to cross-examine Dr. Raúl Plascencia (Respondent's legal expert) and Mr. Raúl Calva (Respondent's witness). The Tribunal invited Mexico to comment on Claimant's communication and on July 11, 2019, Mexico informed the Tribunal that it did not have any comments with respect to Claimant's communication of July 4, 2019. Mexico further stated that it did not wish to cross examine Mr. José Arechederra Tovar (Claimant's witness) and requested that Mr. Diego Gómez Haro and Mr. Alfonso López Lajud from the law firm Sánchez Devanny be examined by video conference.

38.    On July 15, 2019, Claimant responded to the Tribunal's invitation regarding the examination of Mr. Gómez Haro and Mr. López Lajud by videoconference and a possibility of amending the timetable for the hearing. Claimant also requested leave to introduce a new document on record.

39.    On July 17, 2019, the Tribunal transmitted to the Parties a modified schedule from Procedural Order No. 9, with regard to interrogation of the witnesses and experts. The Tribunal also informed the Parties that it would decide on Claimant's request to introduce a new document to the record at the beginning of the hearing, after hearing Respondent's position on the matter[10].

40.    A hearing on the merits was held in Washington, D.C. from July 22, 2019 to July 24, 2019 [the "**Hearing**"]. The following persons were present at the Hearing:

| TRIBUNAL | |
|---|---|
| Prof. Juan Fernández-Armesto | President |
| Dr. David J.A. Cairns | Arbitrator |
| Prof. Laurence Boisson de Chazournes | Arbitrator |

| ASSISTANT TO THE TRIBUNAL | |
|---|---|
| Mr. Luis Fernando Rodríguez | |

| ICSID SECRETARIAT | |
|---|---|
| Ms. Catherine Kettlewell | Legal Counsel |

---

[10] Claimant's request to introduce the legal exhibit on the methodologies for the valuation of real estate identified in its letter of July 10, 2019. The Tribunal ultimately did not need to make a decision as Respondent agreed to the introduction of the evidence into the case file at the beginning of the hearing, see HT, p. 19.

| CLAIMANT | |
|---|---|
| *Counsel:* | |
| Mr. Robert J. Kriss | Mayer Brown |
| Mr. Dany Khayat | Mayer Brown |
| Mr. Alejandro López Ortiz | Mayer Brown |
| Mr. José Caicedo | Mayer Brown |
| Ms. Patricia Ugalde | Mayer Brown |
| Mr. Emiliano Represa | Mayer Brown |
| Mr. Timothy J. Keeler | Mayer Brown |
| Ms. Elaine Liu | Mayer Brown |
| *Parties:* | |
| Ms. Onay Payne | Clarion Partners |
| Ms. Renee Castro | Clarion Partners |
| *Witnesses:* | |
| Ms. Onay Payne | Clarion Partners |
| Mr. James C. Hendricks | Clarion Partners |
| *Experts:* | |
| Mr. Rodrigo Zamora | Galicia Abogados |
| Mr. Richard Marchitelli | Cushman & Wakefield |
| Mr. Cory Savik | Cushman & Wakefield |

| RESPONDENT | |
|---|---|
| *Counsel:* | |
| Mr. Orlando Pérez Gárate | Secretaría de Economía |
| Ms. Cindy Rayo Zapata | Secretaría de Economía |
| Mr. Geovanni Hernández Salvador | Secretaría de Economía |
| Ms. Blanca del Carmen Martínez Mendoza | Secretaría de Economía |
| Mr. Aristeo López Sánchez | Secretaría de Economía |
| Ministro Gerardo Lameda Díaz Pérez | Secretaría de Economía |
| Mr. Pedro de la Rosa | Embajada de México |
| Mr. J. Cameron Mowatt | Tereposky & DeRose LLP |
| Ms. Jennifer Radford | Tereposky & DeRose LLP |
| Mr. Vincent DeRose | Tereposky & DeRose LLP |
| Mr. Alejandro Barragan | Tereposky & DeRose LLP |
| Ms. Ximena Iturriaga | Tereposky & DeRose LLP |

| Mr. Kun Hui | Tereposky & DeRose LLP |
| Mr. Stephan E. Becker | Pillsbury Winthrop Shaw Pittman LLP |
| Mr. Jorge Vera | Pillsbury Winthrop Shaw Pittman LLP |
| ***Experts:*** | |
| Mr. José Ovalle Favela | Legal Expert |
| Mr. Chris G. Maugeri | Damages Expert (CBRE) |
| Mr. Alfredo Rosas | Damages Expert (CBRE) |

| NON-DISPUTING PARTIES | |
| --- | --- |
| Ms. Nicole Thornton | U.S. Department of State |
| Mr. John Blanck | U.S. Department of State |
| Mr. Khalil Gharbieh | Office of the U.S. Trade Representative |
| Ms. Amanda Blunt | Office of the U.S. Trade Representative |

| INTERPRETERS | |
| --- | --- |
| Ms. Charles Roberts | English-Spanish Interpreter |
| Ms. Judith Letendre | English-Spanish Interpreter |
| Ms. Sonia Berah | English-Spanish Interpreter |

| COURT REPORTERS | |
| --- | --- |
| Mr. Dante Rinaldi | Spanish Court Reporter |
| Mr. Dionisio Rinaldi | Spanish Court Reporter |
| Ms. Dawn Larson | English Court Reporter |

41.   During the Hearing, the following witnesses and experts were examined:

> *On behalf of the Claimant*:
> Ms. Onay Payne
> Mr. James C. Hendricks
> Mr. Rodrigo Zamora
> Mr. Richard Marchitelli (for Cushman Wakefield)
>
> *On behalf of the Respondent*:
> Mr. José Ovalle Favela
> Mr. Alfredo Rosas (for CBRE)

42.  On August 1, 2019, the Tribunal invited the Parties to i) agree on a schedule for the next procedural steps; ii) submit electronic copies of the exhibits they agreed to introduce during the hearing; and iii) to confer and agree about the introduction of the two Supreme Court decisions that were addressed in Mr. Zamora's expert presentation. The Tribunal also posed questions to the Parties to be addressed in their post-hearing briefs.

43.  On August 6, 2019, Mexico confirmed that the electronic versions of the exhibits[11] submitted during the Hearing had been uploaded to the Box folder created for this case.

44.  On August 7, 2019, the Parties informed the Tribunal on their agreement for the dates for their post-hearing briefs and statement of costs, their disagreement on the filing of replies on costs and on the introduction of the two Supreme Court decisions.

45.  On August 9, 2019, the Tribunal confirmed the Parties agreed scheduled for the filing of post-hearing briefs and statement of costs, informed them that a second round on costs was not necessary and admitted into the record the decisions of the Mexican Supreme Court and of the *Tribunal Colegiado*.

46.  On August 12, 2019, the Claimant confirmed that electronic versions of the exhibits[12] submitted during the hearing and the Supreme Court decisions had been uploaded to the Box folder created for this case.

47.  The Parties filed simultaneous **Post-Hearing Briefs**[13] on October 1, 2019.

48.  The Parties filed simultaneous **Statement of Costs** with the corresponding supporting invoices on October 22, 2019.

49.  On November 6, 2019, the Tribunal invited the Respondent to provide answer on the President of the Tribunal's proposal made during the hearing to render the Award in English, following by a subsequent Spanish translation.

50.  On November 11, 2019, Mexico informed the Tribunal that it wished for the Award to be issued simultaneously in English and Spanish in accordance with section 12.11 of PO 1.

51.  On May 14, 2020, the Centre informed the Parties that during Mr. Francisco's Grob's paternity leave, Ms. Catherine Kettlewell, ICSID Legal Counsel, would serve as Secretary of the Tribunal.

---

[11] Exhs. R-43 to R-50.
[12] Exhs. C-198 to C-201.
[13] Claimant filed its Post-Hearing Brief together with Annexes I through III.

52.   On September 25, 2020, Mr. Francisco Grob returned from paternity leave.

53.   On December 11, 2020, Mr. Luis Fernando Rodríguez ceased to serve as the Assistant to the Tribunal and the Tribunal proposed that Mr. Adam Jankowski serve as the new Assistant to the Tribunal. On January 7, 2021 the Parties confirmed the appointment of Mr. Adam Jankowski as the Assistant to the Tribunal.

54.   The proceeding was closed on July 19, 2021.

# IV. <u>FACTS</u>

55.　This section describes the factual background of the dispute, which for the most part remains undisputed between the Parties.

## 1.　LION'S INVESTMENT IN MEXICO

56.　Claimant, Lion Mexico Consolidated L.P., is a limited partnership constituted under the laws of Quebec (Canada), with its main place of business in Texas (USA). Lion was created and is managed by Clarion Partners, L.P. ["**Clarion**"], a real estate investment management company founded in New York in 1982, which manages real estate investments for institutional investors[14].

57.　Lion had been making investments in Mexico for over ten years. Over that period, Lion had provided more than US $800 million of capital to entities doing business in Mexico, to be used in developing a wide array of real estate properties, such as hotels, office buildings, residences, warehouses, and resorts[15]. Wishing to develop further investment opportunities in Mexico, Clarion engaged a specialized broker, and through this channel Sr. Héctor Cárdenas Curiel ["**Sr. Cárdenas**"], a Mexican businessman, was introduced[16]. Sr. Cárdenas was presented as a developer seeking funding for the development of two significant real estate projects: the "**Nayarit Project**" and the "**Guadalajara Project**".

## 1.1　SR. CÁRDENAS'S PROJECTS: NAYARIT AND GUADALAJARA

58.　Mr. Hendricks, the managing director at Clarion during the period from 2006 through 2015, confirmed in his Witness Statement that Sr. Cárdenas enjoyed the reputation of a "trusted business partner of respected developers[17]". However, the preliminary inquiries did not extend to Cárdenas's father-in-law, a Sr. Garsin, a person with a "big banking relationship at Bansi Bank[18]" and apparently a powerful figure in the State of Jalisco, who also became involved in the project.

59.　The Nayarit Project included an ocean-front residential and resort development in Bahía de Banderas, State of Nayarit[19]. The development plan called for a mixed-use high-end resort to be anchored by a Ritz Carlton hotel, 1,500 luxury residential units,

---

[14] Exh. C-32.
[15] CM, para. 6.
[16] Arechederra, para. 9.
[17] Hendricks, para. 8.
[18] HT, p. 497.
[19] Hendricks, para. 7.

extensive amenity offerings, and two ocean-front golf courses, to be developed on 855 hectares (2,100 acres) with 2.8 miles of ocean frontage[20].

60.    The Guadalajara Project[21] consisted of two high-end mixed-use skyscrapers, to be built on approximately 15,000 m$^2$ (3.74 acre) in the city of Guadalajara, State of Jalisco[22].

61.    Sr. Cárdenas's plans for the development of the Nayarit and the Guadalajara Projects were preliminary and incomplete at the time he requested capital from Lion to acquire land and begin limited infrastructure development[23]. Lion was willing to provide capital for the development of these projects subject to certain requirements, accepted by Sr. Cárdenas, including the following:

-    The granting of mortgages to Lion over the land acquired by Sr. Cárdenas and on the subsequent improvements made on that land[24]; and

-    The issuance of promissory notes as unconditional commitments to repay the money owed to Lion, with certain procedural privileges under Mexican law[25].

## 1.2    THE THREE SETS OF TRANSACTIONS

62.    In February, June and September 2007, Lion made three loans for financing the purchase of the properties for the Nayarit Project and the Guadalajara Project [the "**Loans**"], as well as working capital.

### A.    <u>The first set of transactions</u>

63.    The first loan took the form of a "Credit Agreement" between Lion (as Lender), Inmobiliaria Bains, S.A. de C.V. ["**Inmobiliaria Bains**"] (as Borrower) and C&C Ingeniería, S.A. de C.V. ["**C&C Ingeniería**"] as joint and several obligor – Inmobiliaria Bains and C&C Ingeniería were two companies owned by Cárdenas. The first loan was signed on February 28, 2007 and had a term of 18 months. Its original due date was August 28, 2008. The loan was for the amount of US $15,000,000, which accrued ordinary interest at a rate of 18% per year, capitalized every three months, and in the event of a default, a default interest rate of 25% [the "**First Loan**"][26].

64.    The Credit Agreement was written in English and governed by the laws of Mexico[27].

---

[20] Exh. C-33.
[21] Hendricks, para. 7.
[22] Exh. C-35 and Exh. C-36.
[23] Hendricks, para. 9 and CI, paras. 17 and 18.
[24] Exh. C-33 and Exh. C-35.
[25] Hendricks, para. 9.
[26] Exh. C-8.
[27] Exh. C-8.

65.    The contract provided for the granting of a mortgage (clause four) and the issue of a non-negotiable promissory note (clause two, 2.2(5)) to secure the loan. It enclosed an Exhibit A (with the "Form of Mortgage") and an Exhibit B (with the "Form of Note").

The First Note

66.    On the same day, Inmobiliaria Bains issued the first promissory note in favor of Lion for US $15,000,000, plus ordinary interest at a rate of 18% per year, capitalized every three months, and in the event of default, an interest rate of 25% ["**First Note**"].

67.    The original maturity date of the First Note was August 28, 2008. The First Note was substituted four times, resulting in a final maturity date as of September 30, 2009[28].

68.    The First Note (as would the other two) was issued under Mexican law, drafted both in English and Spanish (with the Spanish version governing) and submitted to the exclusive and irrevocable jurisdiction of the courts of Mexico City.

The Nayarit Mortgage

69.    About one year after the signing of the Credit Agreement, on April 2, 2008, Inmobiliaria Bains granted in favor of Lion the "**Nayarit Mortgage**" over the Nayarit Project property, located in the Municipality of Bahía de Banderas[29].

70.    The Nayarit Mortgage was drafted in Spanish and subject to the laws of the State of Nayarit[30]. It was recorded at the Office of the *Registro Público de la Propiedad y de Comercio* (Public Registry) ["**Registro Público**"] of Bucerías, Nayarit, on May 19, 2008[31].

71.    The Nayarit Mortgage in its final form would secure not just the First, but all three Loans, including both principal and interest.

---

[28] Exh. C-153 (Versions of the First Note dated February 28, 2007; February 28, 2007; August 28, 2008; January 20; 2009; March 31, 2009; and July 7, 2009. The initial version of the First Note was signed in two separate promissory notes for US$9,177,020.25 and US$5,822,979.75 (totaling US$15 million), respectively, with the same original maturity date for both of them (August 28, 2008). All subsequent versions of the First Note were issued in a single promissory note for US$15 million.

[29] Exh. C-10.

[30] Zamora II, paras. 144 and 147.

[31] The Nayarit Mortgage replaced two previous mortgages in favor of Lion, which were subsequently cancelled: a mortgage issued on February 28, 2007, and another on June 13, 2007. While on February 28, 2007, the mortgage only secured the First Loan, it was subsequently replaced to also cover the Second Loan (on June 13, 2007) and Third Loan (on April 2, 2008), respectively, Protocol Mortgage No. 92.496 of April 2, 2008, recorded under Book 285, section II, A-13 of the Public Property and Commercial Registry of Bucerías, Nayarit on May 19, 2008 / April 2, 2008. *See* Exh. C-010.

### B.     The second set of transactions

72.    The second loan also took the form of a "Credit Agreement", between Lion (as Lender), C&C Capital, S.A. de C.V. ["**C&C Capital**"] another company owned by Cárdenas (as Borrower) and Inmobiliaria Bains (as joint and several obligor). It was signed on June 13, 2007, around three months after the first set of transactions, and had a term of 90 calendar days. Its original due date was September 12, 2007. The loan was for the amount of US $12,450,000 which accrued ordinary interest at a rate of 18% per year, capitalized every three months, and in the event of a default, an interest rate of 25% [the "**Second Loan**"][32].

73.    The contract provided for the granting of a mortgage (clause four) and the issue of a non-negotiable promissory note (clause two, 2.2(2)) to secure the loan. It also enclosed an Exhibit A (with the "Form of Mortgage") and an Exhibit B (with the "Form of Note").

74.    The Credit Agreement was again written in English and governed by the laws of Mexico[33].

The Second Note

75.    The day after the signing of the Credit Agreement, on June 14, 2007 C&C Capital issued the second note ["**Second Note**"] in favor of Lion for US$12,450,000 plus ordinary interest at a rate of 18% per year, capitalized every three months, and in the event of default, an interest rate of 25%[34].

76.    The original maturity date of the Second Note was September 14, 2007. The Second Note was substituted seven times, leading to a final maturity date of September 30, 2009[35].

The Guadalajara Mortgage 1

77.    The "**Guadalajara Mortgage 1**" secured the Second Loan, including both capital and interest. It was granted on June 13, 2007, the date of execution of the Credit Agreement, by Bansi S.A., as trustee, as per the instruction of C&C Capital, as founder and beneficiary of the trust, in favor of Lion, over one of the properties pertaining to the Guadalajara Project[36].

---

[32] Exh. C-12.
[33] Exh. C-8.
[34] Exh. C-13.
[35] Exh. C-154, Copy of the versions of the Second Note dated June 14, 2007; September 12, 2007, December 25, 2007; March 30, 2008; September 30, 2008; January 20, 2009; and July 7, 2009. The 6th modified version of the Second Note, issued on March 31, 2009 and cancelled on July 7, 2009, is not available.
[36] Exh. C-14.

78.   The Guadalajara Mortgage 1 was subject to the laws of the State of Jalisco and was recorded at that *Registro Público* about five months later, on November 23, 2007.

###   C.   The third set of transactions

79.   The third loan again took the form of a "Credit Agreement" between Lion (as Lender), C&C Capital (as Borrower) and Inmobiliaria Bains (as joint and several obligor). It was signed on September 26, 2007 and had a term of 90 calendar days. Its original due date was December 26, 2007. The loan was for the amount of US $5,355,479, which accrued ordinary interest at a rate of 18% per year, capitalized every three months, and in the event of default, an interest rate of 25% [the "**Third Loan**"][37].

80.   The contract provided for the granting of a mortgage (clause four) and the issuance of a non-negotiable promissory note (clause two, 2.1(5)) to secure the loan. It was again accompanied by an Exhibit A (the "Form of Mortgage") and an Exhibit B (the "Form of Note").

81.   The Credit Agreement was written in English and governed by the laws of Mexico[38].

   The Third Note

82.   C&C Capital issued the Third Note ["**Third Note**"] on September 26, 2007, the date of execution of the Credit Agreement, in favor of Lion for US $5,355,479 plus ordinary interest at a rate of 18% per year, capitalized every three months, and in the event of a default, a default interest rate of 25%. Inmobiliaria Bains signed as joint and several obligor[39].

83.   The original maturity date of the Third Note was December 25, 2007. The Third Note was substituted six times, resulting in a final maturity as of September 30, 2009[40].

   The Guadalajara Mortgage 2

84.   The "**Guadalajara Mortgage 2**" secured the Third Loan, including both capital and interest. It was granted on the day of execution of the Credit Agreement, September 26, 2007, by Bansi S.A., as trustee, as per the instruction of C&C Capital, as founder and

---

[37] Exh. C-152, which contains the signature of Lion and the correct original "Due Date" of 90 days at Clause 1.1(7) complements Exh. C-16. There is no dispute between the Parties on this maturity date of 90 days: it is the one indicated at the RfA, para. 34(c), and was acknowledged by Mexico at Mexico's Preliminary Objection, paras. 40 and 41.
[38] Exh. C-16.
[39] Exh. C-152.
[40] Exh. C-155, Copy of the versions of the Third Note dated December 25, 2007; March 30, 2008; September 30, 2008; January 20, 2009; and July 7, 2009. The initial, issued on September 26, 2007 and cancelled on December 25, 2007 and the 5th modified version of the Third Note, issued on March 31, 2009 and cancelled on July 7, 2009, are not available.

beneficiary of the trust, in favor of Lion, over one of the properties pertaining to the Guadalajara Project[41].

85.   The Guadalajara Mortgage 2 was subject to the law of Jalisco and was recorded at the *Registro Público* of that State on December 6, 2007.

## 2.   THE DEFAULTS

86.   None of the initial deadlines for the repayment of any of the three Loans were met. Sr. Cárdenas requested and obtained a series of time extensions: from March 2008 through July 2009 Lion signed maturity date extensions on the First Loan four times[42], on the Second Loan seven times[43], and on the Third Loan six times[44].

87.   The last payment date on the three transactions was, ultimately, September 30, 2009, and the debtors failed to satisfy the outstanding amounts by that date. All three Loans were declared in default and interest at the default rate began to accrue on October 1, 2009.

88.   Lion sent its first invoice to Sr. Cárdenas for the outstanding principal and interest payments due on April 16, 2010[45]. The amounts due on that invoice, calculated and dated as of March 31, 2010, totaled US $26,618,972 for the Nayarit Project and US $29,649,835 for the Guadalajara Project.

89.   Subsequent invoices were sent on July 14, 2010[46]; October 11, 2010[47]; February 14, 2011[48]; April 12, 2011[49], and July 29, 2011[50]. The amounts due on the latest invoices sent, calculated and dated as of June 30, 2011, were US $36,041,328.45 for the Nayarit Project and US $40,065,210.38 for the Guadalajara Project[51].

90.   According to Lion, no payments were ever made.

## 3.   THE NEGOTIATIONS BETWEEN LION AND SR. CÁRDENAS

91.   Lion initiated negotiations and held meetings with Sr. Cárdenas, trying to find an amicable solution to the breach and to avoid initiating formal foreclosure

---

[41] Exh. C-156, which complements Exh. C-18, which did not include the annexes of the protocol.
[42] Exh. C-11.
[43] Exh. C-15.
[44] Exh. C-19.
[45] Exh. C-37.
[46] Exh. C-38.
[47] Exh. C-39.
[48] Exh. C-40.
[49] Exh. C-42.
[50] Exh. C-42.
[51] CM, para. 27.

proceedings[52]. Between September and December 2011 Lion and a representative of Cárdenas discussed the restructuring of the debt according to a term sheet. Such proposal never contemplated the cancellation of the Mortgages, nor the possibility that Lion become a shareholder in Cárdenas's companies[53]. A restructuring term sheet was eventually signed by Sr. Cárdenas in October 2011 on behalf of the borrowers under the three Loan Agreements [the "**Debtors**"], but was not accepted by Lion, as it did not adhere to all the requirements advocated by Lion in the negotiations[54].

92.   The discussions continued until February 2012, without Lion and Sr. Cárdenas reaching an agreement[55]. On February 17, 2012 Lion took a first step towards the enforcement of the Mortgages: it served the Debtors with a formal request demanding payment of the amounts owed plus interest, under penalty of initiating foreclosure actions[56].

## 4.   THE CANCELLATION LAWSUIT

93.   On March 13, 2012, unbeknown to Lion, which was still engaged in *bona fide* negotiations with Sr. Cárdenas[57], the Debtors filed a fraudulent lawsuit [the "**Cancellation Lawsuit**", the proceeding will be referred to as the "**Cancellation Proceeding**"] against Lion before the *Juez Noveno de lo Mercantil* of the State of Jalisco [the "***Juez de lo Mercantil***"].

94.   Under the applicable State laws, mortgages registered in the *Registro Público* can be cancelled through a judgement issued by a competent judge[58]. The Cancellation Lawsuit was the first step in a complex judicial fraud schemed by Sr. Cárdenas to avoid the imminent foreclosure of the Mortgages. It is clear that Sr. Cárdenas organised this fraudulent scheme because:

-   He was the person who controlled the Debtors and the beneficiary of the cancellation of the Mortgages;

-   The fraud purported to transfer jurisdiction over the Mortgages from the Courts of Mexico DF to the Courts of Jalisco, precisely where Sr. Cárdenas resided and was well-established;

-   The scheme required the designation of a false address for the service of Lion, and the collaboration of a person at the false address; this role was fulfilled by a

---

[52] CM, para. 28.
[53] Exh. C-43.
[54] *Ibid.*
[55] CM, para. 31. In fact, Lion claims that negotiations continued as far as until December 2012, CM, para. 32.
[56] Exh. C-45.
[57] CM, paras. 31-33, Exh. C-43.
[58] CC Jalisco, Art. 2581, CC Nayarit, Art. 2312, discussed in Zamora II, para. 175, footnote 156.

lawyer called Lic. José Isaac López Medina, who appeared to be an associate of Sr. Cárdenas;

- The fraudulent scheme eventually required the impersonation of a representative of Lion (Sr. José Javier Tovar Arechederra). This was achieved using a copy of Sr. Arechederra's driving licence on the same date that the driving licence was deposited with security at the venue of the meeting organized by Sr. Cárdenas;

- The Tribunal finally notes that Mexico, while refusing to outright admit that fraud had indeed been perpetrated by the Debtors, argues that the "alleged multi-level fraud" was so complex and sophisticated that its judicial system could not withstand it[59].

95. The objective of the first part of Sr. Cárdenas's fraudulent scheme was to obtain a judgement, register it in the *Registros Públicos*, and thus legally extinguish the Mortgages, making any foreclosure impossible. The second part of the fraudulent scheme was then to preclude any possibility for Lion to file an *amparo* procedure, which would have rectified the previous cancellation of the mortgages. The fraudulent scheme required an impressive knowledge of the intricacies of the Mexican procedural system, suggesting that Sr. Cárdenas was assisted by an experienced legal mastermind.

## 4.1   JUDICIAL ENFORCEMENT OF THE (FALSE) *TÉRMINOS*

96. As a first step, the Debtors approached their local *Juez de lo Mercantil* in Jalisco and requested judicial enforcement of a settlement contract, presented only in the form of a photocopy, titled "*Términos para pago de los contratos de crédito*" [the "***Términos***"] and allegedly executed four months before, on November 14, 2011, between Lion and the Debtors[60].

97. The Debtors' prayer for relief in the Cancellation Lawsuit reads as follows:

> "PRESTACIONES
>
> A) *Por la DECLARACION JUDICIAL que se haga por parte de su Señoría en el sentido de que la demandada "LION MEXICO CONSOLIDATED, L.P." está obligada al CUMPLIMIENTO CABAL de todas las obligaciones que asumió y que dimanan a su cargo del documento base de la acción que las partes denominamos "TERMINOS PARA PAGO DE LOS CONTRATOS DE CREDITO""* [Emphasis added]

98. The Debtors were thus seeking a judicial order granting specific enforcement of the obligations purportedly assumed by Lion in the *Términos*: under what seemed to be the terms of this agreement, Lion had accepted the cancellation of all pending debts against

---

[59] RR, para. 230.
[60] Exh. C-56, p. 4.

the Debtors, the cancellation of the Mortgages securing such debt in the *Registro Público*, and the return of the Notes to the Debtors, and in exchange the Debtors had undertaken to issue and to deliver to Lion a participation in Sr. Cárdenas's companies[61].

99.    The Debtors now alleged that Lion had defaulted on the obligations assumed in the *Términos* and requested the *Juez de lo Mercantil* to order specific performance, resulting in the cancellation of the Mortgages in the *Registro Público*.

100.   The *Términos* included two further important elements of legal engineering:

101.   First, the *Términos* purported to contain a clause awarding jurisdiction to the Courts of Jalisco. While all the Promissory Notes attributed jurisdiction to the Courts of Mexico City, far away from Sr. Cárdenas's main place of business, the *Términos* granted jurisdiction to the Courts of Jalisco[62]:

> "**8. Jurisdicción y Competencia**   Para la interpretación, cumplimiento y ejecución del presente convenio […] las partes se someten […] a los Tribunales del Primer Partido Judicial del Estado de Jalisco, renunciando a cualquier otro fuero o jurisdicción que por razón de convenio previo o domicilio actual o futuro pudiese corresponderles".

102.   Second, the *Términos* included an address for service of process in Jalisco and the name of a process agent. While the Loans provided 3141 Hood Street, Suite 700 Dallas, Texas 75219[63] as Lion's address, with a copy to an address in Mexico at Paseo de los Tamarindos 400-B, Piso 8, Bosque de las Lomas, 05120 Mexico, D.F.[64], oddly the *Términos* identified a Jalisco lawyer[65] and an address in Jalisco[66]:

> "**7. Domicilio para recibir notificaciones y autorizados** [Lion] señala como domicilio para recibir cualquier tipo de comunicación relativa a la presente propuesta y notificaciones el de la finca marcada con el número 95 Despacho 7 de la calle Tomás V. Gómez, Colonia Ladrón de Guevara, en el municipio de Guadalajara, Jalisco y como autorizados para recibirlas y acusar recibo de las mismas a los Licenciados Emilio González de Castilla del Valle y Jose Isaac López Medina".

---

[61] Exh. C-53, p. 7.

[62] *Ibid*.

[63] Exh. C-08, p. 15, Exh. C-12, p.16 and Exh. C-16, pp. 15-16.

[64] *Ibid*.

[65] Claimant's expert witness confirmed, when asked by the President at the Hearing, that it is not a usual practice in Mexico to enumerate persons authorized to receive communications by name, rather than referring to addresses only, see HT, pp. 546-547. In this case, the *Términos* provide the name of a well-known México DF lawyer (González de Castilla), who did not participate in the scheme, and whose name was inserted to give credibility to the clause, and of a Jalisco lawyer (López Medina), who actually received the notifications, never informed Lion of such fact and who seems to have acted as Cárdenas's straw man.

[66] Exh. C-53, p. 7.

## 4.2   THE *TÉRMINOS* DOCUMENT IS A FORGERY

103.   The Tribunal is convinced that the *Términos* are in fact a forgery [and will refer to the document frequently as the "**Forged Settlement Agreement**" or "**Forged Agreement**"]. In reaching this conclusion, the Tribunal finds the following evidence compelling:

- The Forged Agreement purports to have been signed by Lion's legal representative in Mexico, Mr. James Christian Hendricks[67]; Mr. Hendricks appeared as a witness in this procedure, and gave sworn evidence that he never signed the document and that the signature appended to the document (shown below) is false[68];



- Lic. González de Castilla, the other lawyer allegedly designated by Lion as a person authorized to receive notifications in the *Términos,* and a well-known and highly respected professional, has declared in the presence of a Public Notary that: (i) he was not authorized by Lion or by any other company to receive any notification in Guadalajara; (ii) he did not know the said address nor the other person allegedly authorized; and (iii) he had no professional dealings in Guadalajara[69];

- Since the very moment that Lion obtained knowledge of the existence of the Forged Agreement in mid-December 2012[70], it has consistently averred that the document is a forgery; Lion has repeated the averment in this procedure[71];

---

[67] Exh. C-53, p. 8.
[68] HT, p. 444; Hendricks, para. 27.
[69] Exh. C-54.
[70] Payne I, para. 13, HT, pp. 486-487.
[71] HT, pp. 29, 38, 141; CPHB, paras. 92 97, CM, para. 42.

-  Lion has repeatedly tried to obtain a declaration from the Mexican civil Courts, confirming the forgery of the *Términos*[72]; although the Mexican civil Courts have never rendered a judgement confirming the existence of forgery, Claimant says that such refusal is improper and tainted by denial of justice;

-  Upon gaining knowledge of the *Términos*, Lion initiated criminal actions against Sr. Cárdenas[73], some of which were ongoing at the time of the filing of Post-Hearing Briefs[74].

-  The Forged Agreement purports to formalize a settlement, in which Lion agrees to cancel the Loans, the Notes and the Mortgages in exchange for a participation in Sr. Cárdenas's companies; there is no contemporary evidence proving that in the negotiations between Lion and Sr. Cárdenas such solution was ever discussed; to the contrary, the evidentiary record shows that Lion's intention during the negotiation was to obtain repayment of the Loans, and if the negotiation failed, to foreclose on the Mortgages[75];

-  It is unlikely that Lion, a well advised Canadian company, which had insisted that in its previous agreements with Sr. Cárdenas and his companies jurisdiction should lie with the Courts of Mexico City, would accept that the *Términos,* the settlement agreement finalizing the relationship, be subject to the jurisdiction of the Courts of Jalisco; it is even more unlikely that Lion additionally would have consented to designate an obscure lawyer in Jalisco, related to Cárdenas, and with whom Lion had never had relations, as its process agent, authorized to receive all types of notifications;

-  There is a final argument: confronted with Claimant's averment in the present arbitration that the Forged Settlement indeed is a forgery, Mexico has failed to dispute this statement[76].

## 4.3   *EMPLAZAMIENTO* AND DECLARATION *EN REBELDÍA*

104.  Two weeks after the filing of the Cancellation Lawsuit, on April 3, 2012 the *actuario* (a court officer of the *Juez de lo Mercantil*) attempted a first service of process [the "***emplazamiento***"] at the address identified in clause 7 of the Forged Settlement Agreement. The service attempt was done on Lic. José Isaac López Medina[77], one of

---

[72] The multiple attempts by Lion to prove the forgery are discussed under Section 7: Lion's attempts to remedy the cancellation of the Mortgages.
[73] CR, paras. 187-192, RCM, paras. 8, 118-133.
[74] E.g., Criminal Action No. 4713/2016, see CPHB, paras. 40-42.
[75] Exh. C-43.
[76] CPHB, paras. 63-65, CR, para. 71., RPHB, para. 67, RR, para. 94.
[77] Exh. C-52.

the two lawyers identified in the Forged Agreement[78], who apparently had his office at that address.

105. Confronted by the *actuario*, Lic. López Medina formally declared that no legal representative of Lion was present in his office in order to receive the *emplazamiento*. Upon receipt of this representation, the *actuario* withdrew, announcing that he would return the next day.

106. At the second visit, which occurred next day, the *actuario* decided to make the *emplazamiento* against Lion through a *notificación por cédula* delivered to the person who was at the address, Lic. López Medina[79].

107. Lic. López Medina accepted the *emplazamiento* and received a copy of the judicial file ("*autos*").

108. Being unaware that a Court procedure against it was pending before the *Juez de lo Mercantil* of Jalisco, Lion inevitably failed to appear within the statutory time-limit.

109. The consequence of this failure was that six weeks thereafter, on May 22, 2012, Lion was declared *en rebeldía* by the *Juez de lo Mercantil* through notification via *boletín judicial*[80] (a judicial bulletin)[81].

110. Two weeks after the declaration *en rebeldía*, on June 6, 2012 the Debtors submitted their evidence before the *Juez de lo Mercantil*, including the Mortgage deeds and Minutes of the General Shareholders Meeting of C&C Capital. All the evidence marshalled by the Debtors was admitted six days later, on June 12, 2012[82].

**4.4   THE JUDGMENT OF THE *JUEZ DE LO MERCANTIL***

111. Just two weeks after the submission of evidence, on June 27, 2012 the *Juez de lo Mercantil*, acting solely on the basis of the evidence marshalled by the Debtors, and without any participation of Lion, declared the Loans settled and ordered Lion to cancel the Mortgages and return the Notes [the "**Cancellation Judgment**"][83]. From the filing of the Cancellation Lawsuit to the rendering of the Cancellation Judgment, only 170 days had lapsed.

---

[78] Exh. C-53.
[79] Exhs. C-52 and C-52, CR, paras. 95-96.
[80] Exh. C-73.
[81] Claimant's expert explains that while the Commerce Code as well Mexico's procedural codes and statutes provide for different methods of *emplazamiento*, including through *boletín judicial* and *estrados*, for the initial notification of a defendant, only personal service is legally accepted, see Zamora I, para. 142 and footnotes therein. This is not disputed by Mexico.
[82] Exh. C-57.8.
[83] Exh. C-78, pp. 53-54.

The Cancellation Judgement *causa estado*

112. A few days thereafter, on August 8, 2012, and at the request of the Debtors, the *Juez de lo Mercantil,* declared that the Cancellation Judgement *"causa estado por ministerio de la ley"*, i.e. that it has become *res iudicata,* there being no possibility of submitting a *recurso de apelación*. The reason given by the Judge for his decision precluding any further appeal was that the amount claimed in the procedure was less than MEX 500,000 (approximately USD 25,000)[84].

113. The decision is difficult to understand, because the principal amount of the Loans settled and Mortgages terminated amounted to tens of millions of dollars. Be that as it may, the decision was highly relevant, because it deprived Lion of any possibility of launching an ordinary appeal against the Cancellation Judgement.

The Cancellation Judgement is enforced

114. In a subsequent procedural decision, the *Juez de lo Mercantil* gave Lion a peremptory term of three days to voluntarily comply with the Cancellation Judgement[85]. Lion, who was still unaware of the Cancellation Proceeding, failed to comply and on August 30, 2012 the *Juez de lo Mercantil* ordered the *Registro Público* of Jalisco to cancel the Guadalajara Mortgages[86] and that of Nayarit to do the same with the Nayarit Mortgage[87].

115. The *Registro Público* of Jalisco did so on September 7, 2012[88]. The cancellation of the Nayarit Mortgage was recorded on October 19, 2012[89]. Upon these registrations, all three Mortgages became extinct for all legal purposes.

## 5.   FALSE *AMPARO* PROCEEDINGS

116. The Debtors' scheme did not end here.

117. Having orchestrated the cancellation of the Mortgages, the Debtors wanted to ensure that Lion, upon being appraised of the Cancellation Judgment, would encounter considerable procedural obstacles in seeking to reverse such decision.

118. *Pro memoria*: Lion had already been deprived of any possibility of appeal against the Cancellation Judgement, the *Juez de lo Mercantil* having decided, upon the request of

---

[84] Exh. C-79 "*Causar estado*", pursuant to the definition under CLA-216.
[85] Exh. C-79.
[86] Exh. C-84.
[87] This was done through a request for assistance of the 1st Civil Judge in Bucerías, Nayarit to send a following request for cancellation to the *Registro Público* in Nayarit.; Exh. C-86.
[88] Exh. C-85.
[89] *Registro Público* in Nayarit informs about cancellation, 19 October 2012, Exh. C-88.

the Debtors, that the amount in dispute was less than MEX 500,000 and that as a consequence thereof the respondent was not entitled to appeal.

119. The Debtors, well advised on the intricacies of the Mexican procedural system, were aware that the other viable avenue for reversal of the Cancellation Judgment required Lion to initiate an *Amparo* procedure. As explained by Claimant's legal expert, a *juicio de Amparo* is a general challenge procedure governed by the *Ley de Amparo*, which seeks to revert violations of human rights as afforded to citizens and aliens under Mexico's Constitution[90].

120. The Debtors developed a further fraudulent scheme to disrupt the eventual *Amparo* to be filed in due course by Lion. The scheme would develop in two stages, which were to occur before Lion became aware of the Cancellation Judgment (and filed a real *Amparo*):

- in the first stage, a person falsely alleging to be a legal representative of Lion would present a request for *Amparo* purporting to act on behalf of Lion; and

- in the second, that person would abandon the *Amparo*.

121. The purpose of this scheme was to prevent Lion, when it eventually obtained knowledge of what had happened, from presenting a proper *Amparo*: Art. 73 of the *Ley de Amparo* provides a list of eighteen causes for the finding of inadmissibility of an *Amparo*, including when an *Amparo* is based on the same facts as a previously abandoned one[91]. Under this rule, Lion's proper *Amparo* would be inadmissible, because a previous *Amparo* relating to the same facts, had already been submitted and then abandoned. To revert this inadmissibility finding, Lion would have to prove that the person who had submitted and then abandoned the False *Amparo,* purporting to be a representative of Lion, was in fact not authorized by Lion to act on its behalf – an endeavour fraught with difficulties which in the actual facts proved impossible.

122. In order to file an *Amparo* falsely in the name of Lion, the Debtors needed to gain access to a copy of the case file, which in turn could only be obtained by a person holding a power of attorney. Sr. Cárdenas knew from the documents which accompanied one of Lion's requests for payment, that a certain Sr. José Javier Tovar Arechederra was one of Lion's representatives in Mexico. All that was needed was to impersonate Sr. Arechederra.

---

[90] Zamora I, para. 79.
[91] Zamora I-004, Ley de Amparo, Article 73, fracciones III and IX - "El juicio de amparo es improcedente: […]III.- Contra leyes o actos que sean materia de otro juicio de amparo que se encuentre pendiente de resolución, ya sea en primera o única instancia, o en revisión, promovido por el mismo quejoso, contra las mismas autoridades y por el propio acto reclamado, aunque las violaciones constitucionales sean diversas; IX.- Contra actos consumados de un modo irreparable".

**5.1   THE IMPERSONATION OF SR. ARECHEDERRA**

123.   On the same day when the Cancellation Judgment was issued, someone impersonating Mr. Arechederra went to a Notary in Jalisco to obtain a copy of the power of attorney granted to the real Mr. Arechederra[92].

> [Two years later this Notary Public would be arrested on charges of fraud and forgery of documents, subsequently fined and suspended as a Notary Public and eventually permanently disbarred by the State of Jalisco[93]]

124.   The plan was not yet fully completed. Sr. Cárdenas still required a document confirming the impostor's identity as Sr. Arechederra. On July 6, 2012, Sr. Cárdenas summoned the real Sr. Arechederra to a meeting in Jalisco (the city where the *Juez de lo Mercantil* is located)[94]. Sr. Arechederra left his driver's license at the security control of the building where the meeting took place[95].

125.   On the same day, July 6, 2012, an impostor using the same driver's license[96] to identify himself as Sr. Arechederra, filed with the *Juez de lo Mercantil* a request for a certified copy of the entire case file[97], on behalf of Lion, exhibiting the power of attorney obtained from the Notary[98].

126.   With the copy of the case file, on August 7, 2012 an *Amparo* against the Cancellation Judgment, purportedly signed by Sr. Arechederra on behalf of Lion, was submitted at the Jalisco Courts [the "**False** *Amparo*"][99].

**5.2   THE FALSE *AMPARO***

127.   The Tribunal is convinced that Sr. Arechederra never actually signed the False *Amparo* on behalf of Lion. In coming to this conclusion, the Tribunal finds the following evidence compelling:

-   Sr. Arechederra corroborated by his sworn testimony at the Hearing that he never carried out any of the above actions[100];

---

[92] CM, paras. 75-77.
[93] CR, para. 130, CM, para. 78.
[94] CM, para. 67.
[95] Arechederra I, para 16.
[96] Exh. C-58, p. 4.
[97] Exh. C-58.
[98] Exh. C-77.
[99] Exh. C-64.
[100] Arechederra I, paras. 21 and 31; Exh. C-115. Ms. Payne explained that José Arechederra did not sign either the request for copies of the Cancellation Lawsuit file dated 6 July 2012 or the False Amparo.

-   Sr. Arechederra's stamp signature under the False Request for Copies contains a typographical mistake (A**rr**eched**e**ra instead of Arechederra)[101] – it is unlikely that the real Sr. Arechederra would be using a stamp signature containing not one but two typos in his name;



-   Mr. Arechederra has submitted a voucher from the airport[102] confirming that it would have been physically impossible for him to file the request for the certified copy, obtain it, sign its receipt, and make it to the airport within an hour[103];

-   The False *Amparo* designated as domicile for notifications to Lion "*los estrados del Juzgado que en turno conozca de la presente demanda*[104]", i.e, the notice board of the competent Court which would judge the False *Amparo*; and not the address of Lion's lawyers, as was the case in the Loans[105] when an address in Mexico was given for Lion;

-   Lastly, Mexico has not denied that the False Amparo was filed by someone else than the real Sr. Arechederra.

128. The False *Amparo* was (on purpose) filed with a procedural deficiency: the person submitting the request failed to attach sufficient copies as required under Mexican

---

[101] Exh. C-58, p.3, see *infra*.
[102] Exh. C-59; Exh. C-60.
[103] CM, para. 69.
[104] Exh. C-64, p. 2.
[105] Exh. C-08, p. 15, Exh. C-12, p.16 and Exh. C-16, pp. 15-16.

procedural law[106]. The *Juez* in charge of the *Amparo* notified Lion of this mistake (through the *estrados*) granting Lion three days to remedy the deficiency[107].

> [The possibility of amending this procedural deficiency is noteworthy, as it contrasts with the treatment given to the real Lion, when it filed the proper *Amparo*: it was never granted an opportunity to cure an alleged defect in the power of attorney of the person signing an *ampliación de demanda*.]

129. The very purpose of the False *Amparo* was to be filed and then to be abandoned. Consequently, no copies were ever delivered, and the procedural deficiency was never corrected. Consequently, on August 17, 2012, the *Juez* dismissed the False *Amparo*[108] and on September 6, 2012 declared this decision to be final and not subject to appeal[109].

130. The effects came to haunt Lion when it eventually filed the proper *Amparo*.

## 6. LION FORECLOSES ON THE (SOON TO BE CANCELLED) NAYARIT MORTGAGE

131. In the meantime, Lion was still unaware that the Debtors had filed the Cancellation Lawsuit in the local Courts of Jalisco, seeking enforcement of a Forged Settlement Agreement, that the *emplazamiento* had been delivered to an obscure lawyer in Jalisco, that Lion had been declared *en rebeldía* and that the Cancellation Judgement had been rendered in favour of the Debtors, cancelling the outstanding Loans and Mortgages.

132. Lion continued its *bona fide* negotiations with Cárdenas, but in view of the persistence of the default, on April 3, 2012 Lion finally decided to foreclose, but only on one of the three Mortgages: it initiated a *juicio especial hipotecario* [the "***Juicio Hipotecario***"][110] before the *Juez Trigésimo Noveno de lo Civil de México D.F.* [the "***Juez de lo Civil***"][111], against the Debtors, seeking to enforce the Nayarit Mortgage. Lion decided not to foreclose on the Guadalajara Mortgage, trying to minimize costs and with the hope that filing one foreclosure proceeding would incentivize Sr. Cárdenas to pay the outstanding amounts[112].

*Difficulties in the emplazamiento*

133. The attempts to notify the *Juicio Hipotecario* to the various Debtors commenced on April 26, 2012, but it would take several years until all the mortgagors could be properly served (*emplazados*)[113]: Lion requested the *Juez de lo Civil* to serve

---

[106] CM, para. 84.
[107] Exh. C-65.
[108] Exh. C-66.
[109] Exh. C-67.
[110] Exh. C-44.
[111] Exh. C-46.
[112] CM, para. 35.
[113] CM, para. 38.

Inmobiliaria Bains 13 times, providing nine different addresses in both Jalisco and Nayarit; the courts of Jalisco and Nayarit – acting at the request of the *Juez de lo Civil* – were unable to notify the company[114] and this situation prevented the *Juicio Hipotecario* from progressing for more than three years[115].

*Anotación preventiva*

134. While Lion was trying to notify the *Juicio Hipotecario* to the Debtors, it requested and obtained an order from the *Juez de lo Civil* in México D.F., instructing the *Registro Público* in Bucerías to make a preventive annotation in the books setting forth the existence of a foreclosure procedure [the "**Anotación Preventiva**"]. The Registrar did so on May 3, 2012 and added that this *Anotación Preventiva* would guarantee the "*inmovilidad registral*" of the real estate, preventing any future annotation which could disrupt the proper development of the *Juicio Hipotecario*[116]:

> "*[L]o anterior para efectos de que dicha inscripción sirva como inmovilidad registral con la finalidad de que no se pueda verificarse (sic) en la finca hipotecada ningún embargo, toma de posesión, diligencia precautoria o cualquier otra que entorpezca el curso del juicio*".

135. The *Anotación Preventiva* was made on May 3, 2012, a month and a half before the Cancellation Judgment (dated June 27, 2012), and in theory prevented any future annotation which could disrupt the *Juicio Hipotecario*.

136. Notwithstanding this fact, upon rendering the Cancellation Judgement, the *Juez de lo Mercantil* of Jalisco sent (through a local Court) an *oficio* to the *Registro Público de Bucerías*, requesting cancellation of the Mortgage ("*solicito a Usted, cancele la hipoteca*")[117] The Registrar, disregarding the existence of the previous *Anotación Preventiva*, registered the cancellation of the Mortgage in the *Registro Público* on October 16, 2012, the security thus becoming null and void[118]:

---

[114] Exhs. C-47-50.
[115] CM, para.38
[116] Exh. C-157.
[117] Exh. C-87.
[118] Exh. C- 157, pp. 4-5.



Guadalajara Mortgages

137. Since Lion had chosen only to enforce the Nayarit Mortgage, but not the Guadalajara Mortgage, no *Anotación Preventiva* was ever issued in relation to the Guadalajara Mortgages, and the security was cancelled, upon an *oficio* of the *Juez de lo Mercantil* of Jalisco of August 30, 2012[119].

**7.    LION'S ATTEMPTS TO REMEDY THE CANCELLATION OF THE MORTGAGES**

138. In mid-December 2012 Lion was astonished to learn, through informal sources, of the cancellation of the Mortgages[120].

139. Lion immediately turned to trying to undo the cancellation.

140. Mexican procedural law allows for the institution of *Amparo* proceedings to overturn judicial decisions. There are two different types of *Amparo* procedures: *Amparo directo* and *Amparo indirecto*. The *Amparo directo* is most commonly filed against final judgments, and the *Amparo indirecto* against certain procedural orders, or against actions taken after the case ends or against persons who did not participate in proceedings[121].

141. The *Amparo* claim has to be filed by the person affected by the act which is challenged (known as the *acto reclamado*). Other parties to the *Amparo* procedure are

-    the authorities who dictated, promulgated, published, ordered, executed or tried to execute the *acto reclamado* (*autoridades responsables*), and

-    the affected party's counterparty in the procedure in which the challenged action was issued or executed (known as the *tercero perjudicado*)[122].

---

[119] Exh. C-84.
[120] Payne I, para. 13, HT, pp. 486-487.
[121] Zamora I, para. 85.
[122] Zamora I, para. 82.

### 7.1   LION FILES AN *AMPARO INDIRECTO*

142.   On December 18, 2012 Lion filed an *Amparo indirecto* lawsuit[123] ["**Real *Amparo***", also "***Amparo* claim**" and "***Amparo* lawsuit**" (as opposed to the previous False Amparo)] before the *Juez de Distrito en Materia Civil* in Jalisco ["***Juez de Distrito***"].

143.   The claim was brought against the *Juez de lo Mercantil*, against his Secretary and against the officers responsible for the *Registros Públicos* of Nayarit and Bucerías[124]. The Debtors were designated in the *Amparo* claim as *terceros perjudicados* (aggrieved third parties)[125].

144.   The *actos reclamados* included, among others, the lack of proper notification of Lion in the Cancellation Lawsuit:

> "*La falta de emplazamiento al quejoso y todas y cada una de las actuaciones y resoluciones relativas al juicio Ordinario Mercantil radicado ante el Juzgado Mercantil del Primer Partido Judicial del Estado de Jalisco*"[126].

### 7.2   ATTEMPTS TO CLAIM FORGERY

145.   Initially, Lion started the *Amparo indirecto* to obtain declaratory relief that it had never been properly served by the *Juez de lo Mercantil*. It did not include any reference to the Forged Settlement Agreement, because the specific content of the Forged Agreement only became known to Lion when the *Juez de lo Mercantil* filed an *informe* as part of the *Amparo* proceeding[127].

The *ampliación de demanda*

146.   Upon receiving this information, on January 28, 2013 Lion filed an *ampliación de la demanda* (extension request) of the *Amparo* lawsuit, explaining that the service made by the *Juez de lo Mercantil* was based on a forged document and should thus be deemed inexistent[128]:

> "*La falta de emplazamiento legal a la hoy quejosa [i.e. Lion] [...] debido a que el supuesto emplazamiento [...] se hizo en un domicilio que no es de la hoy quejosa [...]. Amén de que el supuesto domicilio donde de practicó dicho emplazamiento, fue señalado en un documento que no fue suscrito por mi mandante ni por persona alguna con facultades, ya que la firma que se advierte*

---

[123] Exh. C-91.
[124] *Ibid*.
[125] *Ibid*.
[126] Exh. C-91, at p. 2.
[127] HT, p. 140; H1, p. 6: Exh. C-97, p. 4.
[128] Exh. C-97, p. 3.

> *en el mismo es completamente falsa por no proceder del puño y letra a quien se atribuye."* [Emphasis added]

147.  Lion's forgery claim was accompanied by, *inter alia*[129]:

-  a graphological expert report to prove that the signature in the Forged Agreement did not belong to Mr. Hendricks, and

-  emails between a broker retained by Lion and Sr. Cárdenas to demonstrate that, after the Forged Agreement was supposedly signed in November 2011, Lion and Cárdenas were still holding discussions on the terms of the repayment of the Loans.

148.  By *proveído* (procedural decision) of January 30, 2013 [the "**Dismissal *Proveído***"] the *Secretario del Juzgado de Distrito* [i.e. the clerk of the *Juez de Distrito*] in Jalisco dismissed the *ampliación* of the *Amparo* submitted by Lion, arguing that[130]

> "*dichos actos ya fueron precisados desde el escrito inicial de demanda*".

149.  Frustrated by this postponement, Lion brought, on February 6, 2013, an *"incidente de falsedad de documento"* before the *Juez de Distrito*, claiming again that the Forged Agreement was the result of fraud[131].

150.  On April 10, 2013, the *Juez de Distrito* stated that he would decide in due course on the admissibility of the proposed graphological expertise on the authenticity of the Forged Settlement Agreement[132]. And on April 19, 2013, the *Juez de Distrito* once again decided to postpone his decision on the admissibility of the evidence, because of a *queja* proceeding which was subsequently initiated and which will be dealt with in the next section[133].

**7.3   THE DISMISSAL OF EVIDENCE ON THE FORGERY**

151.  While the decision on the admission of evidence was pending before the *Juez de Distrito*, one of the Debtors, C&C Ingeniería, filed as a *tercero perjudicado* two *queja*s[134] before the *Segundo Tribunal Colegiado en Materia Civil del Tercer Circuito*

---

[130] Exh. C-103, p. 4.
[131] Exh. C-107.
[132] Exh. C-106, p. 10.
[133] Exh. C-180, p. 2 ("*se reserva a proveer lo que en derecho corresponda*").
[134] The orders and judgments issued in *Amparo* proceedings are themselves subject to three different challenges: *revisión, queja* and *reclamación*. In an *Amparo indirecto*, such as the one file by Lion, the most common challenges are *queja* against different procedural orders (specifically those that cause irreparable harm) and *revisión* against the *Juez de Distrito*'s final judgment, both of which are decided by a *Tribunal Colegiado de Circuito*, referred to as *Tribunal de Queja*, see Zamora I, para. 87.

*Lion Mexico Consolidated v. Mexico*
ICSID Case No. ARB(AF)/15/2
Award

[the "***Tribunal de Queja***"] against the Dismissal *Proveído* issued by the Secretary of the Court[135] and the April 10, 2013 decision of the *Juez de Distrito*[136]. C&C Ingeniería argued that Lion's *ampliación de demanda* was inadmissible, because it had not been properly signed on Lion's behalf.

152. Lion for its part also submitted a *queja* against the same decision, because it precluded Lion from claiming that the Forged Settlement Agreement was a forgery and the origin of the improper service[137].

153. The *Tribunal de Queja* dismissed Lion's *queja* and sided with C&C Ingeniería: the appeal court ruled that the *ampliación de la demanda*, which Lion had filed, was inadmissible, because it had not been properly signed on behalf of Lion: it should have been signed by Lion's legal representative and not by the attorney empowered by Lion to act on its behalf in the *Amparo* proceedings[138].

154. Lion was not given an opportunity to cure the alleged procedural defect, although the *ampliación de demanda* aimed at proving that Lion, an alien company operating in Mexico, had been the victim of an elaborate fraud to avoid its proper *emplazamiento*.

> [This stands in stark contrast with the treatment granted to the complainants when the False *Amparo* was submitted without the requisite copies. In that instance, the *Juez* accorded the complainants the chance to cure the formalistic deficiency.]

### The decisions of the *Juez de Distrito*

155. Once the *queja* had been resolved, the *Juez de Distrito* resumed his work, and in accordance with the decision of the *Tribunal de Queja* resolved that all evidence linked to the forgery claim should be dismissed (both the evidence already admitted and the evidence still pending admission)[139].

156. Thereafter the *Juez de Distrito* rendered a specific ruling on Lion's separate motion ("*incidente de falsedad de documento*"). The judge dismissed it on the grounds that the allegedly false document (the Forged Settlement Agreement) was not related to the subject-matter of the *Amparo* Proceeding[140].

---

[135] Exh. C-181.
[136] C&C Ingeniería's *queja*, No. 37/2013 against *Juez de Distrito*'s decision of April 10, 2013, referenced under CM, p. 34, footnote 164 (but not included in the list of exhibits).
[137] Exh. C-182.
[138] RCM, para. 92, citing Exh. C-105, p. 3-4 and Exh. R-19.
[139] Exhi C-105, pp. 8-9.
[140] Exh. C-108.

Forgery is excluded from the scope of the *Amparo*

157. Be that as it may, from that date on, the scope of the *Amparo* did not include any inquiry into the issue whether the Settlement Agreement had been forged; it was assumed that the Settlement Agreement was valid and binding, having been properly executed by Lion. The scope of the *Amparo* was reduced to the question whether the *emplazamiento* had or not been properly executed in accordance with Mexican law. And – congruently with this reduced scope of investigation – all evidence in the file seeking to prove the forgery of the Settlement Agreement was expurgated.

**7.4    THE *AMPARO* JUDGMENT**

158. On December 4, 2013, the *Juez de Distrito* delivered his decision denying Lion protection against the Cancellation Judgment [the "***Amparo* Judgment**"][141].

> "[…] R E S U E L V E: ÚNICO. LA JUSTICIA DE LA UNIÓN NO AMPARA NI PROTEGE A LION MEXICO CONSOLIDATED, L.P., contra los actos que reclama del JUEZ Y DEL SECRETARIO EJECUTOR, AMBOS ADSCRITOS AL JUZGADO NOVENO DE LO MERCANTIL DEL PRIMER PARTIDO JUDICIAL DEL ESTADO DE JALISCO. […]" [Capitals in the original]

159. The *Amparo Judgement* is a 67-page document, which in its "*Resultando"* summarizes the procedure, and which then reasons the decision in seven "*Considerandos"*.

Sr. Arechederra's signature had been forged

160. As a preliminary question, the *Juez de Distrito* analyzes Lion's allegation that on July 6, 2012 Sr. Arechederra's signature had been forged in the false request for copy before the *Juzgado de lo Mercantil* – see section 5.1. *supra*. (The issue was relevant, because if it had been true that on July 6, 2012 Lion had been aware of the Cancellation Judgement, the *Amparo* would have been inadmissible due to the statute of limitations).

161. The *Amparo* Judgement, after weighing the expert evidence marshalled by the parties, concludes that Sr. Arechederra's signature indeed had been forged, that the request for copy had indeed been false, and that consequently Lion's request for *Amparo* was not time barred[142].

Sr. Cárdenas is in prison

162. The *Amparo* Judgement also acknowledges that Sr. Arechederra and Lion had filed a criminal action against Sr. Cárdenas, accusing him of having forged his signature on various documents, and that on September 26, 2013 the criminal judge had ordered the

---

[141] Exh. C-115, pp. 66-67.
[142] Exh. C-115, p. 39.

imprisonment of Sr. Cárdenas for this crime. However, the *Amparo* Judge accorded little weight to this piece of evidence[143].

### No discussion of forgery of the Settlement Agreement

163. Notwithstanding the finding that at least on one occasion Sr. Arechederra's signature had been forged, and that Sr. Cárdenas was in prison for alleged forgeries of documents, the *Amparo* judgement does not even discuss Lion's argument that the Settlement Agreement might also have been forged: since the *ampliación de demanda* had been dismissed (because it had been signed by Lion's attorney, but not by a legal representative), any issue relating to the falsehood of the Settlement Agreement was off limits in the *Amparo* procedure.

164. The *Amparo* Judgement consequently assumes that the Settlement Agreement was validly executed on Lion's behalf. There being a valid Settlement Agreement with a designation of process agent and an address for service of process, the *Juez de Distrito* dismisses Lion's argument that the *emplazamiento* should have been made in Dallas, Texas, USA, and in accordance with the applicable international treaties[144].

165. Instead, the *Juez de Distrito* discusses at length a minor incident in the way the fraudulent *emplazamiento* had taken place: in accordance with the Settlement Agreement the notification should have been made at Calle Tomás V. Gómez 95, *despacho 7*. But in reality, the *actuario* went to the same address, but to a different office: *despacho 5*.

166. The *Juez de Distrito* finds that this "minor defect" does not invalidate the *emplazamiento*, because the *actuario* was able to locate Lic. López Medina, who, in accordance with the Settlement Agreement, was the person designated by Lion as process agent[145].

## 7.5   THE *RECURSO DE REVISIÓN*

167. Lion was not satisfied with the *Amparo* Judgement. On December 19, 2013 Lion filed a *recurso de revisión* [the "**Recurso de Revisión**"], seeking its revocation, the granting of protection to Lion's constitutional rights and the finding that the Cancellation Lawsuit and related acts were null and void[146].

168. Among other reasons, Lion explicitly challenged the *Amparo* Judgment, arguing that the *Juez de Distrito* had disregarded Lion's claim that the Settlement Agreement had been forged, using the argument that the falsehood was unrelated to the dispute and

---

[143] Exh. C-115, p. 61.
[144] Exh. C-155, p. 47.
[145] Exh. C-155, p. 53
[146] Exh. C-116, pp. 46-57.

that the defendants in the *Amparo* had not participated in the alleged forgery. Lion explained that the falsehood of the Settlement Agreement was indeed relevant for the *Amparo,* because Lion's *emplazamiento* had been delivered to Lic. López Medina, Lion's purported process agent designated in the Settlement Agreement. If the Settlement Agreement was a forgery, the designation of Lic. López Medina was false, and the *emplazamiento* had not been properly made[147].

169.   At first, the *Recurso de Revisión* was assigned to the *Cuarto Tribunal Colegiado en Materia Civil del Tercer Circuito*[148]. However, it was later decided that the *Recurso de Revisión* should instead be heard by the same court that had rejected Lion's earlier *queja* regarding the *decisión sobre la ampliación* (the *Segundo Tribunal del Tercer Circuito,* referred to in this Award as "*Tribunal de Queja*")[149].

<u>The False *Amparo* surfaces</u>

170.   Up to this point, Claimant had undertaken at least four formal attempts requesting that it be authorized to allege in the *Amparo* that the Settlement Agreement was indeed a forgery, and to marshal evidence proving this allegation. Yet the *Tribunal de Queja,* once again, decided not to investigate the issue of forgery nor to admit any evidence to prove it – but this time for a different reason.

171.   More than 16 months after the initiation of the *Recurso de Revisión*, on April 17, 2015, the *Tribunal de Queja* surprisingly decided to remand the case back to the *Juez de Distrito* for a totally different purpose: to determine whether Lion's *Amparo* proceeding was inadmissible, a different *Amparo* relating to the same facts having been filed at an earlier date and thereafter abandoned.

172.   *Pro memoria*: the False *Amparo* had been fraudulently filed and then abandoned by someone impersonating Sr. Arechederra, Lion's representative in Mexico – with the purpose of obstructing the real *Amparo* which Lion was expected to submit in due course.

173.   When the *Tribunal de Queja* raised the issue of the False *Amparo* it came as a total surprise:

-   For the last 16 months of *Amparo* proceeding no party and no prior court had ever referred to this admissibility issue[150];

---

147 Exh. C-116, pp. 16-17.
148 CM, para. 155.
149 CM, para. 156, citing, Exh. C-118.
150 Exh. C-119.

    -      The same *Tribunal de Queja* had also failed to raise the issue when it first intervened in these proceedings, to adjudicate the appeal against interlocutory decisions of the *Juez de Distrito*;

    -      The *Tribunal de Queja* decided *sua sponte,* and over a year into the *recurso de revisión*, to raise the existence of the False *Amparo*; the only reason given by the *Tribunal de Queja* to justify its decision was that an unidentified administrative official had informed the Court of the existence of the previous *Amparo*[151].

174.    As regards the remand procedure, the *Tribunal de Queja* ordered that it should be restricted to adjudicating the admissibility issue, explicitly prohibiting the parties to marshal new evidence regarding the falsehood of the Settlement Agreement[152] and instructing the *Juez de Distrito* not to analyze Lion's allegation that such Agreement had been forged[153].

175.    After three years of judicial battling, Lion still had no decision confirming the falsehood of the Forged Settlement Agreement and now it was fighting to prove that it should not be deprived of *Amparo* recourse – the only way to overturn the wrongful cancellation of the Mortgages.

## 7.6   THE REMAND *AMPARO*

176.    The fact that Lion was being tried by the same judge who had already dismissed evidence on the forgery did not discourage Lion from bringing once more a petition to admit evidence on the fraudulent nature of the Forged Settlement Agreement[154]. And, since Lion had only acquired knowledge of the False *Amparo*'s existence at this point, it also provided evidence pointing to the inauthenticity of the False *Amparo*[155].

177.    On September 23, 2015 the *Juez de Distrito* only accepted the graphology expert report and a brief filing on the False *Amparo* as evidence[156]. The *Juez de Distrito* used formalistic reasoning to reject further evidence provided by Lion[157].

---

[151] Exh. C-119, p. 21.
[152] Exh. C-119, p. 18
[153] Exh. C-119, pp. 17-18.
[154] Exh. C-121.
[155] Exh. C-122.
[156] Exh. C-123.
[157] Exh. C-123: Sr. Arechederra's testimony could not be admitted because it was rendered by Claimant's legal counsel and raised a risk of bias; additionally, the Court found that Claimant incorrectly submitted a questionnaire that included identical questions for Sr. Arecherdera and Mr. Baer, a type of evidence that is forbidden under the applicable law, see RR, para. 119 together with footnote within, invoking inadmissibility of such evidence under Art. 150 of the *Amparo* law.

Lion's withdrawal

178. At that point Claimant had spent almost three years in lawsuits before Mexican civil courts trying to undo the fraudulent cancellation of the Mortgages. It had achieved very little:

- Lion had filed an *Amparo,* but its recurring attempts that the scope of the procedure be extended to cover the forgery of the Settlement Agreement (a fact which Lion only learned after it had filed the *Amparo*) and that it be authorized to marshal evidence proving the forgery, had been repeatedly dismissed by the first instance *Juez de Distrito* and in second instance by the *Tribunal de Queja*, for a purely formalistic reason: the *ampliación de la demanda* had been signed on behalf of Lion by its attorney and not by its legal representative - a minor procedural defect Lion was never offered the opportunity to remedy;

- Unable to submit that the Settlement Agreement had been forged, Lion's *Amparo* had been dismissed by the first instance *Juez de Distrito*; in the *Amparo* Judgement the *Juez de Distrito* assumed the Settlement Agreement to be valid and binding and concluded that Lion's *emplazamiento* had been properly served on Lic. López Medina, Lion's process agent as identified in the Forged Settlement Agreement – an obscure attorney, with whom Lion had never had any relationship and who failed to inform Lion;

- On appeal against the *Amparo* Judgement, the second instance *Tribunal de Queja,* whom Lion had asked to review a further time the prohibition to argue the forgery issue, did not take up this question; instead the *Tribunal de Queja*, in an unexpected move, made *sua sponte* the decision to remand the procedure back to the first instance Judge, with a strictly limited remit: to review whether the *Amparo* had been properly admitted, in light of the existence of a previous *Amparo* (the False *Amparo* – a decoy procedure filed fraudulently by the Debtors to derail the admissibility of the real *Amparo*);

- Upon the instructions of the *Tribunal de Queja,* the *Juez de Distrito* again denied Lion's request to expand the scope of the remand, so that the *Amparo* could encompass the forgery of the Settlement Agreement.

179. On December 11, 2015 Lion waived the *Amparo* lawsuit. Lion says that it took this decision, because it believed it was futile to continue:

- On the one hand, had Lion pursued the Remand *Amparo*, Mexico could have argued in this arbitration that Lion's expropriation claim under NAFTA Article 1110

would be inadmissible pursuant to NAFTA Article 1121(2), which sets a three-year time limit to bring claims[158];

- On the other hand, the circumstances made it clear that further pursuit of Lion's claims, before the same court that had ruled against it before, on the basis on the same evidence admitted previously, and barring admission of other relevant evidence, was futile;

- Additionally, the graphological evidence that was in fact admitted, with the experts opinions two-to-one in favour of the authenticity of the False *Amparo*, made it even less likely that the Remand *Amparo* would make a ruling in favour of Lion[159].

## 8.   CRIMINAL PROCEEDINGS AND THE FATE OF THE NAYARIT PROPERTY

180.   At the time of the filing of Post-Hearing Briefs, three criminal proceedings concerning the alleged irregularities of which Lion says it has been a victim were pending resolution:

- A criminal action[160] had been brought against Sr. Cárdenas in connection with the Forged Settlement Agreement and the false request for copy; the investigation phase had been completely exhausted; Sr. Cárdenas, in his defense, had initiated *Amparos* No. 610/2017 and No. 1518/2018; the criminal proceedings were halted until those *Amparos* were resolved[161];

- A criminal action[162] had been brought against Sr. Cárdenas concerning the False *Amparo*; at the time of the filing of the Post-Hearing Briefs, this proceeding was at the initial investigation phase, before the Prosecutor's Office in Jalisco; the Prosecutor was in the process of analyzing the matter to bring charges formally (the "*imputación*")[163];

- A criminal[164] action had been brought against Sr. Cárdenas for the sale of the Nayarit Property; at the time of the final Party submissions, the proceeding was at the initial investigation phase, before the Prosecutor's Office in Jalisco[165].

181.   Other criminal proceedings initiated by Lion against Sr. Cárdenas had already been finalized at this point, with the *Amparo* Judgment stating that Sr. Cárdenas was in jail

---

158 CM, para. 171.
159 CM, paras. 171-176.
160 No. 4713/2016.
161 CPHB, p. 40, RPHB para. 189.
162 No. 121667/2017.
163 CPHB, para. 41. RPHB para. 189.
164 No. 83426/2017.
165 CPHB, para. 42, RPHB para. 189.

at the time of the rendering of the decision. Implicitly referring to the stature of Sr. Cárdenas's father-in-law and the apparent leniency of Jalisco courts towards Sr. Cárdenas, Ms. Onay Payne (one of Lion's representatives) stated at the Hearing that they were able to "get him [Sr. Cárdenas] behind bars", but "not for long"[166].

182. On July 27, 2016, Inmobiliaria Bains sold the Nayarit Property to "*Hotelera los Tules*"[167]. This sale operation was recorded by the *Registro Público* of Bucerías on May 16, 2017. In the course of one of the criminal proceedings against Sr. Cárdenas, the judge issued a freeze order, suspending temporarily the development of the property.

183. Claimant was not aware of further developments[168].

---

[166] HT, p. 500.
[167] CPHB, para. 49, RPHB, para.
[168] CPHB, p. 49, Exh. C-167, p. 7, Exh. R-33, p. 13, Exh. C-157, p. 70, Exh. C-167, p. 8, Exh. R-33. Also, see CR, para. 190.

# V.  RELIEF SOUGHT BY THE PARTIES

184.  Lion's requests the following relief in its Post-Hearing Brief[169]:

> "The Claimant respectfully request the Tribunal:
>
> a. To declare that Mexico has breached its obligations under Articles 1110 and 1105 of NAFTA and international law;
>
> b. To order Mexico to pay the Claimant the amount of US$81,992,752 as compensation for the loss caused by the cancellation of the Mortgages with interest at the rate mentioned under (e) below;
>
> c. To order Mexico to pay the Claimant the legal fees incurred in the Mexican court proceedings in a minimum amount of US$2,212,004.53 as a result of the cancellation of the Mortgages with interest at the rate mentioned under (e) below;
>
> d. To order Mexico to pay the Claimant whatever amount is assessed against LMC by the Mexican courts (currently valued at US$14,853,013.73) as a result of the waiver of the Foreclosure Proceedings as per Article 1121 of NAFTA;
>
> e. To order Mexico to pay interest on the amounts under (b) to (c) at the Mexican Legal rate provided by Article 362 of the Mexican Commercial Code compounded monthly (i.e., 6%), through the date of full and effective payment of those amounts as from:
>
> (i) 31 March 2015 for the lost value of the Mortgages;
>
> (ii) 31 December 2015 to reimburse LMC for the attorney's fees and costs it incurred in Mexican court proceedings;
>
> f. To order Mexico to reimburse Claimants all their reasonable legal costs and fees in connection with this arbitration with interest as of the date of the award at the interest rate mentioned above at (e); and
>
> g. Any other remedies that the Tribunal consider appropriate in the circumstances given Mexico's breaches"

185.  Mexico's request for relief in its Rejoinder is as follows[170]:

> "For all of the foregoing reasons, the Respondent requests:
>
> • an Order dismissing the Claimant's Claim in its entirety;

---

[169] CPHB, para. 320.
[170] RR, paras. 634 and 635.

- an Order that the Claimant indemnify the Respondent for its costs incurred in this arbitration, including its legal costs and the travel expenses occurred by its legal team, witnesses, and experts; and

- such other relief as the Respondent may request and this Tribunal may deem appropriate.

635. In the alternative, in the unlikely event that the Tribunal concludes that the Respondent is internationally liable for a breach of its obligations under NAFTA Article 1110 and/or NAFTA Article 1105, the Respondent requests:

- that the amount of damages be determined on the basis of the CBRE reports and Sanchez Devanny opinion, which put the value of the property, net of foreclosure fees and expenses, at USD $47,060,068.57;

- *minus* the deduction that the Tribunal finds appropriate to avoid double recovery and to account for the Claimant's contributory fault;

- *plus* an award of interest based on a relatively low and risk-free rate applicable to U.S. dollar denominated amounts, such as the U.S. Treasury Bill with annual compounding; and

- any such other relief as the Respondent may request and this Tribunal may deem appropriate".

186. In its Post-Hearing Brief Respondent specified that[171]:

"[…] any damages found must be subject to a deduction for contributory fault of at least 50% and closer to 100% since the Claimant would not have suffered any losses had it not acted negligently and with a lack of due care".

---

[171] RPHB, para. 217.

# VI. <u>MERITS</u>

187.  Lion has brought this arbitration against Mexico to address Mexico's alleged:

- judicial and administrative expropriation of Lion's investment under NAFTA Art. 1110[172];

- alternatively, Mexico's denial of justice as a failure to provide fair and equitable treatment under NAFTA Art. 1105, and

- alternatively, the failure to grant Lion's investment full protection and security under NAFTA Art. 1105.

<u>General rule: No judicial expropriation without denial of justice</u>

188.  While expropriation constitutes Claimant's primary claim[173], the Tribunal observes that liability for expropriation under Art. 1110 arising from the decisions of domestic courts requires a finding of a denial of justice.

189.  This is agreed upon by both of the Non-Disputing Parties in their submissions:

- The USA states that[174]:

  "Decisions of domestic courts acting in the role of neutral and independent arbiters of the legal rights of litigants do not give rise to a claim for expropriation under Article 1110(1). Moreover, the United States has not recognized the concept of "judicial takings" as a matter of domestic law […]."

- Canada in turn asserts that[175]:

  "A domestic court's bona fide adjudication as to whether a property right exists under domestic law cannot be recast as an expropriation of that property. A neutral and independent judicial determination that a property right is invalid under domestic law, unless it can be impugned as a denial of justice, does not give rise to separate claim of expropriation under customary international law. International tribunals have followed this approach."

---

[172] Claimant alleges that it suffered a judicial expropriation of the Mortgages through the Cancellation Judgment which eventually also resulted in an administrative expropriation through the cancellation of the Mortgages in the Public Registry (See CM, para. 260 and CPHB, para. 179 *et seq.*).
[173] CPHB, paras. 143-150, CR, paras. 200-202, CM, paras. 201-203, 233-236.
[174] USA Submission, para. 20.
[175] Canada Submission, para. 12.

190. This position is buttressed by the *Loewen* tribunal, which stated the following about a judicial expropriation claim presented as an alternative to denial of justice[176]:

> "Claimant's reliance on Article 1110 adds nothing to the claim based on Article 1105. In the circumstances of this case, a claim alleging an appropriation in violation of Article 1110 can succeed only if Loewen established a denial of justice under 1105".

191. A similar view has been expressed by legal scholars, *inter alia*, by Paparinskis, who in his seminal treatise on the international minimum standard and fair and equitable treatment has opined that

> "[w]hile taking of property through the judicial process could be said to constitute expropriation, the rules and criteria to be applied for establishing the breach should come from denial of justice"[177].

Exceptions to the rule

192. There is an exception to the general rule, acknowledged explicitly by both the USA and Canada in their submissions – whenever it can be proved that the courts were not neutral and independent, especially from the other branches of power of the host State.

193. The USA has opined that[178]:

> "Of course, where a judiciary is not separate from other organs of the State and those organs (executive or legislative) direct or otherwise interfere with a domestic court decision so as to cause an effective expropriation, these executive or legislative acts may form the basis of a separate claim under Article 1110, depending on the circumstances."

194. The submission by Canada confirms the exception by stating that "[a] neutral and independent judicial determination [...] does not give rise to separate claim of expropriation under customary international law[179]", thus implying that such a separate claim could be found valid if the judicial determination under question was not neutral or independent.

195. In the current case, the Tribunal does not find sufficient proof to apply the above exception:

  - No proof has been marshalled as to the interference of the executive or legislative branches of Mexico's government in the course of the local proceedings;

---

[176] *Loewen*, para. 141, quoted in Canada Submission, para. 12.
[177] M. Paparinskis, "The International Minimum Standard and Fair and Equitable Treatment", 2013, p. 208.
[178] USA Submission, para. 21.
[179] Canada Submission, para. 12.

- Even though Claimant has presented allegations of bias by Mexico's courts[180], these are not substantiated by evidence; and

- The decisions of the courts failed to benefit the Respondent State.

196. Thus, the Tribunal finds that it must first adjudicate Lion's claim for denial of justice (**VI.1**), then it will analyse the requirement of exhaustion of local remedies (**VI.2**), establish its conclusions (**VI.3**) and finally devote a short chapter to Claimant's alternative claims (**VI.4**).

---

[180] I.e., with regard to the length of the notification process in the Foreclosure Proceeding compared with the swiftness of service and issuance of a decision in the Cancellation Proceeding or the excessive formality of the rejection of the *ampliación de demanda* when compared with the acceptance of a photocopy of the Forged Settlement Agreement instead of the required original.

# VI.1.  <u>DENIAL OF JUSTICE</u>

197. Claimant avers that it was denied justice by the Mexican judicial system.

198. The Tribunal will first make an introduction (**1.**), then it will provide a summary of Claimant's and Respondent's respective positions (**2.** and **3.**) and finally it shall make a decision (**4.**).

## 1.  <u>OVERVIEW</u>

199. Denial of justice, referred to as *denegación de justicia* in Spanish, is

> "a defect in a country's organization of courts or administration of justice, resulting in the country's violating its international legal duties to protect aliens"[181].

200. The concept reaches back to the Middle Ages[182], when private reprisals were allowed against acts of injustice committed by actors of another State[183]. It later evolved into diplomatic protection assumed by States[184]. Traditionally, some authors perceived denial of justice as any internationally illegal treatment of aliens[185]:

> "A denial of justice, in a broad sense, occurs whenever a State, through any department or agency, fails to observe, with respect to an alien, any duty imposed by international law or by treaty with his country",

201. However, currently a narrower view prevails, although there is much debate on what specific State actions constitute denial of justice: points of contention include whether the concept encompasses administrative acts, whether manifestly unjust court decisions on the merits can constitute denial of justice, and whether subjective elements, such as bad faith, should be required[186].

---

[181] Black's Law Dictionary, Ninth Edition, p. 499.
[182] See ILC Yearbook of the International Law Commission, 1957, Volume I, UN DoC/CN.4/SER.A/1957 155, quoted from Paparinskis, *op. cit.*, p. 47: "[the rules relating … to denial of justice were centuries old, thus they could be found, stated in very modern terms […] three hundred years before Grotius".
[183] J. Paulsson, "Denial of Justice in International Law", p. 13.
[184] *Ibid*.
[185] O. J. Lissitzyn, "The Meaning of the Term Denial of Justice in International Law", *The American Journal of International Law* Vol. 30, No. 4 (Oct., 1936), p. 633, providing insight on multiple authors propagating such view.
[186] *Ibid*., pp. 633-635.

202. In 1935, de Visscher famously described denial of justice as "one of the oldest and one of the worst elucidated [concepts] in international law" [187]. Despite the passage of nearly a century, de Visscher's statement still stands true.

203. Paulsson, one of the most prominent contemporary researchers on the subject, has defined denial of justice as follows[188]:

> "[d]enial of justice arises when proceedings are so faulty as to exclude all reasonable expectation of a fair decision [...]".

204. Paulsson's definition puts the emphasis on the active subject (judicial bodies of the host State) and on the wrongdoing (very grave breaches of due process to the detriment of the alien, which preclude the possibility of an unjust decision on the merits be reviewed).

<u>Applicability under the NAFTA</u>

205. Nowhere in the NAFTA treaty do the words "denial of justice" appear. The same happens in most investment treaties. There is, however, unanimous agreement among the Parties (including the Non-Disputing Parties) that denial of justice is an international wrong which breaches the fair and equitable treatment ["**FET**"] standard. Case law and doctrine reach the same conclusion[189].

206. Art. 1105 NAFTA delineates the FET standard:

> "Article 1105: Minimum Standard of Treatment
>
> 1. Each Party shall accord to investments of investors of another Party treatment in accordance with international law, including fair and equitable treatment and full protection and security."

207. Art. 1131(2) of the NAFTA states that an interpretation by the Free Trade Commission of a NAFTA provision "shall be binding on a Tribunal established under this Section".

208. One such interpretation was provided on the protections under Art. 1105 of the NAFTA. The Interpretation Note of July 31, 2001 [the "**FTC Note**"] states as follows:

> "[T]he Free Trade Commission hereby adopts the following interpretations of Chapter Eleven in order to clarify and reaffirm the meaning of certain of its provisions: [...]

---

[187] Ch. de Visscher, "Le déni de justice en droit international", *Recueil des cours*, Vol. 52, 1935, p. 369.
[188] J. Paulsson, "Denial of Justice in International Law", p. 205.
[189] E.g., *Flughafen*, para. 630, *Jan de Nul*, para. 188; *Jan Oostergetel*, para. 272; *Pey Casado*, para. 655, *Compañía de Aguas del Aconquija S.A. and Vivendi Universal v. Argentine Republic*, para. 7.4.11. See also R. Dolzer and Ch. Schreuer, "Principles of International Investment Law", 2008, OUP, p.142.

B. Minimum Standard of Treatment in Accordance with International Law

1. Article 1105(1) prescribes the customary international law minimum standard of treatment of aliens as the minimum standard of treatment to be afforded to investments of investors of another Party.

2. <u>The concepts of "fair and equitable treatment" and "full protection and security" do not require treatment in addition to or beyond that which is required by the customary international law minimum standard of treatment of aliens.</u>" [Emphasis added]

209. In light of the Interpretation Note, the protection to be accorded to investors under the FET and full protection and security standards is set at the level of "customary international law minimum standard of treatment of aliens".

210. Since Claimant has brought a case of denial of justice by the Mexican Courts, the adjudication of this case requires that the Tribunal determine what "customary international law minimum standard of treatment of aliens" is expected from those Courts. Breach of that standard implies denial of justice.

**1.1  PROCEDURAL AND SUBSTANTIVE DENIAL OF JUSTICE**

211. In its Memorial, Claimant argues that the Minimum Standard of Treatment under Article 1105 (1) of the NAFTA incorporates a threefold protection for investors in their dealings with local Courts. Thus, local Courts are prohibited from:

- incurring unreasonable delay in administering justice[190],

- refusing the investors access to justice[191], and

- rendering manifestly unjust and erroneous decisions that a competent judge would not have taken[192].

212. In Claimant's view, denial of justice can thus be subsumed in two great categories: procedural and substantive denial of justice.

213. Claimant's Reply provides a more elaborate typology of denial of justice, introducing a two-fold differentiation into "*déni de justice*" and "*défi de justice*" proposed by the

---

[190] CM, para. 339.
[191] CM, para. 444.
[192] CM, para. 351.

*Institut de Droit International*[193] and a four-fold one under the Harvard Draft Convention[194], which includes substantive denial of justice as one of the categories[195]:

> "A state is responsible if an injury to an alien results from a denial of justice. Denial of justice exists when there is
>
> [i] a denial, unwarranted delay or obstruction of access to courts,
>
> [ii] gross deficiency in the administration of judicial or remedial process,
>
> [iii] failure to provide those guaranties which are generally considered indispensable to the proper administration of justice, or
>
> [iv] a manifestly unjust judgment. An error of a national court which does not produce manifest injustice is not a denial of justice".

214. In differentiating between substantive and procedural denial of justice, Lion finds support in *Oostergetel*[196].

215. Respondent in turn argues that denial of justice is always procedural[197].

216. Mexico retorts that the artificial distinction made by the *Oostergetel* tribunal is misleading and that ultimately it did not lead to the application of any other standard for denial of justice than the traditional, very high one[198]. Respondent also claims that the Harvard Draft Convention and the *Institut de Droite International's* Draft Articles are irrelevant, because they lack customary law status[199].

<u>The view of the Tribunal</u>

217. The Tribunal agrees with Respondent, who convincingly argues that there is no "substantive denial of justice". While the dichotomy between substantive and procedural denial of justice has indeed been adopted (to greater or lower endorsement) by some arbitral tribunals[200], this differentiation is not useful. To determine whether a judgment was outrageous or egregious on the merits would require a tribunal to delve

---

[193] CR, para. 403, citing IDI, "Responsabilité internationale des Etats à raison des dommages causés sur leur territoire à la personne et aux biens des étrangers", 1927, Exh. CLA-618.
[194] "Responsibility of States for Damages Done in their Territory to the Person or Property of Foreigners", 1928), Article 9, 23 AM. J. INT'L L. SPEC. SUP. 133 (1929), Exh. CLA-617, p. 173.
[195] CR, para. 102.
[196] CR, para. 408, citing *Oostergetel*, para. 275, Exh. RL-45.
[197] RR, para. 195-197.
[198] RR, paras. 203-209.
[199] RR, paras. 194, 210.
[200] E.g., *Jan de Nul*, *Oostergetel*.

*Lion Mexico Consolidated v. Mexico*
ICSID Case No. ARB(AF)/15/2
Award

into the decision-making process under national law – it is trite to repeat that international tribunals cannot be and do not constitute domestic courts of appeal[201].

218. The Tribunal endorses Paulsson's view that:

> "in modern international law there is no place for substantive denial of justice […] If a judgment is *grossly* unjust, it is because the victim has not been afforded fair treatment […] Extreme cases should thus be dealt with on the footing that they are so unjustifiable that they could have been only the product of bias or some other violation of the right of *due process*[202]"
>
> "[…] denial of justice is always procedural[203]."

219. Paulsson adds that manoeuvring the line between what appears to be substantively unjust and what is unjust or erroneous because of gross procedural breaches is "the greatest difficulty of our subject" and explains that[204]:

> "gross or notorious injustice - whatever the words used - is not a denial of justice merely because the conclusion appears to be demonstrably wrong in substance; it must impel the adjudicator to conclude that it could not have been reached by any impartial judicial body worthy of that name".

## 1.2 TYPES

220. A review of case law and scholarly writings reveal that procedural denial of justice can be classified in subtypes: the right to access justice (**A.**); the right to be heard and to present one's case (**B.**); and the right to obtain a decision without undue delay (**C.**). These are some of the separate manifestations of denial of justice and, if committed against an alien, constitute international wrongs which can be imputed against the State.

## A. <u>Denying an alien access to justice</u>

221. The first category of procedural denial of justice is uncontroversial. Prof. Paparinskis writes[205]:

> "The easiest case, accepted as uncontroversially wrongful under the Hague Conference, was a discriminatory denial of access to court, described in the Hague Texts as the situation where 'the foreigner has been hindered by the judicial authorities in the exercise of his right to pursue judicial remedies".

---

[201] See e.g., Exh. CLA-272, E. Jiménez de Aréchaga, "International Law in the Past Third of a Century", *159 Recueil des cours 267,* 1978, p. 282.
[202] J. Paulsson, "Denial of Justice in International Law", p. 82.
[203] J. Paulsson, "Denial of Justice in International Law", p. 98.
[204] Paulsson Lecture, p. 31.
[205] Paparinskis, p. 190, footnotes omitted.

222. He also provides the following examples[206]:

> "[…] a purposeful disruption of the commencement of the proceedings, or even the absence of notification about proceedings that exclude the possibility to challenge them could all result in denial of justice".

223. Freeman in turn explains due process under international law in the following words[207]:

> "whenever judicial action is taken without giving the alien a hearing or without properly notifying him in order to prepare a defense; whenever misconduct of the judge in withholding, hiding or destroying papers essential to the foreigner's cause is prejudicial in effect; whenever he has not been permitted to produce evidence or to summon valuable witnesses".

224. Case law supports this view.

225. The judgment in *Ambatielos* offers insight into the basic right of foreigners to access local courts in pursuit of justice[208]:

> "Thus, when 'free access to the Courts' is covenanted by a State in favour of the subjects or citizens of another State, the covenant is that the foreigner shall enjoy full freedom to appear before the courts for the protection or defence of his rights, whether as plaintiff or defendant; to bring any action provided or authorized by law […]" [Emphasis added].

226. In *Idler* the US-Venezuela Commission found that the American claimant, Mr. Idler, was denied justice when the Supreme Court in Caracas gave him notice of an impending hearing without sufficient time for him to physically be able to appear in court[209].

227. The *Cotesworth & Powell* tribunal described the following facts as an "absolute denial of justice"[210]:

> "Still, a plain violation of the substance of natural justice, as, for example, refusing to hear the party interested, or to allow him opportunity to produce proofs, amounts to the same thing as an absolute denial of justice".

---

[206] Paparinskis, p. 191, footnotes omitted.
[207] Exh. CLA 190, A. V. Freeman, "The International Responsibility of States for Denial of Justice", 1938, pp. 267-268.
[208] *Ambatielos*, p. 111.
[209] *Idler*, pp. 152-153.
[210] *Cotesworth & Powell*, p. 188.

228. *Al-Bahloul* explicitly recognized that due process breaches include not notifying the investor of hearings and that deciding in the investor's absence amounts to a gross violation of procedural rules [211].

229. The right to access justice also extends to the right to lodge appeal. This aspect was discussed by the tribunal in *Al-Bahloul*, where the claimant alleged that his appeals were wrongfully rejected without regard to due process standards[212] – the tribunal explicitly acknowledged that the allegations could constitute a denial of due process (but ultimately dismissed the claim because of the limited evidence on the record[213]).

### B.   Denying an alien the right of defense or to present evidence

230. The violation of an alien's right of defense or to present evidence as an international wrong amounting to denial of justice has been universally recognized by academia[214].

231. Case law equally supports this view.

232. This was done by the aforementioned *Cotesworth & Powell* tribunal[215]:

> "Still, a plain violation of the substance of natural justice, as, for example, refusing to hear the party interested, or to allow him [an] opportunity to produce proofs, amounts to the same thing as an absolute denial of justice". [Emphasis added]

233. In the *Ambatielos* ruling[216]:

> "the covenant is that the foreigner shall enjoy full freedom to […] deliver any pleading by way of defence, set off or counterclaim; to engage Counsel; to adduce evidence, whether documentary or oral or of any other kind; to apply for bail; to lodge appeals and, in short, to use the Courts fully and to avail himself of any procedural remedies or guarantees provided by the law of the land in order that justice may be administered on a footing of equality with nationals of the country.",

234. And the *Krederi* decision:

---

[211] *Al-Bahloul*, para. 221.

[212] *Al-Bahloul*, para. 82.

[213] *Al-Bahloul*, para. 227.

[214] For example, Paulsson states that "No serious international lawyer contests either of the first two [types of denial of justice]", with reference to denial of access to justice and denial of justice for undue delay. See Paulsson Lecture, p. 30.

[215] *Cotesworth & Powell*, p. 188.

[216] *Ambatielos*, p. 111.

> "[m]ost frequently a denial of justice may result from a serious defect in the adjudicative process, such as a violation of … the right to be heard <u>and to present evidence</u> […][217]".

235. The US-Mexico General Claims Commission in *Chattin* found that local courts displayed "a most astonishing lack of seriousness" because there was "no trace of an effort to have the two foremost pieces of evidence explained", there was no inquiry made into verifying the statement of a key witness in the domestic prosecution proceedings and there was no effort to examine a witness who could have presented important exculpatory evidence[218].

236. In *Ballistini*, the claimant was denied a crucial piece of evidence necessary to make his case because the judge he accused of arbitrariness deliberately withheld the documents. The French-Venezuelan Commission found a denial of justice

> "because the local authorities deprived Mr. Ballistini of the legal means of instituting before the competent tribunals the actions which the laws would authorize him in case he might improperly have been condemned to a criminal judgment.[219]"

237. In *Joseph F. Rihani*[220], the Supreme Court of Justice of Mexico reversed the decisions of lower courts in enforcement proceedings because it claimed that critical evidence – that was clearly on the record and discussed by one of the justices – had in fact not been presented before it. The American Mexican Claims Commission found that there was denial of justice as[221]:

> "[I]n the face of the clear and indisputable evidence in the record to the contrary, more particularly in view of the fact that the, attention of the court had been drawn to such evidence by one of its members warrants the conclusion that <u>the said court wilfully disregarded such evidence</u>; that the decision of the court was lacking in good faith and that the same fell so far short of international standards as to amount to a denial of justice" [Emphasis added]

### C.   <u>Prohibition of undue delay</u>

238. The final type of procedural denial of justice concerns undue delay in the rendering of a judgement by the local Courts.

---

[217] *Krederi*, p. 61 para. 449 (iii).
[218] *Chattin*, p. 292, para. 22.
[219] *Ballistini*, p. 20.
[220] *Joseph F. Rihani*, p. 254.
[221] *Joseph F. Rihani*, p. 258.

239.  There is unanimous agreement by scholars that undue delay in the exercise of justice is a separate type of denial of justice[222].

240.  As early as the *Fabiani*[223] case discussed *supra*, international tribunals have agreed that "justice delayed is justice denied". It is widely recognized that undue delay amounts to a denial of due process[224].

241.  It is common ground that there is no abstract manner of determining whether a particular period constitutes reasonable delay but each case should be scrutinized under the specific facts[225]. For example, in *Pey Casado*[226], a period of seven years without rendering a first instance decision by local courts amounted to a denial of justice. In *El Oro Mining and Railway Co.*[227], the Great Britain and Mexico Claims Commission found that the passage of nine years without a hearing in its case for compensation for having provided materials to the government, constituted a denial of justice. However, in *Oostergetel*, the length of local proceedings of two years was found not to be in breach of the international minimum standard[228].

242.  The tribunal in *Chevron* devised a widely recognized test for denial of justice for undue delay: it found that "some of the factors that may be considered are the complexity of the case, the behaviour of the litigants involved, the significance of the interests at stake in the case, and the behaviour of the Courts themselves"[229].

243.  The *Chevron* test was followed by the tribunal in *Oostergetel*[230].

244.  Similarly, the more recent *Toto Construzioni*[231] decision, discussed in detail by both Parties in their submissions, has stated that[232]:

> "There is not, under international law, a specific measure by which lapses of time may be condemned as excessive: the lapse is to be considered on a case-by-case

---

[222] For example, Paulsson states that "No serious international lawyer contests either of the first two [types of denial of justice]", with reference to denial of access to justice and denial of justice for undue delay. Paulsson Lecture, p. 30.

[223] *Fabiani*, pp. 4902 and 4904: "by encouraging a debtor's ill-founded opposition has, if not refused to decide, at the very least provoked an unjustified delay […] this last denial of justice alone would be sufficient to justify the diplomatic intervention and guarantee an award on damages against the Defendant State".

[224] See e.g., *Al-Bahloul*, para. 221, Oostergetel, pp. 73-77.

[225] *Toto Construzioni*, para. 155.

[226] *Pey Casado*, para. 659.

[227] *El Oro Mining*, p. 191, para. 9.

[228] *Oostergetel*, paras. 208, 290.

[229] *Chevron I*, para. 250.

[230] *Oostergetel,* para. 290.

[231] CM, para. 342, RR, para. 249, citing *Toto Costruzioni*.

[232] *Toto Costruzioni*, para. 163.

*Lion Mexico Consolidated v. Mexico*
ICSID Case No. ARB(AF)/15/2
Award

basis, taking into account (i) the complexity of the matter; (ii) the need for celerity of decision; and (iii) the diligence of claimant in prosecuting its case."

## 1.3 STANDARD

245.  The Tribunal has already noted that denial of justice has been conceived by international customary law and that there is no treaty formula under the NAFTA (and most treaties for that matter) which can offer guidance on which judicial actions attributable to States amount to *justitia denegata.* Additionally, the Tribunal has decided that denial of justice can only be procedural.

246.  The question remains, however: how to differentiate between procedural decisions properly adopted by local Courts, which are contrary to the alien's interests, and those which amount to an international wrong and engage the responsibility of the State. To clarify this issue the Tribunal shall undertake a brief analysis of some of the major denial of justice cases[233] starting with those of the 19th/20th century (**A.**), then it shall continue with more recent decisions (**B.**), present the Parties' positions (**C.**) and reach a conclusion (**D.**).

## A.  Late 19th and early 20th century cases

247.  At the turn of the 19th and 20th centuries, there was a proliferation of denial of justice decisions that still today serve as guidance for investment tribunals. On the other hand, certain ideas of the concept of denial of justice developed under these early decisions have been superseded[234].

248.  In *Cotesworth & Powell*, a decision from 1875, the international tribunal found multiple instances of denial of justice. A sentence of classification in bankruptcy proceedings was deemed unjust for illegally excluding claimants as common creditors and failing to notify them of the proceedings[235]. Additionally, a sentence issued without hearing the claimants in the case as plaintiffs in the suit was also found to constitute denial of justice[236]. Another denial arose from a one-year delay in notifying an important judicial sentence[237]. Finally, the tribunal identified a conflict between decisions made by the same courts[238].

---

[233] The Tribunal has excluded cases with negative finding of denial of justice, where the denial of justice was administrative rather than judicial, and where the basis for the judgment was judicial expropriation. Only analysing positive findings of judicial denial of justice and excluding instances of judicial expropriation, makes the vast majority of the case law discussed by the Parties inapposite.
[234] See paras. 253-255, *infra.*
[235] *Cotesworth & Powell*, p. 188, para. 2.
[236] *Cotesworth & Powell*, p. 188, para. 5.
[237] *Cotesworth & Powell*, p. 188, para. 5.
[238] *Cotesworth & Powell*, p. 180, para. 2, p. 188, para. 5.

249. *Idler*, a case decided in 1890, concerned the use of an obscure legal remedy from medieval times, which allowed the reversal of any judgments or proceedings detrimental to the government, used by the State to annul previous Court decisions favourable to the alien. The US-Venezuela Commission found that the singular invocation of this ancient remedy by the Supreme Court of Venezuela served to circumvent enforcement of the decisions in favour of the alien and thus constituted a denial of justice[239]. The Commission also found that the claimant was denied justice because the notice of proceedings he was given made it impossible for him to appear in court[240].

250. In *Fabiani*, a case from 1896, Venezuela was held responsible for denial of justice, because its courts refused to enforce an arbitral award of a French national against his Venezuelan partners due to strictly procedural arguments, which amounted to a "disguised refusal to rule" ("*refus déguisé de statuer*"[241]). The arbitrator also found that the claimant was subjected to undue delay[242].

251. In *Ballistini*[243], a decision of the French-Venezuelan Commission of 1902, a Venezuelan judge wrongfully rendered judgment for calumny and injuries against a foreigner. When Mr. Ballistini sued the judge, who apparently had issued an arbitrary decision to arrest him, the same judge withheld the necessary documentary evidence, making it impossible for Mr. Ballistini to make an effective case before local courts. The Commission found that the claimant had been denied justice:

> "[b]ecause the local authorities deprived Ballistini of the legal means of instituting before the competent tribunals the actions which the laws would authorize him in case he might improperly have been condemned to a criminal judgment"[244].

252. In the *Chattin* case of 1928, the American-Mexican Claims Commission found a denial of justice. Mr. Chattin was arrested illegally and sentenced to two years of jail for embezzlement on the basis of spurious evidence, in a trial in which he was not duly informed regarding the charges brought against him and in which the Court hearings lasted as little as five minutes[245]. This was a landmark decision regarding basic procedural guarantees to be afforded to foreigners.

---

[239] *Ibid.*, pp. 161, 164.
[240] *Idler*, pp. 152-153.
[241] *Fabiani,* pp. 4900, 4904.
[242] *Ibid.*, p. 4904.
[243] *Ballistini*, p. 20.
[244] *Ibid.*, p. 20, para. 3.
[245] *Chattin*, p. 290, para. 15.

<u>The *Neer* case and the subjective element of denial of justice</u>

253. One of the traditionally recognized leading cases on denial of justice is the 1926 award of the US-Mexico General Claims Commission in *L. F. H. Neer and Pauline Neer*. In its decision, the US-Mexico Commission laid out its standard[246]:

> "[T]he treatment of an alien, in order to constitute an international delinquency, should amount to an outrage, to bad faith, to wilful neglect of duty, or to an insufficiency of governmental action so far short of international standards that every reasonable and impartial man would readily recognize its insufficiency".

254. The imprint made by *Neer* on the concept of denial of justice has been palpable in investment arbitration awards[247]; however, it appears that the reliance on the case has rightfully declined in the recent years.

255. The *Mondev* tribunal was correct in stating that the facts in *Neer* were centred on a State's alleged failure to carry out an effective police investigation into a foreigner's murder, and are not apposite when discussing treatment of aliens under the FET standard[248]. As the *Azurix* tribunal found[249]:

> "the traditional *Neer* formula … reflects the traditional, and not necessarily the contemporary, definition of the customary minimum standard, at least in certain non-investment fields".

256. Other tribunals have agreed that the *Neer* standard may have reflected the minimum standard – but only as of 1927 and not in contemporary times[250].

257. Similarly, Paulsson writes that

> "there should be no doubt that, to the extent that customary-law minimum standard has any role to play in the interpretation of investment treaties, the *Neer* formula is of limited import"[251].

---

[246] *Neer,* p. 60.
[247] *E.g.*, *Glamis Gold* at para. 22.
[248] *Mondev*, para. 115.
[249] *Saluka*, para. 295.
[250] See e.g., *Azurix*, para. 372, *Mondev*, paras. 116-117.
[251] J. Paulsson, G. Petrochilos, "Neer-ly Misled?", *Miami Law Research Paper Series*, p. 257.

258. An additional reason why the *Neer* standard has become less relevant is that it explicitly requires the finding of bad faith[252]. This notion has been rejected by NAFTA decisions concerning denial of justice[253], and authors alike[254].

### B.     Recent denial of justice decisions

259. The Parties have not drawn the Tribunal's attention to any NAFTA decision with a positive finding of denial of justice.

260. The Tribunal will briefly analyse *Mondev* and *Loewen*, the two major cases discussed by the Parties. The Tribunal shall also discuss *Dan Cake* – a very recent award finding for denial of justice in a non-NAFTA case.

The *Mondev* case

261. The *Mondev* case (2002) concerned a failed investment in the USA by a Canadian construction company and involved a claim that the local authorities prevented the claimant from exercising an option to purchase a certain parcel of land. When the claimant filed a case before US courts, the jury found against the local authorities, a decision which was later overturned on appeal. The claimant then failed to obtain a judgment in its favour from the Massachusetts Supreme Court and the US Supreme Court rejected the case by not granting *certiorari*. According to the claimant, the Massachusetts Supreme Court deviated from its previous rulings to the extent that it had in effect applied "a new rule".

262. The *Mondev* tribunal did not find that denial of justice had occurred as, in any common law jurisdiction, one may and should expect "new" judge-made law and the decisions taken by the US courts were not "extreme cases" that would amount to a denial of justice.

263. The *Mondev* tribunal found that denial of justice would require[255]:

> "a wilful disregard of due process of law, […] which shocks, or at least surprises, a sense of judicial propriety".

---

[252] Exh. CLA-277, "[t]he treatment of an alien . . . should amount to an outrage, to bad faith, to willful neglect of duty, or to an insufficiency of governmental action so far short of international standards that every reasonable and impartial man would readily recognize its insufficiency" [Emphasis added], *Neer*, pp. 61-62.
[253] See e.g., *ADF*, para. 181, *Mondev*, paras. 116-117, *Loewen*, para. 132, *CMS*, para. 280, *Glamis Gold*, para. 627.
[254] See e.g. Paulsson Lecture, pp. 34-35, Opinion of Christopher Greenwood, Q.C. of March 26, 2001 (on the denial of justice under international law) in *Loewen*, para. 64.
[255] *Mondev*, para. 127 (footnote omitted).

264. Its analysis did not end here, however. The tribunal continued to explain that[256]:

> "The Tribunal would stress that the word "surprises" does not occur in isolation. The test is not whether a particular result is surprising, but whether the shock or surprise occasioned to an impartial tribunal leads, on reflection, to justified concerns as to the judicial propriety of the outcome, bearing in mind on the one hand that international tribunals are not courts of appeal, and on the other hand that Chapter 11 of NAFTA (like other treaties for the protection of investments) is intended to provide a real measure of protection. In the end the question is whether, <u>at an international level and having regard to generally accepted standards of the administration of justice, a tribunal can conclude in the light of all the available facts that the impugned decision was clearly improper and discreditable, with the result that the investment has been subjected to unfair and inequitable treatment</u>. This is admittedly a somewhat open-ended standard, but it may be that in practice no more precise formula can be offered to cover the range of possibilities". [Emphasis added].

265. *Mondev* also determined that the threshold for establishing treatment in violation of the FET standard had evolved in the past century and that currently it does not require subjective elements on the part of the Host State such as bad faith[257]:

> "To the modern eye, what is unfair or inequitable need not equate with the outrageous or the egregious. In particular, a State may treat a foreign investment unfairly and inequitably without necessarily acting in bad faith [...] the content of the minimum standard today cannot be limited to the content of customary international law as recognised in arbitral decisions in the 1920s".

The *Loewen* case

266. In *Loewen* (2003), the other major case discussed by the Parties, a Canadian funeral home conglomerate challenged a Mississippi State Court jury award of USD 100 M in compensatory damages and USD 400 M in punitive damages on claims that included fraud and violations of Mississippi antitrust law. The claimant argued that, apart from the egregious damages decision by the Mississippi State court, it was also wronged by the application of civil procedure rules requiring it to post USD 625 M to stay execution of the judgment pending appeal.

267. Interestingly, the investment tribunal appeared to lean towards finding that claimant was indeed denied justice under the facts of the case[258]:

> "After all, we have held that judicial wrongs may in principle be brought home to the State Party under Chapter Eleven, and have criticised the Mississippi

---

[256] *Ibid.*
[257] *Mondev*, paras. 116 and 123
[258] *Loewen*, para. 241.

proceedings in the strongest terms. There was unfairness here towards the foreign investor".

268. The *Loewen* tribunal used the following test, according to which denial of justice amounts to[259]:

> "[m]anifest injustice in the sense of a lack of due process leading to an outcome which offends a sense of judicial propriety"

269. *Loewen* also endorsed the *Mondev* view that under contemporary international customary law, bad faith or malicious intent is not required for a denial of justice[260]:

> "Neither State practice, the decisions of international tribunals nor the opinion of commentators support the view that bad faith or malicious intention is an essential element of unfair and inequitable treatment or denial of justice amounting to a breach of international justice".

270. However, the *Loewen* tribunal ultimately found that the claimant had failed to exhaust all available local remedies when it decided to reach a settlement rather than pursue its case before the US Supreme Court[261].

271. Apart from the claimant not having exhausted the available local remedies, Loewen's claims were dismissed for lack of standing, due to claimant's buyout by a company of the Host State (which led to claimant losing its status as a foreign investor under the NAFTA).

272. The Parties have dedicated a lengthy discussion to the *Mondev* and *Loewen* decisions. The Tribunal observes that these cases may offer assistance regarding the applicable standard of denial of justice in the abstract. The underlying facts of those cases, however, substantially differ from the ones in this case.

The *Dan Cake* case

273. In a recent non-NAFTA decision of 2015, the *Dan Cake* tribunal found denial of justice: under Hungarian law the claimant's enterprise, that was in liquidation, was entitled to convene a composition hearing in order to seek an agreement with its creditors. Instead of following the established procedure, the Metropolitan Court of Budapest ordered claimant to submit a number of documents not required by law, and which the claimant was unable to provide. The tribunal considered that such order was

---

[259] *Loewen*, para. 132.
[260] *Loewen*, para. 132.
[261] *Loewen*, para. 217.

unnecessary and that it prejudged and denied the claimant's right to seek an agreement with its creditors[262].

274. Based on these grounds and taking into account that there was no appeal from the Court's order[263], the tribunal found that the Court's conduct "[did] shock a sense of judicial propriety[264]" and that thus claimant had been denied justice.

### C.   The position of the Parties and the Non-Disputing Parties

275. The Tribunal shall briefly summarize the positions of Claimant and Respondent on the applicable standard for denial of justice. The Tribunal will also review the Non-Disputing Parties' observations on this matter in their NAFTA Art. 1128 submissions.

Claimant's position

276. Claimant argues that with respect to procedural denial of justice, the Tribunal should follow the *Oostergetel* tribunal and apply a standard that the procedural irregularities be "severe" and affect the outcome of the dispute and that any undue delay be "excessive"[265].

277. Lion also claims that it is sufficient for it to prove that Mexico's courts failed to remedy the prior denial of justice, which consisted in the service of process made in a manner inconsistent with the applicable international standards and local law[266].

278. Lion also attacks the *Mondev* standard proposed by Respondent by stating that the decision was based on an incorrect legal basis: that of arbitrariness rather than denial of justice[267].

Mexico's position

279. Respondent in turn argues that a single very high standard should apply to all types of denial of justice[268]. This single standard for the finding of denial of justice should be based on the *Mondev* case[269]:

> "[…] a wilful disregard of due process of law, … which shocks, or at least surprises, a sense of judicial propriety."

---

[262] *Dan Cake*, para. 146.
[263] *Dan Cake*, para. 55 and 154.
[264] *Dan Cake*, paras. 145-146.
[265] CR, para. 410, citing *Oostergetel*, paras. 286-290.
[266] CR, paras. 422-425, 475.
[267] CR, para. 399.
[268] RR, paras. 185-186, 194.
[269] RR, para. 173, RCM, para. 150, citing *Mondev*, para. 127.

280. According to Mexico, the *Mondev* tribunal was not wrong in referring to arbitrariness as part of NAFTA's Art. 1105 minimum standard of treatment. What the tribunal in *Mondev* did was to hold the criterion of arbitrariness "useful in the context of denial of justice"[270], while fully acknowledging the difference between the two.

281. Mexico emphasizes that the standard for denial of justice is very high, summarizing its scope in the following words[271]:

> "The threshold to establish denial of justice is very high – e.g. requiring a 'notoriously unjust' or 'egregious' administration of justice 'which offends a sense of judicial propriety'. It does not suffice to establish that domestic adjudicators have erred, or misapplied or misinterpreted domestic law".

The USA's position

282. In its submission the USA explicitly identifies the denial of justice threshold as high[272], due to the principle of judicial independence, the particular nature of judicial action and the unique status of the judiciary in both international and municipal legal systems[273]. International tribunals should accord deference to domestic courts, whose judgments are presumed to be regular under international law to a higher degree than the actions of a State's legislative or administrative branch[274].

283. The USA provides examples for denial of justice: an "obstruction of access to courts" or a "failure to provide those guarantees which are generally considered indispensable to the proper administration of justice[275]".

284. The USA emphasizes the argument that domestic court decisions, or misapplications or misinterpretation of domestic law, do not in themselves constitute a denial of justice under customary international law[276].

Canada's position

285. Like the USA, Canada advocates for a high standard for denial of justice claims and evokes the traditional standard of Court actions or omissions being "extremely gross" or "egregious" or amounting to "an outrage, bad faith, wilful neglect of duty, or

---

[270] *Mondev*, para. 127.
[271] RCM, para. 147.
[272] USA Submission, para. 8.
[273] *Ibid*.
[274] USA Submission, para. 8.
[275] USA Submission, para. 19, citations omitted.
[276] USA Submission, para. 7.

insufficiency of action apparent to any unbiased man"[277]. The high standard is amplified by the need of international tribunals to defer to local Courts[278].

286.   Canada lists as examples of denial of justice instances where there has been

> "a refusal to entertain a suit or serious failure to adequately administer justice or if there has been a 'clear and malicious misapplication of the law' or if the judgment in question is so patently egregious that 'it is impossible for a third party to recognize how an impartial judge could have reached the result in question".[279]

## D.   The Tribunal's view

287.   The very high standard adopted by *Mondev* has been endorsed by a multitude of tribunals, NAFTA[280] and non-NAFTA[281] alike. The Tribunal also notes that the test has been proposed by Respondent[282] and endorsed by both Non-Disputing Parties[283].

288.   The Tribunal accepts the *Mondev* standard as a guide to adjudicate Lion's denial of justice claim. However, some precisions are required in light of the arguments presented by the Parties.

289.   The starting point for the tribunal in *Mondev* was the *ELSI* judgement. In this case the ICJ assessed the concept of "arbitrariness" under the Treaty of Friendship, Commerce and Navigation between the USA and Italy, in the context of a dispute concerning the requisition and forced liquidation of an insolvent Italian company wholly owned by a US corporation. In this setting the ICJ stated that arbitrariness was[284]:

> "a wilful disregard of due process of law, an act which shocks, or at least surprises, a sense of juridical propriety".

290.   The *Mondev* tribunal replicated the above statement[285]. Taking this isolated sentence, Mexico has suggested that a finding of denial of justice requires "evidence of intention or malice, collusion, corruption, or flagrant abuse by the Respondent's judicial system"[286].

---

[277] Canada Submission, para. 5, citations omitted.
[278] Canada Submission, paras. 5-7.
[279] Canada Submission, para. 5, citations omitted.
[280] E.g., *Loewen*, para. 133, *Waste Management*, paras. 95, 98.
[281] E.g., *Chevron II*, para. 8.35, *Dan Cake*, para. 146, footnote 18.
[282] RR, para. 173, RCM, para. 150.
[283] USA Submission, para. 7, Canada Submission, para. 6.
[284] *ELSI*, para. 128.
[285] *Mondev*, para. 127.
[286] RR, para. 9. See also RR, paras. 223, 230.

291. The Tribunal does not agree with Mexico's conclusion, which is only the result of an incomplete reading of the *Mondev* standard.

292. The *Mondev* tribunal acknowledge that the *ELSI* standard was defined in the context of evaluating arbitrariness, but considered it useful in further defining the test for denial of justice[287]. The tribunal continued stating that for denial of justice[288]:

> "… the test is not whether a particular result is surprising, but whether the shock or surprise occasioned to an impartial tribunal leads, on reflection, to justified concerns as to the judicial propriety of the outcome…".

293. The tribunal continued to frame this test within the standard of FET under Article 1105(1) of NAFTA[289]:

> "In the end the question is whether, at an international level and having regard to generally accepted standards of the administration of justice, a tribunal can conclude in the light of all the available facts that the impugned decision was clearly improper and discreditable, with the result that the investment has been subjected to unfair and inequitable treatment".

294. In defining the test for denial of justice, nowhere does the *Mondev* tribunal allude to a subjective element. Moreover, in assessing international liability of the Contracting States under Article 1105(1) of NAFTA, the tribunal explicitly rejected this possibility[290]:

> "To the modern eye, what is unfair or inequitable need not equate with the outrageous or the egregious. In particular, a State may treat foreign investment unfairly and inequitably without necessarily acting in bad faith" [Emphasis added].

295. Other NAFTA tribunals have endorsed this view[291]. For instance, the *Glamis Gold* tribunal stated[292]:

> "The Tribunal emphasizes that, although bad faith may often be present in such a determination and its presence certainly will be determinative of a violation, a finding of bad faith is not a requirement for a breach of Article 1105(1).

296. The Tribunal agrees: a wilful and intentional illicit conduct by local Courts may serve as the grounds for a finding of denial of justice. Wilful intent thus, might be an

---

[287] *Mondev*, para. 127.
[288] *Ibid.*
[289] *Mondev*, para. 127.
[290] *Mondev*, para. 116.
[291] E.g., *ADF*, paras. 180-181, citing the *Mondev* award, *Eli Lilly*, para. 222 endorsing the standard from *Glamis Gold*.
[292] *Glamis Gold*, para. 627.

accessory element in discerning whether denial of justice has occurred, but it is not a necessary requirement.

297.   The *Loewen* tribunal used a similar test, stressing that denial of justice is procedural[293]:

> "[m]anifest injustice in the sense of a lack of due process leading to an outcome which offends a sense of judicial propriety".

298.   *Loewen* also endorsed the *Mondev* view that under contemporary international customary law, bad faith or malicious intent is not required for a denial of justice claim, framed within the Fair and Equitable Treatment of Article 1105(1) NAFTA[294]:

> "Neither State practice, the decisions of international tribunals nor the opinion of commentators support the view that bad faith or malicious intention is an essential element of unfair and inequitable treatment or denial of justice amounting to a breach of international justice".

\* \* \*

299.   <u>In conclusion</u>, the test is an objective one: denial of justice requires a finding of an improper and egregious procedural conduct by the local courts (whether intentional or not), which does not meet the basic internationally accepted standards of administration of justice and due process, and which shocks or surprises the sense of judicial propriety.

## 2.   CLAIMANT'S POSITION

300.   Lion says that Mexico breached its duty to treat it in a fair and equitable manner through denying Lion justice in its pursuit of legal remedies against the Debtors: Claimant argues that it was not accorded proper due process rights, since first, it was not granted the opportunity to be heard and then, it was deprived of the legal means to defend its rights (**2.1.**); Lion also maintains that it suffered undue delay in the local proceedings (**2.2.**); finally, Lion argues that it complied with the exhaustion of local remedies rule (**2.3.**).

## 2.1   CLAIMANT WAS DENIED DUE PROCESS

301.   Claimant argues that it was denied justice through the violation of its due process rights by being barred access to justice (**A.**) and being prevented from presenting its case before local courts and marshalling evidence to support it (**B.**).

---

[293] *Loewen*, para. 132.
[294] *Loewen*, para. 132.

### A.    Lion was denied access to justice

302. Claimant was denied the chance to participate before the *Juez de lo Mercantil* because it was never properly served.

303. Under Mexican law, proper notification by a Court is subject to making certain ("*cerciorarse*") that the defendant indeed resides in the place where service is made; the service confirmation should explain the reason that led the Court to be certain ("*convencimiento*")[295]. This obligation is enshrined in Arts. 111, 112 and 112 bis, of the Civil Procedure Code of Jalisco ["**CPC Jalisco**"][296]. Additionally, Art. 279 of CPC Jalisco requires the *Juez de lo Mercantil* to "examine the legality of the service of process" ("*examinará la legalidad del emplazamiento*") before declaring Lion in default[297].

304. Lion argues that Mexico clearly failed to comply with these provisions.

305. *First*, the Court based the citation address solely on the domicile indicated by the plaintiff, designated in the Forged Settlement Agreement – a document which was not an original and bore no original signatures. This notwithstanding, the Court accepted the false information without further research[298].

306. *Second* the Court's *actuario* failed to "include particular reasons or objective proof"[299], and to indicate the means upon which Lion's domicile was corroborated; apparently, the Court's *actuario* only relied on the word of the person served, Lic. José Isaac López Medina, although he provided no indication or proof of his position at Lion nor any evidence that he had representation powers[300]. According to Claimant, the *Juez de lo Mercantil* acted erroneously and failed to exercise diligence to ensure that Lion was properly served[301].

307. *Third*, Lion avers that notification by *cédula* was inappropriate given the circumstances of the case[302]. According to Lion, notification by judicial bulletins or boards amounts to fictitious service of process, which is clearly inconsistent with the treatment to be given to a foreign company[303]. Service on Claimant by the *Juez de lo Mercantil* was

---

[295] CR, para. 450.
[296] CM, para. 328.
[297] CR, para. 452, citing CPC Jalisco, Art. 279.
[298] CR, para. 453, citing Exh. C-73.
[299] Zamora I, para.149, footnote 202, judicial precedent (first version), «debe expresar las razones particulares o medios de convicción […] tanto objetivos (aquellos que aprecie directamente el funcionario), como subjetivos (los que le sean proporcionados por otras personas), para tener la certeza […], ya que si carece de tales datos, no puede sostenerse jurídicamente la legalidad del emplazamiento» quoted by Claimant in CM, para. 236.
[300] CR, paras. 87-90; CM, para. 327.
[301] CR, para. 103, CM, para. 328.
[302] CR, para. 461-475.
[303] CR, para. 462.

inconsistent with two international treaties to which Mexico is party – the Inter-American Convention on Letters Rogatory (with its Additional Protocol) and the Hague Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters[304] – personal service to Lion should have been made via an international cooperation mechanism[305].

308. *Furthermore*, Claimant reinforces its argument by stating that a different standard for service was employed by judicial personnel with regard to the Debtors. For example, Claimant observes that while in average, it took a Court in Mexico 42 days to admit and serve a lawsuit[306], the *Juez de lo Civil* failed to serve the *Juicio Hipotecario* on Inmobiliaria Bains for more than three years, and at the same time required only 22 days to serve the incorrect *emplazamiento* on Lion[307].

309. *Finally*, Lion avers that it was limited in its pursuit of justice before local Courts, because it was barred from bringing an ordinary appeal against the Cancellation Judgment, due to an incorrect decision by the *Juez de lo Mercantil* granting said Judgment *res judicata* effect in only 42 days, at the request of the Debtors[308].

### B.    Claimant was deprived of its right to exercise means of defense

310. Claimant says that it was not allowed to properly defend itself. Respondent denied it access to justice through its Courts' continuous failure to scrutinize the authenticity of the forged documents[309]:

311. *First*, the *Juez de lo Mercantil* should have looked *ex officio* into the nature of the Forged Settlement Agreement and the documentation indicating that Lion was a foreign company[310] before declaring Lion in default[311].

312. *Second*, Mexico's Courts have denied Lion the opportunity to prove the forgery. Lion submitted the *ampliación de demanda* as soon as it gained knowledge of the facts underlying the forgery and cannot be blamed for not having raised the issue *ab initio*[312]. In Claimant's view, lack of service is a breach of such a magnitude under Mexican law that the *Juez de Distrito* should have allowed all evidence and arguments that are necessary to prove the circumstances of the allegedly illegal service[313], yet the *Juez de*

---

[304] CR, paras. 438-446.
[305] CR, paras. 446-447.
[306] CM, para. 40, citing Exh. CLA-137.
[307] CM, para. 40.
[308] CPHB, para. 79; CM, paras. 270, 393.
[309] CM, paras. 344-350.
[310] CR, para. 101, citing Zamora IV, para. 86.
[311] CR, paras. 104-106.
[312] CR, paras. 135-139.
[313] CR, para. 153.

*Distrito* dismissed any evidence pointing to the falsehood of the *emplazamiento*[314]. And then the *Juez de Distrito*'s decision in the remand *Amparo* refused to admit Sr. Arechederra's testimony, thereby depriving Lion of the principal evidence that could prove that the person alleged to have signed the False Amparo did not do so[315].

313. *Third*, none of Mexico's Courts seized of Lion's proceedings ruled on the authenticity of the Forged Settlement Agreement. The *Juez de Distrito* refused to decide on the issue[316]; the *Tribunal de Queja* refused as well[317], ruling that the question should be resolved after the False *Amparo* issue was decided in the Remand *Amparo*; and finally the *Juez de Distrito* refused[318], understanding that the *Tribunal de Queja* had excluded from the admissible evidence the evidence concerning the falsehood of the Forged Settlement Agreement[319]. Ultimately, Lion's *Amparo* claim was thus frustrated.

## 2.2 MEXICO'S UNREASONABLE DELAY IN ADMINISTERING JUSTICE

314. According to Claimant, Mexico's Courts failed to decide Lion's *Amparo* claim within a reasonable time.

315. Claimant avers that the time required for the resolution of the *Amparo* lawsuit was at odds with the usual duration of such proceedings in Mexico. According to the statistics from the Mexican *Consejo de la Judicatura Federal*, the *Amparo* lawsuit took almost four times as long as the average for the same year[320].

316. To determine if this delay is unreasonable and amounts to a denial of justice, international tribunals consider three features[321]:

- The complexity of the matter: Claimant maintains that the claim submitted to the *Juez de Distrito* and the *Tribunal de Queja* was not complex; given that the service was performed at the address and to the person mentioned in the Forged Settlement Agreement, there was only one issue to be decided by the Courts in order to determine whether Lion was properly served – was the Forged Settlement Agreement authentic?[322] Claimant states that under normal circumstances, the authenticity of a document is a factual issue that is disposed of preliminarily as a procedural incident[323].

---

[314] CR, para. 152.
[315] CM, para. 379.
[316] CR, paras. 130-141.
[317] CR, paras. 146-147.
[318] This time in the Remand *Amparo*.
[319] CR, paras. 155-157, CM, para. 379.
[320] CM, para. 376.
[321] CM, para. 342, 364.
[322] CM, para. 366.
[323] CM, para. 369.

- The procedural diligence of the interested parties: Claimant did not cause any undue delay through its actions during the Real *Amparo* proceedings[324]; as soon as it learned of the existence of the Forged Settlement Agreement, it filed a petition to challenge its authenticity[325].

- Whether celerity is especially warranted to avoid harm generated in the legal situation of the person involved in the process: Lion submits that celerity was essential because the *Amparo* claim, as a remedy to ultimately prevent the cancellation of the Mortgages, would become ineffective as time went by[326].

317. On a separate note, Claimant compares the delay in its claims with the unusual speed of the Cancellation Judgment, which deprived it of its investment in Mexico[327].

**2.3    CLAIMANT COMPLIED WITH THE EXHAUSTION OF LOCAL REMEDIES RULE**

318. Claimant begins by stating that under international law, the State arguing that a party has failed to exhaust local remedies has the burden to prove the existence, availability and adequacy of such remedies[328], and Mexico has failed to discharge this duty.

319. According to Lion, it fully complied with the exhaustion requirement as it did pursue all adequate remedies available to it[329] (**A.**)

320. Notwithstanding, Lion was not required to exhaust all local remedies because:

- The remedies available were inadequate, ineffective and their exhaustion unreasonable[330] (**B.**), and

- A denial of justice for undue delay claim is not subject to the exhaustion requirement[331] (**C.**).

---

[324] CM, para. 374.
[325] CM para. 132.
[326] CM, para. 370-371.
[327] CPHB, paras. 79-80.
[328] CM, p. 390, citing *ELSI*, at p. 47, para. 62 ("*it was for Italy to show, as a matter of fact, the existence of a remedy which was open to the United States stockholders and which they failed to employ*"), *Diallo*, p. 600, para. 44, ("[*i*]*t is for the respondent to convince the Court that there were effective remedies in its domestic legal system that were not exhausted 1.... Thus, in the present case 1...]; it is, on the other hand, for the DRC to prove that there were available and effective remedies in its domestic legal system against the decision to remove*").
[329] CR, para. 420-421.
[330] CR, paras. 506-520.
[331] CM, paras .392, 394.

### A. Lion's claims did not require further action before Mexico's courts

321. Lion argues that the exhaustion of local remedies rule applies to those domestic recourses that are likely to be successful. In the case at hand, the remedies to be exhausted would be those which could reinstate the Mortgages to Lion; and Lion did pursue them[332]. Lion was not required to initiate any proceedings other than the *Amparo* as it was not feasible for it to launch the *juicio de nulidad*, which offered inferior protection to the Amparo route. The criminal proceedings did not offer appropriate protection either.

322. Claimant elaborates on the concept of 'original judicial misconduct'[333] and distinguishes between the initial wrong, the denial of justice and the exhaustion of local remedies, which requires the exhaustion of all adequate available remedies[334]. Following this threefold concept, Claimant avers that in the present case:

    - The initial wrong would be the Debtors' fraudulent actions;

    - The denial of justice would be the breach of Lion's right to be heard by the *Juez de lo Mercantil* and

    - What followed after the Cancellation Proceeding (i.e., the *Amparo* Proceeding, the Revision Appeal Proceeding and the Remanded Proceeding) is the exhaustion of local remedies, where the "system" failed to correct the initial miscarriage of justice[335].

323. Lion argues that, since all three elements were met, it did in fact exhaust the adequate available local remedies, thus complying with the exhaustion rule under international law[336].

### B. Lion was exempted from exhausting available local remedies

324. In any event, Claimant states that, under international law, it was exempted from the exhaustion rule as the local remedies were inadequate, ineffective and their exhaustion unreasonable[337].

---

[332] CM, p. 400.
[333] CR, para. 417 citing *Cotesworth & Powell*, p. 175.
[334] CR, paras. 418-419.
[335] CR, paras. 420-420.
[336] CR, para. 421.
[337] CPHB, paras. 226-230.

325. Lion uses the *Loewen* standard, stating that only "remedies which are effective and adequate and are reasonably available to the complainant in the circumstances in which it is situated" must be exhausted[338].

326. According to Claimant, the rule provides that only effective remedies, i.e., those providing a reasonable possibility of an effective remedy, must be exhausted and such effectiveness is to be assessed in light of the circumstances in advance of resorting to the remedy (*ex ante*), rather than in light of the actual outcome of the case and in light of the nature of the violation the remedy is aimed at correcting[339].

327. *Secondly*, only those remedies which can reasonably be demanded from the investor are to be exhausted. In the present arbitration, the remedies available to Lion were neither effective nor reasonable[340]:

- Lion's secured returns on its investments were declining every day and Lion would never be made whole because the Debtors' indebtedness continued to grow and exceeded the value of the collateral;

- Pursuing the Remand *Amparo* would have been unreasonably inefficient and would likely have taken more than three additional years.

### C.   Denial of justice for undue delay does not require exhaustion

328. Claimant invokes the ILC Draft Articles on Diplomatic Protection to state that under customary international law, local remedies do not need to be exhausted when there is undue delay in obtaining justice and this delay may be attributed to the Host State[341].

329. Lion therefore submits that its denial of justice for undue delay claim is exempted from the exhaustion requirement[342].

### 3.   MEXICO'S POSITION

330. Mexico avers that Lion was not denied access to justice as it was given proper opportunity to be heard and to exercise its right of defense (**2.1.**). Additionally, there was no unreasonable delay in the Courts' proceedings (**2.2.**). Even if the Tribunal finds that Lion was denied justice, its claim should fail as it did not comply with the exhaustion of local remedies requirement (**2.3.**). Finally, Mexico presents a list of preliminary objections to Lion's claims (**2.4.**).

---

[338] CPHB, para. 226, citing *Loewen*, para. 168.
[339] CPHB, para. 227; RR, paras. 511-512; CM, paras. 403-404.
[340] CPHB, para. 227; CM, pp. 405 and 410.
[341] CM, para. 394, citing I.L.C. Draft Articles on Diplomatic Protection, Art. 15, Exh. CLA-284.
[342] CM, paras. 394 and 396

**3.1   RESPONDENT FULLY ACCORDED CLAIMANT PROCEDURAL DUE PROCESS**

331. Respondent argues that Lion was neither denied access to justice (**A.**) nor barred from defending its case and presenting documents to support it (**B.**).

### A.   Mexico's judiciary did not deny Claimant the opportunity to be heard

332. According to Mexico, Claimant's allegations that the *Juez de lo Mercantil* failed to properly serve it are mistaken[343]:

333. *First*, Mexico is also a victim of the Forged Settlement Agreement[344]. The *actuario* had no reason to doubt the authenticity of the Forged Settlement Agreement. Under Mexican law, a Judge has the obligation to verify that the document that serves as the basis for the legal action is compliant, but the Judge lacks power to question its authenticity[345]. According to Respondent, Claimant has provided no evidence to suggest that the *Juez* knew or should have known that the contact information was false[346]. Claimant also ignores the fact that the *Juez* had no *prima facie* reason not to rely on the documentation before him[347].

334. *Second*, the *actuario*'s duty is limited to making sure "that service takes place at the domicile provided by the claimant"[348]. In this case:

- The *actuario* performed service at the address identified by the plaintiff; this service was directed at the legal representative of Lion, as confirmed by the *actuario*[349].

- On the first attempt of service, dated 3 April, 2012, the *actuario* left a citation with Lic. López Medina ordering the legal representative to be present at a specified date and time to facilitate service; given the legal representative's absence, the *emplazamiento* could be effectuated upon any individual present at the time – in this case, it was Lic. López Medina, who was also identified in the Settlement Agreement as authorized to receive notification on behalf of Claimant[350].

335. The *emplazamiento* was correct: according to the Supreme Court, the *emplazamiento* has to be performed with the legal representative[351] and, if this is not possible, the

---

[343] CM, 70-79.
[344] CRM, 64-65.
[345] RCM, para. 73, citing Ovalle I, para. 87.
[346] RCM, para. 72.
[347] RR, para. 231.
[348] RR, para. 75.
[349] RR, para. 78, citing Ovalle II, para. 37.
[350] RCM, paras. 76-77.
[351] RCM, para. 78.

*actuario* simply has to ask for the legal representative before performing service upon any other person present at the moment[352].

### B.   Claimant was accorded the right to exercise means of defense

336. *First*, if anyone is to be blamed for the Forged Settlement Agreement never being scrutinized by the judicial system in Mexico, it is Lion, whose negligence was the reason why the Courts could not admit the additional evidence[353]: Claimant should have included references to the alleged fraud in its original *Amparo* claim, rather than seeking to introduce them through the *ampliación de demanda* [354].

337. Having failed to include fraud issues, the *Juez de Distrito* followed the law when it adjudicated a claim for improper notification ("*falta de emplazamiento*") rather than a claim for forgery[355]. Therefore, the *Juez de Distrito* was bound to deliver the judgment that it did and Lion cannot claim a denial of justice due to its own negligence in pursuing its claims.

338. In its decision to dismiss the *ampliación de demanda*, the *Secretario del Juzgado de Distrito* acted in accordance with local law, which did not require him to grant Lion an opportunity to cure its procedural defects[356]. It was Lion who failed to demonstrate the necessary link between its claim and the Forged Settlement Agreement[357].

339. When Claimant disagreed with the *Juez de Distrito*'s decision, it exercised its right to challenge it through a review proceeding, but lost[358] due to one more failure to follow procedural law: the *ampliación de demanda* must be signed either by the aggrieved party or by its legal representative[359]. Lion does not appear to contest the fact that it filed its *ampliación de demanda* improperly[360]. Therefore, it was not denied the right to present evidence and defend its case.

340. *Second*, the *Juez de Distrito* in the Remand *Amparo* did not dismiss all of Lion's evidence, but rather explained that some of it was already on the Court's record[361]; in any event, the *Juez de Distrito* was not empowered to admit new evidence in respect

---

[352] RCM, para. 78 citing Exh. RL-39: "*NOTIFICACION A TRAVES DE UNA PERSONA DISTINTA DEL INTERESADO Y A PERSONAS MORALES REQUISITOS EN EL ACTA QUE SE LEVANTE*".
[353] CRM, para. 95, RR, paras. 102 and 103.
[354] RR, para. 245, citing Ovalle II, para. 108.
[355] RR, para. 94-96.
[356] RR, para. 100, citing Ovalle II, para. 91.
[357] RR, para. 102.
[358] RR, para. 105.
[359] RR, paras. 246-247.
[360] RCM, para. 95.
[361] RR, para. 268, with regard to the voicher purporting to prove that Mr. Arechederra could not have signed the False Request for Copies and the *Juez de Distrito*'s decision on the false nature of the False Request for Copies, citing Exh. C-123.

of the authenticity of the Forged Settlement Agreement in the Remand *Amparo* and acted in complete accordance with applicable procedural rules[362].

341.   In conclusion, Claimant cannot claim that the decisions to dismiss the additional evidence were the result of an idiosyncratic or arbitrary decision[363]. By failing to follow the applicable procedural rules, Lion and not Mexico is responsible for Lion's inability to present evidence and defend its case before Mexico's Courts.

**3.2   MEXICO'S COURTS DECIDED LION'S CLAIMS WITHIN A REASONABLE TIME**

342.   Respondent claims that the duration of each of the stages of the *Amparo* Proceeding was reasonable[364]:

-   *First*, the *Amparo* Proceedings took one year to complete, which constitutes an appropriate time given its multiple complexities[365];

-   *Second*, the proceedings before the *Tribunal de Queja* took 16 months to complete, which once again was a justifiable time given the extraordinary complexities involved in it[366];

-   *Third*, the *Juez de Distrito* had only started analysing the Remand *Amparo* and cannot be blamed for not delivering a decision due to Claimant's premature withdrawal from the proceedings[367].

343.   Mexico avers that Claimant still had one or two years of litigation ahead had it chosen to continue, which would not constitute an unusual time given the complexity of the case[368]. Additionally, Lion is equally responsible for any delay as it waited for four years to initiate the *Juicio Hipotecario*[369].

344.   There is nothing in the duration of the proceedings that amounts to a wilful disregard of due process of law, which shocks, or at least surprises, a sense of judicial propriety. Thus, the duration of the local proceedings does not meet the threshold of a denial of justice through unreasonable delay[370].

---

[362] RR, paras. 259-260.
[363] CRM, para. 96.
[364] RR, paras. 250-252.
[365] RR, para. 251.
[366] RR, paras. 261-263.
[367] RR, paras. 273-274.
[368] RPHB, para. 109.
[369] Ibid.
[370] RR, para. 252.

### 3.3   LION FAILED TO EXHAUST LOCAL REMEDIES

345.   Mexico asserts that Lion did not comply with the requirement of the local remedies rule as it did not exhaust all available remedies (**A.**) and no futility exception is applicable (**B.**).

### A.   Claimant did not exhaust all available local remedies

346.   Respondent says that Claimant is improperly using the current arbitration as an appeal of the *Amparo* judgment in lieu of Mexico's domestic legal system[371].

347.   According to Mexico, international law accords the judiciary a greater presumption of regularity and requires a claimant to exhaust local remedies before initiating a denial of justice claim. Otherwise, the host State's judicial system would not have an opportunity to correct itself[372].

348.   Respondent avers that Claimant did not exhaust all available local remedies: it could have and should have initiated a *nulidad de juicio concluido* proceeding and it has also not exhausted the criminal proceedings[373].

349.   Additionally, Respondent emphasizes that a denial of justice may only occur with regard to a State's entire judicial system and not separate judicial acts[374]; a claim of denial of justice can only be based on adjudicative measures that are final. Since Claimant has not exhausted all available options of seeking recourse under Mexican law, it is barred from pursuing a denial of justice claim[375].

### B.   The futility exceptions to the exhaustion rule does not find application in the current case

350.   According to Mexico, the futility standard is high and is not met here[376]. Instances of ineffectiveness and futility include situations where[377]:

-   the local Courts have no jurisdiction over the dispute;

-   the local Courts are notoriously lacking in independence;

---

[371] RR, para. 241.
[372] RCM, para. 169.
[373] RPHB, paras. 116-118, RR, paras. 127-137, Ovalle II, para. 109.
[374] RR, paras. 198-201.
[375] RR, para. 126, RCM, para. 79.
[376] RCM, para. 207.
[377] RCM, para. 206, citing Exh. RL-51, pp. 118-119 citing J. Dugard, "Third Report on Diplomatic Protection to the ILC", *UN Doc. A/CN.4/523* and Add. 1, at pp. 14-17, paras. 38-44.

- the local Courts do not have the competence to grant an appropriate and adequate remedy; and

- the absence of an adequate system of judicial protection.

351. There has been no suggestion by Claimant of a lack of jurisdiction or independence or incompetence or inadequate judicial protection. In fact, Claimant was in the process of seeking remedy through the Remand *Amparo* when it prematurely and unnecessarily withdrew from the proceedings[378].

352. Mexico argues that Lion failed to prove that there was an unavailability of obtaining recourse pursuant to *Apotex*, and instead simply abandoned local proceedings based on its perceived low likelihood of being granted its desired relief[379].

**3.4   LION IS BARRED FROM BRINGING ITS CLAIMS**

353. Mexico additionally raises a number of preliminary objections to Lion's claims. These include:

- Lion is not protected under NAFTA Art. 1105, a rule which, according to Mexico, applies only to investments but not to investors[380];

- Lion failed to exercise due diligence and made irrational business decisions when it decided to grant the Loans to the Debtors, when it improvidently extended their maturities and postponed the decision to foreclose, and when it took the erroneous decision not to foreclose on the Guadalajara Mortgages[381]; and

- Mexico's Courts were confronted with a sophisticated fraud and acted appropriately. Additionally, Mexico's Courts should be excused because there is no allegation that its Judges acted with an intention of malice, or that their decisions were impaired by collusion or corruption[382].

---

[378] RCM, para. 207.
[379] RCM, paras. 210-212.
[380] RR, para. 138; RCM, paras. 134-144.
[381] RPHB, paras. 14-60; RR, paras. 140-147.
[382] RPHB, para. 65-66; RR, paras. 2,9, 214, 220, 223,230; RCM, paras. 11 and 64.

**4.    THE TRIBUNAL'S DECISION**

354.  In the following section, the Tribunal will briefly analyse and dismiss Respondent's preliminary objections (**4.1.**); then it will establish that Lion was indeed denied justice by Mexico's judiciary, in breach of NAFTA Art. 1105 (**4.2.**), and thereafter dismiss Mexico's counterargument that Lion failed to exhaust available and reasonable local remedies (**4.3.**).

**4.1   RESPONDENT'S PRELIMINARY OBJECTION**

355.  The Tribunal will first address Mexico's preliminary objections (summarized in section 3.4. *supra*):

<u>NAFTA Art. 1105 protects investments and investors</u>

356.  Mexico's first argument is based on a literal reading of Art. 1105 of NAFTA, which provides that Mexico "shall accord to investments of investors" of the other treaty Parties treatment in accordance with international law, including FET and FPS. Respondent says that Art. 1105 only extends protection to investments, but not to investors[383].

357.  Contrary to Mexico's submission, the Tribunal finds that NAFTA Art. 1105 does indeed grant protection to Lion as an investor.

358.  The FTC Interpretation Note equates the standard of protection to be applied under Art. 1105 of the NAFTA with the standard of "customary international law minimum standard of treatment of aliens". The reference to "aliens", in a context of investment protection, can only mean investors. A multitude of NAFTA Tribunals have also construed Art. 1105 as a source of protection for investors rather than solely for their investments[384].

<u>Lack of due diligence and irrational business decisions</u>

359.  The Tribunal is also unconvinced by Respondent's argument that Lion failed to exercise due diligence and made irrational business decisions.

360.  When Lion took the business decision to grant various short-term loans to bridge finance the acquisition of certain real estate Claimant, it was already a seasoned investor in Mexico. To secure its rights, Claimant engaged Mexican counsel and formalized the transaction in the instruments which, under Mexican law, grant creditors the maximum level of legal certainty: *pagarés* and *hipotecas*. Mexico has failed to draw the Tribunal's attention to any other action (bar abstaining from investing in Mexico)

---

[383] RR, para. 138, RCM, paras. 134-144.
[384] See e.g.,*Gami,* para. 91; *Chemtura,* para. 179; Exh. CLA-139; *Merrill,* para. 83.

which Claimant could have taken to improve its contractual rights and facilitate enforcement through the Courts.

361.   The business decisions impugned by the Respondent were largely prior to the involvement of the Mexican courts. They form part of the factual and legal matrix submitted to the jurisdiction of the Mexican courts, and irrespective of the wisdom of these decisions (when viewed with hindsight) the Claimant was entitled to the protection of its rights by the Mexican courts in accordance with Mexican law.

362.   Claimant cannot be blamed for its decision to negotiate with Sr. Cárdenas before launching a Court action to enforce the Mortgages. It was within Lion's discretion either, to try to reach an amicable solution with Sr. Cárdenas, or to seek foreclosure on the Guadalajara Properties. The relevant issue in the present case is whether Lion could effectively avail itself of the protection it was entitled to under Mexican law, if it opted to enforce the Mortgages.

363.   The case law invoked by Mexico is inapposite[385].

   <u>Fraud as an excuse</u>

364.   Finally, Respondent invites the Tribunal to take into account the contextual factors of the case which include[386]

   -   the existence of an alleged multi-level sophisticated fraud, and

   -   the absence of allegation that the Mexican judiciary acted with an intention of malice, collusion, corruption, or flagrant abuse of judicial procedure.

365.   Respondent avers that its Courts acted appropriately in the circumstances they faced[387] and that they (like Claimant) also fell victim to Sr. Cárdenas's fraudulent scheme.

366.   The Tribunal concurs with Mexico that the evidence marshalled in this case supports the conclusion that Sr. Cárdenas and the Debtors engaged in a sophisticated fraud, which resulted in the cancellation of the Mortgages in the *Registro Público*. But the existence of a fraud, however sophisticated, does not excuse the respondent State from its duty to have a properly functioning judicial system:

   -   Any proper judicial system must have robust safeguards, which minimize the risk that aliens are not properly notified of procedures filed against them, and that *in*

---

[385] The *MTD v. Chile* tribunal explicitly dealt with a situation where the claimants' lack of diligence consisted in that they failed to "protect themselves contractually"; in cases *Churchill Mining* and *Renée Rose Levy* the tribunals decided that the BIT could not protect against usual business risks or their unwise business decisions. See: *MTD v. Chile*, para. 178; *Churchill Mining,* para. 506; *Renée Rose Levy,* para. 478.
[386] RR, para. 223.
[387] RPHB, para. 66.

*Lion Mexico Consolidated v. Mexico*
ICSID Case No. ARB(AF)/15/2
Award

*absentia* judgements against aliens are only adopted, when the Court is satisfied that the aliens have been properly notified and are aware that they are being sued;

-   A properly functioning judicial system must avoid that false information maliciously provided to the Courts is used, without proper review, to the detriment of an unsuspecting third parties;

-   Finally, the judicial system must offer effective solutions for situations when the falsehood of the party-provided information is detected once a judgment to the detriment of the alien has been rendered; in such cases, the system must facilitate that the aggrieved third party can make allegations and present evidence to overturn the wrongful judgement.

367. The Tribunal's finding that Lion has indeed suffered a denial of justice is based on the premise that the Mexican judicial system, in particular, the Courts of Jalisco, have failed to function properly, to the detriment of Lion, a protected investor under NAFTA (as will be further discussed in section 4.2. *infra*).

368. The Tribunal acknowledges that Lion is not alleging that Mexico's Courts acted in bad faith to the detriment of an alien, nor that they colluded with the fraudsters nor that the judicial decisions were tainted by corruption. The Tribunal will consequently accept as proven that the Mexican judicial system acted in good faith, without colluding with Sr. Cárdenas or the Debtors, and without any impairment by corruption. That said, the Tribunal has already established that a finding of bad faith, is not required to make an adjudication for denial of justice (see section 1.3D *supra*).

**4.2   DENIAL OF JUSTICE**

369. The starting point of any analysis of denial of justice must be an acknowledgement that in this area the Tribunal's powers are subject to strict limitations: the Tribunal is not a municipal Court of appeal; it should pay deference to decisions as to the merits properly adopted by municipal Courts, and should offer such Courts a wide margin of appreciation before the threshold of denial of justice is trespassed. The Tribunal also identifies with the presumption, set forth in *Chevron*, that municipal Courts have acted properly unless Claimant proves otherwise[388].

370. In sum, the Tribunal accepts and supports the finding that the standard for a finding of denial of justice is high, and that Claimant must prove, to the Tribunal satisfaction, that the municipal Courts incurred in an improper and egregious procedural conduct which does not meet the basic internationally accepted standards of administration of justice and due process, and which shocks or surprises the sense of judicial propriety[389].

---

[388] *Chevron II*, para. 8.35.
[389] See para. 296 *supra*.

371. Applying this high standard, the Tribunal is persuaded that Lion was indeed denied procedural justice in three respects:

- Lion was denied access to justice: Lion was, without its fault, never given the opportunity to defend itself in the Cancellation Proceeding (**A.**);

- Lion was also denied the right to appeal the Cancellation Judgement: the *Juez de lo Mercantil*, the same authority who had rendered the Cancellation Judgment, adopted a subsequent decision, at the request of the Debtor, giving *res iudicata* effect (*causar estado*) to the Cancellation Judgement and preclosing any opportunity of appeal (**B.**);

- Lion was also denied the right to allege in the *Amparo* Proceeding that the Forged Settlement Agreement had indeed been forged and to present evidence to prove this claim: three years into the *Amparo* Proceeding the forgery claim had still not been admitted within the *Amparo* Proceeding (**C.**).

### A.   Lion was denied access to justice

372. Lion, a Canadian corporation with corporate domicile in Dallas, Texas[390], was never properly notified that it was being sued in the Cancellation Proceeding, which the Debtors had filed before the *Juez de lo Mercantil* in Jalisco, requesting the cancellation of the Mortgages. Being unaware of these Proceedings, Lion failed to appear before the *Juez* and failed to submit a defense. As a result, the *Juez* declared Lion *en rebeldía*, and without any further effort to ascertain whether Lion was aware of the Proceedings, issued the Cancellation Judgement *in absentia*, mandating that the Mortgages be forthwith cancelled.

373. The Cancellation Proceeding was procedurally faulty – Lion was never properly notified; and the consequences of the defective notification were devastating to its case. The conduct of the *Juez de lo Mercantil* by itself does not amount to a denial of justice. What is relevant, however, is that the Mexican judiciary never corrected this situation, despite multiple opportunities to do so at Lion's request.

374. The Tribunal will first summarize the Parties' positions (**a.**), the proven facts (**b.**) and the applicable law (**c.**) and then analyse why the conduct of the *Juez de lo Mercantil* is the basis of the denial of justice (**d.**).

---

[390] Exh. C-1, p. 7.

### a.    Position of the Parties

375.   Lion claims that it was denied access to justice by Mexico's courts – it was never notified of the Cancellation Lawsuit and thus never participated in it, and as a consequence was declared *en rebeldía* without fault.

376.   This was due to the *actuario* not performing basic diligence in the service[391] and the *Juez de lo Mercantil* sanctioning the faulty *emplazamiento* despite the applicable law requiring that he examine *de oficio y de manera exhaustiva* whether the defendant was duly served[392].

377.   Mexico responds by stating that nothing in the *actuario*'s service or the actions of the *Juez de lo Mercantil* was irregular. Both adhered to the standards prescribed by the applicable State and Federal Mexican law[393].

378.   Respondent says the *actuario* duly confirmed that the address indicated in the basis for the service (*citatorio*) was the same as the one in the notice of service[394]. The *actuario* additionally relied on the representation of Mr. Lopez Medina that the address was Lion's actual place of business and that he was authorized to receive notice on Lion's behalf[395]. These two elements of the *actuario's* conduct satisfy the level of scrutiny required by the applicable law[396].

379.   In any event, even if the Tribunal were to find irregularities in the *emplazamiento* or *declaración en rebeldía*, these would not be sufficient for a finding of denial of justice as recourse from the decision of the Juez de lo Mercantil was available to Claimant, which it did pursue[397].

### b.    Facts

380.   The Tribunal will summarize the facts that underlie the denial of access to justice to Lion by Mexico's Courts.

381.   On April 3, 2012 the *actuario* (a court officer of the *Juez de lo Mercantil*) attempted a first service of process [the "***emplazamiento***"] at the address identified in clause 7 of the Forged Settlement Agreement. The service attempt was made on Lic. José Isaac López Medina[398], one of the two lawyers identified in the Forged Agreement[399], who

---

[391] CPHB, paras. 66, 69; CR, paras. 78, 86-96; CM, paras. 96-98.
[392] CPHB, para. 71. 74; CR, paras. 103-105; CM, para. 99.
[393] RPHB, paras. 70-71; RR, paras. 77-83, 85-87; RCM, paras. 72-78.
[394] RPHB, para. 71; RR, para. 77; RCM, paras. 76-77.
[395] RPHB, para. 71; RR, para. 77; RCM, paras. 76-77.
[396] Ovalle II, para. 37.
[397] RPHB, para. 74; RR, paras. 71-73; RCM, para. 79.
[398] Exh. C-52.
[399] Exh. C-53.

apparently had his office at that address. There is no evidence that Lion at any time had an office or other type of establishment at that address, or that it had ever had any business or professional relationship with Lic. López Medina.

382. Confronted by the *actuario*, Lic. López Medina formally declared that no legal representative of Lion was present in his office in order to receive the *emplazamiento* (a statement which evidently was true, Lic. López Medina himself never having had any power of attorney to represent Lion and no other director or representative of Lion being present). Upon receipt of this representation, the *actuario* withdrew, announcing that he would return the next day. There is no evidence that Lic. López Medina ever informed Lion of these facts.

383. At that second visit, which occurred next day, again no legal representative of Lion was present, since Lion was totally unaware of these occurrences in Jalisco. This being so, the *actuario* decided to make the *emplazamiento* against Lion through a *notificación por cédula* delivered to the person who was at the address, Lic. López Medina[400].

384. Lic. López Medina accepted the *emplazamiento* and received a copy of the judicial file ("*autos*"). In the *emplazamiento* the *actuario* informed Lion that it had a 15-day period to appear before the *Juez de lo Mercantil* and submit its defense, and that if it failed to do so it would be held *en rebeldía*[401].

385. There is no evidence that Lic. López Medina, with whom Lion had no relationship[402], ever informed Lion that he had accepted the *emplazamiento.* Lion never received the *emplazamiento*[403], and being unaware that a Court procedure against it was pending before the *Juez de lo Mercantil* of Jalisco, it inevitably failed to appear within the statutory time-limit.

386. The consequence of this failure was that six weeks thereafter, on May 22, 2012, Lion was declared *en rebeldía* by the *Juez de lo Mercantil* through notification via *boletín judicial*[404] (a judicial bulletin)[405]. Since Lion was not in the habit of reviewing the *boletines judiciales* in Jalisco, nor required to do so, it was completely unaware that it had been declared *en rebeldía.*

387. Two weeks after the declaration *en rebeldía*, on June 6, 2012 the Debtors submitted their evidence before the *Juez de lo Mercantil*, including the Mortgage deeds and

---

[400] Exh. C-52; CR, paras. 95-96.
[401] Exh. C 52, p. 2.
[402] CM, para. 50.
[403] CM, paras. 133, 307.
[404] Exh. C-73.
[405] Claimant's expert explains that while the Commerce Code as well Mexico's procedural codes and statutes provide for different methods of *emplazamiento*, including through *boletín judicial* and *estrados*, for the initial notification of a defendant, only personal service is legally accepted, see Zamora I, para. 142 and footnotes therein. This is not disputed by Mexico.

Minutes of the General Shareholders Meeting of C&C Capital. All the evidence marshalled by the Debtors was admitted six days later, on June 12, 2012[406].

388. Although some of these documents mentioned that Lion was a foreign company domiciled in the United States[407], this information seems to have been overlooked or disregarded by the *Juez de lo Mercantil*, because he never made any attempt to notify Lion at any other address. All further communications of the *Juez de lo Mercantil* – including the final judgment – were simply affixed to the *estrados* (notice board), and Lion was presumed to have been properly notified[408].

389. Just two weeks after the submission of evidence, on June 27, 2012 the *Juez de lo Mercantil*, acting solely on the basis of the evidence marshalled by the Debtors, and without any participation of Lion, declared the Loans totalling USD 32.85 M settled and ordered Lion to cancel the Mortgages and return the Notes through the Cancellation Judgment[409]. From the filing of the Cancellation Lawsuit to the rendering of the Cancellation Judgment, only 170 days had lapsed.

390. Both Parties' legal experts agreed at the Hearing that this constituted an unusually short duration[410].

### c.   Law

391. The Tribunal has already made findings on the nature of denial of justice and the standard that needs to be applied to the facts to decide whether a denial of justice occurred.

392. First, the Tribunal reiterates its view that denial of justice is always procedural[411].

393. Secondly, the Tribunal has also established that denial of access to justice is considered denial of justice in its purest form and is a universally accepted type of this international wrong[412]. The case law and scholarly writings acknowledge that access to justice is impaired when a party is not notified of a proceeding that involves its rights and it is prevented from being heard by the local Courts.

394. Paparinskis recalls that[413]

---

[406] Exh. C-57.8.
[407] Exh. C-74, which refers to Exh. C-10, p. 13; Exh. C-14, p.1 and Exh. R-13, p. 18.
[408] CM, para. 101.
[409] Exh. C-78, pp. 53-54.
[410] CPHB, para. 80; HT, pp. 711-712 (President Fernández-Armesto, Dr. Ovalle and Dr. Zamora).
[411] See Section 1.1, *supra*.
[412] See Section 1.2A, *supra*.
[413] Paparinskis, *op. cit.*, p. 191, footnotes omitted.

*Lion Mexico Consolidated v. Mexico*
ICSID Case No. ARB(AF)/15/2
Award

"[…] the absence of notification about proceedings that exclude the possibility to challenge them could all result in denial of justice".

395. The *Ambatielos* decision also recognizes this basic rule of administration of justice[414]:

"[…] the foreigner shall enjoy full freedom to appear before the courts for the protection or defence of his rights, whether as plaintiff or defendant; to bring any action provided or authorized by law […]".

396. <u>Thirdly</u>, based on the opinions of international scholars and the decisions of investment tribunals, the Tribunal has adopted the prevailing test: a positive finding of denial of justice requires an improper and egregious procedural conduct by the local courts (whether intentional or not), which does not meet the basic international accepted standards of administration of justice and due process, and which shocks or surprises the sense of judicial propriety.

### d.   Discussion

397. In a judicial proceeding, a basic principle of natural justice requires that the defendant, who is being sued, is properly notified of the terms of the claims, and is afforded the opportunity to appear before the Court, to rebut these claims, to make allegations and to present evidence.

398. Lion never knew that the Debtors had filed the Cancellation Proceeding against it before the *Juez de lo Mercantil* in Jalisco, and was denied the opportunity to make allegations or present evidence in that Procedure. It was not the Court, but rather third parties, which informed Lion about the existence of the Cancellation Proceeding, <u>after</u> the Cancellation Judgement had been rendered and had become *res iudicata.*

A deeply flawed *emplazamiento*

399. The *emplazamiento* performed on behalf of the *Juez de lo Mercantil* was deeply flawed.

400. The *actuario* served Lion *por cédula, i.e.,* via a notification which is not given directly to the respondent, but which can simply be handed to a defendant's relatives, employees or domestic helper[415].

---

[414] *Ambatielos*, p. 111.
[415] CPC Jalisco, Article 112 bis, "La cédula, copias y citatorios, en los casos de los dos artículos anteriores, <u>se entregarán a los parientes o empleados del interesado o en su defecto a cualesquiera otra persona que viva o se encuentre dentro del domicilio, después de que el notificador se hubiere cerciorado de que allí vive o de que es el principal asiento de sus negocios</u>, de todo lo cual se asentará razón en la diligencia, incluyendo el medio o la fuente de que se valió o las fuentes de información a que tuvo que recurrir para adquirir la certeza señalada", [Emphasis added]; Zamora IV, para. 59.

401. Lion's expert opines that such service requires a higher degree of certainty than ordinary service, with the *actuario* having to ascertain that the person served is actually at the defendant's domicile, and that such person maintains one of the legally established categories of relationship with the defendant[416].

402. Mexico's expert admits that according to the applicable law, confirmation of service by the *actuario* should explain the reason that led the *Juez* to be certain that the defendant factually resides in the place service is to be made[417].

403. The rules to be applied to the *emplazamiento* of Lion were enshrined in Arts. 112[418] and 112 bis[419] of the CPC Jalisco[420].

404. The general rule is contained in Art. 112 CPC: The *emplazamiento* must be done personally on the respondent ("*se realiza personalmente con el demandado*"); if the respondent is not present when the *actuario* arrives, a new visit is scheduled for the next day, and if the respondent is still absent, a *notificación por cédula* is admissible.

405. Art. 112 bis CPC the regulates the requirements for a valid *notificación por cédula*. The cédula can be delivered to a relative, an employee or to any person found at the domicile, subject to a specific requirement: the *actuario* must verify that the defendant has at such domicile its principal place of business ("*después de que el notificador se hubiere cerciorado [...] de que es el principal asiento de sus negocios*").

406. The *emplazamiento* performed on Lic. López Medina by the *actuario* does not satisfy this legal standard: it is clear from the minutes of service filed by the *actuario* that he failed to obtain any evidence that could corroborate that the domicile set-forth in the Forged Settlement Agreement (that is, that "*número 95, despacho 7, de la calle* Tomás V. Gómez, Colonia Ladrón de Guevara (Guadalajara, Jalisco)" was indeed "*el principal asiento de los negocios*" of Lion LLC, a Canadian incorporated company). It is specially telling that the *actuario* failed to challenge Lic. López Medina's authority, and never requested that the lawyer present any evidence linking himself to Lion.

---

[416] Zamora IV, para. 60, Zamora I, para. 149.
[417] Ovalle I, para. 98.
[418] CPC Jalisco, Article 112, "La diligencia de emplazamiento se realiza personalmente con el demandado; el servidor público judicial, deberá de cerciorarse de la identidad del mismo en la forma prevista por el artículo 70 de este Código, o, dar fe de que lo conoce; haciendo constar en el acta esa circunstancia. Si se trata de emplazamiento a juicio o de requerimiento y sólo si a la primera busca no se encuentra al demandado, se le dejará citatorio para hora fija del día siguiente; y si no espera, se le hará la notificación por cédula; [...]".
[419] CPC Jalisco, Article 112 bis, "La cédula, copias y citatorios, en los casos de los dos artículos anteriores, se entregarán a los parientes o empleados del interesado o en su defecto a cualesquiera otra persona que viva o se encuentre dentro del domicilio, después de que el notificador se hubiere cerciorado de que allí vive o de que es el principal asiento de sus negocios, de todo lo cual se asentará razón en la diligencia, incluyendo el medio o la fuente de que se valió o las fuentes de información a que tuvo que recurrir para adquirir la certeza señalada".
[420] CM, para. 328.

407. Mexico's experts argue that the *actuario* was not obliged to verify the authenticity of the documents serving as the basis for service, and that he did not have the power to do so[421]. However, another of Mexico's experts accepted at the Hearing that the *actuario* has authority to verify the address for the *emplazamiento*[422]. Thus, it is clear that the mechanical checking of whether the address matches that in the *citatorio* is not sufficient to meet the standard required of the *actuario* under the CPC Jalisco.

408. Moreover, the *citatorio*, which served as the basis for the address for notification, contains a discrepancy in the office number, when compared with the address provided in the Forged Settlement Agreement:

-   The Forged Settlement Agreement stated that the address was "*número* 95, *despacho* 7, *de la calle* Tomás V. Gómez, Colonia Ladrón de Guevara (Guadalajara, Jalisco)"[423].

-   The *citatorio* indicated office ("*despacho*)" 5, rather than the *despacho* 7[424].

A deeply flawed *declaración en rebeldía*

409. But not only the *actuario* failed to fulfil its task to ascertain that the *emplazamiento* was proper, so did also the *Juez de lo Mercantil*, who was required to scrutinize whether the *emplazamiento* had been completed without irregularities, before declaring Lion *en rebeldía*.

410. Under Mexican law, the effects of being *en rebeldía* are draconian: the procedure continues, without the participation of the person declared in default; furthermore the defendant is declared *confeso*; i.e. he/she is legally presumed to have accepted the facts as averred in the counterparty's claim[425]. Based on such presumption, the *Juez de lo Mercantil* eventually would accept, without further inquiries, the truthfulness of the Forged Settlement Agreement and order its specific performance, including the cancellation of the Mortgages.

411. This is the reason why Art. 279 CPC requires the *Juez de lo Mercantil* to examine the legality of the service of process before issuing the *declaración en rebeldía*:

"Trascurrido el término del emplazamiento sin haber sido contestada la demanda, se hará la declaración de rebeldía y se observarán las prescripciones del capítulo I del Título Décimo Segundo de este Código. Para hacer la declaración de rebeldía, el juez examinará de oficio y de manera exhaustiva si las citaciones, notificaciones y emplazamientos fueron hechas al demandado en la forma

---

[421] Ovalle II, para. 37.
[422] HT, pp. 644-645.
[423] Exh. C-53, p. 7.
[424] Exh. C-23.
[425] Exh. C-73.

establecida por este código caso contrario, deberá reponer el procedimiento sin
esperar al dictado de la sentencia." [Emphasis added]

412.   The rule could not be clearer: before declaring respondent *en rebeldía,* the Judge must
       examine *ex officio* and exhaustively ("*de manera exhaustiva*") whether the
       *emplazamiento* has been properly performed.

413.   There is no indication in the case file[426], of the *Juez de lo Mercantil* having performed
       any scrutiny with regard to the *emplazamiento*, let alone "examining [it] in an
       exhaustive manner". The *Juez* mechanically corroborated and accepted that the service
       had been properly completed by his *actuario*, and did not take any additional measure
       to verify that the respondent had been properly notified and was actually aware that it
       was being sued in Jalisco.

414.   The omission is especially shocking, because the Cancellation Proceeding was not a
       minor case, but rather a complex procedure, which pitched a group of well-known local
       companies against a US-based corporation, which affected well-known and highly
       valuable pieces of real estate located within the State of Jalisco and which could result
       (and indeed resulted) in the cancellation of multi-million USD Mortgages granted in
       favour of the US creditor. Under these circumstances the Judge should have double-
       checked "*de manera exhaustiva*" that the respondent had been properly notified.

415.   With a minimum of diligence, the *Juez de lo Mercantil* could and should have realized
       that Lion was a foreign company that needed to be served internationally. The
       information available to the *Juez de lo Mercantil* included:

       -   Lion's denomination, "LP", which does not correspond to any incorporation
           under Mexican law[427];

       -   A certified copy of the Nayarit Mortgage, where the actual domicile of Lion was
           specified to be in the US[428];

       -   Certified copies of the Guadalajara Mortgages, which state that Lion was a
           company constituted in conformity with the laws of Quebec, Canada[429];

       -   The mortgages included as attachments to the Loans, which explicitly state that
           Lion's domicile is in the US[430].

---

[426] Exh. C-52; Exh. C-57-3.
[427] CPHB, para. 61, also citing HT, pp. 645-646 (Dr. Ovalle).
[428] Exh. C-10, p. 13.
[429] Exh. C-14, p.1; Exh. C-18, p .1.
[430] Exh. C-8, p. 16; Exh. C-12, p. 16; Exh.C-16, p. 15.

- The Minutes of the Shareholders' Meeting of C&C Capital and Inmobiliaria Bains, which also stated that Lion was a legal entity constituted pursuant to the laws of Quebec, Canada[431]

416. The omission to verify whether the respondent had been properly notified was exacerbated when subsequent procedural steps and decisions were simply notified by means of a noticeboard in the courthouse. No additional effort was ever made, to ascertain whether Lion was aware of the developments within the Cancellation Proceeding[432]. Lion was kept completely in the dark.

417. The lack of any diligence reached its zenith, when the *Juez de lo Mercantil* issued a default judgment, fully accepting the Debtors' claims. No attempt was made to ascertain that Claimant was duly informed of the decision, and of its right to lodge an appeal.

<u>Case law</u>

418. The Tribunal observes the similarity of the current facts with those in *Cotesworth & Powell*, where the tribunal decided that claimants had been denied justice because of the failure of the judge to summon the absent creditors in a bankruptcy proceeding and later also failing to notify them of the sentence of classification[433]. The net result was the same: the creditors were unable to participate in a proceeding in the same way that Lion was not given the opportunity to appear before the *Juez de lo Mercantil*.

419. Similarities may also be drawn between the situation in *Idler*, where the US-Mexico Claims Commission found a denial of the US plaintiff's access to justice, when he was notified of the upcoming hearing in Venezuela with insufficient time left for him to make the necessary travel to appear in court[434]. Lion was likewise given a formalistic notice to appear – on the *estrados* notice board in the State of Jalisco – which in fact amounted to a lack of effective notification. The end result is the same: an impediment to the aggrieved alien to appear before the local Court and defend its rights.

420. Finally, Lion's exclusion from the proceedings was exacerbated by the unusual swiftness of the Cancellation Proceeding. Both Parties' legal experts agreed at the Hearing that the 170 days that it took from the filing of the Cancellation Lawsuit to the rendering of the Cancellation Judgment constituted an unusually short duration[435].

421. Applying the established legal standard, the Tribunal finds that depriving Lion of its right to appear before the *Juez de lo Mercantil* through a severely irregular

---

[431] Exh. R-13, p. 18.
[432] Exh. C-73.
[433] *Cotesworth & Powell*, p. 188.
[434] *Idler*, pp. 152-153.
[435] CPHB, para. 80; HT, pp. 111-112 (President Fernández-Armesto, Dr. Ovalle and Dr. Zamora).

*Lion Mexico Consolidated v. Mexico*
ICSID Case No. ARB(AF)/15/2
Award

*emplazamiento* and *declaración en rebeldía* amounts to an improper and egregious procedural conduct by the local courts, which does not meet the basic international accepted standards of administration of justice and due process, and which shocks or surprises the sense of judicial propriety.

422. As will be analysed in the following sections, the Mexican judiciary never corrected this wrong, despite Lion's numerous requests to the judiciary to do so.

### B.   Lion was also denied the right to appeal the Cancellation Judgement

423. Once the Cancellation Judgement had been rendered, the Debtor approached the *Juez de lo Mercantil* (the same who had rendered the Cancellation Judgment), and alleging spurious arguments requested that the *Juez* give *res iudicata* effect (*causar estado*) to the Cancellation Judgement. The *Juez* did so, and barred any possibility of Lion, once it became aware of the Cancellation Judgement, to lodge an appeal.

424. The decision of the *Juez de lo Mercantil,* granting *res iudicata* status to the Cancellation Judgement, also constitutes a denial of justice.

425. The Tribunal will again apply a fourfold discussion comprising the Party positions (**a.**), the proven facts (**b.**) and the applicable law (**c.**) and an analysis of why the *causar estado* ruling by the *Juez de lo Mercantil* is another component of Mexico's Courts' actions amounting to denial of justice (**d.**).

#### a.   Position of the Parties

426. Claimant says that, as with the Cancellation Proceeding, it was not properly served with the Cancellation Judgment[436]. On August 8, 2012 the *Juez de lo Mercantil* declared that Claimant had no right to appeal the Cancellation Judgment[437] and, upon the Debtors request, issued an order to the Public Registries of Nayarit and Jalisco to cancel the Mortgages[438].

427. Respondent does not offer any argumentation purporting to justify the *Juez*'s decision.

#### b.   Facts

428. On June 27, 2012 the *Juez de lo Mercantil*, acting solely on the basis of the evidence marshalled by the Debtors, and without any participation of Lion, issued the Cancellation Judgement, declaring the Loans settled and ordering Lion to cancel the Mortgages and return the Notes[439].

---

[436] CM, para. 108.
[437] CM, para. 107.
[438] CM, para. 111.
[439] Exh. C-78, pp. 53-54.

429. A few weeks thereafter, on August 8, 2012, and at the request of the Debtors, the *Juez de lo Mercantil* declared that the Cancellation Judgement *"causa estado por ministerio de la ley"*, *i.e.* that it has become *res iudicata,* there being no possibility of submitting a *recurso de apelación*. The reason given by the Judge for his decision precluding any further appeal was that the amount claimed in the procedure was less than MEX 500,000 (approximately USD 25,000)[440].

430. On August 30, 2012 the *Juez de lo Mercantil* ordered specific performance of the Cancellation Judgement, and instructed the *Registro Público* of Jalisco to cancel the Guadalajara Mortgages[441] and that of Nayarit to do the same with the Nayarit Mortgage[442]. The *Registro Público* of Jalisco did so on September 7, 2012[443]. The cancellation of the Nayarit Mortgage was recorded on October 19, 2012[444]. Upon these registrations, all three Mortgages became extinct for all legal purposes.

c.    **The law**

431. The Tribunal reiterates that denial of justice is always procedural and the test for denial of justice established by the Tribunal under Section VI.1.1.3D above, which remains applicable for the second analysis of facts: improper and egregious procedural conduct by the local courts (whether intentional or not), which does not meet the basic international accepted standards of administration of justice and due process, and which shocks or surprises the sense of judicial propriety.

432. Since the second denial of justice pondered by the Tribunal concerns the arbitrary closing of an avenue of appeal that was otherwise guaranteed to it by the law, the conduct of the *Juez de lo Mercantil* falls under the same type of wrong as the deeply flawed *emplazamiento*: denying Lion access to justice.

433. The Hague Texts similarly remind that an international wrong occurs when[445]:

> "the foreigner has been hindered by the judicial authorities in the exercise of his right to pursue judicial remedies".

434. In the same vein, the tribunal in *Krederi* observed that one of the serious defects in the adjudicative process may take the form of a violation of

---

[440] Exh. C-79 "*Causar estado*", pursuant to the definition under CLA-216.
[441] Exh. C-84.
[442] This was done through a request for assistance of the 1st Civil Judge in Bucerías, Nayarit to send a following request for cancellation to the *Registro Público* in Nayarit; Exh. C-86.
[443] Exh. C-85.
[444] Exh. C-88.
[445] Hague Texts (n 5) art, 9(2) quoted from Paparinskis, *op. cit.*, p. 190.

"[…] the right to be heard and to present evidence[446]"

435.   In analysing whether Lion was denied access to justice through the *causar estado* ruling by the *Juez de lo Mercantil*, the same scholarly writing and case law find application as those cited under Section VI.1.1.2A, *supra*.

### d.   Discussion

436.   The decision of the *Juez de lo Mercantil* to grant *estado* to the Cancellation Judgment was deeply flawed.

437.   Under Mexican law, commercial cases of the first instance are subject to appeal. The Commercial Code of Mexico states the following:

> "Artículo 1336.- Se llama apelación el recurso que se interpone para que el tribunal superior confirme, reforme o revoque las resoluciones del inferior que puedan ser impugnadas por la apelación, en los términos que se precisan en los artículos siguientes.
>
> Artículo 1337.- Pueden apelar de una sentencia:
>
> I. El litigante condenado en el fallo, si creyere haber recibido algún agravio […]"

438.   The Commercial Code of Mexico foresees an exception to the general rule, when the value of the dispute is below the threshold of MEX 500,000, adjusted yearly for inflation[447]:

> "Artículo 1340. La apelación no procede en juicios mercantiles cuando por su monto se ventilen en los juzgados de paz o de cuantía menor, o cuando el monto sea inferior a [MEX 500,000[448]] por concepto de suerte principal, debiendo actualizarse dicha cantidad en los términos previstos en el artículo 1339."

439.   The *Juez de lo Mercantil* offers no reasoning as to how he reached the conclusion that the value of the Cancellation Proceeding equalled less than MEX 500,000.

440.   Instead, he automatically accepted the Debtors' request, despite two types of evidence before him demonstrating the obviously superior value of the dispute: the Promissory Notes and the Mortgage deeds. The decision is difficult to understand, because the principal amount of the Loans settled and Mortgages terminated amounted to tens of millions of USD.

---

[446] *Krederi*, para. 449 (iii).
[447] Exh. CLA- 336, Zamora I-3, p. 136.
[448] Art. 1349 additionally stipulates: "Corresponderá a la Secretaría de Economía actualizar cada año por inflación el monto expresado en pesos en el párrafo anterior y publicarlo en el Diario Oficial de la Federación, a más tardar el 30 de diciembre de cada año."

441. The First Promissory Note was issued to Lion for USD 15 M[449], the Second Note for USD 12.45 M[450], and the Third Note for USD 5,355,479[451].

442. The deed for the Nayarit Mortgage, which covered all three Loans, contains explicit reference to all three of the aforementioned amounts[452]:

Exhibit C

**Lic. José Visoso del Valle**
**Lic. Francisco José Visoso del Valle**
**Notarios números 92 y 145**
**del Distrito Federal**

sucesivo el Contrato de Crédito hasta por la cantidad de **($15´000,000.00) QUINCE MILLONES DE DÓLARES, MONEDA DE CURSO LEGAL DE LOS ESTADOS UNIDOS DE AMÉRICA.** -------------- **SEGUNDO.- CONTRATO DE CRÉDITO CON C&C CAPITAL.-** Con fecha trece de Junio de dos mil siete, **"C&C CAPITAL", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE, como Acreditada, "INMOBILIARIA BAINS", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE,** como Obligado Solidario y **LION MEXICO CONSOLIDATED, L.P.,** como Acreedor, celebraron un Contrato de Crédito, hasta por la cantidad de **($12´450,000.00) DOCE MILLONES CUATROCIENTOS CINCUENTA MIL DÓLARES, MONEDA DE CURSO LEGAL LOS ESTADOS UNIDOS DE AMÉRICA.** ------------------- **TERCERO.- CONTRATO DE CRÉDITO CON C&C CAPITAL.-** Con fecha veintiséis de septiembre de dos mil siete, **"C&C CAPITAL", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE,** como Acreditada, **"INMOBILIARIA BAINS", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE,** como Obligado Solidario y **LION MEXICO CONSOLIDATED, L.P.,** como Acreedor, celebraron un Contrato de Crédito, hasta por la cantidad de **($5´355,479.00) CINCO MILLONES TRESCIENTOS CINCUENTA Y CINCO**

443. The Guadalajara 1 Mortgage, apart from referring to the value of the Second Loan, directly instructed the *Juez* of the equivalent in pesos, i.e. MEX 131,197,200[453].

----------SEGUNDA.- CONTRAPRESTACIÓN.- *Se fijó como contraprestación exclusivamente por las partes FIDEICOMISARIA-ENAJENANTE y la FIDEICOMISARIA-ADQUIRENTE, quienes instruyen respectivamente a "Scotiabank" y a "Bansi", que actúan únicamente como instituciones fiduciarias siguiendo instrucciones, la cantidad total de EE.UU.A.$12,000,000.00 (DOCE MILLONES DE DÓLARES 00/100 MONEDA DE CURSO LEGAL EN LOS ESTADOS UNIDOS DE AMÉRICA), que en su equivalente en pesos, y en virtud de que el Tipo de Cambio para Solventar Obligaciones Denominadas en Moneda Extranjera Pagaderas en la República Mexicana, publicado por el Banco de México el día 13 trece de junio de 2007 dos mil siete, en el Diario Oficial de la Federación, es de $10.9331 (DIEZ PESOS CON NUEVE MIL TRESCIENTOS TREINTA Y UN DIEZMILESIMOS MONEDA NACIONAL) por un dólar de los Estados Unidos de América, entonces la cantidad total a la contraprestación en Pesos Mexicanos corresponde a $131,197,200.00 (CIENTO TREINTA Y UN MILLONES CIENTO NOVENTA Y SIETE MIL DOSCIENTOS PESOS, 00/100 MONEDA NACIONAL), misma cantidad que en Pesos Mexicanos se toma solamente para*

---

[449] Exh. C-9.
[450] Exh. C-13.
[451] Exh. C-17.
[452] Exh. C-10, p. 3.
[453] Exh. C-14, p. 5.

444. Finally, the Guadalajara 2 Mortgage deed also contains a reference to the value of the Third Loan at USD 5,355,479.



445. Even disregarding the value of the Notes (which do not constitute a protected investment), the Judge had before him the Mortgage deeds, which also contain references to the value of the Loans, each of which was made for millions of dollars. The Guadalajara Mortgage 1 deed even contains an equivalent in Mexican pesos, which amounts to MEX 131,197,200 – *circa* <u>two hundred and fifty times</u> as much as the threshold for the possibility to bring appeal.

446. The *Juez de lo Mercantil* was well aware of this information. In its own Cancelation Judgment, the *Juez de lo Mercantil* acknowledged that the Mortgages had been established to secure the Loans for a total value of USD 32.8 M[454].

447. The *Juez de lo Mercantil* thus blatantly failed to follow the procedure set out in the Commercial Code of Mexico when it granted *res iudicata* effect to the Cancellation Judgment. The decision was highly relevant, because Lion was denied the possibility to appeal the Cancellation Judgment, once again being subjected to the closing of a legal avenue before even realizing the existence of the Cancellation Proceeding. The only remaining alternative within the civil Court system was to launch an *Amparo*.

448. Applying the relevant test, the Tribunal finds that the decision granting *estado* effect to the Cancellation Judgment, patently disregarding the amount in dispute in the Cancellation Proceeding, and closing one of Lion's avenues of accessing justice before local Courts through an otherwise available appeal mechanism, amounts to improper and egregious procedural misconduct by the local courts, which does not meet the basic internationally accepted standards of administration of justice and due process, and which shocks or surprises the sense of judicial propriety.

### C.   <u>Lion was denied the right to allege and prove the forgery of the Forged Settlement Agreement</u>

449. Lion was also denied justice through the local Courts' consistent denial for Lion to present material and relevant evidence to effectively defend its case.

---

[454] Exh. C-78, p. 6, 8 and 10.

450. The Tribunal will re-apply the previous structure for its reasoning, beginning with the Party positions (**a.**), moving on to the proven facts (**b.**) and the applicable law (**c.**) to finish with an analysis of why Mexico's Courts deprived Lion of its right to present evidence and defend its case, thus constituting a denial of justice (**d.**).

### a.    Position of the Parties

451. Lion avers that despite its multiple attempts to do so, Mexican courts barred it from presenting material and relevant evidence to defend its case in the local proceedings[455].

452. Lion argues that Mexico's Courts have denied it the opportunity to prove the forgery. In Claimant's view, lack of service is a breach of such a magnitude under Mexican law that the *Juez de Distrito* should have allowed all evidence and arguments that are necessary to prove the circumstances of the allegedly illegal service[456] under the *suplencia de la deficiencia de la queja* (supplement of the deficiency of the complaint)[457], yet the *Juez de Distrito* dismissed any evidence pointing to the falsehood of the *emplazamiento* without granting Lion a chance to cure any formal deficiencies[458].

453. Additionally, none of Mexico's Courts seized of Lion's proceedings ruled on the authenticity of the Forged Settlement Agreement. The *Juez de Distrito* refused to decide on the issue[459]; the *Tribunal de Queja* also[460], ruling that the question should be resolved after the False *Amparo* issue was decided in the Remand *Amparo*; and the *Juez de Distrito*[461], understanding that the *Tribunal de Queja* had excluded from the admissible evidence the evidence concerning the falsehood of the Forged Settlement Agreement[462]. Ultimately, Lion's *Amparo* claim was thus frustrated.

454. Mexico responds by arguing that Lion was not denied the right to present evidence and that all prejudice it allegedly suffered is attributable to its own negligent actions.

455. If anyone is to be blamed for the Forged Settlement Agreement never being scrutinized by the judicial system in Mexico, it is Lion, whose negligence was the reason why the Courts could not admit the additional evidence[463]: Claimant should have included

---

[455] CM, paras. 344-350.
[456] CR, para. 153.
[457] Zamora IV, para. 122.
[458] CR, para. 152.
[459] CR, paras. 130-141.
[460] CR, paras. 146-147.
[461] This time in the Remand *Amparo*.
[462] CR, paras. 155-157; CM, para. 379.
[463] CRM, para. 95; RR, paras. 102 and 103.

references to the alleged fraud in its original *Amparo* claim, rather than seeking to introduce them through the *ampliación de demanda* [464].

456. As Lion failed to include allegations of fraud, the *Juez de Distrito* followed the law when it adjudicated a claim for improper notification ("*falta de emplazamiento*") rather than a claim for forgery[465]. Therefore, the *Juez de Distrito* was bound to deliver the judgment that it did and Lion cannot claim a denial of justice due to its own negligence in pursuing its claims.

457. In its decision to dismiss the *ampliación de demanda*, the *Secretario del Juzgado de Distrito* acted in accordance with local law, which did not require him to grant Lion an opportunity to cure its procedural defects[466]. It was Lion who failed to demonstrate the necessary link between its claim and the Forged Settlement Agreement[467].

458. When Claimant disagreed with the *Juez de Distrito*'s decision, it exercised its right to challenge it through a review proceeding, but lost[468] due to one more failure to follow procedural law: an *ampliación de demanda* must be signed either by the aggrieved party or by its legal representative[469]. Lion does not appear to contest the fact that it filed its *ampliación de demanda* improperly[470]. Therefore, it was not denied the right to present evidence.

459. Additionally, the *Juez de Distrito* in the Remand *Amparo* did not dismiss all of Lion's evidence, but rather explained that some of it was already on the Court's record[471]; in any event, the *Juez de Distrito* was not empowered to admit new evidence in respect of the authenticity of the Forged Settlement Agreement in the Remand *Amparo* and acted in complete accordance with applicable procedural rules[472].

460. According to Mexico, Lion cannot claim that the decisions to dismiss the additional evidence were the result of an idiosyncratic or arbitrary decision[473]. By failing to follow the applicable procedural rules, Lion is responsible for barring itself from presenting evidence to defend its case. Therefore, the claim that the Mexican judiciary failed to grant Claimant the right to defend itself and to present evidence should be rejected.

---

[464] RR, para. 245, citing Ovalle II, para. 108.
[465] RR, para. 94-96.
[466] RR, para. paras. 99-100, citing Ovalle II, para. 91.
[467] RR, para. 102.
[468] RR, para. 105.
[469] RR, paras. 246-247.
[470] RCM, para. 95.
[471] RR, para. 268, with regard to the voucher purporting to prove that Mr. Arechederra could not have signed the False Request for Copies and the *Juez de Distrito*'s decision on the false character of the False Request for Copies, citing Exh. C-123.
[472] RR, paras. 259-260.
[473] CRM, para. 96.

### b.   Facts

461. In the course of the local proceedings, Lion tried on multiple occasions to bring relevant evidence that could easily prove the illegality of service and justify the annulment of the Cancellation Judgment. However, the municipal Courts repeatedly denied Lion the possibility to do so.

<u>Failed *ampliación de demanda*</u>

462. In the Cancellation Judgment of June 27, 2012, the *Juez de lo Mercantil*, without Lion's participation, declared the Loans settled and ordered Lion to cancel the Mortgages and return the Notes[474]. In mid-December 2012, Lion learned about the existence, but not the details, of the Cancellation Judgment[475].

463. Within the 15-day deadline to file an *Amparo*, the only available effective remedy, Lion filed its *Amparo* Lawsuit on December 19, 2012[476], to challenge the cancellation of the Mortgages. Lion did not include any reference to the Forged Settlement Agreement, because it did not know of its existence: the Forged Agreement was only made known to Lion when the *Juez de lo Mercantil* filed an *informe* (report) in January 2013[477].

464. Thus, Lion's initial *Amparo* claim was for improper *emplazamiento*, a broad category encompassing different causes, rather than the precise allegation of forgery.

465. Having obtained access to the Forged Settlement Agreement and the file of the Cancellation Proceeding, on January 28, 2013[478], Lion filed an *ampliación de la demanda,* alleging the illegality of the service performed by the *actuario* on the basis of the newly acquired information on the Forged Settlement Agreement[479]:

> "*La falta de emplazamiento legal a la hoy quejosa [i.e. Lion] […] debido a que el supuesto emplazamiento […] se hizo en un domicilio que no es de la hoy quejosa […]. Amén de que el supuesto domicilio donde de practicó dicho emplazamiento, <u>fue señalado en un documento que no fue suscrito por mi mandante ni por persona alguna con facultades, ya que la firma que se advierte en el mismo es completamente falsa por no proceder del puño y letra a quien se atribuye.</u>*" [Emphasis added]

466. Lion's forgery claim was accompanied by, *inter alia*[480]:

---

[474] Exh. C-78, pp. 53-54.
[475] Payne I, para. 13; HT, pp. 486-487.
[476] CR, para. 131.
[477] CR, paras. 138-139; HT, p. 140; H1, p. 6, below; Exh. C-97, p. 4.
[478] CR, para. 138; Exh. C-97.
[479] Exh. C-97, p. 3.
[480] Exh. C-97; Exh. C-55; Exh. C-102.

- a graphological expert report to prove that the signature in the Forged Agreement did not belong to Mr. Hendricks, and

- emails between a broker retained by Lion and Sr. Cárdenas to demonstrate that, after the Forged Agreement was supposedly signed in November 2011, Lion and Sr. Cárdenas were still holding discussions on the terms of the repayment of the Loans.

467. This procedural step of extending the initial claim to include the (highly relevant) inauthenticity of the Forged Agreement, would become a stumbling block hindering the progression of the *Amparo* Proceeding and leading to its eventual demise.

468. The first step occurred on January 30, 2013:  in a *proveído* the *Secretario del Juzgado de Distrito* in Jalisco dismissed the *ampliación* of the *Amparo* submitted by Lion, arguing that

> "*dichos actos ya fueron precisados desde el escrito inicial de demanda*"[481]

- a plainly wrong statement. The *Secretario* further admitted some (rather irrelevant) evidence attached to Lion's forgery claim, but postponed the decision on the admissibility of the expert and witness evidence[482].

469. Frustrated by this postponement, Lion brought, on February 6, 2013, an *"incidente de falsedad de documento"* before the *Juez de Distrito*, claiming again that the Forged Agreement was the result of fraud[483].

470. On April 10, 2013, the *Juez de Distrito* stated that he would decide in due course on the admissibility of the proposed graphological expertise on the authenticity of the Forged Settlement Agreement[484]. And on April 19, 2013 the *Juez de Distrito* once again decided to postpone his decision on the admissibility of the evidence, because of a *queja* proceeding which was subsequently initiated and which will be dealt with in the next section[485].

Dismissal by the *Tribunal de Queja*

471. While the decision on the admission of evidence was pending before the *Juez de Distrito*, one of the Debtors, C&C Ingeniería, filed as a *tercero perjudicado* two

---

[481] Exh. C-103, p. 4.
[482] Exh. C-103, p. 5, see below.
[483] Exh. C-107.
[484] Exh. C-106, p. 10.
[485] Exh. C-180, p. 2.

*queja*s[486] before the *Tribunal de Queja* against the Dismissal *Proveído* issued by the Secretary of the Court[487] and the April 10, 2013 decision of the *Juez de Distrito*. C&C Ingeniería argued that Lion's *ampliación de demanda* was inadmissible, because it had not been properly signed on Lion's behalf.

472.   Lion for its part also submitted a *queja* against the same decision, because it precluded Lion from claiming that the Forged Settlement Agreement was a forgery and the origin of the improper service[488].

473.   The *Tribunal de Queja* dismissed Lion's *queja* and decided in favour of C&C Ingeniería: the appeal court ruled that the *ampliación de la demanda*, which Lion had filed, was inadmissible, because it had not been properly signed on behalf of Lion: it should have been signed by Lion's legal representative and not by the attorney empowered by Lion to act on its behalf in the *Amparo* proceedings[489].

474.   Lion was not given an opportunity to cure the alleged procedural defect, although the *ampliación de demanda* aimed at proving that Lion, an alien company operating in Mexico, had been the victim of an elaborate fraud to avoid its proper *emplazamiento*. This stands in stark contrast with the treatment granted to the complainants when the False *Amparo* was submitted without the requisite copies. In that instance, the *Juez* accorded the complainants the chance to cure the formalistic deficiency.

Failure of *incidente de falsedad de documento*

475.   Once the *queja* had been resolved, the *Juez de Distrito* resumed his work, and in accordance with the decision of the *Tribunal de Queja* resolved that all evidence linked to the forgery claim should be dismissed (both the evidence already admitted and the evidence still pending admission)[490].

476.   Thereafter the *Juez de Distrito* rendered a specific ruling on Lion's separate motion ("*incidente de falsedad de documento*"). The judge dismissed it on the grounds that the allegedly false document (the Forged Settlement Agreement) was not related to the subject-matter of the *Amparo* Proceeding[491].

---

[486] The orders and judgments issued in Amparo proceedings are themselves subject to three different challenges: *revisión, queja* and *reclamación*. In an *Amparo indirecto*, such as the one file by Lion, the most common challenges are *queja* against different procedural orders (specifically those that cause irreparable harm) and *revisión* against the *Amparo* court's final judgment, both of which are decided by a *Tribunal Colegiado de Circuito* (Federal Circuit Court), see Zamora I, para. 87.

[487] Exh. C-181.

[488] Exh. C-182.

[489] RCM, para. 92, citing Exh. C-105, p. 3-4 and Exh. R-19, see *infra*.

[490] Exh. C-105, pp. 8-9.

[491] Exh. C-108.

477.   In so deciding, the *Juez de Distrito* ignored the principle *fraus omnia corrumpit*: an *emplazamiento* obtained by fraud, involving the forgery of the document which purports to provide the address for service of process and the name of the process agent, is evidently unlawful, and can never constitute a proper *emplazamiento*.

478.   Be that as it may, from that date on, the scope of the *Amparo* did not include any inquiry into the issue whether the Settlement Agreement had been forged; it was assumed that the Settlement Agreement was valid and binding, having been properly executed by Lion. The scope of the *Amparo* was reduced to the question whether the *emplazamiento* had or not been properly executed in accordance with Mexican law. And – congruently with this reduced scope of investigation – all evidence in the file seeking to prove the forgery of the Settlement Agreement was expurgated.

<u>Failure to address forgery in *Amparo* Judgment</u>

479.   On December 4, 2013, the *Juez de Distrito* delivered the *Amparo* Judgment denying Lion protection against the Cancellation Judgment[492].

> "[…] R E S U E L V E: ÚNICO. LA JUSTICIA DE LA UNIÓN NO AMPARA NI PROTEGE A LION MEXICO CONSOLIDATED, L.P., contra los actos que reclama del JUEZ Y DEL SECRETARIO EJECUTOR, AMBOS ADSCRITOS AL JUZGADO NOVENO DE LO MERCANTIL DEL PRIMER PARTIDO JUDICIAL DEL ESTADO DE JALISCO. […]" [Capitals in the original]

480.   The *Amparo Judgement* is a 67-page document, which in its "*Resultando"* summarizes the procedure, and which then reasons the decision in seven "*Considerandos".*

481.   As a preliminary question, the *Juez de Distrito* analyzes Lion's allegation that on July 6, 2013 Sr. Arechederra's signature had been forged in the false request for copy before the *Juzgado de lo Mercantil* – see section 5.1 *supra*. (The issue was relevant, because if it had been true that on July 6, 2013 Lion had been aware of the Cancellation Judgement, the *Amparo* would have been inadmissible due to the statute of limitations).

482.   The *Amparo* Judgement, after weighing the expert and other evidence marshalled by the parties, concludes that Sr. Arechederra's signature indeed had been forged, that the request for copy had indeed been false, and that consequently Lion's request for *Amparo* was not time barred[493].

483.   The *Amparo* Judgement also acknowledges that Sr. Arechederra and Lion had filed a criminal action against Sr. Cárdenas, accusing him of having forged his signature on various documents, and that on 26 September 2013 the criminal judge had ordered the

---

[492] Exh. C-115, pp. 66-67.
[493] Exh. C-115, p. 39.

imprisonment of Sr. Cárdenas for this crime. But the *Amparo* Judge accorded little weight to this piece of evidence[494]:

> "*[El auto de formal prisión] únicamente constituye un indicio que unido a otras pruebas, puede coadyuvar a la formación de prueba plena con las que se acrediten, en un momento dado, hechos diversos a los aquí demostrados*"

484. Notwithstanding the finding that at least on one occasion Sr. Arechederra's signature had been forged, and that Sr. Cárdenas was in prison for alleged forgeries of documents, the *Amparo* judgement does not even discuss Lion's argument that the Settlement Agreement was also forged: since the *ampliación de demanda* had been dismissed (because it had been signed by Lion's attorney, but not by a legal representative), any issue relating to the falsehood of the Settlement Agreement was off limits in the *Amparo* procedure.

485. The *Amparo* Judgement consequently assumes that the Settlement Agreement was validly executed on Lion's behalf. There being a valid Settlement Agreement with a designation of process agent and an address for service of process, the *Juez de Distrito* dismisses Lion's argument that the *emplazamiento* should have been made in Dallas, Texas, USA, and in accordance with the applicable international treaties[495].

486. Instead, the *Juez de Distrito* discusses at length a minor incident in the way the fraudulent *emplazamiento* had taken place: in accordance with the Settlement Agreement the notification should have been made at Calle Tomás V. Gómez 95, <u>despacho</u> 7. But in reality, the *actuario* went to the same address, but to a different office: <u>despacho</u> 5.

487. The *Juez de Distrito* finds that this "minor defect" does not invalidate the *emplazamiento*, because the *actuario* was able to locate Lic. López Medina, who, in accordance with the Settlement Agreement, was the person designated by Lion as process agent[496]. The Judge's very words are the following[497]:

> "*De ahí que, aun y cuando aparece que el emplazamiento a juicio de la ahora quejosa [Lion], se practicó en un domicilio diverso al pactado [...], ello de ninguna manera acarrea la consecuencia que [Lion] no estuviera enterada [del juicio], <u>en razón que la diligencia de llamamiento a juicio se entendió personalmente con uno de sus autorizados para recibir cualquier tipo de comunicación</u> [...]*". [Emphasis added]

---

[494] Exh. C-115, p. 61.
[495] Exh. C-155, p. 47.
[496] Exh. C-155, p. 53
[497] Exh. C-155, p. 54

488. The argument is straightforward: since the Settlement Agreement must be deemed valid and binding and Lic. López Medina is Lion's process agent, the *emplazamiento* made to Lic. López Medina, even if at the wrong address, is also valid and binding.

<u>Failure to address forgery in *recurso de revisión*</u>

489. Lion was not satisfied with the *Amparo* Judgement. On December 19, 2013 Lion filed the *recurso de revisión*, seeking its revocation, the granting of protection to Lion's constitutional rights and the finding that the Cancellation Lawsuit and related acts were null and void[498].

490. Among other reasons, Lion explicitly challenged the *Amparo* Judgment, arguing that the *Juez de Distrito* had disregarded Lion's claim that the Settlement Agreement had been forged, with the erroneous argument that the falsehood was unrelated to the dispute and that the defendants in the *Amparo* had not participated in the alleged forgery. Lion explained that the falsehood of the Settlement Agreement was indeed relevant for the *Amparo,* because Lion's *emplazamiento* had been delivered to Lic. López Medina, Lion's purported process agent designated in the Settlement Agreement. If the Settlement Agreement was a forgery, the designation of Lic. López Medina was false, and the *emplazamiento* had not been properly made[499].

<u>Summary of Lion's efforts to introduce evidence</u>

491. As outlined above, Lion attempted on multiple occasions to present evidence regarding the fraudulent character of the Forged Settlement Agreement and was denied at every attempt.

492. Lion filed a total of four petitions to submit evidence on the forgery and was denied the opportunity every single time. It did so in all possible instances:

- On January 28, 2013 Lion filed its *ampliación de la demanda*, explaining that the service made by the *Juez de lo Mercantil* was based on a forged document and should thus be deemed inexistent[500];

- On February 6, 2013, Lion brought an *"incidente de falsedad de documento"* before the *Juez de Distrito*, claiming again that the Forged Agreement was the result of fraud[501];

---

[498] Exh. C-116, pp. 46-57.
[499] Exh. C-116, pp. 16-17
[500] Exh. C-97, p. 3.
[501] Exh. C-107.

- Separately, on February 8, 2013, Lion also submitted a *queja* against Dismissal *Proveído* as precluding it from claiming that the Forged Settlement Agreement was a forgery[502], and

- On December 19, 2013 as part of its *recurso de revisión*, Lion once again tried to claim the forgery of the *Términos* document[503]. However, it was barred from doing so by the express order of the *Tribunal de Queja* which forbade the *Juez de Distrito* to look into the issue in the Remand Proceeding.

### c.   The law

493.   The Tribunal has already established that the third type of denial of justice occurs when municipal Courts prevent an alien from producing evidence to support its case[504].

494.   In *Cotesworth & Powell* the tribunal confirmed that

"[…] refusing to hear the party interested, <u>or to allow him [an] opportunity to produce proofs</u>, amounts to the same thing as an absolute denial of justice". [Emphasis added]

495.   The right to present relevant and material evidence in the context of denial of justice has also been recognized by academia[505]:

"[When discussing procedural guarantees whose violation amounts to denial of justice] One strand of procedural improprieties related to equality of arms, in particular regarding the right of aliens to be notified about procedural developments, the right to be heard, the right to counsel, the right to call and confront witnesses, <u>the right to produce evidence</u>, and the right to public proceedings in criminal cases. […]

[Equality of arms] may also apply regarding matters such as attendance of hearings, neutrality of the expert, the right to call witnesses, <u>submit evidence, have the evidence considered by the court</u>, comment on observations, and be informed about the reasons of challenged decisions."

### d.   Discussion

496.   The *Juez de Distrito* saw fit to decide on the correctness of the *emplazamiento* without first addressing whether the Settlement Agreement was in fact a forgery, which led to

---

[502] Exh. C-182.
[503] Exh. C-116, pp. 16-17.
[504] See section 1.2 B supra.
[505] Paparinskis, *op. cit.*, pp. 193-194, 203, citations omitted.

rulings that are, in the Tribunal's view, contradictory[506]. On July 5, 2013 the *Juez de Distrito* decided that the issue of the forgery of the Forged Settlement Agreement was not related to the subject-matter of the *Amparo* Proceeding[507] and on December 4, 2013 the same *Juez de Distrito* decided, based on the Forged Settlement Agreement, that the *emplazamiento* was performed correctly. The Tribunal finds it logically apparent that the correctness of the *emplazamiento* hinges upon the truthfulness of the Settlement Agreement.

497.   In *Cotesworth & Powell* the international tribunal found multiple denials of justice to claimants, including an instance of contradictory rulings by the same tribunal:

> "That between the sentence of the superior tribunal of March 8, 1861, and that of April 2, 1862, by the same tribunal, there is a direct and irreconcilable contradiction. One recognized the authority of the claimant's attorney to bring action; the other expressly denied it[508]".

498.   The Tribunal also finds it surprising that the *Juez de Distrito*, while explicitly acknowledging that on September 26, 2013 a criminal judge had ordered the imprisonment of Sr. Cárdenas precisely for the alleged forgery, did not find sufficient reason to scrutinize the veracity of the Forged Settlement Agreement[509].

499.   The reasoning behind the refusals to examine the Forged Settlement Agreement was always purely procedural and concerned minor mistakes by Lion which were curable – but Lion was never given the opportunity to correct them. The continuing rejections of Lion's motions to present evidence on the false character of the Forged Settlement Agreement were based on dubious formalistic nuances of local procedural law.

500.   Lion was blamed for not having alleged forgery in its initial *Amparo* claim, since Mexico avers that Lion was aware, as of December 17, 2012, that "[a] lawsuit was simulated, signatures were forged, *et cetera*[510]". But it has been proven that Lion did not have access to the relevant files, which included a copy of the Forged Settlement Agreement, until mid-January 2013[511] and was pressured by the 15-day time limit to bring an *Amparo* from the date of taking notice of the Cancellation Judgment, which occurred on December 17, 2012[512]. At the moment of filing of the *Amparo*, Lion simply

---

[506] The two rulings of the *Juez de Distrito* contradict each other: on July 5, 2013 the *Juez de Distrito* decided that there was: No need to deal with forgery of the Alleged Hendricks Document and on December 4, 2013: Proper service on the basis of the Alleged Hendricks Document (denying LMC's Amparo Claim).
[507] Exh. C-108.
[508] *Cotesworth & Powell*, p. 180, para. 2; p. 188, para. 5.
[509] Exh. C-115, p. 61.
[510] RPHB, para. 180, citing Mr. Hendricks, HT, p. 485.
[511] CPHB, para. 39, citing Exh. C-96 and Exh. C-97, pp. 7, 19.
[512] Payne I, para. 13; HT, pp. 486-487.

knew that a Cancellation Judgment had been rendered in a proceeding of which it was not aware. The Tribunal finds no error on Claimant's side.

501. The Tribunal is further persuaded by Lion's supported arguments that any formalistic errors in the filing of submissions were curable and that the *Juez de Distrito* should have provided Lion the opportunity to amend them[513]. The failure to grant Lion a period to cure the formal deficiency stands in stark contrast not only to basic principles of due process under Mexican law[514], but also the actions of the *Juez del Primer Distrito*, who in the case of the False *Amparo* allowed a three-day period for the plaintiff to provide the requires six additional copies of the False *Amparo*[515].

502. Lion further avers that lack of service amounts to a fundamental breach under Mexican law and that the Mexican Supreme Court has established that, in such cases, the *amparo* court should offer protection to the aggrieved party, even if its arguments were insufficient or incomplete, through the institution of the so-called *suplencia de la deficiencia de la queja* (supplement of the deficiency of the complaint)[516]. According to Lion's expert, the *suplencia de la deficiencia de la queja* gives the *Juez de amparo* the power to *ex officio* complement the *amparo* claim with any evidence that may be relevant to the case in furtherance of an aggrieved party's fundamental rights[517]. Thus, the *Juez de Distrito* could have not only admitted the evidence proposed by Lion but also requested any other relevant evidence, given the gravity of the claim of lack of service. Respondent does not directly oppose Claimant's analysis of the *suplencia de la deficiencia de la queja.*

Case law

503. The Tribunal observes the similarity of the facts with those in *Idler*, where the respondent State invoked a seemingly valid legal basis (an ancient remedy inherited from a codification by Spanish Kings) to circumvent granting the claimant the execution of a judgment he should have been accorded under the law. Mexico was using a similar formalistic excuse – procedural requirements that were very minor in their nature and which did not apply in other circumstances – to bar Lion from exercising its right to defense before a court.

504. The Tribunal also takes note of the similarities of the situation affecting Lion with that of the French individual in the *Fabiani* arbitration, where a denial of justice was found because Mr. Fabiani was unable to obtain a decision granting *exequatur* by Venezuelan courts to a judgment in his favour against local defendants[518]. Similarly, Lion was

---

[513] CR, paras. 482-495.
[514] CR, paras. 485-490.
[515] Exh. C-65.
[516] Zamora IV, para. 122.
[517] Zamora IV, para. 128.
[518] *Fabiani*, p. 4900.

unable to obtain a decision on the false character of the Forged Settlement Agreement from the local Courts, despite multiple diligent attempts to obtain such a ruling.

505. Having been refused the opportunity to produce evidence of the forgery, Lion had no means to prove that the *emplazamiento* was wrong. Lion was disarmed and unable to properly exercise its right to defense. Like in *Ballistini*, where the French-Venezuelan Commission made a finding of denial of justice

> "[b]ecause the local authorities deprived Ballistini of the legal means of instituting before the competent tribunals the actions which the laws would authorize him"[519],

Lion was deprived by the local authorities of the legal means in the form of presenting relevant and material evidence, to defend its case.

## D.   **Conclusion**

506. In conclusion, coming back to Paulsson's definition that "[d]enial of justice arises when proceedings are so faulty as to exclude all reasonable expectation of a fair decision […]", the Tribunal finds that Lion, after three years of fighting within the municipal judicial system, could not expect a fair decision within a reasonable timeframe.

507. Similarly, using the *Mondev* test proposed by Respondent, the Tribunal is convinced that Claimant suffered "a wilful disregard of due process of law, … which shocks, or at least surprises, a sense of judicial propriety": first, when Lion was not properly notified of the Cancellation Proceeding and was judged *in absentia*, and later when it was barred from effectively making its case that it had been the victim of fraud and from presenting relevant and material evidence, necessary to support its argument.

508. The Mexican Courts had four opportunities to address the question of the forgery of the Settlement Agreement. They did not do so for reasons which were unclear, contradictory within the same process, or purely formalistic. The Tribunal finds that the decisions of the Mexican Courts repeatedly denying Lion the right to present relevant and material evidence to defend its case, amount to an improper and egregious procedural conduct, which does not meet the basic internationally accepted standard of administration of justice and due process, and which shocks or surprises the sense of judicial propriety.

509. Having established that Mexico's Courts denied Lion justice by restricting its access to justice and its right to defend itself and present evidence to support its case, the Tribunal does not need to look into whether Lion also suffered undue delay.

---

[519] *Ballistini*, p. 20, para. 3.

## VI.2.  EXHAUSTION OF LOCAL REMEDIES

510. Mexico presents a major counterargument to refute Lion's claim for denial of justice: that Claimant decided to withdraw the *Amparo* claim, and that as a consequence of such withdrawal, it failed to exhaust local remedies – a requirement for a finding of denial of justice[520].

511. Claimant does not deny that it withdrew the *Amparo* Proceeding, but argues that Lion pursued all adequate and effective remedies available to it, within the limits of reasonableness[521].

512. The Tribunal will first summarize the Parties' positions (**1.**), then the relevant facts (**2.**), then the law regarding exhaustion of legal remedies, including its exceptions (**3**.), and finally discuss and dismiss Mexico's counterargument (**4**.).

### 1.   POSITION OF THE PARTIES

#### A.   Claimant's position

513. Claimant acknowledges that under international law a finding of denial of justice is premised on the claimant having exhausted local remedies, i.e. judicial measures which could result in the Mortgages being reinstated[522]. Claimant adds that the exhaustion rule has to be applied with some degree of flexibility and without excessive formalism[523].

514. Claimant explains that it pursued the *Amparo* proceedings, the only avenue which was open to it: it was forced to choose between either filing an *Amparo* claim or a *nulidad de juicio concluido* [also "**nullity proceeding**"] action. According to Lion, it was impossible for it to bring both an *Amparo* claim and a nullity proceeding in the same matter[524]. It further argues that the criminal proceedings are not adequate to deal with contractual issues, and pursuing the case further in criminal courts would not have led to binding findings for civil courts[525].

515. Claimant adds that it filed and pursued the *Amparo Proceedings,* until it became obvious that continuation was futile, whereupon it decided to withdraw such Proceedings.

---

[520] RR, para 168.
[521] CR, paras. 506-520.
[522] CM, p. 400.
[523] CM, para 401.
[524] CPHB, para. 94.
[525] CPHB, para. 227.

516. Claimant's arguments are the following:

### a.  Undue delay

517. Claimant says that, as codified by the International Law Commission, local remedies do not need to be exhausted when there is undue delay in the remedial process, attributable to the State. And in this case, the *Amparo* Proceedings were excessively and unreasonably long and continuation of the *Amparo* Proceeding would have extended that unreasonable delay at least by 2.5 years[526].

### b.  Mexico's lack of diligence

518. Claimant avers that the withdrawal of the *Amparo* Proceedings became necessary due to Mexico's own lack of diligence. The *Amparo* Courts could and should have raised the existence of the False *Amparo* much earlier, in early 2013. If the *Amparo* Courts would have been diligent, Lion would have had the opportunity to exhaust the *Amparo* Proceedings within the three-year time limit provided for by NAFTA Article 1116[527].

519. Lion did everything that was reasonable, but, despite its best efforts, Mexican Courts did not provide effective means to reverse the cancellation of the Mortgages within a reasonable period. Mexico cannot rely on the ineffectiveness of its own system to prevent a finding of denial of justice[528].

### c.  Continuation of the *Amparo* Proceeding was not necessary

520. As a second argument, Claimant says it was not required to continue with the *Amparo* Proceedings, because such proceedings did not meet the test (established in the *Loewen* decision) of being adequate, effective and reasonably available:

521. First, as regards adequacy, Claimant says that the *Amparo* Proceedings were the only adequate proceedings available to undo the cancellation of the Mortgages[529].

522. Second, as regards the effectiveness criterion, Claimant adds that the most likely outcome of the Remand *Amparo* would have been for the *Juez de Distrito* to decide that the *Amparo* was inadmissible[530]. But in the most optimistic scenario, assuming that the *Juez de Distrito* had decided that the False *Amparo* indeed was a fraudulent machination, Lion would then have to re-submit its initial appeal to the *Tribunal de Queja*, requesting the opportunity to prove that the Forged Settlement Agreement had been falsified. However, the same *Tribunal de Queja* had already ruled that no hearing

---

[526] CPHB, 224.
[527] CM, para 417.
[528] CM, para 423.
[529] CPHB, para 227.
[530] CPHB, para 229.

would be allowed; there was no reason to assume that the *Tribunal de Queja* would change its position, and there was no appeal to the Supreme Court[531].

523.    Claimant adds a second argument: even if the *Juez de Distrito* and then the *Tribunal de Queja* had decided in its favour, the result would be a finding that Lion had not been properly served in the Cancellation Lawsuit – but not the reestablishment of the Mortgages. The Cancellation Lawsuit would be reopened before *the Juez de lo Mercantil*, and a new series of proceedings, taking between 18 and 36 months, would have to be started, to annul the Cancellation Judgement and reinstall the Mortgages[532]

524.    Third, concerning reasonableness, Claimant avers that even under the most favourable scenario, the exhaustion of the *Amparo* Proceedings would have lasted an additional 2.5 to 3.5 years as of December 2015, resulting in a delay of six years for a simple and straightforward *Amparo*[533].

525.    Claimant adds that pursuing further *Amparo* Proceedings would have required Lion to definitively waive its judicial expropriation claim before NAFTA tribunals, due to the three-year time limits established in Art. 1116 and 1117 NAFTA – an unreasonable requirement[534].

## B.    Respondent's position

526.    As a starting point, Mexico asserts that under international law, exhaustion of local remedies is a requirement for a finding of denial of justice, as acknowledged by publicists, State practice, NAFTA jurisprudence and non-NAFTA jurisprudence[535].

The unavailability exception

527.    Mexico acknowledges that exhaustion of local remedies knows one exception, which is however subject to a high test: unavailability. An aggrieved alien does not have to exhaust local remedies that are not available. Respondent says that the NAFTA jurisprudence focuses on availability, not on futility. Provided that remedies are available, Claimant is required to exhaust them[536]. Mexico says that the threshold test of unavailability was set in *Loewen* and *Apotex*[537].

528.    Turning to the facts, Mexico says Claimant did not exhaust all proceedings which in accordance with Mexican law were available:

---

[531] CPHB, para 227.
[532] CM, para 410.
[533] CPHB, para 227
[534] CR, paras. 521-537; CPHB, para. 227.
[535] RCM, paras. 168-204.
[536] RCM, para. 208; RR, paras. 281-291.
[537] CR, para. 281.

*Lion Mexico Consolidated v. Mexico*
ICSID Case No. ARB(AF)/15/2
Award

529.  <u>First</u>, Respondent says that Lion failed to exhaust other avenues under Mexican law to avoiding the cancellation of the Mortgages, like a *nulidad de juicio concluido* action[538] or the criminal proceedings already initiated by Lion[539].

530.  <u>Second</u>, Mexico disagrees with Claimant's argument that continuing with the Amparo Proceedings would have been ineffective. In Respondent's view, Claimant essentially is arguing that the *Tribunal de Queja* and the Supreme Court were unlikely to render any decision in its favour. However, as the *Apotex* tribunal announced, what matters is not the likelihood that the higher judicial authority would have granted the relief the Claimant sought, but simply the availability of further remedies. In this case a multitude of remedies existed[540]. Respondent also denies that the Mexican Courts incurred in unreasonable delay, or that the expected duration of the remedy procedures would be unreasonable[541].

531.  <u>Third</u>, as regards Claimant's argument that it was obliged to withdraw the Amparo Proceedings, because the three-year limit established in Art. 1116 and 1117 NAFTA was approaching, Respondent says that the time limitations imposed by these provisions begins on the date on which there is "knowledge of the alleged breach". Since local remedies must be exhausted before it can be determined if justice has been denied, the limitation period had not started to run at the time the *Amparo* Proceedings were abandoned. Thus, the entire rationale for the Claimant abandoning the proceeding was unfounded[542].

532.  <u>Finally</u>, Mexico submits that the Claimant was not required to withdraw from the *Amparo* Proceedings to comply with the waiver requirement established in NAFTA Art. 1121, because the *Amparo* Proceedings fall within the exception of NAFTA Art. 1121(1)(b) ("except for proceedings for injunctive, declaratory or other extraordinary relief, not involving payment of damages")[543].

## 2.  FACTS

533.  On December 18, 2012 Lion filed an *Amparo indirecto* lawsuit[544] before the *Juez de Distrito* in Jalisco. The *Amparo* was based on a breach of Art. 14 and 16 of *Constitución Política* of Mexico, and the *actos reclamados* included the lack of proper *emplazamiento* of Lion in the Cancellation Lawsuit.

---

[538] HT, pp. 654-657; RR, paras. 126, 136: RCM, para. 79, citing Ovalle I, paras. 94-95.
[539] RPHB, paras. 116, 118, citing HT, p. 773.
[540] RR, para. 310
[541] RR, para. 313, 319.
[542] RR, para. 337.
[543] RR, para 350.
[544] Exh. C-91.

534.  The development of the *Amparo* Proceedings has been described in section IV.7 above. Suffice it to say here that more than two years after the initial filing of the *Amparo,* on April 17, 2015, the *Tribunal de Queja* decided *sua sponte* to remand the case back to the *Juez de Distrito*, with the limited purpose to determine whether Lion's *Amparo* proceeding was inadmissible, a different *Amparo* relating to the same facts having been filed at an earlier date and thereafter abandoned.

535.  When the *Tribunal de Queja* raised the issue of the False *Amparo* it came as a total surprise:

- For the last 16 months of *Amparo* proceeding no party and no prior court had ever referred to this admissibility issue[545];

- The same *Tribunal de Queja* had also failed to raise the issue when it first intervened in these proceedings, to adjudicate an appeal against interlocutory decisions of the *Juez de Distrito*;

- The *Tribunal de Queja* decided *sua sponte,* and over a year into the *recurso de revisión*, to raise the existence of the False *Amparo*; the only reason given by the *Tribunal de Queja* to justify its decision was that an unidentified administrative official had informed the Court of the existence of the previous *Amparo*[546].

536.  As regards the remand procedure, the *Tribunal de Queja* ordered that it should be restricted to adjudicating the admissibility issue, explicitly prohibiting the parties from presenting new evidence regarding the falsehood of the Settlement Agreement[547] and instructing the *Juez de Distrito* not to analyze Lion's allegation that such Agreement had been forged[548].

537.  After three years of judicial battling, Lion still had no decision confirming the falsehood of the Forged Settlement Agreement, and after the remand decision it was fighting to prove that it should not be deprived of the *Amparo* recourse – the only way to overturn the wrongful cancellation of the Mortgages.

The Remand *Amparo*

538.  The fact that the Remand *Amparo* was being tried by the same judge who had already dismissed evidence on the forgery, did not discourage Lion from bringing once more a petition to admit evidence on the fraudulent nature of the Forged Settlement[549]. And,

---

[545] Exh. C-119.
[546] Exh. C-119, p. 21.
[547] Exh. C-119, p. 18
[548] Exh. C-119, pp. 17-18.
[549] Exh. C-121.

since Lion had only acquired knowledge of the False *Amparo*'s existence at this point, it also provided evidence pointing to the inauthenticity of the False *Amparo*[550].

539. On September 23, 2015 the *Juez de Distrito* only accepted the graphology expert report and a brief filing on the False *Amparo* as evidence[551]. The *Juez de Distrito* used formalistic reasoning to reject further evidence provided by Lion[552].

> Lion's withdrawal

540. On December 11, 2015 Lion decided to withdraw the *Amparo* Proceedings in their entirety.

## 3.   THE LAW

541. Lion's claim for denial of justice is based on Art. 1105 of NAFTA, which provides that Mexico shall accord to investments of protected investors treatment in accordance with international law, including FET. The FTC Interpretation Note equates the standard of protection to be applied under Art. 1105 of the NAFTA with the standard of "customary international law minimum standard of treatment of aliens".

542. This "minimum standard of treatment" incorporates denial of justice, together with its traditional requirement that the aggrieved investor, to be authorized to proceed against the State, must first have exhausted all legal remedies available in the municipal Court system and must have lodged appeals up to the highest instance (**A.**). The requirement is, however, subject to an exception: exhaustion is unnecessary in situations where lodging an appeal would be obviously futile (**B.**)

### A.   The requirement

543. The rule of exhaustion of local remedies derives from the customary international law principle that, prior to bringing an international claim, the foreign national must have first resorted to the host State's legal remedies to obtain redress.

---

[550] Exh. C-122.
[551] Exh. C-123.
[552] Exh. C-123: Sr. Arechederra's testimony could not be admitted because it was rendered by Claimant's legal counsel and raised a risk of bias; additionally, the Court found that Claimant incorrectly submitted a questionnaire that included identical questions for Sr. Arechederra and Mr. Baer, a type of evidence that is forbidden under the applicable law, see RR, para. 119 together with footnote within, invoking inadmissibility of such evidence under Art. 150 of the *Amparo* law.

544. This principle of customary international law was developed in the context of diplomatic protection in the *Interhandel* and *ELSI* cases[553]. In *Interhandel* the ICJ stated that[554]:

> "The rule that local remedies must be exhausted before international proceedings may be instituted is a well-established rule of customary international law […] Before resort may be had to an international court … it has been considered necessary that the State where the violation occurred should have an opportunity to redress it by its own means, within the framework of its own domestic legal system".

545. The ILC Draft Articles on Diplomatic Protection records this well-established principle in Article 14.

> Article 14. Exhaustion of local remedies
>
> 1. A State may not present an international claim in respect of an injury to a national […] before the injured person has, subject to draft article 15, exhausted all local remedies".

<u>The exhaustion rule in investment protection cases</u>

546. It is unanimously accepted that the exhaustion rule is a substantial element of denial of justice and applies beyond diplomatic protection. Professor James Crawford, rapporteur on State Responsibility of the ILC, said that[555]:

> "the exhaustion of local remedies rule is not limited to diplomatic protection".

547. The academic writings on investment protection support this view. Paulsson recalls that:

> "[f]or a foreigner's international grievance to proceed as a claim of denial of justice, the national system must have been tested. Its perceived failings cannot constitute an international wrong unless it has been given a chance to correct itself[556]".

548. Professor Paparinskis in turn states that:

---

[553] *Interhandel*; *ELSI*.
[554] *Interhandel*, p. 27.
[555] State Responsibility, Document A/CN,4/517 and Add.1 – Fourth report on State responsibility, by Mr. James Crawford, Special Rapporteur.
[556] J. Paulsson, "Denial of Justice in International Law", p. 108.

*Lion Mexico Consolidated v. Mexico*
ICSID Case No. ARB(AF)/15/2
Award

"[i]t is accepted that denial of justice becomes internationally wrongful only after the whole system of administration of justice has been put to the test by exhaustion of local remedies[557]".

549. The Tribunal concurs: a claim for denial of justice only becomes ripe when the remedies available in the legal system of the host State to impeach the decision have been exhausted. The underlying reasons for this requirement are twofold:

-   It guarantees that the host State's judicial system is provided with an opportunity to rectify errors in the decision of lower court instances, and

-   It guarantees that international tribunals do not become appeal Courts for dissatisfied investors.

Case law

550. Investment tribunals in the context of NAFTA have endorsed the same conclusion[558]. The Tribunal in *Loewen* specifically stated that a claim for denial of justice within Article 1105 NAFTA, incorporated the exhaustion requirement[559]:

"The purpose of the requirement that a decision of a lower court be challenged through the judicial process before the State is responsible for a breach of international law constituted by judicial decision is to afford the State the opportunity of redressing through its legal system the inchoate breach of international law occasioned by the lower court decision. The requirement has application to breaches of Articles 1102 and 1110 as well as Article 1105".

551. The *Waste Management II* tribunal, for instance, stated in the context of assessing a denial of justice claim that[560]:

"The system must be tried and have failed, and thus in this context the notion of exhaustion of local remedies is incorporated into the substantive standard and is not only a procedural prerequisite to an international claim".

552. Investment tribunals in non-NAFTA cases have come to the same conclusion. For example, in *OI European Group B.V.* the tribunal emphasized the need to give the host State's judicial system an opportunity to rectify its mistakes so as to avoid the use of international law as a system of appeals against judgments unfavourable to investors:

"International Law cannot become a convenient system to appeal any domestic court decision the investor disagrees with. Before it can be established under

---

[557] M. Paparinskis, *op. cit.*, p. 182 [Footnote omitted].
[558] See e.g., *Loewen*, paras. 150-156, *Waste Management II*, para. 97, *Apotex*, para. 282 and other decisions discussed *infra*. The position in *Mondev* is exceptional and not shared by this Tribunal.
[559] *Loewen*, para. 156.
[560] *Waste Management II*, para. 97.

International Law that a State's legal system has committed a wrong, it is essential to provide it with a chance to correct its own mistake"[561].

Non-Disputing Parties

553. The United States[562] and Canada[563] have defended the same position in their Non-Disputing Party submissions:

- The USA says that the international responsibility of States may only be invoked with respect to final judicial acts, unless recourse to further domestic remedies is obviously futile or manifestly ineffective[564]; judicial acts only result in a breach of Article 1105(1) if the justice system as a whole, as validated by a court of the highest instance, produces a denial of justice[565];

- Canada also submits that a denial of justice claim must be preceded by the local court decisions reaching finality at the court of last resort of the State's judiciary[566].

**B.   The exception of obvious futility**

554. The requirement that local remedies be exhausted is subject to an exception: an alien cannot be required to take a measure or lodge an appeal which will not remedy the international wrong.

**a.   The position of the Parties and the Non-Disputing Parties**

555. The precise scope of the exception to the rule of exhaustion of local remedies has been much discussed by the Parties:

- Lion says that the claimant must only exhaust remedies which are adequate, effective and reasonable[567], while

- Mexico submits that the only remedies which do not have to be exhausted are those which are unavailable, adding that NAFTA jurisprudence (*Loewen, Apotex*) focuses on availability, not on futility[568].

---

[561] *OI*, paras. 533-536.
[562] USA Submission, paras. 11-14.
[563] Canada Submission, paras. 7-8.
[564] USA Submission, para. 11.
[565] USA Submission, paras. 12-13.
[566] Canada Submission, para. 7, citations omitted.
[567] CPHB, para. 227.
[568] RR, para. 280.

556. The Non-Disputing Parties have also presented their views on the exception to the rule of exhaustion:

- The USA recognizes that the exhaustion rule does not apply whenever further recourse for a claimant is obviously futile or manifestly ineffective[569]; further remedies are obviously futile where there "was no justice to exhaust[570]"; but it is not enough for a claimant to allege the "absence of a reasonable prospect of success or the improbability of success, which are both less strict tests[571]".

- Canada also acknowledges that the rule gives way whenever it would be "demonstrably futile" to pursue local remedies[572]; whether recourse to further appeals of a domestic court judgment is futile is "a fact-specific inquiry taking into consideration the availability, adequacy and effectiveness of the remedy"[573].

### b.    Position of the Tribunal

557. Mexico argues that under NAFTA the only remedies which do not have to be exhausted are those which are "unavailable", adding that NAFTA jurisprudence equates unavailability with futility. Mexico seeks support in two NAFTA cases *Loewen* and *Apotex.*

558. Mexico's position is excessively restrictive. It implies that an investor is obliged to pursue all available remedies, even if there is no reasonable prospect that the request or appeal will effectively undo the international wrong.

559. Scholars in the realm of investment protection, such as Paulsson, suggest that the appropriate test should be more flexible, and based on the formulation of Judge Lauterpacht in his separate opinion the *Norwegian Loans* case: the remedies that ought to be pursued are those which offer a "reasonable possibility of an effective remedy"[574]. Paulsson explains that[575]:

> "[t]he victim of a denial of justice is not required to pursue improbable remedies. Nor is he required to contrive indirect or extravagant applications beyond the ordinary path of a frontal attempt to have the judgment by which he was unjustly treated set aside, or to be granted a trial he was denied".

---

[569] USA Submission, paras. 12-13.
[570] USA Submission, para. 14, citations omitted.
[571] USA Submission, para. 14.
[572] Canada Submission, para. 7, citations omitted.
[573] Canada Submission, para. 8.
[574] J. Paulsson, "Denial of Justice in International Law", p. 118; *Norwegian Loans*, p. 39.
[575] J. Paulsson, "Denial of Justice in International Law", p. 113.

*Lion Mexico Consolidated v. Mexico*
ICSID Case No. ARB(AF)/15/2
Award

560.  Prof. Amerasinghe describes the exception as follows[576]:

> "The test of obvious futility clearly requires more than the probability of failure or the improbability of success, but perhaps less than the absolute certainty of failure. The test may be said to require evidence from which it could reasonably be concluded that the remedy would be ineffective".

561.  The ILC has recorded this exception in its Draft Articles on Diplomatic Protection:

> "Article 15. Exceptions to the local remedies rule
>
> Local remedies do not need to be exhausted where:
>
> (a)  There are no reasonably available local remedies to provide effective redress, or the local remedies provide no reasonable possibility of such redress".

562.  In the Tribunal's opinion, the exhaustion rule is subject to two categories of exceptions: an aggrieved alien is only required to pursue remedies

-   which are reasonably available (i), and

-   which have an expectation that they will be effective, *i.e.* the measure or appeal has a reasonable prospect of correcting the judicial wrong committed by the lower courts (ii).

Reasonable availability

563.  (i) The first facet of the exhaustion rule is that the aggrieved alien must launch all remedies, which are not extravagant, and take them to the highest judicial instance in the land.

564.  The burden on Claimant is not to pursue all possible remedies, but only those which are reasonably available. In the words of Paulsson[577]:

> "[t]he victim of a denial of justice is not to pursue improbable remedies. Nor is he required to contrive indirect or extravagant applications beyond the ordinary path of a frontal attempt to have the judgment by which he was unjustly treated set aside, or to be granted a trial he was denied".

565.  Prof. Amerasinghe supports the same conclusion[578]:

---

[576] Ch. Amerasinghe, "Local Remedies in International Law", Cambridge, 2004, p. 206.
[577] J. Paulsson, "Denial of Justice in International Law", p. 113.
[578] Ch. Amerasinghe, *op. cit.*, p. 181.

> "An aggrieved alien is bound only to exhaust those remedies that are available to him. The requirement thus postulated has been described in terms of accessibility".

566. In its Commentary to the ILC Draft on Diplomatic Protection, the ILC recalls that the "reasonable availability" test is supported by judicial decisions that considered that remedies need not be exhausted when[579]:

> "[…] the local court has no jurisdiction over the dispute in question; the national legislation justifying the acts of which the alien complains will not be reviewed by local courts; the local courts are notoriously lacking in independence; there is a consistent and well-established line of precedents adverse to the alien; the local courts do not have the competence to grant an appropriate an adequate remedy to the alien; or the respondent State does not have an adequate system of judicial protection".

Effectiveness

567. (ii) The aggrieved alien is not under an obligation to resort to an appeal which, although available, was obviously futile. As Prof. Amerasinghe explains, this exception[580]

> "was a compromise between the interests of the respondent state in having a fair opportunity of doing justice by its own means and those of the alien in having the most efficient justice done at the lowest cost in the quickest way".

568. The seminal case establishing this exception was the 1934 *Finnish Vessels Arbitration*, which held that a claimant is not obliged to resort to an appeal, provided that such remedy was "obviously futile"[581]. In the specific case the arbitrator found that where the finding of fact by a lower instance court was final, and the success of the claimant's case depended on a different finding of fact, an appeal to a higher Court was obviously futile[582].

569. This initial threshold has been lowered by several decisions that followed. In the *Ambatielos Case*, the Arbitration Commission said that[583]:

> "It is the whole system of legal protection, as provided by municipal law, which must have been put to the test […]. It is clear, however, that [the exhaustion rule] cannot be strained too far. Taken literally, it would imply that the fact of having

---

[579] Text adopted by the International Law Commission at its fifty-eighth session, in 2006, and submitted to the General Assembly as a part of the Commission's report covering the work of that session. The report, which also contains commentaries on the draft articles, appears in Official Records of the General Assembly, Sixty-first Session, Supplement No. 10 (A/61/10).
[580] Ch. Amerasinghe, *op. cit.*, p. 205.
[581] *Finnish Vessels*, p. 1504.
[582] *Finnish Vessels*, p. 1543.
[583] *Ambatielos*, p. 120.

neglected to make use of some means of procedure — even one which is not important to the defence of the action — would suffice to allow a defendant State to claim that local remedies have not been exhausted, and that, therefore, an international action cannot be brought. This would confer on the rule of the prior exhaustion of local remedies a scope which is unacceptable".

570.    In the *Norwegian Loans* case, Judge Lauterpacht issued a separate opinion proposing a lower threshold with regard to effectiveness, which has gathered support in the writings of jurists[584]. He stated that:

> "The requirement of exhaustion of local remedies is not a purely technical or rigid rule. It is a rule which international tribunals have applied with a considerable degree of elasticity [...]

571.    Judge Lauterpacht suggested that the exhaustion rule should be put aside where there was no "reasonable possibility" for the complainant to obtain "an effective remedy"[585].

<u>Case law</u>

572.    The tribunal in *Apotex* relied on the more rigid "obvious futility" test[586]. Other tribunals, such as *Loewen*, resorted to the standards of "effectiveness" and "reasonable availability" of the remedies. The tribunal in *ATA Construction* considered that the complainant has to exhaust those remedies that are "plausibly available"[587]; and in *Jan de Nul*, the tribunal said that the exception applied when "there is no effective remedy or no reasonable prospect of success"[588].

573.    A less rigid approach to the exceptions has been also applied in the non-NAFTA investment cases. In *Duke Energy*:

> "[t]he Claimants are right to point out that there is no obligation to pursue 'improbable' remedies.[589]"

574.    The *Ambiente Ufficio* tribunal also qualified the rule as applicable only to reasonably available remedies[590]:

---

[584] See Text adopted by the International Law Commission at its fifty-eighth session, in 2006, and submitted to the General Assembly as a part of the Commission's report covering the work of that session. The report, which also contains commentaries on the draft articles, appears in Official Records of the General Assembly, Sixty-first Session, Supplement No. 10 (A/61/10), p. 47.
[585] *Norwegian Loans,* p. 39.
[586] *Apotex*, para. 276.
[587] *ATA Construction*, para. 107.
[588] *Jan de Nul*, para. 258.
[589] *Duke Energy*, para. 400.
[590] *Ambiente Ufficio*, para. 599.

"It appears to be generally accepted in international law that obligations requiring an individual to approach a State's local courts before a claim may be taken to the international plane do not apply unconditionally. […] only those remedies must be used which are available 'as a matter of reasonable possibility."

\* \* \*

575. <u>In conclusion</u>, the Tribunal finds that an investor who has suffered denial of justice is only required to exhaust remedies:

- which are reasonably available, and

- which have an expectation that they will be effective, *i.e.* the measure or the appeal have a reasonable prospect of correcting the judicial wrong suffered by the alien.

**4.   <span style="font-variant:small-caps">Discussion</span>**

576. Mexico argues that Claimant did not exhaust local remedies:

- Claimant should have pursued other adequate remedies (and specifically the *nulidad del juicio concluido*), but failed to do;

- Claimant wrongly withdrew the Amparo Proceedings; Claimant's argument is simply an assumption that the *Tribunal de Queja* and the Supreme Court were unlikely to render any decision in its favour.

577. Respondent also denies that the Mexican Courts incurred in unreasonable delay, or that the expected duration of the remedy procedures would be unreasonable[591].

578. Lion defends the contrary position: it avers that

- Mexico incurred in undue delay[592],

- Mexico failed to provide effective means to reverse the cancellation of the Mortgages[593],

- The *Amparo* Proceedings were the only adequate proceedings available[594].

- Continuation of the *Amparo* Proceedings was obviously futile[595],

---

[591] RR, paras. 313 and 319.
[592] CPHB 224.
[593] CM para 423.
[594] CPHB para 227.
[595] CPHB para 229.

- The finalization of the *Amparo* Proceedings would only have resulted in a finding that the *emplazamiento* in the Cancellation Lawsuit had been improperly made – requiring a new procedure to reinstate the validity of the Mortgages;

- Exhaustion of local remedies would in total have lasted six years – an unreasonable period of time[596].

Decision

579. The Tribunal decides in favour of Lion for three reasons:

- The *Amparo* was the only remedy, reasonably available to the Claimant, to undo the cancellation of the Mortgages (**A.**);

- Lion sought redress before the highest Court available within the Amparo proceeding (**B.**);

- Claimant unsuccessfully pursued the *Amparo* Proceedings for three years before the two available instances, and withdrew such Proceedings at a time when continuation would have been obviously futile and no effective redress would be obtained (**C.**).

**A.    The *Amparo* was the appropriate remedy**

580. In the present case, the international wrong committed by Mexico consists in a denial of justice: Mexico's judicial system has denied Lion access to justice by failing to correct the Cancellation Lawsuit, by denying Lion the right to appeal the Cancellation Judgement and finally has denied Lion the right to allege and prove the forgery of the Forged Settlement Agreement. As a result of the denial of justice, the Mortgages, Lion's protected investments, have been cancelled and Claimant has lost the protection afforded by these securities.

581. For Lion the detrimental effects of the Cancellation Proceeding were twofold:

- First, the Judgement ordered the cancellation of the Mortgages – and this was quickly accomplished, because the Judge ordered specific performance of the decision and by October 2012 the *Registros Públicos* had cancelled the Mortgages, which were extinguished for all legal purposes;

- Second, the *Juez de lo Mercantil* also issued a decision, declaring that the Cancellation Judgement had become *res iudicata*, and precluding the possibility that Lion launch a *recurso de apelación.*

---

[596] CPHB, para 227.

582. When Lion finally obtained knowledge of the existence of the Cancellation Judgement, this decision had already become *res iudicata* – the ordinary *recurso de apelación* was not any longer available. In the circumstances, Lion had, in principle, to choose between two procedures:

   -      The *recurso de Amparo*; or

   -      The *recurso de nulidad de juicio concluido.*

583. *Amparo* proceedings are an established institution under State and Federal law of Mexico, and represent the ordinary means to obtain protection from the Courts when constitutional rights have been breached[597]. The *recurso de nulidad de juicio concluido* is an institution developed by Mexican jurisprudence, which is not codified under the law of Jalisco or at the Federal level, which can only be used in extraordinary circumstances to request the annulment of certain civil judgments which are already *causa juzgada.*

584. The Parties' experts discussed whether Lion could have had access to a *recurso de nulidad de juicio concluido*. Mexico's legal expert – Dr. Ovalle – acknowledged that this type of remedy was not available to Lion under Codes of Civil Procedure of Jalisco and Nayarit[598].

### *Recurso de nulidad de juicio concluido*

585. Dr. Ovalle, however, suggests that Lion could have initiated a *recurso de nulidad de juicio concluido*, based on a supplementary application of the Code for Civil Procedure of the Federal District (which regulates the *nulidad del juicio concluido*) and applies to supplement proceedings under the Commercial Code, pursuant to its Article 1054[599]. Dr. Ovalle says that the Mexican Supreme Court has established jurisprudence endorsing this possibility by allowing a party to initiate a *juicio de nulidad* in civil proceedings under specific circumstances[600]. Dr. Ovalle refers to extracts of the jurisprudence of the Mexican Supreme Court applying this doctrine, in a case of the 1960s regarding *prescripción adquisitiva de dominio* (the doctrine of adverse

---

[597] Zamora I, para. 79.
[598] Ovalle II, para. 60.
[599] Ovalle I, para. 94.
[600] Ovalle I, para. 93.

possession)[601] and a case of 2001, regarding a judgement of *estado civil* (marital status)[602].

586. Dr. Zamora – Lion's legal expert – does not agree: he acknowledges the general jurisprudence of the Mexican Supreme Court that allows the supplementary application of the Code for Civil Procedure of the Federal District to civil proceedings before the civil Courts of the Mexican States only in certain cases. Dr. Zamora cites additional jurisprudence that has clarified that the supplementary application of the Code for Civil Procedure of the Federal District to commercial proceedings does not include access to the remedies or appeals not governed in the Commercial Code[603]:

> "De conformidad con el artículo 1054 del Código de Comercio, la aplicación supletoria de la legislación local en los juicios mercantiles no debe entenderse de un modo absoluto, sino con las restricciones que el propio numeral señala […] tratándose de recursos, mismos que se encuentran reglamentados adecuadamente en ese cuerpo normativo, no existe la citada supletoriedad, en virtud de que tal legislación cuenta con un sistema propio y completo de recursos, razón por la cual no puede sostenerse que deba aplicarse lo dispuesto por el referido artículo 1054 del Código de Comercio".

587. In particular, with respect to the suppletory application of the *nulidad del juicio concluido*, the jurisprudence says that it is available in civil proceedings of "*materia civil*", however, it clarifies that[604]:

> "Ahora bien, esta figura jurídica [nulidad de juicio concluido] es improcedente contra juicios mercantiles tramitados conforme al Código de Comercio, ello en razón de que no prevé dicha nulidad, ni alguna similar mediante la cual pueda dejarse insubsistente lo resuelto en un proceso anterior, aunado a que no cabe la supletoriedad del código procesal civil citado, ya que no fue voluntad del legislador hacer excepciones a la cosa juzgada en materia mercantil".

588. Based on the above considerations, the Tribunal is not convinced that the *recurso de nulidad de juicio concluido* was reasonable available to Lion in order to revert the Cancellation Judgment, which is undisputedly, *materia mercantil* and not *materia civil*.

---

[601] Ovalle I, p. 24, citing to Tesis de Jurisprudencia. "Nulidad de Juicio Concluido, declarada en otro juidio posterior. Casos en que procede. Aclaraciones a la tesis de jurisprudencia número 714". Registro 814296, Informes, p. 72.

[602] Ovalle II, p. 25, citing to Tesis de Jurisprudencia. "Nulidad de Juicio Concluido. Sólo procede respecto del proceso fraudulento". Número 296 del Apéndice al Semanario Judicial de la Federación, 1917-2000, t. IV, p. 249, registro 913238.

[603] Zamora IV, para. 37 citing to Tesis: VI.2o. J/20. Registro: 204861. Tomo II, Julio de 1995. Semanario Judicial de la Federación y su Gaceta. Novena Época. Tribunales Colegiados de Circuito. Jurisprudencia. Materia(s): Civil. Página: 154.

[604] Exh. R-41.

589. But even if Claimant could, due to a favourable interpretation, overcome the limitation that the scope of the *nulidad de juicio concluido* is restricted to judgments of *materia civil*, it would encounter an additional hurdle: as pointed by Dr. Zamora, in a judgment of 2008, the Mexican Supreme Court declared the unconstitutionality of a provision of the *nulidad de juicio concluido* regulated in Code for Civil Procedure of the Federal District[605], because it violated the principle of legal certainty[606]. Since then, a party seeking a *nulidad de juicio concluido* is required to provide evidence that the judgement impugned was rendered on the basis of a document that has been declared false. Lion would have to first file a criminal complaint seeking a declaration by the criminal Courts, that the Settlement Agreement was a forged document. Only then, could Lion try to initiate the *nulidad de juicio concluido*, with the hope that the Mexican courts would create new jurisprudence and extend the scope of this extraordinary remedy to a case of *materia mercantil*.

590. In any event, Claimant was also precluded from launching successively an *Amparo* and a *nulidad de juicio concluido*. The filing of an *Amparo* precludes the subsequent presentation of a *recurso de nulidad de juicio concluido*. Although Respondent's expert testified at the Hearing that the *nulidad de juicio concluido* and the *Amparo* are not mutually exclusive[607], the Tribunal agrees with Claimant that they are, based on Art. 73 of the *Amparo* law[608]:

> *"CAPITULO VIII De los casos de improcedencia*
>
> *Artículo 73.- El juicio de amparo es improcedente:*
>
> *[…] XIV.- Cuando se esté tramitando ante los tribunales ordinarios algún recurso o defensa legal propuesta por el quejoso que pueda tener por efecto modificar, revocar o nulificar el acto reclamado".*

591. Claimant chose the *Amparo* route. That this decision was the reasonably available remedy is proven by the Debtors foresight: anticipating that Lion would eventually launch an *Amparo* (and not a *recurso de nulidad de juicio concluido*, which was not reasonably available), the Debtors prepared the False *Amparo* Proceedings, a machination intended to forestall (as it eventually did) Lion's rightful *Amparo*.

592. Based on the above, the Tribunal believes that Claimant resorted to the reasonable available remedy in the given circumstances.

---

[605] Article 737 A, *Fracción II, última parte.*
[606] Zamora, IV, para. 43, citing to Tesis: P./J. 88/2008. Registro: 168856. Tomo XXVIII, Septiembre de 2008. Semanario Judicial de la Federación y su Gaceta. Novena Época. Pleno. Jurisprudencia. Materia(s): Constitucional, Civil. Página: 600 (Exh. Zamora IV-188).
[607] HT, p. 656.
[608] Exh. CLA-308.

Criminal proceedings

593. Claimant also launched criminal proceedings, which are still ongoing. The criminal proceedings also did not constitute a viable alternative avenue for Lion to pursue its economic claims, due to the vastly different character of criminal proceedings and the impossibility of obtaining the reversal of the Cancellation Judgment and the reinstatement of the Mortgages. Thus, Claimant is not required to first reach judicial finality in their respect to bring its NAFTA Art. 1105 claim.

**B.   The *Tribunal de Queja* was the highest Court available within the *Amparo* Proceeding**

594. The rule of exhaustion requires that the aggrieved alien obtain a ruling rendered by highest court in the host State[609]. Claimant says that the *Tribunal de Queja* was acting as the Court of highest instance in the *Amparo* Proceedings and that there was no possibility for Claimant to bring its case to the Supreme Court of Mexico – an allegation which has not been challenged by Mexico[610].

595. It is, thus, undisputed that Lion had taken its case to the highest available authority: the *recurso de revisión* brought the *Amparo* before the *Tribunal de Queja*, which was the highest authority available in the *Amparo* lawsuit.

**C.   Claimant was entitled to withdraw from the *Amparo* Proceeding**

596. On December 11, 2015 Lion waived the *Amparo* lawsuit.

597. At that point Claimant had spent almost three years in *Amparo* lawsuits before Mexican Courts, trying to undo the fraudulent cancellation of the Mortgages. It had achieved very little:

- Lion had been deprived, by an idiosyncratic decision of the *Juez de lo Mercantil*, of filing an ordinary appeal against the Cancellation Judgement (issued by the same *Juez de lo Mercantil*);

- The only avenue open to Lion had been an *Amparo,* which it filed as soon as it became aware of the Cancellation Judgement, but at a time when it still did not know that the Debtors had based their case on the Forged Settlement Agreement; Lion's recurring attempts to extend the scope of the *Amparo* to cover the forgery of the Settlement Agreement and to present evidence proving such forgery, had been dismissed by the first instance *Juez de Distrito* and in second instance by the *Tribunal de Queja*, for a purely formalistic reason: the *ampliación de la*

---

[609] RR, paras. 180, 198-201; RCM, para. 188.
[610] CPHB, para. 227, citing HT, 592-593 (Mr. Zamora); RR, para. 310.

*demanda* had been signed on behalf of Lion by its attorney and not by its legal representative - a minor procedural defect Lion was never offered the opportunity to remedy;

- Unable to submit that the Settlement Agreement had been forged, Lion's *Amparo* had been dismissed by the first instance *Juez de Distrito*; in the *Amparo* Judgement the *Juez de Distrito* assumed the Settlement Agreement to be valid and binding and concluded that Lion's *emplazamiento* had been properly served on Lic. López Medina, Lion's process agent as identified in the Forged Settlement Agreement - an obscure attorney, with whom Lion had never had any relationship and who failed to inform Lion;

- On appeal against the *Amparo* Judgement, the second instance *Tribunal de Queja,* whom Lion had asked to review a further time the prohibition to argue the forgery issue, did not take up this question; instead the *Tribunal de Queja,* in an unexpected move, made *sua sponte* the decision to remand the procedure back to the first instance Judge, with a strictly limited remit: to review whether the *Amparo* had been properly admitted, in light of the existence of a previous *Amparo* (the False *Amparo* – a decoy procedure filed fraudulently by the Debtors to derail the admissibility of the real *Amparo*);

- Upon the instructions of the *Tribunal de Queja,* the *Juez de Distrito* again denied Lion's request to expand the scope of the remand, so that the *Amparo* could encompass the forgery of the Settlement Agreement.

598. According to Claimant's expert[611], the best-case scenario for the progression of the *Amparo* would have required an additional period of between 18 to 30 months to finalize; a positive outcome in favour of Lion would have resulted in the Cancellation Proceeding being held anew, which would take one to two more years[612].

599. But Claimant's prospects for a best-case scenario were limited:

- <u>First</u>, the *Tribunal de Queja* remanded the case to the *Juez de Distrito* with a strictly limited mandate: to only look into the admissibility of the *Amparo* proceedings (in view of the False *Amparo*), explicitly prohibiting the *Juez de Distrito* from discussing the issue of the forgery of the Settlement Agreement, which constituted the cornerstone of Lion's *Amparo* Lawsuit;

- <u>Secondly</u>, Lion's case was going to be heard by the same *Juez de Distrito* who had already dismissed the *Amparo* in the first instance, and

---

[611] Zamora Hearing Presentation, pp. 12-13.
[612] Zamora Hearing Presentation, p. 13.

-     <u>Thirdly</u>, in this Remand *Amparo*, Lion filed a motion alleging the forgery of Mr. Arechederra's signature in the False *Amparo* and requested the *Juez de Distrito* to hear the testimony of Mr. Arechederra. The *Juez de Distrito* rejected the testimony and relied only on three expert reports to determine the authenticity of signature stamped in the False *Amparo*. Lion and one of the Debtors (Bains) appointed each an expert and the *Juez de Distrito* appointed a third expert. Lion's expert certified that the signature was not of Mr. Arechederra. However, the Debtor and the Court appointed experts arrived to the opposite conclusion, considering that the signature in the False *Amparo* was indeed of Mr. Arechederra's[613].

600. At this point, the fate of the Remand *Amparo* was in jeopardy: it is most likely that the *Juez de Distrito* would have ruled that the False *Amparo* was authentic, thereby making Lion's real *Amparo* inadmissible and rendering any further legal actions obviously futile.

> [*Pro memoria*, Lion had lodged an incident at the outset of the *Amparo* proceeding alleging that on July 6, 2012 Sr. Arechederra's signature had been forged in the false request for copy before the *Juzgado de lo Mercantil*. In that instance, two of the three experts (Lion's expert and the one appointed by the *Juez de Distrito*) had concluded that the signature had been forged[614]. Based on the experts' evidence, the *Juez de Distrito* had accepted the falsehood of the signature stamped on the July 6, 2012 request for copy before the *Juzgado de lo Mercantil*[615]. That the first signature of Mr. Arechederra had been forged, would seem to support the conclusion that his second signature had also been forged – the purpose of the machination was to file the False *Amparo*, which required two signatures.]

601. Thus, Claimant was further away from annulling the cancellation of the Mortgages than it was at the outset of the local proceedings. Moreover, it had little prospect of success, since Lion was prohibited from presenting evidence to prove the forgery and the *Juez de Distrito* had already once decided against its position. And even if Lion was successful, the effect of the *amparo* would be limited to a declaration that the *emplazamiento* in the Cancellation Judgement had been improperly made. A new procedure before the *Juez de lo Mercantil* would be required, to annul the Cancellation Judgement, which already had the *status* of *cosa juzgada* – a process that would at least require three years for the Cancellation Judgment to be overturned.

602. It is at this point when Lion abandoned all hope to obtain redress from the Mexican judiciary and waived the *Amparo* lawsuit.

603. <u>In sum</u>, Lion was put in a situation where three years into the *Amparo* Proceeding the only point of discussion was whether such proceedings were admissible at all. In three

---

[613] Zamora I, para. 191.
[614] Exh. C-115, pp. 31-34 and 36-39.
[615] See para. 161 *supra*; Exh. C-115, p. 39.

years of litigation, Lion was unable to obtain from the Mexican judiciary a recognition that it had been subject to such a manifest fraud and identity theft, that would effectively result in the reversal of the cancellation of the Mortgages. It is difficult to accept that Lion did not exhaust all reasonable and available remedies with a reasonable prospect of reversing the denial of justice it had suffered.

Case law

604. Case law supports the Tribunal's finding.

605. In the historic *Montano* case between the US and Peru, the Umpire rejected the US Government objection of non-exhaustion of local remedies and upheld Peru's claim. He wrote[616]:

> "The obligation of a stranger to exhaust the remedies which nations have for obtaining justice, before soliciting the protection of his government, ought to be understood in a rational manner, that such obligation does not make delusive the rights of the foreigner".

606. The Peruvian claimant, a Sr. Montano, had obtained a US Federal judgement in his favour, but it remained unenforced due to the negligence of a US Marshal charged with its execution. The US government considered that claimant should have lodged a complaint against the Marshal, which led the Umpire to ironically reject the US position saying that "what Montano gained by the sentence was the right to bring forward another complaint".

607. The situation is similar in the present case: even if Claimant were to succeed in the *Amparo* Proceedings, what it would have gained is an acknowledgement that it had been improperly notified in the Cancellation Proceeding, and that these Proceedings should be repeated, upon proper notification of the American company.

608. Lion also finds itself in a similar position to the claimant in *Saipem*, who pursued local remedies for two and a half years until it became evident that continuing to litigate in local courts would have amounted to pursuing "improbable remedies" [617]:

> "It is undisputed that Saipem had already litigated the issue of the arbitral misconduct for more than two and a half years in front of different courts in Bangladesh before being served with the decision revoking the power of the ICC Tribunal. It can thus be held to have exerted reasonable local remedies, having spent considerable time and money seeking to obtain redress without success

---

[616] *Peru v. US*, Moore, "Arbitrations", 1630 at p. 1637, quoted from Paulsson, "Denial of Justice in International Law", p. 112.
[617] *Saipem*, para. 183.

although the allegation of misconduct was clearly ill-founded. Requiring it to do more and file appeals would amount to holding it to "improbable" remedies."

\* \* \*

609.   <u>In sum</u>, the Tribunal finds that Lion exhausted the reasonable available remedies that could have reversed the cancellation of the Mortgages. Lion was excused from continuing the Amparo proceeding in light of its obvious futility in the sense of its lack of any reasonable prospect of reversing the cancellation of the Mortgages.

# VI.3.  **CONCLUSION**

610.   The Tribunal's assessment of the facts of the present case and its conclusions on Lion's denial of justice claim are restricted to the conduct of the Courts of Jalisco with respect to the Cancellation and Amparo Proceedings. The Tribunal does not purport to pass judgement on the propriety or efficiency of the entire Mexican judicial system, for which this Tribunal has the utmost respect.

611.   The Tribunal has held that Lion was wrongfully denied the right to appear before the *Juez de lo Mercantil* in the Cancellation Proceeding that resulted in the cancellation of the Mortgages. This was caused by a deeply flawed *emplazamiento* and *declaración en rebeldía* that the Mexican judicial system never corrected.

612.   Lion was further deprived from the right to appeal the Cancellation Judgment, based on an improper procedural decision that patently disregarded municipal law: the *Juez de lo Mercantil* deemed that the value of the Cancellation Proceeding was less than MEX 500,000 (*circa* USD 25,200). This decision was adopted despite the knowledge

-   that the Cancellation Judgment had the effect of removing the security for the Loans with a total value of USD 32.8 M; and

-   that the creditor had been declared in *rebeldía*.

613.   Finally, when Lion sought to remedy this situation through the *Amparo* proceeding, the two instances available (*Juez del Distrito* and *Tribunal de Queja*) refused Lion's repeated requests to be authorized to present evidence and allegations that it had been subject to a sophisticated fraud that had resulted in the loss of its investment.

614.   The Tribunal has also concluded that Lion pursued the reasonably available remedies within the Mexican judicial system that should have effectively restored its rights; and that after several attempts to obtain redress, these remedies proved ineffective and obviously futile.

615.   In view of all of the above, the Tribunal concludes that Mexico incurred in denial of justice and failed to provide Lion fair and equitable treatment under NAFTA Art. 1105.

# VI.4. <u>THE ALTERNATIVE CLAIMS</u>

616.  Claimant has formulated, in the alternative, two additional claims:

-     For judicial and administrative expropriation of Lion's investment under NAFTA Art. 1110; and

-     For failure to grant Lion's investment full protection and security under NAFTA Art. 1105.

617.  Claimant says that Mexico would be liable to award the same compensation for a breach of denial of justice or for any of the breaches alleged as alternative claims[618].

618.  The Tribunal has concluded that Mexico is responsible for a denial of justice in breach of NAFTA Art. 1105, and consequently Lion is entitled to compensation (to be established in the next section). Consequently, Lion's alternative claims are moot.

---

[618] CPHB, paras. 143, 186, 243 and 247.

# VII.   <u>QUANTUM</u>

619.   NAFTA Art. 1135(1)(a) provides for the award of monetary damages and applicable interest where a Party is found to have violated a Chapter Eleven provision. In the previous sections the Tribunal determined that Mexico breached the FET standard enshrined in NAFTA Art. 1105 through a denial of justice.

620.   The NAFTA does not provide rules for the awarding of compensation in denial of justice claims, in breach of Art. 1105 – unlike in expropriation claims under Art. 1110. Consequently, the Tribunal must seek the appropriate standard in customary international law.

Customary international law

621.   The seminal case dealing with compensation under customary international law is the PCIJ's *Chorzów Factory*[619], a decision from 1928 which, despite the passage of nearly a century, remains a precedent which is extensively used by investment tribunals. It established the principle of full reparation for the injury caused, even if the treaty serving as the basis of the dispute does not contain a specific provision requiring full indemnification of the wronged party.

622.   The PCIJ found that:

> "[…] reparation must, so far as possible wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed. Restitution in kind, or, if this is not possible, payment of a sum corresponding to the value which a restitution in kind would bear; the award, if need be, of damages for loss sustained which would not be covered by restitution in kind or payment in place of it - such are the principles which should serve to determine the amount of compensation due for an act contrary to international law".

623.   The customary international law principle of full reparation has been embodied in Art. 31(1) of the ILC's Articles on State Responsibility, which states that:

> "1. The responsible State is under an obligation to make full reparation for the injury caused by the internationally wrongful act".

624.   Customary international law thus mandates that breaches by the host State of the obligations assumed under NAFTA Art. 1105, should be remedied by granting the wronged investor full reparation for the injury caused.

---

[619] *Chorzów Factory,* Exh. CLA-180.

625. Additional guidance is provided by Art. 34 of the ILC Articles on State Responsibility, which states that:

> "Full reparation for the injury caused by the internationally wrongful act shall take the form of restitution, compensation and satisfaction, either singly or in combination, in accordance with the provisions of this chapter".

626. In the present case, Claimant seeks solely reparation in the form of compensation, and Respondent has not proposed that instead it should grant restitution or satisfaction. The Tribunal must consequently award a compensation sufficient to "wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed[620]".

627. Full reparation by compensation requires that the Claimant, as regards its investment, be restored to the situation in which it would have been, had a breach not occurred. The appropriate methodology to establish the impairment suffered by Claimant's investment requires a three-step approach[621]:

- In a first step, the Tribunal must value Claimant's investment (in this case the Mortgages) on a certain valuation date, under the assumption that no international wrong had occurred – the so called "But For Scenario";

- In a second step, the Tribunal must determine the actual value of the investment, taking into consideration the effects of the breach – the so called "As Is Scenario";

- In a final step, the difference between the But For and As Is values of the investment must be calculated, such difference representing the impairment suffered by the investment due to the host State's wrongful action.

628. Claimant is additionally entitled to any additional damages suffered as a consequence of the breach, to the extent that such damages have been incurred and can be proven.

Valuation date

629. Determination of the impairment suffered by Claimant's investment requires selecting an appropriate valuation date. The Parties hold different positions:

- Claimant estimates that in the judicial foreclosure action it would have acquired the Properties without an auction (since the debt exceeded the value of the

---

[620] *Chorzów Factory*, p. 47.
[621] See *Chorzów Factory*, p. 51; *Burlington*, para. 357.

collaterals) and that it would have re-sold the Properties by March 31, 2015; Lion proposes that this date should act as valuation date for all Mortgages[622];

- Respondent, on the other hand, says that the valuation dates should be separate for each Mortgage, and proposes September 7 and October 16, 2012 – the dates immediately before the cancellation of the Guadalajara and the Nayarit Mortgages in the *Registro Público*[623].

630. The Tribunal finds Claimant's proposed valuation date to be purely hypothetical and premised on a large number of uncertainties. The only certain date in Claimant's But For Scenario is the start of the Foreclosure Proceeding for the Nayarit Property; the rest of the counter-factual milestones are purely hypothetical – including the commencement of foreclosure proceedings regarding the Guadalajara Properties, the ending of both foreclosure proceedings with a judgment ordering foreclosure and assignment of the Properties to Lion and, ultimately, the possibility of selling these Properties at arms' length to third parties around March 2015. The Tribunal lacks sufficient evidence to make a proper estimation as to when these events may have happened.

631. In this situation, the Tribunal prefers the valuation date proposed by Respondent: Mexico's denial of justice occurred over several judicial instances and an extensive period of time; but the origin of the denial of justice can be pinpointed to the Cancellation Judgment issued by the *Juez de lo Mercantil*, and the subsequent cancellation of the Mortgages by the Public Registries. There is also no doubt that such cancellation was a harmful act: it caused the extinction of the Mortgages and stripped Claimant's Loans of the collateral which guaranteed repayment. It thus is appropriate that the impairment of the investment be calculated as of the date of cancellation of each Mortgage.

632. In conclusion, the valuation dates should be September 7, 2012 for the Guadalajara Mortgages and October 16, 2012 for the Nayarit Mortgage.

\* \* \*

633. Claimant specifically requests the following categories of compensation[624]:

- The first category is the impairment suffered by the investment, to be calculated as the value of the Mortgages in the But For Scenario (equal to the market value of the Properties, minus transaction costs) minus the value in the As Is Scenario (nil) (**VII.1.**);

---

[622] CPHB, para. 248; Zamora II, para. 201.
[623] CBRE Nayarit I, p. 63 and CBRE Guadalajara I, p. 59.
[624] CPHB, para. 320.

- The second category are certain Legal Fees which Claimant says could arise as a consequence of the withdrawal of the Foreclosure Proceeding (**VII.2**);

- The third category are certain expenses and fees incurred in the exhaustion of local remedies (**VII.3**).

# VII.1.  IMPAIRMENT OF THE INVESTMENT

634. The first category of compensation requested by Claimant is the impairment allegedly suffered by its investment, the three Mortgages, to be calculated as the value of the Mortgages in the But For Scenario minus the value in the As Is Scenario.

<u>But For Scenario</u>

635. Claimant submits that the value of the Mortgages in the But For Scenario should be equal to the market value of the Properties as of the valuation date, minus transaction costs. In Lion's opinion, had it not been for Mexico's breach, it would have been able to acquire the Nayarit and Guadalajara Properties in the Foreclosure Proceedings and promptly re-sell them to a willing third party, using the sales price to set off (part of) the amounts due under the Loans[625].

636. This proposition has not been opposed by Mexico.

637. The Tribunal agrees: were it not for the Cancellation Judgment issued by the *Juez de lo Mercantil* and the failure of Mexico's judicial system to correct this Judgment, in breach of the FET standard, the Mortgage registrations in the Nayarit and Guadalajara Public Registries would never have been cancelled. Upon default of the secured Loans, Lion would have instituted Foreclosure Proceedings, which would have resulted in the judicial enforcement of the Mortgages and in the assignment of the Properties to Lion – assignment of the mortgaged asset to the creditor (and not foreclosure by public auction) is the rule provided for by Mexican Law when the secured debt exceeds the market value of the mortgaged asset[626].

638. In the present case, the secured debt in fact exceeded the value of the Properties: the Nayarit Mortgage was granted to secure the three Loans, and the two Guadalajara Mortgages secured the Second Loan and Third Loan respectively. By October 2012 the total debt under the three Loans amounted to approximately USD 104 M (USD 49,4 M under the First Loan, USD 38,9 M under the Second Loan and USD 15,9 under the Third Loan)[627]. As will be explained *infra*, the value of the Properties as of October 2012 was less than the debts secured by each of the Mortgages[628].

---

[625] CPHB, para. 248.
[626] Zamora II, para. 201.
[627] The last invoice that Lion sent to Sr. Cárdenas for the payment of the debt is as of June 30, 2011 and it records a total debt of USD 76 M (See para. 89 *supra*; CM, para. 27; Exh. C-42). With default interests running, the debt increased by October 2012 to USD 104 M.
[628] See para. 761 *infra*

639. It is also safe to assume that, upon assignment of the Properties, Lion would have eventually sold them to a willing third party to recover its loans[629].

Foreclosure costs

640. In the But For Scenario, the assignment and re-sale of the Properties would imply certain foreclosure costs. Claimant agrees that such costs be deducted from the compensation and avers that the costs include[630]:

- Public Registry and Notary fees, plus transfer taxes, which amount to 4.6% of the Nayarit Property sales price and 0.7% of the sales price of the Guadalajara Properties;

- plus an amount in MEX[631] and USD 50,000 in legal fees.

641. Respondent has not questioned these amounts, and instead has focused its disagreement on the value of the Properties.

Valuation of the Properties

642. Both Parties have engaged valuation experts to determine the market value of the Properties: Claimant presented the expert opinion of Mr. Marchitelli, who works for Cushman & Wakefield, and Respondent relied on the valuation carried out by a team from CBRE.

643. The valuation of an asset, whether an enterprise, or as in this case, real estate, is a complex exercise, which requires the election of a certain methodology, the definition of certain hypotheses, the calculation of certain variables and, at the end of the day, the making by the valuer of certain estimations. Depending on these factors, different valuers may reach materially different results.

644. In this case, Claimant seeks damages of USD 85.9M, based on its expert's proposed valuation of the Properties[632]. Respondent's expert, on the other hand, arrives at a much more conservative figure, proposing a valuation of USD 47M[633].

645. Given the wide spectrum of results that different valuations may yield, tribunals need to retain a certain margin of appreciation in determining the final compensation due. This does not mean that the tribunal becomes an *amiable compositeur*, because the tribunal's margin of appreciation can only be exercised in a reasoned manner and

---

[629] See paras. 762 and 763 *infra*.
[630] Payne II, Appendix B.
[631] 100,700.69 + 3% on the balance of the price – 3,736,575,01.
[632] Payne II, para. 11; H-4, p. 11 and 27
[633] RR, para. 635.

within the boundaries of the principles of international law for the calculation of damages[634].

646. In determining Lion's compensation for Mexico's NAFTA breach the Tribunal will take as its starting point the valuations of the Properties that each of the Parties' experts have presented. The Tribunal will thereafter make an adjustment, to reflect the actual value of the Properties and the Mortgages, in the specific circumstances of this case.

647. The Tribunal will first assess the market values of the Nayarit Property (**1.**) and of the Guadalajara Properties (**2.**), as calculated by the experts; it will then make certain adjustments to reflect the proper calculation of the impairment suffered by the investments (**3.**); and finally, will address and dismiss Respondent's ancillary arguments that purport to reduce the compensation due (**4.**).

**1.**   T<small>HE MARKET VALUE OF THE</small> N<small>AYARIT</small> P<small>ROPERTY</small>

648. The Nayarit Property is located on Banderas Bay, in an area known as Distiladeras[635]. It is an unimproved, oceanfront tract that covers an area of approximately 373,558 m² [636]:



649. Through the property runs an old double lane road, close to the beach, which links the cities of Punta Mita and La Cruz [the "**Old Road**"].

---

[634] *Rusoro*, para. 642; *Gold Reserve*, para. 686.
[635] Cushman I, p. 9.
[636] Cushman I, p. 10.

The Collaboration Agreement

650. On July 30, 2008 the Nayarit State Government and Inmobiliaria Bains (one of Sr. Cárdenas's companies) signed a collaboration agreement [the "**Collaboration Agreement**"][637]. The agreement acknowledged that Inmobiliaria Bains held the Nayarit Property and that the Old Road ran across it[638]. The Old Road, however, did not have its "*derecho de vía liberado*" and this was both problematic and irregular[639]. To resolve that situation, the Nayarit State Government planned on building a new road linking the same two cities (Punta de Mita and La Cruz) but farther away from the coast[640] [the "**New Highway**"].

651. Pursuant to the Collaboration Agreement:

- The Government undertook to give the possession of the Old Road to Inmobiliaria Bains[641] as soon as the works of the New Highway were completed[642] (which were supposed to last eight months[643]);

- Inmobiliaria Bains would transfer an area of land for the construction of the New Highway[644] and contribute to a portion of the building costs[645], estimated at MEX 23.5 M, by bank check issued at that moment in favour of the Government[646].

652. There is no dispute that the New Highway is presently in use, and so still is the Old Road.

653. As will be seen further below, the implications of having the Old Road transverse the Nayarit Property is one of the main points of departure between the experts.

654. This is an aerial photograph of the area, depicting the Old Road, the Nayarit Property and the New Highway[647]:

---

[637] Exh. C-188.
[638] Whereas 2.4.
[639] Whereas 1.3.
[640] Whereas 2.5.
[641] Clause Segunda e).
[642] Clause Sexta.
[643] Clause Séptima.
[644] Clause Tercera a).
[645] Clause Tercera b).
[646] Clause Quinta.
[647] H4, p. 4.



\* \* \*

655. Both experts were tasked with the estimation of the market value of the Nayarit Property, assuming that its highest and best use is for tourist-related development, including hotels, condominiums and single-family homes[648].

656. Claimant's valuation was based on a sales comparison approach[649] (**1.1**); Respondent's expert used the same approach[650], but validated the results with a residual methodology (**1.2.**). The experts' valuations differ by USD 27.3 M[651]. The Tribunal will have to determine which valuation is preferable (**1.3.**).

## 1.1   CLAIMANT'S VALUATION

657. Mr. Marchitelli from Cushman & Wakefield made a special assumption regarding the valuation of the Nayarit Property: since the Collaboration Agreement foresaw that Inmobiliaria Bains would gain full possession of the Old Road once the New Highway

---

[648] Cushman I, p. 11. CBRE Nayarit I, p. 48.
[649] Cushman I, p. 3.
[650] CBRE Nayarit I, p. 51.
[651] Claimant proposes a value of USD 48.6 M in October 2012; Respondent suggested MEX 274,739,000 in October 2012. Respondent's Rejoinder, para. 542 mentions that CBRE values the Nayarit Property as of October 2012 at USD 21.3 M. RPHB, para. 134 refers to a difference of USD 8.3 M but confuses the Nayarit Property's value with the Guadalajara Properties' one.

was built, Mr. Marchitelli assumed that the Old Road would be an integral part of the Nayarit Property and that the strip of land of the Old Road would be developed together with the rest of the Nayarit Property as a single plot[652].

658. Based on the above special assumption, the expert sought comparable properties with ocean frontage. He identified seven sales of parcels of vacant land in the same market area as the Nayarit Property that are suitable for residential and/or hospitality development[653].

659. A summary of the comparables[654] and their location[655] follows:

| Sale No. | Property Location | Sale Date | Sale Price (US$) | Site Size (m2) | Site Size (Ha.) | Price US/m2 | Frontage (m) Beach | Frontage (m) Ocean |
|---|---|---|---|---|---|---|---|---|
| S | Fraction A - San Ignacio de la Cruz | -- | -- | 373,558 | 37.36 | -- | 460 | 1,050 |
| 1 | La Solana, Punta Mita | Dec-13 | $30,460,000 | 161,874 | 16.19 | $188.17 | 196 | 796 |
| 2 | Playa Pontoque, Carr. A Punta Mita | Jun-16 | $76,000,000 | 360,000 | 36.00 | $211.11 | 490 | 660 |
| 3 | El Izote, Fracc. La Reserva | Sep-16 | $86,815,547 | 891,783 | 89.18 | $97.35 | 1,100 | 1,100 |
| 4 | Rosewood Lot H-4/R-19, Mandarina | Nov-16 | $23,266,234 | 215,000 | 21.50 | $108.22 | 260 | 735 |
| 5 | Playa Amor, Carr. A Punta Mita | Dec-17 | $7,500,000 | 40,029 | 4.00 | $187.36 | 64 | 78 |
| 6 | Highway to Punta Mita Lots RU-4A & RT-16 | Offering | $10,500,000 | 74,536 | 7.45 | $140.87 | 125 | 125 |
| 7 | Highway to Punta Mita Lots H-5/B1 & B2 | Offering | $40,000,000 | 237,802 | 23.78 | $168.21 | 377 | 377 |

**LAND SALES SUMMARY**



---

[652] Cushman I, p. 11.
[653] Cushman I, p. 14.
[654] Cushman I, p. 17.
[655] Cushman I, p. 18.

660.    The expert took the valuations of those seven properties and <u>first</u>, adjusted them for the difference in time between the date of the conveyance of title for each sale and the most recent comparable sale. Mr. Marchitelli increased the price for each comparable by the increase in the Mexican National Consumer Price Index during the same period[656]. After this adjustment for market conditions, the prices ranged from USD 105.88/m$^2$ to USD 232.26/m$^2$ [657].

661.    <u>Secondly</u>, the expert adjusted the prices upward or downward depending on whether the comparables' location, size, ocean frontage and marketability were better or worse than the Nayarit Property's[658]; and then weighted the prices according to his expertise[659].

662.    As a result, the expert believes USD 160 per m$^2$ (as of December 2017), in total, USD 59,769,280 to be a market value for the Nayarit Property[660]. The expert suggests using the Mexican National Consumer Price Index to convert that market value to terms of the date of valuation[661]. The value as of March 31, 2015 would be USD 53.3 M[662].

        <u>Respondent's criticism</u>

663.    CBRE does not accept USD 160/m$^2$ as a reasonable price for the Nayarit Property. Especially, taking into consideration that the Nayarit Property was sold in July 2016 for MEX 803.69/m$^2$ – this means that, if Mr. Marchitelli was correct, the property would have increased its value by almost 400%[663].

664.    Additionally, Respondent makes the following comments on the comparables sales chosen by Mr. Marchitelli:

    -    Sales 1, 2, 3 and 4 were adjusted upward artificially because of inflation[664]; and, if anything, inflation adjustments should be made taking the average of past five years' Mexican National Consumer Price Index[665];

---

[656] Cushman I, p. 19.
[657] Cushman I, p. 20.
[658] Cushman I, p. 20.
[659] Cushman I, p. 21.
[660] Cushman I, p. 21.
[661] Cushman I, p. 22.
[662] H4, p. 11.
[663] CBRE II, p. 15.
[664] CBRE II, p. 15.
[665] CBRE II, p. 16.

- Sale 1 was a plot sold in conjunction with a Four Seasons hotel; it is however unclear how Mr. Marchitelli decided to allocate to the plot USD 30.46 M out of the total sale price[666];

- Sale 2 (Playa Pontoque) is an inexistent closing: the alleged buyer has informed CBRE that it never acquired the property[667];

- Sale 4 (Rosewood) is part of a larger development, including infrastructure, which added value to the plot, but no downward adjustment was made in comparison to the Nayarit Property, which is not part of a master plan development[668];

- Sale 6 consists of two parcels with different uses each[669] (a 20,000 m$^2$ parcel with tourist zoning and USD 120/m$^2$, and a second parcel of 54,500 m$^2$ with residential zoning classification[670]) – a downward adjustment is necessary to account for the fact that it is a listing price, not a sales price[671];

- Sale 7 should also be adjusted downward because it is a listing and has a better location than the Nayarit Property[672].

## 1.2   RESPONDENT'S VALUATION

665.   Respondent's expert does not agree with Claimant's special assumption that the Old Road would become an integral part of the Nayarit Property; the property should be valued as it is[673]. Hence, Respondent's expert divides the 373,558 m$^2$ of the Nayarit Property into three distinct areas[674]:

- Ocean frontage: 139,465 m$^2$ (**A.**);

- View on the sea: 204,496 m$^2$ (**B.**);

- Old Road and utility poles[675]: 29,596.9 m$^2$.

666.   The expert values the first two areas separately. The third area is disregarded, as it would not be subject to development.

---

[666] RPHB, para. 160.
[667] CBRE II, p. 17.
[668] RPHB, para. 155.
[669] CBRE II, p. 17.
[670] HT, p. 865. The price of the second parcel was not disclosed.
[671] CBRE II, p. 18.
[672] CBRE II, p. 19.
[673] CBRE II, p. 20.
[674] CBRE Nayarit I, p. 53.
[675] CBRE Nayarit I, p. 18.

*Lion Mexico Consolidated v. Mexico*
ICSID Case No. ARB(AF)/15/2
Award

### A.   Ocean frontage

667.  The expert took four closed sales and two listings as comparable data[676]:

**RESUMEN VENTA DE TERRENOS - RIVIERA NAYARIT**

| No. | Dirección | Fecha Transacción | Área Terreno (m²) | Precio Venta (MX$) | Precio Venta (MX$/m²) | Ubicación | Infraestructura | Uso de Suelo |
|---|---|---|---|---|---|---|---|---|
| 1 | Terreno Denominado "El Izote", Fraccionamiento La Reserva, Bahía de Banderas, Nayarit | Sep-16 | 891,783 | $1,670,634,665 | $1,873.36 | Frente de Playa | Parcial | Turístico |
| 2 | Carretera Cruz de Huanacaxtle - Punta de Mita SN, Bahía de Banderas, Nayarit | Jul-16 | 900,000 | $750,190,792 | $833.55 | Frente de Playa | Completa | Turístico - Residencial |
| 3 | Fracción de Terreno Denominado "La Mandarina", Bahía de Banderas, Nayarit | Ago-12 | 25,000 | $36,257,375 | $1,450.30 | Frente de Playa | Completa | Turístico |
| 4 | Lote de Terreno Identificado como RU-1, RU-2, RU-3, RT15, RT15A y Polígono 1B, Carretera Punta Mita - a la Cruz de Huanacaxtle, Punta Pantoque, en el Municipio de Bucerías, Nayarit | Ago-17 | 135,056 | $170,000,000 | $1,258.73 | Frente de Playa | Parcial | Turístico |
| **OFERTAS ACTUALES** | | | | | | | | |
| L4 | Terreno Sayulita, Nayarit | Listing | 110,000 | $166,320,000 | $1,512.00 | Frente de Playa | Parcial | Turístico |
| L5 | Terreno Vista Hermosa, Sayulita, Nayarit | Listing | 890,000 | $1,345,680,000 | $1,512.00 | Frente de Playa | Parcial | Turístico |

668.  CBRE then applied adjusting factors in view of zone, location, desirability, infrastructure and marketability[677]. The expert obtained normalised values per m², which were then weighted[678]. Finally, CBRE calculated the average of the quadratic and the harmonic means at MEX 1,380/m² which was then multiplied by 139,465 m² of ocean frontage; this results in a value of MEX 192,450,000[679] as of October 8, 2018.

### B.   View on the sea

669.  The expert found two closed sales and five listings with a view on the sea[680]

**RESUMEN VENTA DE TERRENOS - RIVIERA NAYARIT**

| No. | Dirección | Fecha Transacción | Área Terreno (ft²) | Área Terreno (m²) | Precio Venta (MX$) | Precio Venta (MX$/m²) | Precio Venta (US$/m²) | Fuente | Infraestructura | Uso de Suelo |
|---|---|---|---|---|---|---|---|---|---|---|
| 3 | Camino Viejo a La Cruz de Huanacaxtle SN, Bahía de Banderas, Nayarit | Oct-15 | 384,272 | 35,700 | $8,242,949 | $230.89 | $21.45 | Vista al Mar | En breña | Habitacional |
| 5 | Fracción de Terreno Denominado "Villas San Pancho", Bahía de Banderas Nayarit | Dic-11 | 1,174,343 | 109,100 | $76,209,030 | $698.52 | $64.90 | Vista al Mar | Completa | Turístico |
| **OFERTAS ACTUALES** | | | | | | | | | | |
| L1 | Terreno Playa Punta Burro, Bahía de Banderas, Nayarit | Listing | 2,431,567 | 225,900 | $453,600,000 | $2,007.97 | | Vista al Mar | Parcial | Turístico |
| L2 | Terreno Breña, Bahía de Banderas, Nayarit | Listing | 225,929 | 20,989 | $13,326,500 | $634.91 | | Vista al Mar | Parcial | Turístico |
| L3 | Terreno Rancho Primavera, Punta Mita, Nayarit | Listing | 161,168 | 14,973 | $5,575,500 | $372.37 | | Vista al Mar | Parcial | Turístico |
| L6 | Terreno Cruz de Huanacaxtle, Nayarit | Listing | 18,836,843 | 1,750,000 | $1,400,000,000 | $800.00 | | Vista al Mar | Parcial | Turístico |
| L7 | Terreno Tondoroque, Bucerías, Nayarit | Listing | | 32,000 | $ 33,150,000 | $1,035.94 | | Vista al Mar | Parcial | Turístico |
| | Fracción A del Predio Rústico denominado "San Ignacio de la Cruz", Cruz de Huanacaxtle, Bahía de Banderas, Nayarit, México (Porcion Vista al Mar) | — | 2,201,177 | 204,496.00 | — | — | — | Frente de Playa y Vista | Parcial | T - Desarrollo Turístico |

---

[676] CBRE Nayarit I, p. 54.
[677] CBRE Nayarit I, p. 56.
[678] CBRE Nayarit I, p. 57.
[679] CBRE Nayarit I, p. 57.
[680] CBRE Nayarit I, p. 54.

670. The above values were adjusted using the same factors just considered[681]. The means of the normalised value per m² was MEX 750[682], which multiplied by 204,496 m² results in a value of MEX 153,350,000[683].

671. Under<u>In total</u>, both strips of land are valued at MEX 345,800,000[684] as of October 2018; in order to bring this amount back to valuation date – October 16, 2012 – the expert applies the Mexican National Consumer Price Index[685]. The value as of October 16, 2012 is MEX 274,739,000[686].

672. CBRE also adopts a <u>residual method</u> to confirm the above result. That method infers value assuming that a hypothetical development of the land would be possible[687].

673. In this case, the expert projects a sale of the Nayarit Property for tourism use[688]. 39,600 m² would be destined to the construction of a hotel and 29,484 m² for residential use, with an approximate construction and sales time of 14 months for the hotel and a sales period of up to 10 years for the residential area[689], with varying annual sales ratio[690].

674. CBRE projects an income of MEX 4,800,000 per key for the hotel and MEX 4,910,000 for each residential room[691], as a starting price which will increase annually by 4%[692]. The expert then deducts costs and expenses to obtain the free cash flows, which are

**Componente Residencial**

| Inventario | Unidades | Superficie (m2 / Unidad) | | |
|---|---|---|---|---|
| | | | COS: | 30% |
| | | | CUS: | 3.0 |
| Categoria | | | | |
| Vivienda Residencial | 234 | 126 | Superficie Total de Terreno | 204,496 |
| | | | Superficie de Construccion | 29,484 |
| | | | Superficie de Vialidad | 20,450 |
| **Total** | 234 | 29,484 | Superficie de Amenidades | 51,124 |

**Componente Hotelero**

| Inventario | Part. (%) | Cuartos | | |
|---|---|---|---|---|
| Hotel 1 | 24% | 120 | CUS | 1.2 |
| Hotel 2 | 24% | 120 | COS | 30% |
| Hotel 3 | 26% | 125 | Superficie de Construccion | 39,600 |
| Hotel 4 | 26% | 130 | Superficie Total de Terreno | 139,465 |
| **Total Vendible:** | 100% | 495 | Superficie de Vialidades | 4,752 |

Densidad Máxima de 35.5 Cuartos/ha para un total de 495 Cuartos Hoteleros

---

[681] CBRE Nayarit I, p. 58.
[682] CBRE Nayarit I, p. 58.
[683] CBRE Nayarit I, p. 59.
[684] CBRE Nayarit I, p. 60.
[685] CBRE Nayarit I, p. 63.
[686] CBRE Nayarit I, p. 63.
[687] CBRE Nayarit I, p. 65.
[688] CBRE Nayarit I, p. 66.
[689] CBRE Nayarit I, p. 66.
[690] CBRE Nayarit I, p. 68.
[691] CBRE Nayarit I, p. 67.
[692] CBRE Nayarit I, p. 68.

discounted at 20% annually for the hotel[693] and 18% for the residential area[694]; the expert obtains a net value of MEX 344,612,500[695]:

Claimant's criticism

675. Mr. Marchitelli does not agree with CBRE's report, which arrives at a value of the Nayarit Property equivalent to USD 48.22/ m² [696]. Claimant takes issue with a number of premises assumed by CBRE:

- By dividing the Nayarit Property into two discrete geographical areas, disregarding the Collaboration Agreement, its full development potential and true highest and best use was not acknowledged[697];

- Comparable 2 was sold on July 29, 2016 for USD 45.12/m², as a distressed sale, the seller being an entity controlled by Sr. Cárdenas[698] and Comparable 4 was also a distressed sale[699]; but the very definition of market value used also by CBRE, provides that transactions are made without duress and the seller is under no compulsion to sell[700];

- Offering 2 is a property more than 30 km away from the beach – it is not acceptable as a comparable property for an ocean view property[701];

- Adjustment factors based on whether there is access through fewer or more roads only make sense when valuing urban property[702];

- The land residual method is inherently unreliable because of the many assumptions that need to be used[703], which are totally unsupported[704];

## 1.3   THE TRIBUNAL'S DECISION

676. The Tribunal finds that, in order to reach a decision on the adequate value of the Nayarit Property, it must perform a double analysis: how, if at all, the Old Road should impact

---

[693] CBRE Nayarit I, p. 73.
[694] CBRE Nayarit I, p. 71.
[695] CBRE Nayarit I, p. 69.
[696] Cushman II, p. 6.
[697] Cushman II, p. 8.
[698] Cushman II, p. 6.
[699] H4, p. 19.
[700] Cushman II, p. 7.
[701] HT, p. 914.
[702] HT, pp. 932 and 933.
[703] Cushman II, p. 9.
[704] Cushman II, p. 10.

the valuation (**A.**); and which adjusted comparables should be used to determine the value of the Nayarit Property (**B.**).

A.   **Impact of Old Road**

677.   It is undisputed that, at valuation date, an Old Road crossed the Nayarit Property.

678.   Respondent's expert suggests valuing the Nayarit Property as it is, with the Old Road dividing the Property in two plots: one ocean frontage and one with view on the sea. Claimant's expert, on the other hand, puts emphasis on the existence of a Collaboration Agreement by which the Government of Nayarit granted Inmobiliaria Bains full possession over the Old Road in exchange of land and money to build the New Highway; since the New Highway is already built, the expert believes that the Nayarit Property should be valued under the special assumption that the Old Road would be an integral part of the Property, and that it could be developed as a whole.

679.   The Tribunal agrees with Claimant on this point.

680.   The terms of the Collaboration Agreement are clear: upon completion of the New Highway, Inmobiliaria Bains would have complete possession over the Old Road to use it as it saw fit. Since there is no discussion that the Nayarit Property has more value without the Old Road[705], it seems reasonable to assume that a prospective buyer would remove the Old Road and develop that strip of land together with the rest of the Nayarit Property.

681.   In view of the above, the Nayarit Property will be considered, for valuation purposes, a single piece of land, apt for development as a whole, pursuant to its highest and best use.

B.   **Adjusted comparables**

682.   Both experts have valued the Nayarit Property through sales comparisons. Respondent's expert has also applied a residual use method, as a secondary approach for validation, a decision criticized by Claimant's expert[706]: the method allegedly is fraught with unsupported hypotheses[707] and a minor change in any of these could have profound upward or downward effects on the value[708].

683.   The Tribunal notes that both experts have expressed their preference for sales comparison as the most appropriate method to estimate the value of the Nayarit Property; thus, to the extent that the Tribunal is satisfied that this approach renders an

---

[705] HT, p. 830.
[706] HT, p. 952.
[707] Cushman II, p. 10.
[708] Cushman II, p. 9.

appropriate value, there will be no need to perform a validation through the residual method.

684. Under the sales comparison approach the experts have each provided a list of comparables which, duly adjusted, could serve to estimate the Nayarit Property's value. But both experts have raised a number of critiques regarding the comparables and the adjustments proposed by the counter-expert. The Tribunal will analyse the suggested comparables and adjustments, one by one, starting with Mr. Marchitelli's (**a.**), followed by CBRE's (**b.**).

### a. Claimant's adjusted comparables

685. Claimant's expert found seven comparables (five sales and two listings). Respondent's expert has taken issue with three of them:

- Sale 1 (La Solana): according to public information this plot together with a Four Seasons Resort was sold for roughly USD 200 M[709], of which Mr. Marchitelli has allocated USD 30.46 M to the land; CBRE questions how Mr. Marchitelli decided which portion of the price related to the parcel and Mr. Marchitelli responded that the developer, contacted by a local valuer, confirmed the prices[710]; the Tribunal sees no reason to strike Sale 1 as comparable: Respondent's expert has not denied the sale, nor has it challenged the reasonableness of the price allotted to the land, or suggested an alternative price – it simply questions Mr. Marchitelli's method, but the Tribunal notes that real estate transactions occur in a closed market, with scarce public data, and in these circumstances it seems reasonable to rely on local appraisers and on informal contacts with persons directly involved in the transactions to obtain information which would otherwise never reach the public.

- Sale 2 (Playa Pontoque): both experts agree that this sale was never consummated[711]; however, Mr. Marchitelli believes that Sale 2 at least shows a meeting of the minds[712]; the Tribunal considers that if Sale 2 never became a closed deal, the proper way to proceed is to treat this sale as a listing and have its price adjusted accordingly.

- Sale 6: Respondent's expert avers that this plot actually consists of two parcels with different uses – one with 20,000 m² and USD 120/m² has tourist zoning, and the other of 54,500 m² has residential zoning classification[713]; the Tribunal sees no cause to disregard Sale 6: in its residual approach, CBRE has acknowledged

---

[709] HT, p. 822.
[710] HT, pp. 822 and 823.
[711] CBRE II, p. 17. HT, p. 847.
[712] HT, p. 847.
[713] HT, p. 865.

that the best development of the Nayarit Property would be as two distinct facilities (a hotel and a residential area) – it seems that Sale 6, *prima facie*, could similarly be developed separately as a hotel and as a residential area; and, since Respondent's expert has not disclosed the price of the residential zoning parcel of Sale 6, the Tribunal cannot verify whether the average price provided by Mr. Marchitelli for both parcels (USD 140/m$^2$) requires a downward adjustment.

686.   <u>In summary</u>, the Tribunal decides that Sales 1, 2 and 6 are proper comparables; however, Sale 2 needs to be treated as a listing and thus adjusted accordingly. The following paragraphs will address issues regarding appropriate adjustment and weighting that need to be applied to all comparable sales.

<u>Respondent's expert</u>

687.   Respondent's expert, in essence, took issue with two general adjustments undertaken by Mr. Marchitelli (**i.** and **ii.**) and suggested further downward adjustment on two comparables (**iii.**):

(i)   <u>Market conditions</u>

688.   Mr. Marchitelli valued the Nayarit Property as of December 2017, the date the transaction of Sale 5 (Playa Amor) took place. This is the latest date of all transactions used as comparables. The expert decided to bring the price of the other four previous transactions to December 2017 using the Mexican National Consumer Price Index.

689.   Respondent's expert finds that this procedure raises comparable prices artificially[714]. And, if at all, inflation adjustments should be made using the average of the past five years' Mexican National Consumer Price Index[715].

690.   The Tribunal does not agree.

691.   Claimant's valuation relies on comparable sales which took place between December 2013 (Sale 1 – La Solana) and December 2017 (Sale 5 – Playa Amor). But a nominal price of 2013, in times of inflation, is worth less in 2017 – therefore, it becomes necessary to harmonise amounts set at different moments in time before performing a comparison.

692.   To bring forward past amounts and normalise them in terms of inflation, the expert applies the Mexican National Consumer Price Index, an index which – in general terms – measures the evolution of the cost of living.

---

[714] CBRE II, p. 15.
[715] CBRE II, p. 16.

693. In contrast, CBRE has used unaltered nominal prices of transactions reaching back to August 2012 and December 2011[716] to infer a value of the Nayarit Property as of 8 October 2018 – the expert has, thus, assumed that the value of MEX has not changed between 2011/2012 and 2018; but the evolution of the Mexican National Consumer Price Index seems to suggest the opposite, as the following graph shows[717]:



694. As to whether Mr. Marchitelli should have adjusted for inflation using the average National Consumer Price Index of the past five years[718], the Tribunal finds no support for such proposition. Claimant's expert adjusted the past nominal prices to account for the increases in the National Consumer Price Index between transaction dates and December 2017; and did the same when discounting the December 2017 value to the valuation date[719]. Mr. Marchitelli's use of the National Consumer Price Index to bring amounts forward and backwards in time has been consistent.

695. Moreover, it seems that CBRE obviated the criticism just made, when it brought back the value of the Nayarit Property from October 2018 to October 2012 using the difference in the National Consumer Price Index between both dates (and not the average of the past five years)[720].

(ii)   Subjective adjustments

696. CBRE characterises the adjustments on the sales prices performed by Mr. Marchitelli as subjective and lacking explanations[721].

---

[716] CBRE Nayarit I, p. 54.
[717] Cushman I, Exhibit 6.
[718] CBRE II, p. 16.
[719] Cushman I, p. 23.
[720] CBRE Nayarit I, p. 63.
[721] CBRE II, p. 16.

697.  The Tribunal partially agrees with CBRE as all valuation procedures entail a degree of subjectivity. The appraiser decides, based on his or her expertise, what adjustment factors are relevant and how to weight the different comparables. But subjectivity does not equal randomness. The Tribunal is satisfied with the explanations provided by Mr. Marchitelli of the motivation underpinning the adjustment and weighting factors used[722] – this being said without prejudice to the Tribunal's decision regarding further adjustments.

698.  Finally, the Tribunal notes that CBRE's valuation, and more particularly, the choice of normalisation[723] and weighting[724] factors is also premised on the subjectivity of the appraisers who drafted the report.

    (iii)  <u>Further downward adjustment</u>

699.  Respondent has suggested performing an additional downward adjustment to two comparable sales:

-  Sale 4 (Rosewood) is located in a large luxury development called La Mandarina, the master plan development of which foresees the construction of certain infrastructure which Mr. Marchitelli accepted would add value to the plot, yet no downward adjustment was made to account for the fact that the Nayarit Property has no master development plan[725]; the Tribunal agrees with Respondent that a downward adjustment is warranted – the Tribunal notes, however, that Sale 4 has been adjusted upward by Mr. Marchitelli because the Nayarit Property has, generally, a better location[726]; absent evidence on the specific weight to be attributed to adjustment factors for infrastructure and for general location, the Tribunal decides to weigh them equally, with the result that the new downward adjustment and the existing upward adjustment for general location cancel each other out.

-  Sale 7 should be adjusted downward because it is a listing and has a better location than the Nayarit Property[727]; the Tribunal notes that Sale 7 has already been adjusted downwards to reflect that it is a listing[728] – no further adjustments seem necessary.

---

[722] Cushman I, pp. 20 and 21.
[723] CBRE Nayarit I, pp. 56 and 58.
[724] CBRE Nayarit I, pp. 57 and 58.
[725] HT, p. 825.
[726] Cushman I, p. 20.
[727] CBRE II, p. 19.
[728] Cushman I, p. 19.

700.  <u>In conclusion</u>, the Tribunal decides to disregard the general location upward adjustment performed on Sale 4 by Mr. Marchitelli, to compensate for the warranted infrastructure downward adjustment which was lacking.

* * *

701.  Mr. Marchitelli relied upon five sales and two listings which in view of the above decisions must be adjusted as follows[729]:

-  Sale 3 (USD 105.88/m$^2$) needs to be adjusted upwards for an inferior location and larger size than the Nayarit Property; in order to quantify these two upward adjustments, the Tribunal will rely on CBRE's expert opinion, according to which, the degree of desirability should translate into a 10% increase[730] – since for Sale 3 two upward adjustments are warranted, the Tribunal will increase the price by a 1.2 factor; this results in USD 127.06/m$^2$.

-  Sale 4 (USD 116.08/m$^2$) needs only be adjusted upwards for having less beach area than the Nayarit Property – the other two proposed adjustments cancelled each other out, pursuant to the Tribunal's previous decision[731]; the Tribunal will apply a 1.1 factor; this results in USD 127.69/m$^2$.

-  Listing 6 (USD 140.87/m$^2$) requires two downward adjustments for being larger than the Nayarit Property and a listing rather than a sale, and two upward adjustments for having less beach and an inferior configuration than the Nayarit Property – positive and negative adjustments that cancel each other out.

-  Listing 7 (USD 168.31/m$^2$) requires two downward adjustments for having a worse location than the Nayarit Property and being a listing, and an upward adjustment for having less beach – since a positive and a negative adjustment cancel each other out, the Tribunal must only adjust the listing price by applying a 0.9 factor (the factor used by CBRE to adjust listing prices[732]); the resulting price is USD 151.48/m$^2$;

-  Sale 5 (USD 187.36/m$^2$) is adjusted downward for being larger than the Nayarit Property and upward twice for having less beach area and a more complicated shape – this means that the price needs to be increased by a factor of 1.1, USD 206.1/m$^2$.

---

[729] Cushman I, p. 20.
[730] CBRE Nayarit I, p. 56: good desirability has a factor of 1.1, high desirability of 1.2.
[731] See para. 699 *supra*.
[732] CBRE Nayarit I, p. 56.

- Sale 1 (USD 220.75/m$^2$) is adjusted downward twice for being larger and in a better location and upward once for having less beach – in sum, the price will be adjusted by a factor of 0.9 to USD 198.67/m$^2$;

- Sale 2 (USD 232.26/m$^2$) is only adjusted upward once, to account for the fact that it has less beach area than the Nayarit Property; thus, the price will be augmented by a 1.1 factor, USD 255.5/m$^2$.

### b.    Respondent's adjusted comparables

702.    Respondent's expert divided the Nayarit Property in two, on account of the Old Road: one parcel with ocean frontage and one with view over the sea; then the expert looked for comparables for each plot.

703.    The Tribunal, however, has accepted as a special assumption that the Old Road is an integral part of the Nayarit Property and that it is subject to development together with the rest of the land. Thus, the Nayarit Property is a 373,558 m$^2$ ocean frontage plot. It follows that the comparables identified as sea view without ocean frontage are less suitable for estimating the value of an ocean frontage property such as the Nayarit one.

704.    But CBRE also located four sales and two listings of parcels with ocean frontage. These transactions are *prima facie* eligible comparables. However, Claimant has made a number of criticisms, which will be addressed by the Tribunal:

- Comparables 2 and 4 should be disregarded because they were distressed sales[733], sold at half the price commanded by properties without any sea frontage[734]; Respondent accepts that Comparable 2 was a distressed sale and should be eliminated from the analysis[735] and, as Claimant points out, Mexico has not denied that Comparable 4 was a forced sale[736]; the Tribunal agrees: both experts were tasked with estimating the market value of the Nayarit Property[737] and a distressed sale is outside the scope of market value.

- No inflation adjustment was applied to pre-2018 comparables[738]: the Tribunal notes that CBRE uses the Mexican National Consumer Price Index to bring an October 2018 value back to an October 2012 value; however, when calculating the 2018 value, the expert takes transactions which occurred over a period covering from 2012 to 2017 at nominal value, without performing an inflation adjustment – this approach artificially brings down the price as when moving

---

[733] HT, p. 788.
[734] HT, p. 790.
[735] HT, p. 905.
[736] CPHB, para. 275.
[737] Cushman I, p. 2: "I was requested to estimate the market value …". CBRE Nayarit I, p. 5: "El propósito del presente estudio es estimar el valor de mercado de la propiedad en estudio …".
[738] CPHB, para. 278.

forward in time no upright adjustment is made but when projecting back, a downward adjustment is performed. Accordingly, the Tribunal determines that pre-2018 comparables must be subject to an inflation adjustment.

- No adjustment for amount of ocean frontage was made[739] or for proximity to the Nayarit Property[740]: the Tribunal has already accepted that valuation is not an exact science, but rather open to and dependent on the expertise and subjectivity of the appraiser – the Tribunal accepts that CBRE, for good reason, favoured other adjustment factors over those two.

- CBRE adjusted the prices taking into account the number of roads through which the property is accessible, when in fact this would only be relevant for urban properties and Respondent's expert agreed that this adjustment is not relevant to a beach property[741]; the Tribunal will thus disregard this adjustment factor.

705. <u>In summary</u>, the Tribunal shall only consider comparables with ocean frontage and within this group will disregard Comparables 2 and 4 which are distressed sales (**i.**), apply an inflation adjustment (**ii.**), and not adjust any of the comparables in view of the number of roads through which the property has access (**iii.**).

706. (i) These are the remaining comparables – two sales and two listings[742]:

| No. | Dirección | Fecha Transacción | Área Terreno (m²) | Precio Venta (MX$) | Precio Venta (MX$/m²) | Ubicación | Infraestructura | Uso de Suelo |
|---|---|---|---|---|---|---|---|---|
| | RESUMEN VENTA DE TERRENOS - RIVIERA NAYARIT | | | | | | | |
| 1 | Terreno Denominado "El Izote", Fraccionamiento La Reserva, Bahía de Banderas, Nayarit | Sep-16 | 891,783 | $1,670,634,665 | $1,873.36 | Frente de Playa | Parcial | Turístico |
| 2 | Carretera Cruz de Huanacaxtle - Punta de Mita SN, Bahía de Banderas, Nayarit | Jul-16 | 900,000 | $750,190,792 | $833.55 | Frente de Playa | Completa | Turístico - Residencial |
| 3 | Fracción de Terreno Denominado "La Mandarina", Bahía de Banderas, Nayarit | Aug-12 | 25,000 | $36,257,375 | $1,450.30 | Frente de Playa | Completa | Turístico |
| 4 | Lote de Terreno Identificado como RU-1, RU-2, RU-3, RT15, RT15A y Polígono 1B, Carretera Punta Mita - a la Cruz de Huanacaxtle, Punta Pontoque, en el Municipio de Bucerías, Nayarit | Aug-17 | 135,056 | $170,000,000 | $1,258.73 | Frente de Playa | Parcial | Turístico |
| | OFERTAS ACTUALES | | | | | | | |
| L4 | Terreno Sayulita, Nayarit | Listing | 110,000 | $166,320,000 | $1,512.00 | Frente de Playa | Parcial | Turístico |
| L5 | Terreno Vista Hermosa, Sayulita, Nayarit | Listing | 890,000 | $1,345,680,000 | $1,512.00 | Frente de Playa | Parcial | Turístico |

707. (ii) Comparables 1 and 3 need to be adjusted for inflation. Mr. Marchitelli has brought his comparables to December 2017 values; to enable comparison, the Tribunal will capitalise CBRE's values to the same date. To do so, Mr. Marchitelli relied on the Mexican National Consumer Price Index published by the Federal Reserve Bank of St. Louis[743]. According to this publication:

---

[739] CPHB, para. 255.
[740] CPHB, para. 270.
[741] HT, pp. 932 and 933.
[742] CBRE Nayarit I, p. 54.
[743] Cushman I, Exhibit 6. https://fred.stlouisfed.org/series/MEXCPIALLMINMEI

- In September 2016 the index was at 103.08389 whilst in December 2017 it was at 112.11382 – this means an upward change of the Comparable 1 September 2016 price by 1.08[744]: MEX 1,873.36/m² of September 2016 equal MEX 2,037.46/m² in December 2017;

- In August 2012 the index was at 90.2298, whilst in December 2017 it was at 112.11382 – this requires an upward adjustment of the Comparable 3 August 2012 price by 1.24[745]: MEX 1,450.3/m² of August 2012 become MEX 1,802.05/m² in December 2017.

708. Since the comparables provided by CBRE are in MEX, while Mr. Marchitelli's are in USD, the Tribunal will convert all amounts into USD. Mr. Marchitelli concluded that the Nayarit Property was worth USD 160/m²[746] or MEX 3,100/m²[747] as of December 2017; this implies an exchange rate of 19.375 MEX/USD. Converted into USD at this exchange rate, CBRE's comparables look as follows:

- Comparable 1: MEX 2,037.46/m² in December 2017 is USD 105.16/m²;

- Comparable 3: MEX 1,802.05/m² in December 2017 equals USD 93/m²;

- Offerings 4 and 5: MEX 1,512/m² is 78.04 USD/m².

709. (iii) Compared to the Nayarit Property, the only adjustments performed by CBRE for normalisation purposes were[748]:

- On Comparable 3, for surface area (factor 0.92) and equipment (factor 1.05); this means, in average, a factor of 0.985 that applies to USD 93/m² and results in USD 91.61/m².

- On Offerings 4 and 5 to account for the fact that their prices do not reflect a close sale (factor 0.9[749]); this implies that USD 78.04/m² sales price be reduced to USD 70.2/m².

\* \* \*

710. The Tribunal has normalised all comparable transactions provided by both experts and arrives at the following prices per m²:

---

[744] 112.11382/103.08389 = 1.08
[745] 112.11382/90.2298 = 1.24
[746] Cushman I, p. 21.
[747] Cushman I, p. 24.
[748] CBRE Nayarit I, p. 56.
[749] CBRE Nayarit I, p. 56.

- Offering 4: USD 70.2/m$^2$;

- Offering 5: USD 70.2/m$^2$;

- Comparable 3: USD 91.61/m$^2$;

- Comparable 1: USD 105.16/m$^2$;

- Sale 3: USD 127.06/m$^2$;

- Sale 4: USD 127.69/m$^2$;

- Listing 6: USD 140.87/m$^2$;

- Listing 7: USD 151.48/m$^2$;

- Sale 1: USD 198.67/m$^2$;

- Sale 5: USD 206.1/m$^2$;

- Sale 2: USD 255.5/m$^2$.

711. Instead of calculating the arithmetic mean, Respondent's expert has proposed to use the average of the quadratic mean and the harmonic mean[750].

712. Quadratic mean is often used when the sample has both positive and negative figures, which the arithmetic mean would cancel out – here, however, there are no negative figures. The harmonic mean is ordinarily used to calculate the average of ratios and, for positive data, the harmonic mean will always be the least of means – the Tribunal is seeking the average of integers, it thus sees no good reason to choose a mean which tends to minimise the average.

713. Since the different data have already been adjusted for purposes and weighted for normalisation, the arithmetic mean seems the most appropriate average: it places equal value on each element without additional distortions. The arithmetic mean of the prices of the different comparables is USD 140.42/m$^2$.

714. The above amount is set at December 2017; the valuation date of the Nayarit Property is, however, October 16, 2012[751]. The Mexican National Consumer Index was 112.11382 in December 2017 and 91.08599 in October 2012; USD 140.42/m$^2$ brought back to October 2012 is USD 114.08/m$^2$. Multiplied by 373,558 m$^2$ it equals USD 42,615, 497.

---

[750] CBRE Nayarit I, p. 54.
[751] See para. 632 *supra*.

715. At valuation date the Nayarit Property is estimated at USD 42,615, 497.

716. As anticipated[752], the Tribunal must now deduct the costs related to the foreclosure sale: 4.6% on the sales price plus USD 25,000; i.e. USD 1,985,313[753].

717. The net market value of the Nayarit Property, at valuation date, is thus, **USD 40,630,184**.

## 2. THE MARKET VALUE OF THE GUADALAJARA PROPERTIES

718. The Guadalajara property consists of two adjacent plots of land which cover a total area of 15,478 m$^2$ [754]. The two plots are also known as Las Américas A and Las Américas B, with an area of 9,335 m$^2$ and 6,143 m$^2$, respectively[755].

719. Las Américas A and B, although adjacent, pertain to different zoning districts, which impacts on the possible use of the land. Las Américas A is zoned for mixed use and Las Américas B for residential use[756].

720. Here is an aerial photograph of the Guadalajara Properties[757]:



---

[752] See paras. 640 and 641 *supra*.
[753] (USD 42,615, 497 * 4,6%) + USD 25,000.
[754] Cushman I, p. 28.
[755] CBRE Guadalajara I, p. 12.
[756] CBRE II, p. 21.
[757] H5, p. 20.

721. Claimant's expert estimated the fair market value of the Guadalajara Properties using a sales comparison approach (**1.**), as did Respondent's expert, but the latter also performed a residual value approach (**2.**). Although the experts performed their valuations under different premises, the results do not lie too far apart: there is a difference of opinion among the experts of USD 1.5M[758]. The Tribunal will determine which valuation is preferable (**3.**).

## 2.1   CLAIMANT'S VALUATION

722. Mr. Marchitelli acknowledges that Las Américas A and Las Américas B each has a different assigned use. However, he strongly believes that, when two adjacent plots are held by the same owner and have different uses, the owner may choose the use that renders the most value out of the two and develop the entire property for that use[759]. In this case, Mr. Marchitelli determines that the highest and best use is for a mixed-use development[760].

723. The expert found six sales for analysis and one additional sale. Here is a summary of the comparables[761] and their locations[762]:

---

[758] Claimant proposes USD 29.6 M September 2012, opposed to Respondent's suggested MEX 365,725,000 in September 2012. According to Respondent's Rejoinder, para. 542, Mexico values the Guadalajara Properties at USD 27.87 M.
[759] HT, p. 794.
[760] Cushman I, p. 29.
[761] Cushman I, p. 32.
[762] Cushman I, p. 33.



| Sale No. | Property Location | Sale Date | Sale Price (US$) | Site Size (m2) | Site Size (Ha.) | Price US/m2 |
|---|---|---|---|---|---|---|
| **LAND SALES SUMMARY** | | | | | | |
| S | Av. Americas 1785 & Av. Montevideo 2426 | - - | - - | 15,478 | 1.55 | - - |
| A | Av. Patria & Av. Universidad | Apr-13 | $28,000,000 | 14,000 | 1.40 | $2,000 |
| B | Av. Patria 188 & Blvd. Puerta de Hierro | Jun-13 | $15,200,000 | 8,000 | 0.80 | $1,900 |
| C | Av. Americas 1462 & Mar Mediterraneo | Oct-14 | $7,800,000 | 3,900 | 0.39 | $2,000 |
| D | Av. Americas 1500, Col. Providencia | Jun-15 | $7,870,174 | 4,116 | 0.41 | $1,912 |
| E | Av. Empresarios & Paseo de los Virreyes | Jul-15 | $8,957,151 | 4,000 | 0.40 | $2,239 |
| F | Av. Patria, Col. Royal Country | Offering | $38,220,000 | 18,200 | 1.82 | $2,100 |
| **OTHER SALES** | | | | | | |
| G | Av. Americas 1972, Col. Country Club | Aug-09 | $7,307,000 | 4,168 | 0.42 | $1,753 |

724.  The expert made adjustments for market conditions[763] and size[764] and afterwards he weighted them according to his opinion[765]. This results in a value as of July 2015, of the Guadalajara Properties of USD 2,100 per m$^2$ or in total USD 32,503,800[766].

725.  In order to bring back that amount to the relevant valuation date, the expert suggests using the Mexican National Consumer Price Index[767]. The value as of March 31, 2015 is USD 32.6 M[768].

<u>Respondent's criticism</u>

726.  CBRE says that:

---

[763] Cushman I, p. 34.
[764] Cushman I, p. 35.
[765] Cushman I, p. 35.
[766] Cushman I, p. 35.
[767] Cushman I, p. 36.
[768] H4, p. 27.

*Lion Mexico Consolidated v. Mexico*
ICSID Case No. ARB(AF)/15/2
Award

- Sale B is a closing with erroneous information: the deed shows that, in reality, the surface was 7,580.23 m² and the sales price USD 12,282,076[769].

- Sale G is a sale that happened more than nine years ago and should, thus, be considered irrelevant[770].

## 2.2 RESPONDENT'S VALUATION

727. Because each of the Guadalajara Properties has a different use, CBRE assumes that they would be developed separately – each according to their highest and best use: Las Américas A (**A.**), for office use and Las Américas B (**B.**), for residential use[771]. The expert strongly feels that the Guadalajara Properties cannot be valued as a single parcel, like Mr. Marchitelli did[772].

### A.   <u>Las Américas A</u>

728. The expert found five sales and three listings as comparables[773]:

| No. | Dirección | Fecha Transacción | Área Terreno (m²) | Precio Venta (MX$) | Precio Venta (MX$/m²) | Frente | Infraestructura | Uso de Suelo |
|---|---|---|---|---|---|---|---|---|
| | RESUMEN VENTA DE TERRENOS MIXTOS - GUADALAJARA | | | | | | | |
| 1 | Av. De Las Américas 861, Guadalajara, Jalisco | Jul-16 | 15,000 | $202,500,000 | $13,500,00 | Vía Principal | Completa | Mixto |
| 2 | Av. De Las Américas 1500, Guadalajara, Jalisco | Estimado 2015 | 2,700 | $121,824,000 | $45,120.00 | Vía Principal | Completa | Mixto |
| 3 | Av. De Las Américas S/N, Guadalajara, Jalisco | Estimado 2014 | 4,000 | $100,000,000 | $25,000.00 | Vía Principal | Completa | Mixto |
| 4 | Av. Patria 188, Puerto de Hierro, Zapopan, Jalisco | Jul-13 | 15,000 | $507,600,000 | $33,840.00 | Vía Principal | Completa | Mixto |
| 5 | Av. De Los Empresarios 135, Puerto de Hierro, Zapopan, Jalisco | Jul-15 | 4,000 | $142,880,000 | $35,720.00 | Vía Secundaria | Completa | Mixto |
| OFERTAS ACTUALES | | | | | | | | |
| L1 | Av. Lopez Mateos Sur 839, Jardines del bosque, Guadalajara, Jalisco | Listing | 1,860 | $85,000,000 | $45,698.92 | Principal | Parcial | RU-CP/Mu-2(103) |
| L2 | Av. Lopez Mateos, Guadalajara, Jalisco | Actual | 1,215 | $36,000,000 | $29,629.63 | Vía Principal | Parcial | AU 24, MC-3 |
| L3 | Av. De las Américas 343, Altamira, Zapopan, Jalisco | Listing | 1,020 | $32,000,000 | $31,372.55 | Principal | Parcial | AU-UP-AT-PP-PH/MC-4 |
| | Av. Américas No. 1,785, Guadalajara, Jalisco, Mexico | | 9,335 | | | | Completa | AU 04, MD-2 |

729. These comparables were adjusted for normalisation purposes[774] and then, they were weighted according to CBRE's expertise[775]; this resulted in an average value per m² of MEX 35,910[776]. In total, multiplied by 9,335 m² of area, it equals a value of MEX 335,200,000[777].

---

[769] CBRE II, p. 21.
[770] CBRE II, p. 21.
[771] CBRE Guadalajara I, p. 44.
[772] CBRE II, p. 22.
[773] CBRE Guadalajara I, p. 50.
[774] CBRE Guadalajara I, p. 51.
[775] CBRE Guadalajara I, p. 52.
[776] CBRE Guadalajara I, p. 52.
[777] CBRE Guadalajara I, p. 56.

730. The above amounts are as of October 2018; in order to bring them back to the valuation date – September 7, 2012, the date the Guadalajara *Registro Público* cancelled the mortgages – the expert uses the Mexican National Consumer Price Index. On this basis, as of September 7, 2012, Las Américas A was worth MEX 264,976,000[778].

731. CBRE also applied <u>a residual approach</u>, to verify the previous valuation results. The expert assumes that Las Américas A could be sold for office use[779], with 16 suites of 750 m$^2$ each on average with a monthly rent of MEX 410 per m$^2$[780]; after deducting costs and expenses and discounting the free cash flows at a 16% annual rate this would give a value of MEX 338,472,900[781].

### B. <u>Las Américas B</u>

732. The expert only found six listings[782]:

| No. | Dirección | Fecha Transacción | Área Terreno (m²) | Precio Venta (MX$) | Precio Venta (MX$/m²) | Frente | Infraestructura | Uso de Suelo |
|---|---|---|---|---|---|---|---|---|
| | RESUMEN VENTA DE TERRENOS HABITACIONALES - GUADALAJARA | | | | | | | |
| OFERTAS ACTUALES | | | | | | | | |
| L1 | Av. México 2067, Colonia Ladrón de Guevara, Guadalajara, Jalisco | Listing | 2,295 | $59,000,000 | $25,708.06 | Principal | Completa | Habitacional/ Comercial |
| L2 | Av. Patria 2085, Colomos Patria, Zapopan, Jalisco | Listing | 1,800 | $41,400,000 | $23,000.00 | Principal | Completa | Mixto (Construcción Habitacional) |
| L3 | Av. México, Ladrón de Guevara, Guadalajara, Jalisco | Listing | 2,302 | $54,000,000 | $23,457.86 | Principal | Completa | Mixto (Construcción Habitacional) |
| L4 | Calle Barranquilla, Colonia Colomos Providencia, Guadalajara, Jalisco. | Listing | 1,323 | $30,000,000 | $22,675.74 | Principal | Completa | Mixto (Construcción Habitacional) |
| L5 | Rincón de los Proderos 1300, Jardines del Bosque, Guadalajara, Jalisco | Listing | 2,276 | $70,755,000 | $31,087.43 | Secundaria | Completa | Habitacional |
| L6 | San Javier 1, Colinas de San Javier, Guadalajara, Jalisco | Listing | 4,090 | $61,000,000 | $14,914.43 | Secundaria | Completa | Habitacional |
| | Av. Montevideo No. 2426, Guadalajara, Jalisco, Mexico | | 6,143.00 | | | | Completa | AU 07, H2-V |

733. These comparables were adjusted for normalisation purposes[783] then weighted[784], which resulted in an average value per m$^2$ of MEX 20,750[785]. Multiplied by 6,143 m$^2$ of area, this gives a value of MEX 127,450,000 as of October 2018[786]; brought back to September 7, 2012 it was MEX 100,749,000[787].

734. According to the <u>residual approach,</u> Las Américas B could be developed for residential use [788], into 30 units of 240 m$^2$ in average each, an average sales Price of MEX

---

[778] CBRE Guadalajara I, p. 59.
[779] CBRE Guadalajara I, p. 62.
[780] CBRE Guadalajara I, p. 63.
[781] CBRE Guadalajara I, p. 64.
[782] CBRE Guadalajara I, p. 53.
[783] CBRE Guadalajara I, p. 54.
[784] CBRE Guadalajara I, p. 54.
[785] CBRE Guadalajara I, p. 54.
[786] CBRE Guadalajara I, p. 56.
[787] CBRE Guadalajara I, p. 59.
[788] CBRE Guadalajara I, p. 68.

*Lion Mexico Consolidated v. Mexico*
ICSID Case No. ARB(AF)/15/2
Award

11,200,000 increased by 4% annually and a sales period of four to five years[789]; deducting costs and expenses and discounting the free cash flows at 16% annually, this results in a value of MEX 131,960,700[790].

Claimant's criticism

735. Mr. Marchitelli does not agree with the CBRE, for the following reasons:

- The report concludes that the property would be developed as two distinct parcels, but this does not maximise its value as required in the definition of highest and best use[791]; the highest and best is a mixed use and this was acknowledged in an appraisal prepared on October 9, 2014[792];

- The valuation of Las Américas B does not rely on a single comparable sale, it only uses listings[793];

- The residual use method is not completely reliable: small changes in the variables can have dramatic impacts on the value[794].

**2.3   THE TRIBUNAL'S DECISION**

736. The experts focus their disagreement on one main issue: whether the fact that Las Américas A and Las Américas B have different zoning uses warrants that they be valued separately.

737. It is undisputed that Las Américas A and Las Américas B are distinct plots, registered separately. But it is equally undebated that they are adjacent and belong to the same owner.

738. In essence, Mr. Marchitelli has valued the Guadalajara Properties as a single parcel according to a special assumption: that it is permitted to develop them jointly as a mixed-use property. The Tribunal, however, cannot accept the special assumption, which goes against the principle of valuing the property as it is, without proper evidence that would justify the assumption.

739. In the previous valuation of the Nayarit Property, Mr. Marchitelli brought evidence that the Old Road should be deemed an integral part of the Nayarit Property and the Tribunal, thus, validated that special assumption; but here, Mr. Marchitelli has failed to refer to any planning legislation which permits adjacent lands, which belong to the

---

[789] CBRE Guadalajara I, p. 68.
[790] CBRE Guadalajara I, p. 70.
[791] Cushman II, p. 11.
[792] Cushman II, p. 11.
[793] Cushman II, p. 11.
[794] HT, p. 800.

same owner, to be developed as one. Absent supporting evidence, the Tribunal cannot accept the proposed special assumption. Las Américas A and Las Américas B will, thus, be valued separately, each according to its own use.

740. The Tribunal will now estimate the value of Las Américas A (**A.**) and Las Américas B (**B.**) through a sales comparison approach, based on the comparables found by both experts. For reasons already anticipated[795], the Tribunal, if satisfied with the resulting value, will not perform a secondary valuation through a residual use method.

## A.   <u>Las Américas A</u>

741. Las Américas A is a mixed-use plot. The Tribunal will first analyse Claimant's comparables (**a.**) and then Respondent's (**b.**).

### a.   **Claimant's comparables**

742. The Tribunal notes that almost all comparables identified by Mr. Marchitelli are mixed-use lands (Sales A – F); *prima facie* the Tribunal accepts this data as eligible comparables, subject to the appropriate adjustment *infra*.

743. CBRE has only taken issue with Sale B because it, allegedly, contains erroneous information (the surface was 7,580 m² and the sales price USD 12,282,076) – an allegation which has not been disputed. The corrected price per m² is, thus, USD 1,620 (not USD 1,900 as proposed by Mr. Marchitelli[796]). This price needs to be adjusted for inflation and brought forward to July 2015, by a factor of 1.0689[797]; this results in an actual (corrected) price of USD 1,732/m².

744. Mr. Marchitelli's sole additional adjustment is for size: smaller sites tend to sell for more unit price. Since the Guadalajara Properties will be valued separately, the Tribunal must determine whether the adjustments for size made by Mr. Marchitelli still apply, now that the subject property (Las Américas A) is reduced from 15,478 m² to only 9,335 m². The Tribunal notes that Sale B is the only comparable similar in size to Las Américas A (7,580 m² [798], as opposed to 9,335 m²); Sales C, D and E have each an area of around 4,000 m² and thus need a downward adjustment; whilst Sales A and F (14,000 m² and 18,200 m², respectively) require an upward adjustment. Absent specific evidence on the weight attributed by Mr. Marchitelli to the size adjustment, for consistency reasons[799] the Tribunal decides to apply a 0.1 factor upward or downward. The sales adjusted sales prices per m² are as follows:

---

[795] See para. 683 *supra*.
[796] Cushman I, p. 34.
[797] Cushman I, p. 34. July 2015 index is 99,52798 and that of June 2013 is 93,11464.
[798] As corrected by the Tribunal; see para. 743 *supra*.
[799] See para. 701 *supra*.

- Sale D: the price is brought down from USD 1,915/m$^2$ to USD 1,723/m$^2$;

- Sale C: the price is reduced from USD 2,027/m$^2$ to USD 1,824/m$^2$;

- Sale F: the price needs to be raised from USD 2,100/m$^2$ to USD 2,310/m$^2$;

- Sale A: the price will be augmented from USD 2,129/m$^2$ to USD 2,342/m$^2$;

- Sale E: the price is minored from USD 2,239/m$^2$ to USD 2,015/m$^2$.

**b.   Respondent's comparables**

745.   CBRE has identified five sales comparables for mixed use and three listings[800]. The Tribunal will adjust the sales price to account for inflation (**i.**) and then it will convert all amounts into USD (**ii.**).

746.   (i) As already seen in the valuation of the Nayarit Property, an adjustment of the comparable prices for inflation becomes necessary. All values will be adjusted in time to July 2015 – the date used by Mr. Marchitelli in his valuation – using the Mexican National Consumer Price Index[801]:

- Comparable 1 dates from July 2016; in July 2016 the consumer price index was 102.17028, whilst in July 2015 it was 99.53, thus a factor of 0.974[802] needs to be applied – the sale price of MEX 15,341/m$^2$ is brought down to MEX 14,944/m$^2$.

- Comparable 2 is from 2015; no month has been specified – absent this information, the Tribunal assumes that the sale took place in the mid-year and the sale price of MEX 46,442.7/m$^2$ need not be adjusted.

- Comparable 3 is from 2014; lacking evidence on the month in which the transaction happened, the Tribunal will assume it happened in the mid-year – in July 2014 the consumer price index was 96.87454, whilst in July 2015 it was 99.53, thus a factor of 1.027[803] needs to be applied – the sale price of MEX 34,786.64/m$^2$ is raised to MEX 35,739/m$^2$.

- Comparable 4 is from July 2013; in July 2013 the consumer price index was 93.08379, whilst in July 2015 it was 99.53, thus a factor of 1.069[804] needs to be applied – the sale price of MEX 38,454.55/m$^2$ is increased to MEX 41,117/m$^2$.

---

[800] CBRE Guadalajara I, p. 51.
[801] Cushman I, Exhibit 6. https://fred.stlouisfed.org/series/MEXCPIALLMINMEI
[802] 99.53/102.17028 = 0.974
[803] 99.53/96.87454 = 1.027
[804] 99.53/93.08379 = 1.069

- Comparable 5 is exactly from July 2015: the price of MEX 39,762.52/m$^2$ does not need to be adjusted.

747. (ii) Now that CBRE's comparables are adjusted for inflation, they need to be converted into USD and so do the three offerings. Mr. Marchitelli estimates the Guadalajara Properties to be worth USD 2,100/m$^2$ [805] or MEX 32,000/m$^2$[806] in July 2015 – the exchange rate applied is 15.24 MEX/USD. The above sales prices converted into USD are as follows:

- Comparable 1: MEX 14,944/m$^2$ is USD 981/m$^2$;

- Comparable 2: MEX 46,442.7/m$^2$ is USD 3,048/m$^2$;

- Comparable 3: MEX 35,739/m$^2$ is USD 2,345/m$^2$;

- Comparable 4: MEX 41,117/m$^2$ is USD 2,698/m$^2$;

- Comparable 5: MEX 39,762.52/m$^2$ is USD 2,609/m$^2$;

- Offering 1: MEX 48,616/m$^2$ is USD 3,190/m$^2$;

- Offering 2: MEX 32,938/m$^2$ is USD 2,162/m$^2$;

- Offering 3: MEX 36,536/m$^2$ is USD 2,398/m$^2$.

\* \* \*

748. The Tribunal has now six sales from Mr. Marchitelli and the five comparables and three offerings from CBRE, with the following prices:

- Comparable 1: USD 981/m$^2$;

- Sale D: USD 1,723/m$^2$;

- Sale B: USD 1,732/m$^2$;

- Sale C: USD 1,824/m$^2$;

- Sale E: USD 2,015/m$^2$;

- Offering 2 is USD 2,162/m$^2$;

---

[805] Cushman I, p. 35
[806] Cushman I, p. 37.

- Sale F: USD 2,310/m$^2$;

- Sale A: USD 2,342/m$^2$;

- Comparable 3 is USD 2,345/m$^2$;

- Offering 3 is USD 2,398/m$^2$;

- Comparable 5 is USD 2,609/m$^2$;

- Comparable 4 is USD 2,698/m$^2$;

- Comparable 2 is USD 3,048/m$^2$;

- Offering 1 is USD 3,190/m$^2$.

749. For reasons explained above, the Tribunal applies the arithmetic mean of the above prices: USD 2,241.29/m$^2$.

750. This amount is set at July 2015, whereas the valuation date of the Guadalajara Properties is September 7, 2012[807]. The Mexican National Consumer Index was 99.52798 in July 2015 and 90.62747 in September 2012. The average price is, thus, USD 2,040.86/m$^2$ [808] in September 2012. Multiplied by 9,335m$^2$, it equals a total value of USD 19,051,406[809].

## B.   Las Américas B

751. For las Américas B, with residential use, CBRE found six listings: three for residential use and another three for mixed use. Apparently, CBRE incorporated the mixed use listings because the plots were planned to be developed as residential home (*construcción habitacional*)[810]. In view of a criticism made by CBRE, the Tribunal has accepted that each of the Guadalajara Properties be valued separately, on account of the different ground uses, and the Tribunal has disregarded the mixed used properties identified by Mr. Marchitelli as comparables for Las Américas B; consequently, the three mixed use listings relied upon by CBRE to value Las Américas B should equally be disregarded.

752. The Tribunal will estimate Las Américas B's values based on the other three listings with residential use found by CBRE and one additional sale for residential use identified by Mr. Marchitelli (Sale G). Mr. Marchitelli has questioned the relevance of the comparables, since they do not represent closed sales – the Tribunal accepts the

---

[807] See para. 632 *supra*.
[808] USD 2,241.29/m$^2$ * 90.62747/99.52798 = USD 2,040.86/m$^2$
[809] USD 2,040.86/m$^2$ * 9,335m$^2$ = 19,051,406
[810] CBRE Guadalajara I, p. 53.

critique and notes that CBRE has applied a 0.95 reducing factor to account for this fact[811]. In turn, CBRE suggests that Sale G be stricken because the sale took place in 2009 and thus would lack relevance – the Tribunal notes that Sale G is the only closed transaction and for this reason the Tribunal has decided not to disregard it.

753.   Adjusted to July 2015, Sale G has a price of USD $2,168/m^2$ [812]; since the rest of the comparables are listings, they need not be adjusted for inflation[813], and just have to be converted into USD at the 15.24 MEX/USD exchange rate[814]:

-    Listing 1: MEX $21,884/m^2$ is USD $1,436/m^2$;

-    Listing 5: MEX $29,215/m^2$ is USD $1,917/m^2$;

-    Listing 6: MEX $18,104/m^2$ is USD $1,188/m^2$.

754.   The arithmetic mean of the above data is USD $1,677/m^2$.

755.   This amount is set at July 2015. Adjusted to the valuation date, the sale price is reduced to USD $1,527.4/m^2$. Multiplied by 6,143 $m^2$, it equals a total value of USD 9,382,669.

\* \* \*

756.   At the valuation date, September 7, 2012, Las Américas A is worth USD 19,051,406 and Las Américas B is valued at USD 9,382,669; in total, the estimated value of the Guadalajara Properties is USD 28,434,075.

757.   The Tribunal needs now to deduct the foreclosure sales costs which are[815]: 0.7% of the sales price, MEX 100,700.69 plus 3% on the balance price minus MEX 3,736,575, and UD 25,000 in legal fees.

758.   The sales price has to be converted into MEX. Up to this point, as the the exchange rates were undisputed, the Tribunal has relied on the exchange rates used by Mr. Marchitelli; however, September 2012 was not a relevant date in Mr. Marchitelli's expert reports and he does not provide this information. In the absence of this input from the expert, the Tribunal has applied the exchange rate of September 7, 2012

---

[811] CBRE Guadalajara I, p. 54.
[812] Cushman I, p. 34.
[813] Since the listings are offerings made for an unspecified period of time, Mr. Marchitteli and CBRE do not adjust these values for inflation.
[814] See para. 747 *supra*.
[815] Payne II, Appendix B.

published in Mexico's official gazette[816]: 13.0483. The sales price is, thus, MEX 371,016,615.

759. Costs in the amount of MEX 2,597,116[817] and MEX 14,964,753[818] accrue for Public Registry and Notary fees on the one hand, and for transfer taxes on the other; this results in a total amount of MEX 17,561,869, which converted back to USD is USD 1,345,912[819]. Now USD 25,000 needs to be added for legal fees, i.e. USD 1,370,912.

760. The sales price minus associated costs is, thus, **USD 27,063,184**.

### 3.   CALCULATION OF THE IMPAIRMENT

761. The Tribunal has determined the market value of the Nayarit Property on October 16, 2012, to be USD 40,630,184; and that of the Guadalajara Properties on September 7, 2012 to be USD 27,063,184.

762. Lion avers that the impairment of its investment, as a consequence of the breach, equates with the market value of the Properties: upon the Debtor's default and the filing of the Foreclosure Proceedings, Lion would have acquired ownership of the Properties *in lieu* of payment, and would promptly have re-sold the Properties to third parties through arms' length transactions, thereby securing the full market value of the Properties (*i.e.* approximately USD 67 M for all Properties, as established by the Tribunal with the experts' methodologies)[820].

763. The Tribunal finds Lion's assumption far too optimistic.

764. Lion in essence assumes that in the But For Scenario, it would have succeeded in re-selling the Properties at full market value. This assumption disregards the substantial uncertainties and legal risks which Lion would have faced in its efforts to foreclose on the Mortgages and to re-sell the Properties, uncertainties and risks which are unrelated to Mexico's breaches of its NAFTA obligations.

765. These risks arise from the very terms of the Loans (speculatively high interest rates of 18% and 25% when the Loans were in default, and short maturities), and the personal characteristics of the Debtors selected by Claimant. These risks have been exacerbated by Sr. Cárdenas' obstinate (and as the facts show highly effective) defense of his legal rights, above and beyond the proper conduct required by Mexican law. The Tribunal considers that a hostile reaction by Sr. Cárdenas to the resale of valuable properties that he had owned and for many years had sought to develop is not a mere possibility but

---

[816]https://www.dof.gob.mx/indicadores_detalle.php?cod_tipo_indicador=158&dfecha=06%2F09%2F2012&hfecha=11%2F09%2F2012

[817] (0.5% + 0.2%) * MEX 371,016,615.

[818] MEX 100,700.69 + 3% balance price (MEX 370,915,914) – MEX 3,736,575.

[819] MEX 17,561,869/13.0483 = USD 1,345,912

[820] CPHB, para. 248; Zamora II, paras. 201 and 204.

close to a certainty. His willingness to engage in administrative and legal frauds and abuses to obtain his ends has been amply demonstrated in these proceedings as, unfortunately, has his effectiveness with these abuses within his home state of Jalisco.

766. Any possible re-sale of the Properties to a willing buyer would have faced the risks of obstructions and possible legal challenges by Sr. Cárdenas and the Debtors, in proceedings before the Courts of his home State, Jalisco. Most buyers would have shied away from assuming these risks; the few prepared to accept the uncertainty would only do so if offered a significant discount over market prices.

767. The necessity to offer discounts to prospective buyers has an important consequence: awarding Claimant the full market price of the Properties, would not result in re-establishing the situation which would have existed, absent Mexico's breach, but in a windfall profit. The proper compensation must be reduced by the probable discount a willing buyer would have applied.

768. How to calculate the correct percentage of discount?

769. No formula exists, and there is no set of precedents, from which a precise number could be induced. In situations like this, where the precise determination of damage is subject to uncertainty, tribunals are authorized to apply a degree of discretion. As the Annulment Committee in *Rumeli* said[821]:

> "The estimation of damages […] is not an exact science. It is of the essence of such an exercise that the tribunal has a measure of discretion, since the final figure must of its nature be an approximation of the claimant's loss".

770. In light of the above, the Tribunal finds that a discount of approximately 30% over the preliminary market value appropriately reflects the risks faced by prospective buyers: it is safe to assume that, upon foreclosure of the Mortgages, and delivery of ownership of the Properties to Lion, willing buyers would only have been prepared to pay to Lion approximately USD 47 M[822] (and not the full market value of USD 67 M) for the purchase of the Nayarit and the Guadalajara Properties.

771. The Tribunal's figure of USD 47 M is reinforced by the valuation provided by Respondent's expert, who used conservative parameters to establish the market price of the Properties, and, applying a completely different methodology, arrived at a similar figure[823].

\* \* \*

---

[821] *Rumeli*, Decision on Annulment, para. 179(5).
[822] (1-30%)\*(USD 40,630,184 + USD 27,063,184), rounded down to the nearest million
[823] RR, para. 635.

772. Summing up, the Tribunal finds that in the But For Scenario the value of the Claimant's investment would have amounted to USD 47 M.

773. As regards the As Is Scenario, the Tribunal agrees with Claimant that the present value of the investment is nil – upon cancellation in the Property Registry the Mortgages have become extinguished and consequently worthless.

774. Therefore, the Tribunal determines that the compensation due to Lion, for the impairment suffered by its protected investment – the Nayarit and Guadalajara Mortgages – amounts to the difference in the values of the Mortgages in the But For and the As Is valuation, i.e. **USD 47,000,000** – and this is the sum awarded in Claimant's favour under this heading.

**4.   RESPONDENT'S ANCILLARY OBJECTIONS**

775. Mexico submits two additional arguments to sustain that any compensation awarded to Lion should be reduced:

**4.1   SHARES IN DEBTOR COMPANIES**

**A.   Respondent's position**

776. Mexico argues that, if Lion is awarded damages in this arbitration, the Tribunal should reduce the compensation in an amount equal to the value of the shares Lion owns in the Debtor companies[824].

777. To this date, under Mexican law, the forgery of the Settlement Agreement has not been established and it remains legally effective. Pursuant to the Settlement Agreement, share certificates were issued in Lion's name. Thus, Lion is the owner of these shares, and therefore, their value must be subtracted from any compensation awarded by this Tribunal[825].

778. In the course of criminal proceeding 137/2004, Sr. Cárdenas presented various expert reports calculating the book value of Lion's shares in order to sustain his allegation that Lion had not suffered damages as a consequence of his criminal behaviour. Respondent points out that, according to these reports, Lion's shares in the Debtor companies have a book value as of December 2012 of USD 81,8 M[826].

779. Respondent does not share Claimant's position that Lion could assign its rights over the shares to Mexico, in order to avoid double recovery. Mexico has not accepted Claimant's offer and this Tribunal has no jurisdiction to order that Lion's shares be

---

[824] RPHB, para. 11; RCM, para. 299.
[825] RR, paras. 579 and 580.
[826] RCM, para. 301, citing Exh. R-15 and Exh. R-16; RR, para. 583.

transferred to Mexico; and even if it did, there is no assurance that this transaction could legally take place under Mexican law[827].

## B.    Claimant's position

780.  Claimant rejects Respondent's proposition: Lion never acquired shares in the Debtor companies because no legal effects arose from the Forged Settlement Agreement[828]. The fact that the Debtors never recorded the increase of capital at the Commercial Registry, reveals that the whole operation was a sham[829].

781.  In any case, the valuation of the shares proposed by Respondent has not been established in a reliable manner. Claimant had no opportunity to rebut the reports presented by Sr. Cárdenas in the criminal proceedings, which were suspended by the Federal Attorney-General[830].

782.  Claimant says that, in order to avoid double recovery, it has offered to tender any rights it may have over these shares to Mexico, upon receiving the compensation due in this arbitration[831].

## C.    The Tribunal's decision

783.  Respondent argues that any compensation due to Lion must be reduced in an amount equal to the value of the shares it owns in the Debtor companies. Claimant rejects this proposition, alleging that it never acquired ownership of any such shares.

784.  The Tribunal has already established that the Settlement Agreement, in which Lion allegedly agreed to settle the debts owed by the Debtor companies and to cancel the Mortgages, in exchange for shares in these companies, was a forgery[832]. *Quod nullum est, nullum effectum producit.* Furthermore, the increases of share capital in favour of Lion were never recorded in the Commercial Registry, with the consequence that the shares were never formally created[833].

785.  Finally, Respondent has not marshalled any convincing evidence proving the value of the shares in the Debtor companies allegedly owned by Lion. The valuation provided by Sr. Cárdenas himself, as defendant in a criminal case, is not persuasive.

---

[827] RPHB, para. 197.
[828] CR, para. 12 and 194
[829] CR, para. 196
[830] CR, para.197, citing Exh. C-173.
[831] CR, para. 199.
[832] See paras. 103 *et seq supra.*
[833] CR, para 196, with reference to Exh. C-170 and C-171, certificates of records of C6C Capital and Inmobiliaria Bains at the Commercial Registry; these certificates show that other capital increases were duly registered.

786. <u>In sum</u>, the Tribunal concludes that Mexico has failed to prove that Lion is the rightful owner of any participation in the capital of the Debtor companies. And even if Lion were to have validly acquired such shareholdings (*quod non*), the Respondent has not marshalled convincing evidence establishing their proper value.

**4.2   CRIMINAL PROCEEDINGS**

### A.    The Parties' positions

787. Respondent says that Lion has a chance to obtain double recovery, because it can potentially claim reparation if Sr. Cárdenas is found criminally liable for fraud in any of the pending criminal proceedings[834].

788. Claimant says that any hypothetical compensation that it may be awarded under the criminal proceedings cannot prevent it from obtaining the full compensation that is due under international law for Mexico's breaches. In any case, Claimant argues, the issue of double recovery in this case would be something to decide in the future by the Mexican courts when awarding any compensation to Lion[835].

### B.    The Tribunal's decision

### a.    Facts

789. On April 18, 2013 Claimant submitted its first criminal action, 463/2013, before the criminal Court of Jalisco. The action was against Sr. Cárdenas and was based on the Forged Settlement Agreement and the request for certified copies of the Cancellation Proceeding, through the impersonation of Mr. Arechederra. The criminal Court of Jalisco dismissed the case for lack of sufficient evidence[836].

790. On April 19, 2013 Lion filed a parallel action, this time before the criminal Courts of Mexico City (137/2014). The Mexico City Court dismissed the action on the ground that the facts were already being tried in Jalisco[837].

791. Lion made a third attempt, on June 19, 2015, filing another action before the Office of the Attorney General of the State of Jalisco, which resulted in criminal proceedings 181/2016. The case was dismissed on the basis that the statute of limitations had expired[838].

---

[834] RCM, para. 576; Plascencia, para. 84; RPHB, paras. 117 and 202.
[835] CPHB, para. 47.
[836] Exh. R-20.
[837] Exh. R-22.
[838] RCM, para. 126.

792. Respondent's expert, Dr. Plascencia, declared with respect to the abovementioned proceedings that[839]:

> "*Del análisis de los expedientes queda claro que Lion Mexico Consolidated, ejerció las acciones, derecho y recursos correspondientes para tratar de demostrar los hechos aparentemente delictivos que le atribuía a Héctor Cárdenas, sin embargo, de las resoluciones dictadas por tres diferentes jueces penales en tres procedimientos distintos se desprende que no fue posible acreditar de los hechos denunciados la comisión de delito alguno".*

793. Lion was unable to obtain a criminal conviction of Sr. Cárdenas, and consequently, no reparation was granted.

794. Despite the above, Lion has persisted in its attempt to secure a criminal conviction against Sr. Cárdenas and has filed three additional criminal complaints that are currently pending. At the end of the Hearing, the Tribunal requested the Parties to inform the Tribunal on the status of these pending criminal proceedings:

- Criminal Action No. 4713/2016: in these proceedings Lion seeks a criminal conviction of Sr. Cárdenas with respect to the forgery of the Settlement Agreement and the impersonation of Mr. Arechederra; the proceedings remain suspended, pending two *Amparos* initiated by Sr. Cárdenas[840];

- Criminal Action No. 121667/2017: these proceedings concern the forgery and fraud in relation to the filing of the False Amparo; the last information available is that the investigation phase is ongoing, and that no formal charges (*imputación*) have been issued against Sr. Cárdenas[841];

- Criminal Action No. 83426/2017: these proceedings concerning the sale by Sr. Cárdenas of the Nayarit Property, that was subject to a freeze order, is in the investigation phase and no formal charges (*imputación*) have been issued against Sr. Cárdenas[842].

**b. Discussion**

795. Respondent's main argument is that Lion may obtain double recovery, since it still has the potential right to be compensated if Sr. Cárdenas is found guilty under any of the criminal proceedings that are currently pending. Respondent says that the potential

---

[839] Plascencia, para. 87.
[840] CPHB, para. 40.
[841] CPHB, para. 41.
[842] CPHB, para. 42.

compensation of Lion in these criminal proceedings is guaranteed by the "land freezes" imposed by the Prosecutor on the Nayarit and Guadalajara Properties[843].

796. To this date, however, no criminal conviction has been issued against Sr. Cárdenas, and no compensation has been awarded to Lion by any criminal Court. Respondent's expert acknowledges that in the current proceedings a criminal conviction of Sr. Cárdenas is unlikely[844]. The criminal Courts have already dismissed Lion's allegations for lack of evidence, and the statute of limitations and the principle *non bis in idem* make it now highly unlikely that a criminal conviction against Sr. Cárdenas be rendered.

797. Since the Mexican criminal Courts have until now failed to render any decision awarding compensation in favour of Lion, Respondent's request that the compensation granted in this arbitration be reduced is moot.

798. If in the future any Mexican criminal Court is to issue a decision in favour of Lion, and by that time Lion has collected any of the amounts awarded in its favour in the present arbitration, it is for the Mexican Court to adopt the appropriate measures to avoid double recovery.

---

[843] Plascencia, para. 106.
[844] Plascencia, para. 97.

## VII.2. LEGAL FEES ARISING FROM THE WITHDRAWAL OF THE FORECLOSURE PROCEEDING

799.    Art. 1121(1)(b) of the NAFTA requires that, as a condition precedent to the submission of a claim to arbitration, investors withdraw from any parallel local judicial proceedings, except for injunctive, declaratory or other extraordinary proceedings not involving the payment of damages:

> "Article 1121: Conditions Precedent to Submission of a Claim to Arbitration
>
> 1. A disputing investor may submit a claim under Article 1116 to arbitration only if:
>
> […]
>
> (b) the investor […] waive[s] [its] right to initiate or continue before any administrative tribunal or court under the law of any Party, or other dispute settlement procedures, any proceedings with respect to the measure of the disputing Party that is alleged to be a breach referred to in Article 1116, except for proceedings for injunctive, declaratory or other extraordinary relief, not involving the payment of damages, before an administrative tribunal or court under the law of the disputing Party." [Emphasis added]

800.    Lion argues that it should be compensated by Mexico for *gastos, costas y perjuicios* ["**Legal Fees**"] it may be ordered to pay to the Debtors as a result of its withdrawal from the Foreclosure Proceeding[845]. Lion avers that it was required to abandon all local proceedings to comply with the waiver requirement of NAFTA Art. 1121(1)(b), which lists withdrawal from local proceedings as one of the conditions precedent to submitting a NAFTA arbitration claim[846], and thus, such costs are ultimately a consequence of Mexico's breach.

801.    As to the quantification of these Legal Fees, at the time of the Parties' latest submissions, a decision on the exact amount to be paid by Lion was pending before the *Juez de lo Civil*[847], but according to an estimate by Lion, they could reach an amount of up to USD 14 M[848].

---

[845] CPHB, para. 312.
[846] CPHB, para. 312,
[847] CPHB, para. 315.
[848] CPHB, para. 315, Annex II to CPHB, para. 18.

802. Mexico in turn claims that Lion was not required to withdraw from the Foreclosure Proceeding[849]. In fact, the decision to withdraw was "ill-advised", as the NAFTA Art. 1121(1)(b) withdrawal requirement did not apply to the Foreclosure Proceeding[850].

803. The Tribunal must, thus, analyse whether under NAFTA Art. 1121(1)(b) Lion was required to withdraw from the Foreclosure Proceeding and whether Legal Fees ordered by the local Courts as a consequence of such withdrawal, constitute part of the compensation due.

804. To adjudicate this question, the Tribunal will first establish the proper interpretation of Art. 1121(1)(b) of the NAFTA (**1.**), then it will analyse whether Lion was obliged to withdraw the Foreclosure Proceeding (**2.**) and finally it will discuss whether Mexico has to assume the Legal Fees which Claimant may eventually be forced to pay to the Debtors (**3.**)

## 1.   THE PROPER INTERPRETATION OF ART. 1121(1)(B) NAFTA

805. Art. 1121(1)(b) of the NAFTA requires that a protected investor, before accessing international justice, must discontinue any existing parallel proceedings before the municipal Courts, relating to the same dispute. The rationale of the rule is twofold: to avoid contradicting decisions between the local Courts and international arbitration, and to prevent double recovery.

806. The Non-Disputing Parties hold the same opinion:

> US[851]: "The purpose of the waiver provision is to avoid the need for a respondent Party to litigate concurrent and overlapping proceedings in multiple forums, and to minimize not only the risk of double recovery, but also the risk of 'conflicting outcomes (and thus legal uncertainty)'".

> Canada[852]: "The purpose of this provision is to preclude parallel litigation involving the payment of damages in order to avoid conflicting outcomes and double redress with respect to the same measure".

807. *Thunderbird* offers a similar, teleological clarification on how to approach Art. 1121 of the NAFTA[853]:

> "In construing Article 1121 of NAFTA, one must also take into account the rationale and purpose of that article. The consent and waiver requirements set forth in Article 1121 serve a specific purpose, namely <u>to prevent a party from</u>

---

[849] RPHB, para. 106.
[850] RPHB, paras. 125, 127.
[851] USA submission, para. 25.
[852] Canada Submission, para. 9.
[853] International Thunderbird Gaming Corporation v. Mexico, UNCITRAL (NAFTA), Arbitral Award, 26 January 2006, para. 118.

> pursuing concurrent domestic and international remedies, which could either give rise to conflicting outcomes (and thus legal uncertainty) or lead to double redress for the same conduct or measure". [Emphasis added]

808. <u>In sum</u>, under Art. 1121 NAFTA a prospective claimant is required to withdraw from any municipal procedure, if such procedure:

- could give rise to an outcome which conflicts with the result of the investment arbitration, or

- can result in claimant being compensated twice for the same loss or damage.

<u>Exceptions</u>

809. NAFTA Art. 1121(1)(b) contains exceptions to the general rule of withdrawal; there are certain types of proceedings where the Treaty does not require a waiver as a condition precedent to the investor filing an investment arbitration.

810. The NAFTA has been executed in English, French and Spanish, all three versions being equally authentic[854]. As regards the exceptions to the waiver requirement, there are marked differences between the English and French texts, and the Spanish text of Art. 1121(1)(b).

811. In English, the exceptions to the general rule appear to concern three categories of proceedings:

> "[…] except for proceedings for <u>injunctive, declaratory or other extraordinary relief</u>, <u>not involving the payment of damages</u>, before an administrative tribunal or court under the law of the disputing Party".

812. This is also the case in French:

> "*à l'exception d'une <u>procedure d'injonction, d'une procédure déclaratoire ou d'un autre recours extraordinaire</u>, <u>ne supposant pas le paiement de dommages-intérêts</u>, entrepris devant une juridiction administrative ou judiciaire*".

813. While the Spanish version refers to one category ("*medidas precautorias*", i.e. injunctive measures) of threefold character:

> "*salvo los procedimientos en que se solicite la aplicación de <u>medidas precautorias de carácter suspensivo, declaratorio o extraordinario</u>, <u>que no impliquen el pago de daños</u> ante el tribunal administrativo o judicial*". [Emphasis added]

---

[854] Art. 33 of the VCLT acquiesced by Respondent at RR, para. 353.

814. Does a *Juicio Hipotecario* like the Foreclosure Proceeding fall within any of these exceptions?

815. In the Tribunal's opinion, the answer is in the negative, whatever the version of the NAFTA Treaty is preferred (all being equally authentic).

816. The *Juicio Hipotecario* is an ordinary procedure, with the purpose of enforcing a mortgage through the judicial sale of the property and the delivery of the price obtained to the claimant, up to the amount and in payment of the secured debt. Consequently, a *Juicio Hipotecario* is not a "*medida precautoria*", as required in the Spanish version of the rule.

817. If we turn to the English or French versions, the requirements for an exception are also not met. In a *Juicio Hipotecario* the relief requested by claimant consists in the judicial enforcement of the Mortgage, and the allocation of the price obtained to the payment of the debt. The relief does not meet the requirement for the exception to apply ("injunctive, declaratory or other extraordinary relief"); the NAFTA rule additionally requires that the relief does not "involv[e] the payment of damages" – a requirement which the *Juicio Hipotecario* again does not meet, since foreclosure of a mortgage involves the payment of a sum of money for the settlement of a debt.

818. <u>In sum</u>, the Foreclosure Proceeding is a *Juicio Hipotecario*, and as such is not included in any of the exceptions to the general rule that parallel proceedings must be withdrawn as a condition precedent for the filing of an investment arbitration.

## 2.   LION WAS OBLIGED TO WITHDRAW THE FORECLOSURE PROCEEDING

819. The general rule under Art. 1121(1)(b) of the NAFTA is that before bringing a NAFTA claim, a claimant must withdraw any local proceedings "with respect" to the measure adopted by the host State that allegedly constitutes an international wrong.

820. According to Lion, the wording "with respect to" should be interpreted broadly[855]. Claimant argues that the Foreclosure Proceeding was intended to recover the value of the Mortgage, i.e., the investment – the same value as the compensation it seeks to recover in the current arbitration.

821. Respondent counters that the facts show that the Foreclosure Proceeding is not "with respect to" any of the measures giving rise to Lion's claims[856]. Mexico's argumentation

---

[855] CR, para. 537, citing Detroit International Bridge Company v. Government of Canada, PCA Case No. 2012-25, Submission of the United States of America, para. 6 (14 February 2014), Exhibit CLA-660.
[856] RR, para. 349.

is summarized in its reiteration that "none of the measures at issue in this case have anything to do with the Foreclosure Proceedings"[857].

Discussion

822. Does the Foreclosure Proceeding meet the test of being "with respect to" the international wrong committed by Mexico, and was Lion consequently obliged to withdraw before commencing this investment arbitration?

823. *Pro memoria*: in April 2012 Lion filed the Foreclosure Proceeding, a *Juicio Hipotecario*, before a *Juez de lo Civil* in Mexico D.F., seeking to enforce the Nayarit Mortgage (but not the Guadalajara Mortgage). The purpose of the Procedure was to realize the value of such security, by forcing its judicial sale and using the proceeds to settle Lion's secured and unpaid obligations. The Foreclosure Proceeding never matured: Lion encountered numerous difficulties in the *emplazamiento* of the Debtors, and the *Juicio Hipotecario* stalled for more than three years. Eventually, before commencing this NAFTA arbitration, Claimant withdrew the Foreclosure Proceeding.

824. The international wrong committed by Mexico has been established in this Award:

- Lion was denied access to justice and was wrongfully prevented from participating in the Cancellation Proceeding, which eventually led to the cancellation of the Mortgages;

- Lion was also wrongfully denied the right to appeal the Cancellation Judgement; and finally

- Lion was wrongfully denied the right to allege and prove the forgery of the Forged Settlement Agreement,

all in breach of Art. 1105 of the NAFTA.

825. The Tribunal has already established that one situation where Art. 1121 NAFTA requires a prospective claimant to withdraw a municipal procedure, is where such procedure can result in multiple compensation for the same loss or damage.

826. Lion found itself precisely in that situation.

827. In this arbitration Lion is asking to be compensated for its total loss resulting from the cancellation of the Nayarit Mortgage, and such loss is equal to the value of such Mortgage.

---

[857] RPHB, para. 125, RR, para. 358.

828. The continuation of the Foreclosure Proceeding would indeed have created a risk of double recovery: if foreclosure of the Nayarit Mortgage had resulted in the recovery of any amount of money, the total compensation received by Claimant would have exceeded its total loss (equal to the value of the Mortgage and already compensated in these proceedings).

829. It is precisely to minimize this risk that Art. 1121 NAFTA requires that local proceedings be discontinued, as a condition precedent to the filing of a NAFTA arbitration.

830. <u>In sum</u>, the Tribunal concludes that Lion, to comply with the requirement of Art. 1121(1)(b) and secure the admissibility of this arbitration, was obliged to withdraw the Foreclosure Proceeding.

831. All that Lion did was to comply with this obligation.

### 3.   DISCUSSION OF THE LEGAL FEES

832. An unintended consequence of the withdrawal of the Foreclosure Proceeding was the decision of the *Juez de lo Civil* ordering Lion to pay the Legal Fees ("*gastos, costas y perjuicios*") suffered by the Debtor[858]. Despite Lion's appeal in *Amparo*, Mexico's Supreme Court ultimately upheld the original decision[859]: the municipal rule which requires that in foreclosure proceedings a withdrawing party assumes the Legal Fees incurred by the counterparty does not contravene the NAFTA[860].

833. At the time of the Parties' latest submissions, a decision on the exact amount to be paid by Lion was pending before the *Juez de lo Civil*[861]. Lion says that the Debtor is claiming more than USD 14M, avers that it has asserted meritorious defences to such claim, but adds that there is a risk that the Mexican courts will mechanically apply Legal Fees in the amount of 6% of the amount in controversy[862].

834. The question which the Tribunal must decide is whether these Legal Fees (in whichever amount eventually established) have to be borne by Claimant or by Mexico.

835. Lion says that "but for Mexico's breaches", it would not have been required to waive the Foreclosure Proceeding and would not have incurred these liabilities.

---

[858] Resolution of Civil Judge ordering the payment of costs and expenses by Lion, January 7, 2016, Exhibit C-191.
[859] Annex II to CPHB, p. 3.
[860] Supreme Court's decision (Amparo revision) confirming the order for Lion to pay the costs, January 31, 2018, Exhibit C-192.
[861] CPHB, para. 315.
[862] CPHB, para. 315, Annex II to CPHB, para. 18.

836. The Tribunal has already established that the damages awarded must be sufficient (in the words of *Chorzów*) to "wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed" [863].

837. To do so, it is necessary to assume that Mexico had not committed any wrongful conduct. In such case, the Nayarit Mortgage would not have been cancelled, the Foreclosure Proceeding would eventually have been successful, the Nayarit Property would have been foreclosed, and the price obtained would have been used to pay the secured debts. In this scenario Lion would not have incurred any Legal Fees payable to the Debtor.

838. In reality what has happened is that the Mexican Court system has incurred in a denial of justice, which has resulted in the wrongful cancellation of the Nayarit Mortgage, and has forced Lion to seek redress through international arbitration. This award has already acknowledged that Lion is entitled to a compensation for the impairment of its investment. But this compensation does not wipe out all the consequences of Mexico's wrongful act. As a requirement for the admissibility of this arbitration, Lion has been forced to withdraw the Foreclosure Proceeding, and to incur certain, still to be quantified, Legal Fees. Full reparation requires that Mexico assume the obligation of reimbursing Lion for such Legal Fees, in the amount finally established by the Mexican Courts and actually paid by Lion to the Debtor.

839. Lion, in turn, has a duty to mitigate its losses, and consequently must continue defending the claim for Legal Fees filed by the Debtor, with the same diligence as it would be defending its own interest, exhausting non-obviously futile local remedies. (There is no suggestion by Mexico that Lion up to now has breached its duty to mitigate).

---

[863] *Chorzów Factory*, p. 47.

# VII.3. <u>EXPENSES INCURRED IN THE EXHAUSTION OF LOCAL REMEDIES</u>

840. Lion claims that, apart from the costs incurred in the arbitration[864], it is also entitled to recover its legal fees and expenses incurred in the Mexican proceedings, which amount to USD 2,212,004.53[865].

841. Mexico disputes the number proposed by Lion. According to Mexico, Lion initially averred that its attorneys' fees and costs incurred in local proceedings amounted to USD 1,262,650, to suddenly increase that number to USD 2,212,004.53 without justification[866].

842. Mexico additionally argues that the sole evidence supporting Lion's claim, an affidavit by Ms. Rodriguez, the Senior Vice President/Controller of Lion's parent company, providing that

> "[t]o the best of [her] knowledge, the true and accurate amount of fees incurred by L[ion] for these matters to date is US 2,2,12,004.53"[867],

is insufficient. Mexico points out that the affidavit is not accompanied by any explanation or supporting documentation, which confirms the accuracy of the proposed number. Additionally, Ms. Rodriguez was not a witness in the arbitration and since she was not cross-examined at the Hearing, Mexico would be severely prejudiced if the Tribunal took her statement to be accurate.

843. Thus, Mexico requests that the Tribunal dismiss the claim for damages for the legal fees and expenses incurred by Lion in the local proceedings[868].

<u>Decision of the Tribunal</u>

844. Lion asks that Mexico reimbursed it an amount of USD 2,212,004.53, representing legal fees incurred in the Mexican proceedings.

845. Claimant has provided a detailed statement summarizing the expenses and fees incurred in this arbitration (this claim will be analysed in Section IX *infra*)[869]. However, for the costs incurred in the Mexican proceedings, Claimant has not provided a breakdown of the costs incurred, nor has it marshalled any invoices or receipts. The

---

[864] See Section IX *infra*.
[865] CPHB, para. 317, CR, para. 611, Exh. C-193.
of Clarion Partners indicating the attorney's fees incurred by LMC, 20 February 2019, Exhibit C-193.
[866] RPHB, para. 135, RR, para. 612-616.
[867] Exh. C-193.
[868] RR, para. 616.
[869] Claimant's Statement of Costs of October 22, 2019.

*Lion Mexico Consolidated v. Mexico*
ICSID Case No. ARB(AF)/15/2
Award

only evidence marshalled is a two-paragraph affidavit, executed by Ms. Karen Rodriguez, the Senior Vice President/Controller of Lion's parent company, stating that

> "to the best of my knowledge and belief, the true and accurate amount of fees incurred by [Lion] for these matters [the Amparo Proceeding and the defense against Sr. Cárdenas' claim for Legal Fees] is US$2,212,004.53" [870].

846. Ms. Rodriguez has not provided any further evidence or details. No invoices are attached. The evidence was not submitted by means of a witness statement confirming her calculations, nor has Ms. Rodriguez appeared before this Tribunal to aver her declaration.

847. The Tribunal does not consider that the evidence submitted by Claimant is sufficient to support a claim for legal fees of more than USD 2 M, allegedly incurred before the Mexican Courts, in the course of defending its rights in the *Amparo* and in the Foreclosure Proceeding.

848. In any case, even assuming *arguendo* that Lion would have satisfied its burden of proving the legal fees incurred in the local proceedings, the Tribunal is not convinced that Mexico should bear these costs. The Tribunal has already established that a claim for denial of justice requires the aggrieved party to exhaust local remedies[871]. If the exhaustion of local remedies had resulted in the Mexican judiciary correcting the wrongful cancellation of the Mortgages, the denial of justice would have been prevented – but Claimant would still have incurred local legal fees. Whether legal fees incurred in municipal procedures filed by the investor can be recovered and from whom, is a question to be settled by municipal law[872].

---

[870] Exh. C-193.
[871] See para. 543 *supra*.
[872] *Petrobart*, p. 87.

# VII.4.  CONCLUSION

849.   Claimant is seeking three categories of compensation:

850.   The <u>first</u> category is the impairment suffered by Lion's investment (the Nayarit and the Guadalajara Mortgages), caused by Mexico's breach of the NAFTA obligations, such impairment to be calculated as the difference in the value of the Mortgages in the But For Scenario and in the As Is Scenario.

851.   The Tribunal has concluded that in the But For Scenario the value of the Claimant's investment would have amounted to USD 47 M, while the value of the investment in the As Is Scenario is nil, the Mortgages having become extinguished and worthless. The compensation due to Lion, for the impairment suffered by its protected investment, amounts to the difference between both values, i.e., **USD 47,000,000** – and this is the sum awarded in Claimant's favour under this heading.

852.   The <u>second</u> category are certain Legal Fees which Claimant says could arise as a consequence of the withdrawal of the Foreclosure Proceeding.

853.   In the Tribunal's opinion, Lion was forced to withdraw the Foreclosure Proceeding in order to commence this NAFTA arbitration and to incur certain, still to be quantified, Legal Fees as a requirement for the admissibility of this arbitration under the NAFTA. Full reparation requires that Mexico assume the obligation of reimbursing Lion for such Legal Fees, in the amount finally established by the Mexican Courts and actually paid by Lion to the Debtors.

854.   Lion, in turn, has a duty to mitigate its losses, and consequently must continue defending the claim for Legal Fees filed by the Debtors, with the same diligence as it would be defending its own interest, exhausting non-obviously futile local remedies.

855.   The <u>third</u> category are certain expenses and fees incurred in the exhaustion of local remedies, which Claimant says amount to more than USD 2 M.

856.   The Tribunal has dismissed this claim for lack of evidence and, subsidiarily, because the question of whether legal fees incurred by the investor in pursuing municipal procedures can be recovered, and from whom, is a question to be settled by municipal law in the very proceedings where the legal fees arise.

# VIII. <u>INTEREST</u>

857. The Parties agree that the Tribunal should award interest as part of the compensation, if a breach is found to have occurred and the payment of compensation is ordered. They disagree, however, on the applicable interest rate, and whether the interest should be compounded.

## 1. CLAIMANT'S POSITION

858. Claimant seeks interest under the following conditions[873]:

859. *First*, full reparation requires payment of appropriate interest on any amounts awarded, in accordance with Art. 38(1) of the ILC Articles on State Responsibility. If the Claimant is to be kept economically whole, the amount of the final damages awarded must accrue interest[874]:

860. *Second*, the Mexican legal rate for commercial debts in default provided by Art. 362 of the Mexican Commercial Code (i.e., 6% per year) compounded on a monthly basis is warranted. Alternatively, Lion's interest should be that used by Mexican *Amparo* courts when awarding damages, i.e., the 28-day Interbank Equilibrium Interest Rate (TIIE)[875].

861. *Third*, interest should accrue from 31 March 2015 until the date of full and effective payment[876].

## 2. RESPONDENT'S POSITION

862. Mexico does not dispute that the Claimant would be entitled to interest on any amounts awarded, should the Tribunal hold Mexico liable for a breach of its obligations under the NAFTA. It also does not dispute that interest would be due from the date of the breach until the date in which the award is paid. Yet Mexico disagrees about the following aspects[877]:

863. *First*, the interest rate must be consistent with the currency in which the award is granted. Thus, for an award denominated in U.S. dollars, a relatively low or risk-free rate would be that of the U.S. Treasury Bills, and for an award denominated in Mexican pesos, it should be the 28-day CETES rate – *Certificados de la Tesorería de la*

---

[873] CM, paras. 481-487; CR, paras. 612-624, CPHB, paras. 295-298.
[874] CCM, para. 64.
[875] CM, para. 487.
[876] CPHB, paras. 318 and 320.
[877] RCM, paras. 328-334; RR, paras. 621-633, RPHB, para. 137.

*Federeción*[878]. In any case, it would be utterly inappropriate to apply a Mexican peso rate to a U.S. denominated amount, as the Claimant proposes.

864. *Second*, on the issue of how pre- and post-award interest should be calculated, there is no international consensus on whether interest should be calculated using simple or compounded interest. In the circumstances of this case, the Claimant should not be rewarded with compound interest[879].

865. *Third*, there is no consensus among the tribunals that have ordered compound interest as to the compounding period, although the vast majority have opted for annual compounding. Thus, should the Tribunal opt for compounded interest, it should be annual compounding and not monthly compounding[880].

## 3.   THE TRIBUNAL'S DECISION

866. Article 1135 NAFTA says that

> "Where a Tribunal makes a final award against a Party, the Tribunal may award
> […]
>
> (a)  monetary damages and any applicable interest [...]".

867. In line with this provision, prior NAFTA tribunals have recognized that interest forms an essential limb of the compensation due for a breach of the Treaty. The tribunal in *Metalclad*, for instance, stated that[881]:

> "interest becomes an integral part of the compensation itself, and should run consequently from the date when the State's international responsibility became engaged".

868. The Parties also agree that this Tribunal may award interest over the compensation ordered. The Parties, however, disagree on the applicable rate and the method of calculation of interest.

869. The Tribunal's decision on interest, thus, must determine the applicable interest rate and the methodology for their calculation. The Tribunal must also fix the *dies a quo*, *dies ad quem* and the principal amount.

870. Since the Tribunal has determined that the compensation due to Lion is USD 47 M, that is the **"Principal Amount"**.

---

[878] RR, para. 621. The rate applicable to 28 day Certificados de la Tesorería de la Federación
[879] RR, para. 632.
[880] RR, para. 632.
[881] *Metalclad*, para. 128, quoting *Asian Agricultural Products v. Sri Lanka* (4 ICSID Reports 245).

**3.1   INTEREST RATE**

871.  Claimant has requested that interest be granted over the Principal Amount at the Mexican legal rate for commercial debts in default provided for by Art. 362 of the Mexican Commercial Code (i.e., 6% per year); or alternatively, the 28-day Interbank Equilibrium Interest Rate (TIIE), used by the Mexican *Amparo* courts when awarding damages.

872.  Respondent says that the Tribunal should grant the rate applicable to U.S. Treasury Bills; and if the compensation is awarded in Mexican pesos, the rate should be the 28-day CETES rate.

873.  The NAFTA does not establish an applicable interest rate for the compensation awarded by a tribunal for breaches of Article 1105 NAFTA. But Article 1110(4) NAFTA, which governs the appropriate compensation in cases of expropriation, provides that if payment is made in any G7 currency (and the USD forms part of this group of currencies), interest is to accrue at a commercially reasonable rate:

> "If payment is made in a G7 currency, compensation shall include interest at <u>a commercially reasonable rate</u> for that currency […]". [Emphasis of the Tribunal]

874.  In *Archer Daniels* the tribunal by analogy applied a "commercially reasonable rate" to a compensation due for breach of Article 1102 NAFTA (national treatment) and 1106 NAFTA (performance requirement)[882]. In this case, the Tribunal shares the opinion that Article 1110(4) NAFTA may serve as guidance in a case consisting in the breach of the FET standard.

875.  The rates proposed in this case by the Parties are not appropriate:

876.  *First*, Claimant is claiming compensation denominated in USD, but it is requesting the Tribunal to award interests at a rate intended to be applied to a much weaker currency, the MEX, to debts denominated in MEX. This proposal is a *non sequitur*. The principle that the interest rate must be consistent with the currency of the principal is acknowledged in Article 1110(4) of the NAFTA, which states that "[i]f <u>payment is made in a G7 currency</u>, compensation shall include interest at a commercially reasonable rate <u>for that currency</u> …".

877.  *Second*, Respondent does propose a rate applicable to debt in USD, such as the rate applicable to U.S. Treasury Bills; however, this is not a "commercially reasonable rate" – it is the rate accrued for financing the US Government, not for financing commercial enterprises.

---

[882] *Archer Daniels*, para. 296.

878. The Tribunal is of the view that LIBOR is the most widely use "commercially reasonable rate", since it is universally accepted as a valid reference for the calculation of variable interest rates. LIBOR is determined by the equilibrium between supply and demand, representing the interest rate at which banks can borrow funds from other banks in the London interbank market; it is fixed daily by the British Bankers' Association for different maturities and for different currencies.

879. Since the compensation is expressed in USD, the appropriate rate of reference for the calculation of interest should be LIBOR rates for six-month deposits denominated in USD.

880. LIBOR reflects the interest rate at which banks lend to each other money. Loans to customers invariably include a surcharge, and this surcharge must be inserted in the calculation of interest to reflect the financial loss caused to Lion by the temporary withholding of money. In the present market situation, the Tribunal finds that a margin of 2% is an appropriate margin, reflecting the surcharge that an average borrower would have to pay for obtaining financing based on LIBOR[883].

**3.2   CALCULATION METHODOLOGY**

881. Lion has requested that interest should be compounded monthly, while Mexico proposes that simple interest be applied. Alternatively, Mexico says that if the Tribunal were to award compound interest, compounding ought to be carried out annually.

882. The question whether interest should be accumulated periodically to the principal has been the subject of diverging decisions in international investment case law. Older case law[884] tended to repudiate this possibility, but more recent case law tends to accept annual or semi-annual capitalisation of unpaid interest.[885]

883. The Tribunal agrees with the more recent decisions. Loan agreements in which interest is calculated on the basis of LIBOR plus a margin usually include a provision that unpaid interest must be capitalized at the end of the interest period, and will thereafter be considered as capital and accrue interest. The financial reason for this provision is that an unpaid lender has to resort to the LIBOR market in order to fund the amounts due but defaulted, and the lender's additional funding costs have to be covered by the defaulting borrower.

884. This principle implies that, if Claimant had taken out a LIBOR loan to anticipate the amount to which it is entitled under this Award, the bank would have insisted that unpaid interest be capitalised at the end of each interest period. Consequently, if

---

[883] *Lemire (Award)*, para. 356; *PSEG*, para. 90; *Sempra*, para. 137; and *Rumeli*, para. 227
[884] *CMS*, paras. 470-471.
[885] *MTD*, para. 251; *PSEG*, para. 348; *Lemire (Award)*, para. 361.

Claimant is to be kept fully indemnified for the harm suffered, interest owed under the Award should be capitalised at the end of each 6-month interest period.

885.   The Tribunal, thus, decides that due and unpaid interest shall be capitalized semi-annually, from the *dies a quo*.

**3.3   *DIES A QUO* AND *DIES AD QUEM***

886.   The Parties agree that interest shall accrue from the date of the breach until the date in which the award is paid[886].

887.   The Tribunal has already established that Mexico's denial of justice occurred over several instances, beginning with the Cancellation Judgment issued by the *Juez de lo Mercantil*, which ultimately resulted in the cancellation of the Mortgages on September 7 and October 16, 2012. The Tribunal has taken these dates as the valuation dates for establishing the value of the investments[887]. These dates also represent the proper *dies a quo*. To simplify calculation, the Tribunal decides that interest should start to accrue on October 1, 2012.

888.   In light of the above, the Tribunal determines that the *dies a quo* shall be October 1, 2012 and the *dies ad quem* the date of effective payment.

\* \* \*

889.   <u>In summary</u>, the Tribunal decides that from October 1, 2012 until the date of payment, the principal amount of USD 47 M shall accrue interest at a rate of LIBOR for 6-month deposits denominated in USD, plus a 2% margin, compounded semi-annually, from the *dies a quo*.

---

[886] CM, para. 482; RCM, para. 328.
[887] See para. 632 *supra*.

# IX. COSTS

890. Art. 1135 NAFTA states that

> "A tribunal may also award costs in accordance with the applicable arbitration rules".

891. Art. 58 of the Arbitration Rules of the Additional Facility establishes that

> "(1) Unless the parties otherwise agree, the Tribunal shall decide how and by whom the fees and expenses of the members of the Tribunal, the expenses and charges of the Secretariat and the expenses incurred by the parties in connection with the proceeding shall be borne. The Tribunal may, to that end, call on the Secretariat and the parties to provide it with the information it needs in order to formulate the division of the cost of the proceeding between the parties.
>
> (2) The decision of the Tribunal pursuant to paragraph (1) of this Article shall form part of the award".

892. The Parties submitted their second statements of cost on October 22, 2019[888]. Neither of the Parties challenged the items or the amounts claimed by the counterparty.

893. The Parties have incurred two main categories of costs:

- the lodging fee and advance on costs paid to ICSID [the "**Costs of the Proceeding**"]; and

- the expenses incurred by the Parties to further their position in the arbitration [the "**Defense Expenses**"].

## 1. CLAIMANT'S POSITION

894. In its Statement of Costs, Claimant quantified its costs and expenses to a total of USD 8,040,276.32 for the entirety of the arbitral proceedings, which can be broken down to USD 2,093,647.41 incurred in the jurisdictional phase and USD 5,946,628.91 on merits and *quantum*.

895. Claimant requests the following amounts:

---

[888] The Parties have presented their first statement of costs on April 23, 2018.

Costs of the proceedings

- ICSID Administrative costs: USD 625,000[889].

Defense expenses

- Legal Fees: USD 7,193,071.72;

- Fees of legal and valuation Experts: USD 635,659.60;

- Expenses: USD 211,545.

896. Claimant requests the Tribunal to order Mexico to pay the entirety of its costs[890].

## 2. RESPONDENT'S POSITION

897. In its Statement of Costs, Respondent claims that is has incurred costs and expenses amounting to a total of USD 2,962,113.35 in the current proceedings, which may be broken down to USD 1,469,033.57[891] for the jurisdictional phase and USD 1,493,079.78 for the merits phase[892].

Costs of Proceedings

- ICSID Administrative costs: USD 625,000[893].

Defense Expenses

- Legal Fees: USD 2,166,845.36;

- Fees of legal and valuation Experts: USD 227,083.34;

- Expenses: USD 18,184.65.

898. Mexico requests the Tribunal to order that Lion to pay for the entirety of its costs[894].

---

[889] Claimant's Statement of Costs of October 22, 2019; ICSID's Interim Financial Statement 25 May 2021, recording Claimant's advance payment totalling USD 525,000; and ICSID Secretariat's letter of June 7, 2021, confirmin Claimant's additional advance payment of USD 100,000.
[890] Claimant's Statement of Costs of October 22, 2019.
[891] Respondent's Statement of Costs of April 23, 2018.
[892] Respondent's Statement of Costs of October 22, 2019 and ICSID's Letter of August 31, 2021.
[893] ICSID's Interim Financial Statement May 25, 2021 and ICSID's Letter of August 31, 2021.
[894] RR, para. 634.

**3.    THE TRIBUNAL'S DECISION**

899.  Art. 58 of the Arbitration Rules of Additional Facility establishes that

> "(1) Unless the parties otherwise agree, the Tribunal shall decide how and by whom the fees and expenses of the members of the Tribunal, the expenses and charges of the Secretariat and the expenses incurred by the parties in connection with the proceeding shall be borne […].

**3.1    CRITERIA FOR THE DECISION ON COSTS**

900.  Neither the Arbitration Rules of Additional Facility nor the NAFTA establish defined criteria for the apportionment of costs. Art. 58 of the Arbitration Rules of Additional Facility grant wide discretion to the Tribunal to decide how the costs of this arbitration shall be allocated.

901.  Both Parties have requested that the other bear the costs of the proceedings. Claimant suggests that the Tribunal should apply the principle of "costs follow the event"[895]. Respondent has not opposed this proposition.

902.  The Tribunal will adopt the principle that costs follows the event.

903.  As regards the outcome of this procedure, each Party can legitimately claim that it has succeeded in part:

-    Claimant partially succeeded in the jurisdictional phase, because the Tribunal accepted that the Mortgages qualified as a protected investment; however, Respondent also partially prevailed, to the extent that the Tribunal accepted Mexico's objection that the Notes were not protected investments.

-    On the merits of the case Lion succeeded in its claim that Mexico breached Article 1105 NAFTA;

-    On damages, Claimant requested compensation of USD 98.2 M[896]. Respondent argued that, if any compensation was due, it could not be greater than USD 47 M[897]; the Tribunal concluded, albeit with a different argumentation than that defended by Mexico, that the proper amount of compensation was indeed USD 47M.

---

[895] Claimant's Statement of Costs of October 22, 2019, para. 14.
[896] CPHB, para. 320: USD 81,992,752 as compensation for the cancellation of the Mortgages, UDS 2,212004,53 as legal fees incurred in the Mexican court proceedings and USD 14,853,013.73 for the cost of waiving the Foreclosure Proceedings.
[897] RR, para. 635,

904. Taking into account that Lion has partially prevailed in its request for relief, the Tribunal decides that Mexico shall bear part of Claimant's costs.

**3.2  APPLICATION OF THE "COST FOLLOW THE EVENT" PRINCIPLE**

905. The Tribunal will apply the principle that costs follow the event to the two main categories of Claimant's costs: the Costs of the Proceedings and the Defence Expenses.

<u>Costs of the Proceedings</u>

906. The Costs of the Proceedings, including the fees and expenses of the Tribunal and the Tribunal's Assistant, ICSID's administrative fees and direct expenses, amount to:

Arbitrators' fees and expenses

| | |
|---|---|
| Prof. Juan Fernández-Armesto | USD 424,684.78 |
| Prof. Laurence Boisson de Chazournes | USD 132,136.64 |
| Mr. David. J.A. Cairns | USD 156,003.69 |
| Mr. Ricardo Ramírez Hernández | USD 39,675.00 |
| Mr. Luis Fernando Rodríguez (expenses) | USD 12,777.47 |
| ICSID's administrative fees | USD 242,000.00 |
| Direct expenses (estimated) | USD 159,920.24 |
| Total | USD 1,167,197.82 |

907. The above costs have been paid out of the advances made by the Parties in equal parts[898]. As a result, each Party's share of the Costs of the Proceedings amounts to USD 583,598.91.

908. Lion claims the Costs of the Proceedings, i.e., the advances made by the Parties to cover the fees and expenses of the Tribunal and administrative fees of ICSID.

909. Claimant has succeeded in the overall outcome of the proceedings. The Tribunal, thus, finds that these costs should be assumed by Respondent.

---

[898] The remaining balance will be reimbursed to the parties in proportion to the payments that they advanced to ICSID.

910. Accordingly, the Tribunal finds that Mexico must reimburse Claimant the totality of the Costs of the Proceeding paid by Claimant to ICSID (net of any final reimbursements made by ICSID).

<u>Defense Expenses</u>

911. As a first step, the Tribunal must establish the amount of reasonable defense expenses which a standard claimant has to incur, in order to properly present and defend its claim ["**Reasonable Defense Expenses**"]. Taking into consideration the complexity of the case, the amount in dispute and the work legal counsel and experts, the Tribunal considers that the Parties' Reasonable Defense Expenses amount to USD 3M.

912. Mexico must only assume that part of Claimant's Reasonable Defense Expenses that results from applying the principle that costs follow the event. To determine such amount, the Tribunal must:

-   <u>First</u>, determine the main issues that have been decided;

-   <u>Second</u>, give each legal issue a ponderation; and

-   <u>Third</u>, determine the success rate of Claimant's claims in each legal issue and apply it to Claimant's Reasonable Defense Expenses.

913. In this arbitration, the Tribunal has made two significant decisions:

-   Whether it had jurisdiction over the Mortgages and the Notes;

-   Whether Mexico breached the NAFTA and the consequences thereof.

914. Claimant declared to have dedicated approximately 25% of their costs to the jurisdiction phase, while the remaining 75% to merits and quantum[899]. Thus, the Tribunal will assign each of the legal issues the weight apportioned by Claimant:

-   Jurisdiction: 25% of USD 3 M amounts to USD 750,000;

-   Merits and quantum: 75% of USD 3M amounts to USD 2,250,000.

915. The Tribunal must now determine Claimant's rate of success in each legal issue:

-   Jurisdiction: Claimant was successful in 50% of the jurisdictional objections, since the Tribunal accepted jurisdiction over the Mortgages, but rejected jurisdiction over the Notes; the Tribunal considers Claimant's success rate in the jurisdiction phase of 50%.

---

[899] Claimant's Statement of Costs of October 22, 2019.

- Merits and quantum: Claimant was successful in its relief regarding Mexico's liability for denial of justice; with respect to the assessment of damages, the Tribunal granted approximately half of the amount claimed; in light of the foregoing, the Tribunal finds Claimant's success rate in the merits and quantum phase to be 60%.

916. The Tribunal will now apply the success rate to Claimant's Reasonable Defense Expenses for each legal issue:

- Jurisdiction: 50% of USD 750,000, which amounts to **USD 375,000**.

- Merits and Quantum: 60% of USD 2,250,000, which amounts to **USD 1,350,000**.

**3.3 INTEREST**

917. Claimant has requested that interest be granted over the amounts awarded as costs[900].

918. The Tribunal agrees.

919. The Tribunal has already decided that the compensation awarded to Lion shall accrue interest at a rate of LIBOR for 6-month deposits denominated in USD plus a 2% margin, compounded semi-annually.

920. The same shall apply to the amounts Mexico is ordered to reimburse as costs.

921. The *dies a quo* shall be the date of issuance of this Award.

922. The *dies ad quem* shall be the date of effective payment.

\* \* \*

923. In summary, Mexico shall reimburse Claimant (i) the Costs of the Proceedings paid by Claimant in the amount of USD 583,598.91 and (ii) USD 1,725,000 as Defense Expenses, plus (iii) interest on both amounts at a rate of LIBOR for six-months deposits denominated in USD, with a margin of 2%, compounded semi-annually from the date of this Award until the date of payment.

---

[900] Claimant's Statement of Costs of October 22, 2019, para. 24, b).

# X.  <u>DECISION</u>

924.  For the foregoing reasons, the Tribunal unanimously decides as follows:

1. DECLARES that the United Mexican States has breached NAFTA Art. 1105 by reason of denial of justice and a failure to provide Lion Mexico Consolidated L.P. with fair and equitable treatment.

2. ORDERS the United Mexican States pay to Lion Mexico Consolidated L.P. USD 47,000,000 as compensation for the breach declared in point 1 *supra*.

3. ORDERS the United Mexican States to reimburse to Lion Mexico Consolidated L.P. the Legal Fees arising out of the withdrawal of the Foreclosure Proceeding, in the amount finally established by the Mexican Courts and actually paid by Lion Mexico Consolidated L.P. to the Debtor.

4. ORDERS the United Mexican States to pay Lion Mexico Consolidated L.P. interest on the compensation awarded in point 2 *supra*, at the LIBOR rate applicable to six-months deposits denominated in USD, plus a margin of 2%, compounded semi-annually, from 1 October 2012 until the date of effective payment.

5. ORDERS the United Mexican States to pay to Lion Mexico Consolidated L.P. (i) USD 583,598.91 as the Costs of the Proceedings and (ii) USD 1,725,000 as Defense Expenses.

6. ORDERS the United Mexican States to pay Lion Mexico Consolidated L.P. interest on the amounts awarded in point 5 *supra*, at the LIBOR rate applicable to six-months deposits denominated in USD, plus a margin of 2%, compounded semi-annually, from the date of this Award until the date of effective payment.

7. DISMISSES all other claims and requests.

Place of arbitration: Washington D.C. (USA)

Date: September 20, 2021

*Lion Mexico Consolidated v. Mexico*
ICSID Case No. ARB(AF)/15/2
Award

_____          _____
       Dr. David J.A. Cairns                  Prof. Laurence Boisson de Chazournes
            Arbitrator                          Arbitrator

Date:                                    Date:

_____
       Prof. Juan Fernández-Armesto
         President of the Tribunal

Date:    September 9, 2021

_____                   _____
Dr. David J.A. Cairns                                      Prof. Laurence Boisson de Chazournes
Arbitrator                                                Arbitrator

Date:  September 2, 2021                                   Date:

_____
Prof. Juan Fernández-Armesto
President of the Tribunal

Date:

_____               _____
Dr. David J.A. Cairns                  Prof. Laurence Boisson de Chazournes
Arbitrator                             Arbitrator

Date:                                  Date:  August 26, 2021


_____
Prof. Juan Fernández-Armesto
President of the Tribunal

Date:

215

# ANNEX A

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

**LION MEXICO CONSOLIDATED LP**
**Claimant**

**v.**

**UNITED MEXICAN STATES**
**Respondent**

**(ICSID Case No. ARB(AF)/15/2)**

# DECISION ON JURISDICTION

*Members of the Tribunal*
Juan Fernández-Armesto, President of the Tribunal
David J.A. Cairns, Arbitrator
Laurence Boisson de Chazournes, Arbitrator

*Secretary of the Tribunal*
Francisco Grob

*Assistant to the Tribunal*
Luis Fernando Rodríguez

Washington D.C., July 30, 2018

## **TABLE OF CONTENTS**

Table of contents ............................................................................................2

List of cases ...................................................................................................8

I.     Introduction ..........................................................................................9

II.    The Parties ..........................................................................................11

     1.    Claimant: Lion Mexico Consolidated L.P. ..................................11

     2.    Respondent: United Mexican States ...........................................12

III.   Procedural history ..............................................................................13

     1.    The Request for Arbitration and access to ICSID Additional Facility .13

     2.    The constitution of the Arbitral Tribunal .................................13

     3.    First Procedural Orders and Preliminary Objection under Art. 45(6).14

     4.    Claimant's Memorial ...................................................................15

     5.    Bifurcation of the proceedings ...................................................15

     6.    Jurisdictional Phase ....................................................................15

     7.    Replacement of Arbitrator Ramírez ...........................................16

     8.    Hearing on Jurisdiction ..............................................................17

IV.   Summary of the relevant facts ...........................................................19

     1.    Lion meets Mr. Cárdenas ...........................................................19

     2.    Mr. Cárdenas's Projects .............................................................19

     3.    The three sets of transactions ....................................................20

     3.1.  The first set of transactions .......................................................21

        A.    The First Note ......................................................................21

        B.    The Nayarit Mortgage .........................................................21

     3.2.  The second set of transactions ..................................................22

        A.    The Second Note ..................................................................22

        B.    The Guadalajara Mortgage 1 ...............................................22

     3.3.  The third set of transactions .....................................................23

        A.    The Third Note ....................................................................23

        B.    The Guadalajara Mortgage 2 ...............................................23

     4.    The defaults .................................................................................24

     5.    Later developments .....................................................................24

V.     Relief sought .................................................................................26

VI.    Position of the Parties ...................................................................28

    1.     Respondent's position ...............................................................31

    1.1.   Lion's actual investment was to make three short-term loans only ......31

    1.2.   Mortgages, Notes, and Loans: one single legal transaction ...................32

    1.3.   Mortgages and notes are not investments under Art. 1139 NAFTA .....34

    2.     Claimant's position....................................................................35

    2.1.   Loans, Notes, and Mortgages constitute three different *negotia* ...........35

    2.2.   Mortgages and notes are "investments" under Arts. 1139 (g) and 1139(h)
        36

        A.   The Mortgages are "real estate" and "property".....................................36

        B.   The Notes are a valid investment............................................................39

        C.   Mexico's interpretation of Art. 1139 NAFTA is ill-conceived ..............40

    3.     The experts' positions................................................................42

    3.1.   The Irra opinions........................................................................42

    3.2.   The Zamora opinions .................................................................43

VII.   Discussion.......................................................................................44

    1.     The Notes do not qualify as investments ..................................44

        A.   Promissory notes under Mexican law......................................................45

        B.   *Pagarés no negociables* do not meet the requirements of Art. 1139(h)..47

    2.     The Mortgages qualify as investments .....................................51

    2.1.   Mortgages under Mexican law ..................................................52

        A.   Mortgages are *derechos reales* .............................................................53

        B.   Mortgages are *bienes inmuebles* ...........................................................54

    2.2.   Mortgages meet the requirements of Art. 1139(g) ...................54

        A.   The Tribunal's reasoning........................................................................55

        B.   Mexico's counter-arguments considered ................................................57

    3.     Conclusion ..................................................................................59

VIII.  Decision ..........................................................................................61

# GLOSSARY OF TERMS AND ABBREVIATIONS

| | |
|---|---|
| **Américas I** | One of the two high-end mixed-use skyscrapers planned under the Guadalajara Project to be built in the city of Guadalajara, State of Jalisco |
| **Américas II** | One of the two high-end mixed-use skyscrapers planned under the Guadalajara Project to be built in the city of Guadalajara, State of Jalisco |
| **Borrowers** | Two Mexican companies, Inmobiliaria Bains, S.A. de C.V and C&C Capital, S.A. de C.V., the borrowing party in three loans made by Lion |
| **CC Jalisco** | Civil Code of Jalisco |
| **CC Nayarit** | Civil Code of Nayarit |
| **C&C Capital** | C&C Capital, S.A. de C.V., a company owned or controlled by Mr. Cárdenas |
| **C&C Ingeniería** | C&C Ingeniería y Proyectos, S.A. de C.V., a company owned or controlled by Mr. Cárdenas |
| **Clarion** | Clarion Partners, L.P., a real estate investment management company founded in New York in 1982, which manages real estate investments for institutional investors |
| **Credit Agreements** | Three contracts signed by Lion with companies owned or controlled by Mr. Cárdenas in February, June and September 2007, making and governing the Loans. |
| **First Loan** | Loan, in the form of a "Credit Agreement", between Lion (as Lender), Inmobiliaria Bains (as Borrower) and C&C Ingeniería (another company of Mr. Cardenas) as joint and several obligor. It was signed on February 27, 2007, for the amount of US $15,000,000 plus interest. |
| **First Note** | Note issued by Inmobiliaria Bains in favor of Lion for US $15,000,000 on February 28, 2007 |

| | |
|---|---|
| **Guadalajara Mortgage 1** | Mortgage securing the second loan, granted by C&C Capital in favor of Lion over one of the properties pertaining to the Guadalajara Project on June 13, 2007 |
| **Guadalajara Mortgage 2** | Mortgage securing the third loan, granted by C&C Capital in favor of Lion over one of the properties pertaining to the Guadalajara Project on September 26, 2007 |
| **Guadalajara Project** | Real estate project that consisted of two high-end mixed-use skyscrapers (Américas I and Américas II), which were to be built by Mr. Cárdenas's companies in Guadalajara, State of Jalisco |
| **Hearing** | The hearing on jurisdiction held at the World Bank Headquarters in Washington D.C. on March 22 and 23, 2018 |
| **HT** | Transcripts of the Jurisdictional Hearing |
| **ICSID** | International Centre for Settlement of Investment Disputes |
| **ICSID AF Rules** | International Center for Settlement of Investment Disputes Additionally Facility Rules |
| **Inmobilaria Bains** | Inmobiliaria Bains, S.A. de C.V. a company owned or controlled by Mr. Cárdenas |
| **Irra I** | Respondent's expert report prepared by Mr. René Irra Ibarra dated August 29, 2017 |
| **Irra II** | Respondent's expert report prepared by Mr. René Irra Ibarra dated December 7, 2017 |
| **LGTOC** | Ley General de Títulos y Operaciones de Crédito |
| **Lion/ Claimant** | Claimant. Lion Mexico Consolidated L.P. is a partnership constituted under the laws of Quebec (Canada), with its main place of business in Texas (USA) |
| **Loans** | Three Loans that Lion made in 2007 to two Mexican companies owned or controlled by Mr. Cárdenas, for a principal amount of approximately US $32.8 million. The Loans were secured by the three Mortgages and the issue of three Notes. |
| **Mexico/ Respondent** | United Mexican States |

| | |
|---|---|
| **Mortgages** | Mortgages that secured the three Loans given by Lion in 2007, signed before a public notary in the Spanish language and subject to Mexican Law, namely the laws of the States of Jalisco and Nayarit. |
| **NAFTA** | North American Free Trade Agreement between the United States, Canada and Mexico, which entered into force in January 1, 1994 |
| **Nayarit Project** | Real estate project to be developed by Mr. Cárdenas' companies in Bahía de Banderas, State of Nayarit, Mexico. |
| **Nayarit Mortgage** | Mortgage granted by Inmobiliaria Bains in favor of Lion over the Nayarit Project property on April 2, 2008 |
| **Notes** | Notes formalizing the three Loans made by Lion in 2007, issued under Mexican law, and submitted to the exclusive jurisdiction of the courts of Mexico D.F. |
| **Parties** | The Claimant and the Respondent together |
| **PO** | Procedural Order |
| **RfA** | Request for Arbitration submitted by Lion against Mexico and dated December 11, 2015 |
| **Second Loan** | Loan, in the form of a "Credit Agreement", between Lion (as Lender), C&C Capital (as Borrower) and Inmobiliaria Bains (as joint and several obligor). It was signed on June 13, 2007, for the amount of US $12,450,000 plus interest. |
| **Second Note** | Noted issued by C&C Capital in favor of Lion for US $12,450,000 on June 14, 2007. |
| **Third Loan** | Loan, in the form of a "Credit Agreement", between Lion (as Lender), C&C Capital (as Borrower) and Inmobiliaria Bains (as joint and several obligor). It was signed on September 26, 2007, for the amount of US $5,355,479 plus interest. |
| **Third Note** | Note issued by C&C Capital in favor of Lion for US $5,355,479 on September 29, 2007. |
| **VCLT** | Vienna Convention on the Law of Treaties, adopted on 23 May 1969 and opened for signature on 23 May 1969. |

| | |
|---|---|
| **Zamora I** | Claimant's expert report prepared by Mr. Rodrigo Zamora Etcharren dated March 6, 2017 |
| **Zamora II** | Claimant's expert report prepared by Mr. Rodrigo Zamora Etcharren dated October 23, 2017 |
| **Zamora III** | Claimant's expert report prepared by Mr. Rodrigo Zamora Etcharren dated January 18, 2018 |

**LIST OF CASES**

| | |
|---|---|
| ***Emmis*** | *Emmis International Holding BV v. Hungary*, ICSID Case No. ARB/12/2, Award, 16 April 2014, Exh. CLA-501. |
| ***Garanti*** | *Garanti Koza LLP v. Turkmenistan,* ICSID Case No. ARB/11/20, Award, 19 December 2016, Exh. CLA-502. |
| ***Grand River*** | *Grand River Enterprises Six Nations, Ltd., et al. v. United States of America*, UNCITRAL, Award, 12 January 2011, Exh. CLA-117. |
| ***Koch*** | *Koch Minerals Sarl and Koch Nitrogen International Sarl v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/19, Partially Dissenting Opinion of Prof. Zachary Douglas QC, 8 October 2017, Exh. CLA-503. |
| ***Methanex*** | *Methanex Corporation v. The United States of America,* Second Submission of Canada Pursuant to NAFTA Article 1128, 30 April 2001, Exh. CLA-120. |
| ***Sumo*** | *Mayagna (Sumo) Awas Tingni Community v. Nicaragua*, Inter-American Court of Human Rights, Series C no. 79, Judgment, 31 August 2001, Exh. CLA-061. |

# I.   INTRODUCTION

1. On December 11, 2015, the International Centre for Settlement of Investment Disputes ["**ICSID**"] received a request for arbitration [the "**RfA**"] submitted by Lion Mexico Consolidated L.P. ["**Lion**" or "**Claimant**"], a company constituted under the laws of Quebec, Canada, against the United Mexican States ["**Mexico**" or "**Respondent**"].

2. The RfA was made pursuant to Arts. 1116, 1120, and 1122 of the North American Free Trade Agreement ["**NAFTA**"][1]. It included a request for approval of access to the Additional Facility of the Centre.

3. On December 23, 2015, the Secretary-General registered the RfA and approved access to the Additional Facility pursuant to Art. 4 of the ICSID Additional Facility Rules ["**ICSID AF Rules**"].

4. The Tribunal was officially constituted on July 26, 2016, after all the arbitrators accepted their appointments and the proceedings were deemed to have begun.

5. At the time of this Decision, the Tribunal is composed of three following members:

> Mr. Juan Fernández-Armesto
> Chairman – Spanish national
> Appointed by agreement of the Secretary-General on July 20, 2016.
> Armesto & Asociados
> General Pardiñas, 102
> 28006 Madrid, Spain
> Tel.: +34 91 562 16 25
> E-mail: jfa@jfarmesto.com

> Mr. David J.A. Cairns
> Co-Arbitrator – British/New Zealand national
> Appointed by Claimant on March 10, 2016.
> B. Cremades y Asociados
> Goya, 18; Planta 2
> 28001 Madrid, Spain
> Tel.: +34 91 423 7200
> E-mail: d.cairns@bcremades.com

> Prof. Laurence Boisson de Chazournes
> Co-Arbitrator – French/Swiss national
> Appointed by Respondent on February 2, 2018.
> University of Geneva, Faculty of Law

---

[1] RfA, para. 7.

40, boulevard du Pont-d'Arve
1211 Geneva 4 (Switzerland)
Tel.: +41 (0) 22 379 85 44
E-mail: Laurence.BoissonDeChazournes@unige.ch

## II.    <u>THE PARTIES</u>

6.    This arbitration takes place between Lion Mexico Consolidated L.P. (Canada) and the United Mexican States, a sovereign state.

### 1.    <u>CLAIMANT: LION MEXICO CONSOLIDATED L.P.</u>

7.    Claimant is Lion Mexico Consolidated L.P., a partnership incorporated and registered under the laws of the Province of Quebec, Canada. Its main place of business and unified domicile for notifications is the following:

> 1717 McKinney Avenue, Suite 1900
> Dallas, Texas 75202
> United States of America[2]

8.    Claimant is represented in this arbitration by:

> Onay Payne
> Lion Mexico Consolidated L.P.
> 230 Park Avenue, 12th Floor
> New York, NY 10169
> T. 212.883.2507
> Email: Onay.Payne@clarionpartners.com

> Robert J. Kriss
> Mayer Brown LLP
> 71 S. Wacker Drive
> Chicago, Illinois, 60606
> Tel. +1 312 782 0600
> Email: rkriss@mayerbrown.com

> Dany Khayat
> Alejandro López-Ortiz
> José J. Caicedo
> Mayer Brown
> 20, avenue Hoche
> 75008 Paris – France
> Tel. +33.1.53.53.43.43
> Emails:   dkhayat@mayerbrown.com
>                 alopezortiz@mayerbrown.com
>                 jcaicedo@mayerbrown.com

---

[2] RfA, para. 2, and Exh. C-1.

2.    **R**ESPONDENT: **U**NITED **M**EXICAN **S**TATES

9.    Respondent is the United Mexican States, a sovereign State.

10.    The Respondent is represented in this arbitration by the following counsel:

> Samantha Atayde Arellano
> Directora General de Consultoría Jurídica de Comercio
> Internacional
> Email: samantha.atayde@economia.gob.mx
>
> Cindy Rayo Zapata
> Directora General Adjunta de Consultoría Jurídica de
> Comercio Internacional
> Email: cindy.rayo@economia.gob.mx
>
> Gabriela Alcántara Torres
> Email: gabriela.alcantara@economia.gob.mx
>
> Hugo Gabriel Romero Martínez
> Email : hugo.romero@economia.gob.mx
> Aristeo López Sánchez
> Email: alopez@naftamexico.net
>
> Secretaría de Economía
> Av. Paseo de la Reforma 296, piso 25, Colonia Juárez,
> Delegación Cuauhtémoc, C.P. 06600
> Ciudad de México, México
>
> J. Cameron Mowatt
> J. Cameron Mowatt, Law Corporation
> Email: cmowatt@isds-law.com
>
> Stephan Becker
> Pillsbury Winthrop Shaw Pittman
> Email: stephan.becker@pillsburylaw.com
>
> Alejandro Barragán
> J. Cameron Mowatt, Law Corporation
> Email: abarragan@isds-law.com

11.    Henceforth, Claimant and Respondent will together be referred to as the **Parties**.

# III.    PROCEDURAL HISTORY

## 1.    THE REQUEST FOR ARBITRATION AND ACCESS TO ICSID ADDITIONAL FACILITY

12.    On December 11, 2015, ICSID received Lion's RfA against the United Mexican States, together with 20 factual exhibits[3].

13.    The RfA was made pursuant to Arts. 1116, 1120, and 1122 NAFTA[4]. It included a request for approval of access to the Additional Facility of the Centre.

14.    On December 23, 2015 the Secretary-General registered the RfA and approved access to the Additional Facility pursuant to Art. 4 of the ICSID Additional Facility Rules. In accordance with Article 5(e) ICSID AF Rules, the Secretary-General invited the Parties to proceed as soon as possible to constitute an Arbitral Tribunal.

## 2.    THE CONSTITUTION OF THE ARBITRAL TRIBUNAL

15.    Article 1123 NAFTA specifies the number of arbitrators and the method of their appointment to constitute a Tribunal: unless the disputing parties agree otherwise, the Tribunal shall comprise three arbitrators, one arbitrator appointed by each party, and a presiding arbitrator appointed by agreement of the parties.

16.    On March 10, 2016 the Claimant appointed Mr. David J. A. Cairns, a national of the United Kingdom and New Zealand, as an arbitrator in this case. Mr. Cairns accepted his appointment and provided his *curriculum vitae*.

17.    On May 10, 2016 the Respondent appointed Mr. Ricardo Ramírez Hernández, a national of Mexico, as an arbitrator in this case. Mr. Ramírez Hernández accepted his appointment and provided his *curriculum vitae*.

18.    After the Parties failed to reach an agreement on the presiding arbitrator, in accordance with Article 1124 NAFTA, the Secretary-General served as appointing authority. On July 20, 2016, the Secretary-General appointed Juan Fernández-Armesto, a national of Spain, as President of the Tribunal. Pursuant to Arts. 11(2) and 13 ICSID AF Rules, Mr. Fernández-Armesto accepted the appointment by letter of July 27, 2016, attaching his declaration of independence and impartiality.

19.    On July 27, 2016, the Secretary-General confirmed the Arbitral Tribunal had been constituted and the proceedings were deemed to have begun. The Parties confirmed at the first session—held on September 26, 2016—that the Tribunal had been properly constituted

---

[3] Exhs. C-1 to C-20.
[4] RfA, para. 7.

and neither had any objection to the appointment of its members[5]. Ms. Anneliese Fleckenstein, ICSID Legal Counsel was appointed to serve as the Secretary of the Tribunal.

3.    FIRST PROCEDURAL ORDERS AND PRELIMINARY OBJECTION UNDER ART. 45(6)

20.    On August 13, 2016 the Tribunal circulated a first draft Procedural Order No. 1.

21.    On August 24, 2016 Mexico submitted a **Preliminary Objection to the Tribunal's Jurisdiction** under Art. 45(6) ICSID AF Rules, together with 10 legal authorities[6], on grounds that Lion's claims were manifestly without merit.

22.    On August 31, 2016 after receiving the Parties' positions, the Tribunal issued a procedural schedule for the Parties to exchange rounds of pleadings on Mexico's Preliminary Objection.

23.    On September 26, 2016 the Parties and the Tribunal held the first session by telephone conference, during which the terms of the Procedural Order No. 1 were discussed.

24.    On the same day, Lion submitted its **Response to Mexico's Preliminary Objection**, attaching 4 factual exhibits[7] and 108 legal authorities[8].

25.    On October 13, 2016 Mexico submitted its **Reply to Lion's Response on the Preliminary Objection**.

26.    On October 14, 2016 the Tribunal issued **Procedural Order No. 1**, after receiving the Parties' comments[9]. The Order covered some procedural matters for the management of this case, *inter alia*, that the procedural language would be English and Spanish, basic rules on submission of pleadings and evidence, that the place of the proceeding would be determined in a separate order, and that Dr. Luis Fernando Rodríguez would serve as the Assistant to the Tribunal. Annex A to the Order set out the Procedural Calendar for this arbitration.

27.    On October 31, 2016 Lion submitted its **Rejoinder on Mexico's Preliminary Objection**, attaching 7 factual exhibits[10] and 27 legal authorities[11].

28.    On November 24, 2016 the Tribunal issued, after receiving the Parties' positions, the **Procedural Order No. 2**, setting Washington D.C. as the place of this arbitration.

---

[5] *See* PO 1, paras. 2.1.
[6] Exhs. RLA-1 to RLA-10.
[7] Exhs. C-21 to C-24.
[8] Exhs. CLA-1 to CLA-108.
[9] Lion's and Mexico's communications of September 12, 2016, and Lion's communication of September 25, 2016.
[10] Exhs. C-25 to C-31.
[11] Exhs. CLA-109 to CLA-136.

29. On December 12, 2016 the Tribunal issued a **Decision**, dismissing Mexico's Preliminary Objection to the Tribunal's Jurisdiction under Art. 45(6) ICSID AF Rules.


4.  **CLAIMANT'S MEMORIAL**

30. On March 13, 2017 Lion submitted its **Memorial**, together with 120 factual exhibits[12], 200 legal authorities[13], three witness statements (by Onay Payne, Jose Arechederra, and James Hendricks), and the first expert report on Mexican law, prepared by Rodrigo Zamora, which attached 122 authorities[14].


5.  **BIFURCATION OF THE PROCEEDINGS**

31. On April 4, 2017 Mexico filed a **Request for Bifurcation**, in which Mexico raised two objections to the Tribunal's jurisdiction under Art. 45(2) ICSID AF Rules.

32. On May 4, 2017 Lion submitted its Response to Mexico's Request for Bifurcation (which included 20 legal authorities[15]), opposing the request and demanding that Mexico's objections to jurisdiction be heard together with the merits of the dispute.

33. On May 29, 2017 the Tribunal issued its **Decision**, bifurcating the proceedings in respect of only one of the objections raised, namely: that the Tribunal lacks jurisdiction *ratione materiae* because Lion did not make an investment in Mexico within the terms required by Arts. 1101 and 1139 NAFTA[16].


6.  **JURISDICTIONAL PHASE**

34. On June 30, 2017 the Tribunal issued **Procedural Order No. 3**, setting the procedural calendar for the jurisdictional phase, based on the Parties' comments and agreements[17].

35. On July 13, 2017 the Secretary of the Tribunal informed the governments of USA and Canada of the deadline for NAFTA signatories to make submissions on the interpretation of the treaty under Art. 1128 NAFTA.

36. On August 28, 2017 Mexico submitted a Memorial on Jurisdiction, together with 19 legal authorities[18] and an expert report on Mexican law by René Irra Ibarra (which attached 20 authorities).

---

[12] Exhs. C-32 to C-151.
[13] Exhs. CLA-137 to CLA-336.
[14] Exhs. I-1 to I-122.
[15] Exhs. CLA-337 to CLA-356.
[16] Request for Bifurcation, paras. 5 and 7–9.
[17] Communications of June 14, 2017.
[18] Exhs. RLA-11 to RLA-29.

37.    On October 30, 2017 Lion submitted a **Counter-Memorial** on Jurisdiction, together with five factual exhibits[19], 136 legal authorities[20], and a second expert report on Mexican law by Rodrigo Zamora (which attached 28 authorities).

38.    On November 30, 2017 the Tribunal, at the Parties' request[21], granted an extension for the filing of the second rounds of pleadings on jurisdiction.

39.    On December 7, 2017 Mexico submitted its **Reply on Jurisdiction**, together with nine legal authorities[22] and René Irra's second expert report (which attached 22 more authorities).

40.    On January 19, 2018 Lion submitted its **Rejoinder on Jurisdiction**, together with 47 legal authorities[23], and the third expert report on Mexican law, prepared by Rodrigo Zamora (which attached 19 authorities).

41.    On January 22, 2018 the Tribunal and the Parties held a telephone conference to discuss the logistical, procedural, and administrative arrangements for the upcoming hearing on jurisdiction.

42.    One day later, the Tribunal issued **Procedural Order No. 4**, on the organization of the hearing, based on the Parties' comments and agreements.


**7.    REPLACEMENT OF ARBITRATOR RAMÍREZ**

43.    On January 25, 2018 Mexico-appointed co-arbitrator Mr. Ricardo Ramírez tendered his resignation. The following day Mr. Juan Fernández-Armesto and Mr. David J.A. Cairns considered the reasons for and consented to his resignation under Art. 14(3) ICSID AF Rules. By communication of the same date the Secretary of the Tribunal declared the suspension of the proceedings until Mexico appointed another arbitrator pursuant to Art. 16(2) ICSID AF Rules.

44.    On February 2, 2018 Mexico designated Prof. Laurence Boisson de Chazournes, a French and Swiss national, as arbitrator in accordance with Art. 1123 NAFTA and Art. 17(1) ICSID AF Rules.

45.    On February 6, 2018 Prof. Boisson de Chazournes accepted the appointment and submitted her declaration under Art. 13 ICSID AF Rules. The same day the proceedings resumed from the point reached at the time the vacancy occurred.

---

[19] Exhs. C-152 to C-156.
[20] Exhs. CLA-357 to CLA-492.
[21] Communications of November 28 and 29, 2017.
[22] Exhs. RLA-30 to RLA-38.
[23] Exhs. CLA-493 to CLA-539.

8.  **HEARING ON JURISDICTION**

46.  On February 19, 2018 the Parties agreed to reschedule the jurisdictional hearing for March 22 and 23, 2018.

47.  On February 28, 2018 ICSID notified the Parties and the NAFTA Parties of the new venue, dates, and starting time of the hearing.

48.  On March 2, 2018 the Tribunal issued **Procedural Order No. 5**, a revised and updated version of **Procedural Order No. 4** on the organization of the hearing.

49.  A hearing on jurisdiction was held at the World Bank Headquarters in Washington D.C. on March 22 and 23, 2018 [the "**Hearing**"]. The following individuals attended the Hearing:

> Tribunal
> Prof. Juan Fernández-Armesto          President
> Dr. David J.A. Cairns                 Arbitrator
> Prof. Laurence Boisson de Chazournes  Arbitrator
>
> Assistant to the Tribunal
> Dr. Luis Fernando Rodríguez
>
> ICSID Secretariat
> Ms. Catherine Kettlewell
>
> For Claimant
> *Counsel:*
> Mr. Robert J. Kriss                   Mayer Brown
> Mr. Dany Khayat                       Mayer Brown
> Mr. Alejandro López Ortiz             Mayer Brown
> Mr. José Caicedo                      Mayer Brown
> Ms. Patricia Ugalde                   Mayer Brown
>
> *Parties:*
> Ms. Onay Payne                        Lion Mexico Consolidated
> Ms. Reneé Castro                      Lion Mexico Consolidated
>
> *Expert:*
> Mr. Rodrigo Zamora                    Galicia Abogados
>
> For Respondent
> *Counsel:*
> Ms. Samantha Atayde Arellano          Secretaría de Economía
> Mr. Hugo Romero Martínez              Secretaría de Economía

| | |
|---|---|
| Ms. Cindy Rayo Zapata | Secretaría de Economía |
| Ms. Gabriela del Carmen Alcántara Torres | Secretaría de Economía |
| Mr. Aristeo López Sánchez | Secretaría de Economía |
| Mr. Guillermo Malpica Soto | Secretaría de Economía |
| Mr. J. Cameron Mowatt | J. Cameron Mowatt, Law Corp. |
| Mr. Alejandro Barragán | J. Cameron Mowatt, Law Corp. |
| Mr. Stephan E. Becker | Pillsbury Winthrop Shaw Pittman LLP |
| Mr. Greg Tereposky | Tereposky & DeRose LLP |
| Ms. Jennifer Radford | Tereposky & DeRose LLP |

| | |
|---|---|
| *Expert:* | |
| Mr. René Irra Ibarra | Irra Ibarra |
| Mr. René Irra de la Cruz | Assistant to Mr. René Irra Ibarra |

50. On April 27, 2018 each Party submitted its Statement on Costs.

51. On June 12, 2018, the Centre informed the Parties and the Tribunal that Mr. Francisco Grob, ICSID Legal Counsel, would replace Ms. Anneliese Fleckenstein as Secretary of the Tribunal while she is on leave.

## IV.       SUMMARY OF THE RELEVANT FACTS

52.   This section describes the factual background of the transactions carried out by Lion in Mexico. The Tribunal has made no independent enquiry or investigation into the facts. The summary is based on Claimant's account, which Mexico does not dispute: "*Los hechos en sí mismos*", Mexico points out in its last submission, "*no se encuentran en disputa*"[24]. It is the legal assessment of these facts that is at issue.

### 1.   LION MEETS MR. CÁRDENAS

53.   Claimant, Lion Mexico Consolidated LP, is a limited partnership constituted under the laws of Quebec (Canada), with its main place of business in Texas (USA). Lion was created and is managed by Clarion Partners, L.P. ["**Clarion**"], a real estate investment management company founded in New York in 1982, which manages real estate investments for institutional investors[25].

54.   Lion has been making investments in Mexico for over ten years. Over that period, Lion has provided more than US $800 million of capital to entities doing business in Mexico, to be used in developing a wide array of real estate properties, such as hotels, office buildings, residences, warehouses, and resorts[26].

55.   Clarion engaged Real Capital Investment Management to identify and present investment opportunities in Mexico[27], and through this channel Mr. Héctor Cárdenas Curiel, a Mexican businessman, was introduced to Lion and Clarion[28]. Mr. Cárdenas was presented as a developer seeking funding for the development of two real estate development projects: the Nayarit Project and the Guadalajara Project.

### 2.   MR. CÁRDENAS'S PROJECTS

56.   The Nayarit Project ["**Nayarit Project**"] included an ocean-front residential and resort development in Bahía de Banderas, State of Nayarit[29]. The development plan called for a mixed-use high-end resort to be anchored by a Ritz Carlton hotel, 1,500 luxury residential units, extensive amenities offerings, and two ocean-front golf courses, among other features to be developed on 855 hectares (2,100 acres) with 2.8 miles of ocean frontage[30].

---

[24] Reply on Jurisdiction, para. 14.
[25] Exh. C-32.
[26] Claimant's Memorial, para. 6.
[27] First Witness Statement of José Javier Arechederra Tovar, para. 6.
[28] First Witness Statement of José Javier Arechederra Tovar, para. 9.
[29] First Witness Statement of James Hendricks, para. 7.
[30] Exh. C-33.

57.   The Guadalajara Project ["**Guadalajara Project**"][31] consisted of two high-end mixed-use skyscrapers ["**Américas I**" and "**Américas II**"], which were to be built on approximately 15,000 m$^2$ (3.74 acres) in the city of Guadalajara, State of Jalisco[32].

58.   Mr. Cárdenas's plans for the development of the Nayarit Project and the Guadalajara Project were preliminary and incomplete at the time he requested capital from Lion to acquire land and begin limited infrastructure development[33]. Lion was willing to provide capital for the development of these projects subject to requirements including the following:

-   The granting of mortgages to Lion over the land acquired by Mr. Cárdenas and on the subsequent improvements made on that land[34]; and

-   The issue of promissory notes to Lion as unconditional commitments to repay the money owed to Lion, with certain procedural privileges under Mexican law[35].


**3.     THE THREE SETS OF TRANSACTIONS**

59.   In February, June, and September 2007, Lion made three loans for financing the purchase of the properties for the Nayarit Project and the Guadalajara Project ["**the Loans**"], as well as working capital. Lion provided the Loans to two Mexican companies owned or controlled by Mr. Cárdenas ["**the Borrowers**"]:

-   Inmobiliaria Bains, S.A. de C.V. ["**Inmobiliaria Bains**"],

-   C&C Capital, S.A. de C.V. ["**C&C Capital**"].

60.   The three Loans, with a principal amount of approximately US $32.8 million, were secured by three mortgages and the issue of three promissory notes.

61.   The three promissory notes [the "**Notes**"] were all issued under Mexican law, drafted both in English and Spanish (with the Spanish version governing) and submitted to the exclusive and irrevocable jurisdiction of the courts of Mexico, D.F.

62.   The three mortgages [the "**Mortgages**"] were signed before a notary public, in Spanish language and subject to Mexican law, namely, the applicable laws of the States of Jalisco **["Guadalajara Mortgages 1 and 2"]** and Nayarit **["Nayarit Mortgage"]**[36].

---

[31] First Witness Statement of James Hendricks, para. 7.
[32] Exh. C-35 and Exh. C-36.
[33] First Witness Statement of James Hendricks, para. 9, and Claimant's Memorial, paras. 17 and 18.
[34] Exh. C-33 and Exh. C-35.
[35] First Witness Statement of James Hendricks, para. 9.
[36] Zamora II, paras. 144 and 147.

### 3.1. THE FIRST SET OF TRANSACTIONS

63.   The first loan took the form of a "Credit Agreement" between Lion (as Lender), Inmobiliaria Bains (as Borrower) and C&C Ingeniería (another company of Mr. Cardenas) as joint and several obligor. It was signed on February 27, 2007. The loan was for the amount of US $15,000,000, plus ordinary interest at a rate of 18% per year, capitalized every three months, and in the event of a default, a default interest rate of 25% [the "**First Loan**"].

64.   The contract provided for the granting of a mortgage (clause four) and the issue of a non-negotiable promissory note (clause two, 2.2(5)) to secure the loan. It enclosed an Exhibit A (with the "Form of Mortgage") and an Exhibit B (with the "Form of Note").

65.   The Credit Agreement was written in English and governed by the laws of Mexico[37].

### A.   The First Note

66.   One day after the signing of the Credit Agreement, on February 28, 2007, Inmobiliaria Bains issued the first promissory note in favor of Lion for US $15,000,000, plus ordinary interest at a rate of 18% per year, capitalized every three months, and in the event of a default, a default interest rate of 25% ["**First Note**"].

67.   The original maturity date of the First Note was August 28, 2008. The First Note was substituted four times, resulting in a final maturity date as of September 30, 2009[38].

### B.   The Nayarit Mortgage

68.   About one month after the signing of the Credit Agreement, on April 2, 2008, Inmobiliaria Bains granted in favor of Lion the Nayarit Mortgage over the Nayarit Project property, located in the Municipality of Bahía de Banderas[39].

69.   The Nayarit Mortgage in its final form secured all the three Loans, including both principal and interest.

70.   The Nayarit Mortgage was recorded at the Office of the Public Property Registry of Bucerías, Nayarit, on May 19, 2008[40].

---

[37] Exh. C-8.

[38] Exh. C-153 (Versions of the First Note dated February 28, 2007; August 28, 2008; January 20; 2009; March 31, 2009; and July 7, 2009. The initial version of the First Note was signed in two separate promissory notes for US$9,177,020.25 and US$5,822,979.75 (totaling US$15 million), respectively, with the same original maturity date for both of them (August 28, 2008). All subsequent versions of the First Note were issued in a single promissory note for US$15 million.

[39] Exh. C-10.

[40] The Nayarit Mortgage replaced two previous mortgages in favor of Lion, which were subsequently cancelled: a mortgage issued on February 28, 2007, and another on June 13, 2007. While on February 28, 2007, the mortgage only secured the First Loan, it was subsequently replaced to also cover the Second Loan (on June 13, 2007) and Third Loan (on April 2, 2008), respectively, Protocol Mortgage No. 92.496 of April 2, 2008, recorded under Book 285,

## 3.2. THE SECOND SET OF TRANSACTIONS

71.   The second loan also took the form of a "Credit Agreement", between Lion (as Lender), C&C Capital (as Borrower) and Inmobiliaria Bains (as joint and several obligor). It was signed on June 13, 2007, around three months after the first set of transactions. The loan was for the amount of US $12,450,000 plus ordinary interest at a rate of 18% per year, capitalized every three months, and in the event of a default, a default interest rate of 25% [the "**Second Loan**"][41].

72.   The contract provided for the granting of a mortgage (clause four) and the issue of a non-negotiable promissory note (clause two, 2.2(2)) to secure the loan. It also enclosed an Exhibit A (with the "Form of Mortgage") and an Exhibit B (with the "Form of Note").

73.   The Credit Agreement was again written in English and governed by the laws of Mexico[42].

## A.   The Second Note

74.   The day after the signing of the Credit Agreement, on June 14, 2007 C&C Capital issued the second note ["**Second Note**"] in favor of Lion for US$12,450,000 plus ordinary interest at a rate of 18% per year, capitalized every three months, and in the event of a default, a default interest rate of 25%[43].

75.   The original maturity date of the Second Note was September 14, 2007. The Second Note was substituted seven times, leading to a final maturity date of September 30, 2009[44].

## B.   The Guadalajara Mortgage 1

76.   The Guadalajara Mortgage 1 secured the Second Loan, including both capital and interest. It was granted on June 13, 2007, the date of execution of the Credit Agreement, by Bansi S.A., as trustee, as per the instruction of C&C Capital, as founder and beneficiary of the trust, in favor of Lion, over one of the properties pertaining to the Guadalajara Project[45].

77.   The Guadalajara Mortgage 1 was recorded at that Public Property Registry about five months later, on November 23, 2007.

---

section II, A-13 of the Public Property and Commercial Registry of Bucerías, Nayarit on May 19, 2008 / April 2, 2008. *See* Exh. C-10.

[41] Exh. C-12.

[42] Exh. C-8.

[43] Exh. C-12.

[44] Exh. C-154 (Copy of the versions of the Second Note dated June 14, 2007; September 12, 2007, December 25, 2007; March 30, 2008; September 30, 2008; January 20, 2009; and July 7, 2009). The 6th modified version of the Second Note (issued on March 31, 2009 and cancelled on July 7, 2009) is not available.

[45] Exh. C-14 (Protocol Mortgage No. 7.820 of June 13, 2007 over a property located in Guadalajara, Jalisco, recorded under Sheet 117,850 of the Public Property Registry of the City of Guadalajara, Jalisco on November 23, 2007 / June 13, 2007).

### 3.3. THE THIRD SET OF TRANSACTIONS

78.   The third loan again took the form of a "Credit Agreement" between Lion (as Lender), C&C Capital (as Borrower) and Inmobiliaria Bains (as joint and several obligor). It was signed on September 26, 2007. The loan was for the amount of US $5,355,479 plus ordinary interest at a rate of 18% per year, capitalized every three months, and in the event of a default, a default interest rate of 25% [the "**Third Loan**"][46].

79.   The contract provided for the granting of a mortgage (clause four) and the issue of a non-negotiable promissory note (clause two, 2.1(5)) to secure the loan. It again enclosed an Exhibit A (with the "Form of Mortgage") and an Exhibit B (with the "Form of Note").

80.   The Credit Agreement was written in English and governed by the laws of Mexico[47].

### A.   **<u>The Third Note</u>**

81.   C&C Capital issued the Third Note ["**Third Note**"] on September 26, 2007, the date of execution of the Credit Agreement, in favor of Lion for US $5,355,479 plus ordinary interest at a rate of 18% per year, capitalized every three months, and in the event of a default, a default interest rate of 25%. Inmobiliaria Bains signed as joint and several obligor[48].

82.   The original maturity date of the Third Note was December 25, 2007. The Third Note was substituted six times, resulting in a final maturity as of September 30, 2009[49].

### B.   **<u>The Guadalajara Mortgage 2</u>**

83.   The Guadalajara Mortgage 2 secured the Third Loan, including both capital and interest. It was granted on the day of execution of the Credit Agreement, September 26, 2007, by Bansi S.A., as trustee, as per the instruction of C&C Capital as founder and beneficiary of the trust, in favor of Lion, over one of the properties pertaining to the Guadalajara Project[50].

---

[46] Exh. C-152 (Third Loan agreement for US$5,355,479 granted by LMC to C&C, September 26, 2007). This Exh. C-152 contains the signature of Lion and the correct original "Due Date" of 90 days at Clause 1.1(7) complements Exhibit C-16. There is no dispute between the Parties on this maturity date of 90 days: it is the one indicated at the RfA, para. 34(c), and was acknowledged by Mexico at Mexico's Preliminary Objection, paras. 40 and 41.

[47] Exh. C-16.

[48] Exh. C-152 (Third Loan agreement for US$5,355,479 granted by Lion to C&C, September 26, 2007). Exh. C-152 contains the signature of Lion and the correct original "Due Date" of 90 days at Clause 1.1(7) complements Exhibit C-016. There is no dispute between the Parties on this maturity date of 90 days: it is the one indicated at the RfA, para. 34(c), and was acknowledged by Mexico at Mexico's Preliminary Objection, paras. 40 and 41.

[49] Exh. C-155 (Copy of the versions of the Third Note dated December 25, 2007; March 30, 2008; September 30, 2008; January 20, 2009; and July 7, 2009). The initial (issued on September 26, 2007 and cancelled on December 25, 2007) and 5th modified version (issued on March 31, 2009 and cancelled on July 7, 2009) of the Third Note are not available.

[50] Exh. C-156 (Protocol Mortgage No. 7.895 over a property located in Guadalajara and recorded under Sheet 2,000,954 of the Public Property Registry of the City of Guadalajara, Jalisco on December 6, 2007 / September 26, 2007). Exh. C-156 complements Exh. C-18, which did not include the annexes of the protocol.

84.   The Guadalajara Mortgage 2 was recorded at that Property Public Registry on 6 December 2007.

## 4.   THE DEFAULTS

85.   The initial deadlines for repayment of all three Loans were not met. Mr. Cárdenas requested and obtained a series of time extensions: from March 2008 through July 2009, Lion signed maturity date extensions on the First Loan four times[51], on the Second Loans seven times[52], and on the Third Loan six times[53].

86.   The last payment date on the three transactions was, ultimately, September 30, 2009, and the debtors failed to satisfy the outstanding amounts by that date. All three Loans were declared in default and interest at the default rate began to accrue on October 1, 2009.

87.   Lion sent its first invoice to Mr. Cárdenas for the outstanding principal and interest payments due on April 16, 2010[54]. The amounts due on that invoice, calculated and dated as of March 31, 2010, totaled US $26,618,972 for the Nayarit Project and US $29,649,835 for the Guadalajara Project.

88.   Subsequent invoices were sent on July 14, 2010[55]; October 11, 2010[56]; February 14, 2011[57]; April 12, 2011[58], and July 29, 2011[59].

89.   The amounts due on the latest invoices sent, calculated and dated as of June 30, 2011, were US $36,041,328.45 for the Nayarit Project and US $40,065,210.38 for the Guadalajara Project.

90.   According to Lion, no payments were ever made.

## 5.   LATER DEVELOPMENTS

91.   In view of the defaults, in February 2012 Lion sought to enforce its rights judicially. In the following years Lion repeatedly filed legal actions before the Mexican courts. Lion submits that the Mexican courts and public registries engaged in improper conduct, allowing a fraud based upon a forged loan restructuring agreement, which resulted in the unlawful cancellation of Lion's Mortgages and Notes. In its words at the hearing[60].

---

[51] Exh. C-11.
[52] Exh. C-15.
[53] Exh. C-19.
[54] Exh. C-37.
[55] Exh. C-38.
[56] Exh. C-39.
[57] Exh. C-40.
[58] Exh. C-42.
[59] Exh. C-42.
[60] HT, Day 1, 38:14 – 38:21.

> "Unfortunately, Cárdenas failed to move forward with these Projects as planned and didn't repay the capital as required under the Contract with [Lion]. As you know, [Lion] has alleged that it was wrongfully stripped off its Mortgages and Notes by the fraudulent conduct of various Mexican courts and public registries over a period of three years ..."

92. Lion has brought this arbitration against Mexico under NAFTA to address the unlawful taking of its property (allegedly, a violation of Art. 1110 NAFTA) and Mexico's failure to provide fair and equitable treatment and full protection and security (Art. 1105 NAFTA). Lion is asking the Tribunal to issue an award for damages representing the value of its investment, lost as a result of Mexico's breach of NAFTA.

# V.     RELIEF SOUGHT

93.     In its Memorial, Lion submitted the following request for relief[61]:

> "The Claimant respectfully request the Tribunal:
>
> a) To declare that Mexico has breached its obligations under Articles 1110 and 1115 of NAFTA and international law;
>
> b) To order Mexico to pay the Claimant the loss caused by the cancellation of the Mortgages in the amount of US $76,343,347.00 or, alternatively, US $74,706,873;
>
> c) To order Mexico to pay the Claimant the additional loss caused by cancellation of the Notes in an amount to be determined at a later stage;
>
> d) To order Mexico to pay the Claimant the legal fees incurred in the Mexican court proceedings in an amount of US$ 1,262,650;
>
> e) To order Mexico to pay interest on the amounts under (b) to (d) at the Mexican Legal rate provided by Article 362 of the Mexican Commercial Code compounded monthly, through the date of full and effective payment of those amounts or, alternatively, at the monthly interest rate of the 28-day Interbank Equilibrium Interest Rate (TIIE);
>
> f) To order Mexico to reimburse Claimants all their reasonable legal costs and fees in connection with this arbitration; and
>
> g) Any other remedies that the Tribunal consider appropriate in the circumstances given Mexico's breaches".

94.     In its Rejoinder on Jurisdiction, Lion asked the Tribunal for the following relief[62]:

> "140. For the reasons discussed above, the Claimant respectfully requests the Arbitral Tribunal to issue a decision on jurisdiction rejecting Mexico's Jurisdictional Objection and declaring that the Mortgages and Notes are indeed investments under NAFTA Article 1139; and, consequently that it has *ratione materiae* jurisdiction to adjudicate the claims brought by the Claimant; thus ordering the proceedings to continue and the Respondent to file the Respondent's Counter-Memorial in the period remaining, according with the Amended Timetable.
>
> 141. The Claimant also requests the Arbitral Tribunal to order the Respondent to pay all of the costs of the arbitration including the costs of representation associated with the Respondent's Request for Bifurcation and with the jurisdictional phase".

---

[61] Claimant's Memorial, para. 495.
[62] Rejoinder on Jurisdiction, paras. 140 and 141.

95.   Mexico presented its Memorial, requesting the Tribunal the following relief[63]:

> "174. A la luz de lo anterior, la Demandada solicita al Tribunal que desestime esta reclamación en virtud del Artículo 45(2) del Reglamento del Mecanismo Complementario, sobre la base de que la Demandante no ha demostrado haber realizado una inversión en México conforme a la definición del Artículo 1139 del TLCAN y, por lo tanto, carece de competencia *ratione personae* y *ratione materiae*.
>
> 175. La Demandada solicita al Tribunal que ordene a la Demandante reembolsar totalmente los costos de arbitraje y costos de representación legal de la Demandada".

96.   Mexico ended its Reply on Jurisdiction with the following request[64]:

> "152. La Demandada solicita al Tribunal desechar la reclamación de conformidad con el Artículo 45(2) de las Reglas de Arbitraje del Mecanismo Complementario del CIADI sobre la base de que la Demandante no ha establecido haber hecho una inversión en México conforme a la definición del Artículo 1139 del TLCAN y, por lo tanto, que este Tribunal carece de jurisdicción *ratione personae* y *ratione materiae*.
>
> 153. La Demandada solicita, además, que el Tribunal ordene a la Demandante indemnizar por completo a la Demandada por los costos del arbitraje y los costos de representación legal, incluyendo los honorarios de sus expertos y viáticos de los testigos y abogados que participen en la audiencia".

---

[63] Memorial on Jurisdiction, paras. 174 and 175.
[64] Reply on Jurisdiction, paras. 152 and 153.

# VI.   POSITION OF THE PARTIES

97. Under Art. 45 of the Arbitration (Additional Facility) Rules "the Tribunal shall have the power to rule on its competence".

98. Mexico asks the Tribunal to rule that it lacks jurisdiction *ratione materiae* and *ratione personae,* arguing that Lion never made an investment in Mexico within the terms required by Art. 1139 NAFTA and consequently failed to qualify as a protected investor under the Treaty.

99. The definition of investment under Art. 1139 NAFTA reads as follows[65]:

| **Article 1139: Definitions** | **Artículo 1139: Definiciones** |
|---|---|
| For purposes of this Chapter:<br><br>[...]<br><br>**investment** means:<br><br>(a) an enterprise;<br><br>(b) an equity security of an enterprise;<br><br>(c) a debt security of an enterprise<br><br>(i) where the enterprise is an affiliate of the investor, or<br><br>(ii) where the original maturity of the debt security is at least three years,<br><br>but does not include a debt security, regardless of original maturity, of a state enterprise;<br><br>(d) a loan to an enterprise<br><br>(i) where the enterprise is an affiliate of the investor, or | Para efectos de este capítulo:<br><br>[...]<br><br>**inversión** significa;<br><br>(a) una empresa;<br><br>(b) acciones de una empresa;<br><br>(c) instrumentos de deuda de una empresa:<br><br>(i) cuando la empresa es una filial del inversionista, o<br><br>(ii) cuando la fecha de vencimiento original del instrumento de deuda sea por lo menos de tres años,<br><br>pero no incluye una obligación de una empresa del estado, independientemente de la fecha original del vencimiento;<br><br>(d) un préstamo a una empresa,<br><br>(i) cuando la empresa es una filial del inversionista, o |

[65] Exh. C-20.

(ii) where the original maturity of the loan is at least three years,

but does not include a loan, regardless of original maturity, to a state enterprise;

(e) an interest in an enterprise that entitles the owner to share in income or profits of the enterprise;

(f) an interest in an enterprise that entitles the owner to share in the assets of that enterprise on dissolution, other than a debt security or a loan excluded from subparagraph (c) or (d);

(g) real estate or other property, tangible or intangible, acquired in the expectation or used for the purpose of economic benefit or other business purposes; and

(h) interests arising from the commitment of capital or other resources in the territory of a Party to economic activity in such territory, such as under

(i) contracts involving the presence of an investor's property in the territory of the Party, including turnkey or construction contracts, or concessions, or

(ii) contracts where remuneration depends substantially on the production, revenues or profits of an enterprise;

but investment does not mean,

(i) claims to money that arise solely from

(i) commercial contracts for the sale of goods or services by a national or enterprise in the

---

(ii) cuando la fecha de vencimiento original del préstamo sea por lo menos de tres años,

pero no incluye un préstamo a una empresa del estado, independientemente de la fecha original del vencimiento;

(e) una participación en una empresa, que le permita al propietario participar en los ingresos o en las utilidades de la empresa;

(f) una participación en una empresa que otorgue derecho al propietario para participar del haber social de esa empresa en una liquidación, siempre que éste no derive de una obligación o un préstamo excluidos conforme al incisos (c) o (d);

(g) bienes raíces u otra propiedad, tangibles o intangibles, adquiridos o utilizados con el propósito de obtener un beneficio económico o para otros fines empresariales; y

(h) la participación que resulte del capital u otros recursos destinados para el desarrollo de una actividad económica en territorio de otra Parte, entre otros, conforme a:

(i) contratos que involucran la presencia de la propiedad de un inversionista en territorio de otra Parte, incluidos, las concesiones, los contratos de construcción y de llave en mano, o

(ii) contratos donde la remuneración depende sustancialmente de la producción, ingresos o ganancias de una empresa;

pero inversión no significa:

| | |
|---|---|
| territory of a Party to an enterprise in the territory of another Party, or<br><br>(ii) the extension of credit in connection with a commercial transaction, such as trade financing, other than a loan covered by subparagraph (d); or<br><br>(j) any other claims to money,<br><br>that do not involve the kinds of interests set out in subparagraphs (a) through (h); | (i) reclamaciones pecuniarias derivadas exclusivamente de:<br><br>(i) contratos comerciales para la venta de bienes o servicios por un nacional o empresa en territorio de una Parte a una empresa en territorio de otra Parte; o<br><br>(ii) el otorgamiento de crédito en relación con una transacción comercial, como el financiamiento al comercio, salvo un préstamo cubierto por las disposiciones del inciso (d); o<br><br>(j) cualquier otra reclamación pecuniaria;<br><br>que no conlleve los tipos de interés dispuestos en los párrafos (a) a (h); |
| **investment of an investor of a Party** means an investment owned or controlled directly or indirectly by an investor of such Party;<br><br>[...] | **inversión de un inversionista de una Parte** significa la inversión propiedad o bajo control directo o indirecto de un inversionista de dicha Parte;<br><br>[...] |

100. It is undisputed that the three Loans that Lion made to Inmobiliaria Bains and to C&C Capital, two companies not affiliated with the investor (Lion), do not qualify as investments under the NAFTA: Art. 1139(d) requires that loans to unaffiliated enterprises have an original maturity of "at least three years"[66]. And none of the Loans meets this threshold.

101. Claimant's argument is different. The Loans, documented in the Credit Agreements, were additionally secured by the Mortgages and formalized in the Notes (*pagarés no negociables*). Lion says that the Mortgages and the Notes by themselves qualify as protected investments:

   - the Mortgages under Art. 1139(g), as "intangible real estate", and

---

[66] Exh. C-20.

-     the Notes under Art. 1139(h), which extends coverage to "interests arising from the commitment of capital"[67].

102.  Mexico disagrees and avers that Lion only made three short-term Loans, which constitute a single economic transaction that does not meet the three-year maturity threshold for the inclusion of loans as an investment within the meaning of Art. 1139(d). The fact that Lion chose to secure the Loans by the issue of the Notes, and the granting of the Mortgages does not, in Mexico's submission, change the conclusion: there is one single economic transaction and one single investment.

103.  The Tribunal will first summarize Respondent's (**1.**) and Claimant's (**2.**) positions, and then briefly address the experts' opinions (**3.**).

## 1.     RESPONDENT'S POSITION

104.  Mexico says that Claimant made no valid investment under Art. 1139 NAFTA and therefore the Tribunal lacks *ratione personae* and *ratione materiae* jurisdiction to hear Lion's claims.

105.  Mexico's position turns on the following arguments:

-     Lion's actual investment was to lend three short-term loans only (**1.**);

-     The Notes, Mortgages, and Loans are part of a single legal transaction (**2.**);

-     The Mortgages and Notes do not qualify as investments under Art. 1139 NAFTA (**3.**).

### 1.1.    LION'S ACTUAL INVESTMENT WAS TO MAKE THREE SHORT-TERM LOANS ONLY

106.  The sole economic operation carried out by Lion was to make three short-term loans to Mexican entities, an operation that does not qualify as a protected investment under Art. 1139 NAFTA, as acknowledged by Claimant[68]. The three Loans were documented through three instruments, with the sole purpose of securing payment of the debt – this is their *raison d'être*[69] – and they cannot be considered as separate investments[70]. The definition of "loans" in Art. 1139(d) NAFTA includes loans documented in notes and secured by mortgages. Since the Loans in the present case have a maturity date of less than three years, they do not constitute investments. This should be the end of the analysis[71].

107.  The following facts and legal arguments support this conclusion:

---

[67] Exh. C-20.
[68] Reply on Jurisdiction, para. 8.
[69] Reply on Jurisdiction, para. 83.
[70] Reply on Jurisdiction, para. 3.
[71] HT, Day 1, 27:13 – 28:17

108. <u>First</u>, Lion did not intend to invest in promissory notes or mortgages. The language of the Credit Agreements makes clear that the Notes and the Mortgages were an express condition to grant each Loan[72]. In fact, each Loan was implemented through a Credit Agreement, a Note, and one or more Mortgages[73].

109. <u>Second</u>, the definition of "Credit Documents" under the Credit Agreements expressly includes not only the Credit Agreements, but also the Mortgages and the Notes[74]. Each Loan was subject to the conditions set out in the Credit Agreements, and "any other applicable conditions ... under any other Credit Documents", which include its respective Note and Mortgage – Credit Agreements, Notes and Mortgage are therefore deemed to be part of the same operation[75].

110. <u>Third</u>, the terms of the Notes and of the Mortgages just mirror the terms of the Credit Agreements as to their parties, date of execution, amount of principal, due date, ordinary interest rate, default interest rate, etc. These Notes and Mortgages provide Lion with an additional mechanism to recover the debt generated by the Loans. Accordingly, the Notes cannot constitute a separate or independent debt[76].

111. The several extensions granted by Lion to their debtors confirm the fact that the Notes only document the debt created by the Loans. Each extension was implemented through the amendment of the Credit Agreements, which required the cancellation and delivery of the Notes to the creditor and the execution of a new Note in the terms established in the relevant Credit Agreement[77].

## 1.2. MORTGAGES, NOTES, AND LOANS: ONE SINGLE LEGAL TRANSACTION

112. If the Loans did not exist, the Notes and the Mortgages would not exist either, as their existence and economic value depends on the Loans[78]. The validity and enforceability of a promissory note or a mortgage depends on the existence of the debt or obligation guaranteed. Once the loans are paid back, the security right of mortgage and the promissory note lose their purpose and become unenforceable[79]. In this case, the Mortgages were mere accessory contracts[80].

113. In fact, the subject matter of the debtor's obligation is the same in the three legal acts: formalizing or securing the repayment of the Loans. This confirms the link between the three legal acts in such a way that it is not possible to talk about three independent

---

[72] Memorial on Jurisdiction, paras. 14 to 20 and Reply on Jurisdiction, paras. 4 and 8.
[73] Memorial on Jurisdiction, paras. 21 to 30 and Reply on Jurisdiction, para. 16.
[74] Reply on Jurisdiction, para. 16.
[75] Reply on Jurisdiction, para. 16.
[76] Reply on Jurisdiction, paras. 11 and 16.
[77] Reply on Jurisdiction, para. 16.
[78] Reply on Jurisdiction, para. 83.
[79] Reply on Jurisdiction, paras. 24 and 66. Irra II, paras. 19, 20, 55 and 64.
[80] Irra II, para. 48 and Reply on Jurisdiction, para. 30.

transactions or *negotia* with independent economic value. The fact that each legal act is governed by a different legal regime does not change this conclusion. To find otherwise would amount to conclude that three different debts exist[81].

114. Furthermore, the mortgage is a security right created in real property that is never delivered to or owned by the creditor[82], the only right conferred by the mortgage is a preferential right to get paid from the proceeds of the sale of the mortgaged property[83]. This conclusion is not different even if, as in this case, the Civil Codes of Nayarit and Jalisco consider the mortgage as real property[84].

115. Finally, the fact that mortgages and promissory notes have each its own legal features is irrelevant; it just means that payment of the one debt can be obtained through different avenues before the courts in case of the debtor's default[85]. But it does not turn the Notes, the Mortgages, and the Loans into independent operations[86].

116. <u>Consequently</u>, as part of a single legal transaction, the Notes and the Mortgages are subject to the same legal requirements as the Loans to become a protected investment under Art. 1139(d); hence, the requisite of the three-year duration also applies to the Notes and Mortgages, as the instruments securing the Loans[87].

<u>Correct interpretation of Art. 1139 NAFTA</u>

117. A correct interpretation of Art. 1139 NAFTA further reinforces the above conclusion:

118. <u>First</u>, if the Notes and the Mortgages could be considered separately, that would allow protection of any loans – regardless of their original maturity – by just adding a security or an instrument. This was not the intention of NAFTA signatories[88]. The parties to NAFTA sought to restrict the protection to those loans that fulfill the requirements of Art. 1139(d) NAFTA[89]. Claimant's interpretation would cause an absurd anomaly: unguaranteed loans would be subject to the three-year requirement, while guaranteed loans would not; and it would also allow the protection of loans to State enterprises (which are expressly excluded), provided they are guaranteed by a mortgage or another security right[90].

---

[81] Irra II, para. 15; Reply on Jurisdiction, paras. 26 and 27; and Memorial on Jurisdiction, para. 69.
[82] Art. 2264 Código Civil de Nayarit and Código Civil de Jalisco (Docs. 127 and 128 submitted with the Second Expert Report on Mexican Law of Rodrigo Zamora Etcharren; the First, Second, and Third Expert Reports on Mexican Law of Rodrigo Zamora Etcharren are collectively referred to as the **Zamora Reports**); and Reply on Jurisdiction, para. 44.
[83] Irra II, paras. 52 and 60 and Reply on Jurisdiction, para. 45 and 68.
[84] Irra II, para. 57 and Reply on Jurisdiction, para. 56.
[85] Reply on Jurisdiction, paras. 69, 71, 76 and 78. Irra II, paras. 38 to 41.
[86] Reply on Jurisdiction, para. 72.
[87] Reply on Jurisdiction, para. 86.
[88] Reply on Jurisdiction, paras. 88 and 90.
[89] Reply on Jurisdiction, para. 85.
[90] Reply on Jurisdiction, para. 151, and Memorial on Jurisdiction, paras. 90 to 95.

119. <u>Second</u>, a consistent, comprehensive interpretation of Art. 1139 NAFTA under the principles of Art. 31.1 the Vienna Convention on the Law of Treaties ["**VCLT**"] demands to read the provision and its paragraphs (d), (g) and (h) jointly and therefore, to link and apply the three-year requirement to the Mortgages and the Notes as well[91]. This interpretation gives meaning collectively to the three paragraphs, whilst Lion's interpretation suggests that paragraph (d) only refers to non-guaranteed loans, which is wrong as it adds language to the text[92].

120. <u>Summing up</u>, a correct interpretation leads to the conclusion that the three-year restriction of paragraph (d) of Art. 1139 NAFTA also applies to security rights and promissory notes that guarantee loans. If a mortgage or promissory note is not linked to a loan, the three-year requirement is not relevant; but if the guaranteed asset is a loan, the correct interpretation requires that a consistent meaning is given to Art. 1139 NAFTA as a whole[93].

### 1.3. MORTGAGES AND NOTES ARE NOT INVESTMENTS UNDER ART. 1139 NAFTA

121. Even if the Mortgages and the Notes were considered as separate investments from the Loans, neither of them fits within the definitions of Arts. 1139(g) and 1139(h) NAFTA: the ordinary meaning of paragraphs (g) and (h) exclude the Mortgages and the Notes from their scope[94].

122. As for the Mortgages, they are not property but rights *in rem*. Due to its own nature, a mortgage cannot be considered "*bienes raíces u otra propiedad tangible o intangible*" under Art. 1139(g) NAFTA. Their purpose is to secure the payment of the loan up to the secured amount, and they are activated after the debtor's default only. They are thus contingent rights[95].

123. Lion wrongly argues that the definition of "property" must be established under Mexican law[96]. Yet the local law of a signatory cannot be used to interpret the Treaty: the interpretation must be carried out from the language itself of NAFTA, taking into account the ordinary meaning of the text and taking into account the context, object, and purpose of NAFTA and the principle of *effet utile*, as demanded by Art. 31 of VCLT[97].

---

[91] Reply on Jurisdiction, para. 150.
[92] Reply on Jurisdiction, para. 127, and Memorial on Jurisdiction, paras. 80 to 85.
[93] Reply on Jurisdiction, paras. 118 and 123, and Memorial on Jurisdiction, paras. 99-110.
[94] Reply on Jurisdiction, paras. 8 and 85, and Memorial on Jurisdiction, paras. 111-150.
[95] Reply on Jurisdiction, paras. 95 and 96.
[96] Reply on Jurisdiction, paras. 14-16.
[97] Reply on Jurisdiction, paras. 99 and 100, and Memorial on Jurisdiction, paras. 151 to 166.

## 2.   CLAIMANT'S POSITION

124.   Lion contends that the Mortgages and the Notes constitute valid investments under Art. 1139(g) and Art. 1139(h) NAFTA, respectively. Therefore, the Tribunal has both *ratione materiae* jurisdiction and *ratione personae* jurisdiction to adjudicate the present dispute.

125.   Lion's position can be summarized as follows: under Mexican law, the Loans, the Notes, and the Mortgages constitute three different *negotia* (**1.**). It follows that Mortgages and Notes are "investments" under Art. 1139(g) and 1139(h) NAFTA (**2.**).

### 2.1.   LOANS, NOTES, AND MORTGAGES CONSTITUTE THREE DIFFERENT *NEGOTIA*

126.   Three different *negotia* were concluded in this case: the Loans, the Notes, and the Mortgages[98]. The three *negotia* are related but still different and separate[99]. Mexico's reasoning is flawed for various reasons[100]:

127.   <u>First</u>, independence does not mean that notes or mortgages must each create a new obligation. The Notes and the Mortgages are separate *negotia* from the Loans, with different objects and different parties (in the case of the Mortgages) and separate legal regimes[101]. In fact, mortgages are a right *in rem*, effective *erga omnes*, which allows the creditor to follow the asset even if owned by a third party; this entirely transcends the personal obligation of the loans[102].

128.   Claimant does not dispute the fact that whenever there is a mortgage there is a loan (or any other underlying obligation), or that a guarantee is intended to secure a principal transaction. Whenever there is accessoriness, there are two assets: the principal and the accessory[103], as acknowledged by the Supreme Court and the Mexican legal authorities[104]. And these interests require separate treatment for purposes of Art. 1139 NAFTA[105].

129.   <u>Second</u>, Loans, Mortgages, and Notes do not have the same object, even if they refer to the same debt. A mortgage creates different property rights and economic interests compared to a loan. While loans have as their object a payment obligation, mortgages provide the possibility for the creditor to be paid from the sale of the mortgaged asset[106]. But mortgages provide the creditor with much more than just a different procedural avenue to claim the underlying debt: mortgages create substantive rights that go beyond the right under a loan, because they allow the creditor to use a specific asset to obtain payment with full priority,

---

[98] Claimant's Counter-Memorial, para. 19.
[99] Rejoinder on Jurisdiction, para. 20.
[100] Rejoinder on Jurisdiction, para. 22.
[101] Claimant's Counter-Memorial, paras. 18, and 36 to 38.
[102] Zamora II, paras. 160, 169, 170, and 173; and Claimant's Rejoinder, para. 22.
[103] Claimant's Counter-Memorial, para. 157.
[104] Rejoinder on Jurisdiction, paras. 44 and 46, Claimant's Counter-Memorial, para. 246, and Zamora III, para. 105.
[105] Rejoinder on Jurisdiction, para. 43.
[106] Zamora III, paras. 26-32; and Rejoinder on Jurisdiction, para. 22.

regardless of the solvency of the debtor; they also limit the powers of the owner over the asset and they grant the creditor power to protect the value of the asset[107].

130. Therefore, mortgages are autonomous and confer separate economic value[108]. In contrast with the value of the loan, the economic value of the mortgage is unaffected by the debtor's solvency and will remain equal to the value of the asset, as a consequence of the preference granted over the asset[109].

131. <u>Third</u>, while the debtor under a loan undertakes a "debt", the owner of a mortgaged asset (which can be different from the debtor) assumes a "liability" under the mortgage: if the debtor breaches the guaranteed obligation, the owner will suffer the sale of the asset for the benefit of the creditor. No duplication or unjust enrichment takes place[110].

## 2.2. MORTGAGES AND NOTES ARE "INVESTMENTS" UNDER ARTS. 1139 (G) AND 1139(H)

132. The Mortgages and the Notes can be characterized as "investments" under Art. 1139 NAFTA, separately and independently from the Loans[111]. The Mortgages squarely fall within the categories "real estate or other property" provided by Art. 1139(g) NAFTA[112] (**A.**). The Notes fall within the category of "commitment of capital" under Art. 1139(h) NAFTA[113] (**B.**). Furthermore, Mexico's proposed interpretation of Art. 1139 NAFTA is mistaken (**C.**).

## A.   <u>The Mortgages are "real estate" and "property"</u>

133. NAFTA does not define the terms "real estate" or "property". Therefore, and unless Mexico shows that the NAFTA State parties intended to refer to an autonomous understanding of the terms "real estate" and "property", it is necessary to refer to municipal law where the property is located[114].

<u>Under Mexican law</u>

134. Consistent with the above, NAFTA State parties and authors, opine that it is appropriate to look at the law of the host State (in this case, Mexico) for a determination of the definition

---

[107] Claimant's Counter-Memorial, paras. 67 to 72 and 74.
[108] Rejoinder on Jurisdiction, para. 25.
[109] Rejoinder on Jurisdiction, para.14.
[110] Zamora III, para. 32; and Claimant's Rejoinder, para. 22.
[111] Rejoinder on Jurisdiction, para. 49.
[112] Claimant's Counter-Memorial, para. 134; and Rejoinder on Jurisdiction, para. 54.
[113] Claimant's Counter-Memorial, Section IV.C; and Rejoinder on Jurisdiction, para. 54.
[114] HT, 45:19 – 48:1. Rejoinder on Jurisdiction, para. 56.

and scope of "real estate" and "property"[115]. Other international tribunals have seconded this view by holding as follows[116]:

> "In order to determine whether an investor/claimant holds property or assets capable of constituting an investment it is necessary in the first place to refer to host State law. Public international law does not create property rights. Rather, it accords certain protections to property rights created according to municipal law".

135.   Under the Mexican civil codes that govern the Mortgages, all rights *in rem* are considered "real estate" ("*bienes inmuebles*")[117]. Thus under Mexican law, mortgages are considered "real estate", which is a protected category of "asset" under Art. 1139(g) NAFTA[118]. The Claimant notes that even Mexico and its expert have acknowledged so[119].

136.   Mexico's NAFTA-based treaty practice shows that, with only one exception, mortgages are not considered as "related property rights", but interchangeably as either "other tangible or intangible property", "other rights *in rem*", "*autres droits réels*" or "*derechos reales*", "other rights", "other property rights" or "*otros derechos de propiedad*" or, as in NAFTA, as an example of "tangible or intangible property"[120].

137.   Twelve out of the twenty-one investment treaties concluded by Mexico with an express mention of mortgages as investments characterize them as "rights *in rem*"[121]. Other treaties refer to "property rights" ("*derechos de propiedad*")[122] when referring to rights *in rem* such as usufructs and mortgages[123]. Conversely, the expression "related property rights" is found

---

[115]   Claimant's Response to Mexico's Preliminary Objection pursuant to Article 45(6) of the ICSID Arbitration (Additional Facility) Rules, para. 95; Claimant's Counter-Memorial, para. 10(c).

[116]   *Emmis International Holding BV v. Hungary*, ICSID Case No. ARB/12/2, Award (16 April 2014), para. 162 (Exh. CLA-501); *Garanti Koza LLP v. Turkmenistan*, ICSID Case No. ARB/11/20, Award, (19 December 2016), para. 331 (Exh. CLA-502), and *Koch Minerals Sarl and Koch Nitrogen International Sarl v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/19, (Exh. CLA-503). Claimant's Rejoinder, para. 58.

[117]   Claimant's Response to Mexico's Preliminary Objection pursuant to Article 45(6) of the ICSID Arbitration (Additional Facility) Rules, paras. 96-99; Claimant's Counter-Memorial, paras. 56-59.

[118]   HT, Day 1, 48:2 – 48:16.

[119]   Rejoinder on Jurisdiction, para. 52, referring to the Reply on Jurisdiction, paras. 36 and 40.

[120]   Article 1(4)(e) of the Mexico-Spain BIT (10 October 2006) ("movable or immovable property, as well as mortgages, pledges, usufructs or other tangible or intangible property"). *See* Annex I to Claimant's Counter-Memorial on Jurisdiction.

[121]   Treaties concluded with Greece, Portugal, Belgium and Luxembourg, The Netherlands, Iceland, Czech Republic, Korea, Argentina, Germany, Italy, Switzerland and Cuba. *See* Annex I to Claimant's Counter-Memorial on Jurisdiction.

[122]   Reply on Jurisdiction, para. 43. The use of the plural shall be emphasized. It shows that Mexico's strict understanding of "property" as referring solely to full ownership or "el derecho real de propiedad" as the necessary addition of the *iura possidendi*, *utendi*, *abutendi* and *fruendi* is wrong.

[123]   Treaties concluded with Denmark, Sweden, Finland, Panama, Central American countries, Australia. See Annex I to Claimant's Counter-Memorial.

primarily in the treaties concluded by the United States and only in one of the Mexican bilateral investment treaties: the Mexico-Singapore BIT[124].

<u>Under international law</u>

138.  The term "property" has a broad meaning under international law and includes rights in and over a property, i.e., *in rem* rights[125].

139.  International tribunals that adopt an autonomous understanding of the term "property" have explained that[126]:

> "[p]roperty can be defined as those material things which can be possessed, as well as any right which may be part of a person's patrimony; that concept includes all movable and immovable, corporal and incorporeal elements and any other intangible object capable of having value".

140.  Hence, the term "property" used in investment treaties may be understood to refer to both things and rights over such things. "Property" refers to a bundle of *in rem* rights[127]. In contrast, Mexico seems to understand "property" as limited to the right of full ownership, implying that the words "related property rights" cover rights over things other than full ownership[128].

141.  However, the ordinary meaning of "property" in the international arena encompasses or is inherently associated with the "rights" over a property, which includes mortgages[129]:

> "Property" may be broadly defined under international law as an entitlement of a person that is related to a thing. It consists of certain rights with regard to the thing that are usually effective against all other persons, that is, in rem rights".

142.  Therefore, "property" cannot reasonably mean just the thing, nor its full ownership. Full ownership of a thing is one such legal interest. There are other *in rem* legal interests, including mortgages[130].

---

[124] Treaties concluded with Denmark, Sweden, Finland, Panama, Central American countries, Australia. See Annex I to Claimant's Counter-Memorial. Claimant's Rejoinder, para. 82.

[125] Rejoinder on Jurisdiction, para. 75.

[126] Rejoinder on Jurisdiction, paras. 64 and 65. The Case of the *Mayagna (Sumo) Awas Tingni Community v. Nicaragua*, Inter-American Court of Human Rights, Series C no. 79 (Judgment) (31 August 2001), para. 144 (Exh. CLA-061).

[127] Exh. CLA-165 (*Jahangir Mohtadi and Jila Mothadi v. Iran*, Iran-US Tribunal Award (2 December 1996), 32 Iran-USCTR 158, para. 103: "the Tribunal first turns to the so-called "bundle of rights" that make up the right of ownership. [...] the elements of this right traditionally are regarded to include: the right to use the property; the right to enjoy the fruits of it; the power to possess the property; the right to exclude others from the possession or use of the property; and the right to dispose of it. [...] Ownership is thus a comprehensive right".)

[128] Rejoinder on Jurisdiction, para.76.

[129] Claimant's Rejoinder, para. 77, and Exh. CLA-063 (John G. Sprankling, *The International Law of Property*, Oxford, 2014, p. 23).

[130] Rejoinder on Jurisdiction, para. 80.

143.  The term "property" in Art. 1139(g) NAFTA was used generically by the NAFTA Parties. It operates as an umbrella, covering, in addition to real estate, "other property" (tangible or intangible) recognized as such in the respective domestic laws of the NAFTA Parties, which, in the case of Mexico, include mortgages[131].

\* \* \*

144.  It follows from the above that the lack of reference to mortgages or "related property rights" in Art. 1139(g) NAFTA does not prevent the Mortgages from been characterized as "real estate or other property" pursuant to the international *usus loquendi* of the term "property"[132]. Under such *usus loquendi*, the term "property" consists of certain rights with regard to a thing, including those arising from mortgages. The terms "*biens*"/"*bienes*" used in the French and Spanish versions of the NAFTA are understood as expropriable and appropriable movable and immovable elements, including rights *in rem*[133]. Further evidence of the international *usus loquendi* can be found in the treaty practice of the NAFTA State parties, especially those treaties with a definition of "investment" based on Art. 1139 NAFTA. An examination of such treaties shows that, as per Mexico's own *usus loquendi*:

    -   mortgages are treated within the paragraph defining property as an investment; and

    -   mortgages are treated separately from loans[134].

**B.    <u>The Notes are a valid investment</u>**

145.  The Notes are interests of economic nature arising as a result of the commitment of capital of Lion in Mexico and used for an economic activity; as such, they are also a protected investment under Art. 1139(h) NAFTA.

146.  The Notes are "interests":

    -   under Mexican law ("*títulos de crédito*") containing a person's (subscriber) unconditional promise to pay to another person (holder) a determined sum of money[135].

    -   following Canada's understanding of the ordinary meaning of "interests"[136].

147.  Furthermore, the destination of the commitment was clearly an "economic activity" in Mexico: the disbursements made by Lion were intended and used to provide Mexican

---

[131] Rejoinder on Jurisdiction, para. 83.
[132] Rejoinder on Jurisdiction, para. 92.
[133] Claimant's Response to Mexico's Preliminary Objection pursuant to Article 45(6) of the ICSID Arbitration (Additional Facility) Rules, paras. 89-93; Claimant's Counter-Memorial, paras. 84 and 88; and Rejoinder on Jurisdiction, para. 52.
[134] Claimant's Counter-Memorial, paras. 213, 222, and 254; and Rejoinder on Jurisdiction, para. 52.
[135] Claimant's Counter-Memorial, para. 135.
[136] Claimant's Counter-Memorial, para. 134.

companies with the funds for the acquisition of land in Mexico and working capital to develop them[137].

## C.   **Mexico's interpretation of Art. 1139 NAFTA is ill-conceived**

148.   <u>First</u>, Art. 1139(d) NAFTA only refers to loans. There is no reference to mortgages, promissory notes or, more broadly, guarantees securing a loan[138]. The ordinary meaning of the term "loan" in Art. 1139 does not include mortgages, something different and separate from a loan. A mortgage may not exist without an obligation, but an obligation (e.g., a loan) can certainly exist without a mortgage[139].

149.   The term "loan" is used in three other provisions in Chapter 11 in addition to Art. 1139 NAFTA (i.e., Arts. 1108, 1109 and 1110). Under these provisions, loans are treated as separate and distinct from guarantees, and only as credits and monetary obligations[140]. And it is used in seven provisions outside Chapter 11, only three being relevant and in two of them (Arts. 1001(5)(a) and 1201(2)(d)) loans are listed as separate assets from their guarantees[141].

150.   Similarly, there is no reference in paragraphs (g) and (h) to loans, nor is there any reference to a duration requirement of any sort. The fact that paragraphs (g) and (h) are self-standing is furthermore confirmed by the lack of cross-references to paragraph (d), in contrast to other categories listed as investment in Art. 1139 NAFTA[142]. The drafters of the NAFTA carefully[143] identified the paragraphs that were intertwined or connected[144]; and yet nothing in paragraphs (g) and (h), or in any other paragraph of Art. 1139, indicates or implies that the qualification of a real-estate interest or interests arising from the commitment of capital as an investment is subordinated to other paragraphs of Art. 1139[145].

151.   <u>Second</u>, the definition of "investment" under Art. 1139 NAFTA is constituted by eight paragraphs, based upon categories of property rights and economic interests, not business activities[146]. But this does not mean that all the requirements, conditions, and exceptions included in each one of these eight paragraphs must be cumulatively complied with, under the pretext that the ordinary meaning of one those paragraphs shall be read in context. On

---

[137] Claimant's Counter-Memorial, para. 134; and Rejoinder on Jurisdiction, para. 53.

[138] Claimant's Counter-memorial, paras. 186; and Rejoinder on Jurisdiction, para.106.

[139] HT, 42:8 – 45:18.

[140] Claimant's Counter-Memorial, paras. 208-216; and Rejoinder on Jurisdiction, para. 106.

[141] Claimant's Counter-Memorial, paras. 221-223; and Rejoinder on Jurisdiction, para. 106.

[142] Claimant's Response to Mexico's Preliminary Objection, paras. 28-29; Claimant's Counter-Memorial, para. 205; and Rejoinder on Jurisdiction, para. 106.

[143] As explained by Canada: "The drafters of the NAFTA chose specific language, fully aware of the differences reflected in other provisions of NAFTA". *Methanex Corporation v. The United States of America*, Second Submission of Canada Pursuant to NAFTA Article 1128 (30 April 2001), para. 14, Exh. CLA-120.

[144] Subparagraph (f) excludes from the category under consideration the interests arising from the assets listed in subparagraphs (c) and (d) (debt security and loans). Subparagraph (i) and (j) refer to subparagraphs (d) and (a) to (h) to clarify which claims to money are protected.

[145] Claimant's Counter-Memorial, paras. 201-207; and Rejoinder on Jurisdiction, para. 106.

[146] HT, 41:5 – 42:7.

the contrary, the fact that a condition is included in one of the paragraphs, and not in the general heading that precedes the paragraphs, suggests that the condition in question is applicable to that paragraph and not to the others[147].

152.   Since the language of paragraphs (g) and (h) of Art. 1139 NAFTA does not contain any reference to the three-year requirement found in other paragraphs of Art. 1139 NAFTA[148], as Mexico itself has noted, "*sería una interpretación inadmisible dado que implicaría añadir una palabra al Párrafo … que no se encuentra ahí*"[149].

153.   <u>Third</u>, Art. 1139 NAFTA is a definition by enumeration of the economic interests that can be considered to be a covered investment. Only three out of these eight categories include restrictions such as the three-year initial maturity duration for loans (paragraphs (c), (d) and (f))[150]. The three-year requirement is thus an exception and must be interpreted restrictively, pursuant to the general principle *exceptiones sunt strictae interpretationis*[151]. This principle entails that a requirement such as the three-year original maturity cannot be applied to any other hypothesis except those to which the text of Article 1139 NAFTA expressly provides it applies[152]. In fact, the only limitation concerning "real estate" or "property" under paragraph (g) is that they shall be acquired or used for an "economic benefit or other business purpose".

154.   <u>Fourth</u>, given that the Mortgages qualify as an investment under paragraph (g) and the Notes under paragraph (h) of Art. 1139 NAFTA, such characterization must produce an *effet utile*[153].

155.   The *effet utile* doctrine is generally understood as follows[154]:

> "This rule is sometimes invoked as a principle – according to which the interpreter has sometimes to presume that the authors of a treaty, by adopting the wording of a disposition, meant to give it a certain meaning in order for this disposition to receive an effective application".

156.   The doctrine is not intended to give guidance in determining whether the asset under consideration is a loan, real estate or property or a commitment of capital. The doctrine simply states that the rules governing any of those categories shall be given their full effect

---

[147] Rejoinder on Jurisdiction, para. 103.
[148] Rejoinder on Jurisdiction, para. 113.
[149] Reply on Jurisdiction, para. 127.
[150] Claimant's Counter-memorial, para. 195; and Rejoinder on Jurisdiction, para. 106.
[151] Claimant's Counter-memorial, para. 186; and Rejoinder on Jurisdiction, para. 106.
[152] Rejoinder on Jurisdiction, para. 122.
[153] Rejoinder on Jurisdiction, para. 127.
[154] Exh. CLA-539, Jean Salmon, *Dictionnaire de Droit International Public*, Bruylant, 2001, p. 416: "Regle parfois invoquee au titre de principe — selon laquelle l'interprete doit presumer que les auteurs d'un trait&en adoptant les termes d'une disposition, ont entendu leur donner une signification telle que cette disposition puisse recevoir une application effective".)

and meaning[155]. This doctrine operates as a test to make sure that an interpretation is not conducted in bad faith or that it strips a provision of its useful meaning[156]. In this case, nothing prevents an accessory right to be separately qualified as an investment, even when the main operation does not[157].

157. In conclusion, the Loans, the Mortgages, and the Notes fall within three different paragraphs under Article 1139 NAFTA, and shall be characterized separately, as acknowledged by other NAFTA tribunals[158]. Nothing prevents that one asset is protected while another is not[159].

## 3.   THE EXPERTS' POSITIONS

158. The Tribunal will first provide a summary of the expert opinion submitted by Respondent (**1.**) and then of the one produced by Claimant (**2.**).

## 3.1.   THE IRRA OPINIONS

159. Respondent retained Lic. René Irra Ibarra to serve as expert on Mexican law in this arbitration. He submitted two reports with his opinions[160].

160. Lic. Irra testified at the Hearing and ratified the main arguments established in his reports. In particular, he developed the following arguments[161]:

- Lic. Irra identified as his main disagreement with Claimant's expert that in his view there are not three different *negotia*; there is just one *negotium*, evidenced by three legal acts, which are separate, because a mortgage is not a promissory note, and neither of them is a loan; but the existence of three legal acts does not imply that they are different *negotia*[162].

- The Loans are the underlying transaction that gave rise to the other legal acts: the Notes and the Mortgages; Lic. Irra acknowledged that under Mexican law each of the three acts is regulated by a different set of laws; but he rejected that the differences in regulation imply the existence of different *negotia*; the differences are mainly

---

[155] Exh. CLA-105, Application of the Interim Accord of 13 September 1995 (the former Yugoslav Republic of Macedonia v. Greece), Judgment (5 December 2011), I.C.J. Reports 644 (2011), p. 673, para. 92.
[156] Rejoinder on Jurisdiction, para. 131.
[157] Claimant's Rejoinder to Mexico's Preliminary Objection pursuant to Article 45(6) of the Arbitration (Additional Facility) Rules, paras. 7 and 8. *See* Exh. CLA-109 (*ATA Construction, Industrial and Trading Company v. Hashemite Kingdom of Jordan*, ICSID Case No. ARB/08/2, Award (18 May 2010), paras. 103 and 117).
[158] Claimant's Counter-Memorial, para. 52; *Grand River Enterprises Six Nations, Ltd., et al. v. United States of America*, UNCITRAL, Award (12 January 2011), paras. 90-122, Exh. CLA-117.
[159] Rejoinder on Jurisdiction, para. 134.
[160] Irra I, dated August 29, 2017 and Irra II, dated December 7, 2017.
[161] HT, Day 1, 77:14 – 132:13.
[162] HT, Day 1, 83:17 – 84:9.

procedural: loans, notes, and mortgages empower the lender to use distinct court actions to enforce its rights[163], without creating separate transactions[164].

- Mortgages and notes require the existence of a loan that is being secured or formalized[165]; the borrower assumes a single obligation, to repay the money lent, plus interest, and this is the only obligation that the creditor can enforce, either through the loans, the notes or the mortgage[166].

## 3.2.  THE ZAMORA OPINIONS

161. Claimant retained Lic. Rodrigo Zamora Etcharren to serve as expert on Mexican law in this arbitration. He submitted three reports on the matter[167].

162. Lic. Zamora testified at the hearing and ratified the main arguments from his reports, in particular[168]:

- There are essential differences between the Loans, the Mortgages, and the Notes, which go beyond furnishing three procedural actions: there are three *negotia* that confer different rights, include different parties, and create different procedural actions[169].

- Each *negotium* is a commercial asset that confers its own set of rights: creditors have different rights under a loan agreement, under a note and under a mortgage[170].

- The three *negotia* give rise to different procedural actions, which may be brought simultaneously; a creditor can claim under the note, under the mortgage or under the loan; this does not mean, however, that a creditor can recover the principal of the loan three times; the principal is owed only once, and Mexican procedural law provides for mechanisms to avoid such result[171].

---

[163] HT, Day 1, 79:5 – 80:12.
[164] HT, Day 1, 81:15 – 82:4.
[165] HT, Day 1, 83:10 – 83:16.
[166] HT, Day 1, 87:11 – 87:20.
[167] Zamora I, dated March 6, 2017, Zamora II, dated October 23, 2017 and Zamora III, dated January 18, 2018.
[168] HT, Day 1, 135:11 – 169:5.
[169] HT, Day 1, 136:6 – 136:20.
[170] HT, Day 1, 137:5 – 137:19.
[171] HT, Day 1, 142:2 –142:10.

# VII.    DISCUSSION

163.  The Tribunal is called to decide a discrete question: whether non-negotiable promissory notes formalizing, or mortgages securing short-term loans, can still qualify as NAFTA protected investments under Arts. 1139(h) or 1139(g), even if the loans fail the three-year maturity test under Art. 1139(d).

164.  In their submissions, the Parties have not referred to any previous decision by any court or tribunal deciding on this very question[172]. The Tribunal is also unable to rely on the opinion of the United States of America or Canada: although both States were entitled to submit their opinion under Art. 1128 NAFTA, both decided not make use of such right. Nor has the NAFTA Commission approved any binding interpretation (under Art. 1131(2) NAFTA) shedding light on the issue.

165.  In absence of any guidance, the Tribunal must apply the governing law mandated by Art. 1131(1) NAFTA: the Tribunal

> "shall decide the issues in dispute in accordance with this Agreement [i.e. the NAFTA] and applicable rules of international law".

166.  Applying such governing law, the Tribunal will in due course dismiss Claimant's submission that the Notes qualify as protected investments (**1.**), while finding that the Mortgages do indeed qualify as "intangible real estate" for the purposes of Art. 1139(g) NAFTA (**2.**).

## 1.    THE NOTES DO NOT QUALIFY AS INVESTMENTS

167.  Claimant's case is that the Notes qualify as protected investments under Art. 1139(h) NAFTA:

> "(h) interests arising from the commitment of capital or other resources in the territory of a Party to economic activity in such territory, such as under
>
> > (i) contracts involving the presence of an investor's property in the territory of the Party, including turnkey or construction contracts, or concessions, or

---

[172] Claimant has only drawn the attention of the Tribunal to one international law precedent where mortgages were protected as separate investments. Many Americans had mortgages on property taken by Yugoslavia. The Yugoslav Claims Agreement of 1948 did not include any provision concerning mortgages. Notwithstanding the above, the Commission allowed claims for mortgages on the ground that the taking of the encumbered property effectively took from the mortgagee the right to foreclose. Moreover, under the laws of Yugoslavia, a real property mortgage was considered as real property – *see* "Foreign Claim Settlement Commission of the United States", Decisions and Annotations; CLA-511, p. 62; the best known decision is *Erna Lina Klein*, CLA-69.

(ii) contracts where remuneration depends substantially on the production, revenues or profits of an enterprise".

168. In Claimant's view, the Notes constitute "interests arising from commitment of capital". Lion submits that the concept of "interests", as used in this provision, includes titles, and the Notes qualify as titles. "Interests" also cover "*cosas mercantiles*", and under Mexican law the Notes are "*cosas mercantiles*" . Finally, the other requirements are also met: the source of the Notes is Lion's "commitment of capital" and the destination of the capital is an "economic activity" in Mexico[173].

169. Mexico disagrees. In its submission, the requirements of Art. 1139(h) are not met. Lion made no contribution of capital under the Notes – the only contribution of capital was made under the Loans. Notes are simply instruments which evidence the existence of a debt created by the Loans and facilitate collection of the amounts due[174].

170. The Tribunal – without hesitation – sides with Respondent.

171. The Notes clearly do not constitute protected investments under Art. 1139(g) NAFTA. To support its conclusion, the Tribunal will briefly explain the nature of promissory notes under Mexican law (**A.**), and then will reason why promissory notes do not meet the requirements under Art. 1139(h) (**B.**).

## A.   Promissory notes under Mexican law

172. The three Credit Agreements entered into between Lion as Lender, and Inmobiliaria Bains and C&C Capital as Borrowers, required that each "Credit Drawdown will be documented in a non-negotiable Note"[175]. Complying with this contractual obligation:

- on February 28, 2007 Inmobiliaria Bains issued the First Note, undertaking to pay to Lion US$15 million, plus interest, with final maturity date September 30, 2009[176].

- on June 14, 2007 C&C Capital issued the Second Note in favor of Lion for US$12.45 million (plus interest), with final maturity date September 30, 2009[177]; and

- on September 26, 2007 C&C Capital issued the Third Note, again in favor of Lion, for US$5,355,479 (plus interest), with final maturity as of September 30, 2009[178].

173. All three Notes share several characteristics:

---

[173] Claimant's Counter-Memorial, para. 135.
[174] Memorial on Jurisdiction, paras. 117 and 118.
[175] Exh. C-8.
[176] Exh. C-153.
[177] Exh. C-12.
[178] Exh. C-154.

- The Notes are defined as "*pagarés*" subject to Mexican law;

- The Notes incorporate the issuer's unconditional promise to pay Lion the stated amount, plus ordinary and penalty interest;

- The Notes are expressly stated to be "*no negociable*[*s*]";

- Payments are to be made in Lion's designated U.S. bank account, in freely available funds;

- The issuer submits to the jurisdiction of the Courts of Mexico's Distrito Federal.

174. Under Mexican Law *pagarés* are a special category of *títulos de crédito*[179]. And *títulos de crédito* (also known as *títulos valor*) are defined by the Ley General de Títulos y Operaciones de Crédito ["**LGTOC**"] as[180]:

> "*documentos necesarios para ejercitar el derecho literal que en ellos se consigna*".

175. The legal definition underlines the basic trait of a *título de crédito*: a document signed by the issuer, which grants its holder the rights literally mentioned ("*incorporados*", to use the technical expression) in the document.

176. *Pagarés* are one of the basic sub-groups of *títulos de crédito*: documents that formalize the issuer's unconditional promise to pay to the holder a certain amount of money on a certain due date[181]. To be legally considered as a *pagaré*, the document must necessarily include the word "*pagaré*".

177. *Pagarés* are issued to formalize an underlying monetary obligation. Normally, this obligation arises from a contract (*contrato subyacente*) entered into between issuer of the *pagaré* and its first holder. In the present case, the *contratos subyacentes* are the three Credit Agreements signed between Lion and Inmobiliaria Bains/C&C Capital. Under these contracts the borrowers owe certain amounts of principal and interest to Lion, and these obligations are "incorporated" into the three Notes, issued by the borrowers, designating Lion as beneficiary, and which the borrowers delivered to Lion.

178. The relationship between a *pagaré* and its *contrato subyacente* can be "*abstracto*" or "*causal*"[182]:

179. (i) In the first case, the law, seeking to protect third parties that acquire *pagarés* in good faith by endorsement, creates a separation between the underlying contract and the payment obligation incorporated in the *pagaré*. If the initial holder of the note endorses the *pagaré*

---

[179] Mexican law uses the concept *titulos de crédito*. Other Spanish-speaking jurisdictions use the equivalent expression *títulos valor*.
[180] Art. 5 LGTOC.
[181] Art. 170 LGTOC.
[182] Irra I, para. 15 and Zamora II, para. 110.

to a third party (for instance, a bank), such secondary holder is entitled to request that the issuer pay the stated amount on maturity, while the issuer is prohibited from invoking "*excepciones personales*", i.e. defenses arising from the *contrato subyacente* between the issuer and the first holder[183]. A *pagaré* that has been endorsed and against which *excepciones personales* are not admitted is said to be "abstract".

180.   (ii) In the second case, the link between *contrato subyacente* and *pagaré* is not severable: the issuer may deny payment invoking the same defenses that could have been used to reject payment under the *contrato subyacente*. *Pagarés* that have not been endorsed, and especially *pagarés* which are stated to be *no negociables* (i.e., where endorsement is prohibited) are always considered *títulos de crédito causales*[184].

181.   *Pagarés no negociables*, as are the Notes issued in the present case, do not provide the holder with an abstract right to collect. The right incorporated into the note is identical to the right arising from the underlying contract. The main advantage conferred by a *pagaré no negociable* is procedural: the holder can enforce the right against the issuer through an *acción ejecutiva*, an expedited procedure that permits the preliminary attachment of the issuer's assets[185].

## B.   *Pagarés no negociables* do not meet the requirements of Art. 1139(h)

182.   Art. 1139 NAFTA offers a sophisticated and precise definition of protected investments: the provision lists eight categories of "interests" which are considered as investments, and two categories which are excluded[186].

183.   The eight categories of interests that qualify as investment are in its turn divided into two groups:

184.   The <u>first group</u> comprises paragraphs (a) through (f) plus sub-paragraph (h.ii) of Art. 1139. These six categories of interests all relate to situations where the foreign investor owns or finances "enterprises" located in the host state.

185.   The situations where the foreign investor finances an enterprise in the host state are developed in paragraphs (c) and (d) and in sub-paragraph (h.ii):

-   Paragraphs (c) and (d) cover "debt securities" bought or "loans" granted by the foreign investor, and specifically require that the financing, if granted to an enterprise which is not affiliated to the investor, has a maturity of at least three years;

---

[183] *See* Art. 8 LGTOC; Irra I, para. 15.
[184] Irra I, para. 28.
[185] Zamora II, para. 134.
[186] The provision gives the overarching concept of "interests" to the ten categories to which it refers – see last line of the definition.

- Sub-paragraph (h.ii) adds a different type of financing: contracts where the investor commits capital (or other resources), and the remuneration depends "substantially on the production, revenues or profits of an enterprise"; provided that this requirement is met, NAFTA does not additionally require a minimum three-year maturity.

186. The <u>second</u> group of protected investments are those defined in paragraph (g) and sub-paragraph (h.i). These provisions cover two distinct situations:

- Paragraph (g) refers to "real estate or other property, tangible or intangible", acquired or used by the foreign investor for economic benefit or for business purposes; while

- Sub-paragraph (h.i) extends the concept of investments to contracts in which the investor commits capital (or other resources) to economic activity in the host state, "including turnkey or construction contracts or concessions".

### a.   **The Tribunal's decision**

187. The basic facts of the case are not in dispute:

- The lender of the financing was Lion, a Canadian company;

- The Borrowers were two unaffiliated enterprises located in Mexico;

- The maturity was less than three years;

- The contract was formalized in three Credit Agreements;

- The Borrowers' repayment obligations were additionally formalized in three non-negotiable *pagarés*;

- The remuneration for the Loans and the *pagarés* was a fixed-interest rate, without any link to the revenues or profits of the Borrowers.

188. In the Tribunal's opinion, Lion's interest deriving from these financings – be it the Credit Agreements or the Notes – does not meet the requirements to be considered as a protected investment under any of the categories defined in Art. 1139 NAFTA:

189. (i) <u>Art. 1139(d</u>) NAFTA[187]:

"(d) a loan to an enterprise

(i) where the enterprise is an affiliate of the investor, or

(ii) where the original maturity of the loan is at least three years,

---

[187] Exh. C-20.

but does not include a loan, regardless of original maturity, to a state enterprise".

190. The Credit Agreements do not meet the requirements under Art. 1139(d).

191. Whilst it is true that the Credit Agreements qualify as "loans" to an unaffiliated enterprise, as Claimant itself acknowledges, the Loans by themselves cannot constitute protected investments, because they do not pass the three-year maturity test required by Art. 1139(d)(ii).

192. (ii) <u>Art. 1139(c) NAFTA</u>[188]:

"(c) a debt security of an enterprise

(i) where the enterprise is an affiliate of the investor, or

(ii) where the original maturity of the debt security is at least three years,

but does not include a debt security, regardless of original maturity, of a state enterprise".

193. The Notes fail to qualify as "debt security" under Art. 1139(c).

194. The Tribunal shares the Claimant's opinion that *pagarés no negociables* do not fit within the definition of "debt security" set forth in paragraph (c)[189]: debt securities are tradeable, while endorsement of *pagarés no negociables* is prohibited by law.

195. Be that as it may, even if it were accepted that the *pagarés no negociables* can be considered as "debt securities", the Notes would not qualify: having been issued by an unaffiliated enterprise, they must pass, but fail, the three-year-maturity threshold.

196. (iii) <u>Art. 1139(h.i) and (h.ii) NAFTA</u>[190]:

"(h) interests arising from the commitment of capital or other resources in the territory of a Party to economic activity in such territory, such as under

(i) contracts involving the presence of an investor's property in the territory of the Party, including turnkey or construction contracts, or concessions, or

(ii) contracts where remuneration depends substantially on the production, revenues or profits of an enterprise".

197. The Notes also fail to meet the requirements under sub-paragraphs (h.i) and (h.ii).

---

[188] Exh. C-20.
[189] Claimant's presentation at its closing argument ("**H-2**"), p. 11.
[190] Exh. C-20.

198. Sub-paragraph (h.i) only covers contracts involving "the presence of an investor's property in the territory" of the host state; and to clarify its meaning, the provision provides three examples (turnkey contracts, construction contracts and concessions). This category bears no relationship with the case under discussion: *pagarés no negociables*, where the underlying contract is a loan, do not imply the presence of an investor's property in the host state, and have no relationship with turnkey contracts, construction contracts, and concessions.

199. Sub-paragraph (h.ii) also fails to grant protection to the Notes. It refers to contracts where the investor commits capital, provided that the remuneration depends substantially on the production, revenues or profits of an enterprise located in the host state – a requirement which the fixed-interest Notes do not satisfy.

**b. Claimant's counter-arguments**

200. Claimant argues that the Notes are protected, by referring simply to the *chapeau* of paragraph (h), and excluding any reference to the examples provided in sub-paragraphs (i) and (ii). In Claimant's submission, the Notes qualify as "interests arising from the commitment of capital […] to economic activity" and consequently are protected[191].

201. The argument is unconvincing – as Mexico has correctly argued[192].

202. In the present case, Lion formalized the commitment of capital contractually – by signing the Credit Agreements. Additionally, Claimant requested and obtained *pagarés no negociables* issued by the Borrowers. The delivery of this causal (*i.e.*, non-abstract) *título de crédito*, intrinsically bound to the Credit Agreement, does not change the nature or the scope of the legal relationship between Lender and Borrowers: their legal relationship continues to be governed by the Credit Agreements, and – for the purposes of Art. 1139 NAFTA – such legal relationship continues to be a "loan" subject to paragraph (d); a loan which does not meet the three-year maturity test. Contrary to Claimant's view, the delivery of this *título de crédito* does not constitute a separate and severable commitment of capital.

203. Claimant puts the focus of its analysis on the *chapeau* of paragraph (h) and submits that any "interests arising from the commitment of capital" are protected.

204. This is not so.

205. The *chapeau* cannot be read by itself. The NAFTA does not extend protection to any "commitments of capital", but only to those which exhibit certain features so as to give rise to "interests". These features are defined through two illustrative examples in sub-paragraphs (h.i) and (h.ii). Both sub-paragraphs share a common feature: both refer to "contracts". Thus, it is safe to conclude that a minimum requirement of "commitments of

---

[191] Claimant's Counter-Memorial, para. 135.
[192] Memorial on Jurisdiction, para. 116.

capital" protected by paragraph (h) is to be formalized as contracts. The *pagarés no negociables* do not meet this test: they are *títulos de crédito*, not contracts.

206. There is a further argument.

207. The contracts that underlie the *pagarés no negociables* – short-term, fixed-interest loans – do not share any traits with the contracts described in sub-paragraphs (h.i) and (h.ii), which serve as illustrative examples of protected "commitments of capital". Sub-paragraph (h.i) covers construction contracts and concessions, and sub-paragraph (h.ii) contracts with variable remuneration. The ordinary meaning of a term in a treaty must be read in its context, as Art. 31.1 VCLT mandates. And in this case the context provided by sub-paragraphs (h.i) and (h.ii) shows that "commitments of capital" to be protected under paragraph (h) must show some additional, defining feature, which simple short-term fixed-interest loans lack. Loans are specifically governed by Art. 1139(d) NAFTA – and only protected provided that the requirements set forth in that provision are met.

## 2. THE MORTGAGES QUALIFY AS INVESTMENTS

208. Having concluded that the Credit Agreements and the Notes do not qualify as NAFTA protected investments, the Tribunal must now address Claimant's final argument: that the Mortgages qualify as "intangible real estate or other property" acquired by Lion "for the purpose of economic benefit" under paragraph (g) of Art. 1139.

209. Claimant maintains that under Mexican law mortgages are considered "real estate" and under international law, as "other property"[193].

210. Claimant does not dispute that mortgages are accessory transactions, which secure rights deriving from the Loans, but considers that the three-year minimum maturity required by paragraphs (c) and (d) is inapposite[194], because the Loans and the Mortgages are separate *negotia*, with different objects, different parties, and separate legal regimes. Mortgages are rights *in rem*, effective *erga omnes*, allow the creditor to follow the asset even if owned by a third party, and the value of the mortgage differs from the value of the loan: it is unaffected by the debtor's solvency and will remain equal to the value of the asset[195].

211. Mexico disagrees. It says that mortgages are accessory, and that the only economically relevant transaction was the granting of three short-term loans that did not qualify as an investment. Claimant did not invest in mortgages. The definition of "loans" in paragraph (d) includes loans secured by mortgages. Since the Loans in the present case have a maturity date of less than three years, they do not constitute an investment[196].

---

[193] HT, Day 1, 48:17 – 51:4.
[194] HT, Day 1, 51:5 – 52:19.
[195] Claimant's Counter-Memorial, para. 74 and 75.
[196] HT, Day 1, 27:14 – 28:18

212. Mexico adds that the mortgage is a security right created over real property, and the real estate is never delivered to nor owned by the creditor; the only right conferred by the mortgage is a preferential right to get paid from the proceeds of the sale of the mortgaged property, and this does not amount to "real estate or other property" under paragraph (g)[197].

213. Finally, Mexico argues that if the Mortgages are considered separately, that would allow protection of any loans – regardless of their original maturity – by just adding a security. This was not the intention of NAFTA signatories[198].

214. The Tribunal will analyze the nature of mortgages under Mexican law (**1**.), and then will reason why the Mortgages in the present case constitute protected investments under Art. 1139(g) NAFTA, without such protection extending to the Loans or the Notes (**2**.).

## 2.1.  MORTGAGES UNDER MEXICAN LAW

215. Lion obtained three mortgages as a security for the Loans:

    -   On June 13, 2007 Bansi S.A., as trustee, and as per the instruction of C&C Capital, as founder and beneficiary of the trust, granted in favor of Lion the Guadalajara Mortgage 1, which encumbered certain properties of the Guadalajara Project, and secured the principal and interest owed under the Second Loan[199];

    -   On September 26, 2007, Bansi S.A, again acting as trustee, as per the instruction of C&C Capital, granted in favor of Lion the Guadalajara Mortgage 2, which encumbered certain properties of the Guadalajara Project[200], and secured the principal and interest owed under the Third Loan;

    -   On April 2, 2008 Inmobiliaria Bains granted the Nayarit Mortgage over the Nayarit Project, located in Bahía de Banderas, securing the three Loans, including principal and interest[201].

216. Under Mexican law, mortgages are regulated by the Civil Code of the states where the real estate is located, regardless of the nature of the obligation which is being secured. In the present case, the Guadalajara Mortgages 1 and 2 are subject to the Civil Code of Jalisco ["**CC Jalisco**"], and the Nayarit Mortgage to the Civil Code of Nayarit ["**CC Nayarit**"][202].

---

[197] Memorial on Jurisdiction, paras.121 to 150.
[198] HT, Day 1, 29:14 – 33:2.
[199] Exh. C-14.
[200] Exh. C-156.
[201] Exh. C-10.
[202] Zamora II, paras. 144-147.

## A.   Mortgages are *derechos reales*

217.  Arts. 2517 CC Jalisco and 2264 CC Nayarit define mortgages in similar terms[203]:

> "*Artículo 2517.- Es contrato de hipoteca aquél por virtud del cual se constituye un derecho real sobre bienes inmuebles o derechos reales que no se entreguen al acreedor, para garantizar el cumplimiento de una obligación y su grado de preferencia en el pago*"[204].

> "*Artículo 2264.- La hipoteca es una garantía real constituida sobre bienes que no se entregan al acreedor, y que da derecho a éste, en caso de incumplimiento de la obligación garantizada, a ser pagado con el valor de los bienes, en el grado de preferencia establecido por la Ley*"[205].

218.  Mortgages are defined as *derechos reales* that encumber real estate (or other *derechos reales*), affording the mortgagee the right, if the guaranteed obligation is breached, to be paid with the price resulting from the sale in public auction of the asset. The encumbrance follows the asset: if the mortgagor transfers the asset to a third party, the beneficiary's rights over the real estate remain unaffected[206].

219.  Mortgages do not imply that the mortgagee acquires the possession or ownership over the asset. The mortgagee does not enjoy the full set of traditional rights granted to the owner of real estate (*ius utendi*, *ius fruendi*, *ius abutendi*), but only a right of preference: if the secured obligation is not paid, the mortgagee can force the sale of the asset, and the price obtained is used to satisfy the secured obligation[207] – provided that the mortgage has been documented in a notarial deed and registered in the Public Registry[208].

220.  As *derechos reales de garantía*, mortgages always secure an underlying obligation, where the mortgagee is the creditor and the mortgagor, the debtor (or a third party willing to provide a guarantee). Although mortgage and underlying obligation are separate *negocios jurídicos*, created by declarations of intent of different persons, and formalized in separate documents, mortgages are said to be "accessory"[209]. Accessoriness implies that payment or voidness of the underlying obligation provokes the extinction of the mortgage – but not that both legal relationships are identical[210].

221.  The value of the mortgage and that of the underlying obligation also do not have to coincide, neither at the time of creation or thereafter: the value of the main obligation fluctuates with

---

[203] Zamora II, para. 149
[204] Doc. 127 to Zamora Reports.
[205] Doc. 128 to Zamora Reports.
[206] Art. 2546 CC Jalisco and Art. 2265 CC Nayarit (Docs. 127 and 128 to Zamora Reports).
[207] Zamora II, paras. 153-154.
[208] Zamora II, para. 188.
[209] Irra II, para. 48.
[210] *See* Rocío Diéguez Oliva, *El principio de accesoriedad y la patrimonialización del rango*, Cuadernos de Derecho Registral, 2009, Exh. CLA-455.

the solvency of the debtor, while the value of the mortgage depends on the worth of the mortgaged real estate (and the legal preference granted to mortgages)[211].

**B.    Mortgages are *bienes inmuebles***

222.    The CCs of Jalisco and of Nayarit distinguish between "*bienes inmuebles*" and "*bienes muebles*".

223.    Under Art. 799 CC Jalisco and Art. 738 CC Nayarit, the definition of "*bienes inmuebles*" extends not only to tangible assets but also to certain intangible rights:

-    Tangible real estate is labelled as "*inmuebles por naturaleza*", and is defined by the fact that such assets "*no pueden trasladarse de un lugar a otro*";

-    But both CCs, following a long tradition, also extend the concept of *bienes inmuebles* to certain intangible rights over real estate (the so-called "*bienes inmuebles intangibles o incorporales*").

224.    Picking up on this tradition, Art. 799 XII CC Jalisco and Art. 738 XII CC Nayarit provide that "*los derechos reales sobre inmuebles*" are also to be considered as *bienes inmuebles.* The *derechos reales sobre inmuebles* are certain defined categories of rights *in rem*, including but not limited to mortgages[212].

225.    The necessary corollary is that, under the relevant municipal law, the Mortgages constitute *bienes inmuebles* (and more specifically *bienes inmuebles incorporales o intangibles*).

**2.2.    MORTGAGES MEET THE REQUIREMENTS OF ART. 1139(G)**

226.    Under Art. 1139(g) NAFTA, protected investments include (*inter alia*) "intangible real estate", provided that the investor uses the asset for "economic benefit or other business purpose".

227.    Claimant says that the definition of "intangible real estate" must be established applying the *lex situs*, in this case the CCs Jalisco and Nayarit, and that under such rules mortgages indeed qualify as intangible real estate. Lion adds that the second requirement is also met: the Mortgages were granted for economic benefit.

228.    The Tribunal concurs. It will first explain its reasoning (**A.**), and then will analyze Mexico's counter-arguments (**B.**)

---

[211] H-2, p. 70.
[212] Docs. 127 and 128 to Zamora Reports.

A.   **The Tribunal's reasoning**

229.   Under Art. 1139(g) NAFTA an asset, to be considered as a protected investment, must meet two requirements: it must constitute "intangible real estate" and it must be used for economic benefit or other business purpose.

230.   The Mortgages satisfy both requirements.

231.   (i) NAFTA does not offer a definition of the term "intangible real estate" used in its Art. 1139(g). Absent such definition, to determine whether an investor holds "intangible real estate", it is necessary to refer to the law of the host state. As the tribunal stated in *Emmis*[213]:

> "Public international law does not create property rights. Rather, it accords certain protections to property rights created according to municipal law".

232.   The municipal law in this case are the legal systems of the Mexican states of Nayarit and Jalisco, since the encumbered real estate is located in these jurisdictions and both legal systems embrace the *lex loci rei sitae* principle:

> "*Artículo 14.- Los bienes inmuebles ubicados en el Estado y los bienes muebles que en él se encuentren, se regirán por las disposiciones de este Código"*[214].
>
> "*Artículo 15.- La determinación del derecho aplicable se hará conforme a las siguientes reglas: . . .*
>
> *V. Los bienes inmuebles ubicados en el Estado de Jalisco y los bienes muebles que en él se encuentren, se regirán por las disposiciones de este Código"*[215].

233.   Applying the CCs of Nayarit and Jalisco, the Tribunal has already concluded that both civil law systems explicitly and unequivocally include mortgages within the legal category of *derechos reales*, which in their turn constitute *bienes inmuebles*, and more specifically *bienes inmuebles intangibles* or intangible real estate.

234.   The Mortgages thus constitute intangible real estate, and meet the first requirement under Art. 1139(g) NAFTA.

235.   There is a small discrepancy between the terminology used in the Civil Codes of Nayarit and Jalisco, and the one used in the Spanish version of the NAFTA: while the Civil Codes refer to *bienes inmuebles*, the Spanish version of the NAFTA refers to *bienes raíces*. Both expressions are synonyms in Spanish[216]. The same conclusion, that there is no difference between *bienes inmuebles* and *bienes raíces*, is reached by comparing the terminology used

---

[213] *Emmis International Holding BV v. Hungary*, ICSID Case No. ARB/12/2, Award (16 April 2014), para. 162. Exh. CLA-501.
[214] Doc. 128 to Zamora Reports.
[215] Doc. 127 to Zamora Reports.
[216] *See*, Diccionario del Español Jurídico, Real Academia Española, entry "bien raíz"; available at http://dej.rae.es/#/entry-id/E41960.

in the three equally authentic texts of the Treaty[217]: the French text uses the expression "*biens immobiliers*" as equivalent to "real estate" in English and "*bienes raíces*" in Spanish.

236. (ii) The second requirement established by Art. 1139(g) is also met: Lion acquired the Mortgages for economic benefit and with a business purpose. Lion is an investment company, and the purpose of the Mortgages was to secure commercial loans, granted to two Mexican enterprises, with the purpose of earning interest (and eventually to invest in certain real estate projects situated in Mexico).

237. For these reasons, the Tribunal is satisfied that the ordinary meaning of "real estate or other property, tangible or intangible" in Art. 1139(g) includes the Mortgages.

Consistent treaty practice

238. The conclusion that the Mortgages constitute protected investments is confirmed by Mexico's treaty practice. Investment treaties signed by Mexico frequently include *derechos reales* as a category of protected investments, and refer to mortgages as specific *derechos reales* which are contained within the scope of protection.

239. The treaty practice starts with Mexico's proprietary Model of Investment Promotion and Protection Agreement, which in its Art. 2 provides a list of investments, and specifically extends protection to "any other right *in rem*, such as mortgages"[218]:

> "[…] immovable property, acquired in the expectation or used for the purpose of economic benefit or business purposes, as well as any other right *in rem*, such as mortgages, liens, pledges, usufructs and similar rights".

240. There are at least 22 BITs signed by Mexico, which follow the same structure, and confirm that in Mexico's understanding *hipotecas* (mortgages) fall within the category of *bienes inmuebles intangibles*[219]. The first was the BIT between Mexico and Spain, executed back in 1995, whose Art. 1 (4) (e) extended protection to

> "*la propiedad de bienes muebles o inmuebles, así como hipotecas, derechos de prenda, usufructos u otra propiedad tangible o intangible […] adquiridos para actividades económicas u otros fines empresariales*".

241. The language of the Treaty shows that, in Mexico's understanding, *hipotecas* form part of the general category of "*propiedad intangible*" and, more specifically, of "*propiedad intangible de bienes inmuebles*".

---

[217] *See* Art. 2206 NAFTA, Exh. C-20.

[218] *See* Carlos García Fernández, *The Mexican Model of Investment Promotion and Protection Agreement. ¿Hay algo nuevo bajo el sol?*, in Jorge A. Vargas, *Mexican Law: A Treatise for Legal Practitioners and International Investors*, Vol. 4, West Group, 2001, p. 68, Exh. CLA-129.

[219] *See* a list in Claimant's presentation at its opening argument, p. 12.

242. There are good reasons why mortgages should constitute a category of protected investment of their own. Mortgages are also inextricably linked with the piece of real estate that they burden. And the value of this right *in rem* can be affected by measures adopted by the host state, targeted at such piece of real estate (e.g., expropriation) or specifically at the mortgage (e.g., dilution of preference). The purpose of treaties, when they include mortgages among the protected assets, is to extend the scope of protection to this type of situations.

243. <u>Summing up</u>: the Mortgages – i.e. the *derechos reales de garantía* – granted to Lion, meet the two conditions required by Art. 1139(g) to qualify as investments protected by the NAFTA.

**B.    <u>Mexico's counter-arguments considered</u>**

244. Mexico raises several counter-arguments.

245. <u>First</u>, Mexico says that Claimant did not invest in mortgages; the only economically relevant transaction was the granting of three short-term Loans[220]. The Mortgages in this case are accessory to and form an integral part of the Loans, and the definition of "loans" in paragraph (d) including loans secured by mortgages. Since the Loans have a maturity date of less than three years, they do not constitute investments[221].

246. The Tribunal is not convinced.

247. Lion provided funds to Inmobiliaria Bains/C&C Capital, and in exchange obtained two sets of rights:

-    personal rights against the borrowers deriving from the Credit Agreements (and the Notes), plus

-    rights *in rem* (*derechos reales*) over certain real estate assets located in Jalisco and Nayarit.

248. Art. 1139 NAFTA does not define "investment" as an abstract notion. It simply states that "investment means" one of eight categories of assets or "interests", each defined in a separate paragraph, and each subject to specific requirements. The technique followed by Art. 1139 has an important implication: to be considered as a protected investment, an asset or interest must meet the requirements of one of the eight categories. If an investor holds several interests, and all qualify under different paragraphs of Art. 1139, each interest will be protected. And if some of these interests meet the requirements, and others do not, those compliant will still enjoy protection: an investor cannot be denied protection for compliant interests simply because he or she also holds non-compliant assets.

---

[220] Reply on Jurisdiction, paras. 90-93.
[221] HT, Day 1, 27:14 – 28:18.

249. In the present case, Lion holds three interests that fall into two categories:

  - Credit Agreements and Notes: these interests are not protected, because the Notes do not fall under paragraph (h) (as already explained) and under paragraph (d) loans to unaffiliated borrowers require a minimum maturity of three years – a condition which is not met;

  - Mortgages: in accordance with municipal law, mortgages constitute "intangible real estate"; under paragraph (g), "intangible real estate" is protected, provided that the asset was acquired for economic benefit or business purposes – a requirement that Lion does comply with.

250. Art. 1139 NAFTA does not provide that an investor holding distinct interests, some of which individually qualify as a protected investment while others fail, should be denied protection, simply because one or more assets fail the test. Consequently, the Tribunal sees no reason to deny protection to the Mortgages under paragraph (g), simply because its Credit Agreements and Notes fall short of the standards under paragraphs (d) and (h).

251. Mexico has tried to circumvent this conclusion, arguing that the Mortgages are ancillary transactions, and that Loans and Mortgages must be considered as one and the same transaction.

252. Contrary to Mexico's submission, the Mortgages, albeit ancillary, are not and never were integral parts of the Loans. Loans and Mortgages resulted from separate declarations of consent, made by different persons, at different times, and in different documents:

  - The Loans were formalized in the Credit Agreements, the contracts in which Lion consented to lend and the Borrowers undertook to repay principal and interest; while

  - The Mortgages were created thereafter, in three separate notarial deeds, in which the mortgagors unilaterally consented to the encumbrance of their property as a security for the Loans.

253. From an economics point of view, there is also no identity between Loans and Mortgages: the value of the Loans is the dependent on the borrowers' solvency and capacity to pay, while the value of the Mortgages hinges on the price which the encumbered real estate will attain in a public auction and on the legal preference afforded to the mortgagee.

254. Second, Mexico adds that a mortgage is a security right created in real property that is never delivered to or owned by the creditor; the mortgage only confers a preferential right to the proceeds of the sale of the mortgaged property. Mexico concludes that mortgages are not "real estate or other property" under paragraph (g)[222].

---

[222] Memorial on Jurisdiction, paras. 121-150.

255. The Tribunal concurs with Mexico that mortgages are indeed security rights in real estate, and that possession of the asset does not pass to the mortgagee. But Mexico's suggested consequence is a *non sequitur*.

256. As the Tribunal has already explained, under municipal law mortgages are considered *derechos reales*, which by law constitute *bienes inmuebles intangibles*, and Art. 1139(g) expressly extends protection to this category of assets. The ordinary meaning of "intangible real estate" in paragraph (g), which the Tribunal has established by applying Mexico's own municipal law, does not support, but rather contradicts, Mexico's argument that mortgages are to be excluded.

257. Finally, Mexico argues that if the Mortgages are considered separately, that would allow protection of any loan (regardless of its maturity) by just adding a security – a result said to be contrary to the intention of the NAFTA signatories[223].

258. Mexico's counter-argument is based on a misconception: the Respondent assumes that, if the mortgage constitutes a protected investment, the protection is automatically extended to the loan. This is not so.

259. Loan and mortgage constitute separate categories of interests, with separate sets of requirements to become protected investments. This implies that in certain situations the mortgage may constitute a protected investment, while the underlying loan will not. In those cases, the Treaty protection afforded to the mortgage is not extended to the loan. The scope of protection which the investor enjoys, will depend on the measures adopted by the host state in breach of the Treaty. If such measures affect the mortgage or the encumbered real estate asset, the investor will be entitled to invoke NAFTA protection. If the measures target the loan, no such protection will be forthcoming. To provide a simple example: an investor holding a mortgage, which secures an underlying loan that does not meet the three-year maturity requirement, is protected against an improper expropriation of the real estate, which destroys the value of the mortgage[224] – but not for a measure which specifically targets the transfer of funds deriving from loans[225].

### 3. CONCLUSION

260. In its Rejoinder on Jurisdiction, Lion asked the Tribunal for the following relief[226]:

"140. For the reasons discussed above, the Claimant respectfully requests the Arbitral Tribunal to issue a decision on jurisdiction rejecting Mexico's Jurisdictional Objection and declaring that the Mortgages and Notes are indeed investments under NAFTA Article 1139; and, consequently that it has *ratione materiae* jurisdiction to adjudicate the claims brought by the Claimant; thus ordering the proceedings to continue and the

---

[223] HT, Day 1, 29:14 – 33:2.
[224] In breach of Art. 1110 NAFTA.
[225] E.g., a breach of the right to transfer under Art. 1109 NAFTA.
[226] Rejoinder on Jurisdiction, para. 140.

Respondent to file the Respondent's Counter-Memorial in the period remaining, according with the Amended Timetable."

261. Mexico ended its Reply on Jurisdiction with the following request[227]:

> "152. La Demandada solicita al Tribunal desechar la reclamación de conformidad con el Artículo 45(2) de las Reglas de Arbitraje del Mecanismo Complementario del CIADI sobre la base de que la Demandante no ha establecido haber hecho una inversión en México conforme a la definición del Artículo 1139 del TLCAN y, por lo tanto, que este Tribunal carece de jurisdicción ratione personae y ratione materiae".

262. The Tribunal has come to the following conclusions:

- The Notes do not qualify as investments under Art. 1139 NAFTA, for the reasons established in Section VII.1 above;

- The Mortgages do qualify as investments under Art. 1139(g) NAFTA and the Tribunal has *ratione materiae* and *ratione personae* jurisdiction to adjudicate the claims brought by Lion based on measures adopted by Mexico that affect the Mortgages, for the reasons set forth in Section VII.2.

263. In accordance with section 16 and the latest version of the Amended Timetable (Annex A) of the Procedural Order No. 1, as well as para. 13 of the Decision on Bifurcation, the suspension of the proceedings is hereby lifted. Respondent still has 78 days from the date of the issue of this Award to the Parties to file its Counter-Memorial in the period remaining[228].

264. The Tribunal will shortly convene the Parties to discuss the continued progression of the arbitration.

265. The decision on costs is reserved.

---

[227] Reply on Jurisdiction, paras. 152 and 153.
[228] *See* communication of the Tribunal's Secretary dated April 27, 2017, issuing an updated calendar and taking note of March 21, 2017 as the agreed-upon date in which Claimant's Memorial is deemed submitted.

# VIII.      <u>DECISION</u>

266.  For the foregoing reasons, the Tribunal decides as follows:

> 1.  DECLARES that the Mortgages qualify as investments and that the Tribunal has jurisdiction *ratione materiae* and *ratione personae* to adjudicate claims brought by Lion based on measures adopted by Mexico which affect the Mortgages;

> 2.  DECLARES that the Notes do not qualify as investments and that the Tribunal lacks jurisdiction *ratione materiae* and *ratione personae* to adjudicate claims brought by Lion based on measures adopted by Mexico which affect the Notes.

> 3.  RESERVES the decision on costs for a future determination.

267.    In accordance with section 16 and the latest version of the Amended Timetable (Annex A) of the Procedural Order No. 1, as well as para. 13 of the Decision on Bifurcation, the suspension of the proceedings is hereby lifted. Respondent still has 78 days left to file its Counter-Memorial in the period remaining[229].

268.    The Tribunal will shortly convene the Parties to discuss the continued progression of the arbitration.

Place of arbitration: Washington D.C. (USA)

Date: July 30, 2018

---

[229] *See* communication of the Tribunal's Secretary dated April 27, 2017, issuing an updated calendar and taking note of March 21, 2017 as the agreed-upon date in which Claimant's Memorial is deemed submitted.

_____
Dr. David J.A. Cairns
Arbitrator

Date: July 20, 2018

_____
Prof. Laurence Boisson de Chazournes
Arbitrator

Date: July 23, 2018

_____
Prof. Juan Fernández-Armesto
President of the Tribunal

Date: July 19, 2018