# EXHIBIT 3



**BEFORE THE HONORABLE TRIBUNAL ESTABLISHED PURSUANT TO THE
CHAPTER ELEVEN OF THE NORTH AMERICA TRADE AGREEMENT (NAFTA)**

**LION MEXICO CONSOLIDATED L.P.
(CLAIMANTS)**

**v.**

**THE UNITED MEXICAN STATES
(RESPONDENT)**

**ICSID CASE No. ARB(AF)/15/2**

---

**Counter Memorial**

---

**Counsel for the United Mexican States:**
Samantha Atayde Arellano

**Assisted by:**

**Secretaría de Economía**
Cindy Rayo Zapata
Hugo Romero Martínez
Geovanni Hernández Salvador
Blanca del Carmen Martínez Mendoza
Vanessa Rodríguez Camarillo
Rafael Alejandro Augusto Arteaga Farfán

**Tereposky & DeRose LLP**
J. Cameron Mowatt
Greg Tereposky
Jennifer Radford
Alejandro Barragán
Yuritzi Pérez

26 October 2018

# Table of Contents

I.  FACTS ........................................................................................................................... 1

    A.  INTRODUCTION ................................................................................................ 1

    B.  THE CLAIMANT'S CONDUCT IN RESPECT OF ITS INVESTMENTS WAS UNREASONABLE, IMPRUDENT, NEGLIGENT AND EXHIBITED A MANIFEST LACK OF DUE CARE ................................................................................ 3

        1.  *The Claimant failed to undertake proper due diligence before granting the Loans* ............................... 3

        2.  *The Claimant acknowledged the high risks in the Loans' interest rates but did not act accordingly* ...... 7

        3.  *The Claimant granted and repeatedly extended the loan maturity dates in the face of the Debtor's refusal to pay* ............................................................. 7

        4.  *The Claimant inappropriately issued a series of invoices without taking legal action on non-payment* 8

        5.  *The Claimant inappropriately undertook and conducted negotiations with the Debtors without taking legal action* ................................................................. 9

        6.  *The Claimant's persistent omissions prejudiced its investments* ........................................... 9

    C.  FORECLOSURE PROCEEDINGS ................................................................... 10

        1.  *Mexican Courts are not obligated to serve the defendant in a foreclosure proceeding ex oficio* ........ 11

        2.  *The Courts did everything within their power to serve the Debtors* ........................................ 11

    D.  MERCANTILE ACTION 917/2012 (*JUICIO ORDINARIO MERCANTIL*) ..................... 13

        1.  *The Decision* ................................................................................ 14

        2.  *The Mercantile Court followed the usual procedure to notify the Claimant* .............................. 16

        3.  *The cancellation of the Mortgages* ........................................................ 18

    E.  THE *AMPARO* PROCEEDING (1324/2012-VII) ............................................... 19

        1.  *The decision to exclude evidence* ......................................................... 20

        2.  *The ruling in Amparo 1324* ............................................................... 21

    F.  *AMPARO* REVIEW PROCEEDING ................................................................ 22

        1.  *The Claimant prematurely withdrew from the amparo review proceeding* ............................... 22

    G.  CRIMINAL PROCEEDINGS ...................................................................... 25

II.  LEGAL SUBMISSIONS ........................................................................................ 28

    A.  MINIMUM STANDARD OF TREATMENT ...................................................... 28

        1.  *Article 1105 only applies to investments of investors of another Party* ................................. 28

        2.  *Claimant limited to asserting claim under Article 1105(1) that it suffered "denial of justice" in course of attempts to resolve dispute with Mr. Cárdenas, Inmobiliaria Baines, C&C Ingenieria, and C&C and cannot establish it* ................................................................ 30

            a.  The Guidance from US Article 1128 submission in *Eli Lilly v. Canada* for defining "denial of justice" ................ 30

            b.  The threshold for denial of justice is very high ................................................. 34

        3.  *The Claimant was required to exhaust local remedies for its claims against judicial conduct and failed to do so* ...................................................................... 36

            a.  State practice supports deference to national judiciaries ........................................ 38

            b.  NAFTA jurisprudence supports deference to national Courts' decisions under Article 1105 .................. 39

        4.  *The Claimant failed to exhaust all effective, adequate and reasonably available remedies to give the domestic judicial system an opportunity to correct itself* ....................................... 39

            a.  The writings of the most highly qualified publicists ............................................. 40

            b.  State practice supports principle of no denial of justice without final decision of State's highest judicial authority ........................................................ 44

            c.  NAFTA jurisprudence overwhelmingly has required exhaustion of whole system prior to advancement of any denial of justice claim under Chapter 11 ................................... 44

            d.  Non-NAFTA jurisprudence also has required exhaustion of whole system prior to advancement of any denial of justice claim ....................................................... 47

        5.  *The exception to the rule of exhaustion of local remedies is not applicable here* ..................... 50

    B.  EXPROPRIATION .............................................................................. 54

1.  *The arguments of the Claimant* ................................................................................... 54
2.  *No claim for expropriation exists where impugned measures are decisions of Courts resolving disputes between private parties* ................................................................. 55
3.  *The Claimant is attempting to disguise a denial of justice claim -which it is not entitled to bring- as an expropriation* ................................................................................................ 56
4.  *Denial of justice is prerequisite in a judicial taking claim in any event and Claimant cannot establish it* ................................................................................................................... 57

**III.  DAMAGES** .......................................................................................................... **62**

A.  THE CLAIMANT HAS NOT PROVEN THAT ANY LOSS SUFFERED WAS *CAUSED* BY ANY WRONGFUL ACT ................. 63
B.  DAMAGES DERIVING FROM THE LOANS AND NOTES (*I.E.*, THE NON-PROTECTED INVESTMENTS) MUST BE EXCLUDED ........... 65
C.  MAXIMUM AMOUNT OF RECOVERABLE DAMAGES FROM THE MORTGAGES ................................................. 66
1.  *The Mortgages have no recoverable value* ................................................................. 66
2.  *The Respondent's interpretation is consistent with the Tribunal's Decision on Jurisdiction and with the law governing causation* ..................................................................................... 68
3.  *Conclusions* ............................................................................................................... 68
D.  ALTERNATIVELY, THE MAXIMUM AMOUNT OF RECOVERABLE DAMAGES IS LIMITED TO THE VALUE OF THE PROPERTIES COVERED BY THE MORTGAGES *MINUS* COSTS, TAXES AND OTHER APPROPRIATE DEDUCTIONS ........................ 68
1.  *Valuation date of any recoverable damages* ............................................................. 69
2.  *Value of the properties* ............................................................................................ 70
3.  *Costs, taxes and other deductions* .......................................................................... 72
4.  *Value of the properties as per LMF's financials* ..................................................... 73
E.  DEDUCTIONS FROM MAXIMUM AMOUNT OF RECOVERABLE DAMAGES ............................................... 74
1.  *No double recovery* ................................................................................................. 74
2.  *Contributory fault* ................................................................................................... 76
    a.   Investment risk assumed by the Claimant ........................................................... 87
F.  INCIDENTAL EXPENSES AND COSTS ARE NOT PROVEN AND RECOVERABLE ......................................... 87
G.  INTEREST ................................................................................................................. 88

**IV.  REQUEST FOR RELIEF** ............................................................................................ **89**

## I.    Facts

### A.    Introduction

1.    This dispute arises from three short-term loans granted by the Claimant in 2007 to two Mexican entities (the "Debtors") controlled by Mr. Héctor Cárdenas Curiel, a Mexican businessman engaged in the development of real estate properties. The stated purpose of these loans was to provide the Debtors with the necessary funds to develop a resort in the State of Nayarit (the "Nahui Project" or "Destiladeras Project") and two office towers in the city of Guadalajara Jalisco (the "Americas Project").

2.    The parties have described the transactions and the projects in detail during the jurisdictional phase. The Respondent will not repeat those details here. Suffice it to say that these were private transactions between private parties and that the Respondent had no involvement whatsoever in the granting of the Loans, the issuance of the Mortgages or the projects that the Loans intended to fund.

3.    The Claimant contends that, after granting several extensions on the Loans (as many as seven), the Debtors failed to pay their debts by the final due date on 30 September 2009. Upon the amounts becoming due, the Claimant waited for over six months before issuing the first invoice for the outstanding principal and interest (on 16 April 2010) and then issued six additional invoices over the next year and three months. None of the invoices were paid.

4.    During this period and up until 13 March 2012, the Claimant and the Debtors unsuccessfully attempted to negotiate the settlement of the debt. On 13 March 2012, almost *two- and one- half years* after the amounts came due, the Claimant finally decided to initiate foreclosure proceedings on one of the three Mortgages (the "Nayarit Mortgage") that secured the Loans. The Claimant deliberately chose not to initiate foreclosure proceedings on the other two mortgages "to minimize cost and with the hope that initiating [the foreclosure proceedings on the single mortgage] would persuade Cárdenas to an amicable resolution of the dispute" or pursue executive actions to enforce the Notes. By then, the original USD $32.8 million debt had tripled and was accruing interest at a rate of approximately 43%.

5.    These actions of the Claimant must be assessed in the light of the circumstances of the transactions. The high interest rates charged by the Loans clearly evidence that the Claimant understood the high-risk nature of the Loans when it negotiated them. In this light, the Claimant's actions to protect its investments were manifestly improvident, beginning with the first Loan maturity date extension and continuing to its decision to initiate foreclosure proceedings on only one of the three Mortgages. The Claimant continued with inappropriate conduct in the subsequent domestic legal actions discussed below.

6.    The Claimant further contends that, unbeknownst to it, and while the negotiations with Lion Mexico Conolidated L.P. (LMC) were still ongoing, the Debtors engaged in an elaborate fraud whereby an alleged forged document (the "Settlement Agreement") was used to persuade a mercantile Court to grant an order of specific performance to cancel the Notes and Mortgages that secured the Loans, and then fraudulently commenced and abandoned an injunction proceeding (the

so-called "Fake *Amparo*") in order to impede the Claimant's efforts to set aside the original Court judgment, once the alleged fraud was discovered.

7.    Upon learning about the cancellation of the Mortgages, the Claimant pursued a series of domestic legal actions which ultimately resulted in a proceeding aimed at determining whether or not the Claimant's legal representative had initiated the so-called Fake *Amparo*. The outcome of that proceeding was pending but was abandoned when the Claimant submitted this Claim to arbitration, contending (incorrectly) that such was necessary in order to comply with the requirements of NAFTA Article 1121.[1] By doing so, the Claimant acquiesced to the Mercantile Court's decision.

8.    It is worth noting that the Claimant also filed criminal complaints involving fraud and forgery offences against Héctor Cárdenas and Ivan Michel Mercado, through different *fora*. Curiously, LMC did not mention anything about these proceedings where the Respondent found that relevant decisions were issued by the Criminal Courts in relation to the forged document and the so-called False *Amparo*. However, the handling of those cases by the Mexican authorities has not been identified as a measure giving rise to State responsibility in this case. The Memorial on the Merits is silent on these various criminal proceedings (or their findings) some of which have found Mr. Cárdenas to be not guilty of any wrongdoing and others of which are ongoing.

9.    As can be gleaned from the foregoing, the Respondent's involvement in these matters is limited to its role as a neutral and impartial adjudicator in a dispute between private parties, one of which happens to be a foreign investor.

10.    The Claimant contends that the Mercantile Court's decision, that favoured the Debtors and resulted in the cancellation of the Notes and Mortgages, amounts to a violation of Article 1110 (Expropriation) and that the Courts' alleged mishandling of the *amparo* proceedings and the foreclosure proceedings amounts to a violation of Article 1105 (Minimum Standard of Treatment).

11.    It is the position of the Respondent that the Claimant is seeking to make the Mexican State pay for what, according to its own submissions, was a highly sophisticated fraud. This is not appropriate: the NAFTA does not impose upon its Parties an obligation to insure private parties against investment risk of any kind, let alone fraud.

12.    The Respondent's objective in this Counter Memorial is to address what it considers to be the Claimant's principal arguments in a logical, straightforward manner. The Respondent is not to be taken to have admitted any point of fact or law made in the Memorial on the Merits that the Claimant may contend has not been directly or expressly refuted. For the purposes of the record any such argument is expressly denied.

13.    Finally, the Respondent reserves the right to challenge the Decision on Jurisdiction and submits that nothing in this Counter Memorial or in its decision to proceed to the merits phase of this dispute should be taken as a waiver of such a right.

---

[1]   Exhibit R-001, Withdrawal from the Amparo.

**B.   The Claimant's conduct in respect of its investments was unreasonable, imprudent, negligent and exhibited a manifest lack of due care**

**1.   The Claimant failed to undertake proper due diligence before granting the Loans**

14.   The Claimant contends that "[Mr.] Cárdenas' plans for the development of the proposed projects were preliminary and incomplete at the time he requested capital from the Claimant to acquire land and begin limited infrastructure development".[2] For that reason, it claims "LMC was willing to provide capital to the entities controlled by Cárdenas only if the entities granted the Claimant mortgages on the land being acquired by Cárdenas [...]".[3]

15.   However, the Memorial provides very limited information regarding the due diligence that the Claimant conducted before it decided to extend the Loans. Statements like those cited in the previous paragraphs are grounded solely on the testimony of Mr. Hendricks and three reports to the ING Clarion Investment Committee seeking approval of the Loans (Exhibits C-33, C-35 and C-36).

16.   In order to have a better understanding of the underlying transactions and the Claimant's due diligence, the Respondent sought production of various categories of documents, which were objected by the Claimant, but subsequently granted by the Tribunal. However, with the exception of a background check by Grupo Mintz, the Claimant failed to produce any responsive documents:

- Request No. 1 – "Internal documents, including memoranda, reports as well as records of communications related to the approval of the Loans prepared or obtained by LMC before the Loans were issued, with the purpose of determining the financial viability of the projects and whether to approve the loans to the Debtors"[4]

  The request was granted but limited to "the reports and documents prior to the issuance of the Loans related to the due diligence carried out by the Claimant in order to make the decision to grant the Loans".[5] The Claimant's response was:

  These documents are not produced by Claimant.

  It does not appear from the Claimant's records the existence of additional documentation from that already submitted by the Claimant in the arbitration. The Claimant has already provided sufficient information related to the viability and to the due diligence carried out on the projects, as well as the recommendations made to the investment committee to approve the

---

[2]   Memorial on the Merits, ¶ 17.

[3]   *Id*.

[4]   The original text in Spanish reads: "Documentos internos, incluyendo notas, memorandos e informes, así como los registros de comunicaciones relativos a la aprobación de los Préstamos que hayan sido preparados u obtenidos por LMC antes del otorgamiento de los Préstamos, con el propósito de determinar la viabilidad financiera de los proyectos de las Deudoras y para aprobar el crédito a las Deudoras."

[5]   The original text in Spanish reads: "[...] informes y documentos previos al otorgamiento de los Préstamos relativos a la due diligence que llevó a cabo la Demandante para tomar la decisión de otorgar los Préstamos."

granting of the Loans to the Debtors. This information was provided in Exhibits C-033, C-034, C- 035, and C-036.[6] [Emphasis added]

- Request No. 2 – "All funding applications submitted by Mr. Cárdenas and/or the Debtors to LMC (or any related party to LMC) including any documents attached to such application".[7] The request was granted by the Tribunal, but the Claimant indicated that:

  These documents are not produced by Claimant.

  It does not appear from the Claimant's records that financial applications were in fact submitted by Cárdenas and/or the Debtors to LMC. [Emphasis added]

- Request No. 3 sought "Credit reports and background checks including any investigations/consultations on pending litigation against the Debtors prepared or obtained by LMC…"[8]

  The Tribunal granted the "background check performed by Grupo Mintz and any other background or credit report, including any investigation/consultations regarding pending litigation against the Debtors, prepared or obtained by LMC prior to granting the Loans", yet the Claimant did not produce any documents except for the Grupo Mintz report.

17.    Alluding to Exhibits C-33 to C-36, the Claimant takes the position that it "has already provided sufficient information related to the viability and to the due diligence carried out on the projects". The Respondent disputes this contention.

18.    First, the Respondent will point out that, contrary to what the Claimant suggests, Exhibits C-33 to C-36 are not due diligence documents. As noted earlier, Exhibits C-33, C-35 and C-36 are reports submitted to ING Clarion Investment Committee to obtain approval of the Loans and Exhibit C-34 appears to have been prepared after the Loans were granted. This is apparent from the third column of the document which refers to "Phase I Budget Feb'08" and the fourth column which details "Actual Costs Thru Sep'09". Since the Destiladeras Loan was issued in February of 2007, the Claimant cannot argue that this document relates to "the viability and to the due diligence carried out on the projects".

19.    More importantly, these Exhibits do not contain any due diligence information on the Debtors' solvency and/or ability to repay the Loans. Notably missing are any credit reports or investigations on Bains, C&C Capital, C&C Ingenieria and Mr. Cárdenas; the credit applications which, according to the Claimants, were not in fact submitted by Mr. Cárdenas and/or the debtors;

---

[6]    Claimant's communication dated 10 September 2018.

[7]    The original text in Spanish reads: "Solicitud(es) de financiamiento presentada(s) por el Sr. Cárdenas y/o las Deudoras a LMC (o cualquier parte relacionada con LMC), incluyendo cualquier documentación adjunta a dicha solicitud."

[8]    The original text in Spanish reads: "Informes crediticios (i.e., background checks and/or credit reports), incluyendo cualesquiera investigaciones/consultas sobre litigios pendientes contra las Deudoras, preparadas u obtenidas por LMC antes de aprobar los Préstamos. Esta solicitud incluye, pero no está limitada, al informe de antecedentes (i.e., background check) que llevó a cabo el Grupo Mintz que, conforme al Anexo C-33, p. 3, la Demandante esperaba obtener dentro de las siguientes 2 a 3 semanas ("Expected in 2-3 weeks")."

the Debtor's financial statements and other relevant financial information, and; an analysis of the projects' viability and expected profitability.

20.   This is basic information that any reasonable lender would have sought and obtained before risking USD $32.8 million dollars on short term loans to unknown entities in a foreign country. In fact, it appears that the first loan –*i.e.*, the USD $15 million Nayarit Loan– was granted without as much as a background check on Mr. Cárdenas, as evidenced by the fact that the loan was granted on 28 February 2007, one week *before* the Claimant received the Mintz Group report dated 8 March 2007.

21.   The absence of feasibility studies of the projects is all the more relevant given the Claimant's own recognition at the time of the need of such a study "*in order to reach a 'Go-NoGo' decision*", with respect to what it termed the "Mixed-Use Development Project Under Evaluation" in Guadalajara:

> Because of the various market and construction variables that come into play in determining revenue on cost projections for each component; <u>LMF recognizes the inherent complexity of a mixed-use project and has assembled a team with the skills needed to carry out the feasibility study beyond the preliminary level in order to reach a "Go – NoGo" decision</u>.[9] [Emphasis added]

22.   It is unclear to the Respondent whether the study described in section 3 of Exhibit C-36 was supposed to be done before or after the loan was granted.[10] However, from the Claimant's response to Request No. 1, it is clear that the Claimant either decided to extend the Loans without the benefit of feasibility studies on Mr. Cárdenas' projects or decided not to produce them in contravention of the Tribunal's Order on document production.

23.   It is also worth noting that all three Loans were described to the ING Clarion Investment Committee as a "bridge loan" which is defined as "a short-term loan used until a person or company secures permanent financing or removes an existing obligation".[11] However, it seems that the Loans were more about pursuing a joint venture or some other form of business relationship with Mr. Cárdenas than they were about realizing the 18% expected return under the Credit Agreements –through foreclosure of the Mortgages if necessary.

24.   This is apparent from all three reports submitted to the ING Clarion Investment Committee (Exhibits C-33, C-35 and C-36) which discuss a 90-day exclusivity period to evaluate the possibility of such a joint venture and/or evaluate the feasibility of "The Project":

> Subsequently, LMF will explore the potential opportunity to form a joint venture with Cárdenas to develop the Project and/or to participate in the development of other residential and retail opportunities that Cárdenas could provide in Guadalajara<u>. LMF has obtained a period of exclusivity for 90 days to negotiate and structure a joint venture agreement with Cárdenas to begin due diligence on his Project in Vallarta, and more importantly his projects in Guadalajara</u>.[12]

---

[9]   Exhibit C-36, p. 8.
[10]   *Id.*, p. 5.
[11]   Exhibit RLA-012. Definition by Investopedia. http://www.investopedia.com/terms/b/bridgeloan.asp.
[12]   Exhibit C-33, p. 1.

– o –

Approval of the Loan would enable LMF to enter in a 90 day period of exclusivity (the term of the loan) to evaluate the feasibility of developing a mixed-use project (the "Project") on the Site. <u>Pursuant to the Loan's approval, LMF would reserve the right to negotiate and structure joint venture agreement(s) with Cárdenas—and other potential specialty real estate operators brought into transaction as LMF sees fit. LMF also reserves the right to fully or partially reinvest the principal and interest earned into a capital account for the potential investment in Cárdenas' future projects. If LMF decides not to pursue the Project in question, C&C/Cárdenas will be required to pay back the principal plus interest to LMF, at the end of the term of the loan.</u>[13]

– o –

Along with the approval of the Loan in question (for Parcel B), the term of the bridge loan for Parcel A would be extended, so that the maturity dates of the loans are coterminus. <u>During the term of the loan, LMF retains the exclusive right to evaluate the feasibility of The Project. LMF reserves the right to fully or partially reinvest the principal and interest earned into a capital account for the potential investment in Cárdenas' future projects.</u>[14]

25.   This was subsequently confirmed in a letter from Mr. James Hendricks dated 13 June 2007 stating, in relation to the Americas I Loan, that "[w]ithin the next 90 days – following the closing of the loan – it is anticipated that the $12 million US dollar [loan] will be converted into an equity interest and the underlying mortgage will be released."[15]

26.   Other documents, like the memorandum submitted to Lion Mexico Fund in February 2008 in relation to a potential change in the collateral securing the Loans expressed similar plans in the Destiladeras project:

The terms of the loan say that in the event of default or if IB is unable to retire the loan before its maturity date of February 28, 2008, LMF would have the option to foreclose on the real estate collateral or charge the Borrower penalty interest of 25% and extend the term of the Loan by 3 years.

Notwithstanding, LMF plans to participate in the development of the Destiladeras project and expects to make a recommendation to the IC within the next 60 days, once the Capella project is fully underwritten. LMF has outlined the potential terms with IB. LMF expects to convert the Bridge Loan into a structured finance instrument in which the fund receives a 25% return on its invested capital by earning 75% of the proceeds generated by the sale of Destiladera's lots (homesites) and finished residential product.[16]

---

[13]  Exhibit C-35, p. 65.
[14]  Exhibit C-36, p. 3.
[15]  Exhibit, R-002 Letter from Mr. James Hendricks in relation to the Americas I Loan in the criminal proceeding 137/2014, p.1
[16]  Exhibit R-003 Memorandum submitted o Lion Mexico Fund in February 2008.

27.    Collecting on the Loans was always seen as an exit strategy:

> If LMF decides not to pursue the Project in question, C&C/Cárdenas will be required to pay back the principal plus interest to LMF, at the end of the term of the loan.[17]

> – o –

> Upon maturity, and should LMF decide not to pursue The Project, C&C/Cárdenas will be required to repay the principal plus accrued interest to LMF. In the event of default or if C&C/Cárdenas is unable to retire the Loan within the three months, LMF will have the option to foreclose on the Real Estate.[18]

28.    In pursuing this business strategy, the Claimant not only assumed significantly more risk than a normal creditor would but, importantly, failed to take reasonable steps to protect its investment. Indeed, if the Claimant is taken at its own word, it decided to grant USD $32.8 million dollars in loans to unknown entities based on "preliminary and incomplete" plans for two projects without conducting basic due diligence on the Debtors or the projects. Moreover, it allowed the 90-day exclusivity period to come and go many times without entering into a joint venture agreement *or* attempting to collect on the Loans *or* attempting to foreclose on the Mortgages.

### 2.    The Claimant acknowledged the high risks in the Loans' interest rates but did not act accordingly

29.    The ordinary interest rates on the three US dollar short-term Loans were 18% per annum compounded quarterly –an effective rate of 19.25%– and, in the event of default, additional 25% default interest rates applied on top of the ordinary interest rates, for a combined interest rate following default of 43% –an effective rate of 50.44%.[19] These rates reflect the high-risk associated with the Loans at the times they were negotiated by the Claimant on 28 February 2007, 13 June 2007, and 26 September 2007 respectively. This is evident when the quarterly compounded Loan rates are compared to the U.S. prime loan rates, which are the appropriate benchmarks given that the Loans are denominated in U.S. dollars. The rates ranged from 7.75-8.25%.[20] The ordinary, default and combined interest rates in the Loans were 2.3-6.5 times these rates, clearly reflecting the high risks associated with the Loans.

30.    Accordingly, at the time of negotiating the Loans the Claimant was aware of the high risks it was undertaking. Its level of vigilance and actions in relation to the Loans should have reflected these high risks. It did not.

### 3.    The Claimant granted and repeatedly extended the loan maturity dates in the face of the Debtor's refusal to pay

---

[17]    Exhibit C-35, p. 65.
[18]    Exhibit C-36, p. 3.
[19]    Memorial on the Merits, ¶ 23; Exhibit C-8, Clauses 1.1(4) and (17) and 2.3; Exhibit C-12, Clauses 1.1(5) and (18) and 2.3; Exhibit C-16, Clause 1.1(4) and (18) and 2.3.
[20]    Exhibit R-004 U.S. Prime Rate, https://fred.stlouisfed.org

31.    As noted in previous submissions, the three Loans at issue in this case had the following maturities:

- The Nayarit Loan for USD $15 million was granted to Inmobiliaria Bains, S.A. de C.V. (Bains) on 28 February 2007 and had a term of 18 months. Its original due date was 28 August 2018.

- The Americas I Loan for USD $12.45 million was granted to C&C Capital on 13 June 2007 and had an original maturity of 90 days. The original due date was 12 September 2007.

- The Americas II Loan for USD $5.35 million was granted to C&C Ingeniería on 26 September 2007 and also had maturity of 90 days. The original due date was 26 December 2007.

32.    According to the Claimant's account of the facts, the Debtors demonstrated their inability to meet their obligations early on. In fact, by the time the Destiladeras Loan became due and payable on 28 August 2008, the Americas I Loan had already been extended *three* times and the Americas II Loan *two* times.

33.    Despite these obvious signs of the Debtors' inability to repay, the Claimant kept extending the maturity of the loans instead of attempting to recover the principal and interest by foreclosing on the Mortgages or suing the Debtors through an executive action pursuant to the Notes. By the final due date on 30 September 2009:

- the Destiladeras Loan had been extended *four* times, transforming the original 18-month loan into a 31.5-month loan;

- the Guadalajara 1 Loan had been extended *seven* times, transforming the original 90-day loan into an 839-day loan;

- the Guadalajara 2 Loan had been extended *six* times, transforming the original 90-day loan into a 735-day loan; and

- according to the Claimant, the original amount of principal lent to Mr. Cárdenas' companies had grown from USD $32.8 million to approximately USD $56 million.[21]

34.    But again, in the face of these obvious signs of problems, the Claimant chose not to foreclose on the Mortgages or sue the Debtors.

       **4.**    **The Claimant inappropriately issued a series of invoices without taking legal action on non-payment**

---

[21]    According to the Memorial on the Merits, at ¶ 27: "[t]he amounts due on that invoice [16 April 2010], calculated and dated as of 31 March 2010, totaled US $26,618,972 for the Nayarit Project and US $29,649,835 for the Guadalajara Project."

35.   Upon the amounts becoming due under the Loans on 30 September 2008, the Claimant imprudently waited for over six months before sending the first invoice for the outstanding principal and interest (on 16 April 2010) and then sent six additional invoices over the next year and three months with the last invoice being sent on 29 July 2011.[22] Notwithstanding that none of the invoices were paid, the Claimant did not take any legal actions to recover the amounts owing.

### 5.   The Claimant inappropriately undertook and conducted negotiations with the Debtors without taking legal action

36.   The Claimant contends that throughout 2010 and 2011 it attempted to negotiate settlement of the Loans with Mr. Cárdenas:

> 28.   LMC had continued discussions and meetings with Cárdenas and/or his representatives throughout 2010 and 2011, in an attempt to find an amicable solution to the breach of the loan agreements outside of formal foreclosure proceedings. Throughout that time period, LMC was regularly receiving and responding to repayment proposals from Cárdenas.[23]

37.   The Memorial, however, provides very little information on what transpired during this period. The Claimant has provided some evidence of negotiations and proposals in 2011, but there is no evidence whatsoever of what occurred in the year and a half between 30 September 2009 and 2 May 2011 –i.e., the date of the first communication between the Claimant and the Debtors on the record. Request No. 16 was intended to provide further insight into these purported negotiations:

> Internal documents and records of communications between LMC and/or DTZ Rockwood (e.g., Mr. Baer) and the Debtors discussing, analyzing or evaluating the payment of the Loans or proposals to settle the debt. This request refers to documents prepared between 30 September 2009 and 13 April 2012. This request excludes documents in Exhibits C-43 and C-55.[24]

38.   However, the Claimant produced only four documents, the earliest of which is a proposal dated 2 May 2011 and the earliest communication in Exhibits C-43 and C-55 is dated 2 April 2012. By the Claimant's own evidence, it delayed the initiation of negotiations with the Debtors for no apparent reason.

