# EXHIBIT 5

**In proceedings pursuant to NAFTA Chapter 11 and the UNCITRAL Arbitration Rules:**

**BETWEEN**

**GAMI INVESTMENTS, INC.**

**Claimant**

**And**

**THE GOVERNMENT OF THE UNITED MEXICAN STATES**

**Respondent**

# FINAL AWARD

### 15 November 2004

Before the Tribunal comprising:

W. Michael Reisman
Julio Lacarte Muró
Jan Paulsson

Representing the Claimant:

**Weil Gotshal & Manges LLP**
Charles E. Roh, Jr.
Adam P. Strochak
J. Sloane Strickler
Alicia Cate

**SAI Abogados**
Guillermo Aguilar Alvarez
Lucía Ojeda
Elsa Ortega
Itziar Esparza

Representing the Respondent:

**Consultor jurídico de los Estados Unidos Mexicanos**
Hugo Perezcano Díaz

**Secretaría de Economía**
Luis González García

**Thomas & Partners**
J. Cameron Mowatt
Gregory A. Tereposky

**Shaw Pittmann LLP**
Stephan E. Becker
Sanjay Mullick

Secretary to the Tribunal:
Zachary Douglas

Formal seat of the arbitration: Vancouver

# TABLE OF CONTENTS

1.   THE PARTIES..........................................................................1

2.   THE TRIBUNAL AND THE PROCEDURE ...........................2

3.   FACTUAL BACKGROUND......................................................7

4.   THE CLAIMS ........................................................................10

5.   JURISDICTION AND STANDING........................................12

6.   MALADMINISTRATION ......................................................19

    6(A)   Factual bases of GAMI's complaint...........................19

        (i)   The regulatory framework..............................19

        (ii)   Alleged failures of implementation and enforcement............................................25

    6(B)   Minimum standard of treatment: GAMI's claim under Article 1105...........................................31

    6(C)   Discrimination: GAMI's claim under Article 1102 .................................................................43

7.   EXPROPRIATION .................................................................45

8.   COSTS ...................................................................................52

9.   DECISION..............................................................................53

## 1.      THE PARTIES

1.      GAMI Investments Inc. ("GAMI" or "the Claimant") is a US investment corporation created in 1986 under the laws of Delaware.  Its head office is in Las Vegas.  It is a wholly-owned subsidiary of another US company named Great American Management and Investments Inc.  GAMI owns 14.18% of the shares of *Grupo Azucarero México SA de CV* ("GAM").  GAM is a Mexican holding company whose remaining shareholders are Mexican.   Its dominant shareholder is Mr Juan Gallardo Thurlow.  He owns or controls 64.2% of GAM's shares.  The similarity in names of GAMI and GAM is coincidental.

2.      The Respondent is the Government of the United Mexican States ("Mexico" or "the Respondent").  Mexico is a Party to the North American Free Trade Agreement ("NAFTA").

## 2.      THE TRIBUNAL AND THE PROCEDURE

3.      GAMI elected to proceed under the UNCITRAL Arbitration Rules of 1976 (as modified by Section B of NAFTA Chapter 11) by exercising the option available to it under NAFTA Article 1120.

4.      GAMI appointed Professor Michael Reisman as arbitrator.   Mexico appointed Mr Julio Lacarte Múro as arbitrator.   The Parties jointly appointed Mr Jan Paulsson as presiding arbitrator.   The Tribunal was fully constituted on 2 October 2002.   The arbitrators were assisted by Mr Zachary Douglas as the Tribunal's administrative secretary.

5.      The Parties did not agree on the choice of a formal seat of the arbitration.  The Tribunal considered their submissions in this respect and selected Vancouver.  The Parties agreed as a matter of convenience that hearings would be conducted in Washington DC.

6.      The Tribunal sees no need to burden the text of this Award with a recital of correspondence with counsel.  Nor is it necessary to set out the content of procedural orders.  They have all been reduced to writing.  Suffice it to say that the Parties explicitly confirmed that no unresolved procedural issues were extant as of the end of the Final Hearings.

7.      Mexico raised jurisdictional objections.  They were the subject of a special hearing on 17 September 2003 ("the Hearing on Jurisdiction") in the course of which counsel addressed the Tribunal and answered questions put to them by the arbitrators. No witnesses were heard.  Representatives of the Governments of Canada and the United States of America were present.  In light of the submissions the Tribunal decided to join the jurisdictional issues to the merits.

8.      On 20 February 2004 the disputing Parties were informed of a *Sentencia* handed down by the Mexican *Tribunal Colegiado*.  This judgment annulled the expropriation of three sugar mills owned by GAM.  On 27 February 2004 Mexico represented to the Tribunal in writing that the *Sentencia* was unappealable and would be executed by the Federal Government.  The three mills would thus be returned to GAM.  The expropriation of GAM's two remaining mills had not been challenged.  Mexico's letter to the Tribunal represented: "*Los trámites para el pago de la indemnización por la expropiación de los otros dos ingenios también están en curso.*"  ("The formalities for payment of the indemnity for the expropriation of the two other mills are also in progress.")

9.      The hearings on the merits were held on 29 and 30 March and 1 April 2004 ("the Final Hearings").  The following witnesses testified before the Tribunal:

-      Alberto Santos (Witness for the Claimant; Chairman of Ingenios Santos S.A. de C.V. and former President of the CNIAA);

-      Juan Cortina (Witness for the Claimant; Chairman and Chief Executive Officer of GAM);

-      José Manuel Tapia (Witness for the Respondent; official of the Ministry of Agriculture with responsibility for expropriated mills);

-      Fausto García of F. García Asociados (Valuation Expert for the Respondent; author of a report on the valuation of GAM and the minority interest held by GAMI);

-      José Pinto Mazal (Witness for the Respondent; Director of Beta San Miguel S.A. de C.V. and an official of the CNIAA).

Each of them had submitted written statements.  Statements had also been produced by the following witnesses who were not called to answer questions:

-  Timothy H. Hart & Brent C. Kaczmarek (Valuation Experts for the Claimant; authors of the Navigant Consulting report on the valuation of GAM and the minority interest held by GAMI);

-  Luis Ramiro García Chávez (Expert for the Respondent; Professor of the Autonomous University of Chapingo and author of an analysis of the cane sugar industry in Mexico);

-  Mark Alan Radzik (Witness for the Claimant; Managing Director of the GAMI affiliate Equity Group Investments);

-  Pedro Adalberto González Hernández (Witness for the Respondent; Director of *Industrias basicas* of the Ministry of the Economy);

-  Ulises Schmill Ordóñez (Legal Expert for the Claimant; former Chief Justice of the Supreme Court of Mexico and author of an Opinion on legal aspects of the Mexican Government's regulation of the sugar industry);

-  Andrés Antonius González (Expert for the Claimant; former Technical Secretary to the Mexican Inter-Ministerial Working Group on Sugar and author of a report on the Mexican Sugar Industry);

-  Dario Oscos Coria (Legal Expert for the Claimant; Professor of Bankruptcy and Procedural Law and author of an opinion on the *Suspensión de Pagos* Proceeding in Mexico);

-  Jose Cruz Romero Romero (Witness for the Claimant; an accountant and sometime *Asesor General* to the *Unión Nacional de Productores de Caña de Azucar*);

-  Carlos Sempé Minvielle (Legal Expert for the Respondent; former Judge of the Supreme Court

of Mexico and former consultant to the Presidency and author of an opinion on legal aspects of the regulation of the sugar industry).

10.     The principal written submissions referred to in this Award are the following:

-     GAMI's Statement of Claim dated 10 February 2003    ("SoC")

-     Mexico's *Escrito de Contestación* dated 24 November 2003    ("EdC")

-     GAMI's Reply dated 5 July 2004    ("Reply")

-     Mexico's *Escrito de Dúplica* dated 11 March 2004    ("*Dúplica*")

-     GAMI's Post-hearing Brief dated 24 May 2004    ("Post-hearing Brief")

-     Mexico's *Escrito posterior a la audiencia* dated 24 May 2004    ("*Escrito posterior*")

-     GAMI's Rebuttal Post-hearing Brief dated 4 June 2004    ("Rebuttal")

-     Mexico's *Réplica al escrito de GAMI posterior a la audiencia* dated 4 June 2004    ("*Réplica posterior*")

11.     The Tribunal provided Canada and the United States of America the opportunity to file written submissions in accordance with NAFTA Article 1128 both before and after the Hearing on Jurisdiction and the Final Hearings.  The United States of America exercised its right under Article 1128 by filing a submission on questions of jurisdiction before the Hearing on

Jurisdiction. Neither of these two NAFTA Parties filed submissions on the merits. Both sent representatives to the Hearing on Jurisdiction and the Final Hearings in Washington.

## 3.   FACTUAL BACKGROUND

12.     GAM and its predecessors acquired sugar mills from the Government of Mexico in the late 1980s and early 1990s in the context of a privatisation programme.  By 1997 GAM's primary operations consisted of five mills:

- Tala

- Lázaro Cárdenas

- San Pedro

- San Francisco

- Benito Juárez

The first four produced standard sugar.  Benito Juárez produced mostly refined sugar.  In 2001 GAM was Mexico's fourth largest sugar producer.  Its output represented 8.81% of Mexico's total production during the 2000/2001 harvest.

13.     In December 1996 GAMI purchased a block of GAM shares sold by private placement at a cost of US$ 25 million.  In October 1997 GAMI paid a further US$ 5 million to acquire additional GAM shares on the occasion of a public offering.  In December 1998 GAMI received another tranche of shares pursuant to a term of the original private placement conditions.  These three tranches represented a total holding of 14.18% of GAM's common shares.  GAMI enjoyed a contractual right to designate three members of GAM's Board of Directors.

14.     GAM's Chairman and CEO since September 2001 is Mr Juan Cortina.  He testified that when he assumed those functions GAM's position among Mexico's largest sugar producers was in part the result of investments in the approximate amount of US$ 42 million.   Approximately US$ 13.7 million thereof was expended in the years 1998-2000.

15.     GAM had a packaging subsidiary (*Proveedora de Alimentos México SA de CV*).  GAM also had three separate service companies.   None of these four entities owned significant assets.

16.     Mr Cortina testified that the Government failed in a number of ways to fulfil its regulatory functions under the regime established pursuant to the so-called Sugarcane Decree of 1991.  (It was amended in 1993 and affected by ministerial *acuerdos*.)   Export requirements were not enforced.   The establishment of production ceilings were required by law but never materialised.  Sugar was dumped on the domestic market. Mills were caught between low prices for their product and the regulated high cost of their primary raw material (sugarcane). The entire industry experienced a crisis beginning in 1999.  The result for GAM was a filing for *suspensión de pagos* (suspension of payments) on 9 May 2000.   This judicial procedure was intended to allow the restructuring of GAM's debt and its avoidance of bankruptcy.

