# EXHIBIT 7

# APPLETON & ASSOCIATES

### INTERNATIONAL LAWYERS

*Toronto*      *Washington DC*

REDACTED NON-CONFIDENTIAL

## UNDER THE ARBITRATION RULES
## OF THE
## UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW
## AND
## THE NORTH AMERICAN FREE TRADE AGREEMENT

**BETWEEN:**

### MERRILL & RING FORESTRY L.P.

Investor

### - AND -

### GOVERNMENT OF CANADA

Party

## NOTICE OF ARBITRATION
## AND
## STATEMENT OF CLAIM

11.55 l.

| SERVICE OF A TRUE COPY HERE OF |
| SIGNIFICATION DE COPIE COMFORME |

Admitted the _____ 27 _____ day
Acceptée le                              jour

of _____ Dec 20 06
de

for      John H. Sims, Q.C.
pour   Deputy Attorney General of Canada
          Sous-procureur général du Canada

December 27, 2006

Appleton & Associates
International Lawyers
77 Bloor Street West, Suite 1800
Toronto, Ontario, M5S 1M2
Tel: (416) 966-8800
Fax: (416) 966-8801

# APPLETON & ASSOCIATES

### INTERNATIONAL LAWYERS

*Toronto*      *Washington DC*

REDACTED NON-CONFIDENTIAL

## STATEMENT OF CLAIM
## UNDER THE ARBITRATION RULES OF THE
## UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW
## AND
## THE NORTH AMERICAN FREE TRADE AGREEMENT

### MERRILL & RING FORESTRY L.P.

**Investor**

v.

### GOVERNMENT OF CANADA

**Party**

December 27, 2006

77 Bloor Street West, Suite 1800, Toronto, Ontario M5S 1M2   Tel. (416) 966-8800   Fax. (416) 966-8801   www.appletonlaw.com

816 Connecticut Avenue, NW, 12ᵀᴴ Floor, Washington DC 20006   Tel. (202) 293-0900   Fax. (202) 293-0988

1.   Pursuant to Article 18 of the Arbitration Rules of the United Nations Commission on International Trade Law ("UNCITRAL") and Articles 1116 and 1120 of the North American Free Trade Agreement ("NAFTA"), the Investor, **MERRILL & RING FORESTRY L.P.**, hereby submits its Statement of Claim.

## I.   THE PARTIES

2.   The Investor, Merrill & Ring Forestry L.P. ("Merrill & Ring"), is a limited partnership constituted under the laws of the state of Washington.[1] Merrill & Ring is a forestry and land management company that provides a range of services relating to the purchase and sale of logs for export and domestic markets, and engages in the purchase and sale of forest land.

3.   The address for Merrill & Ring is as follows:

> Merrill & Ring Forestry L.P.
> 813 East 8th Street
> Port Angeles, WA
> 98362

4.   The Respondent, the Government of Canada ("Canada"), is a Party to the North American Free Trade Agreement ("NAFTA"). Canada has acted through its organ, the Department of Foreign Affairs and International Trade ("DFAIT"), which is responsible for the administration of export-related legislation. The Province of British Columbia also oversees and regulates logs that may be eligible for export from that province through the Ministry of Forests. Pursuant to NAFTA Article 105, the Government of Canada has assumed international responsibility for the measures taken by the Government of British Columbia.

5.   The address for Canada is as follows:

> Government of Canada
> Office of the Deputy Attorney General of Canada
> 284 Wellington Street
> Ottawa, ON K1A 0H8
> Canada

---

[1] Washington State Certificate of Limited Partnership, October 22, 1991 and Washington State Certificate of Amendment to Certificate of Limited Partnership, December 6, 2004 (Exhibit 1); Agreement of Limited Partnership, August 28, 1991 (Exhibit 2); Amendment to Agreement of Limited Partnership, July 31, 2003 (Exhibit 3); Washington State Certificate of Existence / Authorization for Merrill & Ring Forestry, L.P., December 11, 2006 (Exhibit 4).

## II.    PROCEDURAL HISTORY OF DISPUTE AND JURISDICTION

### A.    The Procedural History of This Dispute

6.    On September 25, 2006, Merrill & Ring served upon Canada a Notice of Intent to Submit a Claim to Arbitration ("Notice of Intent") in accordance with NAFTA Article 1119. The Notice of Intent was delivered to Canada at least 90 days before the submission of this Claim.

