# EXHIBIT 8

IN THE MATTER OF AN ARBITRATION UNDER CHAPTER 11 OF
THE NORTH AMERICAN FREE TRADE AGREEMENT
AND THE UNCITRAL ARBITRATION RULES

BETWEEN:

MERRILL & RING FORESTRY L. P.

Claimant/Investor

and

THE GOVERNMENT OF CANADA

Respondent/Party

(ICSID Administered Case)

---

# AWARD

---

The Tribunal

Professor Francisco Orrego Vicuña, President

Professor Kenneth W. Dam, Arbitrator

J. William Rowley QC, Arbitrator

Eloïse M. Obadia, Secretary of the Tribunal

REPRESENTATION OF THE PARTIES

Claimant/Investor

Mr. Barry Appleton
Appleton & Associates International
Lawyers
77 Bloor Street West, Suite 1800
Toronto, Ontario M5S 1M2
Canada

Respondent/Party

Ms. Sylvie Tabet
Director and General Counsel,
and Ms. Lori Di Pierdomenico
Counsel
Trade Law Bureau
Department of Foreign Affairs
and International Trade
125 Sussex Drive
Ottawa, Ontario K1A 0G2
Canada

TABLE OF CONTENTS

I.   PROCEDURAL HISTORY ................................................................... 5

1.1   THE REQUEST FOR ARBITRATION ................................................. 5
1.2   THE CONSTITUTION OF THE TRIBUNAL ........................................ 5
1.3   PRELIMINARY OBJECTIONS AND FIRST PROCEDURAL MEETING .................. 6
1.4   TRIBUNAL'S DECISIONS ON VARIOUS PROCEDURAL MATTERS .................. 7
1.5   MOTION TO ADD A NEW PARTY ................................................... 7
1.6   PRODUCTION OF DOCUMENTS .................................................... 8
1.7   PARTIES' SUBMISSIONS ............................................................ 10
1.8   EVIDENTIARY HEARING ............................................................ 11
1.9   SUBMISSIONS ON COSTS AND NEW EVIDENCE .......................... 12
1.10   ARTICLE 1128 AND NON-DISPUTING PARTY SUBMISSIONS ...................... 12

II.   MERITS OF THE CASE ................................................................. 15

2.1   THE MEASURES COMPLAINED OF .......................................... 15
   2.1.1   *The British Columbia and Federal Regulatory Framework of Log Exports..*
   ............................................................................................... 15
   2.1.2   *The Investor's Views* ...................................................... 17
   2.1.3   *The Respondent's Understandings* ..................................... 19
2.2   THE EFFECTS OF THE MEASURES COMPLAINED OF IN CONNECTION WITH THE
INVESTOR ............................................................................................ 22
   2.2.1   *The Investor's Argument* ................................................ 22
   2.2.2   *The Respondent's Argument* ............................................ 24
2.3   OVERVIEW OF THE CLAIMS BROUGHT BEFORE THE TRIBUNAL ................... 25
2.4   THE CLAIM CONCERNING NATIONAL TREATMENT UNDER ARTICLE 1102 .... 27
   2.4.1   *The Investor's Argument* ................................................ 27
   2.4.2   *The Respondent's Opposing Views* ..................................... 30
   2.4.3   *The Tribunal's Findings* .................................................. 34
2.5   THE CLAIM CONCERNING PERFORMANCE REQUIREMENTS UNDER NAFTA
ARTICLE 1106 ...................................................................................... 40
   2.5.1   *The Investor's Argument* ................................................ 40
   2.5.2   *Canada's Opposing Arguments* ......................................... 43
   2.5.3   *The Tribunal's Findings* .................................................. 45
2.6   THE CLAIM CONCERNING EXPROPRIATION ............................... 48
   2.6.1   *The Investor's Argument* ................................................ 48
   2.6.2   *Canada's Opposing Views* ............................................... 51
   2.6.3   *The Tribunal's Findings* .................................................. 54
2.7   THE CLAIM CONCERNING FAIR AND EQUITABLE TREATMENT ................... 59
   2.7.1   *The Investor's Arguments* ............................................... 59
   2.7.2   *Canada's Opposing Views* ............................................... 64
   2.7.3   *The Tribunal's Findings* .................................................. 70
   a)   The Intricacies of the Applicable Law .................................... 70
   b)   The Facts of the Case in the Light of Fair and Equitable Treatment ........ 83
   c)   The First Scenario ............................................................ 85
   d)   The Second Scenario ......................................................... 90
2.8   THE CLAIM FOR DAMAGES ...................................................... 97
   2.8.1   *The Investor's Claim for Damages* .................................... 97
   2.8.2   *Canada's Opposition to the Claim for Damages* .................... 99
   2.8.3   *The Tribunal's Findings on the Claim for Damages* ................. 100

*2.8.4    Conclusion in Respect of Damages and Liability Concerning Fair and Equitable Treatment* ........................................................................................ 104

2.9        THE TIME BAR PROVISION OF NAFTA ARTICLE 1116(2) ......................... 105

III.  COSTS .............................................................................................. 106

IV.  OPERATIVE PART ............................................................................. 107

# I.   PROCEDURAL HISTORY

## 1.1   THE REQUEST FOR ARBITRATION

1.     On September 25, 2006, Merrill & Ring Forestry L.P. ("Merrill" or "Investor" or "Claimant") served upon Canada ("Respondent") a Notice of Intent to Submit a Claim to Arbitration in accordance with Article 1119 of the North American Free Trade Agreement ("NAFTA").  This was followed on December 27, 2006, by a Notice of Arbitration served upon Canada and a Statement of Claim submitted by Claimant pursuant to Article 18 of the Arbitration Rules of the United Nations Commission on International Trade Law ("UNCITRAL") and Articles 1116 and 1120 of NAFTA.  The Statement of Claim detailed the measures related to the implementation of the British Columbia and Federal regulatory framework of log exports that Claimant alleged breached the obligations of Canada under Section A of Chapter 11 of the NAFTA, including: (i) Article 1102 – National Treatment; (ii) Article 1103 – Most Favored Nation Treatment; (iii) Article 1105 – Minimum Standard of Treatment; (iv) Article 1106 – Performance Requirements; and (v) Article 1110 – Expropriation.

## 1.2   THE CONSTITUTION OF THE TRIBUNAL

2.     Pursuant to Article 1123 of the NAFTA, the Tribunal was comprised of three arbitrators, with one arbitrator appointed by each of the disputing parties and the third, presiding arbitrator, to be appointed by agreement of the disputing parties. Each party appointed an arbitrator: Professor Kenneth W. Dam by Claimant, and Mr. J. William Rowley, QC by Respondent.  The parties having failed to agree, Professor Francisco Orrego Vicuña was appointed as presiding arbitrator by the Secretary-General of ICSID and the Tribunal was considered constituted on

August 31, 2007.  The parties agreed on certain procedural matters, including the administration of the case by ICSID, as reflected in a letter of October 19, 2007 addressed to the President of the Tribunal.

## 1.3   PRELIMINARY OBJECTIONS AND FIRST PROCEDURAL MEETING

3.    Pursuant to Article 19 of the UNCITRAL Arbitration Rules ("UNCITRAL Rules"), Canada filed on October 30, 2007 a Statement of Defence raising preliminary objections and arguing that the Investor's claims were without merits.  Merrill replied to these objections on November 9, 2007.  On the same date and in advance of the first procedural meeting, the parties filed submissions on procedural questions on which they could not agree: place of arbitration, confidentiality issues, production of documents, and bifurcation of proceedings on jurisdiction.   The parties met with the Tribunal for the first procedural meeting in Washington, D.C. on November 15, 2007.

4.    At the procedural meeting, the parties confirmed that the Tribunal had been duly constituted.  They also agreed that the place of arbitration would be determined by the Tribunal but that the hearings would be held in Washington, D.C.  After having heard the parties on the question of the bifurcation of the proceedings, the Tribunal decided that the preliminary objections would be joined to the merits.   The parties could then agree on a time table for the subsequent submissions and document requests, it being specified that the deadlines would start running from the signature of the Procedural Order reflecting the agreements reached at the meeting.  In addition to these matters, it was specified that Mr. Howard Dean[1] and Ms. Eloïse Obadia, Senior Counsel, ICSID would assist the Tribunal and the parties for this arbitration.

---

[1] Mr. Dean discontinued his functions at ICSID in December 2007.

5.    These agreements and orders were memorialized in a Procedural Order, issued on instructions from the Tribunal by the ICSID Secretariat on November 20, 2007.

## 1.4    TRIBUNAL'S DECISIONS ON VARIOUS PROCEDURAL MATTERS

6.    The Tribunal decided on the matters which the parties had left for its determination.  On December 12, 2007, the Tribunal issued its decision on the place of arbitration.   The Respondent had proposed Ottawa, Ontario or Vancouver, British Columbia while the Claimant had asked that Washington, D.C. be the place of arbitration.  The Tribunal decided in favor of Washington, D.C., mainly for questions of convenience.

7.    On January 21, 2008, the Tribunal issued a Confidentiality Order which dealt with the definition of confidential information, the safeguards for access to restricted information, disclosure obligations, settlement discussions, hearings open to the public and public disclosure of documents.  On January 29, 2008, Canada filed a motion to reconsider paragraph 31 of the Order relating to the return at the conclusion of the proceedings of the material produced during these proceedings.  After having received on February 6, 2008 the Claimant's views, the Tribunal issued a revised Confidentiality Order on February 18, 2008.  In March 2009, the parties agreed on a further variation of the "return-destroy" provision of the Order.  Accordingly, the Tribunal issued a further amended Confidentiality Order on April 1, 2009 which was then signed by the parties.

## 1.5    MOTION TO ADD A NEW PARTY

8.    On December 12, 2007, the Claimant filed a motion to add a new party, Georgia Basin Holdings L.P., as an additional investor.  The Claimant relied on Article

20 of the UNCITRAL Rules and claimed that Georgia Basin owned a small portion of the timber harvest that was the subject of the claim.  Canada replied on January 2, 2008 and opposed the motion on the grounds that it did not meet the test of Article 20 of the UNCITRAL Rules and that it failed to present a *prima facie* claim under Article 1116 of the NAFTA.  On January 31, 2008, the Tribunal decided to reject the motion.  The Tribunal considered that the motion did not appear to be an amendment of the original claim by Merrill, but rather an entirely new claim, requiring Georgia Basin to comply with NAFTA Articles 1119 and 1120.  The Tribunal concluded that compliance with these safeguards would significantly delay the proceedings creating a serious procedural prejudice and rendering a consolidation of the claims inefficient.

## 1.6   PRODUCTION OF DOCUMENTS

9. The question was discussed at the first procedural meeting and a first order was issued by the Tribunal on January 21, 2008 (Order Concerning Requests for Documents and Certain Evidentiary Matters, hereinafter "Document Production Order").  The Tribunal established the conditions to file and admit requests for production of documents and fixed a calendar.  The Tribunal also dealt with the production of evidence in relation to witnesses and interrogatories.

10. The timeline for the various steps in relation to the document production was slightly modified further to the parties' requests of May 16, 2008.   In compliance with the Document Production Order and the new timeline, the parties – in the first part of June 2008– submitted their simultaneous requests for document production and counsel met to assess the objections to the production requests.  Further to that meeting, the parties submitted on June 17, 2008, a joint letter requesting the Tribunal to modify its Document Production Order to: (i)

include additional grounds for refusal; (ii) specify that the Confidentiality Order applies to documents produced by the parties pursuant to the Document Production Order; and (iii) modify the calendar for the filings of the Reply and the Rejoinder. The parties disagreed on some other related matters. The Tribunal issued an amended version of its Document Production Order on June 24, 2008 incorporating the changes jointly requested by the parties and modifying the procedural calendar.

11.    In June and July of 2008, the parties exchanged various correspondences, including a Redfern Schedule, in relation to their refusals to produce certain documents requested by the other party. The Tribunal issued its Decision on Production of Documents on July 18, 2008, ordering the production of some documents and upholding the refusal to produce others. The Tribunal dealt in particular with the questions of documents containing Cabinet Privileges and documents concerning the British Columbia Government, which were grounds of refusal invoked by Canada, as well as confidential commercial information, ground relied upon by both parties.

12.    By letter of July 28, 2008, Canada asked the Tribunal to clarify some parts of its Decision on Production of Documents and to revise the schedule. The Tribunal replied on August 4, 2008 and modified the schedule. On that same date and on August 25, 2008, Canada submitted a list of specific documents for which it was asserting Cabinet Privileges. Merrill objected on August 20 and 25, 2008. On September 3, 2008, the Tribunal issued its Decision on Production of Documents in Respect of Which Cabinet Privilege Has Been Invoked. It ordered Canada to produce 8 of the 9 documents concerned and to designate them as confidential.

13.     The parties encountered some difficulties in reaching an understanding about several aspects of the document process and the potential consequences of these difficulties on the procedural calendar.  The parties argued in particular on the format of the production by Canada of the Export Management System database.  The Tribunal gave directions to the parties on this matter on September 22, 2008 and reestablished a new schedule for the filings of the Reply and Rejoinder.  Due to further difficulties in relation to the production of the large database, the Tribunal issued supplementary directions on this question on November 4 and 17, 2008 and December 1, 2008.

## 1.7   PARTIES' SUBMISSIONS

14.     As agreed at the first session, the Claimant submitted its Memorial on February 13, 2008.  Canada raised some concerns with respect to the filing of the Memorial as Confidential and Restricted Information.  The Tribunal ruled on this question by letter of February 19, 2008 and confirmed that the deadline for Canada to file its Counter-Memorial was unchanged.

15.     Accordingly, Canada filed its Counter-Memorial on May 13, 2008.  As mentioned in the previous section, the schedule for the filings of the Reply and Rejoinder was modified several times to take into account the difficulties which arose out of the document production process.  By letter of September 22, 2008, the Tribunal fixed the dates of December 15, 2008 for the Reply and March 27, 2009 for the Rejoinder.  Due to the issue of the production of the Export Management System database and its volume, the Tribunal –by letters of December 1 and 2, 2008– granted until January 2, 2009 for the Investor to submit a supplement to its Reply in relation to the examination of the database. Considering that when fixing the date for Canada's Rejoinder, the Tribunal had

interrupted the schedule during the year-end period, this decision did not affect Canada's allocation of time to prepare its filing.

16.  Therefore, the Investor submitted its Reply on December 15, 2008 and observations from one of its experts on the Export Management System database on December 24, 2008.  Shortly after the receipt of the Investor's Memorial, the Respondent requested the Tribunal to disregard the Investor's new damages claim including the expert reports, or, alternatively, to grant a 2-month extension to file its Rejoinder.  By letter of December 29, 2008, the Tribunal considered that the Claimant had not changed its claim but rather had provided updated damages information using a new method of calculation responsive to Canada's arguments in its Counter-Memorial.  The deadline for Canada's Rejoinder was unchanged.  It was filed on March 27, 2009.

## 1.8  EVIDENTIARY HEARING

17.  A few weeks before the hearing, the parties raised several issues with respect to: (i) the sequestration of witnesses and experts; (ii) the production of additional documents supporting some of the experts' comments; and (iii) the reclassification of some of the filings and expert reports (from restricted to confidential) to allow counsel to consult with their clients on these documents as well as to avoid sequestration of witnesses and sessions closed the public during the examination of the concerned experts.  The Tribunal decided on these matters by letters of April 10, 15, 23 and 27, 2009, respectively.

18.  The hearing took place at the World Bank offices in Washington, D.C. from May 18, 2009 to May 23, 2009.  The parties started with opening arguments.

This was followed by the examination of witnesses and experts[2] until May 22, 2009.  The closing arguments were presented on May 23, 2009.  Parts of the hearing were held in sessions open to the public.

## 1.9   SUBMISSIONS ON COSTS AND NEW EVIDENCE

19.    As agreed during the hearing, the parties filed simultaneous submissions on costs on June 30, 2009, and simultaneous replies on July 15, 2009.  In addition, in the course of the hearing, Canada argued that the Claimant had introduced new evidence while examining some of the witnesses it had introduced.  Canada developed its arguments on June 4, 2009 and the Claimant replied on June 16, 2009.  The Tribunal indicated on June 24, 2009 that it would take these observations into account during its deliberations.

## 1.10   ARTICLE 1128 AND NON-DISPUTING PARTY SUBMISSIONS

20.    By letter of May 19, 2008, the Tribunal suggested that the non-disputing NAFTA Parties file their Article 1128 submissions on July 14, 2008, i.e., after the first round of pleadings, and that the parties reply to these submissions in their second round of pleadings.  In the absence of any objections from the parties, the non-disputing NAFTA Parties were informed accordingly on May 29, 2008.  The United States filed its submission on July 14, 2008.  No submission was received from the United Mexican States on that date.

21.    On April 3, 2009, the United Mexican States indicated to the parties that it intended to make an oral submission during the hearing, but also proposed to file the submission in writing with the Tribunal in advance of the hearing.  The Claimant objected to the submission as being untimely.  Mexico brought the

---

[2] The witnesses and experts heard were the following: Mr. Schaaf, Mr. Kurucz, Mr. Stutesman, Mr. Ringma, Mr. Cook, Ms. Korecky, Mr. Bustard, Mr. Low, Mr. Ruffle, Mr. Reishus, Mr. Jendro, Mr. Bowie and Mr. Howse.

question before the Tribunal on April 7, 2009.  While regretting that Mexico had missed the deadline of July 14, 2008, the Tribunal accepted, on April 7, 2009, the written submission dated April 2, 2009.

22.    With respect to the non-disputing parties, the representative of the Communications, Energy and Paperworkers Union of Canada, the United Steelworkers and the British Columbia Federation of Labour, informed the ICSID Secretariat that these groups wished to file a joint submission.  At the invitation of the Tribunal, the parties commented on this request for intervention on July 16, 2008.  The Tribunal informed the petitioners on July 31, 2008 of the conditions to file an application for leave and submission of an *amicus curiae* brief.  The Tribunal referred in particular to Section B of the NAFTA Free Trade Commission Statement on Non-Disputing Party Participation dated October 7, 2003.  The Tribunal invited the petitioners to file the application for leave and submission on September 8, 2008.

23.    Due to an error of their representative, the application for leave and the submissions of the petitioners were filed on September 26, 2008.  The Tribunal asked the parties to provide their observations on the late filing by October 2, 2008.  Both parties having consented to the late filing, the Tribunal admitted the application and the joint submissions on October 2, 2008.  The parties were given an opportunity to comment on the joint submissions in their written pleadings and before the hearing.

24.    Further to the Tribunal's direction of May 1, 2009, the parties filed their written observations on the *amici* joint submissions and the NAFTA Parties' Article 1128 submissions, on May 8, 2009.

25.  Following the hearing and the submissions made by the parties thereafter the Tribunal proceeded to its deliberations both at meetings held in May and September 2009 and by correspondence.

## II.   MERITS OF THE CASE

### 2.1   THE MEASURES COMPLAINED OF

#### 2.1.1   *The British Columbia and Federal Regulatory Framework of Log Exports*

26.   This case concerns a claim by the Investor in respect of the implementation of Canada's Log Export Regime to the Investor's timber operations in British Columbia and the requirement that any of its exports be subject to a log surplus testing procedure, among other regulatory measures.

27.   Under regulations currently in force, the removal of logs from British Columbia is subject to provincial legislation as established in the British Columbia Forest Act ("B. C. Forest Act").[3] Also the export of logs from that province is subject to federal regulation as provided in Notice 102 ("Notice 102")[4] enacted under the Export and Import Permits Act.[5] Notice 102 has been in force since April 1, 1998, and it was preceded as from January 1, 1986 by the Notice to Exporters Serial No. 23 ("Notice 23").[6]

28.   Both regulations include a log surplus test prior to authorization of log removal or exports from the province, as the case may be.   Under this test, those interested in removing or exporting logs from British Columbia must first advertise the logs in question in the provincial or the federal "Bi-Weekly List", as the case may be, which allows log processors in that province to make offers for the purchase of such logs.   If no offer is made, or an offer is made at below fair market value (in terms of the BC market), the logs are deemed to be surplus and will be suitable for removal and an export permit can then be approved.   If

---

[3] British Columbia *Forest Act*, R.S.C.B. 1996, c. 157.
[4] Notice to Exporters, Export and Import Permits Act, Serial No. 102, Apr. 1, 1998.
[5] R.S., 1985, c. E-19.
[6] Notice to Exporters, Export and Import Permits Act, Serial No. 23, Jan. 1, 1986.

an offer is determined by the regime's administrator to reflect fair market value, the logs will not be granted an export permit.

