# EXHIBIT 9

IN THE ARBITRATION UNDER CHAPTER ELEVEN OF THE
NORTH AMERICAN FREE TRADE AGREEMENT
AND THE ICSID ADDITIONAL FACILITY RULES BETWEEN

LION MEXICO CONSOLIDATED L.P.

*Claimant*

-and-

UNITED MEXICAN STATES,

*Respondent.*

ICSID CASE NO. ARB(AF)/15/2

---

## SUBMISSION OF THE UNITED STATES OF AMERICA

---

1.      Pursuant to Article 1128 of the North American Free Trade Agreement (NAFTA), the United States of America makes this submission on questions of interpretation of the NAFTA. The United States does not take a position, in this submission, on how the interpretation offered below applies to the facts of this case, and no inference should be drawn from the absence of comment on any issue not addressed below.

**Article 1105 (Minimum Standard of Treatment)**

2.      Article 1105 is titled "Minimum Standard of Treatment."  Article 1105(1) requires each Party to "accord to investments of investors of another Party treatment in accordance with international law, including fair and equitable treatment and full protection and security."

3.      On July 31, 2001, the Free Trade Commission ("Commission"), comprising the NAFTA Parties' cabinet-level representatives, issued an interpretation reaffirming that "Article 1105(1) prescribes the customary international law minimum standard of treatment of aliens as the minimum standard of treatment to be afforded to investments of investors of another Party."[1] The Commission clarified that the concepts of "fair and equitable treatment" and "full protection and security" do "not require treatment in addition to or beyond that which is required by the customary international law minimum standard of treatment of aliens."[2]  The Commission also

---

[1] NAFTA Free Trade Commission, Notes of Interpretation of Certain Chapter 11 Provisions ¶ B.1 (July 31, 2001) ("FTC Interpretation").

[2] *Id.* ¶ B.2.

1

confirmed that "a breach of another provision of the NAFTA, or of a separate international agreement, does not establish that there has been a breach of Article 1105(1)."[3] The Commission's interpretation "shall be binding" on tribunals established under Chapter Eleven.[4]

4.  The Commission's interpretation thus confirms the NAFTA Parties' express intent to establish the customary international law minimum standard of treatment as the applicable standard in NAFTA Article 1105. The minimum standard of treatment is an umbrella concept reflecting a set of rules that, over time, has crystallized into customary international law in specific contexts.[5] The standard establishes a minimum "floor below which treatment of foreign investors must not fall."[6]

5.  Currently, customary international law has crystallized to establish a minimum standard of treatment in only a few areas. One such area, which is expressly addressed in Article 1105(1), concerns the obligation to provide "fair and equitable treatment." The "fair and equitable treatment" obligation includes, for example, the obligation not to deny justice in criminal, civil or administrative adjudicatory proceedings. Other such areas concern the obligation to provide "full protection and security," which is also expressly addressed in Article 1105(1), and the obligation not to expropriate covered investments, except under the conditions specified in Article 1110. The customary international law obligations not to deny justice and to provide full protection and security are further elaborated immediately below, whereas the obligation concerning expropriation is discussed under the Article 1110 heading.

Claims for Judicial Measures

6.  Denial of justice in its historical and "customary sense" denotes "misconduct or inaction of the judicial branch of the government" and involves "some violation of rights in the administration of justice, or a wrong perpetrated by the abuse of judicial process."[7] Aliens have no cause for complaint at international law about a domestic system of law provided that it

---

[3] *Id.* ¶ B.3.

[4] North American Free Trade Agreement, U.S.-Can.-Mex., Dec. 17, 1992, 32 I.L.M. 289, art. 1131(2) (1993).

[5] A fuller description of the U.S. position is set out in *Methanex Corp. v. United States,* NAFTA/UNCITRAL, Memorial on Jurisdiction and Admissibility of Respondent United States of America (Nov. 13, 2000); *ADF Group Inc. v. United States of America*, NAFTA/ICSID Case No. ARB(AF)/00/1, Post-Hearing Submission of Respondent United States of America on Article 1105(1) and *Pope & Talbot* (June 27, 2002); *Glamis Gold Ltd. v. United States of America*, NAFTA/UNCITRAL, Counter-Memorial of Respondent United States of America (Sept. 19, 2006); *Grand River Enterprises Six Nations, Ltd., et al. v. United States of America*, NAFTA/UNCITRAL, Counter-Memorial of Respondent United States of America (Dec. 22, 2008).

[6] *S.D. Myers, Inc. v. Government of Canada,* NAFTA/UNCITRAL, First Partial Award ¶ 259 (Nov. 13, 2000); *Glamis Gold Ltd. v. United States of America,* NAFTA/UNCITRAL, Award ¶ 615 (June 8, 2009) ("*Glamis,* Award") ("The customary international law minimum standard of treatment is just that, a minimum standard. It is meant to serve as a floor, an absolute bottom, below which conduct is not accepted by the international community."); *see also* Edwin Borchard, *The "Minimum Standard" of the Treatment of Aliens*, 33 AM. SOC'Y OF INT'L L. PROC. 51, 58 (1939) ("Borchard, 33 AM. SOC'Y OF INT'L L. PROC.").

