**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED MEXICAN STATES,** | |
| *Petitioner*, | |
| **v.** | Case No. 1:21-cv-03185 (ACR) |
| **LION MEXICO CONSOLIDATED, L.P.,** | |
| *Respondent*. | |

## MEMORANDUM OPINION AND ORDER

Article 1105(1) of the North Atlantic Free Trade Agreement (NAFTA) required Petitioner United Mexican States (Mexico) to "accord to investments of investors of [Canada and the United States] treatment in accordance with international law, including fair and equitable treatment and full protection and security."

In 2015, Respondent Lion Mexico Consolidated, L.P. (Lion), a Canadian limited partnership, brought a NAFTA Chapter 11 arbitration against Mexico, claiming that Mexico failed to accord Lion's investments the protection Article 1105(1) required. Mexico raised several defenses, but only one is relevant here. Mexico argued that, by its plain meaning, the phrase "investments of investors" applied only to *investments*. Because Lion is an *investor*, not an investment, it could not seek relief under Article 1105(1). Lion countered that Mexico's interpretation was mistaken and, if accepted, would have rendered Article 1105(1) toothless. Agreeing with Lion that Article 1105(1) applied and finding that Mexico had violated it, the Tribunal awarded Lion over USD 47 million in damages (Award).

Mexico now petitions to vacate the Award while Lion cross-petitions to confirm it. Mexico acknowledges, and Lion readily agrees, that the Court's power to vacate an arbitral

award is quite circumscribed.  So long as the Tribunal "interpreted" Article 1105(1), the Court must confirm the Award—indeed, must confirm even if the Tribunal committed "serious error." Seeking to sideline this constraint, Mexico claims that the Tribunal did not "interpret" anything. The Tribunal instead ignored the "literal meaning" of "investments of investors" by granting relief to Lion, an investor.

Mexico's contention founders at the get-go.  The Tribunal addressed Mexico's interpretation of Article 1105(1) head on, employed common interpretative tools to reach a different conclusion, cited authorities in support of its reading, and explained its reasoning.  By any definition of the word, the Tribunal interpreted Article 1105(1).  Because the Court cannot second-guess that interpretation, it **DENIES** Mexico's Petition to Vacate the Arbitration Award, Dkt. 32, and **GRANTS** Lion's Cross-Petition for Confirmation, Recognition, and Enforcement of the Arbitral Award, Dkt. 35.

After addressing the dueling petitions, the Court addresses a motion to intervene filed by Héctor Cárdenas Curiel.  Cárdenas, a Mexican businessman, contemporaneously knew the arbitration was proceeding.  And he knew that the arbitral demand turned on Lion's contention that he had orchestrated a massive fraud in the Mexican courts.  Yet, Cárdenas did not move to participate in the arbitration and instead seeks to attack the Award here.  That attack comes too late and, in any event, is futile.  Because Cárdenas does not meet the requirements for intervention under Federal Rule of Civil Procedure 24(a)(2) or 24(b), the Court **DENIES** his Motion to Intervene, Dkt. 42.

## I.    BACKGROUND

Petitioner Mexico is a foreign state as defined in the Foreign Sovereign Immunities Act. Award ¶ 9; 28 U.S.C. § 1603(a)–(b).  Respondent Lion is a Canadian limited partnership with its principal place of business in Dallas, Texas.  Award ¶ 7.

### A.  Unpaid Loans

In 2007, Lion entered financing relationships with C&C Ingeniería, S.A. de C.V. and C&C Capital, S.A. de C.V., two companies owned by Cárdenas.  Award ¶¶ 57, 63–85.[1]  Lion provided financing for Cárdenas—USD 32,805,479 across three loans—to develop two large real estate projects in Nayarit and Jalisco, Mexico.  *Id.* ¶¶ 63–85.  The parties documented the loan agreements in mortgages for the real property in Lion's name, promissory notes to pay on the mortgages, and credit agreements.  *Id.*; *see also id.* ¶ 61.  The structure of these agreements is dizzying and, happily, not relevant to these proceedings.[2]  The relevant point is that Cárdenas's companies never made a single payment on any of the loans.  *Id.* ¶ 90.  Lion tried for years to obtain payment—any payment—to no avail.  *Id.* ¶¶ 86–91.  Tired of waiting for Godot,[3] in 2012, Lion served Cárdenas and his companies with a formal demand for payment and threatened to initiate foreclosure proceedings.  *Id.* ¶ 92.

---

[1] The Court takes these facts from the Tribunal's factual findings and solely to resolve the pending motions.  *See Gold Rsrv. Inc. v. Bolivarian Republic of Venezuela*, 146 F. Supp. 3d 112, 130 (D.D.C. 2015).  The Court takes no position on whether Cárdenas in fact engaged in fraud. To put it mildly, Cárdenas disputes the Tribunal's findings.  Dkt. 42-1 at 16–17.

[2] For the reader who cannot get enough of analyzing financing transactions, the Tribunal summarized the ones here at paragraphs 63 to 85 of the Award.

[3] SAMUEL BECKET, WAITING FOR GODOT (Faber & Faber ed., 2006).

### B.  Court Proceedings in Mexico

Lion's formal demand did not induce Cárdenas or his companies to repay the loans.  The Tribunal found that, instead, Cárdenas effected a scheme of "complex judicial fraud" to evade the obligations.  Award ¶ 94.  That is, Cárdenas created a forged settlement agreement (forged agreement), complete with a fake signature of Lion's attorney, in which Lion purportedly agreed to cancel all existing debts.  *Id.* ¶¶ 98–99, 103.  The forged agreement gave jurisdiction to the courts of Jalisco, Mexico, even though the promissory notes gave jurisdiction to the courts of Mexico City.  *Id.* ¶ 101.  Cárdenas then filed a lawsuit before the Juez Noveno de lo Mercantil in Jalisco (Mercantil Court) to enforce the forged agreement and cancel the loans.  *Id.* ¶¶ 96, 98–99.  The forged agreement also included a fake name and address for notice and service of process to Lion—the lawyer residing at the address had no affiliation with Lion and yet accepted service on its behalf.  *Id.* ¶¶ 94, 102–03, 107.  By design, no one notified Lion of the lawsuit and so Lion did not appear.  *Id.* ¶ 108.

Cárdenas's companies submitted evidence purportedly supporting the forged agreement.  *Id*. ¶¶ 96, 110.  On June 27, 2012, the Mercantil Court issued a default judgment discharging the loans and ordering Lion to cancel the mortgages (Cancellation Judgment).  *Id.* ¶ 111.  It accepted the amount in controversy to be MEX 500,000 (about USD 25,000)—a lower amount than required for appeal—even though the loan documents admitted into evidence described transactions worth "tens of millions of dollars."  *Id.* ¶¶ 112–13.  This low amount precluded a standard appeal, thus cutting off one of only two avenues for Lion to reinstate the loans once it learned of the Cancellation Judgment.