39.   Once negotiations were initiated, there is no evidence that the Claimant addressed or did anything to protect its investments, during the times loan maturity dates were extended, during the times invoices were issued but not paid, or at any other times. The Claimant's omissions were clearly negligent in the circumstances.

### 6.   The Claimant's persistent omissions prejudiced its investments

---

[22]   Memorial on Merits, ¶ 27.
[23]   *Id.*, ¶ 28.
[24]   Respondent's first request for documents of 30 July 2012.

40.     The Claimant has demonstrated a continuous pattern of omissions respecting its investment over the entire time period relevant to this arbitration. This significantly contributed to the prejudice of it claims.

41.     Reflecting the accumulation of the above-noted acts and omissions, the Claimant waited almost two- and one -half years after the Loan amounts came due before it finally decided to initiate foreclosure proceedings on one of the three Mortgages (the Nayarit Mortgage) that secured the Loans on 3 April 2012.[25] By this time, the original USD $32.8 million debt had ballooned to more than USD $100 million and was accruing ordinary and default interest at a combined rate of approximately 43%.

42.     The Claimant deliberately chose not to initiate foreclosure proceedings on the other two mortgages "to minimize cost and with the hope that initiating [the foreclosure proceedings on the single mortgage] would persuade Cárdenas to an amicable resolution of the dispute".[26] The Claimant also failed to take one or more available legal actions to protect its investments, through (i) an ordinary action pursuant to the Credit Agreements and (ii) an executive mercantile action pursuant to the Notes.[27]

## C.     Foreclosure Proceedings

43.     The Claimant contends that "given the persistence of the lack of payment", on 3 April 2012, it initiated foreclosure proceedings (*juicio especial hipotecario*) against the Debtors. It is unclear why foreclosure proceedings were not initiated at an earlier time, given that by early April 2012, more than two years had passed without any apparent progress towards reaching an amicable settlement agreement. It is also hard to accept that the Claimant decided to foreclose only on the Nayarit Mortgage "in order to minimize costs and with the hope that initiating these proceedings would persuade Cárdenas to an amicable resolution of the dispute".[28]

44.     The Respondent has been able to confirm that: the Claimant initiated foreclosure proceedings on 12 April 2012; on 13 April 2012, the claim was admitted by the 39th Civil Court in Mexico City (the "Foreclosure Court") and registered under docket number 482/2012; on 20 April 2012 the 39th Civil Court sent exhort to the Land Registry[29] of Nayarit to register the Claim and; that the foreclosure claim was registered in the Public Property Registry of Bucerías, Nayarit on 3 May 2012, at the request of the Foreclosure Court.

---

[25]   Memorial on the Merits, ¶ 35.
[26]   *Id.*
[27]   Memorial on Jurisdiction, ¶ 37.
[28]   *Id.*
[29]   Registro Público de la Propiedad y del Comercio

45.   On 10 December 2015 the Claimant negligently withdrew from the Foreclosure Proceedings,[30] despite the fact that C&C Ingeniería[31] and C&C Capital[32] had been served.

### 1.   Mexican Courts are not obligated to serve the defendant in a foreclosure proceeding *ex oficio*

46.   The Respondent's legal expert, Dr. Ovalle, explains in his report that civil and mercantile actions in Mexico are governed by the dipositive principle (*principio dispositivo*) which places the burden of commencing the action and furthering the process on the parties to the litigation. Only when the law specifically provides for the Court's action can a Judge intervene to advance the process.[33]

47.   Under the Mexican legal system, the claimant party bears the responsibility of furthering or advancing its own claim. This is also noted in Dr. Ovalle's expert report.[34]

### 2.   The Courts did everything within the legal framework to serve the Debtors

48.   According to the Claimant, the Foreclosure Court, despite numerous requests, was unable to serve the claims on the Debtors. The Claimant does not appear to take issue with the fact that the Court diligently accepted and processed all the service requests it submitted. Instead, it appears to fault the Respondent because:

> 40. It is worth noting that, in average, it takes a court in Mexico 42 days to admit and serve a lawsuit. The Court's failure to serve the Foreclosure Proceedings on Inmobiliaria Bains for more than three years starkly contrasts with the only 22 days that it supposedly took the Mexican Courts to purportedly serve an unauthorized person at a false address in the proceedings which led to the cancellation of the Mortgages and Notes, as will be explained below.[35]

49.   The suggestion that the Courts of Mexico City, Jalisco and Nayarit purposefully or negligently failed to serve the Debtors is offensive. The Respondent submits that the Courts failure to service the Debtors has to be analyzed in the particular circumstances of this case and consideration must be given to the Claimant's negligence, which largely explains the delay in service. As noted by Dr. Ovalle:

---

[30] Exhibit R-005 Withdrawal from the Foreclosure Proceedings, dated 10 December 2015
[31] Exhibit R-006 Court's acknowledgement of voluntary service of C&C Ingenieria, dated 23 October 2012.
[32] Exhibit R-007 Minute of Service Proceeding on C&C Capital, dated 10 August 2015
[33] Expert report of Dr. José Ovalle Favela, ¶ 59.
[34]   *Id.*, ¶¶ 57, 62, 65 – 67.
[35]   Memorial on the Merits, ¶ 40.

The time between the admission of a claim and notification to the respondent varies considerably, because it largely depends on the diligence of the claimant's legal representative.[36] [...]

50.   It is also worth noting that Mr. Raul Calva Balderrama shares the forgoing view. Mr. Calva confirms in his Witness Statement that the reason behind the failure to serve the Debtors for more than two years is that "the Claimant did not provide the correct domicile to serve the Debtors and did not act diligently with respect to the making, submission, and execution of the *exhortos*." Therefore, "it is the Claimant's responsibility that the service is carried out efficiently and successfully, as it is obligated to provide the domicile of the Defendant in its initial claim."[37]

51.   The Claimant concedes that the Foreclosure Court made 13 different attempts to serve the Debtors since the claim was registered –all of them at the request of the Claimant. The Respondent has been able to confirm that the service attempts commenced on 26 April 2012 –i.e., six days after the Claimant's claim was admitted by the Foreclosure Court.

52.   The record shows that on that date, the Foreclosure Court –in Mexico City– sent a rogatory letter (*exhorto*) to the Superior Court of Jalisco ("*Superior Court*"), requesting its assistance to preform service on the Debtors. This is the standard procedure when the service address is located outside the jurisdiction of the Court in which the claim is filed.

53.   Upon receiving the *exhorto*, the Superior Court referred it to the Third Civil Court of Guadalajara, Jalisco ("*Guadalajara Court*"), who attempted service on the Debtors that very same day without success.

54.   According to the Guadalajara Court records, the Claimant's lawyer was present when the Court officers made the first attempt. As noted in Dr. Ovalle's expert report it is common practice for the plaintiff's legal representative to participate in order to assist the Court in the process and ensure that service is done correctly.[38] In this case, however, the Claimant's legal representatives only participated in the first service attempt.

55.   From April 2012 to January 2015, the Foreclosure Court issued 14 additional *exhortos* to the Courts of Guadalajara and Nayarit.[39] All of them, except for the last one, failed because the respondent party could not be located at the specified addresses.

56.   It is important for the Tribunal to appreciate that, under Mexican law, a Judge has no obligation to verify the service address provided by a claimant party. That burden, as explained in Dr. Ovalle's expert report and Mr. Calva's Witness Statement, lies with the Claimant.[40] The Claimant also failed in this regard. It simply allowed Court officers to attempt service at the wrong address time and time again without verifying those addresses beforehand. In fact, the Claimant even insisted on addresses where previous attempts had been unsuccessful. In short, it was the

---

[36]   *Id.*, ¶ 64.
[37]   *Id.*, response to question 9, ¶ 6-7.
[38]   *Id.*, ¶ 23.
[39]   *Id.*, ¶¶ 16-38.
[40]   *Id.*, ¶¶ 24, 63 and Mr. Raul Calva Witness Statement, response to question 3, p. 3

Claimant's own lack of diligence that explains the protracted process of serving the Debtors. In the words of Dr. Ovalle:

> The problem was the notifiers' inability to carry out the *exhortos* sent to the cities of Guadalajara, Jalisco and Bucerías, Municipality of Bahia de Banderas, Nayarit because LMC's legal representatives did not take the necessary actions to verify the addresses in which the *exhortos* would be practiced nor did they make sure that the court secretaries and notifiers of the State of Jalisco validly discharged the *exhortos*.[41]

57.    The Claimant also conveniently overlooks the fact that in addition to issuing *exhortos* to the Guadalajara and Nayarit Courts, the Foreclosure Court assisted the Claimant in its efforts to obtain other possible addresses in which to serve the Debtors. The record shows that at least on two separate occasions, the Foreclosure Court sent letters to various Government agencies to obtain such additional information:

- On 2 October 2012, the Foreclosure Court sent 6 letters to the Federal Commission of Electricity (CFE), the National Housing Institute (INFONAVIT) the Ministry of the Economy, the Ministry of Foreign Relations, the Credit Bureau (Transunión de México), and the Federal Agency of Investigations.[42]

- On or around 9 September 2014, the Foreclosure Court sent 5 letters to the Federal Police, Teléfonos de Mexico (TELMEX), Institute of Social Security and Services for State Employees (ISSSTE), Mexican Institute of Social Security (IMSS) and the Tax Administration Service (SAT).[43]

58.    Mr. Calva affirms in his Witness Statement that in addition to the Claimant's requests, the judicial authorities "sent additional letters to other public institutions that the Claimant did not identify, with the intention of exhausting all options and obtain the correct domiciles to successfully execute service." [44]

59.    However, there is no evidence to suggest that the Claimant made any effort to verify the new addresses provided by those agencies before attempting service.

### D.    Mercantile Action 917/2012 (*juicio ordinario mercantil*)

60.    The mercantile action –which the Claimant refers to as the "Cancellation Proceedings"– was a lawsuit (*demanda mercantil*) filed by the Debtors against the Claimant for breach of contract. The contract at issue was a Settlement Agreement that the Claimant allegedly submitted to the Debtors in late 2011 to settle the Loans. Pursuant to this agreement:

- Bains would capitalize the amount outstanding under the Destiladeras Loan ($492,544,937 pesos) by issuing 492,544,937 shares to the Claimant before 15 February 2012;[45]

---

[41]  *Id*., ¶ 57. See also ¶¶ 24, 62.
[42]  Exhibit R-008 Letters sent to CFE, INFONAVIT, SE, SRE, Transunión and AFI, dated 2 October 2012.
[43]  Exhibit R-009 Letters sent to Federal Police, TELMEX, ISSSTE, IMSS and SAT on 9 September 2014.
[44]  Witness Statement of Mr. Raúl Calva Balderrama, response to question 4, pp.3-4.
[45]  Exhibit R-010, Decision Mercantile Action 917/2012, pp. 13-14.

- C&C Capital would capitalize the amount outstanding under the Americas I and Americas II Loans ($547,343,634 pesos) by issuing 547,343,634 shares to the Claimant before 15 February 2012; and

- Within 8 calendar days from the date the shares were issued, the Claimant would return the Notes to the Debtors and cancel the Mortgages.

61.   The Debtors claimed that they had complied with the terms of the contract whereas the Claimant had not and requested the Court to issue an order of specific performance. The claim was submitted on 13 March 2012 and registered by the 9th Commercial Judge of the First Judicial Party of the State of Jalisco ("Mercantile Court") three days later under case number 917/2012.[46]

62.   On 4 April 2012, the Mercantile Court notified the claim to the Claimant using the contact information included in the Settlement Agreement. Notice was served on Isaac López Medina, one of two individuals identified in the Settlement Agreement as an authorized representative (*autorizado*) of the Claimant. Pursuant to the notice, the Claimant had 15 days to file a statement of defense and failure to do so would be considered an admission of the facts as pleaded by the plaintiffs.[47]

63.   The Claimant did not file a statement of defense and, consequently, on 22 May 2012, at the request of the plaintiffs, the Court ordered the proceedings to continue *in absentia*, and the Claimant was declared in default (*en rebeldía*). The Court also ordered that any further decisions and resolutions be notified to the Claimant by judicial bulleting (*boletín judicial*) until it provided an address for the purposes of the litigation.[48]

64.   The Claimant contends that the Settlement Agreement is a forgery and that it was unaware of the Mercantile Proceedings because service was effected using false information provided therein.[49] This may or may not be true, however, the Respondent will observe at the outset that if the Settlement Agreement is indeed a forgery and a fraud was perpetrated against the Claimant, that fraud was also perpetrated against the Mexican Courts.

65.   The cancellation of the Notes, under that hypothesis, would be the direct result of the alleged criminal behaviour of the Debtors and not the actions and decisions of Mexican Court and registry officials.

### 1.    The Decision

66.   In order to succeed in the Mercantile Action, the Debtors had to satisfy the Court that they had complied with the issuance of the prescribed number of shares in Bains, as payment of the Destiladeras Loan[50] and the prescribed number of shares in C&C Capital, as payment of the

---

[46]   Exhibit C-57.02 and C-72, p. 26.
[47]   Exhibit C-52 and C-57.04.
[48]   Exhibit C-57.06 and C-73.
[49]   Memorial on the Merits, ¶¶ 95 to 101.
[50]   Exhibit C-53, p. 7 ("2. Forma de pago propuesta para el Crédito de Destiladeras").

Americas I and Americas II Loans.[51] Pursuant to Clauses 2 and 4, these shares were to be issued on or before 15 February 2012.[52]

67.    To prove their case, the Debtors submitted the following evidence:

- a certified copy of the Settlement Agreement;[53]

- certified copies of the loan documentation;[54]

- protocolized minutes of the General Shareholders Meeting of C&C Capital held on 10 February 2012 recording the issuance of 547,343,634 shares in favour of LMC;[55]

- ownership certificate for 547,343,634 shares in C&C Capital in favour of LMC;[56]

- protocolized minutes of the General Shareholders Meeting of Inmobiliaria Bains held on 10 February 2012 recording the issuance of 492,544,937 shares in favour of LMC;[57]

- ownership certificate for 492,544,937 shares in Inmobiliaria Bains in favour of LMC;[58] and

- proof that the Claimant was notified that the shares had been issued.[59]

68.    Based on this evidence, the Mercantile Court determined that the Debtors had successfully established the existence of a contract between the Claimant and Bains and C&C Capital[60]; that the Debtors had complied with the terms of the contract[61]; that the Claimant was duly informed that the Debtors had met their obligations thereunder; and that the Claimant failed to comply with its obligations under the contract –i.e., the Settlement Agreement.

69.    Thus, on 27 June 2012, the Mercantile Court issued a decision ordering the Claimant to cancel the Mortgages and return the Notes to the Debtors. The Court subsequently cautioned that it would order the cancellation of the Mortgages *in absentia* and declare the Notes worthless if the Claimant failed to comply with the decision.[62]

---

[51]  *Id.*, p. 7 ("4. Forma de pago propuesta para Créditos Americas I y Americas II")

[52]  *Id.*

[53]  Exhibit R-011, Certified copy of the Settlement Agreement contained in the 917/2012 Proceedings. See also Exhibit C-78,

[54]  Exhibit R-012 Request to submit evidence in the 917/2012 Proceedings, pp. 10-16.

[55]  Exhibit R-010, p. 35. See also Exhibit R-013 Protocolized minutes of the General Shareholders Meeting of C&C Capital.

[56]  *Id.,* p. 36.

[57]  *Id.,* p. 36.

[58]  *Id.,* p. 36.

[59]  Exhibit R-012, Request to submit evidence in the 917/2012 Proceedings, pp. 6-9.

[60]  *Id.*, pp. 10-11.

[61]  *Id.,* pp. 9,13.

[62]  Exhibit R-014, Decision of *Amparo* 1324, dated 4 December 2013, p. 19 and RFA ¶ 41 (c). The ruling was issued on 27 June 2012. On 1 August 2012, the plaintiff requested enforcement of the ruling, noting that the period to appeal the decision had elapsed. On 8 August 2012, the Court cautioned that the judgement could be enforced without a judicial declaration and gave the Claimant 3 days to voluntarily comply. On 16 August 2012, the plaintiff

70.    The Claimant complains of improper service and other alleged procedural irregularities, which will be addressed in following sections. But before addressing those points, the Respondent will point out that the Claimant still holds its shares in Bains and C&C Capital and has omitted any discussion of their value, which, according to evidence filed in one of the criminal proceedings initiated against Mr. Cárdenas, is quite substantial.[63] This point will be further developed in the damages section.

### 2.    The Mercantile Court complied with starndard procedure to notify the Claimant

71.    The Claimant complains that the Mercantile Court failed to properly serve it because: (i) it was served "on the person of Mr. José Isaac López Medina, one of the two persons designated in the Forged Document and completely unrelated to LMC", and (ii) because "service on this person was done at an address in Guadalajara totally unrelated to LMC which, moreover, was not even the address indicated in the Forged Document".[64]

72.    The Mercantile Court had no reason to doubt the authenticity of the Settlement Agreement and, therefore, no reason to doubt the truthfulness and accuracy of the information contained therein. The Claimant has provided no evidence to suggest that the Court knew or should have known that the Settlement Agreement was a forgery and/or that the contact information was false.

73.    Moreover, as Dr. Ovalle points out in his expert report, the Court has the duty to ensure that any document that serves as the basis of a claim complies with all legal requirements, such as identifying the parties and providing contact information, but it has no power to put into question its authenticity:

> 87. The judge has the obligation of verifying that the document that serve as the basis of the legal action complies with all the requirements established by the Law, but he does not have the power to question the authenticity of such documents.[65]

74.    According to the Claimant and its expert, the Court's clerk's alleged failure to obtain additional evidence to corroborate that the domicile indicated in the Settlement Agreement was in fact the Claimant's address and that the person identified as the Claimant's legal representative was in fact the Claimant's legal representative "constitutes a breach of the rules of Mexican Law in respect of service which require that «*if the defendant is a corporation, the Court must seek to*

---

asked the Court to enforce the judgement, since the Claimant had failed to comply. On 30 August 2012, the Court ordered the cancellation of the Mortgages and rendered the actions void.

[63]  The value of the shares became an issue during the criminal proceeding 137/2014 initiated against Mr. Cárdenas for generic fraud, following LMC's complaint dated 16 April and filed on 19 April 2013. In order to demonstrate that LMC had not suffered any damages as a result of his alleged criminal behaviour, Mr. Cárdenas submitted various expert reports, including two reports prepared by Mr. Alfredo Trujillo Betanzos on 17 September 2014, which calculate the book value of the shares of C&C Capital and Bains as of 31 January and 31 December 2012. Exhibit R-015 Valuation C&C Capital, p. 21; Exhibit R-016 Valuation Bains, p. 25.

[64]  Memorial on the Merits, ¶¶ 95-97.

[65]  Expert report of Dr. Jose Ovalle Favela, ¶ 87.

*serve it through its legal representative or through someone who the Court is certain that has such legal capacity by requesting to see the appropriate documentation»*, and that *«the court office must be fully assured that the domicile where process will be served is the defendant's domicile».*"[66]

75.   Mr. Calva explains in his witness statements that the Court officer's duty is to make sure that service is performed at the address identified by the plaintiff and this applies to all Mexican Courts:

> The claimant party has the obligation to provide complete and correct domiciles for the defendant party, and to verify their existence and to take into account that pursuant to Articles 116, 117 and 118 of the Procedural Civil Code of the Federal District the Court's staff, in this case, the Actuary, must ascertain that the Defendant resides at the domicile of service, clarifying that the word "ascertain" implies the certification, attestation or corroboration of the information provided by the plaintiff in its initial claim. [67]

76.   The Mercantile Court performed service at the address identified by the plaintiff. This service was directed to the legal representative of LMC. On the first attempt of service, dated 3 April 2012, the court clerk was informed, by José Isaac López Medina, that he was at LMC's place of business but that the legal representative was not currently present. Hence, the court clerk left a citation with Mr. Lopez ordering the legal representative to be present at a specified date and time to facilitate service. The order stated that should LMC's legal representative not be present, service would be effected upon any individual present at the time.[68]

77.   On 4 April 2012, the clerk returned and was informed by Mr. López Medina that the legal representative was not present. Therefore, the court clerk performed service on Mr. López Medina, who was also identified in the Settlement Agreement as authorized to receive notification on behalf of the Claimant.[69]

78.   This is supported by the Mexican Supreme Court when describing the requirements to be fulfilled in a service process. The Supreme Court established that in dealing with corporations, the service has to be performed with the legal representative. However, in case a citation has been left for the legal representative, it must be established in the minute that the clerk asked for the legal representative before performing the service with any other person present at the moment.[70]

79.   But regardless of whether the Tribunal agrees with the Claimant or the Respondent on whether service was done in compliance with established procedure under Mexican law, the Respondent will observe that the Claimant had available remedies to challenge improper service, and it invoked such remedies in this case.[71] For that reason alone, the actions of the Mercantile Court and the Court's clerk cannot be viewed in isolation as measures giving rise to an expropriation or a violation of Article 1105.

---

[66]   *Id*., ¶ 98 and Dr. Zamora's expert report, ¶ 149
[67]   Witness Statement of Mr. Calva, answer to question 3, p. 3.
[68]   Exhibit C-57.3
[69]   Exhibit C-57.4
[70]   Exhibit RL-039 "*NOTIFICACION A TRAVES DE UNA PERSONA DISTINTA DEL INTERESADO Y A PERSONAS MORALES REQUISITOS EN EL ACTA QUE SE LEVANTE.*"
[71] Expert Report of Dr. José Ovalle Favela, ¶¶ 94 and 95.

### 3.    The cancellation of the Mortgages

80.    The following facts stated at paragraphs 114 to 118 of the Memorial on the Merits are undisputed:

- On 30 August 2012, the Mercantile Court ordered the Public Registry in Guadalajara to cancel the mortgages that secured the Second and Third Loans;

- On 7 September 2012, the Guadalajara Public Registry cancelled the mortgages on 7 September 2012;

- On 30 August 2012, the Mercantile Court requested the assistance (*exhorto*) of the Nayarit Court to cancel the mortgage over the property located in Bucerías, Nayarit (the "Nayarit Mortgage") that secured the three Loans;

- On 16 October 2012, the Nayarit Court requested the Public Registry of Bucerías Nayarit, to cancel the mortgage; and

- On 19 October 2012, the Public Registry cancelled the Nayarit Mortgage.

81.    The Claimant takes issue with the cancellation of the Mortgages by the Public Property Registry because, in its view, it was done "without regard to the previous recording of the Foreclosure Proceedings [which] amounts to a violation of the principles of legality or qualification and of consecutiveness (*tracto sucesivo*) enshrined by the Mexican Public Registry legal system".[72] It is important to note, however, that this objection would only apply to the Nayarit Mortgage because the Claimant did not initiate foreclosure proceedings with respect to the Guadalajara Mortgages.

82.    Dr. Ovalle explains in his report that the Land Registry officials cannot refuse a Court order to cancel a mortgage. They are obligated to comply with the order and are not required to give notice of such cancellation to the foreclosure Court or any of the parties in the foreclosure proceeding:

111. Under Article 69 of the Public Registry Law of Jalisco, there are three situations in which registration can be denied, none of which corresponds to an order to cancel a mortgage due to the previous existence of a foreclosure action registration.

112. Consequently, the head of the Land Registry lacks legal power to refuse registration of the cancelation of the mortgages. It is important to clarify that the registration of the foreclosure action only referred to the property owned by Bains, located in Bucerias, Bahia de Banderas, Nayarit, and not to the other two mortgaged properties.[73]

---

[72]  Memorial on the Merits, ¶ 119.
[73]  Expert report of Dr. Jose Ovalle Favela, ¶¶ 111-112.

83.    Dr. Ovalle also points out that, the Claimant had the opportunity to file a complaint for the improper cancellation of the Mortgages upon learning of such event. However, the Claimant does not appear to have pursued this available remedy:

> 107. It is also worth noting that LMC's legal representative could have complained about the irregular cancelation of the mortgages. However, LMC's legal representative did not file a complaint for said irregularity.[74]

84.    It ill-behoves the Claimant to complain now of the alleged irregularities committed by the Bucerías Land Registry, not having exercised this obvious remedy back in 2012 when it learned of the cancellation of the Mortgages.

### E.    The *Amparo* Proceeding (1324/2012-VII)

85.    At paragraphs 123 to 125 of the Memorial, the Claimant states that on 19 December 2012, the Claimant filed an indirect *amparo* challenging:

- the lack of service on the Claimant by the Secretary of the Mercantile Court and the Judge;

- the order to cancel the Mortgages issued by the Mercantile Court; and

- the cancellation of the Mortgages by the Directors of the Public Property Registry of Bucerías, Nayarit and Guadalajara, Jalisco.

The Claimant claimed that its Constitutional rights to a hearing (*garantía de audiencia*) and legality and juridical safety (*legalidad y seguridad jurídica*) under Articles 14 and 16 of the Constitution of the United Mexican States were violated by the Mercantile Judge, the Secretary of the Mercantile Court and the Directors of the Public Property Registry of Bucerías, Nayarit and Guadalajara, Jalisco.[75]

86.    The following facts appear to be undisputed:

- The original claim was received on 21 December 2012 by the First District Court of the State of Jalisco (District Court) and was registered with docket number 1324/2012 (hereinafter *Amparo* 1324).[76]

- The claim included a request for the suspension of the acts giving rise to the claim (*suspension del acto reclamado*) which was granted, on a provisional basis, on the same date the claim was admitted. The District Court also ordered the responsible authorities to refrain from taking any action to transmit, sell, assign, or pledge the mortgaged

---

[74]  *Id.*, ¶ 107.
[75]  Exhibit R-017, *Amparo* claim 1324/2012, pp. 11-12.
[76]  Memorial on the Merits, ¶ 127.

-19-

properties or from taking any other action that would directly or indirectly limit, restrict, modify or transform the properties.[77]

- On 17 January 2013, the District Court extended the aforementioned protection by granting a definitive suspension of the challenged acts until *Amparo* 1324 was resolved.[78]

87.    The Debtors participated in the *Amparo* 1324 proceedings as affected third parties (*tercero perjudicadas*). On the same date that the claim was admitted, the District Court ordered that the Debtors be notified of the *amparo* filed by the Claimant. C&C Ingenieria was admitted on 1 April 2013 and Bains and C&C Capital on 14 June 2013.[79]

88.    The Respondent does not intend to go into all the details because of their complexity and because they are largely irrelevant for the purposes of this case. It will address, however, the Claimant's claim that it was somehow prevented from submitting relevant evidence.

### 1.    The decision to exclude evidence

89.    On 29 January 2013, the Claimant filed a motion seeking to broaden the scope of the original *amparo* complaint (*ampliación de la demanda*) to include, *inter alia*, (i) the 16 March 2012 decision by the Mercantile Court to admit the Debtors claim; (ii) the 6 July 2012 decision to admit the allegedly false request for copies of the Mercantile Action and; (iv) the decision to cancel the Mortgages.[80] The Claimant also sought to [amend] its claim of "lack of service" in the Mercantile Action to one of "unlawful service".

90.    The request was granted by the District Court by decision dated 30 January 2013, but only with respect to the 16 March and 6 July 2012 decisions by the Mercantile Court, reasoning that the rest of the measures were already included in the original *amparo* claim.[81] In addition, by decision dated 10 April 2013, the District Court admitted into evidence certain documents filed by the Claimant in support of the extended *amparo* claim.[82]

91.    However, on 8 and 17 April 2013, one of the Debtors, C&C Ingenieria, filed two *recursos de queja* against the 30 January and 10 April decisions, which were registered as 33/2013 and 37/2013 respectively.

92.    On 17 May 2013, the Collegiate Court upheld both *recursos de queja* on the grounds that Mr. Miguel Hernandez Quezada, the individual who filed the extension request on behalf of the Claimant, had no legal standing to do so. The Collegiate Court concluded that, although Mr. Hernandez was authorized under Article 27 of the *Amparo* Law to act on behalf of the Claimant

---

[77]   *Id*., ¶ 128.

[78]   *Id*.

[79]   Exhibit R-014, *Amparo* Decision 1324/2012, pp. 4-5.

[80]   Memorial on the Merits, ¶ 138. The request was dated 28 January 2013 but was filed by the Court the following day.

[81]   Exhibit R-014, *Amparo* Decision 1324/2012, p.6.