17.     22 sugar mills were formally expropriated by a decree published on 3 September 2001 ("the Expropriation Decree"). They included all five of GAMI's mills.  34 other mills were left in private hands.  The Expropriation Decree recited that it had been enacted on grounds of public purpose identified in the *Ley de Expropiación* of 1997 ("the Expropriation Law").

18.     GAM forthwith challenged the constitutionality of the Expropriation Law and the Expropriation Decree by means of *amparo* proceedings before the relevant Mexican administrative courts.  Soon thereafter Mr Cortina withdrew the *amparos* relating to San Pedro and San Francisco.  He states that the assets of each of the three other mills exceeded its liabilities as of 30 September 2001.

19.     Other mill owners also brought *amparo* proceedings. In October 2002 one such action resulted in a ruling of invalidity of the expropriation of a mill owned by *Consorcio*

*Azucarero Caze SA de CV*.   In January 2003 the *Grupo Machado* obtained a similar judgment.

20.      On 9 February 2004 the Tribunal Colegiado en Materia Administrativa del Primer Circuito rendered a 600-page *Sentencia de Amparo en Revisión* (the "*Sentencia*") in favour of GAM.   It held the Expropriation Decree to be unlawful and therefore ineffective as to the three mills.

21.      The Parties have confirmed in writing their understanding that the *Sentencia* is unappealable.

22.      The practical consequences with respect to the mills were set out in Mexico's letter to the Tribunal of 27 February 2004 (see Paragraph 8 *supra*).

## 4.    THE CLAIMS

23.    A fundamental feature of GAMI's claims is that they are derivative. GAMI does not claim that Mexican governmental measures were directed against its shareholding in GAM. Its grievance is that the value of its shareholding was adversely affected by measures which caused GAM's business to suffer. Another fundamental aspect of the case is that GAMI cannot invoke contractual commitments by Mexico. Neither GAM nor GAMI had contracts with the Government. GAMI therefore cannot say that its investment decision was predicated on contractual promises to establish or maintain a certain regime for its investment. There is by definition no need to consider contractual intentions in the sense of a meeting of the minds between government and investor. What GAMI must rely on is NAFTA as a means by which Mexico's conduct in the context of its regulatory framework might be subject to international legal review.

24.    GAMI's Statement of Claim identified Mexico's alleged breaches as the following:

(A)    *Failing to accord GAMI's investment "fair and equitable treatment and full protection and security in accordance with international law" as required by NAFTA Article 1105.* GAMI criticises Mexico for "arbitrary conduct with respect to implementation and application of Mexico's sugar regime" and "arbitrary and discriminatory expropriation of GAM's sugar mills."

(B)    *"Treating GAMI and its investments less favourably than it treated Mexican investors and their investments in like circumstances" as forbidden by NAFTA Article 1102.* GAMI criticises Mexico for "expropriating the sugar mills of GAM when investors in other sugar mill-owning enterprises in like

circumstances did not have their sugar mills expropriated" and "requiring GAM to fulfil its export requirements while not also requiring other investments in like circumstances to fulfil their requirements."

(C) *Violating NAFTA Article 1110 which protects investors against wrongful expropriation.* GAMI criticises Mexico for "indirectly expropriating GAMI's share in GAM in a manner inconsistent with the requirements of Article 1110."

25.    The Tribunal accepts GAMI's logic in first presenting the claim under Article 1105. This approach allows a broad examination of the facts to determine whether there was a violation of minimum international standards in general. That background will conveniently set the stage for the more narrowly focused examination of the allegation of discrimination.

## 5.     JURISDICTION AND STANDING

26.     GAMI is an "investor of a Party" as described in NAFTA Article 1139.   GAMI's 14.18% equity interest in GAM is an "investment" under the same Article.  GAMI alleges that Mexico has breached obligations under Section A of NAFTA Chapter 11. GAMI claims it has suffered loss or damage in consequence thereof.

27.     The disputing Parties have devoted considerable efforts to the issue whether GAMI is entitled to claim on account of its derivative prejudice as a shareholder.  The heart of this debate is whether governmental acts or omissions that adversely affect GAM may be pleaded as breaches of NAFTA because they had the result of reducing the value of GAMI's stake in GAM.

28.     Mexico did not formally seize GAMI's shares in GAM. GAMI argues instead that Mexico's expropriation of GAM's five mills rendered GAMI's investment virtually worthless because the mills were substantially all of GAM's productive assets. Chapter 11 does not require a claimant shareholder to be a majority or controlling owner for his investment to qualify for protection.   GAMI argues: "If it were possible for a state to escape liability to foreign shareholders by the simple expedient of seizing the assets without seizing the shares, then the protections of Article 1110 would be illusory for any investor in a corporation."   GAMI invokes *AIG v. Iran*[1] where the claimant was awarded damages for a 35% interest in an Iranian insurance corporation.  GAMI also relies on *Liamco v. Libya*[2] where compensation was ordered following nationalisation of a 25.5% interest in three oil concessions.

---

[1]     4 Iran-US Claims Tribunal Reports 96 (1983)
[2]     20 ILM 1 (1977).

29.     The United States in its written observation before this Tribunal accepts that Article 1116 entitles minority shareholders to bring a claim for loss or damage on their own behalf.  It argues however that Article 1116 does not reflect "an intent to derogate from the rule that shareholders may assert claims only for injuries to their interests and not for injuries to the corporation."  It refers to *Barcelona Traction*[3] as authority for the rule.  It cites a US Statement of Administrative Action from 1993 as evidence that "at least one of the Parties" to NAFTA understood Article 1116 to cover only *direct* injury to an investor while Article 1117 envisages injury caused to a local corporation *owned or controlled* by an investor.

30.     The Tribunal however does not accept that *Barcelona Traction* established a rule that must be extended beyond the issue of the right of espousal by diplomatic protection.  The ICJ itself accepted in *ELSI*[4] that US shareholders of an Italian corporate entity could seise the international jurisdiction when seeking to hold Italy liable for alleged violation of a treaty by way of measures *imposed on that entity*.

31.     The ICSID Tribunal in the *Goetz* case stated:

> "... le Tribunal observe que la jurisprudence antérieure du CIRDI ne limite pas la qualité pour agir aux seules personnes morales directement visées par les mesures litigieuses mais l'étend aux actionnaires de ces personnes, qui sont les véritables investisseurs."[5]

That tribunal included a former President of the ICJ.

32.     The annulment committee in *Vivendi* was more explicit in explaining that:

> "it cannot be argued that CGE did not have an 'investment' in CAA from the date of the conclusion of the Concession Contract, or that it was not an 'investor' in respect of its own shareholding, whether or not it had overall

---

3       ICJ Reports 3 (1970).
4       ICJ Reports 15 (1989).
5       6 ICSID Reports 3, at para. 89 (1999).

> *control of CAA.  Whatever the extent of its*
> *investment may have been, it was entitled to*
> *invoke the BIT in respect of conduct alleged to*
> *constitute a breach ....*"[6]

33.    The Tribunal does not accept that directness for the purposes of NAFTA Article 1116 is a matter of form.  The fact that a host state does not explicitly interfere with share ownership is not decisive.  The issue is rather whether a breach of NAFTA leads with sufficient directness to loss or damage in respect of a given investment.  Whether GAM can establish such a prejudice is a matter to be examined on the merits. Uncertainty in this regard is not an obstacle to jurisdiction.

34.    The classification of alleged breaches described in Section 4 are dictated by the relevant NAFTA Articles.  It would be artificial to consider the factual bases for the alleged breaches under these headings.   The relevant factual propositions being advanced by GAMI are more readily understood as follows:

-    Mexico was guilty of *maladministration* in regulating the sugar industry.  How this purportedly amounted to alleged violations of Articles 1105 and 1102 is obvious. GAMI alleges that the maladministration also resulted in a breach of Article 1110 because it was so egregious as to be tantamount to expropriating GAMI's investment in GAM.

-    Mexico wrongfully *expropriated* GAM's mills.  This is pleaded as a breach of Article 1105 *in regard to GAMI*. The *de jure* expropriation is also invoked as part of the factual circumstances which GAMI argues must lead to the conclusion that it was the victim of governmental conduct tantamount to expropriation of its shareholding in GAM under Article 1110.

35.    The distinction between the alleged *de facto* expropriation of GAMI's shares in GAM and the *de jure* expropriation of GAM's five mills is critical.   GAMI's shareholding was never expropriated as such.  GAMI contends that Mexico's conduct impaired the value of its shareholding to

---

[6]      6 ICSID Reports 340 (2002).

such an extent that it must be deemed tantamount to expropriation.  The mills were expropriated by a formal Decree.  Yet the Mexican courts have neutralised its effect with respect to the three mills that ultimately remained the object of GAM's *amparo*.  The Mexican Government has assured the Tribunal that it will give such compensation as required by Mexican law with respect to GAM's two other expropriated mills.  All this was achieved at the initiative of the owner of the mills: GAM.

36.     The Tribunal therefore faces important questions with respect to two sets of relationships.  The first is that of GAM and GAMI.  The second is that of the Mexican judiciary and the NAFTA Tribunal.

37.     NAFTA Article 1117 would have allowed GAMI as a 100% shareholder of GAM to seek relief for alleged breaches of the treaty by Mexico.  GAMI would not have been required to cause GAM to seek relief before the Mexican courts.  It has been shown above that the fact that GAMI is only a minority shareholder does not affect its right to seek the international arbitral remedy.  Does this conclusion need to be reconsidered because of the initiatives of *other* shareholders in GAM?  The owners of the other 85.82% shares might for reasons of their own have chosen not to cause GAM to seek relief before the Mexican courts.  (They might simply have been defeatists.  Or they might have made their separate peace with the Government and abandoned any complaint in return for offsetting benefits.)  That would not disentitle GAMI.

38.     It is difficult to see why GAMI's position under NAFTA should be impaired because the controlling shareholder caused GAM to seek redress in the Mexican courts:

(A)   Clearly GAMI would not lose its rights if the outcome had been that the local courts upheld the expropriation and fixed a derisory amount of compensation.  It is in the very nature of NAFTA to create a regime in which a foreigner's entitlements do not necessarily coincide with those of a citizen even with respect to ownership of identical types of assets:

"*[It] not infrequently happens that under the rules of international law applied to controversies of an international aspect a nation is required to accord to aliens broader*

*and more liberal treatment than it accords to its own citizens under its municipal laws ... The citizens of a nation may enjoy many rights which are withheld from aliens, and conversely, under international law, aliens may enjoy rights and remedies which the nation does not accord to its own citizens."*

This passage is from the *Hopkins* case.[7]   (Hopkins complained of non-payment of postal money orders he had purchased from the Mexican government. The latter answered unsuccessfully that obligations of the preceding government had been nullified by decree.) Many other similar passages may be found in the authorities and the literature.   The sentences from *Hopkins* have been chosen because they were referred to in *S.D. Myers*.[8]   (That award was transparent whenever the tribunal was not unanimous.   No reservation was expressed with respect to the reliance on *Hopkins*.)