7.    On December 27, 2006, Merrill & Ring submitted this Claim to arbitration by serving Canada with a Notice of Arbitration. Together with the Notice of Arbitration, the Investor filed its consent and waiver as required by NAFTA Article 1121(1).[2]

8.    This claim arises out of measures that constitute a continuing breach of Canada's NAFTA obligations. Each day that the measures remain in force causes new damage to Merrill & Ring and thereby continues to give rise to a NAFTA violation. As a result, this Claim is submitted less than three years from the date the Investor first acquired, or should have acquired, knowledge of the breach and knowledge that the Investor had incurred loss or damage, pursuant to NAFTA Article 1116. Pursuant to NAFTA Article 1120, the Investor submits this Claim on the basis that more than six months have elapsed since the events giving rise to this claim.

9.    The Investor has fulfilled its obligations under NAFTA Article 1118. The parties have exchanged correspondence regarding consultations. The Investor awaits the Respondent's confirmation of a time and place for these consultations, as well as confirmation that the Government of British Columbia has been approached for participation.

### B.    The Jurisdiction of This Tribunal

10.    Sections A and B of NAFTA Chapter 11 contain the arbitration agreement between the disputing parties, in accordance with Article 18(1) of the UNCITRAL Arbitration Rules. A copy of NAFTA Chapter 11 is annexed to this Statement of Claim.[3]

11.    In Section B of NAFTA Chapter 11, Canada has extended an offer to arbitrate any dispute regarding its obligations under Section A to any investor of another NAFTA party. The Investor, Merrill & Ring, has accepted Canada's offer by filing the Notice of Arbitration and Statement of Claim.

---

[2] Merrill & Ring consent and waiver, attached as Schedule A in the Notice of Arbitration.

[3] The text of NAFTA Chapter 11 is set out as Exhibit 8. The Investor relies on the entire NAFTA but the agreement to arbitrate is located in Chapter 11.

12.     The Investor is a limited partnership constituted under the laws of the State of
        Washington in the United States of America. The Investor owns timber lands, timber and
        intangible rights to the fair market value of its timber in Canada, all of which constitute
        investments as defined by NAFTA Article 1139.

## III.     STATEMENT OF FACTS

### A.     The Business Operations of Merrill & Ring

13.     Merrill & Ring is a forestry and land management company headquartered on the
        Olympic Peninsula in Washington state.  Merrill & Ring provides a full range of services
        relating to the purchase and sale of logs for export and domestic markets, including
        harvesting, log marketing, and accounting. It grows, harvests and markets timber from a
        number of investments in Canada.  Merrill & Ring also engages in the purchase and sale
        of forest land. It has owned and operated timberlands in British Columbia for more than
        100 years.

14.     Merrill & Ring's General Partner, Merrill & Ring Family Corporation, is a Washington
        state corporation.[4]  In addition, Merrill & Ring had a second General Partner up until July
        31, 2003, when Richard Stroble, a US national, personally withdrew as General Partner
        from the partnership.[5] Merrill & Ring has two Limited Partners, The Campbell River
        Partnership and the Merrill Family General Partnership.  Both of the Limited Partners are
        Washington state partnerships.

15.     Merrill & Ring is part of a family of companies. Merrill & Ring operates its log business
        in Canada both alone and jointly with related companies. It also uses agents such as log
        brokers in its business. These related companies and agents form an integral part of
        Merrill & Ring's Canadian log operations.

16.     Merrill & Ring owns 10,347 acres of land in the coastal regions of British Columbia.  The
        majority of this land was granted by the Federal Crown prior to 1906 and originally
        acquired by Merrill & Ring and its predecessors during that era for the purpose of forestry
        and timber sales.  Merrill & Ring harvests timber from its land for sale to third parties
        within Canada and for export.

---

[4] Agreement of Limited Partnership, August 28, 1991 (Exhibit 2); Amendment to Agreement of Limited Partnership,
July 31, 2003 (Exhibit 3); Washington State Registration and License of Merrill & Ring Family Corporation (Exhibit
5); Washington State Certificate of Existence / Authorization for Merrill & Ring Family Corporation, December 11,
2006 (Exhibit 6).