29. While both regulations use the same type of mechanism in respect of the surplus test, their respective goals are different. Canada has explained that the provincial regime seeks to ensure the availability of logs for use and manufacture in the province, while the federal regime seeks an adequate supply and distribution of logs in Canada. Their respective requirements and procedures are also different. Notice 102 applies only to "federal land", which is private land acquired through Crown grant prior to March 12, 1906, as well as to aboriginal land. The British Columbia regulations apply to provincially owned land where the harvesting occurs under a tenure agreement; they also apply to private land acquired through Crown grant after March 12, 1906. Log exports from provincial land are subject to both federal export regulation and the provincial use and manufacture regime.

30. The provincial regime is administered by the British Columbia Ministry of Forestry ("BCMOF") upon recommendations of the Timber Export Advisory Committee ("TEAC"). Notice 102 is administered by the Department of Foreign Affairs and International Trade ("DFAIT") upon recommendations from the Federal Timber Export Advisory Committee ("FTEAC"). This last body has the same composition as TEAC, with the addition of one representative from the federal government.

31. Other differences between the two regulatory regimes concern the availability of certain exemptions under the provincial regime, some of which are not available for logs originating in the south coast of British Columbia, where the Investor also harvests. These exemptions are also not available under Notice 102. The

Provincial exemptions may apply when the timber is surplus to the requirements of timber processing in the province, when the timber cannot be processed economically in the vicinity of the land concerned or cannot be transported economically to a processing facility elsewhere in the province, or when the exemption would prevent the waste of or improve the utilization of timber from provincial land.

32.     There are also regime differences in the requirements that apply to certain coastal areas and other areas considered remote.   The provincial regime also applies a fee-in-lieu of manufacture for all provincial logs removed from the province, a fee that does not exist under federal regulations.

### 2.1.2   The Investor's Views

33.     The Investor has explained that 95% of all the productive timberlands in the province are owned by the British Columbia government, while only 4.1% of the remaining timberlands are owned by about 20,000 private landowners, the vast majority of which are Canadian investors.   The Investor is one of over 70 private timberland companies which fall under federal jurisdiction in British Columbia, with a share of 0.21% of the log market.   An expert report submitted by the Investor also explains that the types and species of logs harvested from privately owned federally regulated lands in that province are interchangeable with logs originating in the provincial lands.[7]

34.     The Investor asserts that the federal regulations described affect the conduct of its business in the province.[8] The Investor explains that Notice 102 only applies to the export of federal logs from British Columbia, as opposed to other

---

[7] Investor's Witness Statement of Robert Boeh, December 3, 2008 (single page).
[8] Investor's Witness Statement of Norm Schaaf, February 12, 2008, paras. 24-43; and Reply Witness Statement of Norm Schaaf, December 12, 2008, paras. 6-9.

provinces.   The harvesting requirements established under Notice 102 are particularly disadvantageous when compared to the provincial regulations. Under Notice 102, federal landholders have to harvest their trees before applying for an export permit, while under provincial regulation an exemption may be provided so as to allow for the application before actual harvesting.  Notice 102 also requires that federal logs be scaled metrically, a measurement system not used in the United States and Asian export markets, with the result that the logs must be re-scaled for export to those markets.

35.   It is explained that, in addition, the volume of federal logs from remote areas must be at least 2,800 $m^3$ and never greater than 15,000 $m^3$.   There is also an obligation to sort, boom or deck the logs to conform to normal log market practices, a concept which is not defined.  The task of inspecting compliance with the harvesting requirements is delegated to the BCMOF.  As noted above, none of the standing exemptions benefiting provincial logs are available to federal logs.  The Investor asserts that, moreover, the activities of the British Columbia Timber Sales ("BCTS"), a sub-unit of the Ministry of Forests, grants benefits and assistance to provincial producers but not to federal land owners.

36.   The Investor also complains about the procedures that need to be followed in the export application process, which involves, in particular, the application of the surplus test.  If an offer is made on advertised federal logs, FTEAC has to determine that it is in accordance with prevailing market prices in British Columbia and recommends to DFAIT whether to grant an export permit.  The Investor asserts in this respect that all offers (other than those that are made to it) are kept secret and the meetings and minutes of FTEAC are closed to the public. Although DFAIT can consider in addition to FTEAC recommendations "other

relevant factors" in making a final determination, these have never been specified and almost invariably DFAIT rubber stamps such recommendations. Once an export permit is granted, a fee has to be paid and the applicant has only four months to export its logs, with extensions being limited to one month. None of these restrictions apply to provincially regulated lands, which may be physically and geographically identical.

37.     The Investor's complaint refers particularly to the administration of Notice 102 by FTEAC, maintaining that the federal representative in this body is often not in attendance at the committee's meetings, that there are no specific criteria for determining the prevailing British Columbia prices for similar logs and that many of its members have direct or indirect interests in the provincial sawmill industry.[9] The quality of logs is not adequately assessed and improper recommendations to deny export permits have been made in a number of situations.  Although FTEAC includes a large membership from the industry, no one with significant private federal landholdings has ever participated in this body.

38.     The Investor complains that as a result of such administration, FTEAC decisions are not transparent, particularly as to the "fairness" of an offer, its members are in conflict of interest and no action has been taken to redress this anomaly, and there is no procedure for the appeal or review of a FTEAC recommendation, except an *ad-hoc* review by the DFAIT which is entirely discretionary.

### 2.1.3   The Respondent's Understandings

39.     The Respondent has a different understanding of the measures complained of.  It explains that the Investor holds 7,627 acres of timberland in British Columbia,

---

[9] Evidentiary Hearing, Opening Statement of Mr. Barry Appleton on behalf of the Investor, May 18, 2009, at 24-27.

most of it located in the coastal areas.  Most of these lands are regulated by the Canadian federal government, with the exception of 584 acres that are under provincial regulation.  In spite of its complaints, the Investor has operated under Notice 102 for the last ten years, and under the almost identical regime of Notice 23 from 1986 to 1998.  Given the importance of forestry to Canada and British Columbia, Canada asserts that it is only natural that regulations need to be applied so as to ensure the policy goals related to this resource.  Canada also explains that the activities of BCTS in no way accords benefits to timber sales licensees in that province.[10]

40.  Because of the different commercial viability of forests due to factors such as location, size, distribution, costs of harvesting and environmental restrictions, the harvesting requirements might also be different.[11] It is explained that the measurement of logs in "board feet" used in the United States Pacific Northwest is not that used in Canada, which measures in cubic or linear meters.  The sorting of logs by species, size, quality and other characteristics needs to be appropriate to the local market place.  There are also cost differences between water transportation used in coastal areas and the land transportation used in areas of the interior.

41.  The Respondent also notes that because of the different policy goals of the provincial and the federal regulations, their requirements are also different in many other respects.  This is so, in particular, in respect of the fact that provincial regulations allow for several exemptions that are not available under federal regulations, because they are geared toward the specific needs of local

---

[10] Canada's Affidavit of Michael Falkiner, May 5, 2008, paras. 8-10.
[11] Canada's Counter-Memorial, paras. 7-57.

manufacturing, refer to specific geographical areas or prevent waste and improve utilization of provincial land.

42.    The process of application, advertising and approval is, the Respondent argues, perfectly clear under the regulations in force and the practice of their implementation.[12] Offers that occasionally might be made not in good faith (so called "blockmailing", described further below) can be controlled by the power of DFAIT to discipline companies that violate the requirements of Notice 102 and export permits may be granted to applicants believed to have been unfairly targeted.[13] Moreover, only offers from persons that own or operate log processing facilities will be considered and offers are always to be assessed to determine whether they reflect current market value.

43.    Other factors, such as the location of logs, transportation costs and weather conditions, are taken into account in assessing the fairness of an offer.[14] An offer is normally considered fair if it falls within plus or minus 5% of the current domestic market price.  In arriving at a decision, the Minister of Foreign Affairs may take into account factors other than the FTEAC recommendation, such as the price of offers, the log supply and the interests of log processors in Canada. Exporters can make submissions at any time about such decisions and, in any event, judicial review of the minister's decision is also available.  Canada explains that the Investor has made a number of submissions to the minister and that some have been successful, but has not applied for judicial review.

---

[12] Canada's Witness Statement of Brian Bustard, March 19, 2009, paras. 11-19, with reference to the regulation of offers.
[13] Canada's Affidavit of Judy Korecky, May 10, 2008, paras. 23-24; and Supplemental Affidavit, March 19, 2009, paras. 21-29.
[14] Evidentiary Hearing, Opening Statement of Ms. Sylvie Tabet on behalf of Canada, May 18, 2009, at 46-49.

Challenges to constitutionality of Notice 102 are also available; one such challenge was unsuccessfully made by Timber West Corporation.

## 2.2 THE EFFECTS OF THE MEASURES COMPLAINED OF IN CONNECTION WITH THE INVESTOR

### 2.2.1 *The Investor's Argument*

44.   The Investor is of the view that the log export control regime does not further the Respondent's objectives in terms of job creation because any such effect is offset by the losses in the log export sector, just as it does not further the objective of providing domestic manufacturers with an adequate supply of logs as there is no shortage of supply in the Canadian market.  This may have been different at the origins of the export restrictions, found first in the Log Export Advisory Committee established by the British Columbia government in 1918 with the occasion of World War I, and continued in the 1940 federal War Measures Act and in the National Emergency Transition Power Act of 1945, but it does not find justification today.[15] An Investor's expert report explains that there are a number of less restrictive trade measures that could be applied to achieve the policy goals.[16]

45.   The Investor argues in particular that the measures described have specific adverse effects on the conduct of its business in the province.  This is so first because it considers the harvesting, sorting and booming requirements to be unfair as they impose additional restrictions on coastal log producers in the light of the Coast Domestic Market End Use Sort Descriptions,[17] applicable only to coastal log producers such as the Investor is; they mandate scaling in accordance

---

[15] Investor's Memorial, paras. 47-49.
[16] Investor's Expert Report of Peter H. Pearse, February 6, 2008, para. 27.
[17] Investor's Witness Statement of Tony Kurucz, February 11, 2008, paras. 52 *et seq.*; and Reply Witness Statement of Tony Kurucz, December 14, 2008, paras. 8-27, with particular reference to the question of remote areas.

with the metric system, resulting in the need to re-scale for exports and the inevitable cost of time and money; they prevent the Investor from preparing the logs in the manner most suitable to its clients needs; and provide for minimum and maximum volumes of logs from remote areas.

46.     Adverse effects also result from the practice of allowing sawmills to "blockmail" export applications simply by making an offer on the logs advertised for export, forcing the Investor to sell for a price lower than the export price.[18] The log processors can thus obtain logs at artificially suppressed prices.  This practice also puts the Investor at a competitive disadvantage in respect of other producers operating in both federal and provincial lands and producers that own sawmills.[19] FTEAC, aware as it is of this practice, has not adopted remedial measures.    This is also the experience of other log producers in British Columbia.[20]

47.     Other adverse effects which the Investor identifies are the physical damage suffered by the logs during the long export application process, mostly in terms of degradation and rot and various diseases; the higher costs that it must incur to comply with the regime; the fact that it is prevented from harvesting in an efficient and optimal manner; and missing business opportunities because of its inability to enter into long-term supply contracts with foreign clients.[21]

48.     It also argues that the Investor is prevented under the regime from obtaining standing timber exemptions which are available to provincially-regulated

---

[18] Evidentiary Hearing, Witness appearance of Mr. Tony Kurucz on direct examination by Mr. Greg Nash on behalf of the Investor, May 18, 2009, at 215-216.
[19] Evidentiary Hearing, Witness appearance of Mr. Norm Schaaf on direct examination by Mr. Greg Nash on behalf of the Investor, May 18, 2009, at 86-88.
[20] Investor's Witness Statement of Richard Ringma, December 11, 2008, with reference to the experience of Island Timberlands LP; and Investor's Witness Statement of Christian Schadendorf, December 11, 2008, with reference to the experience of Pluto Darkwoods Corp.
[21] Investor's Witness Statement of Paul Stutesman, February 8, 2008, paras. 3-7; and Reply Witness Statement of Paul Stutesman, December 12, 2008, paras. 2-5.

timberland holders.  Such exemptions involve many benefits, the most important being that of not having to pass the surplus test and thus avoiding the risk of "blockmail".  The Investor also asserts that the DFAIT has granted a standing timber exemption to one corporation in spite of claiming that it has no authority to do so,[22] just as it has done with timber originating from aboriginal lands.

49.    The cumulative effect of such measures is that the Investor must sell its logs below fair market value, and thus it ends up subsidizing the British Columbia sawmills at its own expense.

### 2.2.2   *The Respondent's Argument*

50.    The Respondent believes that the claim by the Investor deals with a miniscule percentage of its exports and thus the measures concerned cannot have adverse effects of any magnitude on its business as the Investor describes.[23]  The Respondent explains that of 38,876 parcels advertised from federal lands between April 1, 1998 and March 31, 2008, only 933 offers were considered by FTEAC.  This represents only 2.4% of all federal booms advertised during ten years, which means that 98% of booms advertised have been granted surplus status.  This experience is also that of the Investor.  Canada asserts, moreover, that the log export control policy is in accordance with regulatory aims of many other jurisdictions which have similar policy goals and legislation.[24] Submissions made by several intervenors maintain that none of the restrictions are incompatible with NAFTA.[25]

---

[22] Investor's Legal Expert Witness Statement of James G. Matkin, QC, December 11, 2008, with reference to Canada's constitutional authority to grant standing timber exemptions, paras. 11-21.
[23] Canada's Expert Report of David Reishus, May 9, 2008, Section VII.
[24] Canada's Affidavit of Professor Benjamin William Cashore, May 12, 2008, paras. 5-9.
[25] Submissions of the United Steelworkers, Communications, Energy and Paperworkers Union of Canada and the British Columbia Federation of Labour, September 26, 2008.

51.    The Tribunal will consider the specific implications of such regulatory framework and its eventual effects in the context of the specific legal claims brought by the Investor.

## 2.3    OVERVIEW OF THE CLAIMS BROUGHT BEFORE THE TRIBUNAL

52.    The Investor believes that regulations are aimed at ensuring that log processors in British Columbia have access to logs at artificially suppressed prices, and the fact that these very log processors have been put in charge of the administration of the regime, breach a number of NAFTA provisions and other standards of international law the Tribunal is bound to take into account.

53.    The claims first concern national treatment under Article 1102.  The Investor claims in this connection that other exporters in "like circumstances" have been provided with more favorable treatment as they are not subject to the requirements and tests laid down under Notice 102, with particular reference to the question of the harvesting requirements, the surplus test and the unavailability of important exemptions benefiting those other exporters.  This differentiated treatment results in the breach of the national treatment standard.

54.    The Investor next claims that the regulatory regime of Notice 102 is in breach of the international law standard of treatment provided in NAFTA Article 1105, with particular reference to the standard of "fair and equitable treatment".  The Investor argues in this connection that it is subjected to unfair and inequitable treatment, in part because of the substantive requirements of Notice 102 and in part because of the highly secretive and non-transparent manner in which the Log Export Control Regime is administered, which, among other consequences, results in the unrestrained practice of "blockmailing".

55.     Another claim brought by the Investor concerns the alleged imposition of performance requirements in breach of NAFTA Article 1106(a) (c) and (e).  In the Investor's view, the Log Control Export Regime imposes performance requirements in respect of the obligation to cut and sort timber from federal land at "normal market practices", scale the rafts metrically and comply with other rules affecting the Investor's properties located in remote coastal areas.

56.     A last claim brought by the Investor relates to the alleged breach of NAFTA Article 1110, because the Log Export Control Regime entails a number of measures that are tantamount to expropriation of the Investor's intangible property right to realize a fair market value for its logs in the international market.

57.     The Investor also claims damages in respect of each of such breaches of the NAFTA provisions indicated.

58.     The Tribunal needs also to consider a jurisdictional objection raised by Canada, a matter which, as noted above, the Tribunal joined to the merits.  Canada maintains that the Investor's claim is time barred by NAFTA Article 1116(2).

59.     The Tribunal will now examine each of these claims, beginning with those concerning national treatment and performance requirements, to be followed by those other claims that involve an allegation of expropriation and the breach of fair and equitable treatment.  Canada's jurisdictional objection and damages will be examined at the end to the extent relevant.

## 2.4 The claim concerning national treatment under Article 1102

### 2.4.1 *The Investor's Argument*

60. The Investor asserts that Canada has failed to accord it treatment equivalent to that provided to the most favorably treated Canadian investor or its investment in breach of NAFTA Article 1102.  This Article provides that :

### Article 1102: National Treatment

1. Each Party shall accord to investors of another Party treatment no less favorable than that it accords, in like circumstances, to its own investors with respect to the establishment, acquisition, expansion, management, conduct, operation, and sale or other disposition of investments.
2. Each Party shall accord to investments of investors of another Party treatment no less favorable than that it accords, in like circumstances, to investments of its own investors with respect to the establishment, acquisition, expansion, management, conduct, operation, and sale or other disposition of investments.

61. It is argued in this connection that the Investor is in "like circumstances" with log producers that export logs from other parts of Canada and from other parts of British Columbia, as is also in "like circumstances" with other log exporters in that province, including those located in coastal areas.  All these other log exporters are either not subject to the Log Export Control regime as practiced by Canada in British Columbia or subject to less restrictive regulatory measures.

62. This different treatment is, in the Investor's argument, particularly evident with respect to the unavailability of standing exemptions for its operations.  Those benefiting from such exemptions have a significant advantage in treatment as opposed to those that have been excluded, such as the Investor.  These advantages result from the fact that the producer knows in advance that it will be able to export its logs and can thus enter into supply contracts with its customers, for which it will be able to obtain the best market price, it is not subject to the surplus test and thus free from "blockmailing", and its products

will not be subject to the exposure to the natural elements resulting in deterioration and infestation.

63.   The Investor asserts that the national treatment requirement of NAFTA Article 1102 reflects the influence of GATT Article III:4 as well as that of GATS Article XII, but that it is broader because the NAFTA requirement applies to investors and investments and not only to "like products" as in the GATT or to "like services" as in the GATS.  It is also said that this interconnection between NAFTA and the GATT was recognized by Canada in its Statement of Interpretation of NAFTA.[26]

64.   In that context, as well as on the basis of the decisions in *Pope & Talbot*[27] and *S.D. Myers*,[28] the Investor asserts that treatment ought to be compared with that accorded to domestic investments in the same economic or business sector, which is to be broadly understood, including in particular the requirement to provide for competitive opportunities.  It is argued in this respect that in view of NAFTA's objective of promoting conditions of fair competition in a free trade area, the equality of competitive opportunities is an essential element of the national treatment standard.   Direct competition in the marketplace is the benchmark the Investor favors for the comparison of treatment, a concept which was broadly construed in *Occidental v. Ecuador*[29] when comparing to that end broad sectors of economic activity.

65.   In the Investor's submission, the concept of "like circumstances" does not mean that circumstances need to be identical and that even if the standard laid down in

---

[26] Investor's Memorial, para. 265.
[27] *Pope & Talbot, Inc. v. Canada*, (NAFTA/UNCITRAL), Merits II, Apr. 2001, para. 78 [hereinafter Pope & Talbot, Merits II].
[28] *S.D. Myers, Inc. v. Canada*, (NAFTA/UNCITRAL), Final Award, Oct. 2002, para. 250, [hereinafter S.D. Myers Final Award].
[29] *Occidental Exploration and Production Company v. The Republic of Ecuador*, Final Award, London Court of International Arbitration Administered Case No. UN 3467 paras. 173-176 [hereinafter Occidental Award].

the *Methanex* decision[30] is followed, so as to compare an investor with a domestic investor in an identical product market, in the instant case the test is satisfied because the product market for all comparisons is that of log producers.