[7] EDWIN M. BORCHARD, THE DIPLOMATIC PROTECTION OF CITIZENS ABROAD OR THE LAW OF INTERNATIONAL CLAIMS 330 (1919) ("BORCHARD"); J.L.BRIERLY, THE LAW OF NATIONS 278 (Sir Humphrey Waldock ed., 6th ed. 286-87, 1963) (defining a denial of justice as "an injury involving the responsibility of the state committed by a court of justice").

conforms to "a reasonable standard of civilized justice" and is fairly administered.[8] "Civilized justice" has been described as requiring "[f]air courts, readily open to aliens, administering justice honestly, impartially, [and] without bias or political control[.]"[9]

7.      A denial of justice may occur in instances such as when the final act of a State's judiciary constitutes a "notoriously unjust"[10] or "egregious"[11] administration of justice "which offends a sense of judicial propriety."[12]  More specifically, a denial of justice exists where there is, for example, an "obstruction of access to courts," "failure to provide those guarantees which are generally considered indispensable to the proper administration of justice, or a manifestly unjust judgment."[13]  Instances of denial of justice also have included corruption in judicial proceedings, discrimination or ill-will against aliens, and executive or legislative interference with the freedom of impartiality of the judicial process.[14]  At the same time, erroneous domestic court decisions, or misapplications or misinterpretation of domestic law, do not in themselves constitute a denial of justice under customary international law.[15]

---

[8] BORCHARD at 198 ("Provided the system of law conforms with a reasonable standard of civilized justice and provided that it is fairly administered, aliens have no cause for complaint in the absence of an actual denial of justice.") (footnote omitted).

[9] Borchard, 33 AM. SOC'Y OF INT'L L. PROC. at 63.

[10] JAN PAULSSON, DENIAL OF JUSTICE IN INTERNATIONAL LAW 44 (2005) ("PAULSSON") (citing J. Irizarry y Puente, *The Concept of "Denial of Justice" in Latin America*, 43 MICH. L. REV. 383, 406 (1944)); *Chattin Case (United States v. Mexico)*, 4 R.I.A.A. 282, 286-87 (1927), *reprinted in* 22 AM. J. INT'L L. 667, 672 (1928) ("Acts of the judiciary . . . are not considered insufficient unless the wrong committed amounts to an outrage, bad faith, wilful neglect of duty, or insufficiency of action apparent to any unbiased man.") (emphasis omitted).

[11] PAULSSON at 60 ("The modern consensus is clear to the effect that the factual circumstances must be egregious if state responsibility is to arise on the grounds of denial of justice.").

[12] *Loewen Group, Inc. and Raymond L. Loewen v. United States of America*, NAFTA/ICSID Case No. ARB(AF)/98/3, Award ¶ 132 (June 26, 2003) ("*Loewen* Award") (a denial of justice may arise where there has occurred a "[m]anifest injustice in the sense of a lack of due process leading to an outcome which offends a sense of judicial propriety"); *Mondev Int'l Ltd. v. United States of America*, NAFTA/ICSID Case No. ARB(AF)/99/2, Award ¶ 127 (Oct. 11, 2002) (finding that the test for a denial of justice was "not whether a particular result is surprising, but whether the shock or surprise occasioned to an impartial tribunal leads, on reflection, to justified concerns as to the judicial propriety of the outcome[.]"); *see also Barcelona Traction, Light and Power Co., Ltd. (Belgium v. Spain)*, 1970 I.C.J. 3 (Feb. 5) Separate Opinion of Judge Tanaka, at 144 ("Separate Opinion of Judge Tanaka") (explaining that "denial of justice occurs in the case of such acts as- 'corruption, threats, unwarrantable delay, flagrant abuse of judicial procedure, a judgment dictated by the executive, or so manifestly unjust that no court which was both competent and honest could have given it, . . . But no merely erroneous or even unjust judgment of a court will constitute a denial of justice'") (citations omitted).

[13] Harvard Research Draft, The Law of Responsibility of States for Damage Done in Their Territory to the Person or Property of Foreigners, art. 9, 23 AM. J. INT'L L. SP. SUPP. 131, 134 (1929).  The commentary notes that a "manifestly unjust judgment" is one that is a "travesty upon justice or grotesquely unjust." *Id*. at 178.

[14] *Id*. at 175.

[15] *Id*. at 134 ("An error of a national court which does not produce manifest injustice is not a denial of justice."); PAULSSON at 81 ("The erroneous application of national law cannot, in itself, be an international denial of justice."); PATRICK DUMBERRY, THE FAIR AND EQUITABLE TREATMENT STANDARD: A GUIDE TO NAFTA CASE LAW ON ARTICLE 1105 at 228 (2013) (noting that a simple error, misinterpretation or misapplication of domestic law is not per se a denial of justice) (internal quotes omitted); BORCHARD at 196 (explaining that a government is not responsible for the mistakes or errors of its courts and that: "[A]s a general rule the state is not liable for the acts of its judicial authorities unless there has been some flagrant or notorious injustice or denial of justice sanctioned by the court of last resort."); Christopher Greenwood, *State Responsibility for the Decisions of National Courts*, in

8.      The high threshold required for judicial measures to rise to the level of a denial of justice in customary international law gives due regard to the principle of judicial independence,[16] the particular nature of judicial action,[17] and the unique status of the judiciary in both international and municipal legal systems.  As a result, the actions of domestic courts are accorded a greater presumption of regularity under international law than are legislative or administrative acts.[18] Indeed, as a matter of customary international law, international tribunals will defer to domestic courts interpreting matters of domestic law unless there is a denial of justice.[19]

---

ISSUES OF STATE RESPONSIBILITY BEFORE INTERNATIONAL JUDICIAL INSTITUTIONS 61 (Malgosia Fitzmaurice & Dan Sarooshi eds., 2004) ("[I]t is well established that a mistake on the part of the court or an irregularity in procedure is not in itself sufficient to amount to a violation of international law; there must be a denial of justice.").