Lion could still have pursued the other avenue, a so-called *amparo* proceeding (*i.e.*, a constitutional challenge) to contest the Cancellation Judgment once Lion learned of it.  *Id.* ¶ 119.

But Cárdenas was on the case—figuratively and literally—and quickly cut off this second avenue for Lion to obtain relief. *See id.* ¶¶ 116–26. He arranged for another attorney to act fraudulently on Lion's behalf using an identification card stolen from a Lion legal representative. *Id*. ¶¶ 124–25. That attorney filed an *amparo* purportedly on Lion's behalf and then purposefully abandoned it. *Id.* ¶ 129. The abandonment rendered the *amparo* final and not subject to further appeal, even after Lion learned of the Cancellation Judgment. *Id.*

Six months later, in early 2013, Lion finally learned of the Cancellation Judgment but not of the forged agreement. *Id.* ¶ 138. Unaware of Cárdenas's preemptive *amparo*, Lion filed its own *amparo* with the Juez de Distrito en Materia Civil in Jalisco (Juez de Distrito), challenging the earlier proceedings based on failure of service. *Id.* ¶¶ 142–45. After filing its *amparo*, Lion finally learned of the forged agreement when a court filing referenced it. *Id.* ¶ 145. At that point, Lion sought to admit evidence proving that the forged agreement was indeed forged. *Id.* ¶¶ 146–47. On January 30, 2013, a court clerk instead dismissed the motion. *Id.* ¶ 148. Lion then brought a second complaint before the Juez de Distrito, seeking for a second time to introduce evidence of the forgery. *Id.* ¶ 149. The court considered Lion's request but postponed its decision until a separate proceeding initiated by one of Cárdenas's companies, C&C Ingeniería, was resolved in yet a different court. *Id.* ¶¶ 150–51.

C&C Ingeniería had challenged Lion's actual *amparo* proceeding in the Segundo Tribunal Colegiado en Materia Civil del Tercer Circuito (Tribunal de Queja), an appeal court. *Id.* ¶¶ 151, 153. The company claimed that Lion's real attorneys had not properly signed the motion to admit evidence in its *amparo* proceeding before the Juez de Distrito, rendering that motion void. *Id.* The Tribunal de Queja agreed, ruling that Lion's legal representative, and not the attorney representing it in the *amparo* proceeding, should have signed the motion. *Id.* The

Tribunal de Queja did not permit Lion to cure the procedural defect.[4]  *Id.* ¶ 154.  Thus—because a real Lion lawyer, but not the right Lion lawyer, signed the motion to admit evidence—Lion could not introduce evidence that a fake Lion lawyer had forged the agreement.  *Id.* ¶ 153.

With this separate proceeding resolved, the Juez de Distrito resumed his work.  Relying on the Tribunal de Queja's decision, he excluded all evidence that the agreement had been forged.  *Id.* ¶¶ 155, 163.  On December 14, 2013, the Juez de Distrito entered a final judgment rejecting Lion's *amparo* and upholding the Cancellation Judgment.  *Id.* ¶ 158.  He reached this decision even though a criminal judge had earlier ordered Cárdenas imprisoned for forging Lion documents and even though he acknowledged a different instance of a forged Lion signature.  *Id.* ¶¶ 160–62.

Lion filed a *recurso de revisión* (*i.e.*, a reconsideration proceeding) that ultimately landed with the Tribunal de Queja.  *Id.* ¶¶ 167, 169.  By this point, Lion had filed numerous formal requests for a court to consider that the agreement was forged.  *Id*. ¶ 170.  On April 17, 2015, more than 16 months after Lion filed the *recurso*, the Tribunal de Queja again decided against Lion and remanded to the Juez de Distrito to determine whether Cárdenas's fraudulent *amparo* exhausted Lion's right to pursue its real *amparo*.  *Id*. ¶ 171.  This was the *first time* Lion learned of the earlier false *amparo*.  *Id*. ¶ 173.  The Tribunal de Queja ordered the Juez de Distrito not to consider the authenticity of the forged agreement, but only to analyze the admissibility of Lion's *amparo*.  *Id*. ¶ 174.

On remand, the Juez de Distrito refused to allow Lion to introduce evidence of the forgery.  *Id.*  By this point, Lion had spent three years in the Mexican civil courts trying to undo

---

[4] That same court permitted Cárdenas's company to cure a procedural defect.  *Id.* ¶ 154.

Cárdenas's fraud with nothing to show for its efforts but a new fight about whether the courts had jurisdiction to consider its claim at all.  *Id.* ¶ 178.  On December 11, 2015, Lion ended its *amparo* because "it was futile to continue."  *Id.* ¶ 179.  It turned instead to arbitration.

### C.  Arbitration Under NAFTA

NAFTA, Can.–Mex.–U.S., Dec. 17, 1992, 107 Stat. 2057, 32 I.L.M. 289, was a multilateral treaty between the United States, Mexico, and Canada that aimed to facilitate trade and strengthen the economic relationship among the three nations.[5]  *Id.* pmbl.  To that end, Chapter 11 of NAFTA required the signatories to provide certain protections and standards of treatment to foreign investors of another signatory and their investments.  *Id.* arts. 1101–10.  Key here is Article 1105(1), which required that "each Party . . . accord to investments of investors of another Party treatment in accordance with international law, including fair and equitable treatment and full protection and security."  *Id.* art. 1105(1).  Article 1139, NAFTA's definition section, provided an exhaustive list of what constituted an "investment" for purposes of Chapter 11.  *Id.* art. 1139.  And Article 1120(1) established a procedure for investors to initiate arbitration proceedings directly against a party government for violating its Chapter 11 protections.  *Id.* art. 1120(1).

In December 2015, Lion filed a request for arbitration with the International Centre for Settlement of Investment Disputes (ICSID).  Dkt. 56-8; *see also* Award ¶ 12.  The arbitration was seated in Washington, D.C., under the ICSID Additional Facility Rules.  Award ¶¶ 3, 40; *see*

---

[5] NAFTA is no longer operative.  The United States–Mexico–Canada Agreement, which took effect on July 1, 2020, replaced it.  Can. –Mex. –U.S., Dec. 10, 2019, 134 Stat. 11.

*also id.* Annex A ¶ 28.  The Tribunal consisted of three experienced arbitrators,[6] and the parties were aptly represented.  *Id.* ¶¶ 13, 40.