[82]   Exhibit R-018 Decision 10 April 2013 admitting evidence.

in the *Amparo* 1324 proceedings, he had no legal standing to broaden the scope of the *amparo* claim once it was filed by the Claimant's legal representative, Mr. Arechederra. An *amparo* claim can only be submitted by the person who has suffered a direct grievance or by his/her legal representative.[83]

93.   As a result, the 30 January 2013 and the 10 April 2013 decisions by the District Court were overruled (*se deja sin efectos*) and the evidence filed by the Claimant in support of the extension request was stricken from the record.[84] The Claimant acknowledges the following in its Memorial:

> However, the partial admission of LMC's extension of the *Amparo* Claim was finally rejected by the Second Collegiate Tribunal of the Third Circuit, deciding on the *quejas* (appeals) filed by LMC and one of the Debtors[163] and, as a result, the *Amparo* Proceedings only dealt with the challenged acts originally included in LMC's initial *Amparo* Claim. Further, due to the rejection of the extension of the *Amparo* Claim, the evidence proposed by LMC in its support was also finally dismissed.[164] [Emphasis added]

94.   Footnote 164 in the above-quoted passage reads as follows:

> Although the *Amparo* Court had initially admitted LMC's proposed evidence (see the *Amparo* Court decision of 10 April 2013 at Exhibit C-106), C&C Ingeniería filed a *queja*, registered with docket number 37/2013 against that decision, which was upheld by the Second Collegiate Tribunal of the Third Circuit (see the Appeal Court decision of 27 May 2013, Exhibit C-105) on the grounds that this evidence related to LMC's request for extension of the Amparo Claim, which had finally been dismissed by the Second Collegiate Tribunal of the Third Circuit in the *queja* 14/2013 and in the *queja* 33/2013. [Emphasis added]

95.   The Claimant does not appear to take issue with the Collegiate Court's decision to uphold the complaints filed by C&C. The Respondent submits that this is tantamount to an admission that the extension requests and the evidence filed with it was improperly submitted to the District Court by Mr. Miguel Hernandez Quezada. Hence, when the Claimant complains that "*[t]hese decisions […] critically limited LMC's opportunities to prove the irregularities committed in the Cancellation Proceedings*" and "*LMC was also deprived of the opportunity of proving that the Forged Document, upon which the Mortgages had been cancelled, was fake*", it really has itself to blame.

96.   Put simply, the decision to dismiss the extension of the claim and the evidence filed in support of such extension was not an idiosyncratic or arbitrary decision. It flowed from a procedural error committed by the Claimant during the *Amparo* 1324 proceedings.

## 2.   The ruling in *Amparo* 1324

97.   The Claimant takes issue with the final decision dismissing the *amparo*. The Respondent will observe, however, that even if this Tribunal were to agree that there is a basis for the Claimant's misgivings, it had the opportunity to challenge this decision and it exercised that right.

---

[83]   Exhibit C-105, p. 3-4. See also Exhibit R-019 Decision Queja 33/2013 and Decision Queja 37/2013.
[84]   Exhibit C-105, p. 8.

Thus, the *amparo* ruling cannot be viewed, in isolation, as a measure giving rise to an expropriation or a breach of Article 1105. The actions taken by the review Court must be taken into consideration.

98.   Because the Claimant decided to challenge the *amparo* ruling, the Respondent finds it unnecessary to address the District Judge's specific findings.

### F.   *Amparo* Review Proceeding

#### 1.   The Claimant prematurely withdrew from the *amparo* review proceeding

99.   The parties seem to agree on the sequence of events that followed the *amparo* Court ruling of 4 December 2013 ("*Amparo* Ruling").

100.   On 19 December 2013, the Claimant appealed the *Amparo* Ruling through what is known as a review proceeding (*recurso de revisión*, hereinafter the "*Amparo* Review").[85] The Claimant requested the revocation of the *Amparo* Ruling and protection against the actions of the Mercantile Court and Land Registry officials that resulted in the cancellation of the Mortgages. Bains joined the *Amparo* Review as *tercero perjudicado*.

101.   The *Amparo* Review was originally assigned to the Forth Collegiate Tribunal of Civil Matters of the Third Circuit, however, by resolution dated 11 September 2014 the Fourth Collegiate Tribunal declined jurisdiction and the *Amparo* Review was remanded to the Second Collegiate Tribunal of Civil Matters of the Third Circuit (the Collegiate Court).[86]

102.   On 17 April 2015, the Collegiate Court issued a decision stating that there was evidence of potential grounds of inadmissibility (*causal de improcedencia*) that prevented further examination of the *Amparo* Ruling.[87] That evidence was the existence of a previous *amparo* claim (*Amparo* 757/2012) allegedly filed by the Claimant on 7 August 2012 against the same authorities and the same actions that gave rise to *Amparo* 1324/2012.

103.   The Claimant affirms that the circumstances of the discovery of *Amparo* 757 are unclear and suggests that the District Court "should necessarily have detected this potential *causal de improcedencia* of LMC's *Amparo* Claim since it has an obligation to «-ex officio- consider and analyze other previous cases filed before said Amparo Court «, as stated by the Expert Report on Mexican Law".[88] The Respondent's expert disputes this conclusion noting that:

---

[85]   Memorial on the Merits, ¶ 151.
[86]   *Id*., ¶¶ 155-156.
[87]   *Id*., ¶ 157.
[88]   *Id*., ¶ 161.

146.   It is not possible for a District Judge to verify whether a previous amparo claim exists every time an *amparo* claim is submitted. However, the *Oficialia de Partes Común* has that information and could provide it to the Judge.

147.   Usually, District Judges have no knowledge of other claims submitted against the same acts to other Judges. It falls on the parties to request the Judge to order the accumulation of the claims in terms of Article 57 of the Amparo Law of 1936.[89]

104.   In any event, the Collegiate Court remanded the case to the District Court and ordered the revocation of the original *Amparo* Ruling and the last part of the constitutional hearing and a replacement proceeding (*reposición del procedimiento*) limited to determining whether the Claimant had indeed filed *Amparo* 757 and, therefore, was barred from submitting a second *amparo* –i.e., *Amparo* 1324.[90]

105.   On 30 April 2015, the District Court revoked the *Amparo* Ruling as ordered by the Collegiate Court and resumed the constitutional hearing to allow the parties to submit evidence on the authenticity or lack thereof of *Amparo* 757.[91]

106.   On 12 May 2015, the Claimant's legal representative (*apoderado legal*) filed a complaint within the *amparo* replacement proceeding alleging that the signature that appeared in the *Amparo* 757/2012 claim was forged (*incidente de falsedad de firma*).

107.   The Claimant, Bains and the Court submitted graphological expert evidence on the signature that appeared in the *Amparo* 757 claim. The Claimant summarizes the evidence at paragraph 170 of its Memorial:

170.   LMC and Inmobiliaria Bains filed graphological reports issued by their respective experts. While LMC's expert confirmed that the signature in the Fake Amparo did not belong to Mr Arechederra, the expert appointed by Inmobiliaria Bains reached the opposite conclusion. The official expert from Jalisco appointed by the Remand Court also asserted that the signature in the Fake Amparo belonged to Mr Arechederra.[92]

108.   On 2 December 2015, the Constitutional Hearing concluded, and the deliberation period began. However, nine days later, the Claimant's legal representative withdrew from the proceeding.

109.   The Claimant maintains, with the assistance of its legal expert, that:

171.   As confirmed by Mr. Zamora in his legal report, it was highly probable that the *Amparo* Court, based upon the narrow record that it erroneously had created and relaying on the expert report issued by the official graphological expert appointed by the Court, could have found that the signature on the Fake *Amparo* filed on 7 August 2012 belonged to Mr. Arechederra, acting on behalf of LMC. Consequently, had LMC

---

[89]   Expert report of Dr. Jose Ovalle Favela, ¶¶ 146-147.
[90]   Memorial on the Merits, ¶ 157.
[91]   *Id*., ¶ 165.
[92]   *Id*., ¶ 170.

> pursued these Amparo proceedings, the Remand Court would have likely decided that
> LMC's Amparo Claim filed on 19 December 2012 had to be dismissed because it was
> barred by a *causal de improcedencia*. This would have been the most probable outcome
> of the Amparo Proceedings, where LMC would have never been granted the opportunity
> to prove that the Forged Document was fake and that LMC was never notified of the
> Cancellation Proceedings that led to the cancellation of the Mortgages.[93]

110.   The above quoted passage is nothing more than speculation. The simple fact remains that no one will ever know how the Court would have resolved the case because the Claimant prematurely and improvidently withdrew from the *Amparo* Review proceeding, effectively denying the Respondent the opportunity to correct any potential errors committed by the Mercantile Court, the land registry officials and the District Court.

111.   It is the Claimant's own evidence that it made a judgment call based on the mistaken impression that it could not commence this arbitration proceeding without withdrawing the *Amparo* Review.[94] This was not the case, as Article 1121 (Conditions Precedent to Submission of a Claim to Arbitration) allows for injunctive relief proceedings, such as the *Amparo* Review, to continue given they provide for no damages relief. Thus, the Claimant was not required to withdraw from the proceeding. The Respondent will further elaborate on this point in its legal submissions.

112.   In any event, Dr. Ovalle does not share Mr. Zamora's views regarding the potential outcome of the *Amparo* Review. He believes there were two distinct possibilities: *First*, the District Judge could have concluded that the signature in *Amparo* 757/2012 was not the signature of Mr. Arechederra (i.e., that *Amparo* 757 was not authentic) in which case the *amparo* would be granted to the Claimant.[95] *Second*, the District Judge could have ruled that *Amparo* 757/2012 was indeed authentic, in which case, the *amparo* would be dismissed.[96]

113.   Importantly, regardless of the outcome, the losing party could have challenged the District Judge's decision through a new review proceeding.[97] This was acknowledged by the Claimant in the Memorial:

> 173. Further, even if LMC had not waived the Amparo Claim, and in the unlikely event
> of the Remand Court having found that the Fake Amparo was not filed by LMC (despite
> the fact that two out of three graphological experts found that the signature of the Fake
> Amparo belonged to Mr. Arechederra), such a decision was still subject to appeal before
> the Appeal Court.

114.   However, the premature and unnecessary withdrawal by the Claimant not only prevented a ruling by the District Judge, it also impeded the functioning of the mechanisms that the Mexican legal system has to correct errors by its judiciary.

---

[93]   *Id.*, ¶ 171.
[94]   *Id.*, ¶ 172
[95]   Expert report of Dr. Jose Ovalle Favela, ¶ 188.
[96]   *Id.*, ¶ 189.
[97]   *Id.*, ¶¶ 188-189.

115.   The fact that it would have taken more time to pursue an appeal of an adverse finding in the *Amparo* Review does not relive the Claimant from its obligation to pursue to completion any domestic remedies it engages.

## G.   Criminal Proceedings

116.   The Claimant has filed several criminal complaints against Mr. Cárdenas, some of which are still pending. A review of the files reveals that many of these complaints are based on the same facts, involve the same individuals and the only distinction is the alleged offence.

117.   The Respondent will only address here the three main complaints that bear on issues that are relevant to the instant case.

118.   The first complaint was filed on 18 April 2013 at the Office of the Attorney General of the State of Jalisco (*Fiscalía General del Estado de Jalisco*) against Messrs. Cárdenas and Michel. The Claimant accused the respondents of forgery and use of a forged document in relation to (i) the Settlement Agreement, which had been submitted to the Mercantile Court as the basis of the Mercantile Action initiated by the Debtors, and (ii) the request for certified copies of the Mercantile Action file, allegedly signed by Mr. Arechederra.[98] This complaint resulted in criminal action No. 917/2012.

119.   The Claimant only requested the graphological examination of the Settlement Agreement. However, the experts concluded that such analysis could not be done on the certified copies on file.[99] Not having found conclusive evidence that the document was indeed forged, the Judge dismissed the case and ordered the release of Mr. Cárdenas who had been incarcerated since 21 September 2013.[100]

120.   On 19 April 2013, the Claimant filed a second complaint against Mr. Cárdenas for fraud. The complaint was filed in Mexico City and was based on the same facts and allegations as the first complaint.[101] The Judge dismissed the case on the grounds that the Mr. Cárdenas was being tried twice for the same facts[102] and, therefore, the *non bis in idem* principle applied.[103]

121.   On 19 June 2015, the Claimant filed a third complaint –docket number 4051/2015[104]– at the Office of the Attorney General of the State of Jalisco (*Fiscalía General de Justicia en el Estado*

---

[98]   The investigation continued, and the criminal case was sent to the *Juez Séptimo de lo Penal en el Estado de Jalisco* and filed as 463/2013. Exhibit R-020 First complaint 1771/2013.

[99]   Criminal case 463/2013-C was resolved on 5 December 2014. The Judge dismissed the case and ordered the release of Mr. Cárdenas on the grounds that there was no proof to convict Mr. Cárdenas. Exhibit R-021 Decision Criminal Proceeding 463/2013.

[100]   Expert report of Mr. Plascencia, ¶ 25

[101]   The complaint for generic fraud was filed as 137/2014 in Mexico City. Exhibit R-022 Second Complaint 137/2014.

[102]   This investigation was heard by the *Juez Trigésimo Segundo de lo Penal*. During the aforementioned proceeding, ancillary complaint U1435/2014 was filed. As a result of said complaint, the matter was dismissed. Exhibit R-023 Decision Toca U1435/2014 and Exhibit R-024 Decision Crimminal Proceeding 137/2014.

[103]   Expert report of Mr. Plascencia, ¶¶ 30- 33  .

[104]   Exhibit R-025 Third Complaint 4051/2015.

*de Jalisco*) alleging forgery of documents and fraud. Subsequently, the Claimant requested the Attorney General's Office to decline jurisdiction in favour of the Federal Attorney General's Office (*Procuraduría General de la República* or PGR) who took over the investigation and gave it docket number 5695/2015.[105] The investigation included document forgery, use of a forged document and the violation of Article 211 of the *Amparo* Law for the alleged forgery of Mr. Arechederra's signature in the *amparo* claim 757/2012 –to which the Claimant refers as the "Fake *Amparo*".

122.   It bears noting that the case file of investigation 5695/2015 includes two expert reports. The first was a graphological analysis of the signature in the *amparo* claim 757/2012 that was conducted during the original investigation (4051/2015). This report concluded that the signature in the *amparo* claim was not the signature of Mr. Arechederra. The second was also a graphological analysis of the signature that was ordered during the *Amparo* 1324 proceeding. The author of this second analysis concluded that the signature in the *amparo* claim was the signature of Mr. Arechederra. However, because this second analysis was not performed before the Prosecutor (*agente del Ministerio Público*) within investigation 5695/2015, the Prosecutor concluded that it could not be considered as an expert report.

123.   In view of these contradictory results, the Prosecutor ordered a third analysis to be conducted by a panel of experts (*pericial colegiada*) to determine whether the signature in *amparo* claim 757/2012 belonged to Mr. Arechederra.[106] This panel of experts concluded that the signature was authentic.[107]

124.   The Claimant, once again, requested the PGR to decline jurisdiction in favour of the local authorities (*fuero local*). In view of the request, the PGR decided to partially decline jurisdiction and only assumed it, within investigation 5695/2005, for the crime of "fraud by simulation" (*fraude por simulación*) but decided not to charge Mr. Cárdenas (*no ejercicio de la acción penal*). The Claimant filed an *amparo* against this decision, which received docket number 366/2018.[108] The *amparo* was granted and, as a result, the decision not to bring charges against Mr. Cárdenas was revoked and the file was returned to the Prosecutor to continue the investigation, so that a panel of experts could examine the two contradictory graphological analysis on file in investigation 5695/2015.

125.   The Respondent is not aware if there have been further developments in this case, specifically, whether the panel of experts have issued their assessment.

126.   Due to the partial remand of jurisdiction to the State's Attorney General's Office of Jalisco for the crime of forgery and use of a forged document, a new investigation was opened – investigation 3322/2016.[109] The file was remanded to the *Juez Noveno de lo Penal* of the State of

---

[105]  Exhibit R-026 Remission 4051/2015-5695/2015.

[106]  Exhibit R-027 Request for Joint Panel of Experts 5695/2015.

[107]  Exhibit R-028 Joint Panel of Experts Report 5695/2015.

[108]  Amparo claim filed by the Claimant against the *dictamen* and approval of the proposal not to file criminally charges following investigation 5696/2015. Exhibit R-029 Decision *Amparo* 366/2018.

[109]  Exhibit R-030 Partial Remission of Jurisdiction 5695/2015-3322/2016

Jalisco who initiated criminal proceeding (*causa penal*) 181/2016[110] for the crime of use of a forged document. However, the case was dismissed because the statute of limitation had expired.

127.   Several aspects of these criminal proceedings are worth noting.

128.   Notwithstanding these problems, the Claimant had access to different remedies, *fora* and actions and was able to seek compensation (*reparación del daño*) and freeze title on the three properties that originated the relationship between the Claimant and Mr. Cárdenas.

129.   The Claimant had the opportunity to submit evidence in all the criminal proceedings and had the opportunity to appeal the decisions though all means available under the Mexican legal system. Specifically, all the documents which authenticity was challenged by the Claimant were duly analyzed and, despite these analyses, the Prosecutor was unable to demonstrate that the documents were forged or that the Claimant was defrauded by Mr. Cárdenas. As a result, the cases were dismissed and the freeze on title (*aseguramiento*) lifted.[111]

130.   While it is true that the Claimant filed several criminal complaints to dispute the authenticity of certain documents that are at the centre of this dispute, these type of proceedings are not the ideal means to seek repayment or enforce contracts. As indicated by the Respondent's legal experts, the best recourse would be civil or mercantile action, which the Claimant did not pursue or terminated prematurely.[112]

131.   Mr. Plascencia indicates in his report that "Lion Mexico Consolidated withdrew from amparo 1324/2012, which was ordered to start replacement proceeding so that Lion could exercise its rights, through the mercantile action and review actions taken during Proceeding 917/2012, which gave the ruling *res judicata* effects."[113]

132.   Although this case arises from issues originating from lack of compliance with civil obligations, the fact that none of the criminal complaints prospered does not bar, in any way, civil action against Mr. Cárdenas.[114]

133.   As far as the Respondent is aware, criminal cases 4713/2016, 2822/2017, 121667/2017 and 83426/2017 are still open and one asset freeze is in place (*aseguramiento de bienes*), as the Claimant acknowledged in its response to the Respondent's first request for documents. [115] As in the case of the concluded criminal cases, in these pending proceedings the Claimant is complaining of different crimes on the basis of the same facts.

---

[110] Exhibit R-031 Decision Criminal Proceeding 181/2016.
[111] Expert report of Mr. Plascencia, ¶¶ 95, 96, 100, 102
[112] *Id.*, ¶ 88. See also, Expert report of Dr. Ovalle, ¶¶ 90-95, 192.
[113] Expert report of Mr. Plascencia, ¶ 83.
[114] Expert report of Mr. Plascencia, ¶¶ 89, 98.
[115] Expert Report of Mr. Plascencia, ¶106.

## II.    LEGAL SUBMISSIONS

### A.    Minimum Standard of Treatment

#### 1.    Article 1105 only applies to investments of investors of another Party

134. Chapter Eleven employs precise definitions that are used purposefully and consistently throughout both Section A and Section B. It is important for the Tribunal to be cognizant of these terms to understand to whom each substantive obligation is owed and who can employ each procedural remedy.

135. This Tribunal has determined that the Mortgages constitute an "investment" within the meaning of that term as defined in Article 1139. In particular, it ruled that the Mortgages fall within the type of investments covered under Article 1139(g):

> **investment** means:
>
> [...]
>
> (g) real estate or other property, tangible or intangible, acquired in the expectation or used for the purpose of economic benefit or other business purposes; and
>
> [...]

136. Consequently, the Claimant is an "investor of a Party" within the meaning of that term, as defined in Article 1139:

> **investor of a Party** means a Party or state enterprise thereof, or a national or an enterprise of such Party, that seeks to make, is making or has made an **investment;** [Emphasis added]

137. An investor of a Party may submit a claim to arbitration on its own behalf, under Article 1116, alleging that another Party (e.g., Mexico) has breached an obligation under Section A for which it has suffered loss of damage:

> **Article 1116: Claim by an Investor of a Party on Its Own Behalf**
>
> 1. An **investor of a Party** may submit to arbitration under this Section a claim that another Party has breached an obligation under:
>
> (a) Section A or Article 1503(2) (State Enterprises), or
>
> (b) Article 1502(3)(a) (Monopolies and State Enterprises) where the monopoly has acted in a manner inconsistent with the Party's obligations under Section A,
>
> and that **the investor** has incurred loss or damage by reason of, or arising out of, that breach.
>
> [...] [Emphasis added]

138.  Alternatively, the investor may submit a claim on behalf of an enterprise that he/she/it owns or controls, under Article 1117, if such an enterprise has incurred loss or damage by reason or arising from the alleged breach:

> **Article 1117: Claim by an Investor of a Party on Behalf of an Enterprise**
>
> 1. An **investor of a Party, on behalf of an enterprise of another Party** that is a juridical person that the investor owns or controls directly or indirectly, may submit to arbitration under this Section a claim that the other Party has breached an obligation under:
>
> (a) Section A or Article 1503(2) (State Enterprises), or
>
> (b) Article 1502(3)(a) (Monopolies and State Enterprises) where the monopoly has acted in a manner inconsistent with the Party's obligations under Section A,
>
> and that **the enterprise** has incurred loss or damage by reason of, or arising out of, that breach. [...]
>
> [Emphasis added]

139.  Importantly, an investor of a Party may *not* bring a claim on behalf of an investment unless that investment is an enterprise of another Party that is a juridical person that the investor owns or controls directly or indirectly. Because the Claimant in these proceedings does not claim to own or control an "enterprise of another Party" that has suffered harm by reason or arising from the alleged breaches, the Claimant may only submit a claim on its own behalf under Article 1116.

140.  This is an important distinction because the treaty is very precise as to "whom" each of the Section A substantive obligations are owed. For example:

- The protection against discrimination on the basis of national origin under Articles 1102 and 1103 applies to *both* **investors of another Party** *and* **investments of investors of another Party** – there is no claim under Article 1102 or 1103 in this case;

- Article 1110 prohibits measures equivalent direct or indirect nationalization or expropriation of **investments of investors of another Party** – in other words, it protects *investments of investors* from expropriation that do not comply with the conditions established therein, that is, that the expropriation is done: (a) for a public purpose; (b) on a non-discriminatory basis; (c) in accordance with due process of law and Article 1105(1); and (d) on payment of compensation in accordance with paragraphs 2 through 6.

141.  Article 1105(1) is equally explicit. It creates an obligation owed by a Party to accord fair and equitable treatment that applies *only* to investments of another Party – not an investor of another party:

> **Article 1105: Minimum Standard of Treatment**
>
> 1. Each Party shall accord to **investments of investors of another Party** treatment in accordance with international law, including fair and equitable treatment and full protection and security. [...] [Emphasis added]

142.  In contrast, the requirement under Article 1105(2) to accord non-discriminatory treatment with respect to measures relating to losses suffered by investments owing to armed conflict or civil

applies to *both* **investors of another Party**, and to **investments of investors of another Party**. However, the Claimant has not alleged a violation of Article 1105(2):

**Article 1105: Minimum Standard of Treatment**

[...]

2. Without prejudice to paragraph 1 and notwithstanding Article 1108(7)(b), each Party shall accord to **investors of another Party, and to investments of investors of another Party**, non-discriminatory treatment with respect to measures it adopts or maintains relating to losses suffered by investments in its territory owing to armed conflict or civil strife.[Emphasis added]

143.   This language was crafted deliberately and intentionally by the parties. "Investors of another Party" was excluded from Article 1105(1) in contrast with the language set out in Articles 1102 and 1103 or even 1105(2) which specifically include both "investors of another Party" and "investments of investors of another Party".

144.   The complaints framed under Article 1105(1) by the Claimant are related to LMC as an "investor of another Party", not the Mortgages –i.e., the "investment of an investor of another Party". For that reason, the Claimant does not have the procedural right to so advance such a claim. Simply put, the Respondent's substantive obligations under Article 1105(1) are not owed to the Claimant.

> **2.   Alternatively, Claimant limited to asserting claim under Article 1105(1) that it suffered "denial of justice" in course of attempts to resolve a dispute with Mr. Cárdenas, Inmobiliaria Bains, C&C Ingenieria, and C&C and cannot establish it**
>
> **a.   Guidance from US Article 1128 submission in *Eli Lilly v. Canada* for defining "denial of justice"**

145.   The Respondent submits that, in considering what constitutes the international law principle of "denial of justice", the United States' Article 1128 submission in *Eli Lilly v Canada* provides a cogent overview, with reliance on the pertinent key authorities:

20. As noted above, the obligation to provide "fair and equitable treatment" under Article 1105(1) includes, for example, the customary international law obligation not to deny justice in criminal, civil or administrative adjudicatory proceedings. Denial of justice in its historical and "customary sense" denotes "misconduct or inaction of the judicial branch of the government" and involves "some violation of rights in the administration of justice, or a wrong perpetrated by the abuse of judicial process."[35] Aliens have no cause for complaint at international law about a domestic system of law provided that it conforms to "a reasonable standard of civilized justice" and is fairly administered.[36] "Civilized justice" has been described as requiring "[f]air courts, readily open to aliens, administering justice honestly, impartially, [and] without bias or political control[.]

21. A denial of justice may occur in instances such as when the final act of a State's judiciary constitutes a "notoriously unjust"[38] or "egregious"[39] administration of justice

"which offends a sense of judicial propriety."[40] More specifically, a denial of justice exists where there is, for example, an "obstruction of access to courts," "failure to provide those guarantees which are generally considered indispensable to the proper administration of justice, or a manifestly unjust judgment."[41] Instances of denial of justice also have included corruption in judicial proceedings, discrimination or ill-will against aliens, and executive or legislative interference with the freedom of impartiality of the judicial process.[42] At the same time, erroneous domestic court decisions, or misapplications or misinterpretation of domestic law, do not in themselves constitute a denial of justice under customary international law.[43] Similarly, neither the evolution nor development of "new" judge-made law that departs from previous jurisprudence within the confines of common law adjudication, implicates a denial of justice denial of justice.

22. The international responsibility of States may not be invoked with respect to non-final judicial acts,[45] unless recourse to further domestic remedies is obviously futile or manifestly ineffective. The high threshold required for judicial measures to rise to the level of a denial of justice in customary international law gives due regard to the principle of judicial independence,[46] the particular nature of judicial action,[47] and the unique status of the judiciary in both international and municipal legal systems. As a result, the actions of domestic courts are accorded a greater presumption of regularity under international law than are legislative or administrative acts.[48] Indeed, as a matter of customary international law, international tribunals will defer to domestic courts interpreting matters of domestic law unless there is a denial of justice.[49]

23. In this connection, it is well-established that international tribunals such as NAFTA Chapter Eleven tribunals are not empowered to be supranational courts of appeal on a court's application of domestic law.[50] Thus, an investor's claim challenging judicial measures under Article 1105(1) is limited to a claim for denial of justice under the customary international law minimum standard of treatment. A fortiori, domestic courts performing their ordinary function in the application of domestic law as neutral arbiters of the legal rights of litigants before them are not subject to review by international tribunals absent a denial of justice under customary international law. Moreover, an investor bringing an Article 1105(1) claim may not invoke an alleged host State violation of an international obligation owed to another State or its home State, for example an obligation contained in another treaty or another Chapter of NAFTA such as Chapter Seventeen.[51] A violation of that Chapter, which is subject to the State-to-State dispute resolution provisions of NAFTA Chapter Twenty, may be the basis of a claim by one NAFTA Party against another, but that violation does not provide a separate cause of action for an investor, who may only bring claims against a host Party for alleged breaches of Chapter Eleven, Section A. And, as stated previously, the FTC Interpretation provides that a "determination that there has been a breach of another provision of the NAFTA, or of a separate international agreement, does not establish that there has been a breach of" the minimum standard of treatment.[52]

24. For the foregoing reasons, judicial measures may form the basis of a claim under the customary international law minimum standard of treatment under Article 1105(1) only if they are final[53] and if it is proved that a denial of justice has occurred. Were it otherwise, it would be impossible to prevent Chapter Eleven tribunals from becoming supranational appellate courts on matters of the application of substantive domestic law, which customary international law does not permit.[54] Nor may judicial measures be challenged under Article 1105(1) for violating another rule of international law. Such a

result would extend the obligations of the NAFTA Parties well beyond the customary international law minimum standard of treatment and what they consented to under Article 1105(1), as reflected in the FTC Interpretation.[116][Underlining added, footnotes remain for reference below]

146. The Respondent submits that the following above-mentioned select footnotes from the Article 1128 submission are worthy of the Tribunal's consideration in considering what constitutes a denial of justice:

- **38** JAN PAULSSON, DENIAL OF JUSTICE IN INTERNATIONAL LAW 44 (2005) ("PAULSSON") (citing J. Irizarry y Puente, *The Concept of "Denial of Justice" in Latin America*, 43 MICH. L. REV. 383, 406 (1944)); id. at 4 ("[A] state incurs responsibility if it administers justice to aliens in a fundamentally unfair manner.") (emphasis omitted); *Chattin Case (United States v. Mexico)*, 4 R. INT'L ARB. AWARDS 282, 286-87 (1927), reprinted in 22 AM. J. INT'L L. 667, 672 (1928) ("Acts of the judiciary . . . are not considered insufficient unless the wrong committed amounts to an outrage, bad faith, wilful neglect of duty, or insufficiency of action apparent to any unbiased man.") [Emphasis omitted.]