(B)   Nor indeed does the position change when one reaches the problem in the present case: the expropriation is rescinded by the national courts but the minority investor remains unsatisfied.   In the wake of the *Sentencia* the majority shareholders may be content or disabused.  They may have complaints about incidental losses caused by the wrongful expropriation notwithstanding its reversal.  They may be dissatisfied with the compensation to be offered on account of the two mills whose expropriation was unchallenged.  They may be sanguine or apprehensive about Mexican judicial acceptance of such complaints.  But this is the relief that is available to them.   They are Mexican nationals and do not have standing under Chapter 11 of NAFTA.  GAMI however is entitled to seek international relief from a NAFTA Tribunal on account of a wrongful expropriation.   It is difficult to see why GAMI's claim should founder because the Mexican courts have *agreed* with GAMI's thesis.   GAMI did not put its thesis to those courts.   GAMI pursued an international action which it was entitled to bring.

---

7   US-Mexican Claims Commission, IV *UNRIAA* 41, at 47 (1926).
8   First Partial Award of 13 November 2000, 8 ICSID REPORTS (forthcoming), at para. 260 (2000).

39.     As the Umpire put it in the *Selwyn* case decided in 1903 by the British-Venezuelan Commission:

> "*International arbitration is not affected jurisdictionally by the fact that the same question is in the courts of one of the nations. Such international tribunal has power to act without reference thereto, and if judgment has been pronounced by such court, to disregard the same so far as it affects the indemnity to the individual, and has power to make an award in addition thereto or in aid thereof as in the given case justice may require.*
>
> *Within the limits prescribed by the convention constituting it the parties have created a tribunal superior to the local courts.*"[9]

40.     This century-old holding was itself based on venerable authority.  The Jay Treaty of 1794 between the US and Great Britain was concluded to resolve acute controversies in the wake of the American Revolution.  International commissions were established to rule on claims brought by individuals.  Some such claims involved citizens of one country dissatisfied with their treatment by the courts of the other.  The British commissioners took the view that the decisions of English courts were final.  The US commissioners were able to secure a majority decision to the contrary.  One of them (William Pinckney) put it as follows in *The Betsy* (1797):

> "*neither the United States nor the claimants its citizens are bound to take for just the sentence of the lords, if in fact it is not so; ... the affirmance of an illegal condemnation, so far from legitimating the wrong done by the original seizure and precluding the neutral from seeking reparation for it against the British nation, is peculiarly that very act which consummates the wrong and indisputably perfects the neutral's right of demanding that*

---

9       J.H. Ralston, Venezuelan Arbitrations of 1903, p. 322, at 327 (1904).

> *reparation through the medium of his own government.*"[10]

89 years later Francis Wharton wrote that this "is now accepted law."[11] The Umpire in *Selwyn* expressly relied on this statement by Wharton.

41.      It was for the Mexican courts to rule on the licitness of the expropriation as a matter of Mexican law.  The present Tribunal defers to the *Sentencia* as an authoritative expression of national law.  The present Tribunal will moreover give respectful consideration to the *Sentencia* insofar as it applies norms congruent with those of NAFTA.  International tribunals are properly reluctant to conclude that national law contradicts international law.  But ultimately each jurisdiction is responsible for the application of the law under which it exercises its mandate.  It was for the Mexican courts to determine whether the expropriation was legitimate under Mexican law.  It is for the present Tribunal to judge whether there have been breaches of international law by any agency of the Mexican government.  A fundamental postulate in applying NAFTA is that enshrined in Article 27 of the Vienna Convention on the Law of Treaties: "A party may not invoke the provisions of its own internal law as justification for its failure to perform a treaty."  Whether such national laws have been upheld by national courts is ultimately of no moment in this regard.

42.      A serious jurisdictional impediment would loom if GAMI's claim for breach of Article 1105 had been based solely on the allegedly "arbitrary and discriminatory expropriation of GAM's sugar mills."  GAMI cannot plead for GAM.  But GAMI's Article 1105 claim has another distinct factual basis; see Paragraph 24(A) *supra.*  GAMI is entitled to raise it.

43.      The Tribunal has jurisdiction with respect to all of GAMI's claims.

---

10      J.B. Moore, History and Digest of International Arbitrations to Which the United States Has Been Party 3184 (1898).

11      A Digest of the International Law of the United States, Vol. 2, Sec. 242 (1886).

## 6.      MALADMINISTRATION

### 6(A)    Factual bases of GAMI's complaint

44.     GAMI asserts that Mexico's maladministration resulted in both a denial of national treatment and in a breach of international minimum standards.

### (i)      The regulatory framework

45.     Agricultural economics tend to be complex.   The Mexican sugar industry is characterised by special complicating factors.   The productive life of sugarcane is 4-8 years.   Farmers (*cañeros*) are understandably disinclined to convert their fields to other crops early in the cycle.   The supply of sugarcane therefore responds slowly to the market.   Sugarcane is processed optimally within 24 hours of harvesting. (48 hours is a maximum given the loss of sucrose.)  Mills must therefore be readily accessible.  *Cañeros* cannot operate without mills in proximity.  Once a mill is constructed it depends on input from *cañeros* in the area.  Mr Antonius estimates that the price paid for sugarcane accounts for 70% of the costs of a mill.  GAMI describes this as "a relationship of mutual dependence." Mr Antonius strikingly speaks of a "bilateral monopoly."

46.     The industry has a considerable political dimension. Harvesting is labour-intensive.  The start-up costs of mills are high.  Mr Antonius writes that 30,000 workers are employed in sugar mills.   Ten times that number work in the fields as growers and cutters.  The industry has a particular historical resonance in Mexico.  Sugar was introduced by Cortés four centuries ago.  Much private wealth in 19th Century Mexico came from large plantations.  Zapata and his revolutionary army were *cañeros*.  The Mexican Constitution long prohibited corporate ownership and leasing of agricultural land. Sugarcane today is grown on thousands of small plots.  The

trend is not toward concentration.  Mexico explains that in 1970 fields smaller than 8 hectares represented 50% of the total surface of canefields.  In 2000/2001 that proportion grew to 66%.  Mexico states that 91% of the country's *cañeros* work on such fields.

47.     Against this background it is not surprising that this Mexican industry has a long tradition of state intervention. Mexico is however far from unique in this regard. Mr Antonius's description is worth quoting:

> *"The world sugar industry is also one of the most economically distorted, almost notoriously so.    In both developed and developing economies one finds evidence of widespread government intervention in the sector.  A very important component of this intervention is protection through trade barriers and quotas, but it also extends to encompass subsidies, production controls, and a series of additional fiscal and legal incentives or restraints.  These policies greatly isolate the industry from price signals.  These practices of protection have also resulted in the sugar industry being one of the most politicised in most economies, as the various interest groups linked to the industry constantly pressure their governments in an attempt to maximize their benefits."*

48.     Mexico does not disagree with GAMI's expert in this respect.     Indeed it considers that GAMI *understates* the magnitude of the "enormous distortions" on the world market. More than 120 countries produce sugar.   About 70% of worldwide sales are made at regulated prices.   Subsidised domestic prices encourage overproduction which in turn leads to dumping.   National regulators and international trade negotiators intervene with unpredictable aggregate effects. The availability of substitute products and the evolution of consumer purchasing power play their part.  The weather does the rest.  Mexico cites these figures (US$ per pound) to reflect the volatility and crisis of the relevant period:

|                 | 1996     | 2000    |
|-----------------|----------|---------|
| Refined sugar   | 17.40 c  | 9.10 c  |
| Raw sugar       | 12.40 c  | 7.53 c  |
| Refining margin | 5.01 c   | 1.57 c  |

The last figure shrank to 0.55 c in the first quarter of 2001.

49.      GAMI suggests that countries which are net importers of sweeteners can support domestic prices by limiting imports. Mexico is not in that position.   Its production is higher than domestic demand.    Import restrictions are insufficient to sustain high prices.   Domestic supply may be controlled by regulating producers in two ways: restricting production or requiring export.  Mexico answers that the experience of the US proves that import restrictions alone are insufficient to ensure the maintenance of price levels.  The government does not seek to reduce excess production by mandatory production limits or export requirements.  The government's policy is rather to seek consensus with industrialists and *cañeros*.

50.      Exports to the US are attractive for Mexican sugar producers.   Prices there have generally been higher than in Mexico.  But the US imposes national quotas for its imports.  Its market therefore offers a limited solution.  The remaining world market is unattractive.  The emergence of other sweeteners and gluts attributable to subsidies have driven the world price down below Mexican prices.  None of this is disputed.

51.      The Mexican Government took over most of the country's mills in the 1970s when they defaulted on debts owed to the government.  GAMI states that their insolvency was to a significant degree caused by the government's "deliberate" imposition of high input prices to benefit the *cañeros* and low output prices to satisfy consumers.    Mexico asserts as a worldwide phenomenon that:

> *"Los gobiernos con frecuencia intervienen para apoyar los precios de los productores agrícolas – i.e. los productores de azúcar de caña y de remolacha.  Estos programas con frecuencia tienen efectos adversos sobre los procesadores de esas materias primas."*

> *("Governments frequently intervene to support the prices of agricultural producers – i.e. the producers of sugar cane and sugar beet. These programmes frequently have adverse effects on those who process these raw materials.")*

52.   Ten years later a privatisation programme was implemented.   For the sugar industry the relevant legal framework became the Sugarcane Decree of 31 May 1991.   This Decree declared all phases of the sugarcane industry – from planting to refining – to be of public interest.   It specifically fixed new rules for the supply of sugarcane to the mills.

53.   The Sugarcane Decree was to be implemented by an entity established under the name *Comité de la Agroindustria Azucarera* ("CAA").   The CAA is chaired by the *Secretaría de Agricultura*.   The *Secretaría de Economía* also participates. (The latter was previously known as the *Secretaría de Comercio y Fomento Industrial* or SECOFI.   It will be referred to in this award by its current name.)   The *cañeros* have two representatives on the CAA.   So do the mills.

54.   So-called *Comités de Producción Cañera de los Ingenios del País* ("*Comités*") were also established by the Sugarcane Decree.   Each of these local bodies includes the leader of the relevant organisation of *cañeros* as well as the manager of the mill.   The *Comités* record the minutes (*acta*) at the end of the campaign.   The Government is not represented in the *Comités*.

55.   Article 7 of the Sugarcane Decree designated the *Junta de Conciliación y Arbitraje de Controversias Azucareras* ("JCACA") as the competent authority to resolve economic disputes between *cañeros* and mills.   This organ is tripartite in the manner of the CAA.