[5] Amendment to Agreement of Limited Partnership, July 31, 2003 (Exhibit 3); Mr. Stroble continued as an officer of
Merrill & Ring Family Corporation. An excerpt from the US Passport of Richard Everett Stroble, issued July 25,
1997 is set out at Exhibit 7.

### B.    The British Columbia Log Export Regime

17.    All logs exported from Canada require federal export permits for all destinations. British Columbia, however, is the only province in Canada where DFAIT exercises its authority to control the export of logs through a surplus testing procedure. The surplus testing procedure requires that logs from both private and public land must be deemed surplus to provincial needs before they can be exported. This measure regulates investors and their investments in British Columbia by subjecting them to special requirements for the export of logs that result in the forced sale of logs at less than fair market value.

18.    Logs harvested in British Columbia are also subject to different export permit application procedures based on their category of land ownership. There are four major categories of land ownership for timber in British Columbia:

       a.       Provincial Crown land;
       b.       Federal Crown land;
       c.       Private land granted before March 1906; and
       d.       Private land granted after March 1906.

19.    Log exports from provincial Crown land in British Columbia and land granted after 1906 are controlled by the provincial government, as complemented by federal export requirements. Log exports from private land granted before 1906, federal Crown lands and aboriginal land are regulated by the federal government. Merrill & Ring owns primarily private land granted before 1906, which means it is subject to federal government regulation.

                 *i.      The Federal Surplus Testing Procedure in British Columbia*

20.    The federal government of Canada acts through its organ, DFAIT, which is responsible for the administration of the *Export and Import Permits Act*, R.S.C. 1985 c. E-19 and the regulations thereunder, including the *Export Control List* SOR/89-202. The *Export and Import Permits Act* and the *Export Control List* prohibit the export of logs of all species of wood to all destinations without an export permit.

21.    DFAIT readily grants export permits for logs for all destinations provided that these logs are harvested outside of the province of British Columbia. However, log exports from British Columbia undergo a surplus testing procedure. Both the provincial and federal governments apply a form of surplus test to log exports from British Columbia that are within their respective jurisdictions.

22.     The federal government administers the federal surplus testing procedure (the "Federal Surplus Test") in consultation with the province of British Columbia under a Memorandum of Understanding ("MoU") between the two governments.[6] In British Columbia, the federal government applies the Federal Surplus Test to private land under its jurisdiction. Logs from Native land are not subject to the federal surplus test.

23.     DFAIT's procedures, requirements and administrative practices in granting or denying export permits for logs are described in its *Notice to Exporters Serial No. 102* ("Notice 102").[7] These measures, adopted and maintained by Canada, relate to the investments of Merrill & Ring by requiring that all timber harvested from Merrill & Ring's private lands be subject to the Federal Surplus Test as a condition for the granting of an export permit.

24.     The MoU between the federal government and the provincial government established the Federal Timber Export Advisory Committee ("FTEAC"). FTEAC is comprised of the same membership as its provincial counterpart, the Timber Export Advisory Committee ("TEAC"), with the addition of a sole federal representative. FTEAC administers the Federal Surplus Test as follows:

   a.      Logs to be exported must be advertised for sale on a bi-weekly list. The exporter must submit an application to advertise the logs to the Export Controls Division of DFAIT. DFAIT will request that the BC Ministry of Forests advertise the logs on the biweekly list;

   b.      Domestic log processors may submit offers to purchase logs for 14 days after advertisement;

   c.      If offers to purchase are received, then the logs are "blocked" from export. FTEAC will determine whether the offers received from domestic log processors reflect the artificially low British Columbia price of the logs;

   d.      If no offers are made, or the offers do not reflect the artificially low British Columbia price, then FTEAC may deem the logs to be surplus to provincial requirements;

   e.      FTEAC sends its recommendation to DFAIT for a final determination; and

   f.      A finding that the logs are surplus to provincial needs means that the exporter may apply for a federal export permit.

---

[6] Memorandum of Understanding, March 30, 1998 (Exhibit 9).

[7] Notice to Exporters Serial No. 102 made under the Export and Import Permits Act, April 1, 1998 (Exhibit 12).