66.    The Investor argues, in addition, that while Article 1102 is subject to the exceptions permitted under NAFTA Article 1108, in respect of sectors that require treatment in accordance with public policies, Canada did not include the forestry sector in its list of exceptions, thus making policy objectives irrelevant as to the treatment in this sector.   Neither does a breach of national treatment require evidence of any discriminatory intent based on the nationality of the foreign investor, as held in *Thunderbird*.[31]

67.    The fact that the Investor is in "like circumstances" with log producers in Alberta,[32] but subject to a restrictive regulatory export regime which does not apply to the latter, should be enough to establish that national treatment has not been observed.   In addition, the Investor, as a producer in the British Columbia coast, is subject to stricter harvesting and sorting requirements than those that apply in the British Columbia interior.   The Investor also asserts to be in "like circumstances" with producers in the British Columbia coast, many of which are

---

[30] The Tribunal in *Methanex* considered in this respect that:

> Given the object of Article 1102 and the flexibility which the provision provides in its adoption of "like circumstances", it would be as perverse to ignore identical comparators if they were available and to use comparators that were less "like", as it would be perverse to refuse to find and to apply less "like" comparators when no identical comparators existed…. the tribunal selected the entities that were in the most "like circumstances" and not comparators that were in less "like circumstances". It would be a forced application of Article 1102 if a tribunal were to ignore the identical comparator and to try to lever in an, at best, approximate (and arguably inappropriate) comparator. The fact stands— Methanex did not receive less favourable treatment than the identical domestic comparators, producing methanol. *Methanex v. United States*, (NAFTA/UNCITRAL), Final Award, Aug. 2005, Part IV-Chap. B, 8-9, paras. 17, 19, [hereinafter Methanex Award]

See also Canada's comments on this view in its Reply, paras. 299-300.
[31] *International Thunderbird Gaming Corporation v. Mexico*, (NAFTA/UNCITRAL), Final Award, Jan. 2006, para 177 [hereinafter Thunderbird Award].
[32] Investor's Expert Statement of Keith Branter, December 9, 2008, paras. 4-6.

subject to the more lenient conditions of provincial regulations.  In view of this likeness, there is no policy justification for Notice 102 applying to the Investor and to none of its comparator producers, particularly in light of the fact that there is no shortage of logs in the British Columbia market or in Canada and, moreover, that there is an active inter-regional flow of logs evidencing the similarities between producers.

68.   The end result of being forced to sell logs domestically at a price invariably below that of the export market, not having available any exemptions, being subject to "blockmailing" and having to observe stricter harvesting requirements, is in itself in breach of national treatment, either because none of the Investor's competitors are subject to such disadvantages or if they are, they are disadvantaged to a much lesser extent.  This differential treatment affects the "establishment, acquisition, expansion, management, conduct, operation, and sale or other disposition of investments" as required under Article 1102.

### 2.4.2  The Respondent's Opposing Views

69.   The Respondent maintains that the Investor has not established the essential elements of Article 1102 in respect of the allegations it has made, particularly because of the fact that it has been accorded exactly the same treatment as domestic investors and because it has not suffered any nationality-based discrimination.

70.   In Canada's view, the first issue is to determine whether there has been a "treatment" involving the establishment, acquisition, expansion, management, conduct, operation and sale or other disposition of investments.  Only once this specific treatment is identified can it be compared with that accorded to other investors, foreign or domestic.  In addition, the treatment that needs to be

identified is that accorded to different investors by the same government.  It is not legitimate to compare treatment accorded by a national government with that accorded by a sub-national government, state or provincial, as is provided by Article 1102(3).

71.     The investors and investments to be compared must also be "in like circumstances", a comparison that requires the identification of an identical domestic investor, if one exists or otherwise those that, as held in *Methanex*,[33] are in the most "like circumstances".  Canada maintains that in the instant case, such identical domestic investors are available, because all federal land owners in British Columbia that seek to export logs operate under the same Notice 102 and are subject to the same export control regime in the same way as the Investor.  If there is a need to identify other comparators that are in the most "like circumstances", NAFTA Chapter 11 Tribunals have considered diverse factors, including general principles of NAFTA that take into account environmental and trade concerns,[34] differences in services and functions of the investors compared[35] or public policy considerations.[36]

72.     Canada argues that, in contrast, the Investor follows a narrow approach identifying only the economic sector in which the Investor competes and introduces a special meaning of the national treatment standard relating it to a guarantee of competitive opportunities.  NAFTA tribunals, as noted above, have taken a broader view that allows for the taking into consideration of different factors relevant to the comparison, just as *Occidental* specifically refused to

---

[33] Methanex Award, *see supra* note 30.
[34] *S.D. Myers, Inc. v. Canada*, (NAFTA/UNCITRAL), Partial Award on the Merits, Nov. 2000, para. 250 [hereinafter S.D. Myers, Partial Award].
[35] *United Parcel Serv., Inc. v. Canada*, (NAFTA/UNCITRAL) Final Award, Jun. 2007, para. 99 [hereinafter UPS Award].
[36] Pope & Talbot, Merits II, para. 79.

interpret the concept of "in like situations" as meaning a comparison exclusively in the same sector of economic activity.[37] Neither should "in like circumstances" be interpreted in the light of the meaning of other NAFTA chapters or other treaties such as the GATT.  This is because Article 1102 reflects a specific understanding and intent of the NAFTA Parties not necessarily found in other contexts and should "be read on its own term".[38]

73.   The Respondent explains that the facts do not support the Investor's allegations in view of the fact that the coastal and interior regions of British Columbia are two economically distinct regions, where different species are harvested, where log processing also differs, and because their logs are rarely interchangeable due to the high costs of transportation from the interior and other factors.  Nor is it factually possible to compare the Investor's operations with those of producers in other Canadian provinces.   Of particular importance, in explaining the differences in regulatory regimes, is the dependence of the British Columbia economy on forestry and the impact that any shortage in supply might have in that province.

74.   Canada argues that because the Investor receives the same treatment as the appropriate domestic comparator there can be no breach of national treatment, nor is there in this case a situation where the domestic investment might have obtained more favorable treatment than that accorded to the Investor.  And there is certainly no nationality-based discrimination in the treatment accorded to the Investor, the prevention of which is the overriding objective of Article 1102 as

---

[37] Occidental Award, para. 173.
[38] Methanex Award, Part IV-Chap. B, para. 37.

has been established by both the Canadian[39] and United States'[40] interpretations of this Article and has been confirmed by Chapter Eleven jurisprudence.[41]

75.     In the Respondent's view, the Investor's allegations can be grouped into three types: the different treatment accorded by Notice 102 depending on where the logs are located in British Columbia; the different treatment of log producers under Notice 102 and those under provincial regulations; and the different treatment of log producers in British Columbia, whether under the federal or provincial regimes, as compared to those in Alberta.   All such differences involve comparing treatment accorded by different jurisdictions, an exercise that results in invoking the elements of each regime which the Investor prefers and that would lead to a better treatment than that available to any domestic investor in Canada.

76.     If the treatment complained of is compared to that of domestic producers in "like circumstances", there is no difference that could be in breach of national treatment.  It follows that the requirements of Notice 102 cannot be compared to those applied to Alberta log producers[42] or to log producers on British Columbia provincial land, but only to log producers on federal land in British Columbia, which are subject exactly the same treatment as the Investor.[43] Similarly, the obligation eventually to sell logs in the domestic market or the "blockmailing" allegation cannot be compared to the treatment in other provinces, such as Alberta, but must be compared with the treatment of federal land log producers

---

[39] Canada, Department of External Affairs, *Statement on Implementation: North American Free Trade Agreement*, vol. 128, no. 1, pp. 148-149, 159. (Ottawa: Canada Gazette, 1994).
[40] United States of America, *NAFTA Implementation Act*, Statement of Administrative Action, (Public Law 103-182, 140 Stat. 2057).
[41] *Roy Feldman Karpa v. United Mexican States*, (NAFTA/ICSID Case No. ARB(AF)/99/1), Award, Dec. 2002, para. 166 [hereinafter Feldman Award]; *ADF Group Inc. v. United States of America*, (NAFTA/ICSID Case No. ARB(AF)/00/1), Award, Jan. 2003, para. 157 [hereinafter ADF Award].
[42] Canada's Affidavit of Darren Tapp, March 20, 2009, paras. 13-16, with reference to Alberta's regulations of log production.
[43] Canada's Rejoinder Memorial, with reference to the proper comparators, paras. 100-135.

in British Columbia, which are again under the same obligations and requirements or are otherwise affected by the same market practices.

77. The proper comparator in terms of cutting and scaling are the log producers in British Columbia and not in other provinces, just as sorting is to be compared with requirements applicable to coastal log producers in British Columbia and not those in the BC interior or Alberta.  Special requirements concerning remote areas are to be compared to the treatment of producers in those areas and not in the coast or elsewhere.  The question of standing exemptions under provincial regulations, which are not available to the Investor, should be compared to the situation of producers on federal lands in British Columbia and not those on provincial land.  Coastal log producers in the province, it is explained, and not those in the interior are the proper comparator for restrictions on the advertising of standing timber, just as log producers on provincial land, and not those on federal land, are the comparators for the fee-in-lieu of manufacture.

78. Each of the measures is applied in identical terms to the entities operating in the same areas and conditions, domestic or foreign, as provided for in the different regulatory regimes and none involves a nationality-based discrimination.

### 2.4.3  The Tribunal's Findings

79. The Tribunal must first address Canada's argument that no "treatment", in the sense of Article 1102, has been identified by the Investor.  The treatment to which that Article refers is with respect to the "establishment, acquisition, expansion, management, conduct, operation and sale or other dispositions of investments".  This is a broad definition indeed, as it includes almost any conceivable measure that can be with respect to the beginning, development, management and end of an investor's business activity.  The treatment is no

different than the aggregate of all the regulatory measures applied to that business.  The Investor has specifically complained about the adverse effects the measures in question have on the expansion, management, conduct and operation of its forestry business in British Columbia.  The Tribunal is thus satisfied that the treatment complained of has been adequately identified by the Investor.

80.    The Tribunal in *S.D. Myers* related "treatment" to a requirement of a practical impact on the investment and not merely a motive or intent so as to produce a breach of Article 1102.[44] While motive or intent cannot be excluded from the scope of Article 1102 beforehand, it is not an issue that arises in the instant case. To the extent that a practical impact must be shown, the Tribunal notes that the Investor has identified the adverse effects it believes arise from the treatment received, and thus also meets this particular test, subject, of course, to proving the actual extent of those effects and the adverse consequences that ensue, if any.

81.    An additional issue concerning treatment that the Tribunal also needs to consider is whether the treatment accorded to the Investor by the national government can be compared to that accorded under British Columbia jurisdiction.  Canada argues in this respect that Article 1102(3) specifically distinguishes the treatment accorded by a state or province from that of the national government and, thus, the two cannot be compared.

82.    Despite the fact that, on occasion, concurrent jurisdictions relating to the same activity might make that distinction difficult, as in some respects the instant case appears to reflect, the Tribunal considers the argument made by Canada correct.

---

[44] S.D. Myers, Partial Award, para. 254.

Treatment accorded to foreign investors by the national government needs to be compared to that accorded by the same government to domestic investors, subject to meeting the requirement to be in "like circumstances", just as the treatment accorded by a province ought to be compared to the treatment of that province in respect of like investments.

83.    While the parties have spent considerable time on the correct analytical steps to establish whether a breach of national treatment has occurred,[45] the issue is finally to determine which investors are in "like circumstances", so as to allow for a comparison of the treatment concerned.  Following different routes the parties reach the same point and the discussion turns on what "like circumstances" mean and which are the proper investors to be compared to each other in connection with the treatment received.

84.    The Tribunal does not exclude the possibility for the contextual interpretation of a provision of a treaty in the light of other provisions of the same treaty, or even of other treaties, as the Investor favors, in appropriate cases, as allowed under Article 31 of the Vienna Convention on the Law of Treaties.[46] The fact that Article 1102 does not define "in like circumstances" has been subject to two different readings.   The Investor believes that because other provisions of NAFTA and also the GATT and GATS have used either that or similar expressions in the broad sense of requiring treatment that shall allow for competitive opportunities, the same special meaning ought to be given to "in like circumstances" in Article 1102.

---

[45] Investor's Reply Memorial, paras. 150 *et seq.*; Canada's Rejoinder Memorial, paras. 55-57.
[46] Investor's Expert Opinion of Professor Robert Howse, December 14, 2008, paras. 4-11, with particular reference to the concept of "systemic integration", at para. 9; Evidentiary Hearing, Witness appearance of Professor Robert Howse on direct examination by Mr. Barry Appleton, May 22, 2009, at 1290-1294.

85.    Canada has, however, a different reading.[47] If a special meaning has been given
       to that concept by other NAFTA Articles or by other treaties and not by Article
       1102, this only allows for the interpretation of the concept in the light of its
       ordinary meaning, which is none other than comparing situations that are
       similar.  A special meaning is thus unwarranted.

86.    The Tribunal is mindful of the need not to make expressions used in different
       contexts and treaties interchangeable in spite of their similarity, as is the case of
       "like products" under GATT Article III:4. WTO panels and other tribunals have
       been extremely careful not to interpret expressions or concepts used in specific
       provisions in the light of the use of those or similar expressions in other
       contexts.  This care is also appropriate in respect of the Investor's argument of
       identifying the meaning of "in like circumstances" of Article 1102 with that
       under Articles 1405 or 1505.

87.    In the strict context of a trade treaty, such as the GATT or a number of NAFTA
       Chapters, the Tribunal might be inclined to understand "in like circumstances"
       as relating to the need to ensure equality of treatment in respect of competitive
       opportunities and other trade objectives.  But, it must also note that NAFTA, and
       some other free trade agreements, includes matters that go beyond trade so as to
       provide for broader mechanisms of economic integration and coordination of
       economic policies.  This is the case of NAFTA Chapter Eleven in respect of
       investments.  It would thus be limiting to relate the concept exclusively to trade
       objectives and it is thus necessary to understand it in a broader sense that will
       allow for the comparison of other relevant elements, not excluding trade where
       appropriate.

---

[47] Canada's Supplemental Expert Opinion of Michael Reisman, February 9, 2009, paras. 8-16.

88.     This explains why NAFTA tribunals have, on a number of occasions, considered various factors in assessing whether investors are "in like circumstances", as evidenced by the references noted above to *S.D. Myers*, *UPS* and *Pope & Talbot*.  The environment, trade, the nature of services and functions, and public policy considerations are found among such factors.  This also explains why it is not enough on occasions to undertake the comparison solely in the same sector of economic activity and it might be necessary, as in *Occidental*, to consider whole sectors of the economy and business.

89.     Having decided that the proper comparison is between investors which are subject to the same regulatory measures under the same jurisdictional authority, which in the instant case is the comparison between foreign and domestic investors subject to Notice 102 and the national jurisdiction of the Canadian government, the Tribunal must now determine which is the appropriate comparator for the purposes of the treatment accorded to investors "in like circumstances" under Article 1102.

90.     To the extent there are investors in identical circumstances to be compared, this makes it unnecessary to resort to the *Methanex* alternative choice noted above of finding investors in the most like circumstances.   Such identically situated investors are those log producers operating on lands under federal jurisdiction in British Columbia and subject of course to the same requirements under Notice 102.  As was also noted, jurisdictional overlaps might occur in certain respects, but these appear to arise mostly in the case of lands that have been reclassified and log producers that are accordingly subject to some transitional regime, such as in the case of one of the Investor's competitors which was granted standing

exemptions under federal regulation notwithstanding that these exemptions are only available under provincial jurisdiction.[48]

91.   Canada has persuasively argued that the Investor must be compared to other log producers subject to Notice 102 and not to producers in other provinces, notably Alberta, or to producers that are operating under the provincial regulations.  As some of the Investor's operations are located in provincially regulated lands, these ought to be compared with those operations of similarly located log producers, whether in respect of the surplus test or of harvesting and sorting requirements.  Some sub-categories of provincially regulated operations, such as producers in remote areas of British Columbia, which is also the case of some of the Investor's operations, ought to be compared within that sub-category.

92.   Referring to a similar discussion that entailed differential treatment of staff in the employment of the World Bank, the Administrative Tribunal of that organization clarified the question of the proper comparator in the following terms: "The Tribunal must note that this is not the meaning of discrimination, because staff members in different situations will normally be governed by different rules or provisions….  Rather, discrimination takes place where staff who are in basically similar situations are treated differently".[49]

93.   That same conclusion is appropriate in the instant case.  In all the comparisons that are made within the appropriate category, the treatment the Investor is accorded is identical to that accorded to domestic investors in the same category.  Here, there is no issue as to which is the best treatment available to an investor, such as was discussed in *Pope & Talbot,* since the treatment here is the same in

---

[48]  Canada's Affidavit of John R. Cook, May 7, 2008, paras. 28-30, with reference to the special transitional case of Pluto Darkwoods.
[49] World Bank Administrative Tribunal, *Crevier*, Decision No. 205, 1999, para. 25.

each category of comparison.  Accordingly, we conclude that no standard of national treatment can be or was breached in these circumstances.

94.    The Tribunal turns lastly to the issue of whether the purpose of Article 1102 is to prevent nationality-based discrimination as discussed in *Feldman*.  In that case, the Tribunal concluded that the concept of national treatment in Article 1102 "is designed to prevent discrimination on the basis of nationality, or by 'reasons of nationality'".[50] While nationality-based discrimination would make a finding of breach of national treatment unavoidable, some argue that this is not the only aim of the concept of national treatment under Article 1102.  They would say that, even in the absence of discrimination, a differentiated treatment which is arbitrary and unjustified might qualify as a breach of national treatment.  Thus discrimination might entail considerations other than nationality.  However, in the instant case there is not the slightest evidence that any of the measures discussed might be based on considerations of the nationality of the Investor.  As concluded above, nor is there any differentiated treatment on other grounds among the appropriate categories of comparison.  Accordingly the Investor's Article 1102 case must fail.

## 2.5    THE CLAIM CONCERNING PERFORMANCE REQUIREMENTS UNDER NAFTA ARTICLE 1106

### 2.5.1  *The Investor's Argument*

95.    The Investor asserts that the Log Export Control regime imposes performance requirements in breach of Article 1106 in connection with the obligation to cut and sort timber in accordance to "normal market practices", to scale timber rafts metrically and to follow additional rules for properties located in the remote

---

[50] Feldman Award, para. 181.

coastal region.  All these requirements, it is also argued, impact the way the Investor manages its investments in Canada.

96.     The Investor explains in this respect that the prohibited performance requirements are listed in Article 1106(1), which is followed by a specific subset of performance requirements, that cannot be imposed upon the Investor as provided under Article 1106(3).  These provisions read as follows:

### Article 1106: Performance Requirements

1. No Party may impose or enforce any of the following requirements, or enforce any commitment or undertaking, in connection with the establishment, acquisition, expansion, management, conduct or operation of an investment of an investor of a Party or of a non-Party in its territory:

(a) to export a given level or percentage of goods or services;

[…]

(c) to purchase, use or accord a preference to goods produced or services provided in its territory, or to purchase goods or services from persons in its territory;

[…]

(e) to restrict sales of goods or services in its territory that such investment produces or provides by relating such sales in any way to the volume or value of its exports or foreign exchange earnings;

[…]

3. No Party may condition the receipt or continued receipt of an advantage, in connection with an investment in its territory of an investor of a Party or of a non-Party, on compliance with any of the following requirements: […]

97.     The Investor complains specifically about the performance requirements it believes have been imposed upon it in breach of Article 1106(1)(a) in imposing the export of a given level or percentage of goods or services; of Article 1106(1)(c) in that it must purchase, use or accord preference to services provided in Canada; and of Article 1106(1)(e) restricting its sale of logs in Canada by relating such sales to the volume of its exports.