[16] *See, e.g.*, Separate Opinion of Judge Tanaka at 154 ("One of the most important political and legal characteristics of a modern State is the principle of judicial independence.").  Judge Tanaka went on to explain that "[t]he independence of the judiciary, therefore, despite the existence of differences in degree between various legal systems, may be considered as a universally recognized principle in most of the municipal and international legal systems of the world. It may be admitted to be a 'general principle of law recognized by civilized nations' (Article 38, paragraph 1(c), of the Statute)."

[17] *See, e.g.*, Zachary Douglas, *International Responsibility for Domestic Adjudication: Denial of Justice Deconstructed*, 63(3) INT'L. & COMP. L.Q. 10-11 (2014) ("Douglas") (explaining that the "rationality inherent in decision-making through adjudication, coupled with the opportunity afforded to affected parties to present reasoned arguments during the course of that decision-making process, . . . sets adjudication apart from other institutions of social ordering within the State," and that an authoritative decision by a domestic adjudicative body "cannot be disturbed by an international court or tribunal simply on the basis that a more rational set of reasons was available to that . . . body. . . . International law is deferential to the particular virtues of adjudication by respecting the integrity of the process and the outcomes it produces.") (footnotes omitted).

[18] BORCHARD at 195-96 (because "[i]n well-regulated states, the courts are more independent of executive control than any other authorities . . . [,] the state is not liable for the acts of its judicial authorities unless there has been some flagrant or notorious injustice or denial of justice sanctioned by the court of last resort."); ALWYN V. FREEMAN, INTERNATIONAL RESPONSIBILITY OF STATES FOR DENIAL OF JUSTICE 33 (1938) ("[T]he question of proof of illegal action will be more difficult [with respect to judicial action] than is the case with other organs of the State.").  *See also Loewen Group, Inc. and Raymond L. Loewen v. United States of America,* NAFTA/ICSID Case No. ARB(AF)/98/3, Response of the United States of America to the Submissions of Claimants Concerning Matters of Jurisdiction and Competence, at 9 (July 7, 2000) ("Given the unique status of the judiciary in both international and municipal legal systems, the actions of domestic courts are accorded a far greater presumption of regularity under international law than are legislative or administrative acts.").  The United States distinguishes between judicial action and other forms of government action as a matter of domestic law.  For example, the U.S. Supreme Court has long recognized liability for legislative and regulatory actions that violate the economic protections of the U.S. Constitution, but has never recognized liability for judicial action under those same provisions.  *See, e.g.*, Jill E. Fisch, *Retroactivity and Legal Change: An Equilibrium Approach*, 110 HARV. L. REV. 1055, 1075 n.121 (1997); Barton H. Thompson, Jr., *Judicial Takings*, 76 VA. L. REV. 1449, 1453 (1990) (observing with disapproval that "[t]he few scholars to have seriously addressed the issue have generally argued that it would be catastrophic to subject the courts to the same constitutional constraints as the legislative and executive branches . . . .").  The status of U.S. law has not changed.  *See Stop the Beach Renourishment, Inc. v. Florida Dep't of Envtl. Prot. et al.*, 560 U.S. 702 (2010); *Shinnecock Indian Nation v. United States*, 112 Fed. Cl. 369, 385 (2013) ("a theory of judicial takings . . . has not been adopted in the federal courts.").

[19] *Robert Azinian, et al. v. United Mexican States*, ICSID Case No. ARB(AF)/97/2, Award ¶ 87 (Nov. 1, 1999) ("The possibility of holding a State internationally liable for judicial decisions does not, however, entitle a claimant to seek international review of the national court decisions as though the international jurisdiction seised has plenary appellate jurisdiction.  This is not true generally, and it is not true for NAFTA.  What must be shown is that the court decision itself constitutes a violation of the treaty.  Even if the Claimants were to convince this Arbitral Tribunal that the Mexican courts were wrong with respect to the invalidity of the Concession Contract, this would not per se be conclusive as to a violation of NAFTA. More is required; the Claimants must show either a denial of justice, or a

9.      In this connection, it is well-established that international tribunals such as NAFTA Chapter Eleven tribunals are not empowered to be supranational courts of appeal on a court's application of domestic law.[20]  Thus, an investor's claim challenging judicial measures under Article 1105(1) is limited to a claim for denial of justice under the customary international law minimum standard of treatment.  *A fortiori*, domestic courts performing their ordinary function in the application of domestic law as neutral arbiters of the legal rights of litigants before them are not subject to review by international tribunals absent a denial of justice under customary international law.

   *Treatment Must Be Accorded to the Investment*

10.     As noted above, Article 1105(1) requires each Party to "accord to investments of investors of another Party *treatment* in accordance with international law, including fair and equitable treatment and full protection and security." (Emphasis added).  Article 1105(1) differs from other substantive obligations, such as those in Articles 1102, 1103 and the second paragraph of Article 1105, in that it obligates a Party to accord treatment only to an "*investment.*"[21]  In the context of a claim for denial of justice under Article 1105(1), a claimant (*i.e.*, an investor) must therefore establish that the treatment accorded to its investment rose to the level of a denial of justice under customary international law.

---

pretence of form to achieve an internationally unlawful end."); *Mohammad Ammar Al Bahloul v. Republic of Tajikistan*, SCC Case No. V(064/2008), Partial Award on Jurisdiction and Liability ¶ 237 (Sept. 2, 2009) ("[I]t is not the role of this Tribunal to sit as an appellate court on questions of Tajik law. Suffice it to say, we do not find the Tajik court's application of Tajik law on this issue to be malicious or clearly wrong, and therefore find no basis for Claimant's claim of denial of justice.").  *See also* PAULSSON at 82.