Lion alleged that the Mexican courts canceled Lion's mortgages based on the forged agreement and "repeatedly denied [Lion] the opportunity to prove that the purported [] agreement [was] a forgery."  Dkt. 56-8 ¶ 15.  This denial, Lion claimed, breached the International Minimum Standard of Treatment required by NAFTA Article 1105(1).  *Id.*

Mexico submitted a preliminary objection to the Tribunal's jurisdiction "on the grounds that Lion's claims were manifestly without merit."  Award, Annex A ¶ 21.  The Tribunal dismissed this objection after full briefing.  *Id.* Annex A ¶¶ 21–29.  Mexico then requested bifurcation, raising two additional objections to the Tribunal's jurisdiction.  *Id.* Annex A ¶ 31.  This time, the Tribunal granted Mexico's request in part, deciding to address Mexico's objection that "the Tribunal lack[ed] jurisdiction . . . because Lion did not make an investment in Mexico within the terms required by Art[icles] 1101 and 1139 [of] NAFTA."  *Id.* Annex A ¶ 33.

The Tribunal held, after full briefing and a jurisdictional hearing, that "the Mortgages qualif[ied] as investments and that the Tribunal ha[d] jurisdiction . . . to adjudicate claims brought by Lion based on measures adopted by Mexico which affect[ed] the Mortgages."  *Id.* Annex A ¶ 266; *see also id.* ¶ 15.  On the other hand, the Tribunal held that Lion's promissory notes were not qualifying investments under Article 1139 and dismissed all claims related to those notes.  *Id.* Annex A ¶¶ 203–08; *see also id.* ¶ 15.

---

[6] The arbitrators were: (1) Chair Juan Fernández-Armesto, appointed by ICSID's Secretary General by agreement of the parties; (2) David J.A. Cairns, appointed by Lion; and (3) Professor Laurence Boisson de Chazournes, appointed by Mexico.  Award ¶ 13; *see also* Dkts. 33-18, 33-19.

In March 2017, Lion submitted its opening brief along with 120 factual exhibits, 200 legal authorities, three witness statements, and an expert report on Mexican law which included another 122 authorities. *Id.* Annex A ¶ 30. Mexico later filed a counter-memorial attaching 33 factual exhibits, 60 legal authorities, a witness statement, three expert reports, and a valuation expert report. *Id.* ¶ 22. Lion's reply included an additional 40 factual exhibits, 218 legal authorities, another witness statement, a fourth legal expert report, an expert evaluation report, and a rebuttal expert report. *Id.* ¶ 27.

The Tribunal then held a three-day merits hearing to address whether Mexico had violated NAFTA Article 1105(1). *Id.* ¶ 40. Lion argued that the Mexican courts' conduct was a denial of justice and thus violated Article 1105(1). Award ¶¶ 187, 197. Mexico shot back that Article 1105(1) did not apply at all because, by its plain terms, it protected only "investments" and did not protect "investors." *Id.* ¶¶ 353, 356.

The Tribunal rendered the Award—which weighed in at 924 paragraphs across 215 pages—on September 20, 2021. *Id.* ¶ 214. The Award was unanimous, with Mexico's appointed arbitrator joining it. The Tribunal addressed and rejected Mexico's "literal reading" that Article 1105(1) covered only investments. *Id.* ¶¶ 356–58. Along with the Article's language, the Tribunal found that it was bound by NAFTA to consider a Free Trade Commission Note of Interpretation (Interpretation Note).[7] *Id.* ¶ 207; NAFTA art. 1131(2). Section B(1) of the Interpretation Note equated Article 1105 with "the customary international law minimum standard of treatment of aliens." Award ¶¶ 208, 356–58 (quoting Interpretation Note § B(1)). The Tribunal determined that the reference to "aliens" in the Interpretation Note meant that

---

[7] The Free Trade Commission consisted of the trade ministers of the three NAFTA signatories. NAFTA art. 1131(2).

investors themselves received protection under the Article. *Id.* ¶ 358. The Tribunal also cited several other arbitration awards containing language supporting its interpretation. *Id.* n.384.

Finding that Article 1105(1) applied, the Tribunal then concluded that Mexico "failed to provide Lion fair and equitable treatment under NAFTA Article 1105." *Id.* ¶¶ 615, 924. Aware that "the standard for finding a denial of justice is high," and required a finding of "improper and egregious procedural conduct" by the local courts, *id.* ¶ 370, the Tribunal nonetheless found that the Mexican courts denied Lion justice. They did so by (1) failing to ensure proper service and improperly declaring default, (2) denying Lion the right to appeal, and (3) denying Lion the right to submit evidence of forgery. *Id.* ¶ 371. The Tribunal summarized that the "Mexican judicial system . . . should have effectively restored [Lion's] rights," *id.* ¶ 614, but failed to do so "despite multiple opportunities" to get it right. *Id.* ¶ 373; *see also id.* ¶ 508. The Tribunal ordered Mexico to pay Lion USD 47,000,000 in compensation, USD 583,598.91 in costs, and USD 1,725,000 in attorney's fees, all with interest. *Id.* ¶ 924.

### D. Confirmation Proceeding in the United States

On December 6, 2021, Mexico filed the present petition to vacate the Award on the grounds that the Tribunal exceeded its power under 9 U.S.C. § 10(a)(4) and acted in manifest disregard of the law. Dkt. 1 ¶ 39. On February 4, 2022, Lion submitted a cross-petition to confirm, recognize, and enforce the Award. Dkt. 15. Lion and Mexico filed responses to each other's petitions in February and March 2022. Dkts. 14–18. Five months after the parties finished briefing their cross-petitions, on August 22, 2024, Cárdenas moved to intervene. Dkt. 23.

While the parties' petitions were pending, the Court Clerk reassigned the case to the undersigned. Dkt. Notice (Feb. 24, 2023). In the interest of judicial efficiency, the Court

10

dismissed all pending motions without prejudice and instructed the parties to refile their motions to reflect any recent developments in the case law. Minute Ord. (May 9, 2023). The parties re-filed their motions and updated their briefing. Dkts. 32–51. The Court heard oral argument on the Motion to Intervene on October 23, 2023, and on the Cross-Petitions for Confirmation and Vacatur three days later.

## II.    THE AWARD

### A.  Legal Standard

The Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.*, represents an "emphatic federal policy in favor of arbitral dispute resolution" that the Supreme Court has recognized "applies with special force in the field of international commerce." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 631 (1985). The Act "lists only four grounds upon which an arbitration award may be vacated." *Kurke v. Oscar Gruss & Son, Inc.*, 454 F.3d 350, 354 (D.C. Cir. 2006). Only one—set forth in Section 10(a)(4)—is at issue here: "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter was not made." 9 U.S.C. § 10(a)(4).