- **39** PAULSSON at 60 ("The modern consensus is clear to the effect that the factual circumstances must be egregious if state responsibility is to arise on the grounds of denial of justice.")

- **40** *Loewen Group, Inc. and Raymond L. Loewen v. United States of America*, NAFTA/ICSID Case No. ARB(AF)/98/3, Award ¶ 132 (June 26, 2003) (a denial of justice may arise where there has occurred a "[m]anifest injustice in the sense of a lack of due process leading to an outcome which offends a sense of judicial propriety*"); Mondev Int'l Ltd. v. United States of America*, NAFTA/ICSID Case ARB(AF)/99/2, Award ¶ 127 (Oct. 11, 2002) (finding that the test for a denial of justice was "not whether a particular result is surprising, but whether the shock or surprise occasioned to an impartial tribunal leads, on reflection, to justified concerns as to the judicial propriety of the outcome[.]")

- **41** Harvard Research Draft, The Law of Responsibility of States for Damage Done in Their Territory to the Person or Property of Foreigners, art. 9, 23 AM. J. INT'L L. SP. SUPP. 131, 134 (1929). The commentary notes that a "manifestly unjust judgment" is one that is a "travesty upon justice or grotesquely unjust." Id. at 178

- **43** Id. at 134 ("An error of a national court which does not produce manifest injustice is not a denial of justice."); PAULSSON at 81 ("The erroneous application of national law cannot, in itself, be an international denial of justice."); DUMBERRY at 228 (noting that a simple error, misinterpretation or misapplication of domestic law is not per se a denial of justice) (internal quotes omitted); BORCHARD at 196 (explaining that a government is not responsible for the mistakes or errors of its courts and that: "[A]s a general rule the state is not liable for the acts of its judicial authorities unless there has

---

[116] Exhibit RL-040, *Eli Lilly and Company and Government of Canada*, UNCITRAL, Case No. UNCT/14/2, Submission of the United States of America, 18 March 2016, ¶¶ 20-24.

been some flagrant or notorious injustice or denial of justice sanctioned by the court of last resort."); Christopher Greenwood, State Responsibility for the Decisions of National Courts, in ISSUES OF STATE RESPONSIBILITY BEFORE INTERNATIONAL JUDICIAL INSTITUTIONS 61 (Malgosia Fitzmaurice & Dan Sarooshi eds., 2004) ("Greenwood") ("[I]t is well established that a mistake on the part of the court or an irregularity in procedure is not in itself sufficient to amount to a violation of international law; there must be a denial of justice.")

- **45** See *Apotex Inc. v. United States of America*, NAFTA/UNCITRAL, Award ¶ 282 (June 14, 2013) ("[A] claimant cannot raise a claim that a judicial act constitutes a breach of international law, without first proceeding through the judicial system that it purports to challenge, and thereby allowing the system an opportunity to correct itself."); *Loewen*, Award ¶ 156 ("The purpose of the requirement that a decision of a lower court be challenged through the judicial process before the State is responsible for a breach of international law constituted by judicial decision is to afford the State the opportunity of redressing through its legal system the inchoate breach of international law occasioned by the lower court decision."); PAULSSON at 108 ("For a foreigner's international grievance to proceed as a claim of denial of justice, the national system must have been tested. Its perceived failings cannot constitute an international wrong unless it has been given a chance to correct itself."); Zachary Douglas, International Responsibility for Domestic Adjudication: Denial of Justice Deconstructed, 63(3) INT'L. & COMP. L.Q. 28 (2014)("Douglas") (explaining that "international responsibility towards foreign nationals for acts and omissions associated with an adjudicative procedure can only arise at the point at which the adjudication has produced its final result; it is only at that point that a constituent element of that responsibility has been satisfied, which is the existence of damage to the foreign national.")

- **47** See, e.g., Douglas at 10-11 (explaining that the "rationality inherent in decision-making through adjudication, coupled with the opportunity afforded to affected parties to present reasoned arguments during the course of that decision-making process, . . . sets adjudication apart from other institutions of social ordering within the State," and that an authoritative decision by a domestic adjudicative body "cannot be disturbed by an international court or tribunal simply on the basis that a more rational set of reasons was available to that . . . body. . . . International law is deferential to the particular virtues of adjudication by respecting the integrity of the process and the outcomes it produces.") [Footnotes omitted]

- **49** *Azinian,* Award ¶ 99 ("The possibility of holding a State internationally liable for judicial decisions does not, however, entitle a claimant to seek international review of the national court decisions as though the international jurisdiction seized has plenary appellate jurisdiction. This is not true generally, and it is not true for NAFTA. What must be shown is that the court decision itself constitutes a violation of the treaty. Even if the Claimants were to convince this Arbitral Tribunal that the Mexican courts were wrong with respect to the invalidity of the Concession Contract, this would not per se be conclusive as to a violation of NAFTA. More is required; the Claimants must show either a denial of justice, or a pretence of form to achieve an internationally unlawful end.")

- **50** *Apotex*, Award ¶ 278 ("[I]t is not the proper role of an international tribunal established under NAFTA Chapter Eleven to substitute itself for the U.S. Supreme Court, or to act as a supranational appellate court."); *Azinian*, Award ¶ 99 ("The possibility of holding a State internationally liable for judicial decisions does not, however, entitle a claimant to seek international review of the national court decisions as though the international jurisdiction seised has plenary appellate jurisdiction. This is not true generally, and it is not true for NAFTA."); Waste Management Inc. v. United Mexican States, NAFTA/ICSID Case No. ARB(AF)/00/3, Final Award ¶ 129 (Apr. 30, 2004) ("[T]he Tribunal would observe that it is not a further court of appeal, nor is Chapter 11 of NAFTA a novel form of amparo in respect of the decisions of the federal courts of NAFTA parties.")

147.  Given the foregoing, it follows that:

- The threshold to establish denial of justice is very high – e.g. requiring a "notoriously unjust" or "egregious" administration of justice "which offends a sense of judicial propriety". It does not suffice to establish that domestic adjudicators have erred, or misapplied or misinterpreted domestic law;

- A claim of denial of justice can only be based on adjudicative measures that are <u>final</u>, i.e., the claimant must exhaust its rights of appeal unless recourse to further domestic remedies is obviously futile or manifestly ineffective; and

- There was no denial of justice in connection with any of the challenged judicial measures.

148.  Each of these principles is substantiated with the detailed supporting law in the sections that follow.

### b.    The threshold for denial of justice is very high

149.  The Respondent draws the Tribunal's attention to *Azinian*, in which the Tribunal found that an error of law committed by a Court would not constitute a denial of justice:

> Even if the Claimants were to convince this Arbitral Tribunal that the Mexican courts were wrong with respect to the invalidity of the Concession Contract, this would not per se be conclusive as to a violation of NAFTA. <u>More is required; the Claimants must show either a denial of justice, or a pretence of form to achieve an internationally unlawful end.</u>[117]

> [Emphasis added]

150.  In *Mondev*, the Tribunal applied the standard of the ICJ's *ELSI* case. It found that for a denial of justice to have occurred, the judicial decision in question would "shock or surprise" any impartial observer and raise "justified concerns as to the judicial propriety of the outcome" of the case:

---

[117] Exhibit RL-041, *Robert Azinian v. The United Mexican States*, ICSID Case No. ARB (AF)/97/2, Award, 1 November 1999, ¶ 99.

In the ELSI case, a Chamber of the Court described as arbitrary conduct that which displays "a willful disregard of due process of law, … which shocks, or at least surprises, a sense of judicial propriety". It is true that the question there was whether certain administrative conduct was "arbitrary", contrary to the provisions of an FCN treaty. Nonetheless (and without otherwise commenting on the soundness of the decision itself) the Tribunal regards the Chamber's criterion as useful also in the context of denial of justice, and it has been applied in that context, as the Claimant pointed out. The Tribunal would stress that the word "surprises" does not occur in isolation. The test is not whether a particular result is surprising, but whether the shock or surprise occasioned to an impartial tribunal leads, on reflection, to justified concerns as to the judicial propriety of the outcome, bearing in mind on the one hand that international tribunals are not courts of appeal, and on the other hand that Chapter 11 of NAFTA (like other treaties for the protection of investments) is intended to provide a real measure of protection. In the end the question is whether, at an international level and having regard to generally accepted standards of the administration of justice, a tribunal can conclude in the light of all the available facts that the impugned decision was clearly improper and discreditable, with the result that the investment has been subjected to unfair and inequitable treatment. This is admittedly a somewhat open-ended standard, but it may be that in practice no more precise formula can be offered to cover the range of possibilities.[118]

151.  The test set out in *Mondev* has been subsequently endorsed by NAFTA Tribunals such as *Waste Management* and *Loewen*. In the *Loewen* case, the Tribunal referred to "manifest injustice" such as a lack of due process that leads to an outcome which "offends a sense of judicial propriety[.]"[119] For the *Waste Management* Tribunal, a denial of justice occurs when a decision by a domestic Court is "clearly improper and discreditable" in the sense that it would "shock or surprise" any impartial observer and would raise "justified concerns as to the judicial propriety of the outcome."[120]

152.  The non-NAFTA jurisprudence follows the same line. In *Oostergetel v. Slovakia*, the Tribunal stated:

The Tribunal notes that a claim for denial of justice under international law is a demanding one. To meet the applicable test, it will not be enough to claim that municipal law has been breached, that the decision of a national court is erroneous, that a judicial procedure was incompetently conducted, or that the actions of the judge in question were probably motivated by corruption. A denial of justice implies the failure of a national system as a whole to satisfy minimum standards.[121]

---

[118] Exhibit RL-042, *Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2, Award, 11 October 2002, ¶ 127 (footnote omitted).

[119] Exhibit RL-043, *The Loewen Group, Inc. and Raymond L. Loewen v. United States of America*, ICSID Case No. ARB(AF)/98/3, Award, 26 June 2003, ¶¶ 132-33.

[120] Exhibit RL-044, *Waste Management, Inc. v. United Mexican States ("Number 2")*, ICSID Case No. ARB(AF)/00/3, Award, 30 April 2004, ¶ 95.

[121] Exhibit RL-045, *Jan Oostergetel and Theodora Laurentius v. The Slovak Republic*, UNCITRAL (Ad hoc), Final Award, 23 April 2012, ¶ 273 (footnote omitted).

153.  Moreover, in the recently issued Second Partial Award of *Chevron v. Ecuador*, the Tribunal specifically endorsed *Loewen*'s test, among other cases, regarding the threshold of denial of justice. The Tribunal firstly laid out prior determinations on the issue:

> As to the doctrine of denial justice under international law, the Tribunal has been guided generally by four awards cited by the Parties: *Azinian v Mexico* (1999), *Mondev v USA* (2002), *Loewen v USA* (2003) and *Oostergetel v Slovakia* (2012).[122]

154.  It went on to say that:

> The Tribunal emphasizes that the legal test for denial of justice requires the claimant to prove objectively that the impugned judgment was "clearly improper and discreditable", with the failure by the "national system as a whole to satisfy minimum standards". There have been many shocks and surprises caused by court judgments in legal history, <u>but without much more, amounting to discreditable improprieties and the failure of the whole national system</u>, such judgments <u>do not</u> amount to a denial of justice.[123]

> [Emphasis added]

155.  Based on this high threshold test, the Tribunal made the following comments regarding a claimant's burden of proof:

> 8.41 A claimant's legal burden of proof is therefore not lightly discharged, given that a national legal system will benefit from the general evidential principle known by the Latin maxim as *omnia praesumuntur rite et solemniter esse acta donec probetur* in contrarium. It presumes (subject to rebuttal) that the court or courts have acted properly […]

> 8.42 This general principle subsumes a second principle, namely that a court is permitted a margin of appreciation before the threshold of a denial of justice can be met.[124]

### 3.   The Claimant was required to exhaust local remedies for its claims against judicial conduct and failed to do so

156.  What is so distinctive about domestic adjudication that a denial of justice as an international delict requires the exhaustion of local remedies compared to other international delicts caused by a state's administrative or legislative organs? The Respondent submits that Douglas provides a comprehensive and convincing explanation: the strength and weakness of the judiciaries justify international law's special treatment toward denial of justice—the requirement of exhaustion of local remedies.

---

[122] Exhibit 046- *Chevron Corporation and Texaco Petroleum Corporation v. The Republic of Ecuador*, UNCITRAL, PCA Case No. 2009-23, Second Partial Award on Track II, 30 August 2018, ¶ 8.35.
[123] *Id.*, ¶ 8.40.
[124] Id., ¶¶ 8.41-8.42.

157. Douglas' position is based on Fuller's characterization of adjudication:

> Adjudication is … a device which gives formal and institutional expression to the influence of reasoned argument in human affairs. As such it assumes a burden of rationality not borne by any other form of social ordering. A decision which is the product of reasoned argument must be prepared itself to meet the test of reason. We demand of an adjudicative decision a kind of rationality we do not expect of the contract or voting. This higher responsibility toward rationality is at once the strength and the weakness of adjudication as a form of social ordering.[125]

158. Douglas goes on to elaborate Fuller's characterization under international law:

> It is this particular 'burden' of rationality inherent in decision-making through adjudication, coupled with the opportunity afforded to affected parties to present reasoned arguments during the course of that decision-making process, that sets adjudication apart from other institutions of social ordering within the State … [T]his 'higher responsibility toward rationality' identified by Fuller also explains the vulnerability of adjudication in the sense that a transparent set of justifications for a particular decision that claims to be the most rational is always exposed to being undermined by a better claim to rationality. Within domestic judiciary this vulnerability is even institutionalized through a hierarchical court system affording rights of appeal.[126]

> [Emphasis added]

159. Because of judiciaries' weakness, international law governs the responsibility for domestic adjudication through the medium of denial of justice.

160. Under the customary international law of denial of justice, a national Court decision "cannot be disturbed by an international court or tribunal simply on the basis that a more rational set of reasons was available to that domestic adjudicative body. That would be tantamount to exploiting the vulnerability of decisions produced through adjudication[.]"[127] In fact:

> There is no such thing as a perfect adjudicative process. International law does not recognize a right of any litigant to the best possible procedure in terms of the accuracy of the outcomes it produces. Nor does any domestic legal system endorse such a right. To a significant extent each State is entitled to construct its adjudicative procedures on the basis of a utilitarian calculation of the costs of maintaining those procedures to the community at large versus the benefits afforded to the litigants in any given case. Every adjudicative procedure for which the State is responsible is the embodiment of a compromise along these

---

[125] Exhibit RL-047, LL Fuller & KI Winston, "The Forms and Limits of Adjudication" (1978) 92 Harvard Law Review 353 at p. 367, cited in Zachary Douglas, "International Responsibility for Domestic Adjudication: Denial of Justice Deconstructed" (2014) 63 ICLQ 867 at p. 876

[126] *Id.*, at p. 876-77 (footnoted omitted and emphasis added).

[127] *Id.*, at p. 877.

> lines. The finality rule reflects the reality that this compromise can and does
> produce error at different stages of the adjudicative process. [128]

> [Emphasis added]

161.   Douglas thus concludes that "States have uniformly accepted the inevitability of such error by incorporating corrective mechanisms within their systems of adjudication and international law is deferential to the particular virtues of adjudication by respecting the integrity of the process and the outcomes it produces. This deference is manifest in the finality rule [exhaustion of local remedies] and the idea that denial of justice focuses upon the procedural aspects of the adjudication rather than the substantive reasons for the decision."[129]

162.   The corollary of judiciaries' special nature is that "domestic courts performing their ordinary function in the application of domestic law as neutral arbiters of the legal rights of litigants before them <u>are not</u> subject to review by international Tribunals absent of a denial of justice under customary international law."[130]

### a.   State practice supports deference to national judiciaries

163.   The Respondent submits that NAFTA state practice also supports international law's deference to judiciaries' conduct in the context of a denial of justice claim.

164.   In the United States' Article 1128 submission in the *Eli Lilly* case, the United States set out that "the actions of domestic courts are accorded a greater presumption of regularity under international law than are legislative or administrative acts."[131]

165.   In the Response of the United States of America to the Submissions of Claimants Concerning Matters of Jurisdiction and Competence in the *Loewen* case, the United States submitted before that "[g]iven the unique status of the judiciary in both international and municipal legal systems, the actions of domestic courts are accorded a far greater presumption of regularity under international law than are legislative or administrative act."[132] In those same submissions, the United States also declared that "unlike actions of the executive or legislature, judicial acts can violate customary international law obligations in only the most extreme and unusual of circumstances."[133]

166.   In short, because of the judiciaries' special nature, international law accords judiciaries a greater presumption of regularity and requires a claimant to exhaust local remedies before initiating a denial of justice claim. The Respondent submits that anything less would not allow an investor to test the host state's whole judicial system and give that system an opportunity to correct itself.

---

[128] *Id.*, at pp. 876-7 (footnote omitted, and emphasis added).
[129] *Id.*, at pp. 877.
[130] Exhibit RL-040, , at ¶ 23 (emphasis added)
[131] *Id.*, ¶ 22 (Footnote omitted).
[132] Id., ¶ 22, footnote 48.
[133] *Id.*

b.    **NAFTA jurisprudence supports deference to national Courts'
decisions under Article 1105**

167.  The Respondent observes that a large number of NAFTA Tribunals have provided a host
State a fair margin of deference regarding to their national Court decisions. To name a few for this
Tribunal:

- *Azinian*: "The possibility of holding a State internationally liable for judicial decisions
  does not, however, entitle a claimant to seek international review of the national court
  decisions as though the international jurisdiction seised has plenary appellate
  jurisdiction."[134]

- *Loewen*: "Whether the conduct of the trial amounted to a breach of municipal law as
  well as international law is not for us to determine. A NAFTA claim cannot be converted
  into an appeal against the decisions of municipal courts."[135]

- *Waste Management*: "In any event, and however these cases might have been decided
  in different legal systems, the Tribunal does not discern in the decisions of the federal
  courts any denial of justice as that concept has been explained by NAFTA tribunals,
  notably in the *Azinian*, *Mondev*, *ADF* and *Loewen* cases. The Mexican court decisions
  were not, either *ex facie* or on closer examination, evidently arbitrary, unjust or
  idiosyncratic. There is no trace of discrimination on account of the foreign ownership
  of Acaverde, and no evident failure of due process. The decisions were reasoned and
  were promptly arrived at. Acaverde won on key procedural points, and the dismissal in
  the second proceedings, in particular, was without prejudice to Acaverde's rights in the
  appropriate forum."[136]

- *Eli Lilly*: "[T]he Tribunal emphasizes that a NAFTA Chapter Eleven tribunal is not an
  appellate tier in respect of the decisions of the national judiciary. It is not the task of a
  NAFTA Chapter Eleven tribunal to review the findings of national courts and
  considerable deference is to be accorded to the conduct and decisions of such courts. It
  will accordingly only be in very exceptional circumstances, in which there is clear
  evidence of egregious and shocking conduct, that it will be appropriate for a NAFTA
  Chapter Eleven tribunal to assess such conduct against the obligations of the respondent
  State under NAFTA Article 1105(1)."[137]

4.    **The Claimant failed to exhaust all effective, adequate and
reasonably available remedies to give the domestic judicial
system an opportunity to correct itself**

---

[134] Exhibit RL-041, ¶ 99.
[135] Exhibit RL-043, ¶ 134.
[136] Exhibit RL-044, , ¶ 130 (Footnote omitted.)
[137] Exhibit RL-048 *Eli Lilly and Company v. Government of Canada*, ICSID Case No. UNCT/14/2, Final Award, 16
March 2017, ¶ 224.

### a.   The writings of the most highly qualified publicists

168.  The Respondent submits that the academic literature, reflecting the views of the most highly qualified publicists,[138] is unified and consistent on the following international law principle: the whole judicial system must be tested. An isolated action cannot be challenged unsuccessfully with an investor then abandoning the system. Exhaustion is a substantive requirement for any denial of justice finding. In withdrawing the review *Amparo*, the Claimant manifestly failed to comply with this requirement and thus is barred from any denial of justice claim.

169.  Because of judiciaries' special nature and international law's deference to national Courts' decisions, many scholars have commented that to assess whether a Court's decision violates the international law on denial of justice, the claimant must exhaust local remedies so as to give the whole judicial system an opportunity to speak and correct itself if there were in fact any wrongdoings.

170.  This is because "international law is not concerned to adjudicate the correctness of the judgment *per se* … [but] protects the institution of adjudication and only intervenes when the process itself fails to afford the basic qualities that justify its existence".[139] Exhausting local remedies is "an inherent material element of the delict"[140] in the context of denial of justice.

171.  Freeman states that the "responsibility [of a State] is engaged as the result of a definitive judicial decision by a court of last resort which violates an international obligation of the State."[141]

172.  Douglas states that a state's responsibility arises "at the point when the whole system for the administration of justice has spoken"[142] because "[t]here is no such thing as a perfect adjudicative process"[143] and "[a] state is only responsible for the *final* result produced by its system for the 'administration of justice'."[144] Douglas also states that "international responsibility towards foreign nationals for acts and omissions associated with an adjudicative procedure can only arise at the point at which the adjudication has produced its <u>final result</u>; it is only at that point that a constituent element of that responsibility has been satisfied, which is the existence of damage to the foreign national."[145]

---

[138]  Exhibit RL-049, Statute of the International Court of Justice, Article 38(1).

[139]  Exhibit RL-050, Campbel McLachlan, Laurence Shore & Matthew Weiniger, International Investment Arbitration: Substantive Principle, 2nd Edition; Oxford University Press, 2017, at p. 298.

[140]  Exhibit RL-051, Jan Paulsson, Denial of Justice in International Law; Cambridge University Press, 2005., at p. 8 [Emphasis added]; Also see Patrick Dumberry "Denial of Justice under NAFTA Article 1105: A Review of 20 Years Case Law" (2014) 32:2 ASA Bulletin 246 at p. 250: "Before being given the option to claim any denial of justice on the international plane, it is paramount that the investor exhausts all available procedural remedies before local courts. This will allow higher courts to correct any maladministration committed earlier by lower courts."

[141]  Exhibit RL-052, Alwyn Vernon Freeman, *International Responsibility of States for Denial of Justice* (Kraus Reprint Co., 1970) at 311-12.

[142]  Exhibit rl-047, at 869, citing *Ambatielos Claim (Greece v. United Kingdom)* (1956) XII UNRIAA, 83 at 120.

[143]  *Id.*, at 877.

[144]  *Id.*, at 872.

[145]  *Id.*, at 894 (emphasis in the original).

173.  Similarly, Paulsson states that "[f]or a foreigner's international grievance to proceed as a claim of denial of justice, the national system must have been tested. Its perceived failings cannot constitute an international wrong unless it has been given a chance to correct itself."[146] Paulsson explains the rationale of the finality rule: exhaustion is a substantive requirement in a denial of justice claim. The Respondent submits his explanation is worthy of full quotation:

> In the particular case of denial of justice, however, claims will not succeed unless the victim has indeed exhausted municipal remedies, or unless there is an explicit waiver of a type yet to be invented. (An *ad hoc compromis* might do.) This is neither a paradox nor an aberration, for it is in the very nature of the delict that a state is judged by the final product – or at least a *sufficiently* final product – of its administration of justice. A denial of justice is not consummated by the decision of a court of first instance. Having sought to rely on national justice, the foreigner cannot complain that its operations have been delictual until he has given it scope to operate, including by the agency of its ordinary corrective functions. […] For a foreigner's international grievance to proceed as a claim of denial of justice, the national system must have been tested. Its perceived failings cannot constitute an international wrong unless it has been given a chance to correct itself.[147]

> [Emphasis added]

174.  McLachlan, Shore and Weiniger found that the requirement of finality must be accepted as a specific requirement when the claimant's case is predicated on a failure on the part of the judicial system to accord fair and equitable treatment.[148] They arrived at this conclusion based on case law and International Law Commission's Second Report on State Responsibility:

> [A]n aberrant decision by an official lower in the hierarchy, which is capable of being reconsidered, does not of itself amount to an unlawful act. [149]

175.  The three authors explain that this consideration applies with particular force in the context of a system of adjudication. "When a plaintiff brings suit in the vindication of his rights, he engages the judicial system as a whole, including its provision for appeals. Where such rights of appeal exist, the Respondent State must be put in a position to redress the wrongdoings of its judiciary."[150]

176.  Sattorova states that "The exceptional applicability of the exhaustion requirement in denial of justice cases was thus founded upon the idea that an entire legal system ought to be tried and failed before a judicial act becomes amenable to review by an international tribunal."[151]

177.  In this same vein, Greenwood QC states that:

---

[146] Exhibit 051, p. 108.
[147] *Id.*, 108.
[148] Exhibit RL-050, p. 305.
[149] Exhibit RL-053, James Crawford, "Second Report on State Responsibility" UN DOC A/CN. 4/498 and Add. 1-4, at ¶ 75 in (1999) YBILC A/CN.4/SER.A/1999/Add.1 (Part I) at p. 26.
[150] Exhibit RL-050, p. 305, (Footnote omitted and emphasis added).
[151] Exhibit RL-054, Mavluda Sattorova, "Denial of Justice Disguised? Investment Arbitration and the Protection of Foreign Investors from Judicial Misconduct" (2012) ICLQ 223 at p. 229.

> [T]he obligation which the State owes the foreign national in this context (whether under general international law or under the specific provisions of a treaty like NAFTA or a bilateral investment treaty) is to provide <u>a system of justice</u> which affords fair, equitable and non-discriminatory treatment. So long as the system itself provides a sufficient guarantee of such treatment, the State will not be in violation of its international obligation merely because a trial court gives a defective decision which can be corrected on appeal. […] The duty of a State towards foreign nationals is to provide a system of justice which ensures fairness and compliance with other standards of international law in all cases. <u>That system includes the appellate and review procedures for which it provides.</u>[152]

> [Emphasis added]

178.  Paparinskis, after an extensive review of literature and case law, finds that "It is accepted that denial of justice becomes internationally wrongful only after the whole system of administration of justice has been put to the test by exhaustion of local remedies."[153]

179.  Similarly, Ago, in his sixth report to the International Law Commission as a Special Rapporteur on state responsibility, contends that "an internationally wrongful act as understood in the term 'denial of justice' is not considered as complete until the higher courts have successively given their judgment and confirmed the decision of the court of first instance."[154]

180.  Demirkol looks at the exhaustion of local remedies from a different angle—the completeness of the conduct. Still, his logic aligns with the requirement of "testing the whole system":

> The allegation that the host state has breached an investment treaty undertaking, or a so-called *standard of treatment*, entails that the misconduct of the relevant state organ has reached a certain threshold of wrongfulness. <u>The question is not how incorrect is the state organ's conduct. The threshold of wrongfulness rather relates to the rigorousness (severity), endurance (continuity), determinacy (finality) and efficacy (influence) of this conduct. Thus, the threshold tests the maturity of the misconduct. The question is whether the misconduct qualifies as a complete breach instead of being a merely isolated action.</u>[155]

> [Emphasis added]

181.  He goes on to say that:

---

[152] Exhibit RL-055, Christopher Greenwood QC, "State Responsibility for the Decisions of National Courts" in M Fitzmaurice and D Sarooshi (eds), *Issues of State Responsibility before International Judicial Institutions* (Hart Publishing 2004) at p. 61.

[153] Exhibit RL-056, Martins Paparinskis, *The International Minimum Standard and Fair and Equitable Treatment* (Oxford University Press: 2013), at p. 182 [Footnote omitted].

[154] Exhibit RL-057, Roberto Ago, "Sixth Report on State Responsibility" UN Doc A/CN.4/302 and Add. 1-3 at ¶ 57 in (1977) 2 YBILC, UN Doc A/CN.4/SER.A/1977Add.1 (Part 1) at p. 25.

[155] Exhibit RL-058, Berk Demirkol, *Judicial Acts and Investment Treaty Arbitration* (Cambridge University Press: 2018), at p. 75 ["Demirkol"].

> The isolated action is simply an interim reflection of the state function throughout its process. An imperfect and ephemeral act of the state organ is insufficient to qualify state's conduct as wrongful or not. Such an act would not give rise to a complete breach of an investment treaty standard of treatment. Indeed, the concept of 'treatment' refers to 'something in the nature of a course of action'.[156]

182.   While not admitting that any of the Claimant's allegations regarding the isolated failings of the Respondent's judicial and administrative branches are legitimate, it matters not in any event even if they were: they were isolated events. The system did not fail the Claimant. The Claimant exited the system before it had an opportunity to complete itself. Isolated acts or omissions do not rise to a breach of international law in this context.