56.   The Sugarcane Decree declared *inter alia* that:

> *"it is necessary to promote the [sugar] industry by giving <u>economic certainty</u> to the different sectors that participate in production thereof, such that said production be <u>profitable</u>, and also be able to foment its own growth.*

> *That it is necessary for trade policies to allow for a permanent sugar supply, thus it is prudent to link the price of sugarcane to that of sugar so as to ensure equity to all participants in the production chain.*"

57.     The words emphasised in this quotation contain the seeds of discord.   GAMI contends that the objectives they identify "require the directions of the Government, either directly or through the CAA that it controls."   Mexico sharply disagrees.   It says the Sugarcane Decree is consensus-driven. The Government attempts to mediate but does not dictate outcomes.

58.     The Sugarcane Decree provided that 54% of the price of sugar would be paid to *cañeros* for the sugarcane.   (This percentage was increased to 57% in 1993 by an amendment to the Decree.)  If there was no official bulk price for sugar it would be as determined by the CAA.  Mills were required to purchase all sugarcane output from designated areas.

59.     An *Acuerdo* issued on 25 March 1997 (the "1997 Acuerdo") purported to establish the manner of determining a national reference price for sugarcane.   It was a weighted average of prices received for the semi-refined *estándar* sugar in the domestic and export markets.  Increased sales on the low world market would in theory reduce the reference price.  They would dissuade the *cañeros* from continuously increasing production.  The *Acuerdo* envisaged that the reference price would be fixed at the beginning of the campaign and be in vigour from October 1st each year to September 30th the next. (The harvest season generally runs from November to June.) The calculation involved *expected* domestic and international sales.  At the end of each campaign an adjustment would be made in light of actual figures.  These were to be established by the *Comité* for each mill.  Underpayments to the *cañeros* would be topped up by the mill and overpayments returned.  Mexico's position is that a mill which received prices inferior to the reference price had the means of adjusting the latter within its *Comité*.   Its failure to do so cannot be attributable to the Government.

60.     GAMI describes the *Acuerdo* as a "government measure ... at the Ministerial level."    Mexico refers to it as the

manifestation of a consensus within the CAA about *reglas* and *disposiciones* to implement the Sugarcane Decree.

61.     GAMI avers that the 1997 *Acuerdo* also established the principle that mills must comply with export quotas set by the *Secretaría de Economía*.  Mills failing to do so were to pay a penalty.    It was substantial:  2.5 times the significant and variable difference between Mexican and world prices.  This differential was simply to be multiplied by the export deficit to derive the amount of the penalty.

62.     Mexico denies that the *Acuerdo* created a legal obligation to satisfy export quotas.    The penalty was *convencionalmente acordada*.    The Government was not responsible for implementing it by coercion.  The *Acuerdo* did not give the relevant *Secretarías* authority to pronounce either of the two possible administrative sanctions: fines or *arresto administrativo*.  The Sugarcane Decree empowered the JCACA to resolve all economic disputes between industrialists and *cañeros* – or between mills *inter se*.  The Government had no means of intervening if the *cañeros* did not ask for upward adjustments when the export ratio fell short.  This was a matter for the relevant *Comité* or if necessary the JCACA.  The task of computing the quota for individual mills fell to the *Cámara Nacional de las Industrias Azucarera y Alcoholera* (CNIAA) under a *Procedimiento* issued on 29 January 1997.  Almost all industrialists subscribed to this *Procedimiento*.   Mr Gallardo signed on behalf of GAM.

63.     On 31 March 1998 this regime was complemented by another *Acuerdo* (the "1998 *Acuerdo*").  It provided production ceilings for mills.    Overproduction was to be penalised. Underproduction was to be rewarded.  Annual ceilings were to be established for each mill before October each year by the Secretaries of Agriculture and Economy (having regard to the views of the CAA).   Mexico points to an agreement dated 10 June 1998 between CNIAA and two *cañero* unions to the effect that those entities would ask the two *Secretarías* to establish a *producción base* for each mill.

64.     The 1998 *Acuerdo* contemplated that production ceilings would be established by reference to the 97/98 campaign.  The actual production during that campaign turned out to have been underestimated.    Mexico affirms that it therefore became necessary to find a more precise method.

Meanwhile the levels were not established. This led to an *Acuerdo* of 2000 pursuant to which production levels were set in proportion to the number of hectares of sugarcane fields that corresponded to each mill.

### (ii)   Alleged failures of implementation and enforcement

65.     GAMI asserts that Mexico "flagrantly and systematically failed to implement and enforce the law." It used unrealistic estimates to inflate the reference price for sugarcane. The export requirements were simply never enforced. Production ceilings were not even set. The result was ruinous for GAM's mills. The domestic price of sugar declined. The cost of sugarcane increased. Finally the cost of production exceeded the price of the sugar produced.

66.     GAMI summarises the "disastrous effect" of Mexico's alleged failures of implementation and enforcement in dramatic figures. GAM's average blended price decreased by 13.2% from 1997 to 2000. Yet the cost of sugarcane rose by 38.8%. GAM's operating profits of M$ 368 million in 1996 were transformed to an operating loss of M$ 302 million in 2000.

67.     GAMI described the thrust of Mr Pinto's testimony as a confirmation that "Mexico's abdication of its responsibilities was a primary cause of the market disorder that eroded the value of GAMI's investment prior to the expropriation." Mexico sharply objects that Mr Pinto said no such thing. He referred to a number of factors. They included imports of fructose as well as a failure to obtain "deserved" quota levels from the US.

68.     **The first of the three general areas in which GAMI alleges that Mexico fell short of its legal duties relates to the reference price and its adjustment.** The 1997 *Acuerdo* (see Paragraph 59 above) was intended to establish a mechanism for determining a national reference price for sugarcane as a weighted average of domestic and export prices for semi-refined sugar. GAMI contends that this system required that the Government communicate prices at the end of each harvest as captured by its *Sistema Automatizado Aduanero Integral*. Its failure to do so prevented any adjustment of the price of sugarcane. GAM's mills were therefore "forced to overpay" during four consecutive years.

69.     Manifestly the 1997 *Acuerdo*'s announced objective failed to materialise.   It is also quite evident that the Government's performance was lacking. No explanation for this failure has been provided by Mexico.  Its defence has rather been to deny that it had a clear obligation.  Alternatively Mexico argues that its passivity was not prejudicial.  The mills and their national Chamber (the CNIAA) had access to the required information in a timely manner.  GAMI retorts that there is no proof to this effect.  Moreover Mexico's contention is no defence to GAMI's challenge that Mexico failed to respect its legal obligation to provide this information.

70.     **The second general area relates to export requirements.**  To require all mills to comply with export quotas would alleviate pressure on domestic prices.   (See Paragraphs 49 and 61 above.)  To fail to do so across the board would distort competition among mills.  GAMI alleges that the Government badly neglected to ensure compliance as it was legally obliged to do.  It did not monitor and establish the level of compliance by individual mills with their export quotas.  Delinquent mills were not penalised by JCACA – which GAMI describes as a "Government-controlled body."

71.     Mexico answers that the mill industry itself was to a significant degree responsible for resolving the problem.   It should have done so through the JCACA – which Mexico insists is a tripartite entity intended to promote consensus rather than to function as a governmental organ.  It may have been the case that some mills ignored their export quotas.  But then GAM should have pursued the violators.   Instead it sought to "frustrate" the functioning of JCACA by challenging its jurisdiction when *cañeros* filed actions demanding information from the mills.   Indeed Mexico wonders why GAM and its compliant allies within the CNIAA did not move to discipline or indeed exclude from that Chamber members whose delinquency was so obviously tantamount to unfair competition.

72.     GAMI points out that two mills actually operated by the Government also failed to comply with export requirements.  This set a poor example which GAMI says "caused further non-compliance."   Mexico answers that these mills were not in fact owned by the Government.   They were bankrupt and run by a public *fideicomiso* (trustee).  GAMI characterises this answer as "hyper-technical."   It argues that the Government had "ample authority to cause Santa Rosalía and La Joya to comply with their export requirements had it wished to do so."

73.     Once again the failure of the 1997 *Acuerdo* is evident.  If Mexico had an obligation to achieve effective implementation its failure seems clear.  Such is the thrust of Lic. Schmill's legal opinion.     But the conclusion is less clear if the test of responsibility involves subjective elements: an *intentional* or *irresponsible* disregard for the success of the regulatory regime. The Tribunal's legal analysis will be developed in due course. The immediate inquiry concerns the causes of the failure of the envisaged export quota scheme.

74.     GAMI argues that Article 7 of the 1997 *Acuerdo* created a "legal obligation" for the Government to issue a determination of each mill's level of compliance with its export obligations. Mexico sharply rejects this as an unjustified reading of the text of the *Acuerdo*.  The individual *Comités* are in fact charged with this task.  Mexico refers to more than 400 recorded instances of *actas* from various *Comités* without any request for confirmation by the Government of the information put forward within the concerned *Comité*.  It would be up to the JCACA to resolve any difference within a particular *Comité*.     The Government's role was to provide (*proporcionar*) information. Mexico insists that this was done – "completely and diligently" – at the request of the JCACA and the *cañeros*.

75.     The present Tribunal is presented with a series of propositions which the parties have debated at length.  Did the setting of quotas require consultations?  Did the mills take sufficient initiatives?  Should their national Chamber have done more to police its members?  Is the JCACA to be deemed an organ of the Government?  Did the mills seek to hamstring the JCACA in 1999?  What difference did it make?  Did the JCACA and the various *comités* function as intended?  If not was the Government obliged to devise and make effective alternative mechanisms to achieve the defined objectives?  Had the mills changed their attitude toward the JCACA by 2000 and 2001? Was GAM in particular entitled (no matter what it may have done on an informal or political level) to maintain formal passivity and nevertheless hold the Government to an obligation of effective implementation?   Was any redress available to GAMI in its position as an indirectly affected party?

76.     There are doubtless answers to these questions under Mexican law.  Whether this Tribunal may and should provide such answers is another matter.  At this juncture it suffices for the Tribunal to observe that the Mexican regulatory regime did not contain an unambiguous affirmation to the effect that *the*

*Government shall announce annually individual export quotas for all mills and shall promptly enforce any non-compliance.* The questions identified in Paragraph 75 demonstrate that the regulatory regime was far more complex. The Tribunal holds that a foreign investor contemplating this regime could not have acted on the certain expectation that it had the import of the italicised words.

77.     A confirmation of this conclusion is to be found when one reflects on Mexico's account of the initiatives it claims to have taken in support of sugar exports. Mexico's *Escrito posterior* describes seven categories of such initiatives:

(a)   In 1998 Mexico sought redress against the USA under NAFTA Article 20 with a view to establishing access of Mexican surpluses to the US market. This initiative was frustrated by the US's refusal to empanel a tribunal. GAMI retorts that this action "does not address compliance by individual mills with the 1997 *Acuerdo*."