*Statement of Claim*
*Merrill & Ring Forestry L.P. v. Canada*                        -6-

25.     DFAIT's practice is to deny export permits to logs that are not deemed surplus to
        provincial needs by FTEAC.  This practice prevents owners of private lands such as
        Merrill & Ring from obtaining the higher prices available in international markets and
        forces them to sell their logs at the artificially reduced prices prevailing in British
        Columbia.  The measures cause private forest landowners such as Merrill & Ring losses
        and damages by reducing their revenues, the value of their logs, the value of their land,
        their ability to provide consistent supply, their production volumes and their ability to
        obtain the highest price for their logs.

            ii.     *The Provincial Surplus Testing Procedure in British Columbia*

26.     Logs from provincial Crown land in British Columbia and private land granted after 1906
        are regulated by the provincial government under Part 10 of the BC *Forest Act*, R.S.B.C.
        c. 157, as complemented by federal export requirements.  Section 127 of the *Forest Act*
        bans the export of logs from British Columbia. However, section 128 allows the Minister
        of Forests to grant exemptions for log exports under strict conditions: namely, if the
        timber is deemed surplus to the needs of BC mills; cannot be processed economically in
        British Columbia; or would prevent the waste or improve the use of timber from Crown
        land.

27.     Landowners subject to the provincial surplus test benefit from additional exemptions that
        are not available to federally regulated landowners.  Both federally and provincially
        regulated landowners may receive individual exemptions from the surplus test for
        harvested logs on a case-by-case basis.  However, provincial landowners may also receive
        two kinds of broader exemptions: standing timber exemptions and blanket standing
        timber exemptions.[8]

28.     Standing timber exemptions apply to standing timber (*i.e.* logs that have not yet been
        harvested).  They provide a company or an individual with permission to export logs of a
        certain species for a specified period of time.  A blanket standing timber exemption may
        be granted to a geographical area of the province.  Such a blanket exemption permits a
        certain percentage of logs to be exported for a specified period of time.  These two
        exemptions bypass the provincial surplus test.

29.     Federally regulated landowners are not entitled to any of the broader exemptions
        available to their provincial counterparts.  The broad exemptions available exclusively to
        provincial landowners provide them with significant advantages, including:

        a.     Increased revenues, since exempted exporters may obtain the international price
               for logs instead of the artificially low British Columbia price;

---

[8]  Province of British Columbia Procedures for Export of Timber, 1999 (Exhibit 10).

> b.    Reduced compliance costs, since exempted exporters do not have to incur the costs of sorting and storing the logs for up to eight weeks; and
>
> c.    Longer term contracts, since exempted exporters can provide a predictable timber supply to international buyers.

30.    Ultimately, the provincial exemption process means that only one-half to one-third of logs exported from provincial Crown lands are subject to the provincial surplus test.  In contrast, all of the logs exported from federal and pre-1906 private lands are subject to the Federal Surplus Test.


## IV.    NAFTA OBLIGATIONS BREACHED BY CANADA

31.    The Investor claims that Canada has breached its obligations under Section A of Chapter 11 of the NAFTA, including but not limited to the following provisions:

> A.    Article 1102 - National Treatment
> B.    Article 1103 - Most Favored Nation Treatment
> C.    Article 1105 - International Law Standards of Treatment
> D.    Article 1106 - Performance Requirements
> E.    Article 1110 - Expropriation


### A.    National Treatment

32.    NAFTA Article 1102 obliges the NAFTA Parties to treat investors from other NAFTA Parties and their investments as favorably as domestic investors and their investments. The analysis of the national treatment obligation can be segregated into three elements:

> a.    A determination that the foreign investors or investments are in like circumstances with local investors or investments;
>
> b.    A determination that the NAFTA Party treats the foreign investors or investments less favorably than it treats local investors or investments; and
>
> c.    The treatment is with respect to the establishment, acquisition, expansion, management, conduct, operation, and sale or other disposition of investments.

          *i.*     *Merrill & Ring and Its Investments are Treated Less Favorably Than Investors and Investments Subject To Provincial Regulation*

33.    Merrill & Ring is in like circumstances with the Province of British Columbia. Both Merrill & Ring and the Province of British Columbia own land from which logs may be harvested. Both Merrill & Ring and the Province of British Columbia obtain revenue from the harvest of logs from that land.

34.    The Province of British Columbia manages its forest resources through the Ministry of Forests, which has a division known as British Columbia Timber Sales ("BCTS"). BCTS operates on commercial principles and markets the right to cut timber from provincial lands to private companies that sell logs for export.