98.     A first alleged breach concerns such measures that impose the exporting of a given level of goods originating in Canada, in the instant case the requirement to advertise for the export of logs from remote areas in a minimum volume of 2.800 m$^3$ and a maximum volume of 15.000 m$^3$.  As this is a precondition for export approval, any advertisement of logs outside those levels cannot be exported.[51]

99.     The Investor complains about a second breach of Article 1106 in that it is required to cut, sort and scale its logs in accordance with the specifications of the *Coast Domestic Market End Use Sort Description* and is thus required to produce certain types of goods.

100.    A third breach of Article 1106 complained of is the alleged obligation to accord preference to services provided in Canada in that the Investor, in complying with the regulations to cut, sort and scale its logs in a certain way, needs to hire the services of those who perform such tasks, which also occurs when it is required to retrieve logs that break up while awaiting the surplus testing procedures. With respect to logs to be exported from remote areas, there is also the need to hire extra towing services.

101.    The Investor complains next of the alleged restriction of the domestic sale of its logs by relating their sale to the volume of its exports, because the minimum and maximum volumes for the advertising of logs from remote areas results in volume restrictions which are inextricably linked to the volume of its exports.

102.    The Investor argues that the ordinary meaning of Article 1106(1)(a), (c) and (e), as well as the related provisions of Article 1106(3), the interconnection of which was discussed in *Pope & Talbot*, as well as the context of these provisions,

---

[51] Investor's Reply Memorial, paras. 409-416.

support its claim.  Although the *Pope & Talbot* tribunal considered the word "requirement", as used in Article 1106(1), to have a mandatory nature, the WTO panel in *Measures Affective the Automotive Industry* considered that "requirement" could include various forms of governmental action that could influence the conduct of private parties.

103.   Despite the fact that Article 1106(5) provides that paragraphs 1 and 3 of the same article do not apply to any requirement other than those set in those paragraphs, the Investor affirms that its arguments do not expand that list of requirements.

104.   The Investor lastly argues that Article 1106(1) must be read in the light of the object and purpose of the treaty as a whole, with particular reference to the objective of eliminating barriers to trade.  The performance requirements imposed do not further this objective, the Investor maintains.  But even if the Article is read in the light of its own objective and purpose, the mere fact that the regulations concerned are designed to encourage the domestic manufacturing of logs means that the investment is being distorted in Canada's favor.  The Investor also points to the fact that Canada did not include the forestry sector among the economic sectors it exempted from Article 1106.

### 2.5.2  *Canada's Opposing Arguments*

105.   Canada is of the view that prohibited performance requirements are specifically listed in Article 1106(1), with a further elaboration in Article 1106(3), and that these provisions, as held in *Pope & Talbot*[52] and *S.D. Myers*[53], cannot be broadened beyond their express terms as indicated by Article 1106(5).

---

[52] *Pope & Talbot, Inc. v. Canada*, (NAFTA/UNCITRAL), Merits I, Jun. 2000, para. 70 [hereinafter Pope & Talbot, Merits I].
[53] S.D. Myers, Partial Award, para. 275.

Otherwise every border measure could be considered a prohibited performance requirement, thus leading to an absurd result.

106.    The Respondent argues, in particular, that none of the measures complained of involve the imposition or enforcement of a requirement, commitment or undertaking, and thus do not meet the ordinary meaning of Article 1106.  There are no requirements found in the regime to increase or limit log exports, and thus producers are free to sell logs in both the domestic and international markets. Moreover, the measures complained of do not relate to the objective of this Article, which is to prohibit export requirements that are designed to oblige an investor to export more than it otherwise would have exported.

107.    The advertisement of a minimum volume of logs concerns only the advertising of logs and has no bearing on the level of goods exported.  In fact, Canada points out that the Investor did not export almost 20% of the logs for which it had obtained an export permit.  Nor is there a preference accorded to logs produced in Canada since the logs are produced there because they grow there. The measure is designed to prevent the advertisement of small volumes in remote areas so as to discourage offers by processors.  Moreover, the maximum volume complained of has no connection with exports and does not restrict the Investor's capacity to export as many logs as have been authorized.

108.    The Investor is free to sell as many logs as it wishes in the domestic market and it is in no way constrained from so doing because of a performance requirement. There is no connection whatever between its domestic sales and the volume of its exports and hence Article 1106(1)(e) simply does not apply, as held in *Pope*

*& Talbot* in interpreting this provision where no such link had been established.[54]

109. Canada also maintains that the use of the metric system in the scaling of logs is simply an application of the measurement system applied in Canada and has no connection with the manufacture or sale of logs. Neither the use of this system nor the recovery of logs compels the Investor to purchase services from persons in Canada, and the Investor is free to hire workers from outside Canada. To hire such services in Canada is purely a business decision.

110. The fact that there might have been incidental consequences of the regulatory regime does not mean that these are a "performance requirement", as was held in *S.D. Myers*.[55]

### 2.5.3 *The Tribunal's Findings*

111. In considering this claim, the Tribunal is mindful of the restricted scope of Article 1106(5) in that the performance requirements that are prohibited are limited to the specific matters identified in paragraphs (1) and (3). The Tribunal finds the views of *Pope & Talbot* and *S.D. Myers* tribunals to be convincing in this respect.

112. Thus the first question for the Tribunal is whether the measures complained of are among those listed in Article 1106(1) and (3), with specific reference to those contained in paragraph (1)(a), (c) and (e). It is also necessary to establish the objective to which this particular Article responds.

113. On this latter point, Canada makes a persuasive argument to the effect that the objective of the article is to prohibit performance requirements designed to oblige an investor to export more than it otherwise would have exported. This is

---

[54] Pope & Talbot, Merits I, para. 79.
[55] S.D. Myers, Partial Award, paras. 270-278.

also evident from the very terms of each of the requirements identified in the article: all are related to the export of goods and services and the conditions under which such exports are made.

114.   The complaint that the requirement to advertise for the export of logs from remote areas in a minimum volume of 2,800 m$^3$ and a maximum volume of 15,000 m$^3$ contravenes Article 1106(1)(a) because it restricts the level of the Investor's export of logs, is difficult to reconcile with the terms of this provision. Canada's argument in this respect is convincing: a requirement related to the advertisement of goods, as a step in the process of obtaining an export permit, cannot be seen as a restriction on the exports themselves, which can be undertaken in any level which has been authorized.  Indeed, the Investor has every right to export an aggregated amount of logs by adding up the various permits obtained within the period of authorization, which may occur depending on the demand of a given customer or destination and the cost effectiveness of transportation.

115.   The Investor also complains about the requirement to cut, sort and scale its logs in accordance with the specifications of the *Coast Domestic Market End Use Sort Description*, which it says constitutes an obligation to produce certain types of goods in contravention of Article 1106(1)(c), in that a preference is accorded to goods which meet the requirements of the domestic market.  This complaint is equally difficult to reconcile with the terms of the provision.  While such a requirement is evidently related to the manner in which goods are to be shipped to the domestic market, an issue that will be discussed further below, it is not a performance requirement designed to restrict or enhance exports.

116.  Scaling in accordance with the metric system is also a measure which simply relates to the measurement system in use throughout Canada, and it would be rather unusual to have a country applying different systems of measurement to different ends.

117.  This is not to say that the requirement at issue might not have an incidentally adverse effect on the Investor's exports to the extent that it might wish to cut, sort and scale its logs as required by its customers in foreign markets.  This, however, does not appear to be the kind of prohibited performance requirement banned by Article 1106, which needs to be directly and specifically connected to exports.  The Articles' ban does not appear to capture other requirements which merely have some indirect effect on exports.

118.  The same holds true of the complaint about a requirement to hire services in Canada for the purposes of cutting, sorting and scaling logs or retrieving logs that have broken loose.  Any connection with exports is only remote and indirect.  Moreover, it has been convincingly explained by the Respondent that the Investor is free to hire these services from anyone it wishes.  To the extent it hires in Canada is because of business convenience.  The higher cost of hiring elsewhere is certainly the core of this business decision.

119.  The Investor's argument about a restriction of the domestic sale of its logs by relating their sale to the volume of its exports, because the minimum and maximum volumes for the advertising of logs from remote areas result in volume restrictions inextricably linked to the volume of the Investor's exports, all of it in contravention of Article 1106(1)(e), is somewhat difficult to understand.  This is so because the Investor, as Canada has asserted, is free to sell as many logs as it wishes in the domestic market and this is in no way

restricted by the minimum and maximum volumes required for advertising in connection with an export permit.

120.   The Tribunal thus concludes that the measures complained of do not lend themselves to inclusion in the closed list of performance requirements laid down under Article 1106, unless these requirements were to be broadened beyond a reasonable interpretation.   However, the Investor is not wrong in arguing that there are effects on its exports, but these effects are incidental and not prohibited by the terms of Article 1106(1).

121.   That said, it is conceivable in certain circumstances that incidental effects, when aggregated may be seen to constitute something more than an incidental effect, even though each measure, when considered individually, does not result in the breach of a specific performance requirement.   To the extent that this issue requires to be examined, the proper place to do so is in the context of fair and equitable treatment.

## 2.6   THE CLAIM CONCERNING EXPROPRIATION

### 2.6.1   The Investor's Argument

122.   The Investor argues next that the Log Export Control Regime results in the expropriation of its investment in breach of Article 1110(1).   This Article provides as follows:

### Article 1110: Expropriation and Compensation

1. No Party may directly or indirectly nationalize or expropriate an investment of an investor of another Party in its territory or take a measure tantamount to nationalization or expropriation of such investment ("expropriation"), except:

    (a) for a public purpose;
    (b) on a non-discriminatory basis;
    (c) in accordance with due process of law and Article 1105(1); and
    (d) on payment of compensation in accordance with paragraph 2 through 6.

123. Relying on *Pope & Talbot*, the Investor maintains that expropriation refers to the taking of an investment of an investor of a NAFTA Party, and that an investment includes any tangible or intangible property interests included in Article 1139 as relating to such investment.[56] Both that case and *S.D. Myers*[57] relied on the substantial deprivation test to the extent that the government's interference would prevent the use, enjoyment or disposition of the property concerned, as opposed to a mere ephemeral interference.

124. Expropriation, it is said, no longer needs to be direct to be in breach of international law, as many forms of indirect or *de facto* expropriation have also been so considered.[58] Neither is motivation or intent a factor to be taken into account in reaching a determination about the effects of interference.

125. The Investor accepts that not every regulatory interference will result in some form of taking under customary international law.  However, it explains that those measures that unreasonably interfere with the effective enjoyment of the property, or unduly delay that right, can result in deprivation and expropriation, as was noted in *Feldman* in connection with the *Third U. S. Restatement on International Law*.[59] Intangible property rights, such as the enjoyment of rights under a license, have been held to be compensable takings,[60] as is also the case of property rights exercised under various legal instruments.

126. The Investor maintains that Article 1110 applies to a broad range of economic interests relating to the definition of investment under Article 1139, including an "enterprise" (Article 1139(a)) and "real estate or other property" (Article

---

[56] Pope & Talbot, Merits II, paras. 96-98.
[57] S.D. Myers, Partial Award, paras. 283, 287.
[58] *Metalclad Corporation v. United Mexican States*, (NAFTA/ICSID Case No. ARB(AF)/97/1), Award, Sep. 2000, para. 103 [hereinafter Metalclad Award].
[59] Feldman Award, para. 105 (*citing* Third U. S. Restatement on International Law, Section 712, comment g).
[60] *Mondev Int'l Ltd. v. United States*, (NAFTA/ICSID Case No. ARB(AF)/99/2), Award, Oct. 2002, para. 98 [hereinafter Mondev Award].

1139(g)).  The *Pope & Talbot* tribunal specifically considered that the ability to sell softwood lumber from British Columbia to the United States was a very important part of the business of the investment undertaken.[61] That case also considered, in measuring interference, the taking of the proceeds of company sales, interference with management activities and depriving the investor of full control of its investment.[62]

127.   On the facts of this case, the Investor asserts that the Log Export Control Regime is a measure tantamount to expropriation as it substitutes government control for the Investor's control over critical parts of its business, including the harvesting, processing and selling of its logs.   The Investor asserts in this connection that it loses control over its logs during the lengthy process of export approval, because the regulations encourage the practice of "blockmailing", because it is compelled to cut its logs to domestic length preferences, and because the logs deteriorate during the waiting time, which may take up to a year.   In the end, the whole regime is geared towards providing low cost raw material for domestic sawmills in British Columbia.

128.   The Investor believes that all the factors listed in *Pope & Talbot* as constituting interference in breach of Article 1110 are triggered in this case because proceeds are taken from the company sales, management activities are interfered with and the Investor is deprived of the full control of its investment.   Furthermore, the expropriation is both discriminatory against small producers such as the Investor and arbitrary, because there are many other alternative policies available to meet the objective of ensuring an adequate supply of logs.[63] Due process requirements

---

[61] Pope & Talbot, Merits I, para. 98.
[62] *Id.* para. 100.
[63] Investor's Expert Report of Peter H. Pearse, February 6, 2008, paras. 20-54.

are also said not to be met and compensation has not been paid for the depressed domestic log prices at which the Investor is forced to sell its logs.

129.   The Investor maintains that its investment includes an interest in realizing a fair market value for its logs in the international market and that this is a property interest protected under Article 1110 as an investment covered under Article 1139(h), as the *Pope & Talbot* decision held in connection with the access to the United States' market.   The deprivation it has suffered is asserted to be substantive, and not merely ephemeral, including both the lower price the Investor receives for its logs and the higher cost it incurs in producing them.

### 2.6.2  Canada's Opposing Views

130.   Canada contends that the Investor has not suffered any deprivation of the benefit of its investment under Notice 102 because Canada has never controlled the Investor's enterprise, directed its operations, taken the proceeds of its sales or in anyway intervened in the management or the shareholders activities.   In addition, those aspects of the log export control regime that are complained of have a minimal effect on the Investor's operations and Canada has never made a commitment to the Investor that it would refrain from regulating log exports.

131.   Canada also maintains that the interests that the Investor claims to have been expropriated, in particular the alleged right to export to foreign markets or to sell at a fair market value, are not within the scope of the definition of "investment" of NAFTA Chapter Eleven.   While Article 1139(h) covers interests in contracts, and contractual rights, and that, although intangible, these have generally been considered to be capable of expropriation, subparagraphs (i) and (j) of Article 1139 specifically stipulate that claims to money under commercial contracts and other commercial arrangements are not investments under NAFTA.

132.    Thus, only the lands, logs or timber would be capable of being expropriated and the price differential which the Investor claims to have been expropriated is just a claim for damages.  Even goodwill cannot be considered a kind of vested right as it cannot stand alone, separate from the value of the enterprise.[64] The investment must be considered as a whole for the purposes of expropriation. Even the *Pope & Talbot* decision, in considering the importance of the access to the United States' market, did not separate this aspect from the investment as a whole, concluding in this light that no expropriation had taken place.

133.    Also, as was held in *Feldman*, an investor cannot recover damages for the expropriation of a right it never had.  And, as in this case, the requirements at issue in *Feldman* were not new and had not changed to the detriment of the Investor at any relevant time.[65]

134.    In any event, Canada contends that the measures here at issue cannot be said to have affected the Investor's business to the degree of interference or deprivation required under international law to amount to a direct or indirect expropriation. The test of rendering property rights "so useless that they must be deemed to have been expropriated" has not been met in this case.[66]

135.    Nor has the degree of substantial deprivation of the investment, as opposed to mere interference, required by *Pope & Talbot* to be measured by the effective control of the investment, been met in this case.[67] In fact, the Investor continues to direct the operations of the company, operates at a profit, its officers are not supervised by the state, no proceeds of its sales have been taken, nor has there

---

[64] Methanex Award, Part IV, Chapter C, para 275; *The Oscar Chinn Case (United Kingdom v. Belgium)*, PCIJ, 1934, Series A/B No. 63, para. 280 [hereinafter The Oscar Chinn Case].
[65] Feldman Award, para. 118.
[66] *Starrett Housing Corp. v. Iran*, 4 Iran-U.S. C.T.R. 122, 154, Dec. 9, 1983, at 28, 36.
[67] Pope & Talbot, Merits I, paras. 100, 102.

been any interference with management or shareholders functions.  A host of other decisions have supported a similar standard of substantial deprivation.[68]

136.  Furthermore, Canada asserts, that the Investor has not demonstrated that it has been deprived of a legally cognizable investment and it does not have an unfettered right to export or sell at any given price.  No representations were made by Canada to that end, nor could the Investor have had any reasonable expectation that it could operate outside the log export control regime.  A significant number of the export permits applied for has been approved and the Investor's profits are also significant.

137.  None of the Investor's allegations concerning the possession or control of logs by Canada during the export permit application process have been demonstrated, nor can Canada be held responsible for the commercial conduct of private actors, such as "blockmailing".  The length of time required for the export permit process does not normally exceed 35-45 calendar days and since 2006 an automated on-line system has been in place.[69] Damage to the logs while in the water has not been demonstrated and, in any event, this is the normal practice for the storage of logs on the British Columbia coast.

138.  Since no expropriation of an investment has taken place, Canada argues that there is no need to examine the conditions of Article 1110(1)(a)-(d), particularly in respect of issues concerning discrimination, arbitrariness, due process or compensation.

---

[68] *Waste Management Inc. v. United Mexican States*, (NAFTA/ICSID Case No. ARB(AF)/00/3), Award, Apr. 2004, paras. 156-60 [hereinafter Waste Management II Award]; *Fireman's Fund Insurance Company v. United Mexican States*, (NAFTA/ICSID Case No. ARB(AF)/02/1), Jul. 2007, para. 176.
[69] Evidentiary Hearing, Witness appearance of Ms. Judy Korecky on direct examination by Ms. Sylvie Tabet on behalf of Canada, May 19, 2009, at 609-612.

### 2.6.3  The Tribunal's Findings

139.  The first question the Tribunal must decide is whether the Investor's claim concerning expropriation relates to an investment as defined under the NAFTA treaty.  NAFTA Chapter Eleven contains a broad definition of "investment" as Article 1139 makes quite evident.  As provided by Article 1139(h), this includes contractual interests and contractual rights, which accords with a well established view of international law about rights that are capable of being expropriated.  However, the Tribunal is mindful that the protection of contractual rights under international law has traditionally been understood within certain limits, particularly having regard to the extent of state participation required to engage international responsibility for a breach of such rights and the related rules on attribution of certain kinds of conduct to the state.  These limits explain the exclusion under Article 1139(i) and (j) of claims to money under commercial contracts and other commercial arrangements from the definition of investment.

140.  The question is then to establish from where the rights the Investor claims for arise.  The Investor defines these rights as an "interest in realizing fair market value for its logs on the international market".[70]  While an intangible investment is certainly capable of expropriation under international law, the issue here is that the right as defined does not appear to arise from a contract that might be considered directly related to the investment made.  In fact, it is only a potential interest that may or not materialize under contracts the Investor might enter into with its foreign customers.  But even assuming that an actual right is involved in this relationship, this appears to be too remote from the protection NAFTA grants to covered investments.

---

[70] Investor's Reply Memorial, para. 456.

141.   While there can be no doubt that property such as the lands, logs or timber which are affected to the requisite degree by government measures will be protected under Article 1139(h), just as intangible interests arising from a contract directly related to the investment will be protected, the kind of right the Investor claims has been expropriated appears to fall under the exclusions noted. This was in fact the kind of situation envisaged in *Methanex* in respect of goodwill and in its conclusion that goodwill cannot be considered as a stand-alone vested right, a view which is also consistent with the principles of international law governing acquired rights, which also had limits, as reflected in the decision in *Oscar Chinn.*[71]

142.   The right concerned would have to be an actual and demonstrable entitlement of the investor to a certain benefit under an existing contract or other legal instrument.  This reasoning underlies the *Feldman* tribunal's conclusion that an investor cannot recover damages for the expropriation of a right it never had.[72] Expropriation cannot affect potential interests.