[20] *See Apotex Inc. v. United States of America*, NAFTA/UNCITRAL, Award ¶ 278 (June 14, 2013) ("*Apotex, Award*") ("[I]t is not the proper role of an international tribunal established under NAFTA Chapter Eleven to substitute itself for the U.S. Supreme Court, or to act as a supranational appellate court."); *Waste Management Inc. v. United Mexican States*, NAFTA/ICSID Case No. ARB(AF)/00/3, Final Award ¶ 129 (Apr. 30, 2004) ("[T]he Tribunal would observe that it is not a further court of appeal, nor is Chapter 11 of NAFTA a novel form of amparo in respect of the decisions of the federal courts of NAFTA parties."); Separate Opinion of Judge Tanaka at 158 (explaining that erroneous decisions of municipal law cannot constitute a denial of justice because the interpretation of municipal law "does not belong to the realm of international law.  If an international tribunal were to take up these issues and examine the regularity of the decisions of municipal courts, the international tribunal would turn out to be a '*cour de cassation*', the highest court in the municipal law system.  An international tribunal . . . belongs to quite a different order; it is called upon to deal with international affairs, not municipal affairs.").

[21] Emphasis added.  Commentators with respect to this provision agree that the obligation to accord the minimum standard of treatment under Article 1105(1) applies only to investments.  *See, e.g.*, Meg N. Kinnear et al., *Article 1105 – Minimum Standard of Treatment, in* INVESTMENT DISPUTES UNDER NAFTA, AN ANNOTATED GUIDE TO CHAPTER 11, at 1105-17 (2008 Supp.) ("Several aspects of this are notable. First, the subject of this protection is investments rather than investors. The first paragraph of Article 1105 is limited to treatment of investments, unlike the second paragraph of Article 1105, and indeed other provisions such as Article 1102 and 1103, which refer to treatment accorded to both investments and investors.  This limitation was present even in the earliest drafts of what became Article 1105(1).").

5

*Requirement of Judicial Finality*

11.     It is well-established that the international responsibility of States may not be invoked with respect to non-final judicial acts,[22] unless recourse to further domestic remedies is obviously futile or manifestly ineffective.

12.     In this connection, while it is not controversial that acts of State organs, including acts of State judiciaries, are attributable to the State,[23] there will be a breach of Article 1105(1) based on judicial acts (*e.g.*, a denial of justice) only if the justice system *as a whole* (*i.e.*, until there has been a decision of the court of last resort available) produces a denial of justice.[24] As the United States has elsewhere explained, while:

> [t]he lower court decision, in and of itself, may be attributable to the State pursuant to article 4 [of the ILC Draft]; whether it constitutes, in and of itself, an internationally wrongful act is a separate question, as recognized in article 2. Except in extraordinary circumstances, there is no question of breach of an international obligation until the lower court decision becomes the final expression of the court system as a whole, *i.e.*, until there has been a decision of the court of last resort available in the case.[25]

As Judge Aréchaga, former President of the International Court of Justice, likewise observed, States are internationally liable only for judicial decisions of "a Court of last resort, all remedies

---

[22] *Apotex,* Award ¶ 282 ("[A] claimant cannot raise a claim that a judicial act constitutes a breach of international law, without first proceeding through the judicial system that it purports to challenge, and thereby allowing the system an opportunity to correct itself."); PAULSSON at 108 ("For a foreigner's international grievance to proceed as a claim of denial of justice, the national system must have been tested. Its perceived failings cannot constitute an international wrong unless it has been given a chance to correct itself."); Douglas at 28 (explaining that "international responsibility towards foreign nationals for acts and omissions associated with an adjudicative procedure can only arise at the point at which the adjudication has produced its final result; it is only at that point that a constituent element of that responsibility has been satisfied, which is the existence of damage to the foreign national.").

[23] Articles on Responsibility of States for Internationally Wrongful Acts, art. 4(1), U.N. Doc. A/RES/56/83 (2001). ("The conduct of any State organ shall be considered an act of that State under international law, whether the organ exercises legislative, executive, judicial or any other functions, whatever position it holds in the organization of the State, and whatever its character as an organ of the central Government or of a territorial unit of the State.").

[24] *See* Draft Articles on Responsibility of States for Internationally Wrongful Acts (2001) with Commentaries, Commentary to Chapter II, Attribution of Conduct to a State ¶ 4 (noting that the fact that conduct can be attributed to the State "says nothing . . . about the *legality* or otherwise of that conduct") (emphasis added); Special Rapporteur, *Second Report on State Responsibility*, Int'l Law Comm'n., U.N. Doc. A/CN.4/498 (July 19, 1999) (by James Crawford) ¶ 75 (explaining that "[t]here are . . . cases where the obligation is to have a *system* of a certain kind, *e.g.* the obligation to provide a fair and efficient system of justice. There, systematic considerations enter into the question of breach, and an aberrant decision by an official lower in the hierarchy, which is capable of being reconsidered, does not of itself amount to an unlawful act.") (emphasis in original).

[25] Draft Articles on State Responsibility, Comments and Observations Received from Governments, International Law Commission, 53d Sess., U.N. Doc. A/CN.4/515 (2001) at 26 (comments of the United States on Draft Article 15).

available having been exhausted."[26] Thus, decisions of lower courts that may be corrected on appeal, for example, have not produced a denial of justice and cannot be the basis of a NAFTA Chapter Eleven claim.