By design, Section 10(a)(4) leaves a court little room to maneuver. The "sole question" is "whether the arbitrators (even arguably) interpreted the parties' contract, not whether they got its meaning right or wrong." *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 573 (2013). It is not enough for a tribunal to have committed a legal or factual error, even if that error is "serious." *United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987); *see also Kurke*, 454 F.3d at 354 (cleaned up) (explaining that "factual or legal error" is insufficient for vacatur); *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010) (holding that even "serious error" is insufficient for vacatur). More bluntly, "[t]he arbitrator's

construction holds, however good, bad, or ugly." *Oxford Health Plans*, 569 U.S. at 573 (cleaned up). "Improvident, even silly, factfinding does not provide a basis for a reviewing court to refuse to enforce the award." *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (cleaned up).

A party seeking vacatur must therefore "clear a high hurdle," *Stolt-Nielsen S.A.*, 559 U.S. at 671, and meet an "onerous" burden, *Republic of Arg. v. AWG Grp. Ltd.*, 894 F.3d 327, 333 (D.C. Cir. 2018) (cleaned up). It must show that an arbitral tribunal acted "outside the scope of [its] contractually delegated authority." *Eastern Associated Coal Corp. v. Mine Workers*, 531 U.S. 57, 62 (U.S. 2000) (cleaned up). Examples include issuing an award that reflects the arbitrators' "own notions of economic justice" or their "own brand of industrial justice." *Mesa Power Grp., LLC v. Gov't of Can.*, 255 F. Supp. 3d 175, 184 (D.D.C. 2017) (quoting *Stolt-Nielsen S.A.*, 559 U.S. at 671) (cleaned up).

This standard of review applies with equal force to an arbitration tribunal's interpretation of treaty language. *See BG Grp., PLC v. Republic of Arg.*, 572 U.S. 25, 33 (2014). "[U]nder our law," "it is up to [a] tribunal to determine what [a] treaty means," and thus a court has "no authority to delve into the merits" of that interpretation. *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 879 (D.C. Cir. 2021); *see also State of Libya v. Strabag SE*, No. 20-cv-02600, 2021 WL 4476771 (D.D.C. Nov. 30, 2021); *Republic of Arg. v. AWG Grp. Ltd.*, 211 F. Supp. 3d 335 (D.D.C. 2016), *aff'd*, 894 F.3d 327 (D.C. Cir. 2018).

A court can also vacate an award if the tribunal acted in "manifest disregard of the law."[8] Like Section 10(a)(4), manifest disregard for the law requires "more than error or misunderstanding with respect to the law." *Petruss Media Grp., LLC v. Advantage Sales & Mktg., LLC*, No. 22-3278, 2023 WL 5507306, at *15 (D.D.C. Aug. 25, 2023) (quoting *Kanuth v. Prescott, Ball & Turben, Inc.*, 949 F.2d 1175, 1180 (D.C. Cir. 1991)). "Instead, a court must find that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case." *Id.* (quoting *LaPrade v. Kidder, Peabody & Co., Inc.*, 246 F.3d 702, 706 (D.C. Cir. 2001)).

## B. The Tribunal's Interpretation

Mexico argued to the Tribunal that Lion could not recover because the language "shall accord to investments of investors" applied to "investments and not investors." Award ¶ 356. The Tribunal disagreed and held that Article 1105(1) also "grants protection to Lion as an investor." Award ¶ 358. Mexico claims that, in doing so, the Tribunal exceeded its powers and acted in manifest disregard of the law. Not so.

### 1. *The Tribunal's Ruling Focused on Affected Qualified Investments*

Mexico's Petition to Vacate is based on its view that "[t]he Tribunal ruled that Mexico owed Lion—the investor—an obligation to fair and equitable treatment under NAFTA" even though Article 1105(1) "extends only to investments, not investors." Dkt. 32 ¶ 2. The

---

[8] In *Hall Street*, the Supreme Court explained that Section 10 "provide[s] the FAA's exclusive grounds for expedited vacatur." *Hall St. Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 584 (2008). The D.C. Circuit has "assumed without deciding that" a tribunal acting in "'manifest disregard of the law' survives [*Hall Street*] as a separate ground for vacatur." *Mesa Power Grp.*, 255 F. Supp. 3d at 183. The Court takes the same approach and assumes without deciding that manifest disregard of the law remains as a separate ground for vacatur.

Tribunal's ruling, however, was not so sweeping. The Tribunal held only that investors had standing to bring claims *if* a challenged action affected a *qualified* investment.

Some background is helpful. Lion's arbitration demand alleged that Mexico had failed to grant its "investments" protection under Article 1105(1). Award ¶ 187. It initially claimed that Article 1105(1) covered each financing Cárdenas's companies received, including the mortgages and promissory notes. But NAFTA protected only investments that fell under the definition of "investment" in Article 1139. Mexico objected that "the Tribunal lack[ed] jurisdiction . . . because Lion did not make an investment in Mexico" as defined in that Article. *Id.* Annex A ¶ 33. The Tribunal agreed with Mexico in part. It determined that the mortgages qualified as investments, *id.* Annex A ¶ 266, but that the promissory notes did *not* qualify and dismissed all claims related to those notes, *id.* ¶¶ 15, 203–08. And thus it awarded damages as to the mortgages but not as to the promissory notes. *Id.* ¶¶ 171, 924.

The Tribunal did not, therefore, rule that Article 1105(1) applied to investors writ large. Instead, it held only that an investor could bring a claim under Article 1105(1) *if* the challenged treatment affected a qualifying investment. This is fully consistent with the approach taken by other NAFTA tribunals. For example, in *Grand River Enters. Six Nations, Ltd. v. United States*, the tribunal held that "Article 1105 provides no scope for individual investors' claims that they have received treatment contrary to international law, *except as that treatment affects a covered investment*." UNCITRAL, Award, ¶ 177 (Jan. 12, 2011), https://2009-2017.state.gov/documents/organization/156820.pdf (emphasis added).

If, as Mexico urges, investors could not bring Article 1105(1) claims, there would have been no enforcement mechanism, and the Article would have been rendered toothless. This is so because, as Lion highlights, "[t]he mortgages themselves [can]not commence legal proceedings,

14

nor can they be served or sued.  Only Lion Mexico, as the investor in the investment and as claimant in the Arbitration, can act to protect its mortgage investment."  Dkt. 15-1 at 16.  Put differently, under Mexico's interpretation, no arbitration could ever have been commenced to protect a qualifying investment.  The Tribunal's approach in permitting Lion to bring claims as to investments covered by Article 1139 sidestepped this fatal flaw in Mexico's approach.