183.   The Respondent also notes Demirkol's emphasis that "The discussion on the completeness of the breach is especially important when it is alleged that the judicial function does not meet a certain standard."[157] He further stresses that there is a distinction between a Court's misapplication of an international convention as a violation of that convention and a state's judicial system's failure to provide justice as required by investment treaty. He explains that:

> A judicial decision, which is in the form of a single act, can be in violation of a norm of international law when for instance the domestic court judge fails to apply a provision of an international convention. A breach of an investment treaty standard of treatment by domestic courts is, however, different from the breach of a specific rule in an international convention: a single court ruling or a decision may not confirm that the judicial function fails to meet a certain standard, which would make the judicial conduct wrongful. Indeed, the adjudicatory process provides several opportunities to redress an incorrect but isolated ruling so that the judicial conduct overall does not fall below this standard.[158]
>
> [footnote omitted and emphasis added.]

184.   He concludes that "without having resorted to the remedies within the system, it would be unsubstantial to claim that the judicial system functions below a certain standard. In order to invoke a breach of the standards of treatment due to judicial system failing to function properly, the individual must diligently make use of the system going through proper channels."[159]

185.   He agrees with Paulsson's conclusion that the exhaustion of local remedies as a substantive requirement in denial of justice claims.[160] He states:

> A denial of justice does not occur unless local remedies are exhausted because the state would not be deemed to have failed to provide a mechanism of justice until then – and not because an error may be corrected at a later stage of the judicial process[.]

---

[156] Id., at p. 75-76.
[157] Id., at p. 76.
[158] Id., at p. 76.
[159] Id., at p. 77 [emphasis added].
[160] Id., at p. 82-83.

> The requirement of exhaustion of local remedies is thus a - substantive and not a procedural - condition for the emergence of a denial of justice. It is a requirement the failure of which would make the breach incomplete – or 'not consummated' in the words of Paulsson or 'not ripened' in the words of the tribunal in *Apotex v USA*.[161]

### b. State practice supports principle of no denial of justice without final decision of State's highest judicial authority

186. NAFTA state practice also supports this position.

187. In the United States' NAFTA 1128 submission in the *Eli Lilly* case, the US states that "[t]he international responsibility of States may not be invoked with respect to non-final judicial acts, unless recourse to future domestic remedies is obviously futile or manifestly ineffective."[162]

188. The United States is consistent with this approach in its position regarding the exhaustion of local remedies outside of NAFTA as well. In the United States Submission in the *Corona Materials, LLC, v Dominican Republic* pursuant to Article 10.20. 2 of the Dominican Republic-Central America-United States Free Trade Agreement (CAFTA-DR), the US states that:

> Instead, a denial of justice arises, for example, when the final act of a State's judiciary constitutes a "notoriously unjust" or "egregious" administration of justice "which offends a sense of judicial propriety." There can be no denial of justice without a final decision of a State's highest judicial authority, unless seeking appeal would be obviously futile or manifestly ineffective. This rule applies to claims of denial of justice brought under treaties, such as the CAFTA-DR, that require claimants to waive their rights to pursue claims before other fora in order to submit a claim to arbitration.[163]

### c. NAFTA jurisprudence overwhelmingly has required exhaustion of whole system prior to advancement of any denial of justice claim under Chapter 11

189. By way of overview, the Respondent sets out five observations on the NAFTA case law regarding denial of justice and the principles at play:

- NAFTA Tribunals have required exhaustion of local remedies for a claimant to bring a denial of justice claim under Chapter 11. The exception is the *Mondev* decision. However, it is inconsistent with the large body of international law of this subject and has been heavily criticized by scholars and rejected by later NAFTA Tribunals, namely, *Loewen* and *Waste Management*;

- The obligation to exhaust all remedies in domestic Court is limited to those remedies that are "effective and adequate and are reasonably available to the complainant." (*Loewen*);

---

[161] *Id.*, at p. 84.
[162] Exhibit RL-040, ¶ 22 (footnote omitted).
[163] Exhibit RL-059, *Corona Materials, LLC, v Dominican Republic*, ICSID Case No. ARB(AF)/14/3, Submission of the United States of America, 11 March 2016, at ¶ 13 (footnote omitted).

- *Loewen* and *Waste Management* both required the assessment of the justice system of the host state <u>as a whole</u> rather than focusing on individual domestic Court decisions.

- NAFTA awards (*Loewen, Waste Management*) have reiterated the obvious point that allegations of denial of justice before a NAFTA Tribunal <u>cannot</u> serve as an appeal mechanism to contest a domestic Court decision. This is recently affirmed by the *Eli Lilly* Tribunal; and

- Two NAFTA Tribunals have put forward a general test to determine when a denial of justice occurs. The *Mondev* Tribunal decided that it is when a Court decision is "clearly improper and discreditable" in the sense that it would "shock or surprise" any impartial observer and would raise "justified concerns as to the judicial propriety of the outcome." The *Loewen* Tribunal adopted a similar test: "manifest in justice" such as a lack of due process that leads to an outcome which "offends a sense of judicial propriety". These tests were endorsed by *Waste Management*. These tests confirm a high threshold of severity for the finding of a denial of justice; only the gravest cases will be considered in breach of Article 1105.[164]

190.  As mentioned, the earlier *Mondev* Tribunal controversially dismissed the idea that the denial of justice rule and exhaustion of local remedies rule "are interlocking and inseparable" (as discussed in detail below, this was later unequivocally rejected by *Loewen* and *Waste Management*). The relevant paragraph of the *Mondev* decision provided that:

> This is significant in two ways. First, under the system of Chapter 11, it will be a matter for the investor to decide whether to commence arbitration immediately, with the concomitant requirement under Article 1121 of a waiver of any further recourse to any local remedies in the host State, or whether initially to claim damages with respect to the measure before the local courts. The standard laid down in Article 1105(1) has to be applied in both situations, i.e., whether or not local remedies have been invoked. Thus under NAFTA <u>it is not true that the denial of justice rule and the exhaustion of local remedies rule "are interlocking and inseparable"</u>. Secondly, in the present case, Mondev through LPA did choose to invoke its remedies before the United States courts. Indeed at the time it did so it had no NAFTA remedy, since NAFTA was not in force. The Tribunal is thus concerned only with that aspect of the Article 1105(1) which concerns what is commonly called denial of justice, that is to say, with the standard of treatment of aliens applicable to decisions of the host State's courts or tribunals.[165]

> [Footnote omitted and emphasis added]

191.  The Respondent points out that this statement has been criticized by practitioners and scholars such as Paulsson and Dumberry. Paulsson states that "The *Mondev* award was therefore in error when it asserted that "under NAFTA it is not true that the denial of justice rule and the

---

[164] Exhibit RL-060, Patrick Dumberry, The Fair and Equitable Treatment Standard: A Guide to NAFTA Case Law on Article 1105 (Wolters Kluwer: 2013) at pp. 256-57 ["Dumberry"].
[165] Exhibit RL-042, Mondev International Ltd. v. United States of America, ICSID Case No. ARB(AF)/99/2, Award, 11 October 2002, ¶ 96.

exhaustion of local remedies rule 'are interlocking and inseparable'."[166] Dumberry has endorsed Paulsson's point.[167]

192.   The *Loewen* decision set the principle that the exhaustion of local remedies is a *substantive* requirement of a denial of justice claim *even* when it found that the Mississippi Court's conduct constituted a manifest injustice:

> [W]e have reached the firm conclusion that the conduct of the trial by the trial judge was so flawed that it constituted a miscarriage of justice amounting to a manifest injustice as that expression is understood in international law. Whether this conclusion results in a violation of Article 1105 <u>depends upon</u> the resolution of Respondent's submissions still to be considered, <u>in particular the submission that State responsibility arises only when final action is taken by the State's judicial system as a whole</u>.[168]
>
> [Emphasis added]

193.   The *Loewen* Tribunal went on to say:

> [T]he whole trial and its resultant verdict were clearly improper and discreditable and cannot be squared with minimum standards of international law and fair and equitable treatment. <u>However, because the trial court proceedings are only part of the judicial process that is available to the parties, the rest of the process, and its availability to Loewen, must be examined before a violation of Article 1105 is established.</u>[169]
>
> [Emphasis added]

194.   The *Loewen* Tribunal added that:

> The purpose of the requirement that a decision of a lower court be challenged through the judicial process before the State is responsible for a breach of international law constituted by judicial decision is <u>to afford the State the opportunity of redressing through its legal system the inchoate breach of international law occasioned by the lower court decision</u>.[170]
>
> [Emphasis added]

195.   In *Waste Management*, the Tribunal endorsed the *Loewen* Tribunal at para. 97:

> The content of Article 1105 in light of the FTC interpretation was also discussed in *Loewen v. United States* in the specific context of denial of justice. The tribunal said:
>
> Neither State practice, the decisions of international tribunals nor the opinion of commentators support the view that bad faith or malicious intention is an essential element of unfair and inequitable treatment or denial of justice amounting to a breach of international justice. Manifest injustice in the sense of a lack of due process leading

---

[166] Exhibit RL-051, p. 111 footnote 34.
[167] Exhibit RL-060, p. 251.
[168] Exhibit RL-043, ¶ 54.
[169] *Id.*, ¶ 137.
[170] *Id.*, ¶ 156.

to an outcome which offends a sense of judicial propriety is enough, even if one applies the Interpretation according to its terms."

The *Loewen* Tribunal also noted that discriminatory violations of municipal law would amount to a manifest injustice according to international law. However, the tribunal held that, where the minimum standards of international law in question in a particular case are raised in respect of a claim of judicial action—that is, a denial of justice—<u>what matters is the system of justice and not any individual decision in the course of proceedings</u>. The system must be tried and have failed, and thus in this context the notion of exhaustion of local remedies is incorporated into the substantive standard and is not only a procedural prerequisite to an international claim.[171]

[Footnote omitted and emphasis added]

196.  In *Apotex*, the Tribunal found that:

[Denial of justice] claims depend upon the demonstration of <u>a systemic failure</u> in the judicial system. Hence, a claimant cannot raise a claim that a judicial act constitutes a breach of international law, without first proceeding through the judicial system that it purports to challenge, and thereby <u>allowing the system an opportunity to correct itself</u>.[172]

[Emphasis added]

> ### d.   Non-NAFTA jurisprudence also has required exhaustion of whole system prior to advancement of any denial of justice claim

197.  In *Ambatielos Claim (Greece v. United Kingdom)*, the Commission of Arbitration concluded that:

The rule requires that "local remedies" shall have been exhausted before an international action can be brought. These "local remedies" include not only reference to the courts and tribunals, but also the use of the procedural facilities which municipal law makes available to litigants before such courts and tribunals. <u>It is the whole system of legal protection, as provided by municipal law, which must have been put to the test</u> before a State, as the protector of its nationals, can prosecute the claim on the international plane.[173]

[Emphasis added]

198.  The *Arif v. Moldova* Tribunal stated that:

As long as such decisions are not final and binding and can be corrected by the internal mechanisms of appeal, they do not deny justice. In other words, as long as the judicial

---

[171]  Exhibit RL-044,  ¶ 97.

[172]  Exhibit RL-061, *Apotex Inc. v. The Government of the United States of America*, ICSID Case No. UNCT/10/2, Award on Jurisdiction and Admissibility, 14 June 2013, ¶ 282.

[173]  Exhibit RL-062, *The Ambatielos Claim (Greece v. United Kingdom)*, (1956) XII UNRIAA, 83 at p. 120, available at http://legal.un.org/riaa/cases/vol_XII/83-153_Ambatielos.pdf.

system is not tested as a whole, the fair and equitable treatment standard is not violated via denial of justice. The State does not mistreat a foreign investor unfairly and inequitably by a denial of justice through an appealable decision of a first instance court, but only through <u>the final product</u> of its administration of justice which the investor cannot escape. The State is not responsible for the wrongdoings of an individual judge as long as it provides readily accessible mechanisms which are capable of neutralizing such judge.[174]

[Emphasis added]

199.  In *Jan de Nul v. Egypt*, the Tribunal endorsed *Loewen* and stated that exhaustion of local remedies is part of the test to trigger the claim of denial of justice:

[T]he Tribunal is of the opinion that the relevant standards to trigger State responsibility for the first set of acts are the standards of denial of justice, including the requirement of exhaustion of local remedies as will be discussed below. Holding otherwise would allow to circumvent the standards of denial of justice.[175]

200.  The Tribunal went on to state that:

The Tribunal considers that the respondent State must be put in a position to redress the wrongdoings of its judiciary. In other words, it cannot be held liable unless "the system as a whole has been tested and the initial delict remained uncorrected". An exception to this rule may be made when there is no effective remedy or "no reasonable prospect of success[.]"[176]

[Footnote omitted]

201.  In *Pantechniki v. Republic of Albania*, the Tribunal held that:

96. Denial of justice does not arise until a reasonable opportunity to correct aberrant judicial conduct has been given to the system as a whole. This does not mean that remedies must be pursued beyond a point of reasonableness. It may not be necessary to initiate actions which exist on the books but are never in fact used. Oblique or indirect applications to parallel jurisdictions (e.g. an administrative appeal to remove a foot-dragging judge) may similarly be held unnecessary. Such determinations must perforce be made on a case-by-case basis.

The Claimant's problem here does not involve such complications. This is a matter of a simple hierarchical organization of civil-law jurisdiction: first instance/appeal/cassation. One cannot fault Albania before having taken the matter to the top.[177]

---

[174]  Exhibit RL-063, *Mr. Franck Charles Arif v. Republic of Moldova*, ICSID Case No. ARB/11/23, Award, 8 April 2013, ¶ 443.

[175]  Exhibit RL-064, *Jan de Nul N.V. & Dredging International N.V. v. Arab Republic of Egypt*, ICSID Case No. ARB/04/13, Award, 6 November 2008, ¶ 191.

[176]  *Id.*, ¶ 258.

[177]  Exhibit RL-065, Pantechniki S.A. Contractors & Engineers (Greece) v. The Republic of Albania, ICSID Case No. ARB/07/21, Award, 30 July 2009, ¶ 96.

[Emphasis added]

202. In *Philip Morris v. Uruguay*, the Tribunal held that:

499. An elevated standard of proof is required for finding a denial of justice due to the gravity of a charge which condemns the State's judicial system as such. A denial of justice claim may be asserted only after all available means offered by the State's judiciary to redress the denial of justice have been exhausted. As held by one decision, "[a] denial of justice implies the failure of a national system as a whole to satisfy minimum standards."

[…]

503. As to the Parties' debate regarding burden of proof of the exhaustion of local remedies, the Tribunal notes that this is a condition that has to be satisfied prior to asserting a denial of justice claim. It is for the Claimants to show that this condition has been met or that no remedy was available giving "an effective and sufficient means or redress" or that, if available, it was "obviously futile." [178] [Emphasis added]

203. In *Corona Materials, LLC v Dominican Republic*, the Tribunal held that:

257. The tribunal in *Loewen v. United States* likewise expressed the view that the purpose of exhaustion of local remedies is to give the respondent State an opportunity to correct its alleged breach. These cases, cited by the Respondent, are only two of a large number of cases that could be cited in support of the proposition, for instance the *Jan de Nul v. Egypt* Case, or the *AMTO v. Ukraine* Case, in which the tribunal emphasized the need to consider the State's legal system as a whole, to assess the propriety of the act against the availability of means to address errors or injustices, and the importance of the investor's own responsibility for the outcome. In the case of *Duke Energy v. Ecuador*, the tribunal took the view that the claimant "never challenged the final arbitral award before the Ecuadorian courts, and therefore "the Ecuadorian system never came into play on the award."

[…]

259. The Tribunal shares this view. Exhaustion of local remedies is, as the Claimant correctly pointed out in its Rejoinder, typically not a jurisdictional prerequisite to an investor's submitting an international claim, but the exhaustion of local remedies is relevant in a consideration of the merits, as a substantive element of the alleged breach.

260. In order to exhaust local remedies, the general requirement (subject to the futility exception discussed below) is as expressed by the United States in its intervention: the investor "must proceed to the *highest* court in the whole system, which may include more than one line of tribunals or courts where the legal system of the respondent or host state has a multiple hierarchy of fora which can provide redress."[179]

---

[178] Exhibit RL-066, Philip Morris Brands Salr, Philip Morris Products S.A. and ABAL Hermanos S.A. v. Oriental Republic of Uruguay, ICSID Case No. ARB/10/7, Award, 8 July 2016, ¶¶ 499, 503.

[179] Exhibit RL-067, *Corona Materials, LLC v Dominican Republic*, ICSID Case No ARB(AF)/14/3, Award on the Respondent's Expedited Preliminary Objections in Accordance with Article 10.20.5 of the DR-CAFTA, 31 May 2016, ¶¶ 257, 259, 260.

[Emphasis added]

204.  In *OI European Group B. V. v Bolivarian Republic of Venezuela*, the Tribunal found that:

> 533. This Tribunal has already reached the conclusion that it is a commonly accepted requirement for the existence of denial of justice that the wronged party has exhausted or demonstrated the futility of pursuing domestic remedies.
>
> 534. In the case at hand, it is a proven fact that Claimant has not appealed the provisional remedy order and it has voluntarily decided not to participate in the expropriation proceedings—to the point where Claimant only appeared before the Court to state that it would not participate. It is also a fact that Claimant has produced no evidence whatsoever to demonstrate the futility of defending itself before Venezuelan Courts.
>
> 535. The requirement to exhaust domestic remedies (or produce proof that the investor is being denied access to domestic justice or that domestic justice has incurred unreasonable delays or that any further motions would most likely be futile) is a requirement for an international tribunal to decide that a court decision has denied justice. International Law cannot become a convenient system to appeal any domestic court decision the investor disagrees with. Before it can be established under International Law that a State's legal system has committed a wrong, it is essential to provide it with a chance to correct its own mistake. […]
>
> 536. In the circumstances of the case at bar, where Claimant voluntarily chose not to appeal the contested court decision and not to participate in the proceedings before Venezuelan courts, its request that this Tribunal declare that the unnamed provisional remedy order amounted to a violation of the FET standard cannot be admitted.[180]

[Emphasis added]

### 5.   The exception to the rule of exhaustion of local remedies is not applicable here

205.  The rule requiring the exhaustion of local remedies has exceptions. A claimant is not required to exhaust local remedies "[where there are no reasonably available local remedies to provide effective redress, or the local remedies provide no reasonable possibility of such redress.]"[181] McLachlan, Shore & Weiniger's position aligns with the International Law Commission's proposition. The International Law Commission takes the view that the exception to exhaustion of local remedies applies when "the local remedies provide no reasonable possibility of effective redress."[182] It explains that this test of reasonability "imposes a heavy burden on the claimant by requiring that he prove that in circumstances of the case, and having regard to the legal

---

[180]  Exhibit RL-068, *OI European Group B.V. v Bolivarian Republic of Venezuela*, ICSID Case No ARB/11/25, Award, 10 March 2015, ¶¶ 533-36.

[181]  Exhibit RL-050, p. 306.

[182]  Exhibit RL-069, International Law Commission, "Draft Articles on Diplomatic Protection with Commentaries" (2006) 2:2 YBILC 26, art 15(a) commentary ¶¶ (2), (3) & (4).

system of the respondent State, there is no reasonable possibility of effective redress offered by the local remedies."[183] When it comes to the availability of the local remedies, the International Law Commission emphasizes that "[t]he test is not whether a successful outcome is likely or possible, but whether the municipal system of the respondent State is reasonably capable of providing effective relief. This must be determined in the context of the local law and the prevailing circumstances."[184]

206.  Instances of ineffectiveness and futility include:

- the local Courts have no jurisdiction over the dispute;

- the local Courts are notoriously lacking in independence;

- the local Courts do not have the competence to grant an appropriate and adequate remedy; and

- the absence of an adequate system of judicial protection.[185]

207.  The futility standard is high and is not met here. There has been no suggestion by the Claimant of a lack of jurisdiction or independence or incompetence or inadequate judicial protection. In fact, the Claimant was in the process of seeking remedy through the review *Amparo* and the Foreclosure Proceedings when it prematurely and unnecessarily withdrew.

208.  The NAFTA jurisprudence focuses on the "availability" of remedies, which the Respondent submits is the correct approach.

209.  For example, in *Loewen*, the Tribunal emphasized that when it comes to the scope of the requirement of exhaustion of local remedies, the concern would be the "availability of the remedy rather than its adequacy or even its effectiveness."[186] The Tribunal held that:

> It is an obligation to exhaust remedies which are effective and adequate and are reasonably available to the complainant in the circumstances in which it is situated.
>
> Availability is not a standard to be determined or applied in the abstract. It means reasonably available to the complainant in the light of its situation, including its financial and economic circumstances as a foreign investor, as they are affected by any conditions relating to the exercise of any local remedy.
>
> If a State attaches conditions to a right of appeal which render exercise of the right impractical, the exercise of the right is neither available nor effective nor adequate. Likewise, if a State burdens the exercise of the right directly or indirectly so as to

---

[183]  *Id.*, ¶ (3).

[184]  *Id.*, art 15(a) commentary para. (4). This position was endorsed by the *Apotex* Tribunal, see *Apotex Inc. v. The Government of the United States of America*, ICSID Case No. UNCT/10/2, Award on Jurisdiction and Admissibility, 14 June 2013, ¶ 276.

[185]  Exhibit RL-051, , pp. 118-119 citing John Dugard, Third Report on Diplomatic Protection to the ILC, UN Doc. A/CN.4/523 and Add.1, at pp. 14-17, ¶¶ 38-44.

[186]  Exhibit RL-043, ¶ 167.

> expose the complainant to severe financial consequences, it may well be that the State has by its own actions disabled the complainant from affording the State the opportunity of redressing the matter of complaint. The scope of the need to exhaust local remedies must be considered in the light of these considerations.[187]

210.  In *Apotex*, the Tribunal emphasized that "unavailability" means the unavailability of the relief by a higher Court, not the "likelihood" that the higher Court would have granted the desired relief. The tribunal said:

> The Tribunal has sympathy for Apotex's position,and can readily appreciate that a judgment call was taken at the time that petitioning the U.S. Supreme Court was unlikely to secure the desired relief. However, as the Respondent has observed, under established principles, the question whether the failure to obtain judicial finality may be excused for "obvious futility" turns on the <u>unavailability</u> of relief by a higher judicial authority, not on measuring the likelihood that the higher judicial authority would have granted the desired relief. In this case, and on balance, the Tribunal is not satisfied that finality was achieved, such as to allow for a claim under NAFTA in respect of the particular judicial decisions in question.[188]

> [Emphasis in original]

211.  As in *Apotex*, the Claimant here made a judgment call to abandon the review *Amparo* and the Foreclosure Proceedings and is bound by the consequences of that in this forum. There is no evidence to support a notion that pursuing the review *Amparo* would prove to be a futile exercise. If the Claimant thought so, why would it have commenced it in the first place?

212.  It is the Claimant's own evidence that it made a judgment call based on the mistaken impression that it could not commence this arbitration proceeding without withdrawing the review *Amparo*.[189] This was not the case, as Article 1121: Conditions Precedent to Submission of a Claim to Arbitration allows for injunctive relief proceedings such as the review *Amparo* to continue given they provide for no damages relief:

> Article 1121: Conditions Precedent to Submission of a Claim to Arbitration

> 1. A disputing investor may submit a claim under Article 1116 to arbitration only if:

> (a) the investor consents to arbitration in accordance with the procedures set out in this Agreement; and

> (b) the investor and, where the claim is for loss or damage to an interest in an enterprise of another Party that is a juridical person that the investor owns or controls directly or indirectly, the enterprise, waive their right to initiate or continue before any administrative tribunal or court under the law of any Party, or other dispute settlement procedures, any proceedings with respect to the measure of the disputing Party that is alleged to be a breach referred to in Article 1116, <u>except for proceedings for injunctive,</u>

---

[187] *Id.*, ¶¶ 168-170.

[188] Exhibit RL-061, *Apotex Inc. v. The Government of the United States of America*, ICSID Case No. UNCT/10/2, Award on Jurisdiction and Admissibility, 14 June 2013, Award, ¶ 276.

[189] See for example, witness statement of Ms. Onay Payne at ¶ 29.

declaratory or other extraordinary relief, not involving the payment of damages, before an administrative tribunal or court under the law of the disputing Party.

2. A disputing investor may submit a claim under Article 1117 to arbitration only if both the investor and the enterprise:

(a) consent to arbitration in accordance with the procedures set out in this Agreement; and

(b) waive their right to initiate or continue before any administrative tribunal or court under the law of any Party, or other dispute settlement procedures, any proceedings with respect to the measure of the disputing Party that is alleged to be a breach referred to in Article 1117, except for proceedings for injunctive, declaratory or other extraordinary relief, not involving the payment of damages, before an administrative tribunal or court under the law of the disputing Party.

[Emphasis added]

213.  The Respondent's reading of Article 1121 is supported by the *Corona Materials, LLC v Dominican Republic* Tribunal, which interpreted a similarly worded treaty, namely the CAFTA-DR.

> 266. Finally, the Claimant is incorrect in contending that the waiver required to submit this international claim for damages barred it from challenging the alleged failure to act on the Motion for Reconsideration. In its Post-Hearing Brief, the Claimant submitted that it was prohibited from exhausting local remedies by the waiver required under DR-CAFTA Annex 10E:
>
> > "Annex 10E of CAFTA-DR contains a "fork in the road" provision for claims brought against the DR. An investor must elect to either (i) submit its claim to arbitration or (ii) to bring its claim before a local court or administrative tribunal. It cannot do both. To require an investor to exhaust local remedies prior to submitting its claim to arbitration, the very consequence of which would be to prevent the investor from submitting that claim to arbitration, would make a mockery of the protections guaranteed under Chapter 10 CAFTA-DR."
>
> […]
>
> 268. In the Tribunal's view, the waiver required to submit a claim to international arbitration pursuant to DR-CAFTA Chapter 10 is clear in its terms. Article 10.18.2 first requires the claimant (whether claiming on its own behalf or on behalf of an enterprise) to waive "any right to initiate or continue before any administrative tribunal or court under the law of any Party, or other dispute settlement procedures, any proceeding with respect to any measure alleged to constitute a breach referred to in Article 10.16", this requirement is immediately qualified by the article's subparagraph 3 which provides:
>
> > "3. Notwithstanding paragraph 2(b), the claimant (for claims brought under Article 10.16.1(a)) and the claimant or the enterprise (for claims brought under Article 10.16.1(b)) may initiate or continue an action that seeks interim injunctive relief and does not involve the payment of monetary damages before a judicial or administrative tribunal of the

respondent, provided that the action is brought for the sole purpose of preserving the claimant's or the enterprise's rights and interests during the pendency of the arbitration."

Thus, an action seeking interim injunctive relief not involving the payment of damages is available to a DR-CAFTA claimant (or its enterprise) while it pursues its DR-CAFTA claim for damages.[190]

## B.   Expropriation

214.  The Claimant cannot successfully assert a claim for expropriation under Article 1110 for two reasons:

1.   A claim of expropriation does not lie where the impugned measure is a decision of a Court or administrative body resolving a dispute between private parties; and

2.   Because the impugned measures of the domestic Courts and Public Property Registries were implemented in good faith efforts to resolve a dispute between private parties, the Claimant is left with asserting a claim under Article 1105 that it suffered a "denial of justice" –as that concept is known at international law– in the course of the ultimate resolution of that dispute. The relevant jurisprudence and academic commentary support Mexico's position on this subject.

### 1.   The arguments of the Claimant

215.  The Claimant argues that the cancellation of a mortgage is an expropriation under NAFTA Article 1110, that a judicial decision qualifies as a measure under that Article, and that a previous finding of denial of justice is not necessary for a finding on expropriation when the expropriation measure is a judicial decision.[191] It argues that the prohibition in Article 1110 applies to all Mexican organs and authorities including state and federal Courts and that expropriation can take the form of a judicial act, judgement or decision.[192] It argues that a finding on expropriation is separate and independent from a denial of justice, that a breach of due process is not a constitutive element of expropriation by judicial act, judgement or decision, and that such an expropriation is a direct violation of the treaty rights of foreign nationals therefore the State is automatically responsible.[193] It argues that a breach of due process concerns the lawfulness of an expropriation, not its existence.[194]

216.  The Claimant's arguments are legally flawed for the reasons that follow.

---

[190] Exhibit RL-067, *Corona Materials, LLC v Dominican Republic*, ICSID Case No ARB(AF)/14/3, Award on the Respondent's Expedited Preliminary Objections in Accordance with Article 10.20.5 of the DR-CAFTA, 31 May 2016, ¶¶ 266, 268.
[191] Memorial on the Merits, ¶¶ 208-209.
[192] *Id.*, ¶¶ 223-228.
[193] *Id.*, ¶¶ 230-235.
[194] *Id.*, ¶¶ 246-250.