(b)   In 1995 Mexico acceded to a request by the owners of sugar mills to eliminate official prices. GAMI retorts that this measure was irrelevant to the export requirement instituted two years later.

(c)   The Government granted subsidies to allow for the stocking of 600,000 tonnes of sugar. Only mills having respected the export requirements were allowed to benefit from these subsidies. GAMI retorts that these subsidies were offset by a Government-mandated increase in the price of sugarcane during three consecutive harvests from October 1997.

(d)   Mexico acceded to a request by mill-owners to launch an antidumping investigation with respect to fructose originating in the US. This resulted in the imposition of compensatory quotas. GAMI retorts that this is irrelevant; proper implementation of the 1997 *Acuerdo* "would result in automatic and balanced adjustments to changing conditions" such as decreases in sugar consumption due to conversion to fructose.

(e)   Mexico put into place a debt restructuring programme. GAM benefited therefrom in that it was given a low-

interest credit facility which enabled it to buy back a portion of its dollar-denominated foreign debt. GAMI retorts that this was no favour. GAM ultimately raised capital from the US public debt market to *prepay* loans from the Mexican development credit organism (FINA).

(f)   Mexico fulfilled its role within the CAA. It used its two seats (of the total of six) to seek consensus with the *cañeros* and the mills. The record shows that the CAA always acted by more than consensus: unanimity. Pursuant to the Sugarcane Decree the CAA developed the regime which ultimately took the form of the *Acuerdos* of 1997 (as amended in 1998) and 2000. The CAA's constant purpose was to come to grips with the problem of excess production. GAMI retorts that the *Acuerdos* on their face were issued by the Government alone.   Above all the problem was not to issue regulations but to enforce them.

(g)   "One of the ways" in which Mexico sought to promote compliance with export quotas was to limit access to the export quota to the high-price US market established under NAFTA to those mills that had complied with their general export quotas. GAMI retorts that this was meaningless because the US quota was very small.

78.   Thus   each   of   Mexico's   arguments   meets   a counterargument by GAMI. Some of GAMI's rebuttals pertain to a lack of logical connection with the particular regulatory mechanism which it insists Mexico had a legal duty to implement and enforce. Other objections relate to a lack of causal connection. Yet others are part of a macroeconomic debate. All of GAMI's counterarguments might be ultimately valid. Yet the record shows that Mexico in many ways and over the course of many years sought to address the problem of excess production. It is by no means established that Mexico repudiated or arbitrarily ignored its own regulations. What GAMI has succeeded in demonstrating is that Mexico failed to make the 1997 *Acuerdo* a reality. The consequences of these findings will be addressed when the Tribunal turns to determine whether international liability on Mexico's part has been established.

79.   A major bone of contention in this case concerns Mexico's alleged failure to take action against the CAZE group

of mills.  GAMI writes that "Mexico does not deny that it was aware of CAZE's fraud as early as October of 1999."  GAMI refers to the alleged falsification of documents to demonstrate ostensible compliance with export requirements.  Mexico emphatically rejects this assertion.  The *Secretaría de Economía* had doubtless received a letter from Mr Santos (as President of the CNIAA) dated 29 October 1999 calling attention to the position of CAZE.  But this letter spoke of "serious irregularities" which "create a presumption" that the declared volumes of exports were not true.  He called on the *Secretaría* to take the "necessary action" to determine who was responsible for this "regrettable" (*lamentable*) state of affairs.  He noted that the CNIAA itself had asked CAZE to give a detailed account of the irregularities.  He wrote a follow-up letter on 14 December 1999 which reiterated the elements summarised above.  He added that CAZE "has initiated its internal investigation ...; its results will in due course be brought to [your] attention."  Mexico observes that this was far from proof of a fraud.  To the contrary the CNIAA ultimately took no action against CAZE.

80.     GAMI suggests that Mexican officials had arbitrarily (or possibly by favouritism) decided not to pursue CAZE.  Mr Santos testified that he had been told by public officials that "the case was closed" and should be forgotten.  This is a serious accusation.  It cannot be given credence in the absence of evidence.  There is only Mr Santos's recollection.  He may have misunderstood.  His memory may be faulty.  And if he were right it is difficult to avoid reflecting that his own stance as the leader of an important industrial organisation was uncourageous given his own views that the matter had "*graves implicaciones a toda la industria*" (letter of 27 October 1999).  GAMI has criticised Mexico for failing to "intervene in a timely manner to protect the public interest that had been harmed by CAZE."  Mexico retorts ironically that GAMI apparently believes that the invocation of the public interest suffices for "executive branches of the governments of the world to take ad hoc initiatives even in the absence of any request by affected parties – and even contrary to their will."

81.     **The third and final general area of alleged maladministration concerns production limits.**  GAMI asserts that the 1998 *Acuerdo* required the Government to perform this function.  The CAA's advisory role did not justify that the Government "abdicate its legal duty to act in the absence of consensus."  Moreover the 2000 *Acuerdo* created a legal obligation to issue rules for the production controls.

Mexico's failure to do so made it impossible to apply and enforce the 2000 *Acuerdo*.

82.     Mexico takes exception to the following passage in GAMI's Post-Hearing Brief:

> *"There is no question that the 1998 Acuerdo required the Government to determine per mill base production levels starting with the 1997-1998 harvest... Chief Justice Schmill's testimony that the Government was under a legal obligation to act stands unchallenged..."*

Mexico insists that Lic. Schmill said no more than that *producción base* levels set by the authorities for individual mills would be obligatory.  This is not the same as saying that Mexico violated the 1998 *Acuerdo* because it did not define such levels for the 1998/99 harvest.   Mexico's position is that both mill owners and *cañeros* agreed that the methodology of the 1998 *Acuerdo* was inadequate.   It was therefore agreed with the Government to seek a new methodology.   The result was a decision that the methodology of the 2000 *Acuerdo* would be based on the number of cultivated hectares corresponding to each mill.   This was an "objective datum."   (The previous reference to volumes produced during the 1997-98 harvest had resulted in an underestimation.)   Each mill as well as the CNIAA itself thus knew what the point of reference would be.  Mr Santos (as President of the CNIAA) explicitly acknowledged it as the product of an agreement which would be applied as of the 2000/01 harvest.  The 2000 *Acuerdo* does not require that the levels be published.   They are simply made available in the offices of the *Secretaría de Economía* and the CAA.  GAM never asked for written or "official" confirmation.

## 6(B)   Minimum standard of treatment: GAMI's claim under Article 1105

83.     One cannot fail to observe that GAMI's complaint of alleged unfair and inequitable treatment is not connected with a demonstration of specific and quantifiable prejudice.  Mexico's alleged wrongdoing would doubtless have resulted in some short-term decline in the value of its shares in GAM.  (There would have been no loss of dividends: GAM's business strategy has never been to distribute earnings to shareholders.)  The ultimate duration of this unspecified decline in value is

uncertain.  It was bound to be reversed to some degree by the
return of the three wrongfully expropriated mills and by the
prospect of compensation for the two others (the expropriation
of which GAM did not challenge).  Above all there is consensus
as to the positive effect of the more vigorous application of
Mexico's Sugar Program.

84.    GAMI did not attempt to prove or even present a
theoretical financial analysis of what the short-term decline
might have been.  GAMI rather proceeds on the basis that the
entire value of its investment has been destroyed.  This is
demonstrably untrue.  GAMI's shareholding in GAM remains
intact.  GAM's principal productive assets have either been
restored to it or are the subject of negotiations to determine
compensation.  The sugar industry is now operating on a better
footing.  Mr Pinto testified that a tax on soft drinks sweetened
by fructose "has turned out to be a very beneficial measure for
the Mexican sugar industry."  GAM has declared itself to be
optimistic for the future.  Counsel for GAMI declared flatly in
final oral submissions that "the system is working now."
GAMI's failure to make good on its claim of total destruction
will be dealt with in detail below when examining its claim of
expropriation.  But also with respect to the Article 1105 claim it
must be noted that GAMI has not sought to quantify the alleged
prejudice arising from particular alleged acts or omissions.

85.    GAMI's approach seems to be all or nothing.  But no
credible cause-and-effect analysis can lay the totality of GAMI's
disappointments as an investor at the feet of the Mexican
Government.  Both sides agree that the economics of sugar are
highly distorted and subject to powerful international market
forces.  No one has suggested that NAFTA entitles an investor to
act on the basis that a regulatory scheme constitutes a
guarantee of economic success.  GAMI can assert only that
maladministration of the Sugar Program caused it *some*
prejudice.   But the prejudice must be particularised and
quantified. GAMI has not done so. The Tribunal does not know
if such a demonstration would even be possible in the
circumstances given the problem of timing.  There are years
when the sun shines on the sugar industry.  In Mexico in
particular the industry has had its ups and downs.  Recent
developments have apparently been positive.   GAMI
presumably benefits from them.  Absent a complete destruction
of its investment GAMI has not identified a particular point in
time when a metaphorical snapshot of its prejudice should be
taken.  It may be that such a demonstration is impossible in this
case.  At any rate the Tribunal would have been in no position to

award damages even if it had found a violation of Article 1105. The Tribunal will nevertheless explain its conclusion that GAMI also failed to establish its claim in principle under Article 1105.

86.     GAMI has comprehensively demonstrated that the regulations which it refers to as "the Mexican Sugar Program" were not carried out in accordance with their terms.  GAMI refers to "legal obligations" incumbent upon the Government under that regulatory scheme.  It relies on an impressive legal opinion by a former Chief Justice of Mexico (Lic. Schmill) to the effect that the Government has a duty "to intervene directly and permanently" to ensure the effective implementation of decrees it has promulgated.

87.     The three broad instances of failure of implementation and enforcement have been described in Section 6(A)(ii) above. The present Tribunal does not doubt that the fulfilment of the overarching regulatory objectives in question (reference price/export requirements/production controls) would in a very significant way have improved GAM's prospects and those of its shareholders.   The Sugar Program has more recently been implemented with considerable success.   The industry as a whole has enjoyed a revival even without the desired access to the US market.