35.    BCTS is treated more favorably than Merrill & Ring. The Province of British Columbia grants standing timber exemptions to provincial Crown land that are not available to federally-regulated land. For example, in 2002, Order in Council No. 121 exempted timber originating within the Prince Rupert Forest Region. This exemption allowed up to 35 per cent of the logs harvested in the timber supply area to be automatically exported for a period of three years.[9]

36.    Merrill & Ring is also in like circumstances with the private timber companies that sell logs harvested from provincial Crown land. Both Merrill & Ring and these private companies sell harvested logs for export. They compete for determinations that their logs are surplus to provincial requirements and thus for export permits.

37.    These private timber companies are treated more favorably than Merrill & Ring. The private timber companies benefit from standing timber exemptions that are not available to Merrill & Ring. These exemptions mean that exporters receive more revenue for their logs by avoiding the artificially low British Columbia price for logs. Further, exporters avoid the compliance costs and uncertainty associated with the surplus testing procedure. The higher revenue obtained for logs from provincial Crown land increases the value of those lands, which means that the value of federally-regulated private lands is artificially depressed.

---

[9] Province of British Columbia Order of the Lieutenant Governor in Council No. 121, February 13, 2002 (Exhibit 11).

> *ii.    Merrill & Ring and Its Investments Are Treated Less Favorably Than Investors and Investments in Other Provinces*

38.    Merrill & Ring is in like circumstances with the owners of private forest lands in other Canadian provinces. British Columbia is the only province in Canada in which DFAIT exercises its authority over log exports by the imposition and administration of the Federal Surplus Test. Private landowners in other Canadian provinces may export logs harvested from these lands without meeting the requirements of the Federal Surplus Test.

39.    Private landowners in other Canadian provinces are treated more favorably than Merrill & Ring. They do not have to incur the compliance costs associated with the surplus testing procedure. They benefit from enhanced certainty and predictability of supply and thus can conclude medium and long-term contracts for the sale of their logs. They receive more revenue for their logs because they are not forced to sell them at artificially depressed prices. They can choose the best price for their logs.

> *iii.    This Treatment Is with Respect To the Management, Conduct, Operation and Sale of Merrill & Ring's Investments*

40.    Canada's less favorable treatment of Merrill & Ring forces it to manage its private land, conduct its log harvesting, and sell its resources from that land in accordance with the log export regime. It is not permitted to freely alienate its logs at the international price. It must incur significant compliance costs, including advertising, sorting and storing the logs. The exemptions received by British Columbia and enjoyed by the private companies holding standing timber rights to provincial Crown land result in an absence of such costs, and thus better treatment in the management, conduct, operation and sale of its investments.

**B.    Most Favored Nation Treatment**

41.    Under NAFTA Article 1103, Canada is required to accord to US investors and their investments treatment no less favorable than that which is available to any other foreign investor or its investment under a similar treaty. Accordingly, NAFTA Article 1103 entitles Merrill & Ring and its investments to receive the best level of treatment available to any foreign investors or investments in Canada under any comparable international investment agreement obligation, including those found in bilateral investment treaties.

42.    Canada has entered into at least 15 bilateral investment treaties since the NAFTA came into force where "international law" encompasses all sources of international law. These investment treaties include:

a)   Ukraine (July 24, 1995) at Article II(2);
b)   Egypt (November 3, 1997) at Article II(2);
c)   Philippines (November 13, 1996) at Article II(2);
d)   Barbados (January 17, 1997) at Article II(2);
e)   Armenia (March 29, 1999) at Article II(2);
f)   Lebanon (June 19, 1999) at Article II(2);
g)   Latvia (July 27, 1995) at Article II(2);
h)   Trinidad and Tobago (July 8, 1996);
i)   Ecuador (June 6, 1997) at Article II(2);
j)   Thailand (September 24, 1998) at Article II(2);
k)   Uruguay (June 2, 1999) at Article II(2);
l)   Venezuela (January 28, 1998) at Article II(2);
m)   Panama (February 13, 1998) at Article II(2);
n)   Croatia (January 30, 2001) at Article II(2); and
o)   Romania (February 11, 1997) at Article II(2).

All of these treaties are between Canada and non-Parties to the NAFTA.