143.   The Tribunal is in agreement with the view expressed in *Pope & Talbot* to the effect that the access to the United States' market was an important aspect of the business concerned in that case.  So too, the Tribunal has no doubt that in this case, the right to access the international market is a fundamental aspect of the log export business of the Investor.  Were this right impeded or prohibited it would certainly qualify for protection under NAFTA because it is the very objective of the investment made.  However, there can be no doubt that the conditions and terms under which such a right may be exercised may be subject

---

[71] *See infra* para. 215.
[72] Feldman Award, para. 118.

to appropriate regulation, provided this does not result in a form of substantial interference with the business.

144.   In this regard, as was also concluded in *Pope & Talbot*, the business of the investor has to be considered as a whole and not necessarily with respect to an individual or separate aspect, particularly if this aspect does not have a stand-alone character.  It could well happen that a certain aspect is so fundamental to the business concerned that interference with it might result in a kind of compensable expropriation.   And while the right to export is one such fundamental aspect, the protection against expropriation does not, and cannot, guarantee exports will be made at a certain price.  Such a conclusion would transform NAFTA into an insurance policy, guaranteeing that every investor exporter will get for its products the best price available in the international market, which is a somewhat farfetched proposition.

145.   The next question for the Tribunal to decide, assuming for this purpose that the Investor complains about the expropriation of a protected investment, is whether the degree of interference relied upon amounts to a taking of the rights concerned, either directly or indirectly.  The standard of substantial deprivation identified in *Pope & Talbot*, and followed by many other decisions, both in the context of NAFTA and other investment protection agreements, is the appropriate measurement of the requisite degree of interference.

146.   It is first patently clear to the Tribunal that neither the Government of Canada nor that of British Columbia has ever directed the operations of the company, which have been at all times directed by the Investor.  In fact, it is the Investor that decides how much timber it wishes to plant and to cut under a production plan which is prepared entirely by its management.  It is the Investor that

decides the amount of logs it wishes to submit to the export permit process and how much it may wish to sell in the domestic market.  The question of minimum and maximum volumes only applies to the advertisement of logs from remote areas and it responds to specific conditions of those areas.  The fact of having the production and export process regulated under government measures is entirely unrelated to the issue of directing the operations of the company.  If it were, all industries and business round the world would have been expropriated because of the existing regulations pertaining to them.

147.    It is also patently clear that the Investor's corporate officers have not been and are not now under the supervision of the state.   There is no government administrator in place, nor is there any measure that might amount to the state watching over the business decisions of those officers.  The observance of and compliance with the log export regime in no way approximates the sort of interference that might affect the independence and professional conduct of those officers.   The same holds true of the management and shareholders activities,  whose  respective  duties  and  rights  have  been  determined independently by the company's decision-making bodies and processes.

148.    In the end, the claim, as framed by the Investor, comes down to whether it could have obtained better profits in exporting logs to the international market, and whether its inability to achieve this profit level because of Notice 102 results in some form of taking of the proceeds of its sales.  The Tribunal must first note in this respect that no argument has been made about the company operating at a loss as a consequence of government measures.  If this were in fact the case, the value of the investment and its essential objectives would have been seriously compromised and this conceivably might amount to a taking.  However, to the

contrary, Canada points out that the Investor operates at a significant profit in spite of the regulations complained of, and that the volume of its exports still constitutes by far the largest part of the Investor's operations.  The Tribunal is satisfied that this is the case indeed.

149.  As for the proceeds from the Investor's future sales, as explained above, such proceeds are only a potential future benefit that cannot be the subject of a taking because the Investor is not contractually entitled to them.  The situation would be totally different if an existing contract for a certain volume of logs, at a certain price, had been interfered with by the government to the requisite extent.  This is the kind of intangible property right protected under NAFTA and international law.  But absent interference with rights of this sort, the state cannot guarantee a profit which is no more than an expectation on the drawing board and which may or may not actually be realized.

150.  Legitimate expectations are no doubt an important element of a business undertaking, but for such expectation to give rise to actionable rights requires there to have been some form of representation by the state and reliance by an investor on that representation in making a business decision.  And here there is no evidence whatsoever that Canada made any sort of representation to the Investor that it would enjoy a certain price level at the international market or the making of a certain profit thereon.

151.  The Tribunal must conclude accordingly that the use, enjoyment or disposition of the property concerned have not been affected in this case so as to amount to an expropriation.  While regulatory measures usually imply a long decision process, a rather typical situation in the forestry sector worldwide, the normal time period for completing an export permit in this case is not excessively long,

as reflected in the 35-45 day approval delay and the operation of the automated online application procedures.  A lengthy delay could of course result in undue interference, but this is not the case here, except in limited and unusual circumstances.

152.   The arguments made by the Investor in respect of losing control over its logs during the process of export approval, the encouragement of the practice of "blockmailing" as a consequence of the regulations, the satisfaction of domestic length preferences for cutting logs, and the deterioration of logs during the waiting time, are, if correct, inconveniences indeed, but they do not meet the standard of substantial deprivation so as to qualify for a compensable expropriation under NAFTA.

153.   The fact that no individual contract right might have been affected or that no substantial deprivation has taken place, so as to constitute an expropriation, does not mean that the regime is necessarily in compliance with the broader standard of fair and equitable treatment, which is a separate matter.  One argument in particular, made in the context of expropriation, is examined in greater detail below in the context of fair and equitable treatment.  That is the Investor's view that the whole regime is geared towards providing low cost raw material for domestic sawmills in British Columbia.

## 2.7   THE CLAIM CONCERNING FAIR AND EQUITABLE TREATMENT

### 2.7.1  *The Investor's Arguments*

154.   The Investor also claims that the Log Export Control Regime is in breach of the international law standard of treatment contained in Article 1105(1) as Canada fails to provide fair and equitable treatment and full protection and security.  Article 1105(1) provides as follows:

## Article 1105: Minimum Standard of Treatment

1. Each Party shall accord to investments of investors of another Party treatment in accordance with international law, including fair and equitable treatment and full protection and security.

155.  This failure is also said to be contrary to the international law obligation to act in good faith, which Article 1105 imports into NAFTA as noted by the *S.D. Myers* decision.[73] The Investor asserts in this respect that good faith entails an obligation of fairness, including therein the obligation to protect the Investor's legitimate expectations, not to act in an arbitrary or discriminatory manner, to fulfill its commitments and not to abuse its rights.  The non-compliance with any of these obligations results in the breach of the treaty standard and does not require that all of them be breached to that end.

156.  Arbitrary and discriminatory conduct have been considered in breach of the minimum standard of fair and equitable treatment, as noted by the *Waste Management* tribunal with reference to *S.D. Myers*, *Mondev*, *ADF* and *Loewen*.[74] That case, and *Gami,* singled out conduct which is "arbitrary, grossly unfair, unjust or idiosyncratic, is discriminatory and exposes the claimant to sectional or racial prejudice".[75]  The Investor points out that other tribunals, deciding under different investment or trade agreements, have arrived at an identical conclusion.[76]

157.  The Investor also emphasizes the *Azinian* conclusion in respect of abuse of rights as a kind of denial of justice arising from a malicious application of the

---

[73] S.D. Myers, Partial Award, para. 134.
[74] Waste Management II Award, para. 98.
[75] *Gami Investments, Inc. v. United Mexican States*, (NAFTA/ UNCITRAL) Final Award, Nov. 2004, para 89, [hereinafter GAMI Award] (*citing* Waste Management II Award, para. 98).
[76] *Eureko B.V. v. Republic of Poland*, Partial Award, Aug. 2005.  *United States - Import Prohibition of Certain Shrimp and Shrimp Products*, Report of the Appellate Body, Oct. 12, 1998, at 177.

law.[77] It is further argued that legitimate expectations have also been included under the fair and equitable standard by both NAFTA and other tribunals, noting in particular the *Metalclad* decision to the effect of protecting an investor "acting in the expectation that it would be treated fairly and just in accordance with the NAFTA".[78]

158. It is also argued that *Waste Management*[79] and *Gami*[80] have identified lack of transparency as a breach of fair and equitable treatment, as was also done in *Metalclad,* in the light of other NAFTA Chapters.  A secure legal environment, the argument follows, is also a part of fair and equitable treatment.

159. The Investor maintains that fair and equitable treatment is a part of the customary international law minimum standard concerning the treatment of aliens as evidenced by state practice and *opinio juris*, including therein the content that has been shaped by over two thousand bilateral investment treaties. Also international jurisprudence has shaped that content, as recognized in *Mondev*[81] and *ADF*.[82]

160. The Investor also discusses in the context of the applicable law the NAFTA Free Trade Commission Notes of Interpretation concerning Article 1105(1) of July 31, 2001 ("FTC Interpretation"), and asserts in this respect that a tribunal deciding on this Article under NAFTA is not bound to apply just customary international law but may apply the normal sources of international law, particularly in the light of Article 1131(1) mandating the tribunal to apply the "applicable rules of international law".

---

[77] *Robert Azinian and others v. United Mexican States*, (NAFTA/ICSID Case No. ARB(AF)/97/2), Award, Nov. 1999, para. 103.
[78] Metalclad Award, para. 99.
[79] Waste Management II Award, para. 98.
[80] GAMI Award, para. 95.
[81] Mondev Award, paras. 116-25.
[82] ADF Award, paras. 181-184, 190.

161.  Consistent with that mandate, the Investor notes that Article 1105(1) provides for treatment in accordance with international law, and not just with customary international law.  Nor do the *travaux préparatoires* contain any evidence that the meaning of this Article might have been restricted to customary international law.  To the extent that the FTC Interpretation narrows down Article 1105(1) to only one source of international law, there is an amendment of the NAFTA and not just an interpretation.  The Investor also maintains that treaties need to be interpreted in the light of international law generally, and that the contents of this law may also be discerned in the light of the decisions of tribunals, as noted in *ADF* when holding that the "general requirement to accord 'fair and equitable treatment' must be disciplined by being based upon state practice and judicial or arbitral case law or other sources of customary or general international law".[83]

162.  The Investor further argues that the ordinary meaning of fair and equitable treatment as an autonomous standard under international law has converged with that under customary law in the light of the evolution that has taken place in recent years to the point that there is no meaningful difference between the two, as held by numerous tribunals.[84]

163.  The Investor also believes that the threshold for breach of this standard is not as high as Canada has argued in the light of the *ELSI* decision and its association of arbitrary state behavior with "a willful disregard of due process of law…which shocks, or at least surprises, a sense of judicial propriety".[85] This lower threshold was the one adopted in *Mondev*, which rejected the suggestion that a breach

---

[83] *Id.* at 184.
[84] Investor's Reply Memorial, paras. 315-320 (*citing Azurix Corp. v. Argentine Republic* (ICSID Case No. ARB/01/12) Award, Jul. 2006, para. 361; *Rumeli* et al. *v. Republic of Kazakhstan*, (ICSID Case No. ARB/05/16), Award, Jul. 2008 para. 611).
[85] Canada's Counter-Memorial, para. 557.

requires a standard of conduct that is "outrageous" or even "egregious".[86] A number of non-NAFTA tribunals have followed this very approach.[87] The Investor concludes its legal argument by maintaining that the test of fair and equitable treatment is a flexible one that needs to be adapted to the circumstances of each case and its facts.

164.    In the light of the preceding understandings, the Investor asserts that Canada has breached the fair and equitable treatment standard as it has subjected export permits to the surplus testing procedure as a condition of authorization, has prevented the Investor from obtaining standing exemptions, has compelled the cutting and sorting of logs to artificial "normal market practices", imposed additional requirements for logs from remote areas, mandated the metric measurement system and required the payment of a fee-in-lieu on the export of provincial rafts.  Normal market practices have never been defined and are left to the determination of the British Columbia Ministry of Forests.  Nor has "remote" been defined.

165.    The Investor also asserts that the highly secretive and non-transparent manner in which the regime is administered is in breach of the rule of law, as is the composition of TEAC and FTEAC because of the exclusion of private log producers.  Moreover, "blockmailing", an unfair practice about which Canada is well aware, has not been remedied.[88] The Investor has not been allowed to make oral submissions to TEAC or FTEAC in respect of the offers made for, and the assessment of the market value of its logs, which takes place in meetings closed to the public.  Nor are the minutes of meetings made public.  A 5% deviation

---

[86] Mondev Award, paras. 116, 127.
[87] *Saluka Investments BV v. The Czech Republic*, Partial Award, March 2006, para. 460; *Continental Casualty Company v. Argentine Republic*, (ICSID Case No. ARB/03/9) Award, Sep. 2008, para. 254.
[88] Investor's Reply Memorial, paras. 348-367.

from the domestic market value is normally considered fair, despite the fact that such a deviation can mean a serious disadvantage in a competitive market. Transparency and accountability are not observed in a decision-making process that is regularly endorsed by the DFAIT, save in very unusual occasions.

166. The requirements concerning the cutting, sorting and scaling of logs are allegedly designed to accord a preference to local mills and prevent the Investor from entering into long term contracts with foreign customers.   Market distortions and significant losses have ensued.  All the elements of unfairness that are complained of have a cumulative nature which is designed to harm private landowners so as to benefit domestic log manufacturers and processors in a manner which discriminates against and harms private log producers.  In the ten-year period between April 1998 and May 2008, TEAC/FTEAC rejected 81.6% of the applications submitted, which in the Investor's case amounted to a 92% rejection of its export applications.

167. In conclusion, the Investor maintains that unfairness, discrimination and an unstable business environment are all elements of Canada's regime which are contrary to the fair and equitable treatment standard.  In addition, the measures in force are in violation of the Investor's legitimate expectations and constitute an abuse by Canada of its rights.

### 2.7.2  Canada's Opposing Views

168. Canada argues first that the applicable law is quite different from what the Investor understands.   Article 1105(1) provides for a minimum standard of treatment based on long-standing principles of customary international law, as was noted in Canada's *Statement on Interpretation* for NAFTA in 1994 and further confirmed by the FTC Interpretation of July 31, 2001.   The FTC

Interpretation, which is binding on NAFTA tribunals, further clarifies that fair and equitable treatment or full protection and security do not require treatment in addition to or beyond that which is required under the customary international law minimum standard of treatment of aliens.

169.   The Respondent also maintains that the fair and equitable treatment and full protection and security standards are not free-standing obligations and that, as held in *Loewen*, they "constitute obligations only to the extent that they are recognized by customary international law".[89] To that end, international law requires that the obligation must be proven in the light of state practice and *opinio juris*.[90] In this context, arbitral awards are not customary international law and this, Canada believes, is not the meaning the Investor assigns to *ADF*.   Nor are bilateral investment treaties relevant in the context of this arbitration as ruled, contrary to the Investor's understanding, in *Mondev*.[91] To the extent that under such treaties there is no link to customary law, then the concept of fair and equitable treatment may be interpreted independently.

170.   Canada opposes, in particular, that good faith and legitimate expectations might be considered independent rules of customary international law, and says that good faith is not an independent source of obligation as the Investor asserts.[92] Moreover, the prohibition of arbitrariness does not constitute a stand-alone obligation and no such conclusion is found in either *Metalclad* or *Waste Management II*, contrary to the Investor's understanding.   Article 1105(1) contains neither a prohibition against discrimination nor an obligation to protect

---

[89] Evidentiary Hearing, Closing Statement by Professor Patrick Dumberry on behalf of Canada, May 23, 2009, at 1546-1549 (*referring to The Loewen Group, Inc. and Raymond L. Loewen v. United States of America*, (NAFTA/ICSID Case No. ARB(AF)/98/3) Award, Jun. 2003 para. 128 [hereinafter Loewen Award]).

[90] *United Parcel Service of America Inc. v. Government of Canada*, (NAFTA/ UNCITRAL), Award on Jurisdiction, Nov. 2002, para 84.

[91] Mondev Award, para. 121.

[92] Canada's Counter-Memorial, paras. 488-491.

legitimate expectations.  In any event, the conditions for a legitimate expectation are not met in this case, as none of the conditions invoked by the Investor prevailed at the time the investment was made and no representations were made by Canada.

171.  Canada also maintains that transparency is not a stand-alone obligation and it is not part of the international law minimum standard.  Contrary to the Investor's argument, Canada says that *Metalclad* was not based on other NAFTA articles, but on Article 1105(1) itself, and this is what led to the award being set aside on judicial review by the British Columbia Supreme Court.  So too, Canada argues that the *Waste Management II* tribunal did not consider transparency as a free standing obligation, but as a part of denial of justice and due process.

172.  In Canada's argument, there is no such thing as a stand-alone obligation to provide a secure legal environment, nor is such an obligation part of customary international law.   NAFTA Article 1105 is a different situation from that considered in *CMS* and *Occidental* under bilateral investment treaties unrelated to customary law.[93] In addition, full protection and security does not refer to legal security, but to physical security, a matter which in this case is not an issue.  Canada also asserts that there is no general prohibition of abuse of rights under Article 1105 and that its consideration in *Azinian* was again in the context of denial of justice.

173.  In Canada's view, the sole mandate of a NAFTA tribunal is to decide whether there has been a breach of Chapter Eleven and not to adjudicate on the legitimacy of a given regime or the soundness of its administration, as noted in *S.D. Myers*.  Neither a failure to satisfy requirements of national law necessarily

---

[93] Canada's Counter-Memorial, para. 539 (*citing CMS Gas Transmission Company v. Argentine Republic*, Award, May 2005, para. 274 and Occidental Award, paras. 183, 190).

violates international law, as held in *Gami*, nor does it necessarily breach the customary international standard embodied in Article 1105(1), as noted in *ADF*.[94] The high threshold identified in *ELSI* in respect of arbitrariness, requiring "wilful disregard of due process of law, an act which shocks, or at least surprises, a sense of judicial propriety"[95] is also applicable in NAFTA and it was the threshold used by both *S.D. Myers*[96] and *Thunderbird*,[97] specifically with regard to regulations and administrative proceedings.

174.   Against this backdrop, Canada contends that the impugned regime cannot be said to breach the Article 1105 standard.  Canada asserts that 97.6% of all logs advertised were deemed surplus and allowed to be exported - and that this outcome was the same for the Investor.  Ultimately the Investor's claim in this respect concerns only a miniscule portion of its log business in British Columbia.  Moreover, Canada has no role in "blockmailing" and has disciplined such conduct when it comes to its attention.[98] These facts can hardly be said to have created an insecure legal and business environment.

175.   Canada also maintains that the regime is not administered in an arbitrary manner, as claimed by the Investor.[99] Canada does not have the legal authority to grant standing timber exemptions and the requirements applicable to logs from remote areas are related to (and were developed to address) the very specific conditions of those areas, as discussed further above.  The same holds true of the minimum and maximum volume requirements.[100]

---

[94] Canada's Counter-Memorial, paras. 552-556 (*citing* S.D. Myers, Partial Award, para. 261, GAMI Award, para. 97, and ADF Award, para. 190).
[95] *Case Concerning Elettronica Simula SpA* (ELSI) (United States of America v. Italy) ICJ, Judgement, 1989, ICJ Reports 1989, 15, para. 128 [hereinafter ELSI].
[96] S.D. Myers, Partial Award, para. 263.
[97] Thunderbird, Award, para. 197.
[98] Canada's Counter-Memorial, paras. 645-655.
[99] Canada's Supplemental Affidavit of John R. Cook, March 19, 2009, paras. 3-18.
[100] Canada's Affidavit of John R. Cook, May 7, 2008, at 16-28.

176.   In particular, Canada contends that the decision-making process is in no way arbitrary, because TEAC/FTEAC cannot influence the domestic market price of logs, which is based only on supply and demand.[101] The private sector members participating in these bodies do not represent the interest of industry but are there as neutral specialists.   Moreover, Canada points out that private landowners have also been invited to participate, but have declined these invitations.   There are also specific conflict of interest procedures in force which result in the exclusion of any person having an interest from the meeting where decisions concerning their interests are considered.

177.   Canada argues that TEAC/FTEAC meetings are not often cancelled and a federal representative is always in attendance, including by conference call. Recommendations are made based on concrete criteria, comprising a number of factors, all of which are well known to the industry, within a margin of flexibility so as to take into account all relevant facts of a case.   The Investor has often made representations to such bodies concerning offers made on its logs, and has succeeded in many instances in having such offers rejected.[102]

178.   Neither does the Minister of Foreign Affairs nor the pertinent provincial body rubber-stamp such recommendations.   Rather, these decision makers take into account a variety of facts in addition to TEAC/FTEAC recommendations.   In any event, the Investor can make and has successfully made representations to the Minister and the Minister's decisions can be judicially reviewed in federal courts.   The rules concerning extensions of export permits have not been changed arbitrarily.