13.     As such, non-final judicial acts cannot be the basis for claims under Chapter Eleven of the NAFTA, unless recourse to further domestic remedies is obviously futile or manifestly ineffective.  Rather, an act of a domestic court that remains subject to appeal has not ripened into the type of final act that is sufficiently definite to implicate state responsibility, unless such recourse is obviously futile or manifestly ineffective.

14.     International tribunals have found that further remedies were obviously futile where there "was no justice to exhaust."[27]  It is not enough for a claimant to allege the "absence of a reasonable prospect of success or the improbability of success, which are both less strict tests."[28] As the tribunal in *Apotex Inc. v. United States of America* explained: "whether the failure to obtain judicial finality may be excused for 'obvious futility' turns on the unavailability of relief by a higher judicial authority, not on measuring the likelihood that the higher judicial authority would have granted the desired relief."[29]  NAFTA Chapter Eleven tribunals are neither meant to, nor are they well equipped to, determine the likelihood of a successful result in exhausting domestic remedies.

Full Protection and Security

15.     As noted above, in 2001, the Commission issued an interpretation reaffirming that "Article 1105(1) prescribes the customary international law minimum standard of treatment of aliens as the minimum standard of treatment to be afforded to investments of investors of another Party."[30] The Commission clarified that the concepts of "fair and equitable treatment" and "full protection and security" do "not require treatment in addition to or beyond that which is required by the customary international law minimum standard of treatment of aliens."[31]

16.     The United States has long maintained that the customary international law obligation to accord "full protection and security" requires that each Party provide the level of police

---

[26] Jiménez de Aréchaga, *International Law in the Past Third of a Century,* 159 RECUEIL DES COURS 281-82 (1978) (emphasis added) (quoted with approval in the *Loewen* Award ¶ 153); *Norwegian Loans* (*France v. Norway*), 1957, I.C.J. 9, 39 (July 6) (Separate Opinion of Judge Lauterpacht) ("[H]owever contingent and theoretical these remedies may be, an attempt ought to have been made to exhaust them.").

[27] *Robert E. Brown Case (United States v. United Kingdom.)*, 6 R.I.A.A. 120, 129 (Nov. 23, 1923) (excusing claimant's failure to exhaust because there was "no justice to exhaust" where "[a]ll three branches of the Government conspired to ruin [claimant's] enterprise"); *see also Finnish Ships Arbitration (Finland v. United Kingdom)*, 3 R.I.A.A. 1480, 1495, 1503-5 (May 9,1934) (rule excusing failure to appeal where reversal was "hopeless" is "most strictly construed, and if substantial right of appeal existed, failure to prosecute an appeal operated as a bar to relief") (quoting BORCHARD 823).

[28] C.F. AMERASINGHE, LOCAL REMEDIES IN INTERNATIONAL LAW 206 (2nd. ed. 2004); *see also* BORCHARD 824 (explaining that a claimant is not "relieved from exhausting his local remedies by alleging ... a pretended impossibility or uselessness of action before the local courts").

[29] *Apotex,* Award ¶ 276.

[30] FTC Interpretation, ¶ B.1.

[31] *Id.* ¶ B.2.

7

protection required under customary international law.³² Customary international law results from a general and consistent practice of States that they follow from a sense of legal obligation.³³ The burden is on the claimant to establish the existence and applicability of a relevant obligation under customary international law that meets the requirements of State practice and *opinio juris*.³⁴ In this connection, while arbitral decisions are not in and of themselves evidence of State practice,³⁵ the vast majority of cases in which the customary international law obligation of full protection and security was found to have been breached are those in which a State failed to provide reasonable police protection against acts of a criminal nature that physically invaded the person or property of an alien.³⁶

---

³² *See, e.g.*, U.S. 2004 and 2012 Model Bilateral Investment Treaties, Art. 5 (Minimum Standard of Treatment), paragraph 2: "For greater certainty, paragraph 1 prescribes the customary international law minimum standard of treatment of aliens as the minimum standard of treatment to be afforded to covered investments. The concepts of "fair and equitable treatment" and "full protection and security" do not require treatment in addition to or beyond that which is required by that standard, and do not create additional substantive rights. The obligation in paragraph 1 to provide: . . . (b) "full protection and security" requires each Party to provide the level of police protection required under customary international law."

³³ This two-element approach – State practice and *opinio juris* – is "widely endorsed in the literature" and "generally adopted in the practice of States and the decisions of international courts and tribunals, including the International Court of Justice." *See Jurisdictional Immunities of the State (Germany v. Italy: Greece intervening)*, 2012 I.C.J. 99, 122 (Feb. 3) ("In particular . . . the existence of a rule of customary international law requires that there be 'a settled practice' together with *opinio juris*.") (citing *North Sea Continental Shelf (Federal Republic of Germany/Denmark; Federal Republic of Germany/Netherlands)*, 1969 I.C.J. 44, ¶ 77 (Feb. 20); *Continental Shelf (Libyan Arab Jamahiriya/Malta)*, 1985 I.C.J. 13, 29-30 (June 3) ("It is of course axiomatic that the material of customary international law is to be looked for primarily in the actual practice and *opinio juris* of States[.]").

³⁴ *Asylum (Colombia v. Peru)*, 1950 I.C.J. 266, 276 (Nov. 20); *see also North Sea Continental Shelf* at 43; *Glamis* Award ¶¶ 601-02 (noting that the claimant bears the burden of establishing a change in customary international law, by showing "(1) a concordant practice of a number of States acquiesced in by others, and (2) a conception that the practice is required by or consistent with the prevailing law (*opinio juris*)") (citations and international quotation marks omitted).