### 2.  *The Tribunal Interpreted Article 1105(1)*

Even putting aside Mexico's misapprehension as to the Tribunal's ruling, its petition fails.  The key question in a confirmation proceeding is whether the tribunal "interpreted" the language of Article 1105(1).  *Oxford Health Plans LLC*, 569 U.S. at 573.  Somewhat oddly, however, courts in the FAA context do not appear to have defined the word "interpret."  Instead, they address what "to interpret" does not encompass, *i.e.*, making public policy or administering one's own brand of industrial justice.  *See Stolt-Nielsen S.A.*, 559 U.S. at 671–72.  This may be because the definition of "interpret" is both broad and straightforward.  To interpret is to "ascertain the meaning and significance of thoughts expressed in words."  *Interpret*, BLACK'S LAW DICTIONARY (12th ed. 2024).  By the same token, interpretation is "the ascertainment of the thought or meaning of the author of, or of the parties to, a legal document, as expressed therein, according to the rules of language and subject to the rules of law."  ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 53 (2012) (quoting H.T. Tiffany, *Interpretation and Construction*, *in* 17 AMERICAN AND ENGLISH ENCYCLOPEDIA OF LAW 1, 2 (David S. Garland & Lucius P. McGehee eds., 2d ed. 1900)).

The Tribunal's work falls comfortably within the realm of interpretation.  It identified and rejected Mexico's argument, applied existing guidance interpreting Article 1105(1), cited cases, and explained its reasoning.  The Tribunal did not, as Mexico complains, "ignore" the

"literal meaning" of "investments of investors."  Dkt. 32 ¶¶ 49–50 (citing Award ¶¶ 356–358).
The Tribunal first regurgitated Mexico's position: "Mexico's first argument is based on a literal
reading of Art[icle] 1105 of NAFTA."  Award ¶ 356.[9]  Then, far from ignoring anything, it
explained why it rejected Mexico's interpretation.  Award ¶¶ 357–358.

The Tribunal began by recognizing its mandate.  An "interpretation" of NAFTA by the
Free Trade Commission (FTC) was "binding on a Tribunal."  NAFTA art. 1131.  And the FTC
had interpreted Article 1105 as "prescrib[ing] the customary international law minimum standard
of treatment of aliens as the minimum standard of treatment to be afforded to investments of
investors of another Party."  Award ¶¶ 207, 357–58; Dkt. 33-4.  Applying this directive, the
Tribunal reasoned that: (a) because [as the FTC opined] the standard of treatment under Article
1105(1) was the same as the customary international standard protecting *aliens*; (b) and aliens
referred to individuals; (c) Article 1105(1) must have also protected individuals; (d) investors
were individuals; and so (e) Article 1105(1) protected investors.  *Id.*  This analysis was assuredly
"interpretation" by the Tribunal.

The Tribunal also cited other awards in support of its holding.  Award ¶ 358 n.384.
Mexico grumbles that the Tribunal "tersely cited" these awards.  Dkt. 32 ¶ 56.  That the Tribunal
cited cases, tersely or in any other tone, confirms that it was "arguably interpreting" Article
1105(1), not "ignoring" it.  And Mexico's complaint that these citations were "misplaced,"
*id.* ¶ 52, is but an inapposite argument that the Tribunal erred.  That said, the Tribunal's citations
were not haphazard.  Each opinion is at least consistent with the conclusion that Article 1105(1)

---

[9] The Tribunal could have made its intent clearer by writing "Mexico's literal reading" instead of
"a literal reading."  But in the context of Mexico's pleading to the Tribunal and the rest of the
Award, the Tribunal unambiguously did not agree with Mexico's "literal reading" of Article
1105.

permitted investors to bring claims.  The tribunal in *Merrill & Ring* wrote that "Article 1105(1) provides for the treatment of another Party's investors in accordance with international law." *Merrill & Ring Forestry L.P. v. Canada*, ICSID Case No. UNCT/07/01, Award ¶ 183 (Mar. 31, 2010) (cleaned up).  *Gami* held that "a government's failure to implement or abide by its own law in a manner adversely affecting a foreign investor may . . . lead to a violation of Article 1105." *Gami Invs. Inc. v. United Mexican States*, Award ¶¶ 91–92 (Nov. 15, 2004).  And in *Chematura*, a case discussing the Interpretation Note to Article 1105, the tribunal stated that "Article 1105 of NAFTA seeks to ensure that investors from NAFTA member States benefit from regulatory fairness." *Chematura Corp. v. Gov't of Can.*, Award ¶ 179 (Aug. 2, 2010).

Mexico complains that the Tribunal ignored the Vienna Convention on the Law of Treaties (VCLT), which can be used to understand applicable "customary international law." Dkt. 32 ¶ 60.  Mexico is correct that the Tribunal did not cite the VCLT.  But that is not germane for two reasons.  First, the Tribunal was not required to set forth every possible basis for its conclusion.  *Kurke*, 454 F.3d at 354 (cleaned up) (holding that a court must confirm an award even if the tribunal gave "no explanation . . . if any justification can be gleaned from the record").  Second, the VCLT arguably supports the Tribunal's interpretation.  It requires that "[a] treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty *in their context and in the light of its object and purpose*."  Dkt. 32 ¶ 60 (quoting VCLT art. 31(1)) (emphasis added).  Here, the context includes the Interpretation Note and other arbitral opinions the Tribunal relied on.  And permitting investors to bring arbitration proceedings for the maltreatment of their investments furthered NAFTA's purpose of encouraging the free flow of goods, services, and investments among the signatories.  *See* NAFTA art. 102(1).

Mexico separately faults the Tribunal for not acknowledging that the United States filed a non-disputing party brief (essentially an *amicus* brief) in which it supported Mexico's interpretation of Article 1105(1).  Dkt. 32 ¶ 50.  This complaint is wide of the proverbial mark. To start, a tribunal is "not require[d] to address [a non-disputing party's] submission at any point in the arbitration."  Free Trade Commission, Statement on Non-Disputing Party Participation ¶ 9, https://2009-2017.state.gov/documents/organization/38791.pdf.  That said, the Tribunal quoted and addressed the United States's brief at length, including its view as to the application of Article 1105(1) to judicial acts.  *See* Award ¶ 553; *see also id.* ¶¶ 189, 205, 282–84, 287, 553, 556, 806.  And, moreover, the United States nowhere argued that investors could not bring Article 1105(1) claims.  To the contrary, its discussion of "investments of investors" is fully consistent with the Tribunal's approach: to succeed, "a claimant (*i.e.*, an investor) must therefore establish that the treatment accorded to its investment rose to the level of a denial of justice under customary international law."  Dkt. 67-1 ¶ 10.[10]

While mistakenly faulting the Tribunal for failing to consider the United States's brief, Mexico fails to mention the brief submitted by Canada.  This may well be because Canada flatly contradicted Mexico's position and arguably went even further than the Tribunal.  It contended that "Article 1105(1) requires the NAFTA Parties to accord to investors *and* their investments the customary law minimum international law standard."  Dkt. 67-1 ¶ 4 (emphasis added).