## 2. No claim for expropriation exists where impugned measures are decisions of Courts resolving disputes between private parties

217.  The Claimant alleges that the measures at issue, namely the cancellation of the Mortgages, and the Court proceedings and related administrative issues that followed constitute a violation of Article 1110 by Mexico.

218.  However, all of the measures in question pertain to attempts to resolve a private dispute between the Claimant and Mr. Cárdenas along with his businesses Inmobiliaria Bains, S.A. de C.V. ("Inmobiliaria Baines"), C&C Ingenieria y Proyectos, S.A. de C.V. ("C&C Ingenieria") and C&C Capital, S.A. de C.V. ("C&C").

219.  The Claimant has been unable to cite any jurisprudence holding a judicial measure in a dispute between private parties to be an expropriation of an investment of an investor of a Party. The Respondent submits that the reason is stated succinctly by the United States in its Article 1128 submission in *Eli Lilly v. Canada*:

> 29. Separately, decisions of domestic courts acting in the role of neutral and independent arbiters of the legal rights of litigants do not give rise to a claim for expropriation under Article 1110(1). It is therefore not surprising that commentators have acknowledged the particular "dearth" of international precedents on whether judicial acts may be expropriatory. Moreover, the United States has not recognized the concept of "judicial takings" as a matter of domestic law.[195]

220.  The dearth of international precedents is unsurprising.

221.  As a matter of course, in most civil disputes one party will prevail over the other. This will be the case in contractual disputes and disputes over the title to land or other assets. Courts, however, do not consider these decisions to constitute takings of the losing party's rights or property. In fact, the U.S. Courts have never embraced the argument that a judicial decision can constitute a taking.[196] The U.S. Supreme Court in *Tidal Oil Co. v. Flanagan* categorically stated that "the mere fact that the state Court reversed a former decision to the prejudice of one party does not take away his property without due process of law."[197]

222.  With the proviso that the judicial body in question must act as a "neutral and independent arbiter", a decision against the interests of a party that happens to be a foreign investor is not equivalent to expropriation of that party's assets. If that were so, every decision by a domestic Court against a foreign investor involving protected rights under a treaty could be viewed as a

---

[195]  Exhibit RL-040, ¶ 29.
[196]  Exhibit RL-070, Vicki Been & Joel C. Beauvais, "The Global Fifth Amendment? NAFTA's Investment Protections and the Misguided Quest for an International 'Regulatory Takings'" (2003) 78:1 NYU Law Review 30 at 79 ["Been & Beauvais"].

taking and there would be a very large body of jurisprudence on the subject under both NAFTA Chapter Eleven and the wider body of investment treaty dispute jurisprudence.[198]

223.   Greenwood QC provides a hypothetical scenario that supports the Respondent's position. In his hypothetical scenario, the original cause of harm is the act of a private party that is not in itself contrary to international law.[199] In this situation, the original cause of harm, for example, a contractual dispute, is not imputable to the respondent State and cannot constitute a cause of action against the State in international law:

> If there is to be a cause of action at all it can only be denial of justice, arising either because the respondent State denies the alien access to the courts or because those courts behave in a way which is discriminatory or manifestly contrary to international standards of behaviour.[200]

224.   The present case falls squarely within the hypothetical situation provided by Greenwood QC. The only claim available to the Claimant regarding Mexico's judiciaries conduct under NAFTA is that of denial of justice.

225.   Scholars such as Been and Beauvais caution that unless any notion that "judicial decision can be considered expropriations under NAFTA is soundly rejected in the near future, NAFTA will become a powerful tool for property owners who have lost disputes over property rights in domestic courts."[201] The Respondent submits that the NAFTA was never intended as a means to preclude adverse findings against foreign nationals in domestic litigation proceedings involving disputes over property rights. Hence, its position that in the circumstances of this arbitration, there is no legal basis for the Claimant's Article 1110 claim. Rather, the Claimant is limited to asserting a claim under Article 1105(1).

### 3.   The Claimant is attempting to disguise a denial of justice claim - which it is not entitled to bring- as an expropriation

226.   The Respondent submits that the Claimant is attempting to cloak a denial of justice claim, which cannot succeed due to the Claimant's failure to pursue the remedies that were available to it, by pitching the alleged breach as one of expropriation.

---

[198] Exhibit RL-071, National Courts take this position. For example, the U.S. Ninth Circuit Court found that "if claimants contesting a state court's interpretation of state law 'were entitled to pursue their claim in federal court, every disappointed litigant in a property dispute would contend in federal court that the state court decision constituted a taking without due process." (*Elks Nat'l Found. V. Weber*, 942 F.2d 1480, 1485 (9th Cir. 1991).
[199] Exhibit RL-055, at pp. 59-60.
[200] *Id.*, at p. 60.
[201] Exhibit RL-070, p. 83.

227.  As outlined herein, an expropriation involves a final and definitive measure, causing irreversible and permanent deprivation. The taking must be permanent, and not ephemeral or temporary.[202]

228.  Thus, a revocable decision of a Court cannot give rise to an expropriation by itself. In as much as there are accessible and effective remedies within the judiciary to withdraw the effects of another Court's act, it is not open to the Claimant to argue that a final, definitive, irreversible and permanent deprivation amounting to an expropriation has taken place.[203] As stated by Demirkol:

> Unless the whole benefit deriving from the right is taken in a final and definitive manner, even if the judicial act obstructs the use of this right, it would not lead to an expropriation. A court ruling that can be challenged and redressed in a straightforward manner is not tantamount to expropriation. For that reason, in order for the investor to establish that the judicial conduct has given rise to an irrevocable and definitive deprivation, it may be necessary to challenge the ruling or the decision, provided this is reasonably possible within the judicial system. Failure to challenge such an improper ruling can prevent the breach from being perfected. In that case, an investment treaty claim invoking the breach of the expropriation standard would remain premature.[204]

> [Emphasis added]

229.  It is also worthy of note that a number of the cases upon which the Claimant relies to assert that judicial activities can constitute a taking[205] dealt with scenarios where local remedies had been exhausted or it was impossible to challenge the Court decision. They certainly support the notion that even if judicial conduct can amount to a taking, it must be from the highest or final Court.

230.  The Claimant abandoned the review *Amparo* proceeding and the Foreclosure Proceedings. Its failure to challenge what it alleges to have been improprieties has resulted in any so-called breach by the Respondent from being perfected. In short, its claim is premature.

### 4.   Denial of justice is prerequisite in a judicial taking claim in any event and Claimant cannot establish it

231.  The Respondent submits that an investor can only claim judicial taking after exhausting local remedies and that a violation of Article 1110 can only succeed if a denial of justice is established under Article 1105. As stated in *Loewen*:

---

[202]  Exhibit RL-072, Fireman's Fund Insurance Company v. The United Mexican States, ICSID Case No. ARB(AF)/02/1, ¶ 176(d)

[203]  Exhibit RL-058, at p. 55.

[204]  *Id.*, at 105.

[205]  Exhibit RL-073, Oil Field of Texas, Inc. v. The Government of the Islamic Republic of Iran & National Iranian Oil Company (NIOC), Iran Award 258-43-1 (Iran-U.S.Cl.Trib.), 12 Iran-U.S.C.T.R. 308, 1986, WL 424380; Exhibit RL-074, Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S. v. Republic of Kazakhstan, ICSID Case No. ARB/05/16, Award (29 July 2008); Exhibit RL-075, Sistem Muhendislik Insaat Sanayi ve Ticaret A. S. v. Kyrgyz Republic, ICSID Case No. ARB(AF)/06/1, Award, 9 September 2009.

> Claimants' reliance on Article 1110 adds nothing to the claim based on Article 1105. In
> the circumstances of this case, a claim alleging an appropriation in violation of Article
> 1110 can succeed only if Loewen establishes a denial of justice under Article 1105.[206]

232.  And in *Eli Lilly*, the Tribunal noted that any assessment of the interplay between the
obligations set out in Articles 1110 and 1105 regarding decisions of a domestic judiciary will
always be governed by the overriding respect that a NAFTA Chapter 11 Tribunal is not an
appellate tier:

> [T]he Tribunal notes that NAFTA Article 1110(1)(c) includes the requirement that, to
> be concordant with NAFTA Article 1110(1), the nationalization or expropriation of an
> investment must be "in accordance with due process of law and Article 1105(1)". As
> regards decisions of the national judiciary, the interplay between obligations under
> NAFTA Articles 1105(1) and 1110 will be a matter for careful assessment in any given
> case, subject to the controlling appreciation that a NAFTA Chapter Eleven tribunal is
> not an appellate tier with a mandate to review the decisions of the national judiciary.[207]

> [Emphasis added]

233.  The Claimant cites and relies upon the non-NAFTA decision in *Saipem*. It is worth noting
that much like the Claimant here, Saipem had a motivation to disguise or label its claim as
expropriation. For Saipem, the only protection offered by the Italy-Bangladesh BIT was
expropriation, not fair and equitable treatment. In addition, the Italy-Bangladesh BIT explicitly
excluded claims for the conduct of the local Courts. As a consequence, Saipem as an investor
would have faced a serious jurisdictional risk if it had based its claim on denial of justice or on
unfair or discriminatory treatment. It therefore elected to base its claim on expropriation of the
rights embodied by the award.

234.  In this context, the Respondent draws the attention of the Tribunal to the following
problematic paragraph of that decision:

> While the Tribunal concurs with the parties that expropriation by courts presupposes
> that the courts' intervention was illegal, this does not mean that expropriation by a court
> necessarily presupposes a denial of justice. Accordingly, it tends to consider that
> exhaustion of local remedies does not constitute a substantive requirement of a finding
> of expropriation by a court.[208]

235.  The Respondent submits that such an approach allows for a Claimant to circumvent the well-
established requirement of exhausting all local remedies and the rule of judicial finality.

236.  This serious issue has been observed by others. Sattorova comments on the problem with the
Saipem Tribunal allowing mislabeling:

> As the tribunal did not dwell on the reasons underlying this distinction, one is left to
> speculate as to whether labelling a denial of justice as "a judicial expropriation" served

---

[206] Exhibit RL-043, , ¶ 141.
[207] Exhibit RL-048, , ¶ 225.
[208] Exhibit RL-076, *Saipem S.p.A. v. The People's Republic of Bangladesh*, ICSID Case No. ARB/05/7, Award, 30
June 2009, ¶ 181.

the sole purpose of justifying the inapplicability of the local remedies rule in the case before the tribunal. While affirming the rule of judicial finality, <u>_Saipem_ has controversially opened the door to the possibility of avoiding the application of the local remedies rule by presenting a denial of justice claim as of one of expropriation</u>. It has undermined the central tenet of the judicial finality rule: indeed, if the exhaustion of local remedies in denial of justice claims is explained by the special nature of the judicial activity, <u>does the labelling of a judicial act as an expropriation change the nature of the underlying wrong</u>? <u>If the host state is obliged to provide a fair and efficient system of justice, thus requiring claimants to exhaust all available remedies, the same principle should arguably be extended to all forms of misconduct by the judiciary.</u>[209]

[Footnote omitted and emphasis added]

237.  Allowing such cherry-picking enables non-compliance with the rule of judicial finality:

In both _Chevron_ and _Saipem_, the investors succeeded in obtaining redress for a denial of justice without having to comply with the rule of judicial finality. By drawing a line between a denial of justice and other judicial wrongs, <u>the respective awards encourage investors to disguise their claims by invoking an investment treaty standard other than the denial of justice guarantee</u>. […] <u>While it is only logical that, in order to avoid the need to satisfy the cumbersome exhaustion rule, investors would prefer to present their cases as anything but a denial of justice, the willingness on the part of tribunals to accept such tactics of cherry-picking is questionable at best</u>. The exercise in 'skilful labelling' undermines the principal justification for the rule of judicial finality, which explains the mandatory exhaustion of local remedies by reference to the special nature of judicial activity and the host state's duty to provide a fair and efficient system of justice, as opposed to ensuring justice at every stage of the judicial process. As argued earlier, if the exercise of judicial power were to be subject to special treatment in international law, <u>the rule of finality would need to be extended to all forms of judicial action</u>.[210]

[Emphasis added]

238. The Respondent submits that allowing challenges against judicial conduct under other grounds of primary state responsibility and the corollary that this alleviates the local remedies requirement poses significant detrimental repercussions to international adjudication:

There is a line of international cases that supports the proposition that domestic adjudicative decisions can supply the predicate conduct for other forms of delictual responsibility to foreign nationals. The corollary of this approach, although it is hardly free from doubt, is that the rule relating to recourse to local remedies is not then applicable to this separate delict. [Referring to _Saipem_] <u>Such a view has significant repercussions given the rapid expansion of international norms that place substantive demands upon the domestic adjudication of cases. If there is something special about a commitment to adjudication as a form of decision-making then the justification for imposing the additional burden for establishing a denial of justice applies to other types</u>

---

[209] Exhibit RL-054,  p. 234-235.
[210] _Id._, at p. 241.

of delictual responsibility regardless of whether another international norm is implicated in that adjudication.[211]

[Emphasis added]

239.  For the system to function as intended, denial of justice must be the exclusive form of delictual responsibility towards foreign nationals for acts or omissions associated with a domestic adjudicative process. An investor can only claim denial of justice through fair and equitable treatment, not through expropriation. This is all that makes sense from a damages perspective, as explained by Douglas:

> A constituent element of all forms of delictual responsibility toward foreign nationals in international law is damage. This is the case for delictual responsibility under general international law and for the special regime of delictual responsibility established by investment treaties. It is also a requirement, although possibly less stringent, for the special regimes established by human rights treaties. The element of damage will, however, arise at different times depending on the delict. In respect of forms of delictual responsibility for acts and omissions relating to the exercise of enforcement powers, such as for unlawful expropriation, or breach of the international minimum standard or failure to accord full protection and security, the damage occurs simultaneously with the misfeasance or nonfeasance in question. The situation is different in respect of acts or omissions in the context of an adjudicative procedure. An adjudicative procedure that fails to respect the foreign national's fundamental procedural rights causes damage to that national when the substantive rights sought to be vindicated in that process are finally denied. A first instance court decision cannot, therefore, generate the predicate conduct for delictual responsibility towards a foreign national in international law because at that point in the adjudicative process there is no cognizable damage to that national or its interests produced by the adjudicative process. The decision may be reversed on appeal and with the result that the national's substantive rights are vindicated. Another way of putting the point is that international responsibility towards foreign nationals for acts and omissions associated with an adjudicative procedure can only arise at the point at which the adjudication has produced its final result; it is only at that point that a constituent element of that responsibility has been satisfied, which is the existence of damage to the foreign national.

> It can be seen from this analysis that the finality rule for denial of justice works in tandem with the requirement of damage as a constituent element of delictual responsibility towards foreign nationals. Damage can only occur when the adjudicative process reaches its final conclusion. The finality rule places the onus on the foreign national to ensure that the adjudicative process has reached its final conclusion.

> With these initial observations in mind, the essence of the problem under review can be revealed through a simple hypothetical. In an investment treaty arbitration, can an investor elect not to seek the reversal of a first instance court decision, which has failed to uphold its putative substantive rights, and claim that, as a result of that decision becoming final and binding, it has suffered damage, and that the host State should be liable to pay compensation for that damage because the court decision amounts to an

---

[211] Exhibit, RL-047, at p. 871.

expropriation or some other violation of the investment treaty? Can the investor avoid the application of the finality rule in this way?

**These questions must be answered in the negative if the integrity of domestic adjudication is to be preserved**. All national legal systems rely upon corrective mechanisms to alleviate the risk of substantive error in adjudicative procedures. All national legal systems accept by the very architecture of the institutions created for adjudicative procedures that substantive errors do routinely occur at the first level of the institutional hierarchy. [...]

[...]

The conclusion must be that acts or omissions attributable to the State within the context of a domestic adjudicative procedure can only supply the predicate conduct for a denial of justice and not for any other form of delictual responsibility towards foreign nationals. The national does not suffer damage until its substantive rights have finally been denied as a result of the breach of its procedural rights. This constituent element of the delict only occurs when the domestic adjudicative procedure has reached its final conclusion and the finality rule obliges the national to pursue the adjudicative procedure to its final conclusion. To answer the hypothetical question: a claim for expropriation in respect of a first instance court decision is inadmissible. A claim for denial of justice would have to be made through the medium of the fair and equitable standard of treatment.[212]

[Emphasis added]

240. The consequences of the approach employed by the *Saipem* Tribunal in the face of a sympathetic Claimant is a rendering of the exhaustion requirement to totally meaningless. As Arbitrator Mourre states:

The ICSID tribunal's will to redress what appears to have been a manifest injustice is perfectly understandable. However, the solution given to the *Saipem* dispute raises difficulties as it allows investment tribunals to avoid the exhaustion requirement by simply requalifying the claim as one of expropriation rather than denial of justice. What the investor was essentially complaining about in *Saipem* is the abuse of the local courts' jurisdiction in favour of one of the parties. And the arbitrators justified at great length in the award why the decision of said courts were totally unacceptable. And they indeed were, by all standards.[213]

241. It may very well be the case that the Claimant was a victim of a highly complex fraud perpetrated by Mr. Cárdenas and his businesses. That is not, however, a reason for this Tribunal to dispense with the requirement that the Claimant exhaust the local remedies, dispense with the rule of finality, or otherwise find a way around them in an attempt to make the Claimant whole by assigning responsibility to the Respondent who was likewise unwittingly manipulated and duped. As the Tribunal concluded in *Loewen*:

---

[212] *Id.*, at pp. 893-96.
[213] Alexis Mourre & Alexandre Vagenheim, "Some Comments on Denial of Justice in Public and Private International Law after *Lowen* and *Saipem*" in Miguel Angel Fernandez-Ballester & David Arias (eds.), *Liber Amicorum Bernardo Cremades* (Wolters Kluwer España; La Ley 2010) at pp. 843-866.

This human reaction has been present in our minds throughout but we must be on guard against allowing it to control our decision. Far from fulfilling the purposes of NAFTA, an intervention on our part would compromise them by obscuring the crucial separation between the international obligations of the State under NAFTA, of which the fair treatment of foreign investors in the judicial sphere is but one aspect, and the much broader domestic responsibilities of every nation towards litigants of whatever origin who appear before its national courts. Subject to explicit international agreement permitting external control or review, these latter responsibilities are for each individual state to regulate according to its own chosen appreciation of the ends of justice. As we have sought to make clear, we find nothing in NAFTA to justify the exercise by this Tribunal of an appellate function parallel to that which belongs to the courts of the host nation.[214]

[Emphasis added]

## III.  DAMAGES

242.  The following submissions are without prejudice to the Respondent's legal arguments. Nothing in this section should be interpreted as an admission of liability or as a waiver of any of the defenses on the merits.

243.  The Claimant is claiming damages in excess of US $200 million for losses related to the Mortgages and the Notes and to the alleged incidental legal expenses and costs incurred in the incomplete legal proceedings it undertook and the related actions taken by the Debtors.[215] These damages are said to arise from two separate alleged breaches of the NAFTA: a breach of Article 1110 (Expropriation) and a breach of Article 1105 (Minimum Standard of Treatment).

244.  The Claimant, however, does not distinguish the damages arising from each of these distinct alleged violations, nor does it distinguish the damages caused by the alleged cancellation of the Mortgages from those caused by the cancellation of the Notes. And it cannot do so.

245.  *First*, as explained in the legal argument above, "decisions of domestic courts acting in the role of neutral and independent arbiters of the legal rights of litigants do not give rise to a claim for expropriation." The claim for expropriation is nothing more than a disguised claim for denial of justice.

246.  *Second*, the Claimant cannot distinguish the damages caused by the cancellation of the Notes from those caused by the cancellation of the Mortgages simply because they are the same. In both cases, the Claimant seeks to recover the principal and interest owing under the Loans. The only difference is that the maximum amount recoverable under the Mortgages is the value of the mortgaged properties, whereas the maximum recoverable under the Notes is limited to the value of the Debtors' assets.

---

[214] Exhibit RL-043, ¶ 142.
[215]  Memorial on the Merits, ¶¶ 430-496.

247. The Claimant's case, however, is limited in fact and law to actions relating to the Mortgages.[216] If the Tribunal finds that the Respondent has acted inconsistently with Articles 1110 and/or 1105 of the NAFTA in respect of the Mortgages, the Claimant bears the burden of proof in relation to the fact and the amount of its losses as well as the causal link between the wrongful acts found by the Tribunal and the losses.[217] It has not met that burden.

248.  The Respondent will further observe that the Claimant has not submitted expert evidence in support of its claim for damages. It relies instead on appraisals of the Nayarit and Guadalajara properties and the testimony of Ms. Onay Payne. As will be further discussed in the following sections, the Respondent's expert has found this evidence to be lacking, in particular the evidence submitted on the value of the Nayarit property, which has been grossly overstated.

249.  It is the Respondent's position that in addition to failing to prove the facts and amounts of the claimed losses, the losses claimed cannot be attributed to any NAFTA-inconsistent actions found in respect of the Mortgages, or, to the extent that they can be so attributed, the amounts claimed manifestly exceed those that could be properly attributed.

### A.    The Claimant has not proven that any loss suffered was *caused* by any wrongful act

250.  To the extent that the Claimant can prove it has suffered a loss, the issue of causation is central to the determination of damages and the burden is on the Claimant to establish the causal link between the wrongful act and the damages suffered.[218] As a general principle of law, the concept of causation excludes compensation for damages that have *not* been *caused* by the alleged act, whether they are lawful or unlawful.[219] The Respondent, therefore, is obliged to make reparation only for injury *caused* by the acts that have been found by the Tribunal to be inconsistent with NAFTA Articles 1110 and/or 1105 in respect of the Mortgages.[220]

251.  Causation is at the heart of the issue of compensation.[221] In fact, it is existential for the Claimant's damage claim.[222] Pearsall and Heath unequivocally state that "For the claimant, failing to establish an injury caused by the alleged breach of an investment treaty can lead to a finding of

---

[216]  The Nayarit Mortgage is defined in ¶ 23 of the Memorial on the Merits.

[217]  Exhibit RL-077, Sergey Ripinsky and Kevin Williams, *Damages in International Investment Law*, British Institute of International and Comparative Law, 2008, p. 162 ["Ripinsky & Williams"].

[218]  *Id.*, at p. 135.

[219]  Exhibit RL-078, Borzu Sabahi, Compensation and Restitution in Investor-State Arbitration, Principles and Practice; Oxofrd University Press, 2011, at p. 170.

[220]  Exhibit RL-077, Ripinsky & Williams, at p. 135. "A State responsible for an internationally wrongful act is under an obligation to make reparation only for the injury *caused* by that act". (emphasis in original)

[221]  Exhibit RL-079, Mark Kantor, Valuation for Arbitration: Compensation Standards, Valuation Methods and Expert Evidence (The Netherlands: Wolters Kluwer, 2008) at 104.

[222]  Exhibit RL-080, Patrick W. Pearsall & J. Benton Heath, "Causation and Injury in Investor-State Arbitration" in Christina L. Beharry eds. *Contemporary and Emerging Issues on the Law of Damages and Valuation in International Investment Arbitration* (Brill Nijhoff, 2018), at pp. 83-110 ["Pearsall & Heath"].

liability but no damage."[223] Causation ensures that "States are not held liable for … the independent actions of the claimant or third parties."[224]

252.  Under the law of State responsibility, causation stands as a bridge between the separate issues of breach (or "liability" for a wrongful act) and damages (or "quantum").[225] Accordingly, "[o]nce a wrongful act is established, the tribunal's task would be to sort out which, if any, of these injuries are traceable to the treaty breach, rather than to the actions of third parties, to other lawful actions of the respondent State, or to the actions of the claimant itself."[226]

253.  Causation has two spectrums: factual causation and legal causation.[227] Under the factual test of causation, the issue is whether the wrongful conduct plays some part in bringing about the harm or injury or was irrelevant to its occurrence.[228] This is also known as a "but-for" test: would the harm have occurred or sustained but for the unlawful conduct?[229] Under the legal test of causation, the key issue is whether the wrongful conduct is a sufficient, proximate, adequate, foreseeable or direct cause of the harm or injury.[230] Both factual and legal causation are relevant in determining the existence of the required causal relationship, but factual causality alone is insufficient.[231]

254.  The assessment of causation encompasses circumstances which reduce the amount of damages. The relevant circumstances in this arbitration are "contributory fault" and "inadequate assessment of risk and the voluntary assumption of risk" (in the sense that damage which could have been avoided by the Claimant cannot be attributed to the alleged wrongful conduct and therefore is not caused by that conduct).[232]

255.  The Respondent submits that the Final Award of *Lauder v. Czech Republic* is pertinent. In the Final Award, the Tribunal found that a Dr. Zelezny —a private party— rather than the Government was the main cause of the damage incurred by Lauder's investment in Czech Republic in 1991. The Tribunal further found that Czech's violation of the BIT in 1993 had caused no damage to the investment or had no causal connection to damages that occurred six years later in 1999 through the intervening act of Dr. Zelezny. The Tribunal provided the following analysis:

> 235. The arbitrary and discriminatory breach by the Respondent of its Treaty obligations constituted a violation of the Treaty. The alleged harm was, however, caused in 1999 by the acts of CET 21, controlled by Mr. Železný. The 1993 breach of the Treaty was too remote to qualify as a relevant cause for the harm caused. A finding on damages due to the Claimant by the Respondent would therefore not be appropriate.[233]

---

[223] *Id.*, Pearsall & Heath, at p. 83; also see Exhibit RL-078, Sabahi's discussion on the *Biwater Gauff v. Tanzania* in Sabahi, at p. 174.

[224] *Id.*, at pp. 83-84.

[225] *Id*, at p. 87.

[226] *Id.*, at p. 90.

[227] *Id.*, at p. 135; Sabahi, at p. 171; Pearsall & Heath, at p. 94.

[228] *Id.*, at p. 135; Sabahi, at pp. 171-172.

[229] Exhibit RL-077, Ripinsky & Williams, at p. 135; Pearsall & Heath, at p. 95.

[230] *Id.*, at p. 135; Exhibit RL-078 Sabahi, at pp. 171-172.

[231] *Id.*, at pp. 135, 138-140; Exhibit RL-078 Sabahi, at pp. 171-172.

[232] *Id*., pp. 314-315 and 319.

[233] Exhibit RL-081, *Ronald S. Lauder v. The Czech Republic*, UNCITRAL, Final Award, 3 September 2001, ¶ 235.

256.  Consideration of causation, including the above factors:

- Establishes that there is no causal linkage between any wrongful conduct found by the Tribunal and any losses incurred by the Claimant;

- Limits the *maximum* damages to those derived exclusively from the Mortgages, excluding any damages derived from the Loans and Notes;

- Reduces the maximum damages by amounts attributable to the Claimant's contributory fault, inadequate assessment of risk and the voluntary assumption of that risk; and

- Further reduces the maximum damages by amounts attributable to the Claimant's failure to mitigate.

257.  The cumulative consideration of these factors significantly reduces any damages owing the Claimant caused by the alleged inconsistencies with NAFTA Articles 1110 and/or 1105 in respect of the Mortgages.

## B.    Damages deriving from the Loans and Notes (*i.e.*, the non-protected investments) must be excluded

258.  The Tribunal's Decision on Jurisdiction substantially restricts the damages that can be claimed.[234] In making that Decision, the Tribunal had to determine whether the non-negotiable promissory Notes formalizing the short-term Loans, or the Mortgages securing the Loans, could qualify as NAFTA protected investments under Articles 1139(h) or 1139(g), even if the Loans failed the three-year maturity test under Article 1139(d).[235] The Tribunal ruled that the Loans did not meet the three-year maturity test under Article 1139(d) of the NAFTA and therefore did not constitute protected investments.[236] It also ruled that the Notes did not constitute protected investments under Article 1139(g) of the NAFTA.[237] Finally, it ruled that the Mortgages constituted protected investments under Article 1139(g) of the NAFTA.[238]

259.  Accordingly, the investments at issue in this arbitration are solely the Mortgages. Any wrongful actions found by the Tribunal must relate to the Mortgages only. More specifically, the Respondent is obliged to make reparation only for injury *caused* by the NAFTA inconsistencies found in respect of the Mortgages. Thus, losses derived from the Loans and the Notes are not legally relevant to the assessment of damages and cannot form a basis for damages claims.