88.     GAMI contends that Mexico's failure to implement and enforce its laws was flagrant and arbitrary.  GAMI submits that Mexico has thus infringed the standard articulated in *Técnicas Medioambiente Tecmed* as follows:

> "The Arbitral Tribunal considers that this [fair and equitable treatment] provision of the Agreement, in light of the good faith principle established by international law, requires the Contracting Parties to provide to international investments treatment that does not affect the basic expectations that were taken into account by the foreign investor to make the investment. The foreign investor expects the host State to act in a consistent manner, free from ambiguity and totally transparently in its relations with the foreign investor, so that it may know beforehand any and all rules and regulations that will govern its investments, as well as the goals of the relevant policies and

> *administrative practices or directives, to be able to plan its investment and comply with such regulations. Any and all State actions conforming to such criteria should relate not only to the guidelines, directives or requirements issued, or the resolutions approved thereunder, but also to the goals underlying such regulations. The foreign investor also expects the host State to act consistently, i.e. without arbitrarily revoking any preexisting decisions or permits issued by the State that were relied upon by the investor to assume its commitments as well as to plan and launch its commercial and business activities."[12]*

89.     GAMI considers that the terms articulated in the subsequent *Waste Management II* award suggest greater leniency in assessing state behaviour under Article 1105. (*Técnicas Medioambiente Tecmed* was not a NAFTA case. It arose under the Spain/Mexico BIT which provides that each state party "shall guarantee fair and equitable treatment" to investors of the other state party.) GAMI submits that its grievance nevertheless satisfies the requirements articulated in that award. It quotes *Waste Management II* with the following added emphasis:

> *"Taken together, the* S.D. Myers, Mondev, ADF *and* Loewen *cases suggest that the minimum standard of treatment of fair and equitable treatment is infringed by conduct attributable to the State and harmful to the claimant if the conduct is <u>arbitrary, grossly unfair, unjust or idiosyncratic, is discriminatory and exposes the claimant to sectional or racial prejudice, or involves a lack of due process</u> leading to an outcome which offends judicial propriety – as might be the case with a manifest failure of natural justice in judicial proceedings or <u>a complete lack of transparency and candour in an administrative process</u>. In applying this standard it is <u>relevant that the treatment is in breach of representations made by the host</u>*

---

12      Award of 29 May 2003, 10 ICSID REPORTS (forthcoming) at para. 154.

> *State which were reasonably relied on by the*
> *claimant.*"[13]

90.　Mexico does not question this synthesis as such.　It rather insists that this Tribunal does not have the mandate to control the application of national law by national authorities.

91.　This contention misconceives the role of international law in the context of the protection of foreign investment. International law does not appraise the content of a regulatory programme extant before an investor decides to commit.　The inquiry is whether the state abided by or implemented that programme.　It is in this sense that a government's failure to implement or abide by its own law in a manner adversely affecting a foreign investor may but will not necessarily lead to a violation of Article 1105.　Much depends on context.　The imposition of a new licence requirement may for example be viewed quite differently if it appears on a blank slate or if it is an arbitrary repudiation of a preexisting licensing regime upon which a foreign investor has demonstrably relied.

92.　The relevant international obligation is expressed in Article 1105(1) as follows:

> *"Each Party shall accord to investments of*
> *investors of another Party treatment in*
> *accordance with international law, including*
> *fair and equitable treatment and full*
> *protection and security."*[14]

The challenging task for this Tribunal is to apply these abstractions.　It is necessary first to enquire how they relate to compliance with national law.

---

[13]　Para. 98.

[14]　The NAFTA Free Trade Commission issued Notes of Interpretation of Certain Chapter 11 Provisions in July 2001. These Notes state that Article 1105 is not intended to require treatment of aliens "beyond that which is required by the customary international law minimum standard."　They also state that the determination that there has been a breach of another treaty obligation does not of itself establish a breach of Article 1105.　GAMI says that its claims in this case "satisfy the standard set forth in the interpretation."　It therefore deems it unnecessary to question whether the Notes constitute "a proper exercise of the interpretive power in Article 1131."

93.    To repeat: NAFTA arbitrators have no mandate to evaluate laws and regulations that predate the decision of a foreigner to invest.  The present Tribunal endorses and adopts the following passages from *S.D. Myers*:

> *"When interpreting and applying the 'minimum standard', a Chapter 11 tribunal does not have an open-ended mandate to second-guess government decision-making. Governments have to make many potentially controversial choices.  In doing so, they may appear to have made mistakes, to have misjudged the facts, proceeded on the basis of a misguided economic or sociological theory, placed too much emphasis on some social values over others and adopted solutions that are ultimately ineffective or counterproductive. The ordinary remedy, if there were one, for errors in modern governments is through internal political and legal processes, including elections."*[15]

94.    The duty of NAFTA tribunals is rather to appraise whether and how preexisting laws and regulations are applied to the foreign investor.  It is no excuse that regulation is costly. Nor does a dearth of able administrators or a deficient culture of compliance provide a defence.   Such is the challenge of governance that confronts every country.  Breaches of NAFTA are assuredly not to be excused on the grounds that a government's compliance with its own law may be difficult. Each NAFTA Party must to the contrary accept liability if its officials fail to implement or implement regulations in a discriminatory or arbitrary fashion.

95.    The ICSID tribunal in *Waste Management II* made what it called a "survey" of standards of review applied by international tribunals dealing with complaints under Article 1105.  It observed the emergence of a "general standard for Article 1105."[16]  It noted that a violation does not require proof of "the kind of outrageous treatment referred to in the *Neer* case."[17]  *Neer* envisaged conduct that amounted to an "outrage,

---

[15]    First Partial Award, *op. cit.*, note 8, para. 261.
[16]    Award of 24 April 2004, 10 ICSID REPORTS (forthcoming) at para. 98.
[17]    *Ibid.* para. 93.

to bad faith, to wilful neglect of duty, or to an insufficiency of governmental action so far short of international standards that any reasonable and impartial man would readily recognize its insufficiency."[18]   *Neer* was decided more than half a century before NAFTA saw the light of day.   The *ADF* award observed that customary international law as reflected in Article 1105 is "constantly in a process of development."   The standard which emerged from the *Waste Management II* tribunal's study has been properly identified by GAMI and is reproduced in Paragraph 89 above.   GAMI contends that its claim satisfies this standard.

96.     The award in *Waste Management II* goes on to say: "Evidently the standard is to some extent a flexible one which must be adapted to the circumstances of each case."   The arbitrators concluded that the acknowledged failure to fulfil contractual obligations did not suffice to create liability under Article 1105.[19]   This non-performance was balanced against the authorities' *attempts* to achieve the objectives of the concession. The tribunal was not persuaded that the record *as a whole* proved a breach of international law.

97.     Four implications of *Waste Management II* are salient even at the level of generality reflected in the passages quoted above.   (1) The failure to fulfil the objectives of administrative regulations without more does not necessarily rise to a breach of international law.     (2) A failure to satisfy requirements of national law does not necessarily violate international law.   (3) Proof of a good faith effort by the Government to achieve the objectives of its laws and regulations may counter-balance instances of disregard of legal or regulatory requirements.   (4) The record as a whole – not isolated events – determines whether there has been a breach of international law.   It is in this light that GAMI's allegations with respect to Article 1105 fall to be examined.

98.     GAMI recognises that NAFTA tribunals have taken the view expressed as follows in *ADF v. USA*:

> "[S]omething more than simple illegality or lack of authority under the domestic law of a State is necessary to render an act or measure

---

[18]     L.F. Neer v. Mexico, 1927 AJIL 555 at 556.
[19]     *Op. cit.* n. 16, at para. 109.

> *inconsistent with the customary international*
> *law requirements of Article 1105(1), even under*
> *the Investor's view of that Article."*[20]

GAMI argues that the requirement of "something more" is met
as follows:

> *"Mexico's conduct in this case is far more*
> *egregious than a simple or isolated failure to*
> *follow some provision of the Sugarcane Decree.*
> *Mexico's actions and failures to act*
> *individually and cumulatively undermined the*
> *fundamental balance of the sugar laws,*
> *effectively turning GAMI's investment in GAM*
> *into a large contribution for the benefit of*
> *cañeros, and the Mexican Government itself,*
> *and those mills that were left unexpropriated.*
> *This is precisely what NAFTA prohibits. Such*
> *conduct is arbitrary, grossly unfair and far*
> *below the minimum standard required under*
> *Article 1105 and international law. ... [Mexico]*
> *arbitrarily and discriminatorily implemented*
> *certain aspects of the law and capriciously*
> *refused to implement and enforce others,*
> *thereby substantially destroying GAMI's*
> *investment."*

99.     The factual and legal components of this argument
must be examined.  The proposition that GAMI's investment
was destroyed is plainly not proven.  GAM still exists.  Its chief
executive officer testified that GAM is recovering and he is
"optimistic."  Nor can it be accepted that GAM's difficulties were
due entirely to Mexico's alleged failure to implement the Sugar
Program.  GAMI's argument is not that its investment would
have been profitable but for Mexico's non-feasance.  It is quite
evident that this is not what GAMI believed at the time.  Its
Form 20-F Annual Report to the US Securities Exchange
Commission for the year 1999 stated:

> *"There can be no assurance that the Company*
> *will be able to maintain sales at generally*
> *prevailing market prices for sugar in Mexico*
> *without discounts and that sufficient exports*

---

20      6 ICSID REPORTS 470, at para. 190 (2003).

*will take place in order to assure a domestic market balance."*

100.    The key question is the extent to which an investor may rely on the implementation by the host state of laws in place before its investment is made.  What efforts by a government to implement its regulatory programme suffice to fulfil the international standards requirement of Article 1105?  *Waste Management II* involved contractual undertakings between a governmental authority and the investor.  No such undertakings may be invoked by GAMI.  Some elements of the analysis in *Waste Management II* are nevertheless instructive.

101.    The investor in *Waste Management II* adduced evidence which made it "clear that the City failed in a number of respects to fulfil its contractual obligations to Claimant."[21]  The investor's contractual claims could be brought before the Mexican courts.  Indeed as contractual claims they could be brought nowhere else given the relevant jurisdictional provisions.  Yet claims of breaches of NAFTA could be brought to arbitration under Chapter 11 without the need to exhaust local remedies.  The problem in *Waste Management II* was therefore to identify the types of interference with contractual rights that could rise to the level of a breach of international obligations.  The tribunal noted that in itself "even the persistent non-payment of debts by a municipality is not to be equated with a violation of Article 1105."[22]  Otherwise "Chapter 11 would become a mechanism of equal resort for debt collections and analogous purposes in respect of all public (including municipal) contracts, which does not seem to be its purpose."[23]  Something more was required.  The conduct giving rise to the complaint does not violate Article 1105 as long as it does not "amount to an outright and unjustified repudiation of the transaction" and "some remedy is open to the creditor to address the problem."[24]

102.    Something akin to this sequence of propositions is extant in the present case.

---

[21]    *Op. cit.* n. 16, at para. 109.
[22]    Para. 115.
[23]    Para. 116.
[24]    Para. 115.  This leaves open the issue of denial of justice.  Such a claim was raised in *Waste Management II* but rejected.  No such claim arises in the present case.