43.   In the event that this Tribunal determines that the Note of Interpretation issued by the
      NAFTA Free Trade Commission on July 31, 2001 restricts the contents of the NAFTA
      Article 1105 standard to that provided by customary international law, then this Tribunal
      is required to apply the higher standard available to investments of investors of non-
      NAFTA Parties under one of these treaties under NAFTA Article 1103's Most Favored
      Nation obligations.

44.   If it is determined that the level of treatment that Canada must provide to Merrill & Ring
      and its investments under NAFTA Article 1105 is less than that provided to investors or
      their investments by Canada under other treaties, including these 15 investment treaties,
      then Merrill & Ring is nonetheless entitled to receive the better level of treatment
      provided under such treaties by virtue of the application of NAFTA Article 1103.

**C.      International Law Standard of Treatment**

45.   NAFTA Article 1105(1) sets out the international law standards of treatment that a
      NAFTA Party is obliged to accord to investments of investors of another NAFTA Party.
      Canada fails to provide Merrill & Ring with the international law standard of treatment
      through the operation of six measures:

      a.   The membership of FTEAC consists of primarily domestic log processors;
      b.   There is no transparency or legal security in the surplus testing procedure;
      c.   The government fails to exercise proper diligence over the log export regime;
      d.   The arbitrary time and sort requirements of the Federal Surplus Test;
      e.   The domestic log purchasers abuse their governmental authority to block logs; and
      f.   The arbitrary grant of exemptions to standing timber from provincially-regulated
           land.

46.     The composition of FTEAC results in procedural unfairness. Many of the members of FTEAC are domestic log processors. In addition, some of the members of FTEAC are competitors of the potential log exporter. This means that decisions on offers are made in part by individuals who have a direct interest in obtaining lower cost logs or by competitors who have a direct interest in exporting logs themselves. The members of FTEAC include ███C-1(b)(iv)███ which either export logs from British Columbia, process logs in British Columbia, or both. The conflicts of interest created by the membership of FTEAC raise issues of procedural fairness.

47.     There is no transparency or legal security in the FTEAC administrative process. The federal government does not provide exporters with the criteria considered by FTEAC or DFAIT in making their determinations. Nor will it provide a list or description of the criteria used by DFAIT to make its surplus decision. There is no opportunity for private landowners to make submissions to FTEAC or to observe FTEAC meetings. There is no codified process for appeal or review of an FTEAC recommendation. Although a potential exporter may request an *ad hoc* review from DFAIT, such a review relies entirely on the unchecked discretion of federal government officials.

48.     The federal government fails to exercise due diligence to prevent abuses of the surplus testing procedure. FTEAC permits domestic purchasers to submit non *bona fide* offers. Such offers are submitted by shutdown mills, mills located several hours away, and companies with standing timber exemptions. Another manner in which domestic log processors manipulate the surplus testing procedure occurs when subsidiaries of large corporations exporting logs apply to purchase the logs of other corporations. Many of these bad faith offers have been considered reasonable by FTEAC. Some examples follow:

   a.     On October 11, 2005, Merrill & Ring wrote to DFAIT regarding the offers received on five hemlock booms. Merrill & Ring requested that the offers made by ███C-1(b)(ii) and C-1(b)(iv)███ should be ruled invalid as they were in bad faith and below market price. After waiting two months for a response, Merrill & Ring was forced to mitigate the water damage being caused to the logs by selling them to ███C-1(b)(ii) and C-1(b)(iv)███

   b.     On March 13, 2006, Merrill & Ring wrote to DFAIT requesting that ███C-1(b)(ii) and███ C-1(b)(iv) Lumber be declared ineligible to make offers on logs while exporting logs itself. ███C-1(b)(ii) and C-███ is a subsidiary of ███C-1(b)███ which regularly purchases logs for export to Japan. DFAIT has still not responded to this letter.

REDACTED NON-CONFIDENTIAL

49.     The time frame and sort specifications required for FTEAC to administer the Federal
        Surplus Test are arbitrary and unfair.  The potential exporter is required to separate the
        logs into sorts. Moreover, the Federal Surplus Test procedure can take up to three
        months, during which time potential log exporters lose some of the value of their logs.
        Teredo infestation, sun check, stain and weight loss all impact the value of the timber
        while the log exporter waits for the surplus test procedure to be completed. In 2004,
        Merrill & Ring paid ███C-1(b)(ii)███ over US$16,000 in compensation for teredo
        damage, an insect infestation that occurs when logs remain in water for extended periods
        of time.