---

[101] Evidentiary Hearing, Witness appearance of Mr. John Cook on direct examination by Ms. Sylvie Tabet on behalf of Canada, May 19, 2009, paras. 454-456.
[102] Evidentiary Hearing, Witness appearance of Brian Bustard on direct examination by Professor Patrick Dumberry on behalf of Canada, May 20, 2009, at 798-806.

179.  Canada further asserts in this respect that none of the aspects about which the Investor complains reach the necessary threshold to be in breach of customary international law.  Canada argues further that the regime is transparent, because remote areas have been reasonably defined and known to all log exporters and normal market practices are established and understood by the industry and not by regulation under Notice 102.

180.  Neither is Canada responsible for "blockmailing" nor special targeting by competitors.  Indeed, it has taken all necessary measures to prevent and discipline these practices, including on those occasions where a matter was brought to the attention of the Minister of Foreign Affairs by the Investor.  The log export regime creates in Canada's view a stable legal and business environment that cannot be compared to cases where such environment was completely transformed by government measures.

181.  In concluding its argument, Canada maintains that no legitimate expectations of the Investor could have been frustrated as no representations have been made. There is also no abuse of rights, because TEAC/FTEAC do not approve offers below the fair market value, within a 5% variation.  If there is no arbitrariness and there is transparency, there is no insecure legal and business environment, the Investor's legitimate expectations have not been frustrated and there is no abuse of rights, then there can be no breach of the fair and equitable treatment standard under Article 1105(1).

### 2.7.3  *The Tribunal's Findings*

### a)      *The Intricacies of the Applicable Law*[103]

182.   The most complex and difficult question brought to the Tribunal in this case is

that concerning fair and equitable treatment.  This is so because there is still a

broad and unsettled discussion about the proper law applicable to this standard,

which ranges from the understanding that it is a free-standing obligation under

international law to the belief that the standard is subsumed in customary

international law.   NAFTA and investment treaty tribunals have had the

occasion to discuss this question under different legal frameworks.  Under either

view, the difficulties associated to this question are further compounded because

of the need to determine the specific content of the standard.  In addition, in this

case there is a particular difficulty in assessing the facts and how they are related

or unrelated to the governing law.

183.   The Tribunal first notes that Article 1105(1) provides for the treatment of

another Party's investors "in accordance with international law".  It goes on to

indicate that such treatment includes fair and equitable treatment and full

protection and security.  Under the methods of interpretation generally accepted

under international law, in particular Article 31 of the Vienna Convention on the

Law of Treaties, a treaty "shall be interpreted in good faith in accordance with

the ordinary meaning to be given to the terms of the treaty in their context and in

the light of its object and purpose".[104] Consistent with this use of terms, NAFTA

---

[103] The Tribunal is conscious that it has referred to many authorities that were not cited by the parties in
its analysis on the content of the minimum standard of treatment of aliens required by customary
international law.  In the normal course, had its reliance on these authorities been likely to have had a
determinative effect on the outcome of the case, it would have asked the parties to address them.
However, having regard to the Tribunal's disposition of the case for reasons unrelated to the applicable
minimum standard of treatment, it concluded that there was no need to do so.
[104] Vienna Convention on the Law of Treaties, 1969, Article 31(1).

Article 1131(1) directs NAFTA tribunals to decide the issues in dispute in accordance with "this Agreement and applicable rules of international law".

184. The meaning of international law can only be understood today with reference to Article 38(1) of the Statute of the International Court of Justice, where the sources of international law are identified as international conventions, international custom, general principles of law, and judicial decisions and the teachings of the most highly qualified publicists as a subsidiary means for the determination of the rules of law. The Investor's understanding of the role of Article 38(1) of such Statute in the context of this particular discussion is correct. In fact, the reference that Articles 1105(1) and 1131(1) make to "international law" must be understood as a reference to the sources of this legal order as a whole, not just one of them.

185. Had a more limited meaning been intended it would have had to be specifically identified in the terms of the Agreement, which was not the case. The Max Planck Encyclopedia of Public International Law has concluded in discussing the minimum treatment standard that its development "has been through customary international law, judicial and arbitration decisions, and treaties".[105]

186. To the extent relevant, it is thus possible for this Tribunal to examine various sources of international law in the effort to identify the precise content of this standard. Treaties and international conventions, however, are not of great help to this end, as for the most part, they also contain rather general references to fair and equitable treatment and full protection and security without further elaboration. This is the case with most bilateral investment treaties and multilateral instruments. More important, besides the NAFTA Agreement itself,

---

[105] Max Planck Encyclopedia of Public International Law, Max Plank Institute for Comparative Public Law and International Law, on-line edition, Oxford University Press, entry on Minimum Standards by Hollin Dickerson, October 2006, para. 6.

there does not appear to be in this matter relevant treaties to which all three NAFTA members are parties, which is where the standard could have been spelled out in greater detail. This leaves customary international law as the other principal source to be applied.

187.  The Tribunal must note that general principles of law also have a role to play in this discussion. Even if the Tribunal were to accept Canada's argument to the effect that good faith, the prohibition of arbitrariness, discrimination and other questions raised in this case are not stand-alone obligations under Article 1105(1) or international law, and might not be a part of customary law either, these concepts are to a large extent the expression of general principles of law and hence also a part of international law. Each question will have to be addressed on its own merits, as some might be closely related to such principles while other issues are not. Good faith and the prohibition of arbitrariness are no doubt an expression of such general principles[106] and no tribunal today could be asked to ignore these basic obligations of international law. The availability of a secure legal environment has a close connection too to such principles and transparency, while more recent, appears to be fast approaching that standard.

188.  The same holds true for the role of the subsidiary sources indicated above. Judicial decisions, while not a source of the law in themselves, are a fundamental tool for the interpretation of the law and have contributed to its clarification and development. The teaching of highly qualified publicists has a similar role. The fact that both parties have made extensive use of the jurisprudence and the views of writers in their pleadings is sufficient evidence to demonstrate this role. Here again, cases and writers have to be considered on

---

[106] Bin Cheng: General Principles of Law as Applied by International Courts and Tribunals, 1953, at 105-160.

their own merits, as some might be related to different legal frameworks and applicable law. Yet, on the whole, they all contribute one way or the other to the same end of identifying the content of customary law and other sources.

189. The jurisprudence of NAFTA tribunals has dealt directly and indirectly with the question whether fair and equitable treatment is linked to a particular source of international law, notably customary law, or is a concept that can be applied in some autonomous manner.[107] In linking fair and equitable treatment with the requirement of transparency under international law, but not identifying a specific source of this requirement, the *Metalclad* tribunal appears to have relied on some kind of autonomous role of fair and equitable treatment,[108] a view that was not shared by the reviewing court.[109] This also appears to have been the case of *S.D. Myers* in emphasizing the relationship between fair and equitable treatment and international law generally.[110] These interpretations prompted the Free Trade Commission Notes of Interpretation of July 31, 2001, noted above, to the effect of linking fair and equitable treatment with customary law only and to the effect of de-linking it from breaches of other NAFTA articles or separate treaties.

190. While NAFTA tribunals have thereafter followed the FTC Interpretation in the light of its binding character, as provided for in Article 1131(2), the first major question as to the meaning of customary international law in this matter, is whether the customary international law minimum standard of treatment of aliens has been frozen in time since the 1920's or has evolved accordingly with

---

[107] K. Yannaca-Small: "Fair and Equitable Treatment Standard: Recent Developments", in August Reinisch (ed.): Standards of Investment Protection, 2008, 111-130, at 113-115.
[108] Metalclad Award, para. 76.
[109] *United Mexican States v. Metalclad Corp.*, (2001), B. C. T. C. 664, 2001, para. 72.
[110] S.D. Myers, Partial Award, paras. 259-264.

current international law. *Mondev*[111] and *ADF*,[112] while accepting that fair and equitable treatment had to be understood within customary international law, favored a dynamic interpretation of the content of this source, the first in conjunction with the role of investment treaties and the second, it appears, more generally on state practice, judicial and arbitral case law or other sources of customary or general international law.[113] This evolutionary approach was also endorsed by *Waste Management II*[114] and *Gami.*[115]

191.   The second major question which the Tribunal requires to address is the meaning of customary international law regarding fair and equitable treatment and full protection and security. And as to this, the Tribunal is mindful of the FTC Interpretation referred to above, as well as Canada's *Statement of Implementation,* which understood Article 1105 as a minimum standard of treatment under customary law.

192.   However, the binding character of the FTC Interpretation does not mean that that interpretation necessarily reflects the present state of customary and international law. As the Investor has argued, the FTC Interpretation seems in some respect to be closer to an amendment of the treaty, than a strict interpretation. In any event, the Tribunal is mindful of the evolutionary nature of customary international law, as discussed below, which provides scope for the interpretation of Article 1105(1), even in the light of the Free Trade Commission's 2001 interpretation.

---

[111] Mondev Award, paras. 116-25.
[112] ADF Award, paras. 181-184, 190.
[113] R. Dolzer: "Fair and Equitable Treatment: A Key Standard in Investment Treaties", The International Lawyer, Vol. 39, 2005, 87-106, at 98-99.
[114] Waste Management II Award, para 93.
[115] GAMI Award, para. 95.

193.    In spite of arguments to the contrary, there appears to be a shared view that customary international law has not been frozen in time and that it continues to evolve in accordance with the realities of the international community.  No legal system could endure in stagnation.   The issue is then to establish in which direction customary law has evolved.  State practice and *opinio juris* will be the guiding beacons of this evolution.

194.    Canada has maintained that, to the extent that an evolution might have taken place, it must be proven that it has occurred since 2001, when the FTC Interpretation was issued, and this almost certainly has not happened.[116] Such a view is unconvincing.   The FTC Interpretation itself does not refer to the specific content of customary law at a given moment and it is not an interpretative note of such content.   Accordingly, the matter needs to be examined in the light of the evolution of customary law over time.

195.    The concept of a minimum standard of treatment of aliens was born over a century ago.  After 1840, about sixty claims tribunals were established to resolve claims by foreign citizens.[117] The concept became paramount in the context of the work of international claims commissions, particularly as a result of the work of the Mexico-United States Claims Commission.  This is how it came to be identified with the oft-cited *Neer* case,[118] which has been paramount in Canada's pleadings in other NAFTA cases.[119] The Tribunal notes, however, that that decision has not been invoked by Canada in the instant case, perhaps because of its contention that arbitral awards do not form part of customary international law.

---

[116] Canada's Rejoinder, para. 168.
[117] Encyclopedia, *see supra* note 105, para 4.
[118] *LFH Neer and Pauline Neer (USA) v. United Mexican States* (1926), 4 RIAA 60.
[119] *S.D. Myers*, Canada's Counter-Memorial, para. 289 *et seq.*; *Pope & Talbot*, Canada's Counter-Memorial, paras. 258 *et seq.*

196.    The Commission in the *Neer* case referred to a breach of the minimum standard of treatment of aliens as requiring treatment that amounts "to bad faith, to willful neglect of duty, or to an insufficiency of governmental action so far short of international standards that every reasonable and impartial man would readily recognize its insufficiency".[120] A few other historical cases applied that or a similarly worded standard in connection with treatment to aliens.[121]

197.    The Tribunal notes, however, that all such cases were dealing with situations concerning due process of law, denial of justice and physical mistreatment, and only marginally with matters relating to business, trade or investments. This was also the case of the International Court of Justice decision in *ELSI*. This oft-cited decision also set a high threshold requiring "wilful disregard of due process of law, an act which shocks, or at least surprises, a sense of judicial propriety".[122]

198.    In the NAFTA context, a number of tribunals have adopted that demanding standard. *Pope & Talbot*, in particular, applied the *Neer* standard to conduct that would "shock and outrage every reasonable citizen in Canada".[123] The same holds true of the more recent *Loewen* case, where a NAFTA tribunal identified the minimum standard with "manifest injustice in the sense of lack of due process leading to an outcome which offends a sense of justice…".[124] Similarly, the *Thunderbird* tribunal required a finding of conduct that amounts "to gross

---

[120] *Neer, see supra* note 118, at 61-62.
[121] Jan Paulsson and Georgios Petrochilos: "Neer-ly Misled?", <u>ICSID Review-Foreign Investment Law Journal</u>, Fall 2007, 242-257, with reference to Faulkner, Roberts and Chattin, at 253-257.
[122] ELSI, para. 128.
[123] Pope & Talbot Award, paras. 68-69.
[124] Loewen Award, para. 132.

denial of justice or manifest arbitrariness falling below acceptable international standards" for there to be a breach of the standard.[125]

199.   *Waste Management* also identified unfair and inequitable treatment with conduct that is arbitrary, grossly unfair, unjust or idiosyncratic which, in so far as it also encompasses questions of due process, leads to an outcome which "offends judicial propriety".[126]   Even before the FTC Notes of Interpretation the *S.D. Myers* tribunal required unjust or arbitrary treatment unacceptable from the international perspective.[127]

200.   It is also quite evident that NAFTA jurisprudence has stiffened since the FTC Interpretation.   For example, the recent *Glamis Gold* decision relied on the *Neer* standard requiring an act which is "egregious" and "shocking".[128]

201.   The approach of the *Neer Commission* and of other tribunals which dealt with due process may best be described as the first track of the evolution of the so-called minimum standard of treatment.   In fact, as international law matured and began to focus on the rights of individuals, the minimum standard became a part of the international law of human rights, applicable to aliens and nationals alike.[129]   This evolution led to major international conventions on human rights as well as to the development of rules of customary law in this field.   A second track, which shall be discussed below, is also discernable in so far it concerns business, trade and investment.

202.   The early work of the International Law Commission on the principles of international law governing state responsibility was well aware of the evolution

---

[125] Thunderbird Award, para. 194.
[126] Waste Management II Award, para. 98.
[127] S.D. Myers, Partial Award, para. 263.
[128] *Glamis Gold Ltd. v. United States of America,* (NAFTA/UNCITRAL), Award, Jun. 2009, para. 616.
[129] International Law Association, Final Report of the International Committee on Diplomatic Protection of Persons and Property, Toronto, 2006.

that characterized customary law in this matter,[130] gradually evidenced by the increasing obsolescence of the traditional (first track) standard of minimum treatment in the light of different and more recent standards.[131]   Similarly, the Asian African Legal Consultative Committee concluded in 1961 that the "minimum standard of treatment" had become outmoded and that, in the context of human rights, what now mattered was "fair treatment" to nationals and foreigners alike.[132]

203.    The work of highly qualified writers and associated codification efforts also patently reflected the evolution that was taking place.   Although issues concerning the minimum standard of treatment (particularly regarding questions of due process) were prominent in the first decades of last century, particularly in Borchard,[133] the early approach was subject to criticism in the work of the International Law Commission on State Responsibility in the late 1950's and early 1960's.   Thereafter it has been scarcely mentioned in the principal works concerning the codification of the law of state responsibility, particularly the draft articles prepared by Baxter and Sohn[134] and, more recently, the Commentary on the Articles on State Responsibility approved by the United Nations General Assembly on the basis of the draft of the International Law Commission.[135]

---

[130] Yearbook of the International Law Commission, 1961 II, 46; F. V. Garcia-Amador: The Changing Law of International Claims, Vol. II, 1984, 784.

[131] Garcia-Amador, *see supra* note 130, at 750.

[132] Report of the Fourth Session of the Asian African Legal Consultative Committee, Yearbook of the ILC 1961 II, 78, at 82.

[133] E. Borchard: The Diplomatic Protection of Citizens Abroad, 1915; A. Roth: The Minimum Standard of International Law Applied to Aliens, 1949.

[134] Louis B. Sohn and R. R. Baxter: "Draft Convention on the International Responsibility of States for Injuries to Aliens", 1961, in F. V. Garcia-Amador, Louis B. Sohn and R. R. Baxter: Recent Codification of the Law of State Responsibility for Injuries to Aliens, 1974, at 156.

[135] James Crawford: The International Law Commission's Articles on State Responsibility, Introduction, Texts and Commentary, 2002.

204.   This development was indicative of the fact that state practice was increasingly seen as being inconsistent with the first track concept of an "international minimum standard".   State practice was even less supportive of the standard referred to in the *Neer* case.   And in the absence of a widespread and consistent state practice in support of a rule of customary international law there is no *opinio juris* either.   No general rule of customary international law can thus be found which applies the *Neer* standard, beyond the strict confines of personal safety, denial of justice and due process.

205.   As foreshadowed above, just as there was a first track concerning the evolution of the minimum standard of treatment of aliens in the limited context indicated, there was also a second track that concerned specifically the treatment of aliens in relation to business, trade and investments.   This other standard, which was much more liberal, is evidenced by the tendency of states to support the claims of their citizens in the ambit of diplomatic protection with an open mind, and without requiring a showing of "outrageous" treatment before doing so.   Parallel to the development of this second track, diplomatic protection gradually gave way to specialized regimes for the protection of foreign investments and other matters.[136]

206.   The digest of cases concerning state responsibility in respect of acts of legislative, administrative and other state organs, published by the United Nations Secretariat in 1964 unequivocally illustrates a new liberal approach.[137]   Indeed, a host of successful claims were made without conceptual restrictions

---

[136] International Law Commission, Draft Articles on Diplomatic Protection, 2006, Article 17.
[137] Digest of the decisions of international tribunals relating to State Responsibility, prepared by the Secretariat, Yearbook of the International Law Commission, 1964, Vol. II, 132.

dealing with interference with and annulment of private rights,[138] the breach of concession contracts by the state,[139] acquired rights under the law in force at the time of the investment,[140] the entitlement to money wrongfully withheld,[141] the entitlement to the value of money orders,[142] and the refusal to grant an export permit.[143]   In many instances, it was the commissions, courts or tribunals that had to make a determination on the applicable legal principles.   This is another good reason why judicial decisions, as a subsidiary means for the determination of the rules of law, are not lightly to be dismissed.

207.   The trend towards liberalization of the standard applicable to the treatment of business, trade and investments continued unabated over several decades and has yet not stopped.   The examination of claims brought by many governments for settlement by agreement is also illustrative of such open-minded standard, including all kinds of property, rights and interests.[144] The Iran-United States Claims Tribunal has also significantly contributed to this trend.[145]

208.   Conduct which is unjust, arbitrary, unfair, discriminatory or in violation of due process has also been noted by NAFTA tribunals as constituting a breach of fair and equitable treatment, even in the absence of bad faith or malicious intention

---

[138] *Case Concerning Certain German Interests in Polish Upper Silesia* (Merits), PCIJ, 1926, Series A. No.7, at 19, Digest cit., No. 26; *German Settlers in Poland*, PCIJ, 1923, Series B., No. 6, pp. 19-20, 35-38, Digest cit., No. 27.

[139] *Aboilard Case*, 1925, (Haiti, France), Reports of International Arbitral Awards, Vol. XI, 71, at 79-81, Digest cit., No. 28.

[140] *Robert E. Brown Case*, 1923, (United Kingdom, United States), Reports of International Arbitral Awards, Vol. VI, 120, at 129-130, Digest cit., No. 32.

[141] *George W. Cook Case*, 1927, (Mexico, United States), Reports of International Arbitral Awards, Vol. IV, 213, at 214-215, Digest cit., No. 36.

[142] *Hopkins Case*, 1926, (Mexico, United States), Reports of International Arbitral Awards, Vol. IV, 41, at 46-47, Digest cit., No. 43.

[143] *Lalanne and Ledoux Case*, 1902, (France, Venezuela), Reports of International Arbitral Awards, Vol. X, 17, at 18, Digest cit., No. 47.

[144] Burns H. Weston et al. (eds.): International Claims: Their Settlement by Lump Sum Agreements, 1975-1995, 1999, at 67-75.