³⁵ Decisions of international courts and arbitral tribunals interpreting "fair and equitable treatment" as a concept of customary international law are not themselves instances of "State practice" for purposes of evidencing customary international law, although such decisions may be relevant for determining State practice when they include an examination of such practice. *See, e.g.*, *Glamis* Award ¶ 605 ("Arbitral awards, Respondent rightly notes, do not constitute State practice and thus cannot create or prove customary international law. They can, however, serve as illustrations of customary international law if they involve an examination of customary international law, as opposed to a treaty-based, or autonomous, interpretation.") (footnote omitted); *see also* M. H. Mendelson, *The Formation of Customary International Law*, 272 RECUEIL DES COURS 155, 202 (1998) (noting that while such decisions may contribute to the formation of customary international law, they are not appropriately considered as evidence of "State practice").

³⁶ *See, e.g.*, *American Mfg. & Trading, Inc. v. Zaire,* 36 I.L.M. 1531 (1997) (failure to prevent destruction and looting of property constituted violation of protection and security obligation); *Asian Agric. Products Ltd. v. Sri Lanka,* 30 I.L.M. 577 (1991) (destruction of claimant's property violated full protection and security obligation); *United States Diplomatic and Consular Staff in Tehran (United States v. Iran)*, 1980 I.C.J. 3 (May 24) (failure to protect foreign nationals from being taken hostage violated most constant protection and security obligation); *Chapman v. United Mexican States (United States v. Mexico)*, 4 R.I.A.A. (Mex.-U.S. Gen. Cl. Comm'n 1930) (lack of protection found where claimant was shot and seriously wounded); *H.G. Venable (U.S. v. Mex.)*, 4 R.I.A.A. 219 (Mex.-U.S. Gen. Cl. Comm'n 1927) (bankruptcy court indirectly responsible for physical damage to attached property); *Biens Britanniques au Maroc Espagnol (Reclamation 53 de Melilla - Ziat, Ben Kiran) (Spain v. Great Britain)*, 2 R.I.A.A. 729 (1925) (reasonable police protection would not have prevented mob from destroying claimant's store). Other cases are in accord. *See, e.g., Crystallex International Corporation v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/11/2, Award ¶ 632 (Apr. 4, 2016) (holding that the "full protection and

17. The United States has consistently maintained, moreover, that the Article 1105(1) obligation to provide "full protection and security" does not, for example, require States to prevent economic injury inflicted by third parties,[37] nor does it require States to guarantee that aliens or their investments are not harmed under any circumstances. Such interpretations would impermissibly extend the duty to provide "full protection and security" beyond the minimum standard under customary international law.

**Article 1110 (Expropriation and Compensation)**

18. Article 1110(1) provides that no NAFTA Party may expropriate or nationalize an investment of an investor of another NAFTA Party (directly or indirectly) except for a public purpose; in a non-discriminatory manner; in accordance with due process of law; and on payment of compensation in accordance with paragraphs 2 through 6 of Article 1110. The obligation not to expropriate except as set forth in Article 1110(1) reflects customary international law and forms part of the customary international law minimum standard of treatment.

19. Judicial measures may give rise to a claim for denial of justice under the circumstances described above with respect to Article 1105(1). As previously explained, a denial of justice may exist where there is, for example, an obstruction of access to courts, failure to provide those guarantees which are generally considered indispensable to the proper administration of justice, or a manifestly unjust judgment. Additional instances of denial of justice have included corruption in judicial proceedings and executive or legislative interference with the freedom of impartiality of the judicial process.

20. Decisions of domestic courts acting in the role of neutral and independent arbiters of the legal rights of litigants, however, do not give rise to a claim for expropriation under Article

---

security" treaty standard "only extends to the duty of the host state to grant physical protection and security"); *Suez, Sociedad General de Aguas de Barcelona, S.A. and Vivendi Universal, S.A. v. Argentine Republic,* ICSID Case No. ARB/03/19, Decision on Liability ¶ 173 (June 30, 2010) (holding that "the full protection and security standard primarily seeks to protect investment from physical harm"); *Saluka Investments B.V. v. Czech Republic,* UNCITRAL, Partial Award, ¶ 484 (Mar. 17, 2006) ("[T]he 'full security and protection' clause is not meant to cover just any kind of impairment of an investor's investment, but to protect more specifically the physical integrity of an investment against interference by use of force."). *See also, e.g.*, Article 7(1) of the *Responsibility of the State for injuries caused in its territory to the person or property of aliens: Revised draft, reprinted in* F.V. GARCIA-AMADOR ET AL., RECENT CODIFICATION OF THE LAW OF STATE RESPONSIBILITY FOR INJURIES TO ALIENS 129, 130 (1974) ("The State is responsible for the injuries caused to an alien by illegal acts of individuals, whether isolated or committed in the course of internal disturbances (riots, mob violence or civil war), if the authorities were manifestly negligent in taking the measures which, in view of the circumstances, are normally taken to prevent the commission of such acts.").