---

[10] The United States discussed the meaning of Article 1105(1) as applied in a "denial of justice" claim, *see* Dkt. 67-1 ¶ 10, and as applied to a "minimum standard of treatment" claim, *see id.* n.21.  The United States does not appear to have attached any meaning to the two different types of claims.

### 3. *The Cases Mexico Cites Do Not Support Its Petition*

Bringing its focus to case law in the United States, Mexico asks the Court to compare the Tribunal's work with those of other tribunals whose awards have been confirmed and vacated. *See* Dkt. 32 ¶¶ 63–71. Doing so fully supports the Court's decision to confirm.

Mexico directs the Court's attention to *Mesa Power Grp. LLC v. Gov't of Can.*, in which the court confirmed an arbitral award after finding that the tribunal had "'used all the standard interpretative tools' an arbitrator 'would normally use.'" *Id.* ¶ 64. Mexico contrasts that work with what the Tribunal did here which, in Mexico's view, "did not apply . . . any of the methods normally used by tribunals to interpret treaty text save for terse citations" to three other inapposite awards. *Id.* ¶ 65. This both overstates the Tribunal's obligations and understates its work. The law does not require a tribunal to use "all" or even most of the available interpretative tools or even to use them correctly. *See supra* Sections II.A & II.B(2). And, at a minimum, the Tribunal interpreted the treaty language by its citation to the FTC's Interpretation Note of Article 1105(1) and other awards.

Mexico claims that "[t]he Tribunal's conduct is similar to the conduct of other arbitrators whose awards [courts have] vacated because of their failure to adhere to the text of the contract." Dkt. 32 ¶ 63. Not so. Here, the Tribunal chose one of two competing interpretations of treaty language. In the cases Mexico cites, the arbitrators created new contractual terms that unequivocally contradicted existing terms. In *Hay Adams Hotel LLC v. Hotel & Rest. Emps., Loc. 25*, the arbitrator acknowledged that petitioner had the contractual right to terminate the respondent employee. No. 06-968, 2007 WL 1378490, at *1 (D.D.C. May 9, 2007). And yet the arbitrator ordered petitioner not to fire the employee and instead to have "a qualified professional [carefully inquire] into [the employee's] possible psychological problems." *Id.* at *2. In

*Raymond James Fin. Servs Inc. v. Bishop*, the arbitrator granted wrongful termination damages even though the employee was at will and therefore not entitled to any damages. 596 F.3d 183, 187 (4th Cir. 2010). In *Davey v. First Command Fin. Servs., Inc.*, the arbitrator granted punitive damages even though a contractual term prohibited such damages. No. 11-CV-1510, 2012 WL 277968, at *1 (N.D. Tex. Jan. 31, 2012). And in *Mo. River Servs. Inc. v. Omaha Tribe*, the arbitrator had ordered damages be paid from proceeds of a casino in Iowa even though the contract unambiguously limited proceeds to be paid from a casino in Nebraska. 267 F.3d 848, 855 (8th Cir. 2001).

### 4. *The Tribunal Did Not Act in Manifest Disregard of the Law*

For the same reasons applicable to the Section 10(a)(4) analysis above, the Tribunal did not act in manifest disregard of the law. *See Mesa Power Grp.*, 255 F. Supp. 3d at 183–84. Mexico does not deny that it received due process and that the arbitral proceeding followed the Additional Facility Rules. And the Tribunal did not replace the treaty language with a public policy determination, ignore the treaty language, or otherwise go rogue.

\*      \*      \*

Simply put, the Tribunal interpreted Article 1105(1). Whether it reached the correct interpretation is beyond this Court's mandate.

### C.  Confirmation

"[A]t any time within one year after" a tribunal issues an award, "any party to the arbitration may apply . . . for an order confirming the award." 9 U.S.C. § 9. The Court "must

grant such an order unless the award is vacated, modified, or corrected as prescribed in [S]ections 10 and 11 of [the FAA]."[11]  *Id.*

Lion timely sought confirmation, *see* 9 U.S.C. § 9, within one year of when the Award was issued on September 20, 2021, *see* Award at 212.  Dkt. 1.  And for the reasons stated above, the Court rejects Mexico's arguments for vacatur.  The Court therefore confirms the Award.

## III.    INTERVENTION

The Court now turns to the Motion to Intervene.  Dkt. 42.  Héctor Cárdenas Curiel, who did not participate in the arbitration, seeks collaterally to attack the Tribunal's Award.  Dkt. 42.  The Tribunal found that Cárdenas organized and carried out a fraudulent scheme against Lion, including using the forged agreement in legal proceedings his companies brought to cancel Lion's mortgages.  Award ¶¶ 94–95.  Cárdenas takes serious exception to these findings, proclaims his innocence, and seeks to unwind the Award.  Dkt. 42-1 at 16–17.  Even though Cárdenas knew of the arbitration proceedings and that they concerned allegations that he perpetuated a fraud on Lion, he made no attempt to intervene in the arbitration.  Instead, Cárdenas first moved to intervene here nine months after Mexico moved to vacate the Award and eight months after the applicable limitations period expired.  Dkts. 23, 42.

Lion opposes intervention, arguing mainly that Cárdenas fails to establish he is entitled to intervene as of right or provide grounds for permissive intervention.  Dkt. 49 at 8.  Mexico takes no position, but "emphasizes" "that the Motion is entirely unrelated to Mexico's Petition." Dkt. 50 at 3.

---

[11] Though Lion seeks confirmation under 9 U.S.C. § 9, courts typically confirm foreign arbitral awards under 9 U.S.C. § 207.  *See Republic of Arg.*, 211 F. Supp. 3d at 345–46.  The Court need not decide which applies because Lion satisfies the requirements of both.

The Court finds that Cárdenas cannot intervene as of right under Rule 24(a) and denies permissive intervention under Rule 24(b).

### A. Intervention as of Right

#### 1. Legal Standard

Federal Rule of Civil Procedure 24(a)(2) permits anyone to intervene as of right who, "on timely motion . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." FED. R. CIV. P. 24(A)(2).