260.  For these reasons, there is no legal basis for the Claimant's argument that it is entitled to the amount it could have recovered by enforcing the Notes (*i.e.*, "over US$ 200 million… to be determined at a later stage") and its claim for such damages must be rejected.[239] This applies to any

---

[234] The Respondent disagrees with the Decision and its acknowledgement of the Decision in this submission is without prejudice to the Respondent's positions regarding the Decision.
[235] Decision on Jurisdiction, ¶ 163.
[236] *Id.*, ¶¶ 100, 191, 208 and 249.
[237] *Id.*, ¶¶ 171, 187-208, 249, 262 and 266.
[238] *Id.*, ¶¶ 214, 229-259, 262 and 266.
[239] Memorial on the Merits, ¶¶ 478-480 and 495(c).

claims of damages in respect of the Loans and Notes in isolation and to any claims of damages related to the Mortgages that derive from the Loans and the Notes.

### C.    Maximum amount of recoverable damages from the Mortgages

#### 1.    The Mortgages have no recoverable value

261.  As noted above, the Respondent's damages obligations are limited to reparation for the injury caused by actions found to be NAFTA-inconsistent in relation to the Mortgages. The causation issue in this arbitration is unique because the underlying source of the Complainant's economic interests under the Mortgages, and therefore the foundation of any damages claims, lie *exclusively* in Loans and Notes which are not protected investments under the NAFTA and for which no wrongful acts have taken place. In the circumstances, the Respondent is not obliged to make reparation for the economic interests that are derived from the Loans and the Notes. It would be legally erroneous for the Tribunal to rule otherwise because it would amount to awarding damages for non-protected investments.

262.  The Loans and Notes *alone* provide the repayment and interest obligations that form the factual basis for the Claimant's damages claims. The Mortgages simply secure these obligations. The Mortgages do not include independent repayment and interest obligations. The relevant parts of the Mortgages read as follows:

> First.- In order to guarantee the timely and complete compliance with each and every one of the obligations and complete and timely payment of the liabilities… including but not limited to: payment of the principal, ordinary interest and default interest in accordance with: (i) the credit agreement between [LMC] and [Bains]… (ii) the credit agreements between [LMC] and [C&C Capital] (ii) the legal instruments (hereinafter "Credit Documents") stemming from the Credit Agreements, any fees or expenses or any other amounts outstanding under the Credit Agreements or Credit Documents [...][240]

---

[240] Exhibit C- , [Nayarit Mortgage, p. ]. Similar provisions can be found in the Guadalajara mortgages. See Exhibits C- , p.  and C- , p.  . The original text in Spanish reads as follows:
"PRIMERA.- Para garantizar el cumplimiento puntual y total de todas y cada una de las obligaciones y el pago total y puntual de todos los pasivos (ya sea a su vencimiento, por vencimiento anticipado o de cualquier otra forma), incluyendo enunciativa mas no limitativamente, el pago total de la suma principal, intereses ordinarios e intereses moratorios, de conformidad con (i) el contrato de crédito celebrado entre Lion Mexico Consolidated, L.P., como acreditante e Inmobiliaria Bains, S.A. de C.V, como acreditada, de fecha veintiocho de febrero de dos mil siete, según el mismo se modifique de tiempo en tiempo; (ii) los contratos de crédito celebrados entre Lion Mexico Consolidated, L.P., como acreditante y C&C Capital, S.A. de C.V., como acreditada, de fecha trece de junio de dos mil siete y veintiséis de septiembre de dos mil siete, respectivamente (en lo sucesivo colectivamente los "Contratos de Crédito"), según los mismos se modifiquen de tiempo en tiempo; y, (iii) los instrumentos legales (en lo sucesivo los "Documentos del Crédito" que se deriven de los Contratos de Crédito, cualesquiera honorarios, gastos y cualesquier otras cantidades adeudadas conforme a dichos Contratos de Crédito o Documentos del Crédito, el GARANTE HIPOTECARIO[1] en este acto constituye una HIPOTECA EN PRIMER LUGAR Y GRADO en favor de LION MEXICO CONSOLIDATED, L.P., sobre todos los derechos, títulos e intereses del

> Third.- The Mortgage… guarantees the timely payment of each and every one of the "Obligations" and "Liabilities", including without limitation, all amounts owed in accordance with each and every Credit Contracts and Credit Documents, including any note, up to an amount of [32.8 million] plus interest accrued on the same [...][241]

263.   In its Decision on Jurisdiction, the Tribunal and the Claimant acknowledged that the Mortgages are accessory transactions that secure rights deriving from the Loans and "if the secured obligation is not paid, the mortgagee can force the sale of the asset, and the price obtained is used to satisfy the secured obligation".[242] In the view of the Tribunal, the "[a]ccessoriness implies that payment or voidness of the underlying obligation provokes the extinction of the mortgage".[243] The Tribunal further found that the value of the Mortgages depends on both the "worth of the mortgaged real estate" and the "legal preference granted to the mortgages".[244] The legal preference granted to the Mortgages links the value of the Mortgage to the amounts owing under the Loans and Notes. If these amounts are less than the worth of the Mortgaged real estate, the values of the Mortgages are this lesser amount. If these amounts are zero, the values of the Mortgages are zero.

264.   These fundamental characteristics of the Loans, the Notes and the Mortgages and the relationships between them must be accounted for in assessing the causal linkage and determining whether and to what degree there are recoverable losses from the violations found by the Tribunal in respect of the Mortgages. This assessment must be undertaken in the light of the Tribunal's prior rulings that the Loans and Notes are not protected investments. In such circumstances, for the purpose of assessing damages, the repayment and interest obligations in the Loans and Notes must be treated as if they do not exist. Since they do not exist, the Mortgages have no recoverable value and there is no basis to claim damages in respect of the Mortgages. "But for" the Loans and the Notes, there would be no amounts payable. This fact completely severs the causal linkage between any NAFTA-inconsistencies in respect of the Mortgages and the damages claimed. Consequently, the amount of damages owing to the Claimant is nil.

265.   To rule otherwise would mean that non-protected investments for which no illegal action has occurred give rise to recoverable damages under international law. Such an outcome would be contrary to the rules of interpretation under the *Vienna Convention* and with the principles governing the responsibility of States for internationally wrongful acts.

---

GARANTE HIPOTECARIO, ya sea que existan en el presente o que se adquieran en el futuro, sobre los siguientes bienes […]"

[241] Exhibit C- , [Nayarit Mortgage, p.  ]. Similar provisions can be found in the Guadalajara mortgages. See Exhibits C- , p.  and C- , p.  . The original text in Spanish reads as follows:
'TERCERA.- La Hipoteca constituida sobre la Fracción "A" de conformidad con la Cláusula Primera del presente instrumento, garantiza el pago puntual y total de todas y cada una de las "Obligaciones" y de los "Pasivos", incluyendo sin limitar, todas las cantidades adeudadas conforme a todos y cada uno de los Contratos de Crédito y de los Documentos del Crédito, incluyendo cualquier pagaré, hasta por la cantidad de TREINTA Y DOS MILLONES OCHOCIENTOS CINCO MIL CUATROCIENTOS SETENTA Y NUEVE DÓLARES, MONEDA DE CURSO LEGAL DE LOS ESTADOS UNIDOS DE AMÉRICA, más intereses devengados sobre las mismos […]"

[242] Decision on Jurisdiction, ¶¶ 210 and 219. (*Id.*, ¶¶  ).

[243] *Id.*, ¶ 220

[244] *Id.*, ¶¶ 221 and 253.

### 2. The Respondent's interpretation is consistent with the Tribunal's Decision on Jurisdiction and with the law governing causation

266. The foregoing interpretation is consistent with the Tribunal's Decision on Jurisdiction. A distinction must be made between the existence of a protected investment and the recoverable damages that can flow from an illegal act in respect of that investment. In its Decision, the Tribunal ruled on the existence of a protected investment but not the damages that could flow from an illegal act in respect of that investment.

267. Under the above interpretation put forward by the Respondent, although the Mortgages can be recognized and treated as separate protected investments as the Tribunal ruled, the recoverable damages derived from the Mortgages in the circumstances of this arbitration are nil. This situation can be distinguished from a situation where the loans and notes are covered investments and mortgages secure the repayment and interest obligations under the loans and notes. In such circumstances, the damages derive from covered investments and can be recovered through either or both the loans and notes (*i.e.*, repayment and interest obligations) and the mortgages, up to the amount owing under the loans and notes. For the mortgages, a ceiling is established by the value of the mortgaged assets. In this way, the mortgages have independent recoverable value that is additional to the covered loans and the notes. They allow the lender to recover amounts owed through the security in the mortgages.[245] Under this scenario, covered investments –*i.e.*, the loans and notes which are protected investments– give rise to the damages obligations which carry through to the mortgages, and the mortgages can be recognized and treated as separate investments, and recoverable damages related to the loans and the notes can be derived from the mortgages. This recognition is important where the borrower cannot meet the payment obligations in the loans and notes and it is necessary to resort to the mortgage security. However, this is not the situation here because the underlying Loans and Notes are not protected investments.

### 3. Conclusions

268. For the foregoing reasons, in the circumstances of this arbitration, the recoverable damages from the Mortgages are zero.

### D. Alternatively, the maximum amount of recoverable damages is limited to the value of the properties covered by the Mortgages *minus* costs, taxes and other appropriate deductions

269. Alternatively, the damages must be limited to the value of the properties covered by the mortgages *minus* any costs associated with foreclosing on the properties and any reduction in the

---

[245] This is recognized in the Decision on Jurisdiction where the Tribunal reasoned: "There are good reasons why mortgages should constitute a category of protected investment of their own. Mortgages are also inextricably linked with the piece of real estate that they burden. And the value of this right in rem can be affected by measures adopted by the host state, targeted at such piece of real estate (e.g., expropriation) or specifically at the mortgage (e.g., dilution of preference). The purpose of treaties, when they include mortgages among the protected assets, is to extend the scope of protection to this type of situations". Decision on Jurisdiction, ¶¶ 242.

proceeds of the sale of the properties arising from higher priority claims on the available funds – *e.g.*, taxes, other liens, consumer claims by timeshare purchasers.

### 1.      Valuation date of any recoverable damages

270.  The Claimant proposes two different valuation dates for the alleged violations of Article 1110 (Expropriation) and Article 1105 (Minimum Standard of Treatment):

- In the case of the expropriation claim, the Claimant assumes that the Debtors would have been served by the end of 2012, and the Foreclosure Proceedings would have been completed in March 2013.[246]

- In the case of the minimum standard of treatment claim, the Claimant maintains that the "improper dismissal of LMC's Amparo action" would have occurred approximately on 4 December 2013 and, but-for that measure, the Foreclosure Proceedings would have been completed and obtained title of the properties in March 2014.[247]

271.  It is readily apparent from the foregoing that the Claimant's position is that damages should be determined on the date in which the Claimant would have obtained title of the properties following successful foreclosure proceedings. The Respondent submits that this approach is plainly wrong.

272.  In the case of an expropriation, Article 1110(2) establishes that:

> 2. Compensation shall be equivalent to the fair market value of the expropriated investment <u>immediately before the expropriation took place ("date of expropriation")</u>, and shall not reflect any change in value occurring because the intended expropriation had become known earlier. Valuation criteria shall include going concern value, asset value including declared tax value of tangible property, and other criteria, as appropriate, to determine fair market value.

273.  Thus, the relevant date for the purposes of determining the value of an investment that has been expropriated is the date immediately before the expropriation took place which, in the context of this Claim, is the date immediately before the Claimant lost its rights under the Mortgages. Since the Guadalajara mortgages were cancelled on 7 September 2012 and the Nayarit Mortgage on 16 October 2012, the relevant valuation dates are 6 September and 15 October 2012, respectively.

274.  The NAFTA provides little guidance regarding the appropriate date to assess damages arising from any other violation of the obligations set out in Section A. The Respondent submits that proper date to determine the damages caused by a beach of Article 1105 is the date of the breach, which the Claimant places in December 2013.

275.  It bears noting that the damages from the breach of Article 1105 and the breach of Article 1110 appear to be the same. In other words, what the Claimant appears to be alleging is that the dismissal of it's *amparo* was tantamount to an expropriation. If the Tribunal accepts this

---

[246] Memorial on the Merits, ¶¶ 460-461.
[247] *Id.*, ¶¶ 472-473.

proposition, then the proper valuation date for damages arising from this violation would be the date immediately before the dismissal of the *amparo* on 4 December 2013.

276.  This, however, raises the issue of finality. If finality of the measure is to be considered for the purposes of determining the proper valuation date, then the Respondent submits that the breach, if any, of Article 1105 was not consummated when the Judge dismissed the Claimant's *amparo*. The Claimant had the opportunity to challenge that decision and it did. However, the Mexican legal system did not have the opportunity to correct any mistakes that could have been made by the *amparo* Judge because the Claimant withdrew from the *Amparo* Review.

## 2.  Value of the properties

277.  The Claimant relies on a series of contemporaneous appraisal reports that the Claimant obtained in the normal course of business to determine the value of its collateral (Exhibits C-136 to C-151). According to this evidence, the value of the Nayarit property fluctuated between USD $80.4 million in 2009 and USD $56.3 million while the value of the Guadalajara property fluctuated between USD $23.6 million in 2009 and USD $21.1 million in 2013.[248]

278.  The Respondent has engaged CBRE Valuation & Advisory Services (CBRE), to opine on the value of the properties and on the quality and reliability of the appraisals on which the Claimant relies for its claim for damages.

279.  CBRE valued the properties "as is" as of 8 October 2018 in accordance with applicable norms, technical guidelines and valuation methodologies established by the National Banking Commission, as well as the directives and recommendations of the Appraisal Institute of Canada.

280.  CBRE employed two different methodologies to determine the value of the Guadalajara and Nayarit properties: the Comparable Market Approach ("*Enfoque Comparativo de Mercado*") and the Residual Approach ("*Enfoque Residual*").

281.  The Comparable Market Approach, as the name implies, uses comparable market transactions to approximate the value of the property. Once a reasonable set of comparable transactions has been obtained the values are adjusted to account for differences in location, front, shape of the plot of land and size. After these adjustments the resulting values are averaged to arrive at a final figure.[249]

282.  Once the 2018 value was determined, CBRE then adjusted the result by inflation to approximate the value of the properties as of the respective expropriation dates –i.e., 7 September and 16 October 2012. The following table summarizes the results obtained through the Comparable Market Approach.

---

[248] *Id.*, ¶ 463.
[249] Expert Report by CBRE,pp. 59 -67 and 158- 166.

| | Nayarit | | Americas A | | Americas B | |
|---|---|---|---|---|---|---|
| Valuation date | 08-Oct-18 | 16-Oct-12 | 08-Oct-18 | 07-Sep-12 | 08-Oct-18 | 07-Sep-12 |
| Area (m2) | 373,558 | 373,558 | 9,335 | 9,335 | 6,143 | 6,143 |
| | | | | | | |
| **Comparable Market** | | | | | | |
| Value MXP | 345,800,000 | 274,739,000 | 335,200,000 | 264,976,000 | 127,450,000 | 100,749,000 |
| Exchange rate | 19.1328 | 12.8901 | 19.1328 | 13.1221 | 19.1328 | 13.1221 |
| Value (USD) | 18,073,675 | 21,313,954 | 17,519,052 | 20,193,109 | 6,661,336 | 7,677,811 |
| Value / m2 (USD) | 48.38 | 57.06 | 1,876.77 | 2,163.16 | 1,084.38 | 1,249.85 |

Source: Respondent using data from CBRE reports. The exchange rate that was used is the "*tipo de cambio para solventar obligaciones denominadas en dólares de los EE. UU. A.*" published by Banco de México, available at: http://www.anterior.banxico.org.mx/portal-mercado-cambiario/

283.  The second methodology that CBRE employed is the Residual Approach, which consists in estimating the potential revenues from the sale of the final real estate product for every year in the projection period; subtracting the estimated direct and indirect costs as well as the developer's profit margin, and; discounting the resulting net revenues using an appropriate discount rate.[250]

284.  The results using the Residual Approach are very similar to those obtained with the Comparable Market Approach, as can be gleaned from the following table:

| | Nayarit | Americas A | Americas B |
|---|---|---|---|
| Valuation date | 08-Oct-18 | 08-Oct-18 | 08-Oct-18 |
| Comparable Market | 345,800,000 | 335,200,000 | 127,450,000 |
| Residual | 344,612,500 | 338,472,900 | 131,960,700 |
| Difference | 0.34% | -0.98% | -3.54% |

Source: Respondent using data from CBRE reports. Figures in Mexican pesos.

285.  CBRE places the combined value of the Guadalajara properties as of 7 September 2012 at USD $27.87 million, which is approximately USD $7.6 million more than the appraised value as of 30 September 2012 included in Exhibit C-143. Although this departure is significant, it is clear that it is mainly due to fluctuations of the exchange rate. While the value of the properties increased by 26% in terms of Mexican pesos from 2012 to 2018, the value in USD decreased 13.24% due to the depreciation of the peso.

286.  In the case of the Nayarit property, however, there is a significant departure that cannot be explained by the depreciation of the peso over time. The appraisals obtained by the Claimant place the value of the property at USD $56.3 million as of 30 September 2012[251], while the Respondent's expert puts it at USD $21.3 million as of 16 October 2012.

287.  The Respondent has requested CBRE to opine on the appraisals submitted by the Claimant in support of its claim for damages with a focus on the 2012 appraisal for the Nayarit property.

---

[250] Expert Report by CBRE, pp. 71 - 81 and 170 - 183.
[251] Exhibit C-142.

The expert found a series of irregularities that put into question the reliability of the evidence submitted by the Claimant, which can be summarized as follows:

- The analyses are based on inadequate comparable samples. The sample is too small (only three transactions); it includes very old transactions (5 years), and also includes transactions involving properties that are too small to be considered adequate comparables;[252]

- There are unexplained inconsistencies in the results. For example: in 2009 the appraiser reports a value of USD $80.4 million. One year later, using the same information, the value drops to USD $60.3;[253]

- From 2012 to 2016 –i.e., 5 years– the value remains constant at USD 53.6 million;[254]

- The Claimant's appraisers do not take into account that a portion of the property is unusable due to rights of way for the federal highway and power lines that cross the property. Hence, by multiplying the resulting price per square meter by the total area of the property, they overstate its value;[255] and

- The Claimant's 2012 report describes the property as part of the Nahui Development with good access and high-density tourism use of land (*uso de suelo*). The property, however, is not part of the Nahui Development and the licensed use of land is T-25 (tourism with maximum density of 25 rooms/ha). Moreover, the quality of the beachfront is mixed and has limited access.[256]

### 3.    Costs, taxes and other deductions

288.   After determining the value of the properties, the Claimant subtracts certain cost components to arrive at the final damages figure. These costs include: foreclosure legal fees, foreclosure public registry fees, foreclosure notary fees, sales transfer taxes and sales legal fees. In total the Claimant estimates these costs to be USD $1,788,800 for the Nayarit property and USD $904,829 for the Guadalajara properties.

289.   The Respondent has also engaged the law firm Sanchez Devanny to opine of the Claimant's assessment of these costs. In order to calculate certain deductions which value depends on the value of the properties (such as property taxes), the expert has considered the values offered by CBRE as of the expropriation date, which explains why their results are lower than the Claimant's figures.

290.   Sanchez Devanny concludes that the total fees and expenses that the Claimant would have incurred are USD $2,124,805.60.

---

[252] Expert Report by CBRE pp. 100 – 102.
[253] *Id.*
[254] *Id.*
[255] *Id.*
[256] *Id.*

### 4.    Value of the properties as per LMF's financials



---

[257] See for example, Exhibit R-032 LMC Audited Financial Statements.
[258] *Id.*, p. 10.



### E.   Deductions from maximum amount of recoverable damages

298.   The above maximum amount of recoverable damages is subject to reductions to avoid double recovery, to account for the Claimant's contributory fault and its failure to mitigate damages. Some of the facts establishing the bases for these reductions overlap.

#### 1.   No double recovery

299.   The Claimant completely omits from its case the fact that it received corporate shares in Bains and C&C Capital in lieu of payment of the amounts outstanding under the Loans, as well as the value of those shares. The latter is an important consideration for *quantum*, as it is well established in international arbitration that double recovery should not be allowed.[259]

300.   The value of the shares became an issue during the criminal proceeding 137/2014 initiated against Mr. Cárdenas for generic fraud, following the Claimant's complaint of 19 April 2013. In order to demonstrate that the Claimant had not suffered any damages as a result of his alleged criminal behaviour, Mr. Cárdenas submitted various expert reports, including two reports prepared by Mr. Alfredo Trujillo Betanzos on 17 September 2014, which calculate the book value of the shares of C&C Capital and Bains as of 31 January and 31 December 2012.[260]

---

[259]  Exhibi RL-077 Ripinsky and Williams.
[260]  Exhibit R-015 Valuation C&C Capital, p. 21; Exhibit R-016 Valuation Bains, p. 25

301.  The following table summarizes the findings in these reports and calculates the value of the shares issued to the Claimant pursuant to the terms of the Settlement Agreement.



302.  Since the value of the shares, even if heavily discounted, exceeds the value of the mortgaged properties, the Respondent submits that the Claimant has not suffered any damages. Alternatively, the Respondent submits that the Tribunal should subtract the value of such shares from any award of damages to avoid double recovery by the Claimant.

303.  The Claimant also omits from its Memorial on the Merits the fact that there are ongoing Criminal Proceedings, namely Nos. 2822/2017, 121667/2017, 83426/2017 and 4713/2016. In No. 4713/2016, the charge is the felony of fraud on the part of Mr. Cárdenas. The property located in Nayarit has been frozen as a result.[261] If Mr. Cárdenas is convicted of fraud, the property will automatically pass to the Claimant as a reparation. As noted by Dr. Plascencia in his expert report:

> 84. The matter of reparation of damages and other compensation to which a person who is a victim of a criminal offense is entitled, is a juridical consequence that a criminal judge must determine in the condition of public penalty. In the case at hand, there is no court conviction from which follows that there is proof that LMC was a victim of a criminal offense. However, since there are criminal procedures still ongoing in which there are judicial orders to freeze the mortgaged properties that guaranteed the loans, there is always the possibility of repairing the damage with such frozen assets inasmuch as Hector Cardenas could be declared guilty of a criminal offense and Lion Mexico Consolidated a victim of a possible crime.
>
> […]
>
> The prosecution investigation files 2822/2017, 121667/2017, 83426/2017 and 4713/2016 are still standing. Therefore, Lion Mexico Consolidated continues exercising a variety of actions in the matter of access to justice. The properties are frozen and subject to the determinations taken within the legal resources that Lion Mexico Consolidated continues exercising, according to the letter dated 3 September 2018

---

[261] Exhibit R-033 Record of asset freeze in Nayarit, p. 8.

> signed by the Principal of the Registrar's Office of Bucerias Nayarit, as well as the securing certificates of the Land Registry of Guadalajara, Jalisco dated 10 July 2018. Consequently, the assets derived from the granted loans property of Lion Mexico Consolidated, are duly protected.[262]

304.  The Respondent submits that the potential for double recovery must be guarded against in this context as well and that the Tribunal will not be positioned to address this issue pending the results of the outstanding Criminal Proceedings.

### 2.    Contributory fault

305.  A reduction to the maximum amount referenced above must be made to account for the contributory fault of the Claimant, *i.e.*, it contributed to the creation of the damages in that its own conduct serviced as a cause for the losses alongside other causes.[263] Contributory fault relates to inadequate assessment of risks and is evidenced by a victim's understanding of a dangerous situation and voluntary entry into it.[264] The Claimant's actions and inactions that amount to contributory fault must be assessed in the light of the nature and magnitude of the above-identified business risks voluntarily assumed by the Claimant.

306.  Article 39 of the ILC Draft Articles on State Responsibility reads:

> Article 39. Contribution to the injury
>
> In the determination of reparation, account shall be taken of the contribution to the injury by wilful or negligent action or omission of the injured State or any person or entity in relation to whom reparation is sought.[265]

307.  The Commentary to Article 39 specifies that the Article deals with the situation where damage has been caused by an internationally wrongful act of a State, which is accordingly responsible for the damage in accordance with Articles 1 and 28, but where the injured State, or the individual victim of the breach, has materially contributed to the damage by some wilful or negligent act or omission. Its focus is on situations which in national law systems are referred to as "contributory negligence", "comparative fault", "*faute de la victime*", etc.[266]

308.  Article 39 recognizes that the conduct of any person or entity in relation to whom reparation is sought (i.e., the Claimant in this arbitration), should be taken into account in assessing the form and extent of reparation.[267] Relevant actions are those which can be considered as wilful or negligent, i.e. which manifest a lack of due care on the part of the victim of the breach for his or

---

[262] Expert report of Dr. Plascencia, ¶¶ 84, 106.

[263] Exhibit RL-077Ripinsky and Williams, at p. 319.

[264] Exhibit RL-082, David J. Bederman, "Contributory Fault and State Responsibility", (1990) 30 Va. J. Int'l L. 335 at pp. 335-336, also see Ripinsky & Williams, at p. 314-315.

[265] Exhibit RL-083, International Law Commission, Draft articles on Responsibility of States for Internationally Wrongful Acts, with commentaries (2001), p. 109.

[266] *Id*., p. 110.

[267] *Id*.

her own property or rights.[268] Under Article 39, when contributory fault is established, the compensation is to be reduced proportionally with the injury caused to the claimant.[269] The purpose of this methodology is to ensure fairness between the responsible State and the victim of the breach.[270]

309. The deduction of compensation due to claimants' contributory fault is recognized by scholars[271] and investment arbitration Tribunals. The Respondent draws the Tribunal's attention to the following decisions (chronologically) in which Tribunals deducted compensation payable based on the claimants' contributory fault:

- In *MTD v. Chile*, the Tribunal deducted 50% of the claimed compensation. This was upheld by the *MTD v. Chile ad hoc* annulment committee;

- In *Azurix v. Argentina*, the Tribunal found that the fair market value of the concession Azurix negligently invested in at the time of the tender was only US$60 million compared to the actual amount it paid—US$438,555,551. As a result, the Tribunal decided that that "no more than a fraction of the [investment] could realistically have been recuperated under the existing Concession Agreement";

- In *Occidental v. Ecuador*, the Tribunal deducted 25% of the claimed compensation. However, the dissenting Arbitrator Professor Stern considered that at least 50% of the claimed compensation should be deducted based on the claimant's contributory fault;

- In *Yukos v. Russia*, the Tribunal deducted 25% of the claimed compensation;

- In *Copper Mesa v. Ecuador*, the Tribunal deducted 30% of the claimed compensation; and

- In *Bear Creek v. Peru*, the dissenting Arbitrator Professor Sands stated that 50% of the claimed compensation should be deducted due to the claimant's contributory fault.

310. These awards are discussed in detail in what follows here.

311. In *MTD v. Chile*, the Tribunal found that the investor had contributed to its own injury by failing to undertake adequate due diligence of its own in order to investigate whether it would be able to obtain the various licenses and approvals needed for the investment to proceed. Accordingly, the Tribunal held:

> 242. […] As already noted, the Claimants, at the time of their contract with Mr. Fontaine, had made decisions that increased their risks in the transaction and for which they bear responsibility, regardless of the treatment given by Chile to the Claimants.

---

[268] *Id.*
[269] Exhibit RL-077, Ripinsky and Williams, at p. 316.
[270] Exhibit RL-083, International Law Commission, "Draft Articles on Responsibility of States for Internationally Wrongful Acts, with Commentaries" (2001) 2:2 YBILC 31, at p. 110, ¶ (5). Also see James Crawford, *State Responsibility: The General Part* (Cambridge University Press: 2013), at p. 500.
[271] Exhibit RL-084, Irmgard Marboe, *Calculation of Compensation and Damages in International Investment Law (2nd Edition)* (Oxford University Press, 2017), at pp. 121-125; Ripinsky & Williams, at pp. 316-319.

They accepted to pay a price for the land with the Project without appropriate legal protection. A wise investor would not have paid full price up-front for land valued on the assumption of the realization of the Project; he would at least have staged future payments to project progress, including the issuance of the required development permits.

243. The Tribunal considers therefore that the Claimants should bear part of the damages suffered and the Tribunal estimates that share to be 50% after deduction of the residual value of their investment calculated on the basis of the following considerations.272

[Emphasis added]

312.  The *MTD* Tribunal's 50:50 split of the damages was upheld by the *MTD ad hoc* annulment Committee.273

313.  In *Azurix v. Argentina*, the Tribunal found that Azurix had made an ill-informed business judgment and grossly overpaid for a concession. The offers from other bidders had been at least ten times lower than the one submitted by Azurix. Stating that no well-informed investor would have paid for the concession the price paid by Azurix, the Tribunal reasoned:

426. First of all, in the Tribunal's view, no well-informed investor, in March 2002, would have paid for the Concession the price (and more particularly, the Canon) paid by Azurix in mid-1999, irrespective of the actions taken by the Province and of the economic situation of Argentina at that time. In that regard, the Tribunal refers to some of the concerns expressed by OPIC at the time it denied financing the investment plan of ABA. As already noted, OPIC pointed out the size of the investments needed to achieve the Concession's objectives as compared to the estimated revenues expected from the tariffs in effect, and considered that failure to agree on a modification of the Concession in order to establish a sustainable situation was an obstacle to OPIC's financing. […]

427. More importantly, the Tribunal refers to the conclusions it reached concerning the RPI review process and the impossibility of including the Canon in the recoverable asset base for the purpose of tariff increases. Azurix has argued that the right price for an auctioned item is the price paid by the winning bidder. Argentina, for its part, argues that the fair market value of the Concession should be based on the much lower competing bids. The function of the Tribunal is not to second-guess the values established by the various bidders at the time of the privatization of AGOSBA, but to try and determine what an independent and well-informed third party would have been willing to pay for the Concession in March 2002, in a context where the Province would have honored its obligations. In that regard, being aware that the RPI tariff adjustment was not automatic and that the Canon could only be recoverable over the remaining duration (some 27 years and 9 ½ months) of the Concession and on the basis of the existing tariffs as adjusted periodically through the review process spelled out in the

---

272 Exhibit RL-085, *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/7, Award, 25 May 2004, ¶¶ 242-243.
273 Exhibit RL-086, *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/7, Decision on Annulment, 21 March 2007, ¶ 101.