103.    GAMI has demonstrated clear instances of failures to implement important elements of Mexican regulations.  It has adduced eminent evidence to the effect that the Mexican government is constitutionally required to give effect to its regulations.   Claims of maladministration may be brought before the Mexican courts.  Indeed as breaches of Mexican administrative law they could be brought nowhere else.  Yet GAMI's claims of breaches of NAFTA may be brought before this Tribunal under Chapter 11 without the need to exhaust local remedies.   The problem is therefore to identify the type of maladministration that could rise to the level of a breach of international obligations.  A claim of maladministration would likely violate Article 1105 if it amounted to an "outright and unjustified repudiation" of the relevant regulations.  There may be situations where even lesser failures would suffice to trigger Article 1105.  It is the record as a whole – not dramatic incidents in isolation – which determines whether a breach of international law has occurred.

104.    GAMI has not been able to show anything approaching "outright and unjustified repudiation" of the relevant regulations.  The Sugarcane Decree and its related measures certainly did not operate in accordance with their terms.  But there is no evidence that Mexico set its face against implementation.  There is no reason to doubt that Mexico would have *preferred* that all participants in the industry would find prosperity in the economic equilibrium conceived by the regulators.   The Mexican authorities might have acted with greater initiative and perseverance.  But it is not certain that the Mexican government was the sole and critical actor.  There are unexplained questions with respect to the ultimate responsibility for the "consultations" which were to take place within the *Comités* and the JCACA.    The same is true with respect to the apparent passivity of the CNIAA.

105.    Would something less than repudiation still be actionable under Article 1105?  What about an egregious failure to regulate?  Might it be said that Mexico refused to hold feckless administrators to account for failure to carry out their assigned task?  GAMI's thesis is not that Article 1105 requires Mexico to conceive and implement a successful regime of regulations for the sugar industry.  Mr Roh rather put it as follows:

> "... *having chosen to create a sugar program, Mexico must abide by it and cannot arbitrarily*

> *apply some of its elements to reward some*
> *groups at the severe pain of others."*

GAMI understandably places much relevance on Lic. Schmill's statement to the effect that "*tratándose de une actividad de interés público, el Gobierno necesitaba intervenir de manera directa y permanente para hacer cumplir los objetivos del Decreto de 1991, sus modificaciones de 1993 y los Acuerdos de 1997, 1998 y 2000*" ("as this concerned an activity *de interés público*, the government had the duty to intervene in a direct and permanent manner to cause the objectives of the 1991 Decree to be fulfilled, along with its modifications in 1993 and the *Acuerdos* of 1997, 1998 and 2000").

106.    GAMI argues that it relied on this proposition. Mr Aguilar forcefully outlined governmental shortcomings. He insisted that there was no valid explanation for the Government's failure to provide the data necessary for the adjustment of the reference price pursuant to the 1997 *Acuerdo*. He said that the CAA could hardly be faulted for not having generated timely base production levels when the Government waited for 21 months before convening the CAA. He opined that it would have been "futile" for aggrieved mills to go before the JCACA given that it "depended on government data and initiative."

107.    Did Mexico indeed refuse to implement regulations in accordance with their terms? Or has GAMI overstated the import of those terms?

108.    The record shows that Mexico failed to implement key struts of its Sugar Program notwithstanding its duties as explained by Lic. Schmill. GAMI alleges an abject failure to implement a regulatory program indispensable for the viability of foreign investments that had relied upon it. GAMI urges that in law this is no different from a violation by the government of the rules of that program. Both action and inaction may fall below the international standard. So far the Arbitral Tribunal is prepared to accept GAMI's proposition. But a critical step at this stage of the analysis is whether the specific failures of the Sugar Program are attributable to the government. It is on this point that the Tribunal concludes GAMI has not made its case.

109.    The preamble of the 1997 *Acuerdo* refers to the objective of the Sugarcane Decree to augment the participation

of the social and private sectors (i.e. labour and industry) "*como responsables de la producción nacional de azúcar.*"   It also refers to the authorisation given to the CAA to draw up "rules, definitions, and provisions" ("*reglas, definiciones y disposiciones*") to enhance the competitiveness of sugar production.  The *Acuerdo* itself contains sophisticated formulae. Yet anyone can see that the expected national consumption and production are key elements (*Ce* and *Qu* in the formula).  These were to be determined by the *Secretaría de Comercio* and other relevant government officials after having considered:

> "*la opinión de la Secretaría de Agricultura, Ganadería y Desarrollo Rural, de Financiera Nacional Azucarera S.N.C. del Comité de la Agroindustria Azucarera, de la Cámara Nacional de las Industrias Azucarera y Alcoholera, de la Unión Nacional de Productores de Caña de Azúcar de la Confederación Nacional Campesina y de la Unión Nacional de Cañeros de la Confederación Nacional de la Pequeña Propiedad.*"

110.     In sum: the regulatory regime was structured on the premise of broad consultations and cooperation.  The intervention of the private sector was explicitly called for.  An explicit role was reserved for the unions.  The Mexican government was not the only actor in important aspects of the Sugar Program.  GAMI says the Government could have forced the issue to ensure that the consultations took place.  GAMI's closing oral arguments sought to build on a declaration by the *Secretaría de Agricultura* to the effect that the industry "*debe estar adecuadamente supervisada por el Estado.*"   But the argument turns against GAMI.   The distinction between "adequate supervision" and "effective implementation" is hardly subtle.   There are certainly arguments on both sides.   The debate is complex.  For an international tribunal the relevant conclusion is simply that GAMI has not shown that the government's self-assigned duty in the regulatory regime was simple and unequivocal.  It is impossible to conclude that the failures in the Sugar Program were both directly attributable to the government and directly causative of GAMI's alleged injury.

**6(C)    Discrimination:   GAMI's   claim   under   Article 1102**

111.    The core of the relevant principle of national treatment is expressed in NAFTA Article 1102(2) as follows:

> *"Each Party shall accord to investments of investors of another Party treatment no less favorable than it accords, in like circumstances, to its own investors, with respect to the establishment, acquisition, expansion, management, conduct, operation, and sale or other disposition of investments."*

112.    The issue in the present case pertains to a programme of nationalisations which assuredly affected different Mexican companies differently.    Only some sugar mills were expropriated.   Some mills that were expropriated belonged to Mexican corporations which had no foreign shareholders.   The issue inherent in GAMI's claim is therefore whether it follows that GAM's mills could not be expropriated without violating NAFTA Article 1102 simply because GAM has US minority shareholders.   The answer to this question is no.

113.    GAMI argues that the Tribunal "need look no further than the testimony of Mr Pinto" as evidence of a violation of Article 1102.   GAMI specifically refers to Mr Pinto's account of the disparate treatment of GAM and BSM:

> *"Can there be any doubt that GAM and BSM were in like circumstances?   Each had five mills. Each was operating at a loss.   Each had to defer payments to its cane growers, and each secured its debt with pledges of sugar inventories.*
>
> *Likewise, can there be any doubt that the two companies, and thus their shareholders, were treated differently?   BSM and its shareholders retained their mills and have profited greatly from the recovery of sugar prices.   GAM and its shareholders were deprived not only of their property but also the opportunity to benefit from the reordering of the market, reordering*

*that Mr Pinto himself concedes was driven by the reestablishment of export compliance.*

*Furthermore, Mr Pinto concedes that GAM's balance sheet was no better or no worse than BSM's – just different."*

114.   The Arbitral Tribunal has not been persuaded that GAM's circumstances were demonstrably so "like" those of non-expropriated mill owners that it was wrong to treat GAM differently.   Mexico determined that nearly half of the mills in the country should be expropriated in the public interest.   The reason was not that they were prosperous and the Government was greedy.   To the contrary: Mexico perceived that mills operating in conditions of effective insolvency needed public participation in the interest of the national economy in a broad sense.   The Government may have been misguided.   That is a matter of policy and politics.   The Government may have been clumsy in its analysis of the relevant criteria for the cutoff line between candidates and non-candidates for expropriation.   Its understanding of corporate finance may have been deficient.   But ineffectiveness is not discrimination.   The arbitrators are satisfied that a reason exists for the measure which was not itself discriminatory.   That measure was plausibly connected with a legitimate goal of policy (ensuring that the sugar industry was in the hands of solvent enterprises) and was applied neither in a discriminatory manner nor as a disguised barrier to equal opportunity.

115.   The Arbitral Tribunal ultimately accepts (as Mr Perezcano put it in his oral summation) that GAMI has failed to demonstrate that the measures it invokes "resulted from or have any connection to GAMI's participation in GAM; nor were they geared towards treating GAM in a different mode because of GAMI's participation in their social capital."   In the circumstances of this derivative claim that defence is decisive. It is not conceivable that a Mexican corporation becomes entitled to the anti-discrimination protections of international law by virtue of the sole fact that a foreigner buys a share of it.

## 7.    EXPROPRIATION

116.    A consequence of GAMI's independent right of action under NAFTA may be illustrated by a hypothetical example. The notional compensation of GAM by Mexico in an amount representing M$ 100 per share would not in principle disentitle GAMI from asking the NAFTA Tribunal for an additional amount representing an additional M$ 50 per share.  But the theory gives rise to a number of practical difficulties.  One might imagine a perfect world in which a national court of last recourse sits down with a NAFTA tribunal incapable of reviewable error to discharge their respective responsibilities. This could be done quite logically.  The Mexican court could order payment to GAM based on an evaluation of the five expropriated mills.  As a matter of mathematics that evaluation might represent M$ 100 per share of all shares of GAM.  At the same time the NAFTA tribunal might find that a higher level of compensation was mandated and thus order a top-up to GAMI of M$ 50 per share proportionate to its 14.18% shareholding. This would be a graphic illustration of the value to GAMI of its entitlement to a direct international remedy beyond its indirect benefit from the national remedy obtained by GAM.  A state cannot avoid international responsibility by arguing that the foreigner must content himself with whatever compensation has been decreed by national authorities.

117.    This scenario is of course a fantasy.  It is factually implausible.  It lacks legal foundation.  The Tribunal is aware of no *procedural* basis on which such coordination could take place.  And the *Sentencia* itself plausibly rejects the right of shareholders to challenge the expropriation on the *substantive* ground that the protected interest is that of the corporate owner of the expropriated assets.

118.    The scenario also lacks commercial credibility.  On what basis could one rationally conclude that the payment to GAMI should be reduced to account for the payment to GAM?  It is an

acknowledged fact that GAM has never paid a dividend to its shareholders.   Why should GAMI's recovery be debited on account of a payment to GAM which is perhaps utterly unlikely to find its way to the pockets of its shareholders?

119.     The overwhelming *implausibility* of a simultaneous resolution of the problem by national and international jurisdictions impels consideration of the practically *certain* scenario of unsynchronised resolution.