50.     Domestic purchasers abuse their ability to block the export of logs for their own benefit.
        The practice of "log blocking" refers to the process used by a domestic purchaser to gain
        concessions from the potential log exporter in exchange for a withdrawal of its bids for
        logs.  A blocker is not required to purchase the logs which were the subject of its bid. The
        concessions range from lower prices to different private log sorts, and result in a loss to
        the potential log exporter. FTEAC's administration of the Federal Surplus Test
        knowingly permits such "log blocking".

51.     Merrill & Ring regularly receives such blocking letters. In cases where the offer is
        evidently below current market prices, Merrill & Ring will request a review. The logs sit
        in the water during this review process. On most occasions, Merrill & Ring is informed
        by FTEAC and/or DFAIT that the offer is fair and the logs cannot be exported.  Some
        examples of these blocking letters are as follows:

        a.      In the fall of 2004, ███C-1(b)(ii)███ submitted a blocking letter to
                Merrill & Ring.  Merrill & Ring requested a review of the offer. DFAIT forced
                Merrill & Ring to sell the logs to ███C-1(b)(ii)███ at the artificially low British
                Columbia  price.  It deemed the offer to be fair and therefore the logs were not
                surplus to domestic needs.

        b.      In the spring of 2006, ███C-1(b)(ii)███ submitted a blocking
                letter to Merrill & Ring. Merrill & Ring requested a review of the offer. DFAIT
                forced Merrill & Ring to sell the logs to ███C-1(b)(ii)███ at
                the artificially low British Columbia price. It deemed the offer to be fair and
                therefore the logs were not surplus to domestic needs.

        c.      In April 2005, ███C-1(b)(ii)███ submitted a blocking letter to Merrill &
                Ring. Merrill & Ring requested a review of the offer. DFAIT forced Merrill &
                Ring to sell the logs to ███C-1(b)███ at the artificially low British Columbia price. It
                deemed the offer to be fair and therefore the logs were not surplus to domestic
                needs.

52.     Merrill & Ring regularly receives such blocking letters and must negotiate agreements
        whereby the domestic processor agrees to lift blocks on certain private logs in return for
        the sale of other private log sorts.  For example, on July 27, 2006, Merrill & Ring
        negotiated the sale of two booms to C-1(b)(ii) and C-1(b)(iv) in return for the
        release of two other booms and the promise not to block logs on the next biweekly list.  It
        also negotiated the sale of two booms to C-1(b)(ii) and C-1(b)(iv) in exchange for the
        lifting of blocks on two other booms.

53.     Finally, the arbitrary grant of exemptions to standing timber from operators and regions
        of provincially-regulated land is a violation of the international law standard of treatment.
        There is no similar process for obtaining an exemption for private land that is federally-
        regulated.  Logs from such lands must incur the additional compliance costs associated
        with the Federal Surplus Test.  It is an abuse of governmental discretion to approve
        standing timber exemptions for provincial land but not for private land.  Moreover, the
        process governing the determination by which operators and regions receive standing
        timber exemptions is itself discretionary and opaque.

54.     The arbitrary and unfair administration of the log export regime violates Canada's
        obligations under Article 1105.  These practices further suppress the price of harvested
        timber and the resulting uncertainty lowers the volume of Merrill & Ring's production.

        **D.     Performance Requirements**

55.     NAFTA Article 1106 restricts the ability of the NAFTA Parties to impose performance
        requirements on investors or investments of other NAFTA Parties.  By refusing to grant
        export permits to Merrill & Ring unless the Federal Surplus Test is satisfied, Canada has
        imposed a requirement on the expansion, management, conduct or operation of Merrill &
        Ring and its investments and conditioned receipt of an advantage in connection with the
        investments.

56.     Canada has violated Article 1106(1)(a) by requiring Merrill & Ring to export a given
        level of logs.  Merrill & Ring is not permitted to freely export its logs, but may only
        export the amount or level of logs deemed acceptable by Canada.  Canada, in turn, bases
        that amount or level on the needs of the British Columbia timber industry.