[145] Richard B. Lillich and Daniel B. Magraw (eds.): The Iran-United States Claims Tribunal: Its Contribution to the Law of State Responsibility, 1998.

on the part of the state.[146] Transparency as noted was unsuccessfully linked to this concept and legitimate expectation has been discussed in several cases, although not endorsed on questions of fact and evidence.[147]

209.   State practice with respect to the standard for the treatment of aliens in relation to business, trade and investments, while varied and sometimes erratic, has shown greater consistency than in respect of the first track, as it has generally endorsed an open and non-restricted approach to the applicable standard to the treatment of aliens under international law.  At the same time it shows that the restrictive *Neer* standard has not been endorsed or has been much qualified.  The parties have extensively discussed whether the customary law standard might have converged with the fair and equitable treatment standard, but convergence is not really the issue.  The situation is rather one in which the customary law standard has led to and resulted in establishing the fair and equitable treatment standard as different stages of the same evolutionary process.

210.   A requirement that aliens be treated fairly and equitably in relation to business, trade and investment is the outcome of this changing reality and as such it has become sufficiently part of widespread and consistent practice so as to demonstrate that it is reflected today in customary international law as *opinio juris*.  In the end, the name assigned to the standard does not really matter.  What matters is that the standard protects against all such acts or behavior that might infringe a sense of fairness, equity and reasonableness.  Of course, the concepts of fairness, equitableness and reasonableness cannot be defined precisely: they require to be applied to the facts of each case.[148]  In fact, the concept of fair and

---

[146] S.D. Myers, Partial Award, para. 263; Waste Management II Award, para. 98.
[147] ADF Award, para. 189; Thunderbird Award, para. 147.
[148] C. Schreuer: "Fair and Equitable Treatment: Interaction with other Standards", Transnational Dispute Management, 2007, 4; Dolzer, *see supra* note 113; Yannaca-Small, *see supra* note 107.

equitable treatment has emerged to make possible the consideration of inappropriate behavior of a sort, which while difficult to define, may still be regarded as unfair, inequitable or unreasonable.

211.    In the context of the FTC Interpretation, the Tribunal accepts that it cannot be said that fair and equitable treatment is a free-standing obligation under international law and, as concluded in *Loewen*, its application will be related to a finding that the obligation is part of customary law.  As to this latter point, Canada has argued that the existence of the rule must be proven.  But against the backdrop of the evolution of the minimum standard of treatment discussed above, the Tribunal is satisfied that fair and equitable treatment has become a part of customary law.

212.    The Tribunal also notes that if the FTC Interpretation was construed so as to narrow the protection against unfair and inequitable treatment to an international minimum standard requiring outrageous conduct of some kind, then consistency would demand that the same standard be followed in respect of such claims made by the NAFTA States in respect of the conduct of other countries affecting business, trade or investments interests of their citizens abroad.  Yet, this is not the case under current international practice.  Customary international law cannot be tailor made to fit different claimants in different ways.  To do so would be to countenance an unacceptable double standard.

213.    In conclusion, the Tribunal finds that the applicable minimum standard of treatment of investors is found in customary international law and that, except for cases of safety and due process, today's minimum standard is broader than that defined in the *Neer* case and its progeny.  Specifically this standard provides for the fair and equitable treatment of alien investors within the confines of

reasonableness.  The protection does not go beyond that required by customary law, as the FTC has emphasized.  Nor, however, should protected treatment fall short of the customary law standard.

b)      *The Facts of the Case in the Light of Fair and Equitable Treatment*

214.    The Tribunal has had the occasion to examine most of the facts of this case in connection with the other standards provided for under Chapter Eleven.   The conclusions reached in that context are for the most also applicable to the question of fair and equitable treatment.   No breach of national treatment has occurred in this case, and neither have performance requirements been imposed by Canada.   To that extent, at least in so far those conclusions may be taken beyond the meaning and extent of the specific articles discussed, it would not be possible to find that there is a breach of the fair and equitable treatment required under Article 1105(1) in that respect.

215.    The Tribunal has also concluded in respect of expropriation that a potential and eventual benefit relating to export prices cannot be affected by an alleged act of taking because it has not materialized in an existing contract and there is thus no actual contractual right that can be protected as an intangible interest.   The Permanent Court of International Justice dealt with this issue in *Oscar Chinn*, noted above, concluding that while there is an obligation under international law to respect the vested rights of foreigners, the possession of customers and the possibility of making a profit that Mr. Chinn claimed for, did not constitute a genuine vested right because "[f]avourable business conditions and good-will are transient circumstances, subject to inevitable changes;…No enterprise…can

escape from the chances and hazards resulting from general economic conditions".[149]

216. In the instant case, however, unlike *Oscar Chinn*, the Investor is not trying to escape from general business conditions but, to the contrary, is seeking to be allowed to operate under those conditions and not to be prevented from so doing in light of the regulations in force.  In the absence of actual contracts, however, the question arises as to what is the specific intangible interest to be protected.

217. The principal argument of the Investor, as explained above in respect of expropriation, is that the whole regime is geared towards providing low cost raw material for domestic sawmills in British Columbia at the expense of private log producers.  While not qualifying as an act of expropriation, it is still necessary to examine whether this particular situation could result in the breach of fair and equitable treatment, as the ability of the Investor to conduct its business without undue interference might be unreasonably hindered.

218. The Tribunal is mindful of Canada's argument that the Tribunal's task is to determine whether there has been a breach of the fair and equitable treatment standard and not to pass judgment on the legitimacy of the legislation or the regulations in force.  The Tribunal fully accepts that view.  However, in considering this question, the consequences of those regulatory measures on the Investor's business and the related issue of damages should not be ignored.

219. The Tribunal has considered a possible breach of the protections provided by Article 1105(1) under two different scenarios.  The first is based on the Investor's view that the protection provided by Article 1105(1) is significant and that the threshold to be applied to establish breach is a comparatively low one,

---

[149] The Oscar Chinn Case at 27.

and thus the log export regime's interference with its business could readily result in a breach of Article 1105(1).  The second scenario, while not relying on the *Neer* or some other similarly high threshold, is based on the view that for there to be an 1105(1) breach, a state's wrongful conduct or behavior must be sufficiently serious as to be readily distinguishable from an ordinary effect of otherwise acceptable regulatory measures.  In either case, as will be discussed further below, assuming breach be found, it is also necessary to determine whether the state's conduct or measures have resulted in damages to the Investor.

### c)      The First Scenario

220.    Under the first scenario it is appropriate to note the Investor's argument that the log export control regime originated in emergency and extraordinary measures adopted in time of war and its immediate aftermath, a fact which does not appear to be disputed.  This could be considered a question of necessity so as to guarantee the supply of logs to the local and Canadian industry.  The regime, however, has been kept in force thereafter in one form or another until the current regulations under Notice 102.  Jurisprudence has generally not favored extraordinary measures kept in force for a long period after the originating circumstances have come to an end.[150]

221.    To the extent that such regulations constitute a form of subsidy directed to benefit the local industry and which negatively affect the Investor's ability to conduct its business, it is possible that the fair and equitable treatment standard might be placed in issue.

---

[150] François Bellanger: "Droit de nécessité et état d'exception", in D. Thürer *et al.* (eds.): <u>Droit Constitutionnel Suisse</u>, 2001, 1261, at 1270, where a long period of application of emergency legislation beyond the war was considered an "abus du droit de nécessité".

222. In this case, however, there is no direct subsidy or transfer of funds.[151] The benefit to the local industry follows a different path in that the impugned regulations require log producers who wish to export to offer their logs for sale in the local market as a condition for applying for an export permit.[152]

223. In examining each aspect of the regime about which the Investor complains, the Tribunal notes that some of its requirements are entirely unrelated to any benefit to the local industry, some are doubtful in that respect, and yet others translate into some form of direct benefit to the local sawmills processors.  The difference lies in the objectives and purposes of those regulations.

224. Some aspects of the impugned regulation are directed to benefit society as a whole, as is the case of environmental, safety, conservation or sanitary regulations, among others.  On the other hand, some aspects of the regime are specifically designed to benefit a particular industry.  It is the latter, under this first scenario, that could compromise Canada's obligation to ensure fair and equitable treatment.  Customary international law has for long recognized that the minimum standard of treatment may be curtailed for reasons of public policy,[153] which necessarily has to pursue a genuine public policy.

225. In so far as the specific acts complained of are concerned, the Tribunal accepts that the Canadian government does not have the constitutional authority to grant standing exemptions.  It also accepts that regulations concerning remote areas and minimum and maximum volume requirements, which may cause

---

[151] In fact, if this was a direct transfer of funds from the Canadian government to the industry there might be, *mutatis mutandis,* a case for an actionable subsidy under the WTO Agreement on Subsidies and Countervailing Measures. *See* World Trade Organization, Agreement on Subsidies and Countervailing Measures.

[152] To the extent that this results in the ability for local sawmills processors to purchase logs at less than the fair market price, it may translate into an objectionable measure under the WTO, if the effect of the regulations is to require a premium to be paid by the exporter for the benefit of the local industry in order to obtain an export permit.

[153] Ian Brownlie, *Principles of Public International Law*, 2008, at 525-528.

considerable inconvenience to a would be exporter, are responsive to the specific economic and transportation conditions of those areas.  Similarly, scaling in the metric system cannot properly be subject to criticism as it is the normal measurement system in use throughout Canada.  This kind of regulations, even when considered under the first scenario, could not be held in breach of fair and equitable treatment.

226.    However, other aspects of the log export regime appear to be geared towards ensuring some form of benefit to the local industry.  The mandatory cutting and sorting of timber in accordance with the needs of the local industry, for example, is designed to address the requirements of a particular potential local consumer. It is imposed on the Investor by regulation, not market forces.

227.    More serious issues arise in connection with the functioning of the log market. The first concerns the composition of TEAC/FTEAC, the membership of which is said to be heavily weighted in favor of the local industry that is the beneficiary of the regulations and upon which it is required to make recommendations. While there is no reason to doubt the professional competence of the members of these bodies, entrusting very significant components of the implementation of the log export regime to its domestic beneficiaries is facially troubling.

228.    A truly independent body would be able to ensure the impartiality of the decisions taken.  Although formally the decision on the issue of an export permit lies with the Minister of Foreign Affairs, the advice gathered in the decision-making process will generally have a predominant (if not determinative) influence on those decisions, even if other factors may be taken into account. And the record shows that these other factors, while not absent, are marginal and are not often resorted to.  The fact that the TEAC and FTEAC memberships are

the same, except that in the latter case where a federal representative is added, does not contribute materially to the independence of FTEAC.

229.  The record also indicates that TEAC/FTEAC operates so as to favor domestic log purchasers.  This occurs as a result of the committees' policy according to which offers below the market price but within 5% of that price are still considered a fair market price.  The benefit to domestic purchasers and the prejudice to would be exporters is apparent.  An entirely different result would obtain if, for example, the local industry would have a right of first refusal to purchase logs contracted for sale by the Investor to foreign customers, as it would ensure both the secure supply and the prevailing true market price.[154]

230.  The market distorting nature of the regulations is further illustrated by the existence of "blockmailing".  Canada has persuasively explained that "blockmailing" is a private practice which cannot be attributed to the government and that, whenever possible, it has made efforts to discipline this practice.  However, the very existence of the practice proves that Canada's export log regime is used by domestic purchasers as a tool for extracting benefits from the logs exporters.[155]

231.  The Investor's arguments concerning transparency also require to be considered in the context of the first scenario.  And while a requirement for transparency may not at present be proven to be part of the customary law standard, as the judicial review of *Metalclad* rightly concluded, it is nonetheless approaching that stage.  Indeed, it would be difficult today to justify the appropriateness of a

---

[154] A witness for Canada explained at the hearing that the regulatory bodies do not take into account the international price in making a determination of the market price for offers.  Evidentiary Hearing, Witness appearance of Mr. John Cook on cross-examination by Mr. Greg Nash on behalf of the Investor, May 19, 2009, at 475-476.

[155] Evidentiary Hearing, Closing Statement by Mr. Barry Appleton on behalf of the Investor, May 23, 2009, at 1401-1403.

secretive regulatory system.  In the instant case, some aspects of the log export regime appear to meet the need for transparency in a satisfactory manner.  The Tribunal accepts, for example, Canada's explanation of the industry understanding about what is to be regarded as a remote area or as normal market practices.  As regards other aspects of the regime, the situation is not entirely satisfactory.  Examples include TEAC/FTEAC holding closed meetings and not publishing their minutes.

232.   The stability of the legal environment is also an issue to be considered in respect of fair and equitable treatment.   State practice and jurisprudence have consistently supported such a requirement in order to avoid sudden and arbitrary alterations of the legal framework governing the investment.  In this case, if stability were to be measured in the context of the framework existing when the investment was made in 1906, important alterations have indeed taken place.  Yet, that would be a significantly exaggerated approach.  A number of the changes that have intervened were well justified in the light of emergency war measures.  The continuation of these measures under different modalities, but with the same objective, cannot in a contemporary perspective be considered an abrupt change of the legal environment.  To the extent that it was adverse, it has been continuously and stably adverse.  As such, the stability is not an issue in itself in this case.

233.   The Investor raises the violation of its legitimate expectations as another issue.  While it is clear that no representations have been made by Canada to induce the Investor to make a particular decision or to engage in conduct that is later frustrated, any investor will have an expectation that its business may be conducted in a normal framework free of interference from government

regulations which are not underpinned by appropriate public policy objectives. Emergency measures or regulations addressed to social well-being are evidently within the normal functions of a government and it is not legitimate for an investor to expect to be exempt from them.   Yet, regulations which end-up creating benefits for a certain industry, to the detriment of an investor, might be incompatible with what that investor might reasonably expect from a government.

### d)    The Second Scenario

234.   Having concluded that certain aspects of the Investor's case for breach of the applicable standard must fail even if the Tribunal were to conclude that the scenario one threshold were to apply,[156] we consider here, in connection with scenario two, only those aspects of the Investor's case that relate to:

> (a)    the fact that the regime, in application, may be said to benefit local sawmill processors;
>
> (b)    the regime's cutting and sorting requirements for timber;
>
> (c)    the make-up and operations of TEAC/FTEAC;
>
> (d)    "blockmailing"; and
>
> (e)    the Investor's legitimate expectations.

235.   As to the fact that the regime may, in design and/or application, benefit a particular domestic industry, namely the sawmills, to the detriment of the Investor, there is a substantial argument in Canada's favor that this reflects a legitimate public policy objective: *i.e.,* the creation of domestic employment and the retention in Canada of part of the timber value chain that would otherwise go

---

[156] *See* the Tribunal's conclusions above concerning: (a) the Canadian government's lack of constitutional authority to grant standing exemptions; (b) the reasonableness of the regulations pertaining to remoteness, minimum and maximum volume requirements and metric scaling; and (c) the stability of the log export permit regime.

to foreigners as a result of the export of unprocessed logs.  Bearing in mind that Canada's export regime treats Canadian owners of timberland, who are minded to export logs, in precisely the same fashion as it treats foreign timberland owners, it is difficult to see how either Notice 102 (which is not under attack as such), or its implementation (which is questioned) could be seen to constitute sufficiently adverse behavior by Canada against an alien investor so as to breach a minimum standard of treatment of aliens which carries the sort of threshold associated with this second scenario.

236.    It is non-controversial that the Tribunal's task is not to pass judgment on the policy legitimacy of Canada's log export regime, but only to determine in this case whether its application breaches the minimum standard of treatment for aliens.  Canada clearly feels it is in the country's national interest to promote local processing of its timber.  The fact that its chosen regulatory instrument imposes a degree of constraint on the freedom of other Canadian based businesses, particularly the timberland owners, to export their unprocessed logs may properly be seen as a legitimate public policy consequence of its chosen industrial policy.  Indeed, it would be hard to see the imposition of such a non-discriminatory policy in respect of foreign investors as sufficiently reprehensible to amount to a breach of a minimum standard with the substantial threshold considered under scenario two.  Such policy could not be fairly described in this context as meeting any of the adjectives that have been used over the years, such as egregious, outrageous, arbitrary, grossly unfair or manifestly unreasonable.

237.    Turning to the Investor's complaints regarding the cutting and sorting requirements of Notice 102, if it is legitimate public policy for a state to have a log export control regime which is aimed at preserving local value and ensuring

a sufficient supply of logs to domestic sawmills, whether Canadian or foreign owned, it would seem hard to base a breach of a scenario two type international minimum standard on the implementation of that policy objective by a requirement that logs for which an export permit is sought be advertised and made available to potential domestic bidders in a format that is compatible with local market custom and usage.[157]

238.    The make-up and *modus operandi* of TEAC/FTEAC, which was considered possibly to give rise to more serious questions under a scenario one analysis, looks to be of considerably less concern under the second scenario - especially when considered against the backdrop of the following uncontradicted evidence:

    (a)    of the seven members of TEAC/FTEAC specifically identified for criticism by the Investor by reason of partiality towards local sawmills, the two who were once employed by BC sawmills have now become independent consultants and log brokers, the third is the manager of a log broker which exports logs, the fourth purchases rough sawn lumber rather than logs, but is also a logging contractor whose interest is to get the highest possible price for logs and the fifth and sixth each have responsibilities in their respective organizations which would either favor allowing more exports and/or high prices for logs.[158]  In short, six of the seven industry representative members of TEAC/FTEAC who were singled out for criticism do not appear to have a particular interest in keeping log prices artificially low;

---

[157] In any event, on the factual record before the Tribunal, the sorting complaint would not appear to offer a valid factual basis for criticism of Notice 102.  *See* Canada's Affidavit of John R. Cook, May 7, 2008, at 54, to the effect that sorting may be done in any way a log producer wants.

[158] *Id.*, paras. 31-38.

(b)    on a number of occasions, following consultation with private landowners, including the Investor, representatives of private landholders have been invited by BC and Canada to become members of TEAC/FTEAC, but they have always declined;[159]

(c)    TEAC/FTEAC have clear guidelines to deal specifically with any potential or perceived conflict of interest which require, *inter alia*, that any committee member who has any business relationship with an advertiser or an offering mill to leave the committee meeting before any discussion of the matter starts. This has been the consistent operational practice of the committees and it means that those members will not know the reason behind any acceptance or rejection recommendation;[160]

(d)    at each meeting of the relevant committee, and prior to any review of offers, the committee members engage in a detailed "log market review" which establishes the market price, during the period of advertisement, for an established range of logs of various types and grades. The market level is established by reference to what has been paid in the market; not what purchasers and sellers would have liked to pay or receive. This review is carried out at every meeting of the committee, regardless of whether offers for advertized logs are to be considered;

(e)    logs typically are sold at prices around the median range of market prices for the relevant period. Ranges of price exist

---

[159] *Id.*, paras. 47-51.
[160] *Id.*, paras. 39-45.

because prices vary even for logs of a similar type and quality. This occurs because of the nature of the log market where criteria such as the location of logs, transportation and weather considerations can affect price.  An offer is thus considered fair if it falls within 5% of the current domestic market value.   And while not set out in Notice 102, the 5% benchmark has long been in use and known to the industry;[161] and

(f)     contrary to the Investor's assertions, the federal representative is always in attendance at meetings of FTEAC at which there are offers to consider for logs harvested from federal lands, either in person of via conference call.[162]

239.    On the basis of this evidentiary record,[163] it would seem to be something of a stretch to suggest that the implementation of the log export regime is entrusted to its beneficiaries who operate in a sufficiently non-transparent, arbitrary and unfair manner such that it can be said that Canada's implementation of Notice 102 contravenes the threshold of the minimum standard as understood under the second scenario.[164]

240.    The fact that the federal Minister usually accepts the recommendation of FTEAC really does not add much to the Investor's case unless: (a) the FTEAC process can also be shown to have had serious fundamental failures of due

---

[161] Canada's Affidavit of Judy Korecky, May 10, 2008, paras. 112-117.

[162] Canada's Affidavit of John R. Cook, May 7, 2008, para. 52.

[163] It is important to note that counsel for the Investor did not seek to confront either Ms. Korecky or Mr. Cook on this evidence.