[37] *See, e.g.*, *Methanex Corp. v. United States of America*, Reply Memorial of Respondent United States of America on Jurisdiction, Admissibility and the Proposed Amendment, at 38-39 (Apr. 12, 2001) ("Indeed, if the full protection and security requirement were to extend to an obligation to 'protect foreign investments from economic harm inflicted by third parties,' . . . Article 1105(1) would constitute a very substantial enlargement of that requirement as it has been recognized under customary international law."); *Methanex Corp. v. United States of America*, Rejoinder of Respondent United States of America on Jurisdiction, Admissibility and the Proposed Amendment, at 39 (July 27, 2001) (accord); *Loewen Group, Inc. v. United States of America*, NAFTA/ICSID Case No. ARB (AF)/98/3, Counter-Memorial of the United States of America, at 179-80 (Mar. 30, 2001) (accord).

1110(1).[38] Moreover, the United States has not recognized the concept of "judicial takings" as a matter of domestic law.[39]

21.     Of course, where a judiciary is not separate from other organs of the State and those organs (executive or legislative) direct or otherwise interfere with a domestic court decision so as to cause an effective expropriation, these executive or legislative acts may form the basis of a separate claim under Article 1110, depending on the circumstances.  Were it otherwise, States might seek to evade international responsibility for wrongful acts by using the courts as the conduit of executive or legislative action.

### **Articles 1116(2) and 1117(2) (Limitations Period)**

22.     All claims under NAFTA Chapter Eleven must be submitted to arbitration within the three-year limitations period set out in Articles 1116(2) and 1117(2).[40]  Specifically, Articles 1116(2) and 1117(2) require a claimant to submit a claim to arbitration within three years of the "date on which the" investor or enterprise "first acquired, or should have first acquired, knowledge" of (i) the alleged breach, and (ii) loss or damage incurred by the claimant or enterprise.

23.     With regard to knowledge of the "alleged breach" under Articles 1116(2) and 1117(2), a "breach" of an international obligation exists "when an act of th[e] State is not in conformity with what is required of it by that obligation."[41]  As explained above, non-final judicial acts have

---

[38] *See, e.g.*, MARTINS PAPARINSKIS, THE INTERNATIONAL MINIMUM STANDARD AND FAIR AND EQUITABLE TREATMENT 208 (2013) (expressing the view that "while taking of property through the judicial process could be said to constitute expropriation, the rules and criteria to be applied for establishing the breach should come from denial of justice"); *Loewen* Award ¶ 141 (noting that claimants' expropriation claim based on judicial acts "adds nothing to the claim based on Article 1105. In the circumstances of this case, a claim alleging an appropriation in violation of Article 1110 can succeed only if Loewen establishes a denial of justice under Article 1105.").

[39] It was the position of the United States Government in *Stop the Beach Renourishment* that the concept of a judicial taking should not be adopted under the Just Compensation Clause, and that continues to be the position of the United States.  In *Stop the Beach*, only four Supreme Court Justices would have recognized that judicial actions taken by states may be subject to a Just Compensation (or Takings) Clause analysis under the United States Constitution. Plurality opinions do not form binding precedent.  *See Stop the Beach Renourishment,* 560 U.S. 702 (2010). Nor did the United States recognize the concept of "judicial takings" in decisions of the Foreign Claims Settlement Commission, such as *Elizabeth Leka and Diana Repishti v. Government of Albania*, Claim Nos. ALB-093/185.  In those cases, the relevant claims settlement agreement covered not only expropriation, but any "intervention, or other taking, *or measures affecting*" property of U.S. nationals. (Emphasis added)  The FCSC found that the Albanian government's "auction of the claimants' property without notice to claimants, *coupled with* the actions of the court in denying them subsequent legal rights to the property" constituted an "uncompensated 'intervention, or other taking of, or measures affecting' the claimants' property." (Emphasis added)  In other words, the FCSC determined that certain executive action, coupled with court action denying any legal recourse, entitled claimants to an award of compensation under the circumstances.

[40] The claims limitation period has been described as "clear and rigid" and not subject to any "suspension," "prolongation," or "other qualification." *Grand River Enterprises Six Nations, Ltd. v. United States of America*, NAFTA/UNCITRAL, Decision on Objections to Jurisdiction ¶ 29 (July 20, 2006); *Marvin Roy Feldman Karpa v. United Mexican States*, NAFTA/ICSID Case No. ARB(AF)/99/1, Award ¶ 63 (Dec. 16, 2002).

[41] Articles on Responsibility of States for Internationally Wrongful Acts, art. 12.

not ripened into the type of final act that is sufficiently definite to implicate state responsibility, unless further recourse is obviously futile or manifestly ineffective.

24.     In the context of a claim of denial of justice, therefore, the three-year limitations period set out in Articles 1116(2) and 1117(2) will not begin to run until the date on which the investor or enterprise first acquired, or should have acquired, knowledge that either the breach has occurred – *i.e.*, when all available domestic remedies have been exhausted, unless obviously futile or manifestly ineffective – or the claimant or enterprise has incurred loss or damage, whichever is later.

**Article 1121(1)(b) and (2)(b) (Waiver)**

25.     Article 1121(1)(b) and (2)(b) requires a waiver of an investor's (or an investor's and enterprise's) "right to initiate or continue . . . any proceedings with respect to the measure of the disputing Party that is alleged to be a breach referred to in" Articles 1116 or 1117.[42]  The purpose of the waiver provision is to avoid the need for a respondent Party to litigate concurrent and overlapping proceedings in multiple forums, and to minimize not only the risk of double recovery, but also the risk of "conflicting outcomes (and thus legal uncertainty)."[43]

26.     Article 1121(1)(b) and (2)(b) includes an exception to the waiver requirement for "proceedings for injunctive, declaratory or other extraordinary relief, not involving the payment of damages, before an administrative tribunal or court under the law of the disputing Party."  The purpose of this exception is to allow a claimant to initiate or continue certain proceedings to preserve its rights during the pendency of the arbitration, in a manner consistent with the broader purposes of the waiver requirement.