A motion to intervene as of right must be timely as "judged in consideration of all the circumstances, especially weighing the factors of time elapsed since the inception of the suit, the purpose for which intervention is sought, the need for intervention as a means of preserving the applicant's rights, and the probability of prejudice to those already parties in the case." *Karsner v. Lothian*, 532 F.3d 876, 886 (D.C. Cir. 2008) (quoting *United States v. Brit. Am. Tobacco Austl. Servs., Ltd.*, 437 F.3d 1235, 1238 (D.C. Cir. 2006)). "The most important circumstance relating to timeliness is whether a party sought to intervene as soon as it became clear that its interests would no longer be protected by the parties in the case." *Campaign Legal Ctr. v. Fed. Election Comm'n*, 68 F.4th 607, 610 (D.C. Cir. 2023) (cleaned up).

#### 2. Cárdenas's Motion Was Not Timely

##### a) Cárdenas Should Have Raised His Complaints with the Tribunal

Cárdenas complains that the Tribunal's finding that he committed widespread fraud caused, and will continue to cause, him substantial harm. Dkt. 42. Maybe so. But he should

have challenged the fraud allegations during the arbitration, not as a third party in a vacatur proceeding.

To be sure, failure to intervene in an arbitration does not make a subsequent attempt to intervene in a vacatur proceeding untimely per se. *See Techcapital Corp. v. Amoco Corp.*, No. 99 CIV. 5093, 2001 WL 267010, at *4 (S.D.N.Y. Mar. 19, 2001). However, courts allow such interventions primarily where the intervenor could not have intervened earlier. *See Eddystone Rail Co., LLC v. Jamex Transfer Servs., LLC*, 289 F. Supp. 3d 582, 590 (S.D.N.Y. 2018). This is not such a case. Cárdenas knew full well about the arbitration and "was on general notice that there would be some allegations made about him." Dkt. 54 at 18:23–24, 21:12–16.[12] Yet, he did nothing to try and intervene in the arbitration to protect his interests.

Cárdenas attempts to explain away his inaction by bemoaning that the Tribunal never invited him to participate "as a witness or in any other capacity during the arbitration." Dkt. 42-2 ¶ 25; Dkt. 42-1 at 5–6. But a third party need not wait for an emblazed invitation to intervene. It was up to Cárdenas, not the Tribunal or the parties, to act on his behalf.

Cárdenas alternatively contends that he *did* try to intervene in the arbitration because his companies sought "to participate as non-disputing parties" and the Tribunal rejected that request.

---

[12] The publicly available Request for Arbitration referenced Cárdenas eight times, Dkt. 56-8 ¶¶ 33–34, 36-37, 39, 41, and explained the forged document scheme and the alleged illegitimate legal proceedings, *id.* ¶¶ 41–50.

Dkt. 42-2 ¶ 26.  This is the reddest of red herrings.[13]  Yes, Iván Mercado, a legal representative acting on behalf of Cárdenas's companies, filed letters with the Tribunal seeking to participate. Dkt. 42-2 ¶ 26.  And yes, the Tribunal denied the request.  Dkt. 42-6 at 2.  But Cárdenas's companies are not seeking to intervene here—Cárdenas himself is.  And at no time did Mercado act on behalf of Cárdenas in his individual capacity, seek to defend Cárdenas's actions, or even contest the alleged fraud.  Instead, in each letter, Mercado represented the companies and focused solely on challenging the Tribunal's jurisdiction.  Dkts. 42-7, 42-11.

Even accepting Cárdenas's argument that he can rely on his companies' efforts to intervene does not help him.  Instead, it raises its own obstacle.  Cárdenas claims that he "is best positioned to raise the additional argument on lack of jurisdiction that the attorney representing Mr. Cárdenas's companies tried to raise five different times during the arbitration but was not allowed."  Dkt. 57 at 7.  In other words, he wants this Court to allow the very intervention the Tribunal rejected.  The FAA prohibits this.  *See* 9 U.S.C. § 10(a); *see also supra* Section II.A.

---

[13] The figurative use of "red herring" has a fishy etymology.  In 1667, *Gentleman's Recreation* suggested using the scent of red herring to keep hounds *on* the trail during a fox hunt.  *See Red Herring*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/dictionary/red-herring_n (last visited Oct. 17, 2024) (citing NICHOLAS COX, THE GENTLEMAN'S RECREATION 59 (1674)).  But in 1807, William Cobbett wrote that he had used a red herring as a *decoy to deflect* hounds chasing after a hare.  *See id.*  He then used that as a metaphor to claim that the English government had been misled by false foreign intelligence to divert attention away from domestic matters:  "Alas! it was a mere transitory effect of the political red-herring; for, on the Saturday, the scent became as cold as a stone."  *Id.* (citing COBBETT'S WKLY. POL. REG., Feb. 14, 1807). He retold the story numerous times, transforming the phrase into its figurative meaning of a clue used to divert from an issue at hand.  *See id; see also* Michael Quinion, *The Lure of the Red Herring*, WORLD WIDE WORDS (Oct. 25, 2008), https://www.worldwidewords.org/herring.html (citing Robert Scott Ross & Gerald Cohen, *Two Contributions to the Study of Red Herring*, *in* COMMENTS ON ETYMOLOGY 58, 58–69 (Gerald Cohen ed., 2008)).

b) <u>Cárdenas Did Not Timely File His Motion</u>

Even if the Court were inclined to excuse Cárdenas's failure to seek to participate in the arbitration, he did not timely raise his arguments here. He moved to intervene "to vacate an arbitral award that adversely affects [him]." Dkt. 57 at 3. But under the FAA, "[n]otice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered." 9 U.S.C. § 12. Cárdenas missed this deadline, moving to intervene to argue vacatur more than eight months after the limitations period expired. *See* Dkt. 23 (filed August 22, 2022); Dkt. 42-2 ¶ 57.

Cárdenas claims that this limitation period does not apply to him. He argues: "[t]he text of Section 10(a) of the FAA is clear that '[i]n any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award *upon the application of any party to the arbitration*— . . . .'" and "[he] was not a party to the arbitration and the three-month limitations period of Section 12 is therefore inapplicable to him." Dkt. 57 at 2 (cleaned up). By that reasoning, however, Cárdenas could not move to intervene to vacate the Award at any time because he was never a party to the arbitration.