Concession Agreement, such investor would have realized that his only hope of recouping the Canon was essentially through expansion of the system and through efficiency improvements between the periodic 5-year tariff reviews. On the other hand, as to the RPI review process, it would have been reasonable for such an investor to conclude that the ORAB would have approved tariff increases from time to time to take into account the Argentine inflation rate, if not the American one.

428. At the same time, the Tribunal cannot ignore the fact that the Province, through its actions and inaction, contributed to the loss in value of the Concession. When the Province accepted Azurix's bid, it considered it as the fair market value for the Concession and the Province benefited from the alleged aggressive price paid.

429. Considering those factors and valuing the Canon at present-day value, the Tribunal is of the opinion that no more than a fraction of the Canon could realistically have been recuperated under the existing Concession Agreement. The Tribunal therefore concludes that the value of the Canon on March 12, 2002 should be established at US$60,000,000 (sixty million US dollars).

430. Secondly, Azurix should be compensated, as part of the fair market value of the Concession, for the additional investments to finance ABA. In its Memorial, Azurix has claimed US$102.4 million in additional capital contributions to the initial sum invested of US$449 million of which US$438,555,551 represent the payment for the Canon. The amount of US$102.4 million when added to the difference between the initial sum invested and the Canon results in investments additional to the Canon of US$112,844,446 (one hundred and twelve million eight hundred forty-four thousand four hundred forty-six US dollars). However, the Tribunal considers that this amount **should be reduced by US$7,603,693** (seven million six hundred and three thousand six hundred ninety-three US dollars) which represent the aggregate of the claims presented by Azurix on account of damages which the Tribunal has found to be related to contractual claims -those related to the works listed in Circular 31(A) **except for Bahía Blanca355- and that should be borne by Azurix as part of its business risk. Therefore, the amount awarded on account of additional investments is US$105,240,753** (one hundred and five million two hundred forty thousand seven hundred fifty-three US dollars).[274]

[Emphasis added]

314. In *Occidental v. Ecuador*, the claimant transferred its interest in an Ecuatorian oilfield without obtaining the relevant ministry's prior consent. Finding this negligent and illegal, the Tribunal concluded that:

670. The Tribunal notes that it is not any contribution by the injured party to the damage which it has suffered which will trigger a finding of contributory negligence. The contribution must be material and significant. In this regard, the Tribunal has a wide margin of discretion in apportioning fault.

[…]

---

[274] Exhibit RL-087, *Azurix Corp. v. The Argentine Republic*, ICSID Case No. ARB/01/12, Final Award, 14 July 2006, ¶¶ 426-430.

686. The Tribunal agrees with the ICSID Annulment Committee in the MTD Equity case that "the role of the two parties contributing to the loss [is] [...] only with difficulty commensurable and the Tribunal [has] a corresponding margin of estimation." However, the Tribunal must reach a decision and it has.

687. Having considered and weighed all the arguments which the parties have presented to the Tribunal in respect of this issue, in particular the evidence and the authorities traversed in the present chapter, the Tribunal, in the exercise of its wide discretion, finds that, as a result of their material and significant wrongful act, the Claimants have contributed to the extent of **25%** to the prejudice which they suffered when the Respondent issued the *Caducidad* Decree. The resulting apportionment of responsibility as between the Claimants and the Respondent**, to wit 25% and 75%,** is fair and reasonable in the circumstances of the present case.[275]

[Emphasis added]

315.  The Respondent notes that in her dissenting opinion, Professor Brigitte Stern stated the contribution of the claimants to the damage has been overly underestimated by the majority. She said that the fault contributable to the claimants should be 50% considering the claimants' fault. Professor Stern stated:

7. I consider that the contribution of the Claimants to the damage has been overly underestimated, as the Claimants deliberately took the risk of *caducidad* by their behaviour – meaning that *caducidad* could happen or not happen, and there were indeed more chances that it could happen than not, considering the text of the law and the reference to *caducidad* in the contract. It is interesting to note that in the *MTD* case both the tribunal and the ad hoc committee have endorsed a 50/50 split on the sole ground that the claimant had acted imprudently from a business point of view though not illegally. Here the split 50/50 would have been even more justified, as the Claimants have acted both very imprudently and illegally. This critique of the majority's position, however, is not based on an error of law or an excess of power, but on a different appreciation of the factual situation, which is at the discretion of the Tribunal.

8. As a result of the foregoing, I consider that a fair and reasonable apportionment of responsibility between the Claimants and the Respondent should more appropriately have been a 50/50 split.[276]

[Emphasis added]

316.  In *Yukos v. Russia*, the Tribunal reduced 25% of the damages due to the claimant's negligent conduct. It held:

4. Tribunal's Decision on Contributory Fault

1633. Paraphrasing the words of Article 39 of the ILC Articles on State Responsibility and its commentary, the Tribunal must now determine whether Claimants' and Yukos'

---

[275] Exhibit RL-088, Occidental Petroleum Corporation and Occidental Exploration and Production Company v. The Republic of Ecuador, ICSID Case No. ARB/06/11, Award, 5 October 2012, ¶¶ 670, 686-687.

[276] Exhibit RL-089, Occidental Petroleum Corporation and Occidental Exploration and Production Company v. The Republic of Ecuador, ICSID Case No. ARB/06/11, Dissenting Opinion (Brigitte Stern), ¶¶ 7-8.

tax avoidance arrangements in some of the low-tax regions, including their questionable use of the Cyprus-Russia DTA summarized above, <u>contributed to their injury in a material and significant way</u>, or were these minor contributory factors which, based on subsequent events such as the decision of the Russian authorities to destroy Yukos, cannot be considered, legally, as a link in the causative chain. <u>As the Tribunal noted earlier in this chapter, an award of damages may be reduced if the victim of the wrongful act of the respondent State also committed a fault which contributed to the prejudice it suffered and for which the trier of facts, in the exercise of its discretion, considers the claiming party should bear some responsibility.</u>

1634. In the view of the Tribunal, Claimants should pay a price for Yukos' abuse of the low-tax regions by some of its trading entities, including its questionable use of the Cyprus-Russia DTA, which contributed in a material way to the prejudice which they subsequently suffered at the hands of the Russian Federation.

1635. In considering the extent of the contribution of Claimants' faults to their injury, the Tribunal notes that the subsequent conduct of the Russian Federation, as the Tribunal has found, was disproportionate and tantamount to expropriation of Claimants' investment in Yukos. Claimants' damages were caused by the series of events starting with the arrest of Messrs. Khodorkovsky and Lebedev, and the tax assessments, and culminating in the YNG auction, which led to the bankruptcy and liquidation of Yukos. The Tribunal must now determine to what extent and in what proportion Claimants' and Yukos' conduct prior to 2003, including their questionable use of the Cyprus-Russia DTA, contributed so as to lessen the responsibility of Respondent.

1636. The Tribunal agrees with the ICSID Annulment Committee in the *MTD v. Chile* case that "the role of the two parties contributing to the loss [is] [ . . . ] only with difficulty commensurable and the Tribunal [has] a corresponding margin of estimation." However, the Tribunal, as other tribunals have done, must reach a decision and it has done so on the basis of all the evidence which it has reviewed.

1637. Having considered and weighed all the arguments which the Parties have presented to it in respect of this issue the Tribunal, <u>in the exercise of its wide discretion, finds that, as a result of the material and significant mis-conduct by Claimants and by Yukos (which they controlled), Claimants have contributed to the extent of 25 percent to the prejudice which they suffered as a result of Respondent's destruction of Yukos.</u> The resulting apportionment of responsibility as between Claimants and Respondent, namely 25 percent and 75 percent,<u> is fair and reasonable </u>in the circumstances of the present case.[277]

[Emphasis added and footnotes omitted]

## 317.  In *Copper Mesa v. Ecuador*, the Tribunal also deducted the compensation payable because of negligence on the part of a claimant, holding that:

6.91. Contributory Fault: As to "contributory fault", the Tribunal refers to Article 39 of the ILC Articles on State Responsibility, entitled "Contribution to the Injury" as being declaratory of international law. It provides: "In the determination of reparation, account

---

[277] Exhibit RL-090, *Yukos Universal Limited (Isle of Man) v. The Russian Federation*, UNCITRAL, PCA Case No. AA 227, Final Award, 18 July 2014, ¶¶ 1633-1637.

shall be taken of the contribution to the injury by wilful or negligent action or omission of the injured State or any person or entity in relation to whom reparation is sought." In the ILC Commentary (paragraph 1), Article 39 is described as dealing "with the situation where damage has been caused by an intentionally wrongful act of a State, which is accordingly responsible for the damage in accordance with Articles 1 and 28, but where … the individual victim of the breach has materially contributed to the damage by some willful or negligent act or omission. Its focus is on situations which in national law systems are referred to as 'contributory negligence', 'comparative fault', 'faute de la victime' etc."

6.92. The ILC Commentary also explains what is meant by wilful or negligent action or omission (paragraph 5): "Not every action or omission which contributes to the damage suffered is relevant for this purpose. Rather article 39 allows to be taken into account only those actions or omissions which can be considered as wilful or negligent, i.e., which manifests a lack of due care on the part of the victim of the breach for his or her own property or rights [footnote omitted]. While the notion of a negligent action or omission is not qualified, e.g., by a requirement that the negligence should have reached the level of being 'serious' or 'gross', the relevance of any negligence to reparation will depend upon the degree to which is has contributed to the damage as well as the other circumstances of the case. The phrase 'account shall be taken' indicates that the article deals with factors that are capable of affecting the form or reducing the amount of reparation in an appropriate case." The ILC Commentary cites (inter alia) the decisions in *LaGrand*, *Delagoa Bay Railway* and *The Wimbledon*.

[…]

6.96. As was cited by the Yukos tribunal, the *MTD* committee held that the role of the two parties contributing to the loss was only with difficulty commensurable; and that the tribunal had "a corresponding margin of estimation" (paragraph 101). The *Occidental* tribunal decided likewise that it had "a wide margin of discretion in apportioning fault." (paragraph 670). The Tribunal does not discount the difficulty in estimating a contribution by way of percentage contribution; but it prefers to interpret these references to "margin" and "discretion" as requiring the same exercise for any issue of causation. In the present case, that issue is essentially factual.

6.97. For present purposes, the Tribunal considers that the general approach taken in all these decisions, whether treated as causation, contributory fault (based on wilful or negligent act or omission) or unclean hands, is materially the same, deriving from a consistent line of international legal materials. The Tribunal decides to apply that general approach in this case. As further explained below, it decides that the Claimant's injury was caused both by the Respondent's unlawful expropriation and also by the Claimant's own contributory negligent acts and omissions and unclean hands. Given that the Tribunal draws no distinction between these different concepts for this case, it prefers to refer only to Article 39 of the ILC Articles.

[…]

6.100. In the Tribunal's view, the evidence establishes that several of the Claimant's senior personnel in Quito were guilty of directing violent acts committed on its behalf, in violation of Ecuadorian criminal law. Their resort to subterfuge and mendacity aggravated those acts. The consequences could have led to serious injury and loss of

life. The adverse response from members of the local communities, already hostile, was inevitable. That is not to say that the Claimant's senior management in Canada was fully privy to the planning and execution of these acts. <u>On the evidence, the</u> Tribunal prefers to base its decision on the Claimant's negligence, rather than the wilful conduct of its Canadian senior management. […]

[…]

6.102. Taking all these factors into account, including the provocations by certain anti-miners, the Tribunal assesses the Claimant's contribution to its own injury as at November 2008, for the purpose of applying Article 39 of the ILC Articles, <u>at 30 per cent</u>. On the facts of this case, it could not be less.[278]

[Emphasis added]

318.   In *Bear Creek v. Peru*, the dissenting Arbitrator Professor Sands found that the compensation payable should be deducted by 50% owing to the claimant's negligence. He provided a detailed analysis which the Respondent sets out for this Tribunal's consideration:

4. I disagree, however, with the Majority's assessment of the amount of damages that are due, in application of this approach, and in particular the failure to reduce that amount by reason of the fault of the Claimant in contributing to the unrest. Whilst I agree that it is for the Respondent to establish any contributory fault, my assessment of the evidence before the Tribunal is that the Respondent has clearly established the Claimant's contributory responsibility, by reason of its acts and omissions, to the social unrest that left the Peruvian government in the predicament it faced, and the need to do something reasonable and lawful to protect public well-being. I set out my reasons in this Partial Dissent.

[…]

6. In reaching a contrary view to my colleagues<u>, I rely on the totality of the evidence</u> that was put before us by the Parties, and in particular the extensive testimony of numerous witnesses and experts. For the reasons set out below, in my view this evidence clearly shows that the Claimant's acts and omissions, in the period before 2008, during 2008, thereafter, and right up until May 2011, <u>contributed in material ways</u> to the events that unfolded and then led to the Project's collapse. In particular, the Project collapsed because of the investor's inability to obtain a "social license", the necessary understanding between the Project's proponents and those living in the communities most likely to be affected by it, whether directly or indirectly. It is blindingly obvious that the viability and success of a project such as this, located in the community of the Aymara peoples, a group of interconnected communities, was necessarily dependent on local support. In this regard, the Project can hardly be said to have got off to a good start, with the Claimant making use of a degree of subterfuge, by obtaining permits in the name of one of its own lowly employees – Ms Villavicencio, a Peruvian national – which it, as a foreign corporation, was not at the time authorised or lawfully entitled to obtain. If nothing else, the absence of transparency at that early stage of the Project can only have contributed to an undermining of the conditions necessary to build trust over

---

[278] Exhibit RL-091, *Copper Mesa Mining Corporation v. Republic of Ecuador*, PCA Case No. 2012-2, Award (Redacted), 15 March 2016, ¶¶ 6.91-92, 6.96-97, 6.100, 6.102. [Emphasis added].

the longer term. The discontent that followed, expressed by many members of the affected local communities, was foreseeable.

[…]

33. In summary, it is apparent from his testimony, which is not really contradicted by the Claimant, that the investor's outreach programme was inadequate: it failed to involve all the potentially affected communities, offering jobs only to some and engaging in consultations which were uneven and insufficient across the totality of communities. What should the Claimant have done? Professor Peña says the Claimant should have dealt with communities as a collective: "rather than focus on the communities that were close to the mining field … they should have included the other communities that they felt were affected." He hazards the opinion that "had they discussed with the entire collective [of communities] and reached an agreement, it is quite likely that the answer … would have been different." Equally, he argues, a more equal distribution of jobs, and a different approach to their being offered, would have had positive consequences[.]

[..]

35. […] [I]t is clear that the Claimant did not do all it could have done to engage with all the affected communities, especially after the initial protests in 2008. That evidence also makes clear that the Claimant failed to acknowledge that those events were motivated, in significant part, by the fact that certain affected (or potentially affected) communities had serious concerns with the Project because of its potential environmental risks, and because they felt themselves to be excluded from its benefits. The Claimant failed to draw the obvious and necessary conclusions from the early indications of opposition in 2008, in particular the need to improve its community outreach and relations.

[…]

37. As regards the role of the Respondent, it too has legitimate interests and rights, including respect for the rights of the Claimant under the Canada-Peru FTA. By the means in which Decree 032-2011 was adopted, and perhaps also for the failure to respond effectively to the complaints received in 2011, as noted by Professor Peña, it bears a significant share of the responsibilities. It may be the function of a State or its central government to deliver a domestic law framework that ensures that a consultation process and outcomes are consistent with Article 15 of ILO Convention 169, but it is not their function to hold an investor's hand and deliver a "social license" out of those processes. It is for the investor to obtain the "social license", and in this case it was unable to do so largely because of its own failures. The Canada-Peru FTA is not, any more than ICSID, an insurance policy against the failure of an inadequately prepared investor to obtain such a license.

[…]

39. That financial contribution amounted to US\$ 18,237,592. I conclude that the Claimant's contribution was significant and material, and that its responsibilities are no

less than those of the government. For this reason I would <u>reduce the measure of damages by one half</u>, to US$ 9,118,796.[279]

[Emphasis added and footnotes omitted]

319.  The Respondent submits that an investor's obligation to act prudently to avoid an attribution of contributory fault extends to the exercise of their rights within a legal system. After citing the *Mondev* award's paragraph 127 (the standard on finding denial of justice—shock or surprise) with approval, the *Limited Liability Company Amto v. Ukraine* Tribunal held that:

> In the context of the present arbitration, the Tribunal would add that the experience of an investor in domestic courts may involve a series of decisions, and these decisions should be considered in their entirety. Further, the available means within the host State's legal system to address errors or injustices, and whether or not they were exercised, are relevant to the assessment of the propriety of the outcome. <u>The investor that fails to exercise his rights within a legal system, or exercises its rights unwisely, cannot pass his own responsibility for the outcome to the administration of justice, and from there to the host State in international law</u>.[280]

[Emphasis added]

320.  Viewed individually or cumulatively, the Claimant's bad business decisions, lack of diligence and other inappropriate actions including the conduct of domestic legal procedures are the source of the majority of the Claimant's losses if not all of them. The Respondent submits that the following imprudent and negligent actions should give rise to a finding of contributory fault and a significant reduction in the amount of damages:

- Granting the Loans without proper due diligence on the Debtors, including: their credit history, their ability to repay the debt and the expected profitability of the projects the Loans were intended to fund. It is important for this Tribunal to bear in mind that it was the Claimant who chose Mr. Cárdenas as a business partner and decided to put their capital at risk without proper vetting. The adverse result of this risky behaviour should not be visited upon the Respondent;[281]

- Failure to foreclose on the properties or sue the Debtors for payment of the Loans when they first became due and payable on 12 September 2007 (Americas I Loan), 26 December 2007 (Americas II Loan) and 28 August 2008 (Destiladeras Loan) respectively. Had the Claimant done so, the debt, including interest, would have totalled approximately USD $38.1 million, instead of the USD $223.2 million indicated in the NOA;[282]

---

[279] Exhibit RL-092, *Bear Creek Mining Corporation v. Republic of Peru, ICSID Case No. ARB/14/21*, Partial Dissenting Opinion of Professor Philippe Sands QC, 30 November 2017, ¶¶ 4, 6, 33, 35, 37, 39.

[280] Exhibit RL-093, *Limited Liability Company Amto v. Ukraine*, SCC Case No. 080/2005, Final Award, 26 March 2008, ¶¶ 76.

[281] *Supra* at ¶¶ 18-20.

[282] *Supra* at ¶¶ 33-34.

- Extending the due date of the Loans numerous times despite obvious signs of the Debtors' inability to repay them. The Claimant has offered no reasonable explanation for extending the maturity dates for the Destiladeras Loan (4 times), the Americas I Loan (7 times), and the Americas II Loan (6 times);[283]

- Failure to foreclose on the Mortgages or attempt to collect the debt under the Notes immediately after the final due date of 30 September 2009. On the Claimant's own evidence, between September 2009 and September 2012 the Nayarit property lost nearly 30% of its value and the Guadalajara property lost approximately 14% of its value while the Claimant was allegedly negotiating settlement with Bains;[284]

- Continuing to issue invoices for default amounts after the final due date without initiating foreclosure or other actions (Seven invoices issued for default amounts owing between 16 Apr 2010 and 29 Jul 2011 and none were paid);[285]

- Waiting one and a half years to engage the Debtors in negotiations. As noted in the fact section, the Claimant has been unable or unwilling to provide evidence of settlement discussions between 30 September 2009 and 2 May 2011;[286]

- Engaging in protracted negotiations with the Debtors after the final due date, while letting the debt to increase at a significant rate of interest. The Claimant has offered no reasonable explanation for its decision to negotiate (unsuccessfully) settlement with the Debtors over the two and one half years period that elapsed between the final due date and the date in which the Claimant decided to foreclose on the Nayarit property;[287]

- Failing to foreclose on all three Mortgages. The Claimant opted for the approach of initiating the foreclosure only on the Nayarit Mortgage to minimize the cost and with the hope that initiating these proceedings would persuade Cárdenas to an amicable resolution of the dispute. The Claimant is now suing the Respondent for the expropriation of rights it never sought to exercise, even when it had a chance to do so;[288]

- Withdrawing from the *amparo* review. The Claimant withdrew from a process that existed to address the problems that it encountered;[289]

- Withdrawing from the Foreclosure Proceedings;

- At ¶ 443 of the Memorial, the Claimant acknowledges:

  if LMC's foreclosure on the Nayarit Project property had proceeded normally, LMC also would have commenced parallel actions seeking the same relief against the Guadalajara Project property, as its ability to vindicate its rights in court would have removed any obstacle from the initiation of that second foreclosure proceeding. This would have been the most reasonable course of action for LMC,

---

[283] Memorial on the Merits, ¶¶ 21 and 26. *Supra* at ¶¶ 33.
[284] Memorial on the Merits, table at ¶ 463. According to this table the properties lost USD $27.4 million.
[285] *Id.*, ¶¶ 26-27.
[286] *Supra* at ¶¶ 37-39.
[287] *Supra* at ¶ 41.
[288] *Supra* at ¶¶ 43, Memorial on the Merits ¶ 35.
[289] *Supra* at ¶¶ 107, 110 and 165.

as the principal and accrued interest on Cárdenas's loans at that time had already far exceeded the estimated value of the Nayarit property. In fact, LMC could have also initiated proceedings to enforce the Notes over any other present and future assets of the Debtors in respect of any outstanding amount after the foreclosure of all the properties. Instead, LMC's inability to vindicate its rights through its first proceeding deterred it from incurring the expense of filing a second action with respect to the Guadalajara property, and even more on the Notes as LMC had every reason to believe that a second action would face the same stagnation and would likewise yield nothing".

321.  These actions were unreasonable, imprudent and negligent.

322.  As a result of these actions, the Claimant severely prejudiced its ability to recover the amounts owning under the loans and notes. In the Respondent's submission, the amount of any award on damages should be reduced by at least the value of the Guadalajara Mortgages.

### a.  Investment risk assumed by the Claimant

323.  A reduction to the maximum amount referenced above must be made to account for investment risks borne by the Claimant to avoid putting the Claimant in a better position than it would have been but for the illegality.[290] The NAFTA does not impose upon its Parties an obligation to insure private parties against investment risk.

324.  The Claimant voluntarily assumed risks that go beyond the typical business risks associated with providing bridge financing for the development of two real estate projects that were inherently high-risk investments as evidenced in the high interest rates and short maturity terms in the loans and notes. As noted in the fact section, the Claimant decided to issue the Loans without a proper background and credit checks on the debtors or an analysis of the projects' expected profitability.

325.  These actions and inactions and the materialization of the risks voluntarily undertaken by the Claimant were the primary causes of the situation it now finds itself in. The Respondent cannot be held liable for losses that materialized from business risks that are voluntarily assumed by the Claimant.[291]

### F.  Incidental expenses and costs are not proven and recoverable

326.  Incidental expenses are those that an investor has incurred exclusively as a consequence of the unlawful conduct.[292] The Respondent does not dispute the general proposition that "where a claimant has been denied justice in domestic courts in breach of an international obligation and the loss of legal expenses is a result of such breach, it would be legitimate to treat them as incidental expenses in a subsequent international arbitration."[293]

---

[290]  Exhibit RL-077, Ripinsky Williams, at p. 330.
[291]  *Id.*, pp. 331-332.
[292]  *Id.*, at p. 299.
[293]  *Id.*, at p. 303.

327. However, incidental expenses, as any other head of damages must be proven and the Claimant in this case has failed to do so. Indeed, the Claimant has offered no evidence whatsoever in support of their USD $1,262,650.00 claim for "legal costs in Mexican proceedings". Moreover, the Claimant cannot claim legal fees and expenses related to the *amparo* review proceeding from which it prematurely withdrew.

### G.    Interest

328. The Respondent does not dispute that the Claimant would be entitled to interest on any amounts awarded, should the Tribunal hold the Respondent liable for a breach of its obligations under the NAFTA. It also does not dispute that interest would be due from the date of the breach until the date in which the award is paid.

329. The parties to this arbitration also seem to be in agreement that the interest rate applicable to any award on damages is "a relatively low and risk-free rate of interest".[294] The parties, however, disagree on what that risk-free rate of interest should be.

330. The Claimant proposes the legal rate for commercial debts in default provided by Article 362 of the Mexican Commercial Code (6% per year). Alternatively, it proposes the 28-day Interbank Equilibrium Interest Rate (TIIE). Neither of these rates is relatively low or risk-free, but more importantly, these rates are not applicable to U.S. denominated amounts.

331. The Respondent maintains that the interest rate must be consistent with the currency in which the award is granted. Thus, for an award denominated in U.S. dollars a "relatively low or risk-free" rate would be that of the U.S. Treasury Bills and for an award denominated in Mexican pesos, it should be the 28-day CETES rate. In any case, it would be utterly inappropriate to apply a Mexican peso rate to a U.S. denominated amount as the Claimant proposes.

332. On the issue of how pre and post-award interest should be calculated, the Respondent observes that there is no international consensus on whether interest should be calculated using simple or compounded interest. There are numerous Tribunals that have opted for simple interest[295] and also numerous Tribunals that have opted for compound interest. However, the Respondent maintains that, in the circumstances of this case, the Claimant should not be rewarded with compound interest.

333. The Respondent also observes that there is also no consensus among the Tribunals that have ordered compound interest as to the compounding period, although the vast majority have opted

---

[294] Memorial on the Merits, ¶ 486, where it reads: "Accordingly, the interest factor to be applied to the period between the aforementioned dates and the date of actual payment of damages to LMC is a relatively low and risk-free rate of interest." [Emphasis added]

[295] See for example: Exhibit RL-094, *Marvin Roy Feldman Karpa v. United Mexican States*, ICSID Case No. ARB(AF)/99/1, Award, 16 December 2002; Exhibit RL-095, *Occidental Exploration and Production Company v. Republic of Ecuador*, LCIA Case No. UN3467, Final Award, 1 July 2004; Exhibit RL-063, *Mr. Franck Charles Arif v. Republic of Moldova*, ICSID Case No. ARB/11/23, Award, 8 April 2013.

for annual compounding.[296] Thus, should the Tribunal opt for compounded interest, the Respondent submits that it should be annual compounding and not monthly compounding as the Claimant suggests.

## IV.   Request for relief

334.   For all of the foregoing reasons, the Respondent requests:

- an Order dismissing the Claimant's Claim in its entirety;

- an Order that the Claimant indemnify the Respondent for its costs incurred in this arbitration, including its legal costs and the travel expenses occurred by its legal team, witnesses, and experts; and

- such other relief as the Respondent may request and this Tribunal may deem appropriate.

335.   In the alternative, in the unlikely event that the Tribunal concludes that the Respondent is internationally liable for a breach of its obligations under NAFTA Article 1110 and/or Article 1105, the Respondent requests:

- that the amount of damages be determined on the basis of the CBRE reports and Sanchez Devanny opinion, which put the value of the property, net of foreclosure fees and expenses, at USD $47,060,068.57;

- *minus* the deduction that the Tribunal finds appropriate to avoid double recovery and to account for the Claimant's contributory fault;

- *plus* an award of interest based on a relatively low and risk-free rate applicable to U.S. dollar denominated amounts, such as the U.S. Treasury Bill with annual compounding; and

- any such other relief as the Respondent may request and this Tribunal may deem appropriate.

336.   All of which is submitted this 26th day of October, 2018.

Respectfully submitted,

Samantha Atayde Arellano

General Counsel for the United Mexican States

---

[296] See for example: Exhibit RL-096, *S.D. Myers, Inc. v. Government of Canada*, UNCITRAL, Second Partial Award, 21 October 2002, ¶ 306; Exhibit RL-097, *Cargill Incorporated v. United Mexican States*, ICSID Case No. ARB(AF)/05/2, Award, 18 September 2009, ¶ 560, Exhibit RL-098, *RosInvest Co UK Ltd. v. Russian Federation*, SCC Case No. V079/2005, Final Award, 12 September 2010, ¶ 690.