120.     It is sufficient to consider the hypothesis that a NAFTA tribunal were to order payment to GAMI before the Mexican courts render their final decision.   One might adapt the hypothetical example given in Paragraph 116 above.   GAMI would thus have received M$ 150 per share. (There would have been no prior offsetting Mexican recovery.)  What effect should the Mexican courts now give to the NAFTA award?  How could GAM's recovery be reduced because of the payment to GAMI?  GAM is the owner of the expropriated assets.  It has never paid dividends.   It would have been most unlikely to distribute revenues in the amount recovered by GAMI.  At any rate such a decision would have required due deliberation of GAM's corporate organs.   Creditors would come first.   And other shareholders would have an equal right to the distribution.  GAM would obviously say that it is the expropriated owner and that its compensatable loss under Mexican law could not be diminished by the amount paid to one of its shareholders.

121.     These difficulties are attributable to the derivative nature of GAMI's claim.  They can quickly transport the analysis onto a fragile limb.   It is necessary to revert to basic propositions.

122.     GAM's title to its five productive assets was lost in 2001 by an act of expropriation.  The Mexican courts have held that the Expropriation Decree was not compliant with Mexican law. It is likely that it was therefore also non-compliant with NAFTA since the requirements of Mexican law coincide to a significant degree with those of NAFTA.   But GAM cannot be a NAFTA claimant.  Mexico has represented to this Tribunal that it is in the process of returning the three mills affected by the *Sentencia* to GAM (see Paragraph 8 *supra*).   The wrongful expropriation of those mills may have caused prejudice to GAM notwithstanding their reversal.   That prejudice may be remedied by Mexican authorities.  The expropriation of the two

other mills was ultimately not challenged by GAM.   It is
therefore definitive.   The Mexican Constitution requires that
compensation be paid.   Mexico has represented to this Tribunal
that "the formalities for payment of indemnity on account of the
expropriation of the other two mills are also in progress" (see
Paragraph 8 *supra*).

123.   GAMI's shares in GAM have not been expropriated.
GAMI must therefore say that its *investment* in GAM has
suffered something tantamount to expropriation. This question
arises prior to any analysis of quantum.   It relates to the
*substantive* determination of a breach.   Some precedents
involve a full deprivation of the benefit of the relevant property
rights. *Starrett Housing*[25] referred to rights rendered "useless."
*Santa Elena* held that an expropriatory effect is "to deprive the
owner of title, possession or access to the benefit and economic
use" of the property.[26]  The tribunals in those cases were not
required to determine whether legal protections were also
extant in cases of *partial* deprivation of use or benefit.   That
issue has been addressed by a number of NAFTA tribunals.

124.   *S.D. Myers* held that a temporary discriminatory
regulation which eliminated the claimant's competitive
advantage in a particular market was not expropriatory.
(Redress was given on other grounds.)  The tribunal added this
dictum: "it may be that, in some contexts and circumstances, it
would be appropriate to view a deprivation as amounting to an
expropriation, even if it were partial or temporary."[27]  It did not
explain what those contexts and circumstances might be.

125.   The *Pope & Talbot* tribunal noted[28] that the claimant in
that case had "conceded, correctly, that under international law,
expropriation requires a substantial deprivation."   It appears
however that that tribunal viewed the requirement as stricter
than that.   The tribunal's own test was "whether that
interference is sufficiently restrictive to support a conclusion
that the property has been 'taken' from its owner."  It concluded
that a diminution of the profits of the corporate claimant due to
restrictions on selling softwood lumber from British Columbia
to the US did not satisfy this test.   The award explicitly states

---

25    4 IRAN-US CLAIMS TRIBUNAL REPORTS 122.
26    Award of 17 February 2000, 5 ICSID REPORTS 153, at para. 77; 39
      ILM 1317, at 1329 (2000).
27    First Partial Award, *op. cit.*, para. 283.
28    Para. 102.

that "an impairment of economic value" is tantamount to expropriation only if the degree of impairment is *equivalent* to expropriation.[29]

126.    Should *Pope & Talbot* be understood to mean that property is taken only if it is so affected in its entirety?  That question cannot be answered properly before asking: *what property*?    The taking of 50 acres of a farm is equally expropriatory whether that is the whole farm or just a fraction. The notion must be understood as this: *the affected property* must be impaired to such an extent that it must be seen as "taken."

127.    GAM's own case would thus not have been affected in principle if only one mill had been expropriated.   GAM's property rights in that single mill would have been "taken" because GAM was formally dispossessed of those rights. (Indeed GAM's success in the *Sentencia* was not impaired by its decision to abandon the complaint with respect to two of the five mills.)

128.    But this Tribunal is not seised by GAM.  GAMI's case is more difficult.  The notions developed by *Pope & Talbot* may suggest that the "impairment" of the value of its property (i.e. GAMI's shares in GAM) would not be equivalent to a "taking" of that property if only one of five equally valuable GAM mills had been expropriated without compensation.   The impairment might on the other hand have been *total* if that single mill was the only one having a positive value.  (GAMI may thus be right in dismissing as irrelevant GAM's decision not to challenge the expropriation of the San Francisco and San Pedro mills.)

129.    The position then is this: GAMI is entitled to invoke the protection of Article 1110 if its property rights (the value of its shares in GAM) were taken by conduct in breach of NAFTA. GAMI argues that such conduct was manifest in the Expropriation Decree.   This Tribunal finds it likely that the Expropriation Decree was inconsistent with the *norms* of NAFTA.  But Mexican conduct inconsistent with the norms of NAFTA is only a *breach* of NAFTA if it affects interests protected by NAFTA.  GAMI's investment in GAM is protected by Article 1110 only if its shareholding was "taken."

---

29      Para. 104, at footnote 86.

130.    It would in the first of these two hypotheses be disturbing to conclude that GAMI could recover only if it had taken a 14.18% participation in each of the five separate subsidiaries which owned the mills.  That would be formalistic to a degree which could not easily be reconciled with the objectives of NAFTA.  It is true that neither *Pope & Talbot* nor *S.D. Myers* delivered an extended analysis of Article 1110.  Their brief discussion of Article 1110 is inconclusive with respect to a number of unanalysed hypotheses.  Each award granted relief to the claimants on other grounds.  Their references to Article 1110 may therefore be considered *obiter dicta*.

131.    Other NAFTA awards have given support for the proposition that *partial* destruction of the value may be tantamount to expropriation.   Thus the ICSID tribunal in *Metalclad* stated:

> "... *expropriation under NAFTA includes not only open, deliberate and acknowledged takings of property, such as outright seizure or formal or obligatory transfer of title in favour of the host State, but also covert or incidental interference with the use of property which has <u>the effect of depriving the owner, in whole or in significant part, of the use or reasonably-to-be-expected economic benefit of property</u> even if not necessarily to the obvious benefit of the host State.*"[30]

The Supreme Court of British Columbia set aside part of the *Metalclad* award.  The Court concluded that the arbitrators exceeded their mandate when interpreting Article 1105 as including a duty of transparency.  But the passage quoted above was undisturbed.  The Court explicitly held:

> "*There is no ground under s.34 of the International Commercial Arbitration Act to set aside the Award as it relates to the conclusion of the Tribunal that the issuance of the Ecological Decree amounted to an*

---

[30]    5 ICSID Reports 230 (emphasis added).

> *expropriation of the Site without compensation."*[31]

Similarly the ICSID award in *Santa Elena* cited with approval the following phrase from *Tippets* as a test of expropriatory effect:

> *"Whenever events demonstrate that the owner was deprived of fundamental rights of ownership and it appears that this deprivation is not merely ephemeral."*[32]

The *Santa Elena* tribunal then went on to say that a governmental measure may constitute a taking if it "effectively freezes or blights the possibility for the owner reasonably to exploit the economic potential of the property."[33]

132.   But this Tribunal need not decide whether *partial* destruction of shareholding interests may be tantamount to expropriation.   It would *in any case* be necessary to assess the value of shareholdings in GAM at the time of the Expropriation Decree.  GAM was and remains in the hands of its owners.  Its principal assets had been taken.   But Mexican law gave it substantial protections.  GAM could sue for the reversal of the taking.    Or it could accept the taking and claim for compensation.   (GAM has of course successfully obtained the return of three mills and is awaiting compensation for the other two.   It would seem difficult to suggest that GAM has been unduly passive in protecting its rights.   Such a case could naturally be imagined.  The minority shareholder might then have no effective means of initiating remedial action on behalf of the company. But that would have to be proved.)  GAMI may have had *subjective apprehensions* that Mexican judicial remedies would be insufficient.  But this Tribunal can only act on the basis of *objective findings justified by evidence* that GAM's value as an enterprise had been destroyed or impaired.

133.    With knowledge of the magnitude of diminution one might be in a position to consider whether a line is to be drawn beyond which the loss is so great as to constitute a taking.  But

---

[31]    *Ibid.* 260.
[32]    6 Iran-US Claims Tribunal Reports 219, 226 (1986).
[33]    5 ICSID Reports 172, at para. 76.

GAMI has staked its case on the proposition that the wrong done to it did in fact destroy the whole value of its investment. GAMI seeks to lend credibility to its posture by agreeing to relinquish its shares in GAM as a condition of the award it seeks.  It suggests that any residual value is therefore of no moment.  This posture is untenable.  The Tribunal cannot be indifferent to the true effect on the value of the investment of the allegedly wrongful act.  GAMI has neglected to give *any* weight to the remedies available to GAM.  Assessment of their effect on the value of GAMI's investment is a precondition to a finding that it was taken.  GAMI has not proved that its investment was expropriated for the purposes of Article 1110.

## 8.    COSTS

134.    The Tribunal wishes to record its appreciation for the thorough professionalism with which each side has presented its case.    The Parties' well-organised arguments and constructive attitude with respect to matters of procedure have been of great assistance to the Tribunal.    They have demonstrated that courteousness is compatible with determined advocacy.

135.    The claims fail.    The Tribunal nevertheless finds it equitable that each side should bear its costs.    There are two main reasons for not giving Mexico any recovery in this respect. The first is that Mexico raised an unsuccessful jurisdictional objection which became a major feature of the proceedings. Mexico insisted against GAMI's wishes that its objections be heard separately.    The costs associated with that special hearing were significant.    The second is that GAMI's grievance must be considered as serious.    It raised disquieting questions with respect to regulatory acts and omissions.

136.    The arbitrators have broad discretion under the UNCITRAL Rules with respect to the allocation of costs.    They deem it appropriate to make no award of costs.    Each Party shall bear its own expenditures.    The amounts paid to the Tribunal on account of its fees and expenses are divided equally.

## 9.    DECISION

137.    For the reasons stated above the Tribunal hereby unanimously declares that it has jurisdiction over the claims and dismisses them in their entirety.  All contentions to the contrary are rejected.  There is no award of costs.

Done on 15 November 2004 in equally authoritative English and Spanish versions.

Julio Lacarte Muró

W. Michael Reisman

Jan Paulsson