57.     Canada has violated Article 1106(1)(b) by requiring Merrill & Ring to achieve a certain
        level of domestic content before its logs can be exported.  Again, that level of domestic
        content is determined by the needs of the British Columbia timber industry.

58.     Canada has violated Article 1106(1)(c) by requiring Merrill & Ring to accord a
        preference to logs produced in Canada. Merrill & Ring is ordered to prefer domestic logs
        for the use of the British Columbia timber industry. In so doing, Merrill & Ring is
        prevented from exporting its logs and receiving the international price. Instead, this
        preference for goods produced in Canada forces Merrill & Ring to supply the British
        Columbia timber industry with its logs at artificially depressed prices.

59.     Canada has also violated Article 1106(3)(a). Canada provides an advantage - an export
        permit - conditional on compliance with the achievement of a given level of domestic
        content. Canada conditions the provision of an export permit on the needs of the British
        Columbia timber industry. Specifically, Canada requires that the industry achieve a given
        level of logs before it will grant an export permit.

        **E.      Expropriation**

60.     NAFTA Article 1110 protects against governmental acts that deny some benefit of
        property. Merrill & Ring's access to international markets for its log exports is a
        proprietary right subject to protection from expropriation. DFAIT's application of the
        Federal Surplus Test substantially deprives Merrill & Ring of this proprietary right and
        thereby violates Canada's obligations under Article 1110.

61.     The application of the Federal Surplus Test forces Merrill & Ring to sell the large
        majority of its log production at prices that are substantially below those prevailing in
        international markets.  Merrill & Ring is denied the international price when proposed
        exports are successfully blocked by domestic purchasers. In addition, the application of
        federal export restraints serves to artificially depress the price of log sales within British
        Columbia.

62.     Canada violates this provision each time that it requires Merrill & Ring to sell logs at the
        artificially depressed British Columbia price. Once Merrill & Ring decides that it wishes
        to export its harvested timber, Canada controls the sale of that timber.  In so doing,
        Canada has substantially interfered with Merrill & Ring's ability to freely sell or
        otherwise dispose of its investment, thereby depriving Merrill & Ring of the difference
        between the international price for timber and the artificially depressed British Columbia
        price.

REDACTED NON-CONFIDENTIAL

## V.    DAMAGE

63.    The effect of the log export regime in British Columbia and its corollary administrative processes has been to harm private forest landowners by raising their production and carrying costs, reducing their revenues, the value of their logs, the value of their land, their ability to provide consistent supply, their production volumes and their ability to obtain the highest price for their logs.

## VI.    POINTS AT ISSUE

64.    Has the Government of Canada taken measures inconsistent with its obligations under Articles 1102, 1103, 1105, 1106 and/or 1110 of the NAFTA?

65.    If the answer to the above question is yes, what is the quantum of compensation to be paid to the Investor as a result of the failure of the Government of Canada to comply with its obligations arising under Chapter 11 of the NAFTA?

## VII.    RELIEF SOUGHT AND APPROXIMATE DAMAGES CLAIMED

66.     The Investor claims damages for the following:

a.    Damages of not less than US $25 million as compensation for the damages caused by or arising out of Canada's measures that are inconsistent with its obligations contained in Part A of Chapter 11 of the NAFTA;

b.    Costs associated with these proceedings, including all professional fees and disbursements;

c.    Fees and expenses incurred to oppose the effect of the measures;

d.    Pre-award and post-award interest at a rate to be fixed by the Tribunal;

e.    Tax consequences of the award to maintain the integrity of the award; and

6.    Such further relief that counsel may advise and that this Tribunal may deem appropriate.

*Statement of Claim*
*Merrill & Ring Forestry L.P. v. Canada*                 -16-            REDACTED NON-CONFIDENTIAL

DATE OF ISSUE:  December 27, 2006

**Appleton & Associates International Lawyers**

816 Connecticut Avenue, Suite 1200          77 Bloor Street West, Suite 1800
Washington, DC 20006                        Toronto, ON M5S 1M2
Telephone:    (202) 293 0900                Telephone:    (416) 966 8800
Fax:          (202) 293 0988                Fax:          (416) 966 8801

BARRY APPLETON
Counsel for the Investor

SERVED TO:

Office of the Deputy Attorney General of Canada
284 Wellington Street
Ottawa, ON K1A 0H8
Canada