[164] The Investor's assertion that the implementation of Notice 102 is sufficiently flawed that it can be said to breach the minimum standard as defined by scenario two is difficult to accept in the face of the evidence of Ms. Korecky that FTEAC has considered offers from domestic purchasers on only as 7.4% of the 1.834 booms advertised by the Investor since the inception of Notice 102, and that, after FTEAC recommendations of permits in the case of invalid or low offers, late offer withdrawals or further consideration of FTEAC recommendations, the Minister denied an export license in the case of only 65 (or 3.57%) of the Investor's applications.

process, which, under the second scenario would be unlikely; (b) the Minister can be shown to have had a closed mind to expressions of concerns expressed by log exporters, the evidence on this being to the contrary; and (c) the Minister's decisions were not subject to judicial review, which they were.

241.    Dealing next with "blockmailing", having regard to the fact that the practice is carried out by private parties, that Canada disapproves and actively seeks to discipline the practice, and that truly "low ball" offers will not prevent an export permit,[165] it would again be difficult to conclude that Canada's implementation of Notice 102 falls short of the minimum standard of protection as understood in this scenario.

242.    Finally, the Tribunal comes to the Investor's case based on the question of legitimate expectations.  Faced with a complete absence of evidence of any representation by Canada to the Investor which might be said to have induced or even encouraged its investment, if it were necessary to reach a decision on the question, the Tribunal would be likely to conclude, as with all the other arguments considered in relation to a scenario two threshold, that Canada had not contravened the provisions of Article 1105(1).  But, for reasons explained below, the Tribunal puts aside a definitive conclusion on the alleged contravention by Canada of Article 1105(1) as interpreted by the FTC Notes of July 31, 2001.

243.    Before determining which of the two above scenarios should guide the conclusions of the Tribunal and whether, under either such scenario, Canada may be said to have breached its Article 1105(1) obligations, matters on which there were different opinions, the Tribunal considers it advisable first to

---

[165] It is to be borne in mind that, despite bearing the onus of proof, the Investor provides no evidence that TEAC/FTEAC had ever recommended against the grant of a permit for an advertised boon in respect of which it alleged that the relevant offer was below a fair market price.

determine whether the Investor has proven it was damaged by Canada's alleged breaches.

244.    The Tribunal proceeds in this fashion being mindful that international responsibility for the breach of an international obligation has traditionally been identified with the concepts of "liability" and "responsabilité civile" and thus with the duty to make reparation for the damage sustained.[166] While, for specific purposes, responsibility has occasionally been de-linked from the occurrence of damages, so as to enlarge the scope of its application, the fact is, as stated by the Permanent Court of International Justice in the *Chorzów Factory (Jurisdiction)* case, that "[i]t is a principle of international law that the breach of an engagement involves an obligation to make reparation in an adequate form … *Reparation therefore is the indispensable complement of a failure to apply a convention*".[167] (Tribunal's emphasis added.)   Liability has thus become inextricably associated with the occurrence of damages.  This has also been the approach followed by the early academic efforts at the codification of the rules of State responsibility[168] and the diplomatic conferences and other official work on the matter.[169]  *Waste Management II* was also explicit in linking the infringement of fair and equitable treatment with "conduct attributable to the State and harmful to the claimant…".[170]

---

[166] F. V. Garcia-Amador, The Changing Law of International Claims, Vol. I, 1984, at 88-90.

[167] *Case Concerning the Factory at Chorzów (Claim for Indemnity) (Jurisdiction)*, 1927, PCIJ, Series A, No. 9, at 21, and comments by Ian Brownlie: Principles of Public International Law, 1990, at 433-435.

[168] Institut de Droit International, *Responsabilité internationale des Etats à raison des dommages causés sur leur territoire à la personne et aux biens des étrangers*, Resolution adopted on  Sep. 1, 1927, Article 1; 1929 Harvard Draft Convention on Responsibility of States for Damage Done in Their Territory to the Person and Property of Foreigners; 1961 Harvard Draft Convention on the International Responsibility of States for Injuries to Aliens.

[169] League of Nations Conference for the Codification of International Law, 1930; International Law Commission, *First Report on Diplomatic Protection by Special Rapporteur John Dugard*, March 7, 2000.

[170] Waste Management II Award, para. 98.

245.   In the commentaries to the International Law Commission Articles on State
Responsibility, the issue of whether a wrongful act could exist in the absence of
damage being caused was considered.   The commentaries state that "whether
such elements [damages] are required depends on the content of the primary
obligation, and there is no general rule in this respect".[171]  Valid as that
conclusion may be as far as state responsibility is concerned, in the case of
conduct that is said to constitute a breach of the standards applicable to
investment protection, the primary obligation is quite clearly inseparable from
the existence of damage.   Indeed, a finding of liability without a finding of
damage would be difficult to explain in the context of investment law arbitration
and would indeed be contrary to some of its fundamental tenets.

246.   In these circumstances, and because of the different opinions within the Tribunal
on the applicable scenarios and their corresponding thresholds, and whether,
under either scenario, there has been a breach, we consider it appropriate first to
determine the Investor's claim for damages.

## 2.8   THE CLAIM FOR DAMAGES

### 2.8.1   *The Investor's Claim for Damages*

247.   The Investor has submitted with its Reply two expert reports on which it bases
its claim for damages.   The first Report, prepared by Mr. Douglas A. Ruffle[172]
reviewed the Harvest Plan prepared by Merrill & Ring, and concluded that the
potential harvest volume from the Investor's lands was lower than that originally
estimated by the Investor.   In the end, the earlier reports submitted with the
Investor's Memorial in respect of damages were withdrawn.   In the second

---

[171] James Crawford: The International Law Commission's Articles on State Responsibility, 2002, at 84.
[172] Investor's Witness Statement of Mr. Douglas A. Ruffle, December 11, 2008.

report, on the basis of the revised harvest plan, Mr. Robert Low calculated the damages for which compensation is claimed.[173]

248.   Taking into account the projected volumes, the quality of the rafts, the historical percentage of logs exported and other technical factors, the Investor identified three categories of loss.   The first concerns past losses of export premiums between December 2003 and December 2008.   The second concerns future losses of export premiums.   And the third addresses the incremental costs of compliance with the regulatory regime in force.   Export premiums are defined as the higher prices exporters of logs from British Columbia would receive "if they could sell like rafts of logs in the export market rather than in the domestic BC market".[174]   Various witness statements by Messrs. Schaaf, Stutesman, Kurucz, and Ringma, all noted above, addressed issues associated with export premiums.

249.   The Investor then applied notional export premiums to past actual sales and to the estimated sales through 2016, the last year of its operations.   Estimates of future losses were based on the same types of losses the Investor had historically incurred.[175]   The Investor also claims for additional costs of compliance with the regulatory regime in connection with incremental timber management costs, towing and storage costs, boom materials, inventory holding costs, scaling costs, sales commissions, fee-in-lieu payments and staffing costs.

250.   Losses in connection with the breach of Article 1102 were claimed to amount to CND$ 16,804,068.   The same amount was claimed, in the alternative, for the breach of Article 1105.   In addition, or in the alternative, losses said to be due

---

[173] Investor's Expert Witness Report of Mr. Robert Low, December 14, 2008.
[174] Investor's Reply, at para. 279.
[175] Losses for 2008 and 2009 were excluded because of the impact of current extreme market conditions; for this reason, the last two years premiums were based on the premiums realized in 2008.

for the breach of Article 1106 were estimated at CND$ 16,756,272, and those due for the breach of Article 1110 at CND$ 18,682,368.

### 2.8.2 Canada's Opposition to the Claim for Damages

251.    In support of its opposition to the Investor's claim for damages, Canada filed Supplemental Expert Affidavits from Messrs. Jendro[176] and Reishaus[177] and a Supplemental Report from Mr. Bowie.[178] Canada contends that the Investor has not proved how any specific loss flows from and was caused by any of the specific measures alleged to constitute a breach of its NAFTA obligation and that the Investor relied on only one measure of loss regardless of which element of the Regime might be in breach of NAFTA.   The Investor has thus failed to establish causation as required under Article 1116(2).

252.    Canada also says that a "but for" assumption, based on the Investor operating outside of the regime while all other log exporters in British Columbia are subject to its measures, is unrealistic.   Indeed, the only realistic "but for" scenario would see every log exporter operating outside the regime with the Investor facing increased competition in international markets.

253.    Canada also objects to the concept of an export premium which is based on sales prices allegedly achieved by other Merrill & Ring operations, which are located principally in the United States and which were not subject to the Canadian regime.   It pointed out that, in a number of instances, the "best market" price used to calculate the export premium was actually achieved on sales of logs exported from Canada that had been subject to the regime.   Thus, rather than damaging the Investor, the regime appeared in those cases to have benefitted it,

---

[176] Canada's Supplemental Expert Affidavit of Mr. David Jendro, March 16, 2009.
[177] Canada's Supplemental Expert Affidavit of Mr. David Reishus, March 19, 2009.
[178] Canada's Supplemental Report of Mr. Michael D. Bowie, March 25, 2009.

an aspect that had been ignored in the Investor's argument.  Canada also asserts that the Investor's "best market" price did not compare like sales, but was simply based on the highest price achieved for a given sort and time period not considering the many differences that influence the price and value.

254.    Having regard to these criticisms of the Investor's methodology, Canada asserts that its claim for future losses is entirely speculative and lacks a sufficient degree of certainty.  In any event, no causal connection has been established between the regime and the alleged loss for export premiums.

255.    Finally, Canada contested the reliability of the Investor's calculation of costs of compliance, arguing that most of the costs claimed appear to be normal costs associated with the day-to-day operations of the Investor and that no  causal link had been established with specific breaches.

### 2.8.3  *The Tribunal's* Findings on the Claim for Damages

256.    Having concluded that the Investor has failed to make a case for breach of NAFTA Articles 1102, 1106 and 1110, its only possible claim for damages concerns the alleged breach of Article 1105.  This claim, in the amount of CND\$ 16,804,068, is considered next.

257.    The Tribunal has discussed above, in connection with both expropriation and fair and equitable treatment, the specific nature of the interest for which the Investor is claiming protection and particularly whether, in the absence of affected contractual rights, it is possible to identify an intangible interest which could be affected by the measures complained of.  This question goes to the heart of the Investor's claim for damages.  If, for example, a contract for the export of logs had been executed but its performance had been affected by the regulatory measures, by requiring, for example, that a preference to local

producers be observed, as a result of which the Investor obtained a lower price for the logs concerned, that contract would have been the intangible interest to be protected and the difference in price could have offered an objective measure of the damages suffered.

258. But this, as has been explained, is not the case.  No such contracts exist and the expectation that they could have been available in the near future is an uncertain fact, not supported by the evidentiary record submitted to the Tribunal.  Such an uncertain expectation, like the goodwill considered in *Oscar Chinn*, does not appear to provide a solid enough ground on which to construct a legitimately affected interest.  Nor does the Investor's general business outlook, while a perfectly legitimate and valid concern, constitute such an interest for the purpose of calculating damages.

259. Another difficulty with the Investor's damages claim arises from its choice of its Harvest Plan as the basis for estimating its damages.  In this regard, we find Canada's criticism of the Harvest Plan, which was based on information supplied by Merrill & Ring, to be valid.  Neither the Ruffle Report, which simply re-evaluated the information supplied by the Investor and the ensuing adjustments introduced, appears to contribute an independent source of evaluation.  Without for a moment questioning the professional competence of those intervening at one stage or another, the fact is that objectivity and impartiality might be compromised in such studies.

260. The Tribunal is also troubled by the use of the "but for" scenario to quantify the Investor's alleged losses.  Here again, Canada's criticism is persuasive.  Either all log exporters from British Columbia are outside the regulatory regime or they are all in.  One cannot selectively place different exporters in different categories

of the scenario.   If the "but for" places all exporters outside the regime, competition in foreign markets will inevitably increase and prices will be likely to be influenced.   The same is true of the competitive prices that would have to be offered by local producers so as to ensure the appropriate supply.   In these circumstances, the "export premium", which the Investor used as a basis for its calculations, may or may not have been available.

261.   More difficult still is the identification of the appropriate benchmarks to be used to estimate the prices for the logs in exports markets and the prices that would have been obtained in the local market.   While, in principle, past prices can offer such a benchmark, the main question will be how does one compare, and adjust for, different volumes and qualities of the logs sold in one market or another, an exercise that would seem almost impossible in view of the fact that these factors rarely coincide.   Technical issues have been discussed by the parties in this context showing how complex any comparison might be.   Also, the fact that the Investor has chosen the prices it obtained for certain exports from its operations in the United States as the appropriate benchmark does not make it any easier to establish a comparison with the situation that might have characterized its operations in British Columbia.   Canada points out that the use of that benchmark ignores sales in which the "best market price" was obtained by the Investor from operations in British Columbia which were subject to the regulatory regime, casts another element of doubt on how to identify the benchmark and draw the appropriate comparison.

262.   In light of the above considerations, the Tribunal cannot conclude with any certainty that the Investor would have achieved any "export premiums" for past operations.   Accordingly, such a methodology does not support the Investor's

claim for past damages.  In any event, the "past" in this case is rather limited in view of the time limits governing NAFTA claims.  This element, coupled with the uncertainty as to the intangible interest to be protected, necessarily leads to a conclusion that does not allow for damages.

263.   The situation concerning future losses is not any more certain.  The problems noted in respect of past losses means that the Investor's claimed past loss figure cannot simply be extended into the future.  Even if the Investor's past loss figures were accurate, there is no way of knowing whether the situation in the future will be identical or altogether different.  Indeed, the fact that for the 2008-2009 period of economic crisis a different basis for estimating damages had to be used, in order to accommodate the collapse of the construction industry and the consequential demand for logs in world markets, evidences how difficult it is to make any realistic projections in this matter.  What the future of such markets might be until 2016 is entirely speculative.

264.   Of course, there is always some element of uncertainty involved in future scenarios, and even in often used valuation methods, such as the discounted cash flow, future estimates are based on assumptions.  But these are inevitably drawn from specific information provided by a historical record of profitability, or other elements that allow for an educated estimate.  In the instant case, such an educated estimate is not possible because the record of profitability on the Investor's British Columbia operations has been inextricably and permanently related to the existence and application of the regulatory regime.  There is thus no measure of profitability relating to the period before the measures were adopted.   However, in these circumstances, the future scenario will be characterized more by speculation than by educated estimates, an approach

which has not been favored by arbitration tribunals,[179] and upon which this Tribunal would not be prepared to base an award of damages.

265.   A third type of damage that the Investor claims for is the cost of compliance with the regime.  The Tribunal is in no doubt that there has indeed been a cost of compliance - this is the case with every regulatory regime.  However, this cost is no different from that which every entity subject to the regime must pay and does not appear to be out of the ordinary in such a context.  Compensation for such costs, particularly in the absence of a finding of specific, past or future, damages is not possible.

### 2.8.4   Conclusion in Respect of Damages and Liability Concerning Fair and Equitable Treatment

266.   As explained above, the Tribunal has considered two scenarios in respect of possible liability for breach of the fair and equitable treatment standard: one with a low threshold favored by the Investor and the other with a high threshold favored by Canada.  While the Tribunal held different views in respect of both the applicable threshold and possible breach thereof, when it examined the question of damages, the Tribunal has had no such difference of views.  Even if the scenario most favorable to the Investor were to be adopted, and breach of the Article 1105(1) obligation assumed, damages have not been proven to the satisfaction of the Tribunal.  In these circumstances, the Tribunal both dismisses the Investor's claim for damages and concludes that Canada has not been shown to have breached Article 1105(1) since one and the other are inextricably related and, as previously noted, an international wrongful act will only be committed in

---

[179] Canada's Rejoinder, para. 363 (*citing LG&E Energy Corp.* et al. *v. Argentine Republic* (ICSID Case No. ARB/02/1), Award, Jul. 2007.  *See* also *PSEG Global Inc et al. v. Republic of Turkey* (ICSID Case No. ARB/02/5), Award, Jan. 2007, paras. 312-313.

international investment law if there is an act in breach of an international legal obligation, attributable to the Respondent that also results in damages.

## 2.9   THE TIME BAR PROVISION OF NAFTA ARTICLE 1116(2)

267.   The parties have also extensively discussed the meaning and extent of NAFTA Article 1116(2) in so far as it establishes the critical date for the applicable three year time limitation period which is to be applied to Chapter 11 claims, that is the date on which the Investor "first acquired, or should have first acquired, knowledge of the alleged breach and knowledge that the Investor has incurred loss or damage".   Expert opinions were submitted from Professor Michael Reisman[180] and Robert Howse[181] in support of the parties' respective arguments on the matter, and the pertinent NAFTA decisions and awards were competently discussed.[182] Submissions under Article 1128 were also made on this matter by Mexico and the United States.[183]

268.   As noted above in the procedural section of this Award, the Tribunal decided at the outset of the proceedings to join its consideration of this issue to the merits, since the three-year time limitation period would have to be examined in light of the specific breaches that might have been found to exist and also in light of the relationship of such breaches to the date on which the Investor first acquired knowledge of it having incurred loss or damage.   The inextricable relationship between breach and damages is emphasized again in this context as the guiding criteria to establish liability and compensation.

---

[180] Canada's Affidavit of Professor W. Michael Reisman, April 22, 2008; Supplemental Expert Opinion of Professor W. Michael Reisman, February 9, 2009.
[181] Investor's Expert Opinion of Professor Robert Howse, December 14, 2008.
[182] *Feldman v. United Mexican States*, Interim Decision on Preliminary Jurisdictional Issues, Dec. 2000; Feldman Award; *Grand River Enterprises Six Nations Ltd. v. United States of America*, Decision on Objections to Jurisdiction, Jul. 2006; Mondev Award; UPS Award.
[183] Submission of the United States of America pursuant to NAFTA Article 1128, July 14, 2008; Submission of the United Mexican States pursuant to NAFTA Article 1128, April 2, 2009.

269.    Having now concluded that even if liability were established under either of the scenarios considered by the Tribunal, and that any such breach did not give raise to demonstrable damages, the Tribunal believes it to be unnecessary to consider the question of the time limitation period.  Indeed, the time the measures were adopted or applied, or whether such measures might be considered of a continuing character, becomes irrelevant in the absence of proven breach and liability for damages.

## III.   COSTS

270.    The parties have duly submitted their respective claims for costs.  The Tribunal is of the view that the Investor had in some respects plausible arguments and indeed raised question of particular interest for the Tribunal to consider both under NAFTA and international law.  Professional competence characterized the submissions, allegations and arguments of both parties at all times.

271.    Because of this, the Tribunal concludes that each party should bear equally the costs of the arbitration and that each shall pay for its own costs.  For the purposes of UNCITRAL rules, it is noted that the total costs of the arbitration, including administration fees and expenses and the expenses and fees of the Tribunal amount to US$ 959,500.[184]

---

[184] The total costs of the proceeding (US$ 959,500) provided by ICSID include an estimate of the courier services expenses for sending the certified copies of the Award as well as estimates for the printing and binding costs of the Award.  Therefore, the total amount of the actual final costs will likely be subject to a slight variation.  A financial statement will be provided by ICSID when the account for this case is financially closed.

# IV.   OPERATIVE PART

In the light of the above considerations the Tribunal ORDERS and AWARDS as follows:

1.  The claim is dismissed.

2.  The parties shall bear the costs of the Arbitration in equal shares and any remaining balance will be refunded to the parties equally by the administering institution.

3.  Pursuant to Article 40(3) of the UNCITRAL Arbitration Rules, the Tribunal fixes the following amounts as costs of the arbitration:

    Administering institution charges and expenses: US$ 138,595.25

    Tribunal's fees and expenses: US$ 820,904.75

        Professor Orrego Vicuña's fees: US$ 365,200.00

        Professor Dam's fees: US$ 169,675.00

        Mr. Rowley's fees: US$ 235,895.00

        Tribunal's expenses: US$ 50,134.75

    Total costs of the arbitration: US$ 959,500.00

Place of Arbitration: Washington D. C., United States of America.

Date of the Award: March 31, 2010.

Prof. Kenneth W. Dam
Arbitrator

J. William Rowley QC
Arbitrator

Prof. Francisco Orrego Vicuña
President