27.     It is well-established that the responsibility of a State may not be invoked if "the claim is one to which the rule of exhaustion of local remedies applies and any available and effective local remedy has not been exhausted."[44]  As discussed above, denial of justice is a claim to

---

[42] As the United States has previously explained, the phrase "with respect to" in Article 1121(b) should be interpreted broadly.  *See, e.g.*, *Consolidated Softwood Lumber Proceedings* (NAFTA/UNCITRAL), Reply Post-Hearing Submission of Respondent United States of America, at 2 n.2 (Mar. 10, 2006); *Canfor v. United States of America* (NAFTA/UNCITRAL), Reply on Jurisdiction of Respondent United States of America, at 12 (Aug. 6, 2004) (citing North American Free Trade Agreement, Implementation Act, Statement of Administrative Action, H.R. Doc. No. 103-159, Vol. 1, 103d Cong., 1st Sess., at 147 (1993)); *see also id.* (commenting on the "with respect to" construction in other NAFTA provisions); *accord Consolidated Softwood Lumber Proceedings*, NAFTA/UNCITRAL, Decision on Preliminary Question ¶ 201 (June 6, 2006) ("[T]he Tribunal is of the view that the words "with respect to" are to be interpreted broadly."). This construction of the phrase is consistent with the purpose of the waiver provision, including to avoid the need for a respondent Party to litigate concurrent and overlapping proceedings in multiple forums.

[43] *International Thunderbird Gaming Corp. v. United Mexican States*, NAFTA/UNCITRAL, Award ¶ 118 (Jan. 26, 2006) ("In construing Article 1121 of the NAFTA, one must also take into account the rationale and purpose of that article. The consent and waiver requirements set forth in Article 1121 serve a specific purpose, namely to prevent a party from pursuing concurrent domestic and international remedies, which could either give rise to conflicting outcomes (and thus legal uncertainty) or lead to double redress for the same conduct or measure.").

[44] Articles on Responsibility of States for Internationally Wrongful Acts, art. 44(b) (Admissibility of claims).  The Commentaries to the Draft Articles further explain that: "Subparagraph (b) provides that when the claim is one to

11

which a rule requiring judicial finality, unless obviously futile or manifestly ineffective, does apply, as a substantive element of the claim. Nothing in Article 1121 departs from this rule.[45]

28.     As the *Loewen* tribunal recognized, "Article 1121 … says nothing expressly about the requirement that, in the context of a judicial violation of international law, the judicial process be continued to the highest level."[46]  Indeed, that tribunal found no "basis for implying any dispensation of that requirement[:]"

> It would be strange indeed if *sub silentio* the international rule were to be swept away. And it would be very strange if a State were to be confronted with liability for a breach of international law committed by its magistrate or low-ranking judicial officer when domestic avenues of appeal are not pursued, let alone exhausted.  If Article 1121 were to have that effect, it would encourage resort to NAFTA tribunals rather than resort to the appellate courts and review processes of the host State, an outcome which would seem surprising, having regard to the sophisticated legal systems of the NAFTA Parties.  Such an outcome would have the effect of making a State potentially liable for NAFTA violations when domestic appeal or review, if pursued, might have avoided any liability on the part of the State. . . .
>
> For the reasons given, Article 1121 involves no waiver of the duty to pursue local remedies in its application to a breach of international law constituted by a judicial act.[47]

---

which the rule of exhaustion of local remedies applies, the claim is inadmissible if any available and effective local remedy has not been exhausted.  The paragraph is formulated in general terms in order to cover any case to which the exhaustion of local remedies rule applies, whether under treaty or general international law, and in spheres not necessarily limited to diplomatic protection." Draft Articles on Responsibility of States for Internationally Wrongful Acts, with Commentaries (2001), art. 44 (Admissibility of Claims) ¶ 3. *See also Elettronica Sicula S.p.A. (ELSI) (United States v. Italy)*, 1989 I.C.J. 15, 42 (July 20) (holding that "the Chamber finds itself unable to accept that an important principle of customary international law should be held to have been tacitly dispensed with, in the absence of words making clear an intention to do so" in the context of determining whether the Treaty of Friendship, Commerce, and Navigation between Italy and the United States waived the local remedies rule).

[45] As the United States has previously explained in the context of substantively identical waiver language in the CAFTA-DR, the "local remedies rule": "applies to claims of denial of justice brought under treaties, such as the CAFTA-DR, that require claimants to waive their rights to pursue claims before other fora in order to submit a claim to arbitration." *Corona Materials, LLC v. Dominican Republic*, ICSID Case No. ARB(AF)/14/3, Submission of the United States of America ¶ 13 (Mar. 11, 2016) (citing authorities).

[46] *Loewen*, Award ¶ 161.

[47] *Id*. ¶¶ 163-64.

29. Thus, claims based on judicial measures, as explained above, can only be based on *final* judicial acts sufficient to engage a respondent Party's responsibility and constitute a cognizable breach of the NAFTA. This conclusion is consistent with the time-limitations period set forth in Articles 1116(2) and 1117(2), for the reasons stated above.

*Respectfully submitted*,

Lisa J. Grosh
 *Assistant Legal Adviser*
Nicole C. Thornton
 *Chief of Investment Arbitration*
Office of International Claims and
 Investment Disputes
UNITED STATES DEPARTMENT OF STATE
Washington, D.C. 20520

June 21, 2019