The applicability of the limitations period aside, the "parties to the arbitration"—Lion and Mexico—would be prejudiced if the Court granted Cárdenas's belated motion. By the time he moved, the parties had fully briefed both the Petition to Vacate and Cross-Motion to Confirm. Dkts. 16, 18, 23. Given this timing, his supplemental briefing in support of Mexico's vacatur proceeding would be supplemental briefing in name only. It would, in practice, function as an independent petition by requiring a fresh round of opposition and reply briefing on vacatur arguments not raised in the vacatur and confirmation petitions already ripe for judgment. Cárdenas's intervention would delay the proceeding further by requiring the parties to dedicate

substantial time and resources briefing arguments that they jointly contend are unrelated to the existing petitions.  *See* Dkt. 49 at 15; Dkt. 50 ¶ 9.

### *3. Intervention Would Be Futile*

Courts regularly deny motions to intervene when the intervention would be futile.  *See, e.g.*, *Stotts v. Memphis Fire Dep't*, 679 F.2d 579, 582 (6th Cir. 1982); *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 210 (D.D.C. 2012); *In re Nat'l Football League Players' Concussion Inj. Litig.*, No. 14-1995, 2019 WL 188431, at *4 (E.D. Pa. Jan. 14, 2019); *New York Life Ins. Co. v. Singh*, No. 14-CV-5726, 2017 WL 10187670, at *7 (E.D.N.Y. Mar. 8, 2017) (citing *United States v. Glens Falls Newspapers, Inc.*, 160 F.3d 853, 855 (2d Cir. 1998)).  Here, intervention would indeed be otiose.

Cárdenas contends that "excluding [him] from these proceedings would deprive the Court of the opportunity to be briefed on an important jurisdictional defect in the Award" not raised by Mexico.  Dkt. 42-1 at 13.  But the parties agreed to the ICSID Additional Facility Rules, which provide that "[t]he Tribunal shall have the power to rule on its jurisdiction and competence."  *See* NAFTA art. 1120(1)(b) (adopting ICSID Additional Facility Rule 53(1)).  By consenting to proceed under those rules, the parties delegated all decisions about the Tribunal's jurisdiction to the Tribunal itself.  *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 244 F. Supp. 3d 100, 111 (D.D.C. 2017), *aff'd*, 760 F. App'x 1 (D.C. Cir. 2019).

An argument by Cárdenas that the Tribunal lacked jurisdiction would be futile.  Where, as here, the parties assign arbitrability to the arbitrator, "a court possesses no power to decide the arbitrability issue," even if it thinks the argument for arbitrability is "wholly groundless."  *LLC SPC Stileks*, 985 F.3d at 878 (quoting *Henry Schein, Inc. v. Archer and White Sales, Inc.*, 586 U.S. 63, 68 (2019)).  Instead, "the court's standard for reviewing the arbitrator's decision about

that matter should not differ from the standard courts apply when they review any other matter

that parties have agreed to arbitrate." *Id.* at 878 (quoting *First Options of Chi., Inc. v. Kaplan*,

514 U.S. 938, 943 (1995)); *see also supra* Section II.A.  This may well explain why Mexico's

petition did not raise lack of jurisdiction as a basis to vacate the Award.

### 4. *Mexico Can Protect Cárdenas's Interests*

Intervention is not necessary if the "existing parties adequately represent [the third

party's] interest." FED. R. CIV. P. 24(A)(2).

Cárdenas claims that neither Lion nor Mexico can protect his interests before this Court.

Dkt. 42-1 at 3.  That is true as to Lion.  But Mexico and Cárdenas share the same goal: vacatur of

the Award.  Cárdenas seeks to intervene to raise "an important jurisdictional defect in the

Award" Mexico did not raise.  *Id.* at 13.  He does not explain, however, why Mexico is not

equally incentivized to raise the same jurisdictional defect.  And so Cárdenas's motion at best

reflects a strategy disagreement with Mexico as to whether to raise a jurisdictional argument in

support of vacatur.  Such disagreement is not a basis to find that Mexico cannot represent

Cárdenas's interest.  *See Jones v. Prince George's Cnty.*, 348 F.3d 1014, 1020 (D.C. Cir. 2003).

### B. Permissive Intervention

Cárdenas asks, in the alternative, that the Court allow permissive intervention.

Dkt. 42-1 at 1.  "As its name would suggest, permissive intervention is an inherently

discretionary enterprise." *E.E.O.C. v. Nat'l Child.'s Ctr., Inc.*, 146 F.3d 1042, 1046 (D.C. Cir.

1998).  The Court may allow permissive intervention under Federal Rule of Civil Procedure

24(b) so long as the prospective intervenor presents "(1) an independent ground for subject

matter jurisdiction; (2) a timely motion; and (3) a claim or defense that has a question of law or

fact in common with the main action." *Id.*  But the Court also has the discretion to deny such a motion, even if the proposed intervenor meets these baseline criteria.  *Id.* at 1048.

The final requirement under Rule 24(b)(2), a timely motion, dooms Cárdenas's permissive intervention request.  Courts apply a more lenient standard of timeliness to intervention as of right than to permissive intervention.  *Stadnicki on Behalf of Lending Club Corp. v. Laplanche*, 804 F. App'x 519, 522 (9th Cir. 2020); *Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 834 F.3d 562, 566 n.1 (5th Cir. 2016).  The Court has already explained why Cárdenas's Motion was not timely under the more stringent standard and will not regurgitate that analysis.  *See supra* Section II.A.  Suffice it to say that Cárdenas neither asked to participate in the arbitration nor filed his motion within the time the FAA prescribes to move to vacate.  Intervention at this late stage would delay the proceedings and prejudice Lion by allowing the intervenor to circumvent the statute of limitations.

Even if Cárdenas's Motion were timely, the Court would deny permissive intervention. The Rule 24(b) requirements are the floor where the Court's discretion begins, not the ceiling where it ends.  *See Nat'l Child.'s Ctr.*, 146 F.3d at 1048.  Like intervention as of right, permissive intervention is not appropriate because Cárdenas's arguments are futile, *see supra* Section II.A, making his intervention unlikely to "significantly contribute to . . . the just and equitable adjudication of the legal question presented."  *Aristotle Int'l, Inc. v. NGP Software, Inc.*, 714 F. Supp. 2d 1, 18 (D.D.C. 2010).

## IV.    CONCLUSION

For the reasons stated above, the Court **DENIES** Cárdenas's Motion to Intervene, Dkt. 42; **DENIES** Mexico's Petition to Vacate, Dkt. 32; and **GRANTS** Lion's Cross-Petition for Confirmation, Recognition, and Enforcement of the Arbitral Award, Dkt. 35.

**SO ORDERED**.

This is a final appealable Order.  *See* FED. R. APP. P. 4(A).

Date: November 8, 2024

_____

ANA C. REYES
United States District Judge